## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **SCOTT WEAVER,** individually and on behalf of all others similarly situated**,** | Case No. _____ |
| **PLAINTIFF,** | |
| **v.** | |
| **CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP,** | CLASS ACTION |
| | JURY TRIAL DEMANDED |
| **DEFENDANTS** | |

## CLASS ACTION COMPLAINT

1.      Plaintiff Scott Weaver, individually and on behalf of all others similarly situated, by and through his undersigned attorneys, brings this Class Action Complaint against Defendants Champion Petfoods USA, Inc. and Champion Petfoods LP ("Defendants"), for their negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the risk and/or presence of heavy metals, pentobarbital, toxins, Bisphenol A ("BPA"), and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements of products sold throughout the United States.  Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (defined below), including requiring full disclosure of all such substances in its marketing, advertising, and labeling; prohibiting the utilization of suppliers who are street renderers or rendering facilities that accept euthanized animals; requiring testing of all ingredients and final products for such substances; and restoring monies to the members of the proposed Class. Plaintiff alleges the following based  upon personal knowledge as well as investigation by his counsel and as to all other matters, upon information and belief.  Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### DEFENDANTS MARKET THEMSELVES AS ONLY SELLING PREMIUM DOG FOOD WITH THE SIMPLE MISSION OF "TO BE TRUSTED BY PET LOVERS"

2.      Defendants manufacture, market, advertise, label, distribute, and sell pet food under the brand names Acana and Orijen throughout the United States, including in this District.

3.      Defendants have created a niche in the pet food market by "making biologically 'appropriate' pet food- as close to what animals would eat in nature as possible- and producing it using fresh, natural ingredients…" They then charge a premium for this purportedly higher-quality food. The chief brand officer and son of the company's founder, Peter Muhlenfeld, said, "Our core family beliefs are [] entrenched in the company, and that is to make the very best food."[1]

4.      Defendants tout that "Biologically Appropriate™ ORIJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary adaptation to a diet rich and diverse in fresh meat and protein[]" and that it is "trusted by pet lovers everywhere."[2]

5.      Defendants' packaging and labels further emphasize fresh, quality, and properly sourced regional ingredients and even declare its dog food has "ingredients we love":

---

[1] The Globe and Mail, "How once-tiny pet-food maker took a bite of the global market," Jan. 16, 2018, https://www.theglobeandmail.com/report-on-business/small-business/canadian-powerhouse-export-your-dog-is-eating-it/article37605774/ (last visited Dec. 12, 2018).
[2] http://www.orijen.ca/us

Case 2:18-cv-01996-JPS   Filed 12/18/18   Page 2 of 71   Document 1



6.     Yet nowhere in the labeling, advertising, statements, warranties and/or packaging do Defendants disclose that the Contaminated Pet Foods (defined herein) include and/or have a high risk of containing heavy metals, pentobarbital, BPA, toxins, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements, nor do they disclose that they do not properly test the ingredients received from the suppliers and final products for these contaminants.

7.    Indeed, the Contaminated Dog Foods have been shown to contain the following levels of arsenic, mercury, lead, cadmium, and/or BPA — all known to pose health risks to humans and animals, including dogs:[3]

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Dog Food | 3256.40 | 32.50 | 113.00 | 51.20 | 249.30 |
| Orijen Six Fish With New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Dog Food | 3169.80 | 39.50 | 200.50 | 54.90 | 38.70 |
| Orijen Original Chicken, Turkey, Wild- Caught Fish, Eggs Dry Dog Food | 907.60 | 0.00 | 93.20 | 10.80 | 489.80 |
| Orijen Regional Red Angus Beef, Boar, Goat, Lamb, Pork, Mackerel Dry Dog Food | 849.40 | 43.60 | 123.10 | 21.40 | 167.70 |
| Acana Regionals Meadowland with Poultry, Freshwater Fish and Eggs Dry Dog Food | 846.40 | 82.70 | 37.50 | 8.70 | 489.00 |
| Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Dog Food | 358.20 | 82.90 | 32.50 | 14.90 | 336.70 |
| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |

---

[3] All the below pet food collectively is referred to as the "Contaminated Dog Foods." Discovery in this action likely will lead to the identification of additional products based on Defendants' public acknowledgment that their foods do contain heavy metals.

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Dog Food | 262.80 | 0.00 | 30.60 | 9.60 | 305.00 |
| Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food | 1066.50 | 37.70 | 62.10 | 21.70 | 138.50 |
| Acana Singles Duck and Pear Formula Dry Dog Food | 523.40 | 102.70 | 30.90 | 15.40 | 537.40 |
| Acana Singles Lamb and Apple Formula Dry Dog Food | 401.20 | 73.20 | 35.00 | 3.20 | 423.40 |
| Acana Heritage Free-Run Poultry Formula Dry Dog Food | 292.90 | 62.20 | 27.80 | 3.30 | 290.20 |
| Acana Heritage Freshwater Fish Formula Dry Dog Food | 977.70 | 0.00 | 56.20 | 27.40 | 486.80 |
| Orijen Tundra Freeze Dried Venison, Elk, Bison, Quail, Steelhead Trout Wet Dog Food | 23.13 | 6.02 | 27.64 | 5.35 | 12.26 |
| Orijen Adult Dog Freeze Dried Chicken, Turkey, Wild-Caught Fish, Eggs Wet Dog Food | 23.21 | 13.41 | 7.74 | 9.45 | 7.33 |
| Orijen Regional Red Freeze Dried Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Wet Dog Food | 102.66 | 0.00 | 23.40 | 19.60 | 16.85 |

Case 2:18-cv-01996-JPS   Filed 12/18/18   Page 5 of 71   Document 1

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish Dry Dog Food | 2173.90 | 39.70 | 92.20 | 58.80 | 55.10 |
| Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit Dry Dog Food | 1628.50 | 40.30 | 134.50 | 43.60 | 471.80 |
| Orijen Grain Free Puppy Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog Food | 791.20 | 32.20 | 87.20 | 12.20 | 490.80 |
| Acana Singles Mackerel and Greens Formula Dry Dog Food | 1510.70 | 40.10 | 112.20 | 29.60 | 251.10 |
| Acana Heritage Meats Formula Dry Dog Food | 384.80 | 58.30 | 24.40 | 6.40 | 1731.90 |
| Acana Singles Pork and Squash Formula Dry Dog Food | 373.70 | 57.60 | 25.60 | 4.00 | 329.60 |

8.     Moreover, Defendants themselves admit that all formulations of their dog and cat foods contain heavy metals.

9.     Defendants do not test all of the ingredients received from suppliers or finished products for pentobarbital, heavy metals, toxins, BPA, and or unnatural ingredients.

10.     Yet, Defendants warrant, promise, represent, mislead, label, and/or advertise that the Contaminated Pet Foods are free of any heavy metals, pentobarbital, toxins, BPA, and/or unnatural ingredients by making assurances that the food represents an evolutionary diet that mirrors that of a wolf – free of anything "nature did not intend for your dog to eat."



11.    Defendants assert that: "Virtually All Of The Nutrients In Acana Are Natural And Not Synthetic."[4] Defendants make a similar claim to the Orijen Dog Foods in maintaining that that the main source of any nutrient in Orijen is from a natural source.[5]

12.    Defendants further warrant, promise, represent, advertise and declare that the Contaminated Dog Foods are made with fresh protein sources that are "Deemed fit for human consumption" in direct contradiction to the true nature of its contents, which include, but are not limited to, pentobarbital, toxins, BPA, and/or unnatural ingredients.

