# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SCOTT WEAVER, | |
| Plaintiff, | |
| v. | Case No. 18-CV-1996-JPS |
| CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP, | **ORDER** |
| Defendants. | |

## 1.    INTRODUCTION

Plaintiff filed this class action on December 18, 2018. (Docket #1). In the second amended complaint, Plaintiff's operative pleading, he alleges that Defendants misrepresented the presence of certain contaminants in their dog foods, to the detriment of a class of consumers who believed they were buying a premium product free of such impurities. (Docket #23). Similar allegations have been leveled against Defendants in other actions in this District and across the country. Defendants moved to dismiss the second amended complaint on April 4, 2019. (Docket #26). For the reasons stated below, Defendants' motion must be granted in part and denied in part.[1]

## 2.    STANDARD OF REVIEW

Defendants have moved to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6). FRCP 12(b)(6) provides

---

[1] Plaintiff asserts that this Court has diversity jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). (Docket #23 at 10); *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 827 (7th Cir. 2018). Defendants do not challenge this claim.

for dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). In reviewing Plaintiff's complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in [his] favor[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016) (citation omitted). To state a viable claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak*, 810 F.3d at 480 (quotation omitted). Ultimately, dismissal is only appropriate "if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to the relief requested." *Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016).

### 3.    RELEVANT FACTS

Accepting the truth of Plaintiff's well-pleaded allegations and drawing all reasonable inferences in his favor, the relevant facts are as follows. Defendants sell pet food under the Orijen and Acana brand names throughout the United States. (Docket #23 at 2). They tout their products as being of high quality, including that they are "biologically appropriate" and made from fresh, regionally-sourced ingredients. *Id.* According to Plaintiff, however, the pet foods are contaminated with harmful heavy metals, pentobarbital, a chemical used to euthanize animals, Bisphenol A ("BPA"), an industrial chemical which is "an endocrine disruptor," and non-regional and non-fresh ingredients. *Id.* at 3, 39.

The products' packaging does not disclose the presence of these impurities, and Defendants do not test all of their products for such impurities. *Id.* at 6. Defendants nevertheless warrant, via the products' packaging, that they are selling a premium, healthy product. *Id.* at 6–9. Plaintiff claims that Defendants are hiding the existence and extent of contaminants in their products, and otherwise exaggerating or misrepresenting the quality of their products, to the detriment of Wisconsin consumers. *Id.* at 9. In other words, "Plaintiff was injured when he paid the purchase price or a price premium for the Contaminated Dog Foods that did not deliver what was promised." *Id.* at 11.

Plaintiff further alleges that the heavy metals and other chemicals listed above are potentially harmful to humans and pets. *Id.* at 31–39. This danger stands in contrast to Defendants' advertising for the products, which promotes the products' healthfulness and proximity to nature. *Id.* at 40–44. Plaintiffs also contend that Defendants falsely assert their compliance with European Union's standards for healthy pet food. *Id.* at 45–46. Plaintiff alleges that a reasonable consumer would have no reason to suspect, in light of Defendants' numerous representations of quality, that the products were contaminated or harmful in any way. *Id.* at 51–54. Those consumers would, therefore, be happy to pay a premium price for the products. *Id.*

Plaintiff also alleges that Defendants should have expected consumers' reliance on their marketing statements, while simultaneously knowing that those statements were false. *Id.* at 55–57. Indeed, Plaintiff notes that Defendants' website asserts that they test their ingredients and final products for heavy metals, thus revealing an expectation that consumers would want to know such information. *Id.* at 34. Additionally,

Plaintiff contends that privity exists between Defendants and consumers of their products because Defendants control where and how the products are sold, intend that consumers see their advertisements, and intend that consumers purchase the products. *Id.* at 58–59.