---

[4] https://acana.com/wp-content/uploads/2015/10/DS-ACANA-Dog-Brochure-002.pdf

[5] https://www.orijen.ca/us/foods/dog-food/dry-dog-food/tundra/

Other pet foods define fresh as 'just arrived'. In other words, they'll tell you their fish oil, potato powder or pea protein is fresh because it just arrived yesterday! No wonder there's so much confusion! When we say fresh we mean it. Our fresh ingredients are:

- **NEVER FROZEN** – refrigeration is the only means of preservation
- **PRESERVATIVE FREE** – no chemicals or synthetics added whatsoever
- **AUTHENTIC** – our fresh ingredients arrive at our kitchen within a day or two of harvest

We think pet lovers want to know where the ingredients in their pet's food originate. That's why we focus on ingredients that are sustainably raised within our region by people we know and trust, deemed fit for human consumption, and then delivered to our kitchens FRESH EACH DAY.

13.    It was recently revealed on information and belief that Defendants were knowingly, recklessly, and/or negligently selling certain of the Contaminated Dog Foods from the Dogstar® Kitchens containing pentobarbital, a substance largely used to euthanize animals.

14.    Plaintiff brings this action individually and on behalf of all other similarly situated consumers within Wisconsin who purchased the Contaminated Dog Foods, in order to cause the disclosure of the presence and/or risk of inclusion of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Foods; to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Dog Foods are high quality, safe, and healthy; and to obtain redress for those who have purchased the Contaminated Dog Foods.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds

the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class reside in states other than the states in which Defendants are citizens and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff is a citizen of the State of Wisconsin and suffered injury as a result of Defendants' acts in the State of Wisconsin, a substantial part of property that is the subject of the action is situated in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws and markets of this District, Defendants are subject to personal jurisdiction in this District, and a related matter involving substantially similar facts is pending in this District.

## PARTIES

17.     Plaintiff Scott Weaver ("Plaintiff Weaver") is, and at all times relevant hereto has been, a citizen of the state of Wisconsin.  Plaintiff Weaver purchased the following Contaminated Dog Foods for his dogs, Jill, a 10-year-old female Golden Retriever, Jack, a 11-year old male Golden Retriever, and Prince Harry, a 5-year old male Golden Retriever (all who are  therapy and literacy volunteer dogs): Orijen Six Fish and Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel, Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food.  Plaintiff Weaver purchased the Contaminated Dog Foods approximately once a month on average between approximately January 2007 and October 2017, generally from Mounds Pet Food Store in Fitchburg, Wisconsin.  Prior to purchasing the Contaminated Dog Foods, Plaintiff Weaver saw the nutritional claims on the packaging, which he relied on when deciding to purchase the Contaminated Dog Foods.  During that time, based on the false and misleading claims, warranties, representations, advertisements,

and other marketing by Defendants, Plaintiff Weaver was unaware that the Contaminated Dog Foods contained any level of heavy metals, chemicals, or toxins and would not have purchased the food if that was fully disclosed. Plaintiff Weaver was injured by paying a premium for the Contaminated Dog Foods that have no or *de minimis* value based on the presence of the alleged heavy metals, chemicals, and toxins.

18.     As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when he paid the purchase price or a price premium for the Contaminated Dog Foods that did not deliver what was promised. He paid the premium price on the assumption that the labeling of the Contaminated Dog Foods was accurate and that the Contaminated Dog Foods were healthy, superior quality, natural, and safe for dogs to ingest. Plaintiff would not have paid this money had he known that the Contaminated Dog Foods contained any levels of the heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. Plaintiff was further injured because the Contaminated Dog Foods have no or *de minimis* value based on the risk and/or actual presence of the alleged heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements. Damages can be calculated through expert testimony at trial. Further, should Plaintiff encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

19.     Defendant Champion Petfoods USA Inc. ("Champion USA") is incorporated in Delaware.  Its headquarters and principal place of business, as of March 2016, is located at 12871

Bowling Green Road, Auburn, Kentucky 42206. Since that time, all Contaminated Pet Foods sold in the United States are manufactured, sourced, and sold by Champion USA.

20.     Defendant Champion Petfoods LP ("Champion Canada") is a Canadian limited partnership with its headquarters and principal place of business located at 11403- 186 Street NW, Edmonton, Alberta T5S 2W6. Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA. Prior to March 2016, all Contaminated Pet Foods sold in the United States were manufactured, sourced, and sold by Champion Canada.

21.     Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell the Contaminated Dog Foods under the dog food brand names Orijen and Acana throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for the Contaminated Dog Foods, relied upon by Plaintiff, were prepared, reviewed, and/or approved by Defendants and their agents, and were disseminated by Defendants and their agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for the Contaminated Dog Foods were designed to encourage consumers to purchase the Contaminated Dog Foods and reasonably misled the reasonable consumer, *i.e.*, Plaintiff and the Class, into purchasing the Contaminated Dog Foods. Defendants own, manufacture, and distribute the Contaminated Dog Foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Dog Foods. Defendants are responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished Contaminated Dog Foods.

# FACTUAL ALLEGATIONS

## I.     THE CONTAMINATED DOG FOODS

    22.    The Contaminated Dog Foods include the following:

        (a) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish Dry Dog Food





(b) Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird Dry Dog Food





(c) Acana Regionals Meadowland with Free-Run Poultry, Freshwater Fish, and Nest-Laid Eggs Dry Dog Food





(d) Acana Regionals Wild Atlantic with New Wild New England Fish & Fresh
    Kentucky Greens Dry Dog Food





(e) Orijen Original with Fresh Free-Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs Dry Dog Food





(f) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel Dry Dog Food





Case 2:18-cv-01996-JPS   Filed 12/18/18   Page 17 of 71   Document 1

(g) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food



(h) Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake Dry Dog Food





(i) Acana Singles Duck and Pear Formula Dry Dog Food





(j) Acana Singles Lamb and Apple Formula Dry Dog Food





(k) Acana Heritage Free-Run Poultry Formula Dry Dog Food





(l)  Acana Heritage Freshwater Fish Formula Dry Dog Food





(m)     Orijen Tundra Freeze-Dried Venison, Elk, Bison, Quail, Steelhead Trout
        Wet Dog Food



(n) Orijen Adult Dog Freeze-Dried Chicken, Turkey, Wild Caught Fish, Eggs
    Wet Dog Food



(o) Orijen Regional Red Freeze-Dried Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Wet Dog Food



(p) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food



(q) Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish Dry Dog Food



(r) Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit Dry Dog Food



(s) Orijen Grain Free Puppy Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog
    Food





(t)  Acana Singles Mackerel and Greens Formula Dry Dog Food





(u) Acana Heritage Meats Formula Dry Dog Food





(v) Acana Singles Pork and Squash Formula Dry Dog Food





## II. THE KNOWN RISKS OF INCLUSION OF HEAVY METALS, PENTOBARBITAL, TOXINS, BPA, AND ANY OTHER CHEMICAL IN THE CONTAMINATED PET FOODS

### A. Heavy Metals

23.   Exposure to toxins like arsenic, mercury, cadmium, and lead can cause serious illness to humans and animals. A company should be vigilant to take all reasonable steps to avoid causing family pets to ingest these toxins.

24.   The Contaminated Dog Foods contain arsenic, which is a carcinogen and toxin. Arsenic is a semi-metal element in the periodic table. It does not degrade or disappear and is odorless and tasteless. Arsenic occurs naturally in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals. Arsenic is combined with other elements such as oxygen, chlorine, and sulfur to form inorganic arsenic compounds. Historically, arsenic compounds were used in many industries, including: (i) as a preservative in pressure-treated lumber; (ii) as a preservative in animal hides; (iii) as an additive to lead and copper for hardening; (iv) in glass manufacturing; (v) in pesticides; (vi) in animal agriculture; and (vii) as arsine gas to enhance junctions in semiconductors. The United States has canceled the approvals of some of these uses, such as arsenic-based pesticides, for health and safety reasons. Some of these cancellations were based on voluntary withdrawals by producers. For example, manufacturers of arsenic- based wood preservatives voluntarily withdrew their products in 2003 due to safety concerns, and the EPA signed the cancellation order. In the Notice of Cancellation Order, the EPA stated that it "believes that reducing the potential residential exposure to a known human carcinogen is desirable."