4.     **ANALYSIS**

Plaintiff asserts five distinct claims for relief based on his core theory that Defendants' products are contaminated. Count One alleges a violation of the Wisconsin Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18(1), which prohibits false or misleading statements in the sale of goods to consumers. *Id.* at 62–65. Count Two states that Defendants have made, and breached, numerous express warranties to consumers. *Id.* at 65–68. Count Three accuses Defendants of fraud by failing to disclose that their products are contaminated. *Id.* at 68–69. Count Four alleges negligence, and Count Five asserts that Defendants have been unjustly enriched. *Id.* at 69–72.

Defendants seek dismissal of each claim. (Docket #27). Other than agreeing to voluntarily dismiss the negligence claim in Count Four, (Docket #29 at 22), Plaintiff opposes Defendants' arguments. The Court will address each claim in turn. The Court notes that it recently dealt with nearly identical claims and arguments in *Kellie Loeb v. Champion Petfoods USA Inc. et al.*, 18-CV-494-JPS (E.D. Wis.), in addressing both a motion to dismiss and a motion for summary judgment. *See Loeb v. Champion Petfoods USA Inc.*, No. 18-CV-494-JPS, 2018 WL 2745254 (E.D. Wis. June 7, 2018) (hereinafter "*Loeb I*," deciding the motion to dismiss); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597 (E.D. Wis. 2019) (hereinafter "*Loeb II*," deciding the motion for summary judgment). The passages below may, therefore, be somewhat duplicative of the *Loeb* decisions where appropriate.

### 4.1    Count One – WDTPA

The purpose of the WDTPA "is to deter sellers from making false and misleading representations in order to protect the public." *Novell v. Migliaccio*, 749 N.W.2d 544, 550 (Wis. 2008). Toward that end, Section 100.18 prohibits the use of marketing statements for products or services which "contain[ ] any assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). A cause of action pursuant to Section 100.18 requires proof of three elements: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was 'untrue, deceptive or misleading,' and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff." *Novell*, 749 N.W.2d at 553.

Understanding Plaintiff's instant claim requires a brief historical detour. In her complaint, Loeb alleged that Defendants violated the WDTPA by selling pet foods containing excessive or dangerous levels of heavy metals, which rendered false their advertisements of premium quality. *Loeb I*, 2018 WL 2745254, at *2. Defendants moved to dismiss the claim asserting, *inter alia*, that Loeb had failed to plead any standard by which one could assess whether the heavy metal concentrations were in fact excessive or dangerous. *Id.* at *5. The Court rejected this contention, concluding that Loeb's allegations stated a claim for relief, and that she was free to marshal evidence to support those allegations. *Id.* at *5–6.

Defendants later sought summary judgment on Loeb's WDTPA claim. They offered expert testimony to the effect that the heavy metal levels in their products were neither dangerous nor excessive. *Loeb II*, 359 F. Supp. 3d at 603–04. Loeb did not submit any evidence to contradict Defendants' expert. *Id.* The Court held that without such evidence, the WDTPA claim

had to be dismissed. *Id.* In other words, Loeb had expressly tied her claim to the theory of excessive and dangerous heavy metal concentrations, but had failed to support that theory when the time came. *Id.* at 604.

The Court emphasized that Loeb did not "plead a simpler form of her claim: that [Defendants' pet food] is misleadingly advertised as healthy because of mere presence of *any* heavy metals." *Id.* She did not, the Court surmised, because that theory is "absurd." *Id.* at 605 n.7. The Court explained:

> If a WDTPA claim would lie whenever a product is marketed as healthful, but nevertheless contains naturally occurring heavy metals at levels not shown to be harmful, then in light of the data [showing that heavy metals exist in many consumer food products], consumers would have grounds to sue the manufacturer of nearly every product in a typical grocery store. True, [Loeb] need not show actual injury to herself or her pets. But she must at least offer some evidence of potential harm to establish a form of genuine deception on Defendants' part. Otherwise, every manufacturer would be required to disclose that their products contain heavy metals or be barred from making any assertion of quality about the products.