25.   Inorganic arsenic is highly toxic and a known cause of human cancers. The association between inorganic arsenic and cancer is well documented. As early as 1879, high rates

of lung cancer in miners from the Kingdom of Saxony were attributed, in part, to inhaled arsenic. By 1992, the combination of evidence from Taiwan and elsewhere was sufficient to conclude that ingested inorganic arsenic, such as is found in contaminated drinking water and food, was likely to increase the incidence of several internal cancers. The scientific link to skin and lung cancers is particularly strong and longstanding, and evidence supports conclusions that arsenic may cause liver, bladder, kidney, and colon cancers as well.

26.     Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA).[6]

27.     The Contaminated Dog Foods also contain lead, which is another carcinogen and developmental toxin known to cause health problems. Lead is a metallic substance formerly used as a pesticide in fruit orchards, but the use of such pesticides is now prohibited in the United States.

28.     Lead poisoning can occur from ingestion of food or water containing lead. Lead, unlike many other poisons, builds up in the body over time as the person is exposed to and ingests it, resulting in a cumulative exposure which can, over time, become toxic and seriously injurious to health. Acute or chronic exposure to lead can lead to chronic poisoning, cancer, developmental and reproductive disorders, severe brain and kidney damage, and untimely death.

---

[6] The FDA has taken action based on consumer products exceeding this limit, including testing and sending warning letters to the manufacturers. *See, e.g.*, Warning Letter from FDA to Valley Processing, Inc. (June 2, 2016), https://www.fda.gov/iceci/enforcementactions/warningletters/2016/ucm506526.htm.

29.     In recognition of the dangers of lead, the State of Wisconsin has enacted a robust statutory schemed to prevent lead poisoning. *See* Wis. Stat. § 254.11 *et seq*. These laws, among other things, provide for lead poisoning or lead exposure prevention grants, prohibit certain applications of lead-bearing paints, require physicians and hospitals to report diagnoses of lead poisoning or lead exposure, and define "lead poisoning or lead exposure" as a level of lead in the blood of 5 or more micrograms per 100 milliliters of blood.

30.     The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. *See* 21 C.F.R. §165.110(b)(4)(iii)(A).

31.     The Contaminated Dog Foods also contain mercury, a known toxin which can damage the cardiovascular system, nervous system, kidneys, and digestive tract in dogs. The impact of the various ways humans and animals are exposed and ingest mercury has been studied for years. In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals.[7]

32.     Continued exposure to mercury can injure the inner surfaces of the digestive tract and abdominal cavity, causing lesions and inflammation. Mercury can also cause lesions in the central nervous system (spinal cord and brain), kidneys, and renal glands.[8]

33.     Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state levels.

---

[7] https://www3.epa.gov/airtoxics/112nmerc/volume5.pdf

[8] https://wagwalking.com/condition/mercury-poisoning

34.     Finally, the Contaminated Dog Foods contain cadmium, which has been observed to cause anemia, liver disease, and nerve or brain damage in animals eating or drinking it.[9]  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[10]  It has been specifically noted that "Kidney and bone effects have [] been observed in laboratory animals ingesting cadmium."[11]

35.     Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[12]

36.     Despite the known risks of exposure to these heavy metals, Defendants have negligently, recklessly, and/or knowingly sold the Contaminated Dog Foods without disclosing they contain levels of arsenic, mercury, cadmium, and lead to consumers like Plaintiff. Indeed, Defendants have publicly acknowledged that consumers "have deep feelings and a sense of responsibility for the well-being of their dogs and cats."[13]

37.     ███████████████████████████████████████████

███

---

[9] https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf

[10] https://www.atsdr.cdc.gov/phs/phs.asp?id=46&tid=15

[11] https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf

[12]  https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/default.htm

[13] https://www.theglobeandmail.com/amp/report-on-business/small-business/canadian-powerhouse-export-your-dog-is-eating-it/article37605774/

38.     Moreover, Defendants' own actions show their knowledge that a reasonable consumer would care about the inclusion of heavy metals as they specifically addressed this concern on their website by touting that they require their suppliers to "provide heavy metals and mercury test results, for which we also test our final food products."[14]

39.     Additionally, Defendants knew or should have been aware that a consumer would be feeding the Contaminated Dog Foods multiple times each day to his or her dog, making it the main, if not only, source of food for the dog.  This leads to repeated exposure of the heavy metals to the dog.

**B.     Pentobarbital**

40.     Pentobarbital is a Class II controlled substance, and there is no safe or set level for it in pet food. If pentobarbital is present, the food is adulterated.[15]  The ingestion of pentobarbital by a pet can lead to adverse health issues, including: tyalism (salivation); emesis (vomiting); stool changes (soft to liquid stools, blood, mucus, urgency, explosive nature, etc.); hyporexia (decreased appetite); lethargy/depression; neurologic abnormalities (tremor, seizure, vocalization, unusual eye movements); ataxia (difficulty walking); collapse; coma; and death.[16]

41.     Despite laws governing pet foods and providing government oversight, "[p]et food manufacturers are responsible for taking appropriate steps to ensure that the food they produce is

---

[14] https://doodlekisses.com/forum/topics/keeping-my-dog-on-an-orijen-six-fish-diet?groupUrl=thefoodgroup

[15] http://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm544348.htm

[16] The Honest Kitchen, "Pentobarbital—What Is It, How It Entered the Pet Food Supply Chain, and What You Can Do to Protect Your Canines & Felines" (Mar. 1, 2017), *available at* https://www.thehonestkitchen.com/blog/pentobarbital-entered-pet-food-supply-chain-can-protect-pet/

safe for consumption and properly labeled" including "verify[ing] the identity and safety of the ingredients they receive from suppliers."[17]

42. "It is not acceptable to use animals euthanized with a chemical substance in pet or other animal foods.… The detection of pentobarbital in pet food renders the product adulterated. It is the responsibility of the manufacturer to take the appropriate steps to ensure that the food they produce is safe for consumption and properly labeled."[18]

43. Pentobarbital is routinely used to euthanize animals, and the most likely way it could get into pet food is through rendered animal products. Rendered products come from a process that converts animal tissues to feed ingredients, which may include animals that were euthanized, decomposed, or diseased.

44. Pentobarbital residue from euthanized animals will still be present in pet food, even if it is rendered or canned at a high temperature or pressure.[19]

45. Historically, the FDA has not aggressively taken action under section 342(a)(1) or (5) of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, *et seq*. ("FDCA"), against the pet food companies that it has found to have used non-slaughtered animals and sold pet food containing pentobarbital. Therefore, manufacturers in the pet food industry, including Defendants, have continued their illegal practice of using non-slaughtered animals that may contain poisonous substances, like pentobarbital, in their pet foods.

46. Defendants do not adequately or regularly test their ingredients or finished products for pentobarbital.

---

[17] https://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ ucm544348.htm (last visited Apr. 27, 2018)

[18] *Id*.

[19] *Id*.

47.     On May 8, 2018, Defendants were notified they were sold beef tallow contaminated with pentobarbital by MOPAC, an eastern Pennsylvania rendering facility belonging to JBS USA Holdings Inc.  Three shipments of adulterated beef tallow were delivered by MOPAC and JBS to Defendants' DogStar® Kitchens and used to manufacture thousands of pounds of Defendants' Contaminated Dog Foods.