*Id.*

Returning to the present case, Plaintiff's theory is precisely what the Court rejected in that *Loeb II* footnote. He pleads that the mere existence of contaminants in Defendants' products is enough to support a WDTPA claim. In sum, he states that Defendants market their products as being of premium quality. They did so knowing their assertions were false because of the presence of contaminants, or the risk of the presence of contaminants. This was to the detriment of consumers, who would not have purchased

the products at a premium price (or at all) if they had known about the contaminants.

The Court continues to believe, as it did in *Loeb II*, that this theory is not viable with respect to any of the naturally occurring substances allegedly present in the products. Plaintiff does not allege that Defendants have intentionally added those substances to their products. Instead, he contends that they are either naturally present in the products or, based on a lack of testing by Defendants, there is at least risk that they are present. The factual basis of these allegations is essentially undisputed; Defendants' products contain heavy metals and no one would disagree that those substances can be harmful.

The problem is a legal one. *All* pet (and human) foods contain at least some tiny amount of heavy metals. Plaintiff does not allege a comparative theory—that Defendants' products have greater concentrations of heavy metals than other pet foods, thus making the "premium" label arguably false. Rather, he insists that the mere presence of heavy metals defeats Defendants' quality claims. If this were true, the result would be truly preposterous. No one would sell foodstuffs in Wisconsin. If they had the audacity to claim that their products were "tasty," or "fresh," or in any other way of high quality, they would be quickly slapped with a WDTPA lawsuit based on the lead, arsenic, mercury, and cadmium indisputably present in their products.

The Court's holding here has some important limitations. As of now, it applies only to the allegations concerning heavy metals. Defendants maintain that BPA is just as omnipresent in consumer products as the heavy metals, but Plaintiff has not directly alleged this. Further, data provided by Loeb establishes the foundation of the Court's view on heavy metals. That

data demonstrates that heavy metals exist in nearly all human and animal foods sold in grocery stores. *Id.* at 601 (discussing the FDA's Total Diet Study, which is "a reference chart detailing the contaminant levels in various consumer food products," including heavy metal concentrations). The Court is not equipped with similarly concrete information for BPA. The Court deems it more prudent, then, to allow the BPA allegations to continue and await the parties' evidentiary submissions on the matter. As for pentobarbital, Defendants do not claim that it is a naturally occurring substance. Thus, Plaintiff's allegations about the mere presence of the chemical, or even the risk of its presence, are adequate to survive dismissal at this time.

The Court's holding is also inapplicable to Plaintiff's allegations regarding Defendants' use of non-regional and non-fresh ingredients. This theory of liability fits squarely within the purview of the WDTPA. Plaintiff alleges that Defendants are making claims about their products which are arguably false, or at least misleading. Unlike the heavy metal allegations, these are amenable to proof, or disproof, and can be argued to the factfinder.

Defendants nevertheless contend that all of the WDTPA allegations must be dismissed because the marketing statements on their product packaging are either non-actionable puffery or are demonstrably not misleading. As it did in *Loeb*, the Court declines Defendants' invitation to parse the minutiae of its marketing statements or accept factual arguments in a motion to dismiss. *Loeb I*, 2018 WL 2745254, at *6. It is better to allow the parties to proceed through discovery, which will demonstrate whether a particular statement is false or even capable of being proven false.

### 4.2    Count Two – Express Warranties

Plaintiff alleges that the marketing statements on Defendants' product packaging represent express warranties which, Plaintiff learned after his purchases, have been breached. Defendants argue that Wisconsin law requires privity of contract to assert a claim for breach of express warranties, and Plaintiff has failed to plead such privity. An identical claim was advanced in *Loeb*. *Loeb I*, 2018 WL 2745254, at *7–8. This Court found that privity "is a requirement of an express warranty claim that extends even to ultimate purchasers of consumer goods." *Id.* at *7 (citing *St. Paul Mercury Ins. Co. v. The Viking Corp.*, 539 F.3d 623, 628 (7th Cir. 2008) ("St. Paul claims that Wisconsin law is evolving toward eliminating the privity requirement for remote purchasers of products. . . . Whether fair or not, the most recent pronouncement by the Wisconsin Supreme Court on this issue suggests that privity of contract still applies for warranty claims like the one here[.]")).