48.     Indeed, Defendants own actions show that pentobarbital is a known risk. Specifically, after the discovery of the contaminated beef tallow utilized by Defendants, they admitted to the FDA that the lack of a written agreement with MOPAC requiring where the beef tallow is to be sourced from was an oversight that would be corrected.

49.     In response, Defendants did not report the incident to the FDA's Reportable Food Registry, nor did it notify consumers or initiate a recall.  Instead, Defendants knowingly, recklessly, and/or negligently continued allowing the sale of Contaminated Dog Foods containing pentobarbital from their DogStar® Kitchens.

**C.      BPA**

50.     The dangers of BPA in human food are recognized by the FDA, along with various states. For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers with intentionally added BPA.

51.     Despite these known dangers, Defendants do not consistently test their ingredients or finished products for BPA.

52.     Certain Contaminated Dog Foods are sold by Defendants that contain levels of BPA— an industrial chemical that "is an endocrine disruptor. It's an industrial chemical that according to Medical News Today '…interferes with the production, secretion, transport, action,

function and elimination of natural hormones.'"[20]  BPA has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems.[21]

53.    Despite the risk and/or actual presence of these unnatural and potentially harmful chemicals, Defendants prominently warrant, claim, feature, represent, advertise, or otherwise market the Contaminated Dog Foods as made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables. Indeed, each bag prominently displays the percentage of these ingredients on the front.

## III.    DEFENDANTS FALSELY ADVERTISE THE CONTAMINATED DOG FOODS AS NUTRITIOUS, SUPERIOR QUALITY, PURE, AND HEALTHY WHILE OMITTING ANY MENTION OF THE RISK AND/OR ACTUAL INCLUSION OF HEAVY METALS, PENTOBARBITAL, BPA AND OTHER TOXINS

54.    Defendants formulate, develop, manufacture, label, package, distribute, market, advertise, and sell their extensive Acana and Orijen lines of dry and freeze-dried pet food products across the United States, including the Contaminated Dog Foods.

55.    Defendants tout themselves as "a leader and innovator in making pet foods, Champion works to our own standards.  These are our standards, not USDA, not FDA, not CFIA. These agencies set minimum standards which we exceed exponentially.  Why? Because our Mission and our Values dictate that we do, and that's what pet lovers expect from us."

56.    In 2016, Defendants opened DogStar® Kitchens, a 371,100 square foot production facility on 85 acres of land outside Bowling Green, Kentucky.  This facility has the capacity to

---

[20] Dr. Karen Beeker, *A Major Heads Up: Don't Feed This to Your Dog,* Healthy Pets (Feb. 13, 2017),   https://healthypets.mercola.com/sites/healthypets/archive/2017/02/13/dogs-canned-food-dangers.aspx.

[21] Christian Nordquist, *Bisphenol A: How Does It Affect Our Health?* Medical News Today (May 24, 2017), https://www.medicalnewstoday.com/articles/221205.php.

produce up to 220 million pounds of Acana and Orijen pet food per year. The CEO of Champion Pet Foods, Frank Burdzy, said, "The US is our fastest growing market."[22] Prior to this facility's construction, Defendants' Acana and Orijen products were exclusively manufactured in Canada. Since that facility began production, all Acana and Orijen foods sold in the United States are manufactured at the DogStar® Kitchens facility.

57.     Defendants have represented a commitment to using fresh and local ingredients, including wild-caught fish.

58.     Defendants have represented that their DogStar® Kitchens meet the European Union's standard for pet food: "USA Dogstar® kitchens, ingredients, processes, and foods all meet the strictest European Union standards – which are stricter than those set by AAFCO, the CFIA or FDA. Likewise, Defendants proclaim that Orijen is "[u]nmatched by any other pet food maker anywhere, our kitchens meet the strictest standards in the world, including the Government of Canada, and the European Union." Indeed, Defendants' own CEO has stated that "[e]ven if we're selling in Canada or the U.S or Asia, we manufacture to the EU standard…"

59.     However, contrary to Defendants' assertions, they do not meet the European Union standards for pet foods or human consumption.

60.     The European Parliament and the Council of the European Union state that "[p]roducts intended for animal feed must be sound, genuine and of merchantable quality and therefore when correctly used must not represent any danger to human health, animal health or to the environment or adversely affect livestock production." The European Parliament and the Council of the European Union provide maximum levels for undesirable substances in animal feed,

---

[22] https://www.foodengineeringmag.com/articles/95994-champion-petfoods-opens-dogstar-kitchens

such as lead, arsenic, mercury, and cadmium, and make clear that products that contain undesirable substances that exceed the specified maximum levels will be prohibited. In relevant part, subject to certain exceptions, arsenic must not exceed 2ppm (or 2000ppb).

61.    Defendants' representations that the food and ingredients are fit for human consumption are likewise misleading under the European Union standards.

62.    Defendants warrant, claim, state, represent, advertise, label, and market their Contaminated Dog Foods as natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of freshmeat, poultry, fish, and vegetables; containing "only 1 supplement – zinc;" "provid[ing] a natural source of virtually every nutrient your dog needs to thrive;" and "guaranteed to keep your dog healthy, happy and strong." Defendants therefore had a duty to ensure that these statements were true. As such, Defendants knew or should have known that the Contaminated Dog Foods had a high risk and/or actually included heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements, including fresh and regional ingredients.

63.    Likewise, by warranting, claiming, stating, featuring, representing, advertising, or otherwise marketing that Orijen and Acana foods, including the Contaminated Dog Foods, are natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables, Defendants had a duty to ensure that there were no chemicals included in the Contaminated Dog Foods. In fact,

Defendants offered further assurances by representing that the quality control over the manufacturing of the Contaminated Dog Foods as a rigid process free of outsourcing.

64.     Defendants specifically promise on their website, "[W]e prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation — from where our ingredients come from, to every cooking, quality and food safety process." Similarly, Defendants promise that their "Dogstar® Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients." Finally, Defendants promise "[s]tandards that rival the human food processing industry for authenticity, nutritional integrity, and food safety." According to the Orijen and Acana websites, Defendants "feature state-of-the-art fresh food processing technologies." As such, Defendants knew or should have known that higher temperatures coupled with the type of containers used in manufacturing create a real risk of BPA in their products.

65.     Defendants' websites and packaging also warrant, claim, feature, represent, advertise, or otherwise market that their products are natural. In fact, Orijen's slogan is "Nourish as Nature Intended" and the protein, oil, and fat sources are "fit for human consumption."



66.     In promoting their promises, warranties, claims, representations, advertisements, or other marketing that the Contaminated Dog Foods are safe and pure, Defendants further assure their customers:

> Equipped with state-of-the-art fresh food processing technologies, our DogStar® kitchens feature 25,000 square feet of cooler space, capable of holding over 500,000 pounds of fresh local meats, fish and poultry, plus fresh whole local fruits and vegetables.

> Unmatched by any pet food maker, our ingredients are deemed fit for human consumption when they arrive at our kitchens fresh, bursting with goodness, and typically within 48 hours from when they were harvested.

67.     To this end, Defendants' websites further warrant, claim, feature, represent, advertise, or otherwise market that the Contaminated Dog Foods are manufactured in such a way that would prevent BPA from forming by closely monitoring temperatures and quality:

> "[O]ur unique Votator Heat Exchangers bring chilled fresh ingredients to room temperature without introducing water or steam, which enables us to add even more fresh meats into our foods."

> "Referred to as 'the most significant preconditioning development for extrusion cooking in the last 20 years,' our High Intensity Preconditioners were custom-built for DogStar®, feeding fresh meats from the Votators to Extruders at rates previously unheard of, and without high temperatures.'