Plaintiff maintains that the Court got it wrong in *Loeb*. He contends that Wisconsin law distinguishes between implied warranty claims, which do require privity, and express warranty claims, which do not. The Court disagrees, finding that it must maintain its position set out in *Loeb*. Plaintiff's citations to the contrary do not aid him as much as he believes. Most pre-date *St. Paul Mercury*, and are either non-binding opinions from various district courts, or are actually in agreement with the *Loeb* opinion. *See* (Docket #29 at 19–20). Further, Plaintiff's cases are not factually analogous. They involve statements made by the manufacturer aimed directly toward the end user and which were identified as "warranties" in the traditional manner. *See Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 437 N.W.2d 213, 214 (Wis. 1989). Here, the "express"

warranties allegedly arose simply from the marketing statements on the product's packaging. This theory for relief is fully encompassed in Plaintiff's claim under the WDTPA. In the end, the Court is bound to follow Seventh Circuit authority and reject Plaintiff's attempt to broadly expand express warranty claims to encompass consumers who saw nothing more than advertisements.[2]

### 4.3 Count Three – Fraud By Omission

Plaintiff's claim for fraud by omission is better described as one for intentional misrepresentation. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 211–13 (Wis. 2005). The claim is founded on Plaintiff's belief that Defendants were required to inform him of the tainted nature of their products. Defendants assert that they were under no duty to disclose any defects in their products because "[t]he traditional legal rule that there is no duty to disclose in an arm's-length transaction is part of the common law doctrine of caveat emptor." *Ollerman v. O'Rourke Co., Inc.*, 288 N.W.2d 95, 101 (Wis. 1980). Defendants apparently stopped reading *Ollerman* there, as the opinion goes on to reject that traditional rule. It notes that modern attitudes are more sympathetic to unknowing buyers. *Id.* at 102. *Ollerman* recognized several exceptions to caveat emptor:

> [T]he rule does not apply where the seller actively conceals a defect or where he prevents investigation; where

---

[2]Plaintiff's second amended complaint includes detailed allegations asserting that privity exists because of Defendants' intimate involvement in the marketing, packaging, and even the ultimate sale of the subject pet foods. (Docket #23 at 67). He did not, however, rely on these allegations in his brief as a basis to avoid dismissal of the express warranty claim. *See* (Docket #29 at 19–22) (a single sentence mentions the privity allegations). Instead, he simply asserts that privity is not required at all. *Id.* Without argument from Plaintiff, the Court will not consider whether his privity allegations would breathe new life into his express warranty claim.

the seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and he does so; where there is a fiduciary relationship between the parties; or where the facts are peculiarly and exclusively within the knowledge of one party to the transaction and the other party is not in a position to discover the facts for himself.

*Id.*

Applying this rule to a residential real estate transaction, *Ollerman* found that a duty to disclose existed. *Id.* at 102–08. The Wisconsin Supreme Court later emphasized that *Ollerman* offered a narrow holding directed at the issue of residential real estate. *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 239 (Wis. 2004). The "significant common-law policy issue" of whether *Ollerman*'s expansion of the duty to disclose should be applied "more broadly to sales of consumer goods" remains an open question in Wisconsin. *Id. Tietsworth* did not decline to reach the issue for any reason other than the parties' failure to brief it. *Id.*

The parties have not cited, and the Court has not located, any cases extending *Ollerman* to consumer goods scenarios in the manner *Tietsworth* declined to do. Nevertheless, post-*Ollerman* and *Tietsworth* cases provide quite broad descriptions of the duty to disclose. In 2005, reviewing *Ollerman* and other opinions, the Wisconsin Supreme Court concluded that

> a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Kaloti Enters.*, 699 N.W.2d at 213. In 2017, the Wisconsin Court of Appeals held that

> [t]he crucial element in determining whether a duty to disclose exists is whether the mistaken party would reasonably expect disclosure. There is a reasonable expectation of disclosure when taking advantage of a party's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling in which the party is led by appearances into a bargain that is a trap of whose essence and substance he is unaware.