> "At the heart of our kitchens is a twin thermal extruder which is fed fresh ingredients from our High Intensity Preconditioner.

> The first of its kind in North America, it took 11 months to build, and features custom steam injection to enable very high fresh meat inclusions and a gentle cooking process which helps further reduce the carbohydrates in our foods and preserves their natural goodness."

68.     Thus, Defendants engaged in deceptive advertising and labeling practice by expressly warranting, claiming, stating, featuring, representing, advertising, or otherwise marketing on Acana and Orijen labels and related websites that the Contaminated Dog Foods are natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional

Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables when they contain the non-naturally occurring chemicals of pentobarbital and BPA.

69.     Based on these false representations, Defendants charge a premium, knowing that the claimed natural make-up of the Contaminated Dog Foods (as well as all of the other alleged false and/or misleading representations discussed herein) is something an average consumer would consider as a reason in picking a more expensive dog food. By negligently and/or deceptively representing, marketing, and advertising the Contaminated Dog Foods as natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables, Defendants wrongfully capitalized on, and reaped enormous profits from, consumers' strong preference for natural pet food products. Moreover, Defendants were improperly selling adulterated dog food that should not have been on the shelves at all as any level of pentobarbital is not acceptable in pet food.

70.     Additionally, Defendants knew or should have known that their ingredients, and thus final products, could contain materials such as toxins, heavy metals, pentobarbital, and BPA, and yet they did not test all ingredients and finished products, including the Contaminated Dog Foods, for such materials. Indeed, Defendants themselves admitted that having no written agreement with MOPAC as to any requirement as to the source of the beef tallow was an oversight.

71.     The Contaminated Dog Foods are available at numerous retail and online outlets in the United States, including Wisconsin.

72.     The Contaminated Dog Foods are widely advertised, and Defendants employ a Chief Marketing Officer, a Vice President for Customer Engagement, and a Director of Marketing in both the United States and Canada.

73. The official websites for Acana and Orijen display the Contaminated Dog Foods; descriptions and full lists of ingredients for the Contaminated Dog Foods and includes the following promises:



74. Defendants' websites repeat the false and misleading claims, warranties, representations, advertisements, and other marketing about the Contaminated Dog Foods' benefits, quality, purity, and natural make-up, without mentioning they contain heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements . This is not surprising given that natural pet food sales represent over $5.5 billion in the United States and have consistently risen over the years.[23]

---

[23] Statista, *Natural and Organic Pet Food Sales in the U.S. from 2009 to 2019,* The Statistics Portal (accessed Oct. 25, 2017). https://www.statista.com/statistics/548957/us-sales-of-natural-and-organic-pet-food/



Natural and organic pet food sales in the United States from 2009 to 2019 (in billion U.S. dollars)

75.     Moreover, Defendants have themselves acknowledged the importance of quality

dog food to the reasonable consumer:

> According to Frank Burdzy, President and Chief Executive Officer of Champion
> Petfoods, "Our No. 1 mandate is BAFRINO – biologically appropriate, fresh
> regional ingredients, never outsourced." Burdzy continued, "We build relationships
> with our suppliers and farms and fisheries. We are trusted by pet owners,.."[24]

76.     As a result of Defendants' omissions, a reasonable consumer would have no reason

to suspect the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural

or other ingredients that do not conform to the labels, packaging, advertising, and statements in

the Contaminated Dog Foods without conducting his or her own scientific tests, or reviewing third-

party scientific testing of these products.

77.     However, after conducting third-party scientific testing, it is clear that the

Contaminated Dog Foods do in fact contain levels of heavy metals, pentobarbital, and/or BPA.

---

[24] Mason, C., *Champion Petfoods DogStar Kitchens holds housewarming*, BOWLING GREEN DAILY
NEWS (Jan. 5, 2016) *available at* http://www.bgdailynews.com/news/champion-petfoods- dogstar-
kitchens-holds-housewarming/article_bf34275d-2242-5f3f-a9cc-14174235acc1.html?utm_
medium=social&utm_source=email&utm_campaign=user-share (last accessed March 1, 2018).

78.     Defendants have wrongfully and misleadingly advertised and sold the Contaminated Dog Foods without any label or warning indicating to consumers that these products contain heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements, or that these toxins can accumulate over time in the dog's body to the point where poisoning, injury, and/or disease can occur.

79.     Defendants' omissions are material, false, misleading, and reasonably likely to deceive the public. This is true especially in light of the long-standing campaign by Defendants to market the Contaminated Dog Foods as healthy and safe to induce consumers, such as Plaintiff, to purchase the products. For instance, Defendants market the Contaminated Dog Foods as "Biologically Appropriate," using "Fresh Regional Ingredients" comprised of 100 percent meat, poultry, fish, and/or vegetables, both on the products' packaging and on their websites.

80.     Moreover, Defendants devote significant web and packaging space to the marketing of their DogStar® Kitchens, which they tell consumers "are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry."

81.     Defendants state on their website that the Orijen pet foods "feature[] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive." Defendants further promise on the products' packaging and on their websites that Orijen and Acana foods are "guaranteed" to "keep your dog happy, healthy, and strong."

82.     Using such descriptions and promises make Defendants' advertising campaign deceptive based on the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Foods. Defendants knew or should have reasonably expected that the risk and/or mere presence of such contaminants are material facts that an average,

reasonable consumer, like Plaintiff, would consider when considering what pet food to purchase. Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are healthy, safe, and free of contaminants.

83.     Moreover, reasonable consumers, such as Plaintiff and other members of the Class (as defined herein), would have no reason to not believe and/or doubt that the Contaminated Dog Foods are "Biologically Appropriate" foods that use "Fresh Regional Ingredients" consisting only of meat, poultry, fish, and vegetables. Non-disclosure and/or concealment of the toxins in the Contaminated Dog Foods, coupled with the misrepresentations alleged herein by Defendants that suggest that the food provides complete health and is safe, is intended to and does, in fact, cause consumers to purchase products Plaintiff and members of the Class would not have bought if the true quality and ingredients were disclosed. As a result of these false or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Dog Foods.

84.     The expectations of reasonable consumers and deception of these consumers by Defendants' advertising, misrepresentations, packaging, labeling is further highlighted by the public reaction to the allegations in this lawsuit as reported by various websites.

## IV.    DEFENDANTS' FALSELY ADVERTISE THAT THE CONTAMINATED DOG FOODS CONTAIN FRESH REGIONAL INGREDIENTS CONFORMING TO THEIR LABELS AND REPRESENTATIONS ON THEIR WEBSITES

85.     The packaging for the Contaminated Dog Foods contains a list of ingredients and nutritional analysis. This list of ingredients is also set forth on Defendants' website and in its brochure. Defendants also identify the MeatMath® for each of their Contaminated Dog Foods, which describes the type and percent or weight of meat found in each package,

reasonable consumer, like Plaintiff, would consider when considering what pet food to purchase. Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are healthy, safe, and free of contaminants.

83.     Moreover, reasonable consumers, such as Plaintiff and other members of the Class (as defined herein), would have no reason to not believe and/or doubt that the Contaminated Dog Foods are "Biologically Appropriate" foods that use "Fresh Regional Ingredients" consisting only of meat, poultry, fish, and vegetables. Non-disclosure and/or concealment of the toxins in the Contaminated Dog Foods, coupled with the misrepresentations alleged herein by Defendants that suggest that the food provides complete health and is safe, is intended to and does, in fact, cause consumers to purchase products Plaintiff and members of the Class would not have bought if the true quality and ingredients were disclosed. As a result of these false or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Dog Foods.

84.     The expectations of reasonable consumers and deception of these consumers by Defendants' advertising, misrepresentations, packaging, labeling is further highlighted by the public reaction to the allegations in this lawsuit as reported by various websites.