*JBCB, LLC v. McKenna Berry Co., LLC*, 909 N.W.2d 210, 2017 WL 6403089, at *3 (Wis. Ct. App. Dec. 14, 2017) (citation omitted).

Defendants do not dispute that Plaintiff's allegations easily satisfy the first three elements of the duty as pronounced in *Kaloti*. Thus, the Court is left to decide whether Plaintiff could reasonably expect disclosure under the fourth element. The Court finds that he could, on the facts of this case. Plaintiff could have reasonably expected that something so dangerous and disgusting as harmful chemicals and other contaminants would be disclosed if present in Defendants' products, where all of the marketing materials emphasized their premium quality and healthfulness. Plaintiff has, therefore, properly pleaded a claim of intentional misrepresentation.

Defendants offer two additional arguments counseling against this view, but neither changes the Court's determination. First, Defendants cite an Illinois district court's dismissal of a similar claim of fraudulent omissions. *Leppert v. Champion Petfoods USA Inc.*, No. 18-C-4347, 2019 WL 216616, at *11 (N.D. Ill. Jan. 16, 2019). *Leppert* is inapposite, however, because Illinois law finds a duty to disclose only when the parties have an intimate relationship, such as between fiduciaries or one of "trust and

confidence." *Id.* The Court concludes that Wisconsin law is not so restrictive. Second, Defendants contend that their product packaging made no affirmative representations about a lack of contaminants and did disclose the use of frozen and non-regional ingredients. This argument was raised for the first time in Defendants' reply brief, and is therefore waived. S*ee Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 768 (7th Cir. 2018) ("Arguments raised for the first time in a reply brief are waived.").

### 4.4    Count Five – Unjust Enrichment

In Wisconsin, an unjust enrichment claim requires "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so." *Sands v. Menard*, 904 N.W.2d 789, 798 (Wis. 2017). The conferral of the benefit must be directly from the plaintiff to the defendant and not, for instance, a third-party retailer. *Loeb II*, 359 F. Supp. 3d at 605. Plaintiff does not allege that he purchased the pet foods directly from Defendants. Instead, the products were bought from independent retailers. *See* (Docket #23 at 10–11). Thus, he has not properly pleaded a claim for unjust enrichment.

Plaintiff counters that Defendants were intimately involved in the marketing and sale of the products at the store level. Thus, Defendants *indirectly* benefited from sales of the product, because they controlled the sale and ultimately were paid a portion of the proceeds—that portion being "overpayment for a purportedly premium product." (Docket #29 at 26). As the Court stated in *Loeb*, however, "*Sands* means what it says; the benefit conferred must be from the plaintiff to the defendant." *Loeb II*, 359 F. Supp. 3d at 605.

The Court went on to state that it "will not expand on [the *Sands*] definition where [Loeb] refuses to make even a minimal effort to supply contrary authority." *Id.* Unlike Loeb, Plaintiff has supplied a few citations in his argument defending his unjust enrichment claim. However, none are persuasive. He notes that unjust enrichment is an equitable doctrine focused on recouping an improperly conferred benefit. Plaintiff also quotes *Sands* for the proposition that the Court should focus "on the property accumulated [by Defendants], not on the type of personal relationship between the parties." (Docket #29 at 26) (quoting *Sands*, 904 N.W.2d at 801).