## IV.    DEFENDANTS' FALSELY ADVERTISE THAT THE CONTAMINATED DOG FOODS CONTAIN FRESH REGIONAL INGREDIENTS CONFORMING TO THEIR LABELS AND REPRESENTATIONS ON THEIR WEBSITES

85.     The packaging for the Contaminated Dog Foods contains a list of ingredients and nutritional analysis. This list of ingredients is also set forth on Defendants' website and in its brochure. Defendants also identify the MeatMath® for each of their Contaminated Dog Foods, which describes the type and percent or weight of meat found in each package,

reasonable consumer, like Plaintiff, would consider when considering what pet food to purchase. Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are healthy, safe, and free of contaminants.

83.     Moreover, reasonable consumers, such as Plaintiff and other members of the Class (as defined herein), would have no reason to not believe and/or doubt that the Contaminated Dog Foods are "Biologically Appropriate" foods that use "Fresh Regional Ingredients" consisting only of meat, poultry, fish, and vegetables. Non-disclosure and/or concealment of the toxins in the Contaminated Dog Foods, coupled with the misrepresentations alleged herein by Defendants that suggest that the food provides complete health and is safe, is intended to and does, in fact, cause consumers to purchase products Plaintiff and members of the Class would not have bought if the true quality and ingredients were disclosed. As a result of these false or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Dog Foods.

84.     The expectations of reasonable consumers and deception of these consumers by Defendants' advertising, misrepresentations, packaging, labeling is further highlighted by the public reaction to the allegations in this lawsuit as reported by various websites.

## IV.    DEFENDANTS' FALSELY ADVERTISE THAT THE CONTAMINATED DOG FOODS CONTAIN FRESH REGIONAL INGREDIENTS CONFORMING TO THEIR LABELS AND REPRESENTATIONS ON THEIR WEBSITES

85.     The packaging for the Contaminated Dog Foods contains a list of ingredients and nutritional analysis. This list of ingredients is also set forth on Defendants' website and in its brochure. Defendants also identify the MeatMath® for each of their Contaminated Dog Foods, which describes the type and percent or weight of meat found in each package,

86.     Defendants advertise that their Contaminated Dog Foods contain "Fresh Regional Ingredients." The Orijen Regional Red dog foods state that "AMERICA'S VAST AND FERTILE LANDS" are Defendants' "SOURCE OF INSPIRATION AND FRESH REGIONAL INGREDIENTS".  Defendants also include photographs on their packaging and websites of local farmers, captioned with their names, locations, and the trademark "Kentucky Proud".  They further include photographs of cattle with the captions "Fresh and Regional" and "Delivered Daily From Local Farms and Ranches".

87.     The expectation of reasonable consumers, including Plaintiff and the Class, is that the term "Fresh Regional Ingredients" refers all ingredients, not just meat products, and that those ingredients are sourced from locations in close geographical proximity to Defendants' DogStar® Kitchens.  Reasonable consumers, including Plaintiff and the Class, would have no reason to believe that the term "Ingredients" is limited to meat or that the term "Regional" extends far beyond Kentucky and the United States.

88.     ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████.  As a result, the promise of "Fresh Regional Ingredients", the listed ingredients and MeatMath®, and the nutritional analysis – all of which are found on Defendants' packaging, websites, and brochures – are inaccurate, false, and misleading to the Plaintiff and the Class

## V.    DEFENDANTS' STATEMENTS AND OMISSIONS VIOLATE WISCONSIN LAWS

89.     Wisconsin laws are designed to ensure that a company's claims about its products are truthful and accurate. Defendants violated these state laws by negligently, recklessly, and/or

intentionally incorrectly claiming that the Contaminated Dog Foods are pure, healthy, and safe for consumption and by not accurately detailing that the products contain heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. Defendants misrepresented that the Contaminated Dog Foods are natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables; "feature[] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive;" and are "guaranteed" to "keep your dog happy, healthy, and strong."

90.     Defendants' marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiff to plead reliance upon each advertised misrepresentation.

91.     Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods were pure, healthy, safe for consumption, and did not contain harmful ingredients such as arsenic and lead. Likewise, Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods are natural, pure, and safe despite the risk and/or actual presence of pentobarbital and/or BPA in the food.

## VI.     PLAINTIFF'S RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANTS

92.     Plaintiff reasonably relied on Defendants' own claims, warranties, representations, advertisements, and other marketing concerning the particular qualities and benefits of the Contaminated Dog Foods.

93.     Plaintiff also relied upon Defendants' false and/or misleading representations alleged herein, including the websites and the Contaminated Dog Foods' labels and packaging in making their purchasing decisions.

94.     Any reasonable consumer would consider the labeling of a product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase. Here, Plaintiff relied on the specific statements and misrepresentations by Defendants that the Contaminated Dog Foods were natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables; "feature[ing] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive;" and were "guaranteed" to "keep your dog happy, healthy, and strong" with no disclosure of the risk and/or actual inclusion of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.

## VII.    DEFENDANTS' KNOWLEDGE AND NOTICE OF THEIR BREACHES OF THEIR EXPRESS WARRANTIES

95.     Defendants had sufficient notice of their breaches of express warranties. Defendants have, and had, exclusive knowledge of the physical and chemical makeup of the Contaminated Dog Foods. Defendants also had exclusive knowledge of their suppliers and whether any were rendering facilities that supplied ingredients at risk for containing pentobarbital. Indeed, Defendants themselves admitted that having no written agreement with MOPAC as to any requirement as to the source of the beef tallow was an oversight.

96. Defendants have publicly stated on their website that they require their suppliers to "provide heavy metals and mercury test results, for which we also test our final food products."[25] As such, they have had test results that show the inclusion of heavy metals in the Contaminated Dog Foods.

97. Additionally, Defendants received notice of the contaminants in their dog and cat foods, including the Contaminated Dog Foods, through the Clean Label Project, which found higher levels of heavy metals in their dog and cat food products. In fact, Defendants responded to the Clean Label Project's findings. Defendants spoke with the Clean Label Project by phone regarding its findings and methodology, which showed that Orijen pet foods have high levels of heavy metals when compared to other pet foods. The Clean Label Project informed Defendants that it compared Orijen pet foods to competitors' products and gave them a one-star rating, meaning they contained higher levels of contaminants than other products on the market.[26] Defendants' direct contact with the Clean Label Project demonstrates their knowledge about the Contaminated Dog Foods.

98. Defendants also issued a white paper in defense of the Clean Label Project findings that acknowledges that their products contain heavy metals.[27] In that same White Paper, Defendants stated "[w]e systematically test ORIJEN and ACANA products for heavy metals (arsenic, cadmium, lead and mercury) at two third-party laboratories."

---

[25] https://doodlekisses.com/forum/topics/keeping-my-dog-on-an-orijen-six-fish-diet?groupUrl=thefoodgroup

[26] Clean Label Project, "Orijen: Why Aren't You Listening to Your Customers?" http://www.cleanlabelproject.org/orijen-customers/ (last visited Feb. 6, 2018).

[27] http://www.championpetfoods.com/wp-content/themes/champion-petfoods/res/research/Champion-Petfoods-White-Paper-Heavy-Metals.pdf

99.     The White Paper discusses the sources of arsenic, cadmium, lead, and mercury, and what Defendants contend to be acceptable levels of those heavy metals in pet food.

100.     Defendants did not widely disseminate this White Paper or direct consumers to this White Paper. Moreover, Defendants did not change their packaging or labeling to include a disclaimer that the Contaminated Dog Foods contain any levels of the heavy metals or include a copy of the White Paper findings on the packaging or labeling. Finally, there is no disclosure as to whether the Contaminated Dog Foods tested were manufactured in the United States or Canada.