As to the first point, the equity concern embodied in the doctrine of unjust enrichment is "getting something for nothing, not providing a product for a price." *Tsamota Certification Ltd. v. ANSI ASQ Nat'l Accreditation Board LLC*, No. 17-CV-839-JPS, 2018 WL 1936840, at *9 (E.D. Wis. Apr. 24, 2018) (quoting *Assoc. Banc–Corp v. John H. Harland Co.*, No. 06–C–1097–WCG, 2007 WL 128337, at *2 (E.D. Wis. Jan. 11, 2007)). Plaintiff did receive something, just not something of the quality he desired. As noted above, he has adequate legal avenues to redress this concern. Plaintiff need not resort to a parallel equitable theory of recovery.

As to the *Sands* quotation, it is taken out of context. *Sands* focused on the application of the unjust enrichment principle to unmarried former cohabitants who disagreed on the division of property obtained during their relationship. *Sands*, 904 N.W.2d at 797–801. Its comment about the "relationship" between the parties was, then, nigh-literal, and had nothing to do with the retail context present in this case. Indeed, directly after Plaintiff's quote, *Sands* goes on: "[s]tated otherwise, a claim for unjust enrichment may lie when two people work together to acquire property through the efforts of both, regardless of their personal relationship." *Id.* at

801. This confirms that *Sands* was focused on a specific, and for present purposes irrelevant, nuance of unjust enrichment law with respect to long-standing relationships between unmarried persons. The "relationship" of the parties in this case was purely economic.

Plaintiff's final contention is that, if the Court's view of Wisconsin law is correct, "an unjust enrichment claim will almost never be available in a retail sales context." (Docket #29 at 26). Plaintiff states that this "can hardly be appropriate precedent for the state of Wisconsin." *Id.* Why? Wisconsin offers other protections to consumers, not the least of which is the WDTPA, which happens to be the very centerpiece of Plaintiff's lawsuit. Plaintiff bemoans that a "wrongdoer manufacturer who benefits from the harm visited on the end purchaser consumer is insulated from unjust enrichment liability through the privity of contract defense." *Id.* But isn't a lack of privity appropriate as a defense for a *quasi-contractual* theory of liability?

**5.     CONCLUSION**

In light of the foregoing, Defendants' motion to dismiss will be granted in part and denied in part. Plaintiff may not proceed on Count One with respect to heavy metals, but his claim will survive as to BPA, pentobarbital, and the alleged use of non-regional and non-fresh ingredients. Counts Two, Four, and Five will be dismissed.

Plaintiff has requested leave to amend his pleading if the Court granted any portion of Defendants' motion. (Docket #29 at 27). Defendants' only response to this request is that Plaintiff has already amended his complaint twice. (Docket #31). This is not a sufficient reason to deny leave to amend at this stage. *See* Fed. R. Civ. P. 15(a)(2) (a court "should freely give leave when justice so requires"). Plaintiff is free to file a third amended

complaint on or before **July 22, 2019**. If he does not, this case will proceed on the surviving claims of the second amended complaint.[3]

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Docket #26) be and the same is hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order;

**IT IS FURTHER ORDERED** that the allegations regarding heavy metals as the basis for Count One of Plaintiff's second amended complaint (Docket #23 at 62–65) be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Counts Two and Five of Plaintiff's second amended complaint (Docket #23 at 65–68, 71–72) be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count Four of Plaintiff's second amended complaint (Docket #23 at 69–71) be and the same is hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff may file a third amended complaint on or before **July 22, 2019**; and

**IT IS FURTHER ORDERED** that Plaintiff's motion to seal (Docket #2) be and the same is hereby **DENIED as moot**.

Dated at Milwaukee, Wisconsin, this 1st day of July, 2019.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

---

[3] The Court will also deny as moot a pending motion by Plaintiff to seal the filing of his original complaint. (Docket #2). The second amended complaint was publicly filed by stipulation of the parties. *See* (Docket #22).