101.     Defendants likewise had knowledge of the potential risk and inclusion of pentobarbital and BPA in their Contaminated Dog Foods. Defendants have publicly stated they ask their suppliers if the packaging contains BPA, while at the same time admitting they in fact do not perform any tests to confirm that the Contaminated Dog Foods are BPA- free. Moreover, Defendants no longer boast about "exceeding" regulations when asked if the Contaminated Pet Foods are BPA free.

102.     Defendants also misrepresented the sourcing of their ingredients with respect to the presence of, or risk of presence of, pentobarbital. Moreover, Defendants themselves admitted that having no written agreement with MOPAC as to any requirement as to the source of the beef tallow was an oversight.

## VIII.   PRIVITY EXISTS WITH PLAINTIFF AND THE PROPOSED CLASS

103.     Defendants knew that consumers such as Plaintiff and the proposed Class would be the end purchasers of the Contaminated Dog Foods and the target of their advertising and statements.

104. Defendants intended that the warranties, advertising, labeling, statements, and representations would be considered by the end purchasers of the Contaminated Dog Foods, including Plaintiff and the proposed Class.

105. Defendants directly marketed to Plaintiff and the proposed Class through statements on their websites, labeling, advertising, and packaging.

106. Plaintiff and the proposed Class are the intended beneficiaries of the express warranties.

## CLASS ACTION ALLEGATIONS

107. Plaintiff bring this action individually and on behalf of the following Class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons who reside in the State of Wisconsin who, from July 1, 2013, to the present and purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Class").

108. Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

109. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

110. The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and Court.

111. Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

Case 2:18-cv-01996-JPS   Filed 12/18/18   Page 53 of 71   Document 1

(a) whether Defendants owed a duty of care to Plaintiff and the Class;

(b) whether Defendants knew or should have known that the Contaminated Dog Foods contained heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements;

(c) whether Defendants failed to test for the presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements;

(d) whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

(e) whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are healthy, superior quality, nutritious, and safe for consumption;

(f) whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are natural;

(g) whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are pure and safe;

(h) whether Defendants wrongfully represented and continue to represent that the manufacturing of the Contaminated Dog Foods is subjected to rigorous standards, including temperature;

(i) whether Defendants wrongfully failed to state that the Contaminated Dog Foods contained heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements;

(j) whether Defendants' representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

(k) whether those representations are likely to deceive a reasonable consumer;

(l) whether a reasonable consumer would consider the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements as a material fact in purchasing pet food;

(m)   whether Defendants had knowledge that those representations were false, deceptive, and misleading;

(n) whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(o) whether a representation that a product is healthy, superior quality, nutritious and safe for consumption and does not contain heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements is material to a reasonable consumer;

(p) whether Defendants were negligent and/or reckless in having no written agreement with MOPAC as to any requirement as to the source of the beef tallow was an oversight.

(q) whether Defendants' representations and descriptions on the labeling of the Contaminated Dog Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(r)  whether Defendants violated various Wisconsin laws;

(s)  whether Defendants breached their express warranties;

(t)  whether Defendants engaged in unfair trade practices;

(u) whether Defendants engaged in false advertising;

(v) whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions;

(w) whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages; and

(x) whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

112.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

113.    Plaintiff's claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

114.    Plaintiff will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

115.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

116.    Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

117.    As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.* Against Defendants on behalf of the Class

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    Defendants willingly engaged in deceptive trade practices, in violation of the WDTPA, by:

    (a) Representing that their Contaminated Dog Foods have characteristics, ingredients, uses, and benefits that they do not have;

    (b) Representing that their Contaminated Dog Foods are of a superior standard, quality, and grade when they contain levels of various heavy metals,

pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements; and

(c) Representing that their Contaminated Dog Foods are natural when they contain pentobarbital, BPA, and other unnatural ingredients.

120. Defendants knew or should have known that the Contaminated Dog Foods did not have the ingredients, uses, and benefits described herein because:

(a) They contain levels of various heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements;

(b)  and

(c)

121. Defendants knew or should have known that the Contaminated Dog Foods were not of a superior standard, quality, or grade because they contain levels of various heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements that a reasonable consumer would consider material.

122. Defendants knew or should have known that the Contaminated Dog Foods were not natural because they contain material levels of pentobarbital, BPA, and other unnatural ingredients.

123. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Class with respect to the Contaminated Dog Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs.

124. Defendants intended that Plaintiff and the Class would rely on Defendants' misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the

Contaminated Dog Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs.

125. Defendants' conduct and omissions described herein occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

126. The facts concealed or not disclosed by Defendants were material facts in that Plaintiff and any reasonable consumer would have considered them when deciding whether to purchase the Contaminated Dog Foods. Had Plaintiff known the Contaminated Dog Foods did not have the quality and ingredients advertised by Defendants, they would not have purchased the Contaminated Dog Foods.

127. Defendants intended that Plaintiff and the Class would rely on the deception by purchasing the Contaminated Dog Foods, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

128. Defendants' unlawful conduct is continuing, with no indication that Defendants intend to cease this fraudulent course of conduct.

129. As a result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known of levels of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. There is an association between Defendants' acts and omissions as alleged herein and the damages suffered by Plaintiff.

130. As a direct and proximate result of Defendants' violations of the WDTPA, Plaintiff and the Class have been injured, and that harm is likely to continue unless Defendants are enjoined

from misrepresenting the ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs of their Contaminated Dog Foods described herein.

131.    Pursuant to Wis. Stat. § 100.18, Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the WDTPA.

**COUNT II**
**Breach of Express Warranty, Wis. Stat. § 401.714 *et seq.*, Against Defendants**
**on Behalf of the Class**

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    Defendants marketed and sold their Contaminated Dog Foods into the stream of commerce with the intent that the Contaminated Dog Foods would be purchased by Plaintiff and the Class.

134.    Defendants expressly warranted, advertised, and represented to Plaintiff and the Class that their Contaminated Dog Foods are:

(a) Natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

(b) Contain "only 1 supplement – zinc";

(c) Nutritious, superior quality, pure, natural, healthy, and safe for consumption;

(d) "Provid[e] a natural source of virtually every nutrient your dog needs to thrive";

(e) "Guaranteed to keep your dog healthy, happy and strong"; and

(f) Manufactured using "Fresh Regional Ingredients."

135. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

136.     Defendants made these express warranties regarding the Contaminated Dog Foods' quality, ingredients, and fitness for consumption in writing through their websites, advertisements, and marketing materials and on the Contaminated Dog Foods' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Contaminated Dog Foods.

137.     Defendants' advertisements, warranties, and representations were made in connection with the sale of the Contaminated Dog Foods to Plaintiff and the Class. Plaintiff and the Class relied on Defendants' advertisements, warranties, and representations regarding the Contaminated Dog Foods in deciding whether to purchase Defendants' products.

138.     Defendants' Contaminated Dog Foods do not conform to Defendants' advertisements, warranties and representations in that they:

(a) Are not natural or suitable for consumption by humans or canines;

(b) Contain levels of various heavy metals and toxins;

(c) Contain pentobarbital;

(d) Contain levels of BPA and other unnatural ingredients;

(e) ████████████████████████████████████████████ ██████ and

(f) ███████████████████████████████████████████ ██████████████████████

139. Defendants were on notice of this breach as they were aware of the included heavy metals and/or BPA in the Contaminated Dog Foods and based on the public investigation by the Clean Label Product that showed their dog food products as unhealthy.

140. Distributors and agents are under the direction and control of Defendants with respect to the sale of Defendants' Contaminated Dog Foods to Plaintiff and the Class. Specifically, ████████████████████████████████████████████████████████████ ████████████████████████████.

141. Privity exists because Defendants expressly warranted to Plaintiff and the Class, directly and through its agents, that the Contaminated Dog Foods were natural, suitable for consumption, and contained only meat, poultry, fish, and/or vegetables, and guaranteed to keep dogs healthy, happy, and strong.

142. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements .

143. Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT III
### Intentional Misrepresentation Against Defendants on Behalf of the Class

144. Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

145. Defendants falsely represented to Plaintiff and the Class that their Contaminated Dog Foods are:

(a) Natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

(b) Contain "only 1 supplement – zinc";

(c) Nutritious, superior quality, pure, natural, healthy and safe for consumption;

(d) "Provid[e] a natural source of virtually every nutrient your dog needs to thrive";

(e) "Guaranteed to keep your dog healthy, happy and strong"; and

(f) Manufactured using "Fresh Regional Ingredients."

146. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

147. Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase their Contaminated Dog Foods.

148. Defendants knew that their representations about the Contaminated Dog Foods were false in that the Contaminated Dog Foods contain levels of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. Defendants allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

149. Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Contaminated Dog Foods to their detriment. Given the deceptive manner in which Defendants

advertised, represented, and otherwise promoted the Contaminated Dog Foods, Plaintiff and the Class's reliance on Defendants' misrepresentations was justifiable.

150.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

151.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**COUNT IV**
**Fraud by Omission Against Defendants on Behalf of the Class**

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    Defendants concealed from and failed to disclose to Plaintiff and the Class that their Contaminated Dog Foods contained heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

154.    Defendants were under a duty to disclose to Plaintiff and members of the Class the true quality, characteristics, ingredients and suitability of the Contaminated Dog Foods because: (1) Defendants were in a superior position to know the true state of facts about their products; (2) Defendants were in a superior position to know the actual ingredients, characteristics, and suitability of the Contaminated Dog Foods; and (3) Defendants knew that Plaintiff and the Class could not reasonably have been expected to learn or discover that the Contaminated Dog Foods were misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Contaminated Dog Foods.

155.    The facts concealed or not disclosed by Defendants to Plaintiff and the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Contaminated Dog Foods.

156.    Plaintiff and the Class justifiably relied on the Defendants' omissions to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Contaminated Dog Foods, which is inferior when compared to how the Contaminated Dog Foods are advertised and represented by Defendants.

157.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

158.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### COUNT V
### Negligent Misrepresentation Against Defendants on Behalf of the Class

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    Defendants had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the formulation, testing, manufacture, marketing, distribution, and sale of the Contaminated Dog Foods.

161.    Defendants breached their duty to Plaintiff and the Class by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff that do not have the ingredients, qualities, characteristics, and suitability for consumption as advertised by

Defendants and by failing to promptly remove the Contaminated Dog Foods from the marketplace or to take other appropriate remedial action.

162.     Defendants knew or should have known that the ingredients, qualities, and characteristics of the Contaminated Dog Foods were not as advertised or suitable for their intended use, consumption by dogs, and were otherwise not as warranted and represented by Defendants. Specifically, Defendants knew or should have known that: (1) the certain of the Contaminated Dog Foods were not natural because they contained levels of the chemical BPA and the toxin pentobarbital; the Contaminated Dog Foods were not nutritious, superior quality, pure, natural, healthy and safe for consumption because they contained high levels of heavy metals; the Contaminated Dog Foods were adulterated, or at risk of being adulterated, by pentobarbital; and the Contaminated Dog Foods were otherwise not as warranted and represented by Defendants.

163.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known they contained heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

164.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT VI
### Negligence Against Defendants on Behalf of the Class

165.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.     Defendants' conduct is negligent per se.

167.    Defendants violated their statutory duty under Wis. Stat. § 94.72, which prohibits

the sale and distribution of adulterated and misbranded feed products. This statute was adopted to

protect public safety and to protect consumers, such as Plaintiff.

168.    The term "feed product" is defined as "any commercial feed or other product or

material used or distributed for use as a feed or an ingredient in the mixing or manufacturing of

feed for animals or birds" and includes Defendants' Contaminated Dog Foods.  *Id.*

169.    A feed product is adulterated if:

(a) It bears or contains any poisonous or deleterious substance which may render
it injurious to the health of animals or which is unsafe within the meaning of
section 406, 408 or 409 of the federal food, drug and cosmetic act, 21 USC
346, 346a and 348;

(b) It is, or bears or contains any color additive which is unsafe within the
meaning of section 706 of the federal food, drug and cosmetic act, 21 USC
376;

(c) A valuable component is omitted or abstracted from it in whole or part or a
less valuable substance is substituted for a valuable component; or

(d) Its composition or quality falls below or differs from that which it is purported
or represented to possess by its labeling.

*Id.*

170.    A feed product is misbranded if "its labeling is false or misleading in any

particular."  *Id.*

171.    Defendants falsely represented to Plaintiff and the Class that their Contaminated

Dog Foods are:

(a) natural, fit for human consumption, fit for canine consumption, in compliance
with relevant EU regulations and standards and made from "Biologically
Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh
meat, poultry, fish, and vegetables;

(b) contain "only 1 supplement – zinc;"

(c) nutritious, superior quality, pure, natural, healthy and safe for consumption; "provid[e] a natural source of virtually every nutrient your dog needs to thrive;"

(d) "guaranteed to keep your dog healthy, happy and strong"; and

(e) manufactured using "Fresh Regional Ingredients."

172. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

173. Defendants failed to exercise due care when it sold the Contaminated Dog Foods to Plaintiff and the Class based on: (1) its exclusive knowledge of the ingredients, content and sourcing materials of the Contaminated Dog Foods; (2) failing to properly audit and monitor third-party suppliers; and (3) failing to test its ingredients and finished products for pentobarbital, a controlled substance that's inclusion renders pet food adulterated.

174. Defendants' violations of Wis. Stat. § 94.72 was a substantial factor in the harm suffered by Plaintiff and the Class, including purchasing a product with *de minimis* value.

175. Due to Defendants' negligence, Plaintiff and the Class have been damaged in an amount to be proved at trial or, alternatively, seek rescission and disgorgement under this Count.

**COUNT VII**
**Unjust Enrichment Against Defendants on Behalf of the Class**

176. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177. Substantial benefits have been conferred on Defendants by Plaintiff and the Class through the purchase of the Contaminated Dog Foods. Defendants knowingly and willingly accepted and enjoyed these benefits.

178.    Defendants either knew or should have known that the payments rendered by Plaintiff and the Class were given and received with the expectation that the Contaminated Dog Foods would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendants. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

179.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiff and the Class.

180.    Plaintiff and the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

181.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and his counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Contaminated Dog Foods until the levels of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements are removed or full disclosure of the risk and/or presence of such appear on all labels, packaging, and advertising;

C.    An order enjoining Defendants from selling the Contaminated Dog Foods in any manner suggesting or implying that they are healthy, natural, and safe for consumption;

D.     An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.     An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Wisconsin law, plus pre- and post-judgment interest thereon;

G.     An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.     An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I.     An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class; and

J.     An order providing for all other such equitable relief as may be just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 18, 2018                    LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By: s/ Charles N. Nauen
CHARLES N. NAUEN, #1031943
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: cnnauen@locklaw.com
rkshelquist@locklaw.com
rapeterson@locklaw.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
KARLA M. GLUEK
RAINA C. BORRELLI
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com


ROBBINS ARROYO LLP
STEVEN M. MCKANY (271405)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: smckany@robbinsarroyo.com

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone:  (973) 623-3000
E-mail:   jdepalma@litedepalma.com
scruzhodge@litedepalma.com

**Attorneys for Plaintiffs**