UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

SCOTT WEAVER, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiff,

   v.

                                 Case No. 2:18-cv-1996-JPS

CHAMPION PETFOODS USA INC. and
CHAMPION PETFOODS LP,

        Defendants.

## DEFENDANTS CHAMPION PETFOODS USA INC.'S AND CHAMPION PETFOODS LP'S ANSWER AND AFFIRMATIVE DEFENSES TO THIRD AMENDED CLASS ACTION COMPLAINT

Defendants Champion Petfoods USA Inc. and Champion Petfoods LP (collectively, "Champion") hereby submit their Answer and Affirmative Defenses to the Third Amended Class Action Complaint filed by Plaintiff Scott Weaver ("Plaintiff").

## <u>GENERAL DENIAL</u>

Except as otherwise expressly stated herein, Champion denies each and every allegation in the Third Amended Class Action Complaint (the "Complaint" or "TAC"), including, without limitation, any allegations contained in the headings, subheadings, or footnotes. Further, Champion objects to Plaintiff's defined term "Contaminated Petfoods," as Champion denies that any of its pet foods are contaminated. Champion reserves the right to seek to amend and/or supplement their Answer as may be necessary and appropriate.

# ANSWER

1.      Plaintiff Scott Weaver ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned attorneys, brings this Third Amended Class Action Complaint against Defendants Champion Petfoods USA, Inc. ("Defendant Champion USA") and Champion Petfoods LP ("Defendant Champion Canada") (together, "Defendants"), for their negligent, reckless, and/or intentional practice of misrepresenting, failing to test for, and failing to fully disclose the presence and/or risk of inclusion in their pet food of heavy metals, pentobarbital, toxins, Bisphenol A ("BPA"), non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements throughout the United States.  Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (defined below), including:  (i) requiring full disclosure of all such substances and ingredients in Defendants' marketing, advertising, and labeling; (ii) prohibiting the utilization of the term "Fresh Regional Ingredients" and also suppliers who are street renderers or rendering facilities that accept euthanized animals; (iii) requiring testing of all ingredients and final products for such substances; (iv) prohibiting the use of "Biologically Appropriate™" unless full disclosure is made concerning the risk of pentobarbital, heavy metals, non-fresh and non-regional ingredients, and the now known risks of feeding a grain-free diet; and (v) restoring monies to the members of the proposed Class.  Plaintiff alleges the following based upon personal knowledge as well as investigation by his counsel and discovery and as to all other matters, upon information and belief.

> **Answer:**      Champion admits that Plaintiff purports to bring this TAC on behalf of himself and all others similarly situated and seeks both monetary and injunctive relief. Champion lacks knowledge or information sufficient to form a belief as to whether

2

Plaintiff's allegations are based on personal knowledge or investigation by counsel and denies the allegations related thereto. Champion denies that the putative class could ever be certified in this action or that Plaintiff or the putative class is entitled to any damages or injunctive relief. Champion denies the remaining allegations in Paragraph 1 of the TAC.

## DEFENDANTS MARKET THEMSELVES AS ONLY SELLING PREMIUM DOG FOOD WITH THE SIMPLE MISSION OF "TO BE TRUSTED BY PET LOVERS"

2.     Defendants manufacture, market, advertise, label, distribute, and sell pet food under the brand names Acana and Orijen throughout the United States, including in this District.

**Answer:**     Champion admits that it sells pet food under the brand names ACANA and ORIJEN to specialty retailers throughout the United States, including in this district. Champion denies the remaining allegations in Paragraph 2 of the TAC.

3.     Defendants have created a niche in the pet food market by allegedly "making biologically 'appropriate' pet food—as close to what animals would eat in nature as possible— and producing it using fresh, natural ingredients ...." They then charge a premium for this purportedly higher-quality food. The founder of the company, Peter Muhlenfeld, said, "Our core family beliefs are ... entrenched in the company, and that is to make the very best food."

**Answer:**     Champion lacks knowledge or information sufficient to form a belief concerning allegations related to Peter Muhlenfeld's statement and therefore denies the allegations related thereto. Champion denies the remaining allegations in Paragraph 3 of the TAC.

4.     Defendants tout that "Biologically Appropriate™ represents a new class of foods, designed to nourish dogs according to their evolutionary adaptation to meat and protein-rich diets" and that it is "[t]rusted by [p]et lovers [e]verywhere." Defendants advertise that they use premium, high quality ingredients from "[p]eople we trust." Defendants' packaging claims "[i]ngredients

we love from people we know and trust," further reinforce that the quality of Defendants' products are directly tied to the trusting relationship Defendants have with its ingredient suppliers.

> **Answer:** Champion admits only that the statement "Biologically Appropriate ORIJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary adaptation to a diet rich and diverse in fresh meat and protein[]" has appeared at times on ORIJEN's website, and the statements "trusted by pet lovers everywhere," "people we trust" and "ingredients we love from people we know and trust" have appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 4 of the TAC.

5. Defendants' packaging and labels further emphasize fresh, quality, and properly sourced ingredients and even declares their dog food has "ingredients we love":

> **Answer:** Champion admits that the statement "ingredients we love" has appeared at times on some of Champion's product packaging. Champion admits that the image below Paragraph 5 of the TAC is a package of ACANA dog food. Champion denies the remaining allegations in Paragraph 5 of the TAC.

6. Yet nowhere in the labeling, advertising, statements, and/or packaging do Defendants disclose that the Contaminated Dog Foods (defined herein) contain and/or have a high risk of containing heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements nor do they disclose that they do not adequately test their ingredients and final products for contaminants.

> **Answer:** Champion denies the allegations in Paragraph 6 of the TAC.

7.     Indeed, the Contaminated Dog Foods have been shown to contain the following levels of arsenic, mercury, lead, cadmium, and/or BPA—all known to pose health risks to humans and animals, including dogs:

**Answer:**     Champion denies the allegations in Paragraph 7 of the TAC, including the allegations in the table below Paragraph 7 of the TAC.

8.     Moreover, Defendants themselves admit that all formulations of their dog and cat food in fact contain heavy metals yet failed to update the packaging to reflect this admission.

**Answer:**     Champion denies the allegations in Paragraph 8 of the TAC.

9.     Defendants do not test all of their ingredients or finished products for heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients.

**Answer:**     Champion denies the allegations in Paragraph 9 of the TAC.

10.     Yet, Defendants warrant, promise, represent, mislead, label, and/or advertise that the Contaminated Dog Foods are free of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients and would not pose a risk for pets developing Dilated Cardiomyopathy ("DCM") by touting the Contaminated Dog Food as "Biologically Appropriate™" (a nutritional statement) and assuring the food represents an evolutionary diet that mirrors that of a wolf—free of anything "nature did not intend for your dog to eat."

**Answer:**     Champion denies the allegations in Paragraph 10 of the TAC.

11.     Defendants assert that: "Virtually All Of The Nutrients In Acana Are Natural And Not Synthetic." Defendants make a similar claim to the Orijen Dog Foods in maintaining that the main source of any nutrient in Orijen is from a natural source.

5

**Answer:** Champion admits that the statement "Virtually All Of The Nutrients In Acana Are Natural And Not Synthetic" has appeared at times on some of ACANA's brochures. Champion denies the remaining allegations in Paragraph 11 of the TAC.

12. Defendants further warrant, promise, represent, advertise, and declare that the Contaminated Dog Foods are made with protein, oils, and fat sources that are "Deemed fit for human consumption" in direct contradiction to the true nature of the ingredients utilized, which include, but are not limited to, pentobarbital, BPA, and/or unnatural ingredients.

**Answer:** Champion denies the allegations in Paragraph 12 of the TAC.

13. It was recently revealed that Defendants were knowingly, recklessly, and/or negligently selling certain of the Contaminated Dog Foods from the DogStar® Kitchens ("DogStar Kitchens") containing tallow contaminated with pentobarbital that was allegedly caused by cross-contamination that resulted from its supplier, MOPAC, an eastern Pennsylvania rendering facility belonging to JBS USA Holdings, Inc. ("JBS"), having accepted and processed euthanized horses in earlier production runs for other customers. This revelation renders any statement as to ingredients claimed to be "fit for human consumption" false. Here, the contaminated beef tallow was made from beef meal that would also have been utilized in the Contaminated Pet Foods and originated from MOPAC. An investigation by the U.S. Food and Drug Administration ("FDA") concluded that MOPAC's 2017 and 2018 tallow samples tested positive for pentobarbital. A government agency has since requested this same supplier to confirm the date that it stopped accepting dead horses. Moreover, the risk of manufacturing the Contaminated Dog Foods with ingredients tainted with pentobarbital existed since 2016 when MOPAC first started supplying tallow and meal to Defendants.

**Answer:** Champion lacks knowledge or information sufficient to form a belief relating to the allegations regarding the FDA's investigation into MOPAC and therefore denies the allegations related thereto. Champion denies the remaining allegations in Paragraph 13 of the TAC.

14. Additionally, on July 12, 2018, the FDA issued a warning that "dogs eating certain pet foods containing peas, lentils, other legume seeds, or potatoes as main ingredients" were experiencing DCM, a heart muscle disease that results in an enlarged heart. "As the heart and its chambers become dilated, it becomes harder for the heart to pump, and heart valves may leak, leading to a buildup of fluids in the chest and abdomen. DCM often results in congestive heart failure." Thereafter, on June 27, 2019, the FDA released a report of its investigation into DCM that disclosed Defendants' brands account for 14.88 percent of reported cases of DCM in the past 5 years. Defendants were aware of the risk and the reported cases associated with the Contaminated Pet Foods from at least July 2018 and yet chose not to include any warning or link to the FDA investigation into DCM.

**Answer:** Champion lacks knowledge or information sufficient to form a belief relating to the allegations regarding the FDA's investigation into DCM and therefore denies the allegations related thereto. Champion denies the remaining allegations in Paragraph 14 of the TAC.

15. Defendants also mislead consumers by marketing that the Contaminated Dog Foods are made from fresh and regional ingredients that are delivered daily. Indeed, this misrepresentation is made numerous times and in numerous ways on the packaging. Defendants go as far as to include photos of local Kentucky or neighboring state suppliers on the packaging. In reality, Defendants source ingredients both internationally (e.g. New Zealand, India, France,

Denmark, Ireland, Australia, Canada, China) and across the United States (Idaho, Ohio, Midwest, West Coast, Northeast). Additionally, Defendants utilized frozen products (some of which have been stored for years) and store the delivered meals at their Kitchens for several months prior to use. Finally, Defendants also utilize expired ingredients and kibble regrinds.

**Answer:** Champion denies the allegations in Paragraph 15 of the TAC.

16. Defendants also outsource the production of their meals despite claiming the Contaminated Dog Foods are "Never Outsourced." Moreover, Defendants have failed to inspect or visit the ingredient suppliers of certain meals to ensure that the quality and source of the ingredients matches the representations made to consumers.

**Answer:** Champion denies the allegations in Paragraph 16 of the TAC.

17. Finally, when considering the packaging as a whole with each of these statements highlighted and often repeated, the whole packaging is misleading and promises to consumers that the Contaminated Dog Foods are superior quality, natural, healthy, and regionally sourced.

**Answer:** Champion denies the allegations in Paragraph 17 of the TAC.

18. Plaintiff brings this action individually and on behalf of all other similarly situated consumers within Wisconsin who purchased the Contaminated Dog Foods, in order to cause the disclosure of the presence and/or risk of inclusion of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Foods, to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Dog Foods are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced, and to obtain redress for those who have purchased the Contaminated Dog Foods.

**Answer:** Champion denies the allegations in Paragraph 18 of the TAC.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class reside in states other than the states in which Defendants are citizens and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

**Answer:** Champion admits only that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). Champion denies that a class could ever be certified in this action or that Plaintiff or the putative class is entitled to any damages.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff is a citizen of the State of Wisconsin and suffered injury as a result of Defendants' acts in the State of Wisconsin, a substantial part of property that is the subject of the action is situated in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws and markets of this District, Defendants are subject to personal jurisdiction in this District, and a related matter involving substantially similar facts is pending in this District.

**Answer:** Champion does not contest or challenge venue in this Court, and denies the remaining allegations in Paragraph 20 of the TAC.

## PARTIES

21.     Plaintiff is, and at all times relevant hereto has been, a citizen of the state of Wisconsin.  Plaintiff purchased the following Contaminated Dog Foods for his dogs, Jill, a 10-year-old female Golden Retriever, Jack, an 11-year-old male Golden Retriever, and Prince Harry, a 5-year-old male Golden Retriever (all who are therapy and literacy volunteer dogs):

9

Orijen Six Fish and Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel, Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food. Plaintiff purchased the Contaminated Dog Foods approximately once per month on average between approximately January 2007 and August 2017, generally from Mounds Pet Food Store in Fitchburg, Wisconsin. Prior to purchasing the Contaminated Dog Foods, Plaintiff saw the nutritional claims on the packaging, which he relied on when deciding to purchase the Contaminated Dog Foods. During that time, based on the false and misleading claims, representations, advertisements, and other marketing by Defendants, Plaintiff was unaware that the Contaminated Dog Foods contained and/or had a risk of containing the disclosed levels of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements and would not have purchased the food if that was fully disclosed. Plaintiff was injured by paying a premium for the Contaminated Dog Foods that have no or *de minimis* value based on the presence of the alleged heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.

> **Answer:** Champion lacks knowledge or information sufficient to form a belief as to the allegations in the first four sentences of Paragraph 21 of the TAC and therefore denies them. Champion lacks knowledge or information sufficient to form a belief as to the allegations relating to Plaintiff's subjective beliefs and expectations with respect to his purchasing decisions and therefore denies the allegations related thereto. Champion denies the remaining allegations in Paragraph 21 of the TAC.

22.     As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when he paid the purchase price or a price premium for the Contaminated Dog Foods that did not deliver what was promised. He paid the premium price on the assumption that the labeling of the Contaminated Dog Foods was accurate and that it was healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced. Plaintiff would not have paid this money had he known that the Contaminated Dog Foods contained and/or had risk of containing levels of heavy metals, pentobarbital, ingredients cross-contaminated with euthanized horse meat, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements. Plaintiff was further injured because the Contaminated Dog Foods have no or *de minimis* value based on the presence of the alleged heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements. Damages can be calculated through expert testimony at trial. Further, should Plaintiff encounter the Contaminated Dog Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Dog Foods.

**Answer:**     Champion denies the allegations in Paragraph 22 of the TAC.

23.     Defendant Champion USA is incorporated in Delaware. Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn, Kentucky 42206. Since that time, all Contaminated Dog Foods sold in the United States are manufactured, sourced, and sold by Champion USA.

**Answer:**     Champion admits the allegations in the first two sentences in Paragraph 23 of the TAC. Champion denies the remaining allegations in Paragraph 23 of the TAC.

24.     Defendant Champion Canada is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6.  Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA.   Prior to March 2016, all Contaminated Dog Foods sold in the United States were manufactured, sourced, and sold by Champion Canada.

**Answer:**     Champion denies the allegation in Paragraph 24 of the TAC that it sells "Contaminated Pet Foods." Champion admits the remaining allegations in Paragraph 24 of the TAC.

25.     Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell the Contaminated Dog Foods under the dog food brand names Orijen and Acana throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for the Contaminated Dog Foods, relied upon by Plaintiff, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein.  The marketing, advertising, packaging, and labeling for the Contaminated Dog Foods was designed to encourage consumers to purchase the Contaminated Dog Foods and reasonably misled the reasonable consumer, *i.e.*, Plaintiff and the Class, into purchasing the Contaminated Dog Foods.  Defendants own, manufacture, and distribute the Contaminated Dog Foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Dog Foods.  Defendants are responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished Contaminated Dog Foods.

**Answer:**     Champion admits only that that it sells ORIJEN and ACANA dog food products to distributors throughout the United States, including in Wisconsin and in this District. Champion denies the remaining allegations in Paragraph 25 of the TAC.

## FACTUAL ALLEGATIONS

### I.    THE CONTAMINATED DOG FOODS

26.    The Contaminated Dog Foods include the following:

    (a)    Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish Dry Dog Food;

    (b)    Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird Dry Dog Food;

    (c)    Acana Regionals Meadowland with Free-Run Poultry, Freshwater Fish, and Nest-Laid Eggs Dry Dog Food;

    (d)    Acana Regionals Wild Atlantic with New Wild New England Fish & Fresh Kentucky Greens Dry Dog Food;

    (e)    Orijen Original with Fresh Free-Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs Dry Dog Food;

    (f)    Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel Dry Dog Food;

    (g)    Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food;

    (h)    Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake Dry Dog Food;

    (i)    Acana Singles Duck and Pear Formula Dry Dog Food;

    (j)    Acana Singles Lamb and Apple Formula Dry Dog Food;

    (k)    Acana Heritage Free-Run Poultry Formula Dry Dog Food;

    (l)    Acana Heritage Freshwater Fish Formula Dry Dog Food;

    (m)    Orijen Tundra Freeze-Dried Venison, Elk, Bison, Quail, Steelhead Trout Wet Dog Food;

(n)      Orijen Adult Dog Freeze-Dried Chicken, Turkey, Wild Caught Fish, Eggs Wet Dog Food;

(o)      Orijen Regional Red Freeze-Dried Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Wet Dog Food;

(p)      Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food;

(q)      Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish Dry Dog Food;

(r)      Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit Dry Dog Food;

(s)      Orijen Grain Free Puppy Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog Food;

(t)      Acana Singles Mackerel and Greens Formula Dry Dog Food;

(u)      Acana Heritage Meats Formula Dry Dog Food;

(v)      Acana Singles Pork and Squash Formula Dry Dog Food;

**Answer:**      Champion admits that the products named in subparagraphs (a) through (v) are produced by Champion (though not by both kitchens) and the images in subparagraphs (a) through (v) are accurate representations of the respective packaging for the products at certain times, but denies that any of these products were "Contaminated" and denies any other allegations in Paragraph 26 of the TAC.

## II.    THE INCLUSION AND/OR RISK OF INCLUSION OF HEAVY METALS, PENTOBARBITAL, TOXINS, BPA, AND ANY OTHER CHEMICALS, ALONG WITH THE RISK OF DCM IN THE CONTAMINATED DOG FOODS IS MATERIAL BASED ON KNOWN RISKS

27.      Consumption and/or exposure to heavy metals, pentobarbital, BPA, and/or unnatural or other ingredients carry known risks.

**Answer:**      Champion admits that heavy metals, pentobarbital, and/or BPA can cause serious illness to humans and animals when they are exposed to quantities which far exceed

the quantities in Champion's dog food. Champion denies the remaining allegations in Paragraph 27 of the TAC.

28.     Thus, whether pet food contains heavy metals, pentobarbital, BPA, and/or unnatural or other ingredients is material to a reasonable consumer when making purchasing decisions.

**Answer:**     Champion denies the allegations in Paragraph 28 of the TAC.

**A.     Heavy Metals**

29.     Defendants know or should know that the Contaminated Dog Foods contain arsenic, mercury, cadmium, and lead, and that exposure to these toxic heavy metals at certain levels is potentially dangerous to dogs.  Defendants' statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are superior quality that do not have the presence and/or risk of heavy metal contamination.

**Answer:**     Champion denies the allegations in Paragraph 29 of the TAC.

30.     Exposure to arsenic at certain levels can cause dogs to experience symptoms such as gastrointestinal pain, colic, diarrhea, vomiting, dehydration, weak pulse, and even mortality. Defendants know or should know that arsenic is a toxic heavy metal that poses potentially serious health risks to dogs.

**Answer:**     Champion admits that arsenic can be toxic when dogs are exposed for sufficient amounts of time to quantities which far exceed the quantities in Champion's dog food. Champion admits that a dog may experience the symptoms set forth in Paragraph 30 of the TAC if the dog is experiencing arsenic poisoning. Champion affirmatively avers that Plaintiff has not claimed that his dogs have exhibited these symptoms or suffered from

arsenic poisoning. Champion denies the remaining allegations in Paragraph 30 of the TAC and any implication that Champion's products are toxic or result in poisoning.

31. Exposure to cadmium at certain levels can negatively affect a dog's gastrointestinal tract and central nervous system, causing convulsions, ataxia, blindness, anorexia, vomiting, colic, and diarrhea. Defendants know or should know that cadmium is a toxic heavy metal that poses potentially serious health risks to dogs.

**Answer:** Champion admits that cadmium can be toxic when dogs are exposed for sufficient amounts of time to quantities which far exceed the quantities in Champion's dog food. Champion admits that a dog may experience the symptoms set forth in Paragraph 31 of the TAC if the dog is experiencing cadmium poisoning. Champion affirmatively avers that Plaintiff has not claimed that his dogs have exhibited these symptoms or suffered from cadmium poisoning. Champion denies the remaining allegations in Paragraph 31 of the TAC and any implication that Champion's products are toxic or result in poisoning.

32. Exposure to lead at certain levels can cause dogs to experience symptoms such as gastrointestinal pain, colic, diarrhea, vomiting, dehydration, weak pulse, and even mortality. Defendants know or should know that lead is a toxic heavy metal that poses potentially serious health risks to dogs.

**Answer:** Champion admits that lead can be toxic when dogs are exposed for sufficient amounts of time to quantities which far exceed the quantities in Champion's dog food. Champion admits that a dog may experience the symptoms set forth in Paragraph 32 of the TAC if the dog is experiencing lead poisoning. Champion affirmatively avers that Plaintiff has not claimed that his dogs have exhibited these symptoms or suffered from lead

poisoning. Champion denies the remaining allegations in Paragraph 32 of the TAC and any implication that Champion's products are toxic or result in poisoning.

33. Exposure to mercury at certain levels can negatively affect a dog's cerebral cortex, causing blindness, ataxia, paralysis, coma, and even death. Defendants know or should know that mercury is a toxic heavy metal that poses potentially serious health risks to dogs.

**Answer:** Champion admits that mercury can be toxic when dogs are exposed for sufficient amounts of time to quantities which far exceed the quantities in Champion's dog food. Champion admits that a dog may experience the symptoms set forth in Paragraph 33 of the TAC if the dog is experiencing mercury poisoning. Champion affirmatively avers that Plaintiff has not claimed that his dogs have exhibited these symptoms or suffered from mercury poisoning. Champion denies the remaining allegations in Paragraph 33 of the TAC and any implication that Champion's products are toxic or result in poisoning.

34. Moreover, Defendants' own actions show their knowledge that a reasonable consumer would care about the inclusion of heavy metals as they have specifically addressed this concern on their website by touting they require their suppliers to "provide heavy metals and mercury test results, for which we also test our final food products."

**Answer:** Champion denies the allegations in Paragraph 34 of the TAC.

35. Additionally, Defendants know or should know that a consumer would be feeding the Contaminated Dog Foods multiple times each day to his or her dog, making it the main, if not only, source of food for the dog. This leads to repeated exposure of the heavy metals to the dog.

**Answer:** Champion denies the allegations in Paragraph 35 of the TAC.

36. Defendants know or should know that the standards for heavy metal levels in human foods have become increasingly prohibitive over recent years. Defendants knew or should

know that regulatory agencies have recently reduced the "safe" level for heavy metals in many different types of foods and beverages.

    **Answer:**    Champion denies the allegations in Paragraph 36 of the TAC.

37.    In 2005, the National Research Council (the "NRC") wrote a guidance document that suggested a range for the maximum tolerable amount ("MTL") of heavy metals that are permissible in animals' foodstuffs. In 2011, the FDA utilized and interpreted the NRC's MTLs for heavy metals in a safety memorandum on pet foods, but capped the permissible maximum heavy metal levels at the lowest amount within the NRC's original recommended range. Accordingly, Defendants knew or should know that heavy metal standards for pet foods are not fixed, but are becoming increasingly prohibited over time. Defendants knew or should have known that, as more is learned about the dangers of heavy metals, less heavy metals in pet food is better than more levels of heavy metals in pet food.

    **Answer:**    Champion admits that in 2005, the NRC wrote a guidance document that suggested MTLs for heavy metals in animals' foodstuffs, and in 2011, the FDA interpreted these MTLs in a safety memorandum on pet foods. Champion denies the remaining allegations in Paragraph 37 of the TAC.

38.    Defendants know or should know that disclosing details regarding heavy metals on their packaging, including heavy metal testing results and schedules, is critical to ensure consistency with their packaging claims, including Defendants' claims to be "trusted everywhere," to produce "Biologically Appropriate™" food and to use "ingredients we love."

    **Answer:**    Champion denies the allegations in Paragraph 38 of the TAC.

39.    Defendants have publicly acknowledged that consumers "have deep feelings and a sense of responsibility for the well-being of their dogs and cats." However, despite the known

risks of exposure to these heavy metals, Defendants have negligently, recklessly, and/or knowingly sold the Contaminated Dog Foods without disclosing they contain and/or have a high risk of inclusion of arsenic, mercury, cadmium, and lead to consumers like Plaintiff and other members of the Class.

**Answer:**     Champion denies the allegations in Paragraph 39 of the TAC.

40.     Defendants know or should know that the Contaminated Dog Foods contain and/or have a high risk of heavy metal inclusion because they have tested their pet food products for the presence of heavy metals on and off since at least 2008.

**Answer:**     Champion admits that it tests its products for heavy metals, but denies all other allegations in Paragraph 40 of the TAC.

41.     Further, Defendants fail to meet their own testing frequency standards for heavy metals.  Since 2016, Defendants have scheduled regular heavy metal testing for their finished kibble.  However, Defendants routinely violate their own internally established heavy metal testing schedule.  For instance, Defendants only conducted 30% of the scheduled heavy metal tests for 2016 at their DogStar Kitchen.  Defendants even failed to test their finished kibble for lead and mercury for over a year at a time, leaving both Defendants and consumers blind to being exposed to potentially harmful levels of lead and mercury.  Defendants' omission of heavy metal testing schedules from their packaging is misleading because Defendants know or should know that a failure to comply with their heavy metal testing schedules would not conform to their other packaging claims.

**Answer:**     Champion admits that it tests its products for heavy metals, but denies all other allegations in Paragraph 41 of the TAC.

42.     Defendants know or should know that the Contaminated Dog Foods contain and/or have a high risk of containing heavy metals because Defendants do not sufficiently monitor, test, or validate ingredients from third party suppliers for heavy metals.  Despite the acknowledged dangers of heavy metals, Defendants do not require ingredient suppliers to test for heavy metals and Defendants typically do not hold ingredient suppliers to any specific limitation on heavy metal levels.  Defendants' omission of heavy metal information for supplier ingredients from their packaging is misleading because Defendants know or should know that a failure to adequately monitor supplier ingredients for heavy metals would not conform to their other packaging claims.

**Answer:**     Champion denies the allegations in Paragraph 42 of the TAC.

43.     Additionally, Defendants' products contain heavy metal levels that are higher on average than similarly priced premium dog food brands.  In fact, Defendants' products have heavy metal levels that are comparable to much cheaper, low quality dog food brands.  Defendants' omission of heavy metal testing results from their packaging is misleading because Defendants know or should know that these results would not conform to their other packaging claims.

**Answer:**     Champion denies the allegations in Paragraph 43 of the TAC.

44.     Defendants know or should know that by omitting from their packaging any reference (or website citing) to specific heavy metal levels in the Contaminated Dog Food, consumers are misled about the actual quality of the Contaminated Dog Foods and are unable to make an informed purchasing decision about a product they may not have otherwise purchased had that information been available.

**Answer:**     Champion denies the allegations in Paragraph 44 of the TAC.

45. Furthermore, Defendants know or should know that omitting heavy metal levels misleads consumers about the actual amount of heavy metals they are exposing their pets to by feeding them the Contaminated Dog Food.

**Answer:** Champion denies the allegations in Paragraph 45 of the TAC.

46. Defendants know or should know that consumers rely on pet food manufacturers to disclose heavy metal testing results and details. Defendants exclusively hold and have easy access to their heavy metal testing schedule, results, and details, and are capable of disclosing this information with little to no cost. Defendants maintain these records as a part of their regular course of business, yet refuse to release these details to consumers, even when directly asked.

**Answer:** Champion denies the allegations in Paragraph 46 of the TAC.

***Defendants' White Paper Actively Misleads Consumers to Underestimate Heavy Metal Levels in Defendants' Products***

47. In response to an article that suggested that Defendants' pet foods contained heavy metals, Defendants relented and publicly confirmed that their pet food contained heavy metals through a white paper in 2017 (the "White Paper"). However, instead of educating consumers on the subject of heavy metals, Defendants' White Paper continues to be a marketing ploy that acts as a smokescreen to obscure the real presence and/or risk of heavy metal contamination in Defendants' products.

**Answer:** Champion admits only that it published online a White Paper discussing the presence and average levels of heavy metals (arsenic, cadmium, mercury, and lead) in its dog and cat foods. Champion denies the remaining allegations in Paragraph 47 of the TAC.

48. Defendants know or should know that their White Paper is misleading by causing consumers to underestimate the presence and/or risk of heavy metals in Defendants' products because Defendants withheld key details as to their heavy metal testing, used averages to obfuscate

the high amounts of heavy metals tested in some of their products, and underreported both the average and maximum heavy metal test results.

> **Answer:** Champion denies the allegations in Paragraph 48 of the TAC.

49. Defendants know or should know that their White Paper lacks the meaningful detail on heavy metals necessary to allow consumers to understand the true presence of heavy metals in Defendants' products. Defendants' White Paper fails to provide any information on testing frequency, the total amount of heavy metal tests conducted, and the actual test results used to calculate the reported averages. Defendants' White Paper also does not disclose that the reported amounts were not representative of all of the Defendants' dog foods because some of Defendants' diets were not included in the White Paper testing data set.

> **Answer:** Champion denies the allegations in Paragraph 49 of the TAC.

50. Defendants' White Paper on heavy metals is also misleading to consumers because Defendants only reported the average heavy metal test results for all Acana and Orijen dog food products. By using this average, Defendants knew or should have known that consumers would be completely unable to determine the actual amount of heavy metals in any particular Acana or Orijen product. In some instances, Defendants received test results for specific diets that were four times higher than the averages reported by their White Paper. Accordingly, Defendants' White Paper is misleading to consumers because it obscures the fact that some of Defendants' Contaminated Dog Foods have a substantially higher presence and/or risk of heavy metal contamination in some instances. Additionally, the White Paper hides the lack of uniformity and consistency in the quality of Defendants' pet food.

> **Answer:** Champion denies the allegations in Paragraph 50 of the TAC.

51.     Defendants knew or should have known that their White Paper is deceiving consumers into underestimating the presence and/or risk of heavy metals in their products because their White Paper underreports some of their maximum heavy metal test results.  For instance, Defendants' White Paper claimed that their maximum reported results for arsenic was less than 16% for dogs of the NRC MTL, when in fact Defendants' actual maximum reported results for arsenic was 29% of the NRC MTL.

**Answer:**          Champion denies the allegations in Paragraph 51 of the TAC.

52.     Defendants knew or should have known that underreporting the average amounts of heavy metals tested would mislead consumers into underestimating the presence and/or risk of heavy metals in Defendants' Contaminated Dog Foods.  Defendants' White Paper deceives consumers because Defendants reported inaccurate heavy metal levels that are unsupported by the underlying data.  Defendants substantially underreported heavy metal averages by over 25% for some heavy metals in order to deceive consumers and misrepresent the actual amount of heavy metals in Defendants' products.

**Answer:**          Champion denies the allegations in Paragraph 52 of the TAC.

53.     Through Defendants' deceptive White Paper and the lack of heavy metal disclosure on their packaging, Defendants mislead consumers about the quality of their Contaminated Dog Foods.  Defendants continue to refuse to disclose heavy metal testing details because Defendants know or should know that consumers would be upset about Defendants' actual heavy metal levels, inadequate heavy metal testing practices, and sub-premium heavy metal standards.

**Answer:**          Champion denies the allegations in Paragraph 53 of the TAC.

**B.      Pentobarbital**

54.     Pentobarbital is a Class II controlled substance, and there is no safe or set level for it in pet food.  If pentobarbital is present, the food is adulterated.  The ingestion of pentobarbital

by a pet can lead to adverse health issues, including: tyalism (salivation); emesis (vomiting); stool changes (soft to liquid stools, blood, mucus, urgency, explosive nature, etc.); hyporexia (decreased appetite); lethargy/depression; neurologic abnormalities (tremor, seizure, vocalization, unusual eye movements); ataxia (difficulty walking); collapse; coma; and death.

> **Answer:**     Champion states that the allegations in Paragraph 54 of the TAC are a conclusion of law and no response thereto is required. To the extent a response is required, Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 54 of the TAC and therefore denies them.

55.     Despite laws governing pet foods and providing government oversight, "[p]et food manufacturers are responsible for taking appropriate steps to ensure that the food they produce is safe for consumption and properly labeled" including "verify[ing] the identity and safety of the ingredients they receive from suppliers."

> **Answer:**     Champion states that the allegations in Paragraph 55 of the TAC are a conclusion of law and no response thereto is required. To the extent a response is required, Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 55 of the TAC and therefore denies them.

56.     "It is not acceptable to use animals euthanized with a chemical substance in pet or other animal foods.... The detection of pentobarbital in pet food renders the product adulterated. It is the responsibility of the manufacturer to take the appropriate steps to ensure that the food they produce is safe for consumption and properly labeled."

> **Answer:**     Champion states that the allegations in Paragraph 56 of the TAC are a conclusion of law and no response thereto is required. To the extent a response is required,

Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 56 of the TAC and therefore denies them.

57.     Pentobarbital residue from euthanized animals will still be present in pet food, even if it is rendered or canned at a high temperature or pressure.

   **Answer:**     Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 57 of the TAC and therefore denies them.

58.     Pentobarbital is routinely used to euthanize animals, and the most likely way it could get into pet food is through rendered animal products.  Rendered products come from a process that converts animal tissues to feed ingredients, which may include animals that were euthanized, decomposed, or diseased.

   **Answer:**     Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 58 of the TAC and therefore denies them.

59.     Historically, the FDA has not aggressively taken action under section 342(a)(1) or (5) of the Food, Drug, and Cosmetics Act, 21 U.S.C. §301, *et seq*. ("FDCA"), against the pet food companies that it has found to have used non-slaughtered animals and sold pet food containing pentobarbital.  Therefore, manufacturers in the pet food industry, including Defendants, have continued their illegal practice of using non-slaughtered animals that may contain poisonous substances, like pentobarbital, in their pet foods.

   **Answer:**     Champion lacks knowledge or information sufficient to form a belief as to the allegations relating to the actions of other pet food manufacturers and therefore denies the allegations related thereto. Champion denies the remaining allegations in Paragraph 59 of the TAC.

60.     Defendants do not test their ingredients or finished products for pentobarbital and knowingly utilized a supplier to make ingredients that had an inherent risk of accepting raw materials that would include deads, thereby creating a risk for inclusion of pentobarbital in supplied ingredients to Defendants.  And this is exactly what occurred.

**Answer:**     Champion denies the allegations in Paragraph 60 of the TAC.

61.     On May 8, 2018, Defendants were notified they were sold beef tallow contaminated with pentobarbital by MOPAC.  The shipments of adulterated beef tallow were delivered by MOPAC and JBS to Defendants' DogStar Kitchens and used to manufacture thousands of pounds of Defendants' Contaminated Dog Foods.

**Answer:**     Champion denies the allegations in Paragraph 61 of the TAC.

62.     Indeed, Defendants' own actions show its negligence and misconduct and also that pentobarbital is a known risk that could have (and should have) been avoided.

**Answer:**     Champion denies the allegations in Paragraph 62 of the TAC.

63.     First, Defendants reacted to the news by seeking to avoid further liability by quarantining all unused tallow and meal supplied by MPOAC.  Defendants have admitted that it is not legal to use any ingredient that contained pentobarbital, and that is the basis for the decision to quarantine all unused tallow and meal.  Yet, Defendants did not follow the same precautions concerning the 1.7 million pounds of kibble made with the contaminated tallow and instead chose to leave the kibble that was currently on the shelves of retailers (approximately 100,000 pounds). Defendants did recall the kibble that was sitting at distributors and in house at their DogStar Kitchens so it would not be sold in commerce.  This decision to not recall, call back, or even notify consumers of the kibble that was made with contaminated tallow was justified as to avoid "panic in the marketplace."   In the end, Defendants knowingly and intentionally allowed the sale of

Contaminated Dog Foods made from the contaminated tallow (that was not legal to use) to consumers in order to save Defendants' reputation and trust with Pet Lovers. To date, Defendants have yet to disclose to consumers that they chose to not to pull back the approximately 100,000 pounds of kibble or that they in fact sold kibble that utilized the pentobarbital contaminated ingredient from one of their "trusted suppliers."

**Answer:** Champion denies the allegations in Paragraph 63 of the TAC.

64.     Second, Defendants' interactions and communications with the FDA and MOPAC after the pentobarbital revelation show the negligence and/or recklessness in preventing the risk and/or actual presence of pentobarbital in their ingredients supplied by MOPAC. Defendants admitted to the FDA that Defendants' failure to obtain a written agreement or contract requiring MOPAC to identify the source of the beef tallow was an oversight that would be corrected. Instead, Defendants only operated from purchase order to purchase order with MOPAC. At or around the same time and in connection with an on-going investigation, MOPAC received a request from the Pennsylvania Department of Agriculture for the date it stopped accepting dead horses for processing yet Defendants did not have internal knowledge that MOPAC accepted dead horses.

**Answer:** Champion denies the allegations in Paragraph 64 of the TAC.

65.     Additionally, Defendants did not report the incident to the FDA's Reportable Food Registry as requested by the FDA. Moreover, Defendants did not test samples of tallow or meal supplied to Defendants by MOPAC in 2017 or earlier, nor did they demand MOPAC test or retain samples of previously supplied tallow or meal to Defendants. Indeed, Defendants chose to turn a blind eye to its duty to investigate and determine the full extent of the pentobarbital contamination in the ingredients delivered by MOPAC, including any earlier shipments of tallow or meal and

whether any actual change occurred in the manufacturing of the tallow or meal that would have created an isolated issue for pentobarbital in the ingredients supplied by MOPAC in early 2018.

**<u>Answer:</u>** Champion denies the allegations in Paragraph 65 of the TAC.

66. Defendants did, however, look to ensure they were protected and also reimbursed for the kibble and contaminated tallow and meal by suing MOPAC for over three million dollars and requesting punitive damages. In this lawsuit, Defendants admit that "the exposure risk of the kibble was determined to be 0.093 ug/kg-bw/day." Defendants further admit the presence of pentobarbital in the tallow "substantially impair[s]" the value of the tallow and that they would not utilize the tallow as it was a nonconforming good.

**<u>Answer:</u>** Champion admits it filed a lawsuit against MOPAC in state court in Kentucky, and that the statement "the exposure risk of the kibble was determined to be 0.093 ug/kg-bw/day" appears in the allegations in the complaint. Champion denies all remaining allegations in Paragraph 66 of the TAC.

67. Third, Defendants knew or should have known that the risk and/or presence of pentobarbital in ingredients supplied by MOPAC was always there since MOPAC first started supplying ingredients in 2016.

● One, MOPAC uses suppliers that are street renderers that pick up deads from places like farms. [REDACTED] This information could have easily been confirmed by Defendants if they had required reviewing a list of all suppliers used at MOPAC.

● Two, Defendants did not inspect the related slaughterhouse that would be supplying the raw materials for the ingredients utilized to make the tallow and meal supplied to Defendants, nor did Defendants perform adequate audits and/or follow-up on the one physical audit actually performed by Defendants. In fact, Defendants' Director

of Certification and Compliance, who performs the audits, admitted in May 2018

that following up on any required corrective actions was a weak point for him. This

is especially telling here, where the one physical audit performed on MOPAC just

months before the pentobarbital revelation indicated that there was excessive

buildup on the machines from other products.

- [REDACTED] Defendants did not mandate any type of DNA or pentobarbital

   testing [REDACTED]    Importantly, Defendants [REDACTED]

**Answer:**        Champion denies the allegations in Paragraph 67 of the TAC, including all

allegations filed under seal by Plaintiff.

68.    Finally, the recent FDA findings concerning MOPAC show that the pentobarbital

contamination was not an isolated incident and was an on-going issue based on the lack of proper

manufacturing oversight and practices to ensure no euthanized animals or pentobarbital

contaminated materials were entering MOPAC's plant. On April 23, 2019, the FDA issued a

warning letter to MOPAC in which it stated that even the new requirements and quality control

measures were not sufficient to prevent pentobarbital contaminated ingredients:

> Specifically, our investigation found that you failed to identify and exclude raw
> materials and ingredients containing pentobarbital. For example, your firm did not conduct
> testing on raw materials other than grease. In March, during the investigation, you
> indicated you implemented several changes to attempt to gain more information about your
> suppliers and control over your incoming ingredients. These actions included refusing to
> receive equine ingredients, having your suppliers complete a questionnaire about their food
> safety practices, having suppliers sign guarantees that they do not pick up euthanized
> animals, and excluding suppliers that could not meet these new requirements....

> However, a sample collected by FDA in August 2018 from a tank that was filled
> after ...  corrective actions were taken was found to be contaminated with trace levels of
> pentobarbital. This indicates that the changes you have made to your examination of raw
> materials and other ingredients from your suppliers may not be sufficient to prevent
> pentobarbital contaminated ingredients, such as those potentially sourced from euthanized
> animals, from entering your facility and contaminating your finished tallow product.

**Answer:** Champion denies the allegations in the first sentence of Paragraph 68 of the TAC. Champion lacks knowledge or information sufficient to form a belief concerning the remaining allegations in Paragraph 68 of the TAC and therefore denies them.

69. Defendants also failed to properly monitor and/or investigate the JBS related slaughterhouse that supplied the raw materials for the tallow and meal. Indeed, Defendants did not require a new supplier even after the slaughterhouse was shut down by the U.S. Department of Agriculture ("USDA") for over a week due to pests in November 2017 (less than six months from the manufacturing of the contaminated tallow and meal). This is especially telling as Defendants repeatedly tout the quality of their ingredients and that they only use trusted suppliers; yet this supplier was only utilized by one other pet food manufacturer who makes dog food sold at 99 cents, not $90 a bag or more.

**Answer:** Champion denies the allegations in Paragraph 69 of the TAC.

70. Defendants' actions and non-disclosures are material, false, misleading, and reasonably likely to deceive the public. This is true especially in light of the long-standing campaign by Defendants to market the Contaminated Dog Foods as superior quality, natural, healthy, and safe to induce consumers, such as Plaintiff, to purchase the products. Defendants' advertising campaign is deceptive based on the presence and/or risk of presence of pentobarbital and also the risk that beef-based products are made with ingredients containing euthanized meat (including possibly from horse or other companion animals). Reasonable consumers, like Plaintiff and other members of the Class, would consider the mere risk of pentobarbital or the risk that the products, including the Contaminated Dog Foods, are made with ingredients containing euthanized meat (including possibly from horse or other companion animals) as a material fact in considering what pet food to purchase. Defendants' statements, representations, partial disclosures, and

omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are superior quality, healthy, safe, and are not at any risk of inclusion of pentobarbital. Moreover, Defendants knew or should have reasonably expected that the presence of a toxin such as pentobarbital in their Contaminated Dog Foods is something an average consumer would consider in purchasing dog food. Defendants' representations and omissions are false, misleading, and reasonably likely to deceive the public. Indeed, Defendants chose to not implement changes that would require suppliers to test for pentobarbital in any delivered meal or tallow.

  **Answer:**  Champion denies the allegations in Paragraph 70 of the TAC.

  71.  Moreover, a reasonable consumer, such as Plaintiff and other members of the Class would have no reason to not believe and/or anticipate that the Contaminated Dog Foods are "Biologically Appropriate" foods that use "Fresh Regional Ingredients" consisting only of meat, poultry, fish, and vegetables. Non-disclosure and/or concealment of the inclusion (or risk thereof) of the toxin pentobarbital in the Contaminated Dog Foods coupled with the misrepresentations alleged herein by Defendants suggesting that the food provides complete health and is safe is intended to and does, in fact, cause consumers to purchase a product Plaintiff and members of the Class would not have bought if the true quality of the ingredients were disclosed. As a result of these false or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Dog Foods.

  **Answer:**  Champion denies the allegations in Paragraph 71 of the TAC.

  **C.**  **BPA**

  72.  The dangers of BPA in human food are recognized by the FDA, along with various states. For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers

with intentionally added BPA. Moreover, many companies are using "BPA free" packaging or offering "BPA free" products.

> **Answer:** Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 72 of the TAC and therefore denies them.

73. Despite these known dangers, Defendants do not consistently test their ingredients, packaging, or finished products for BPA.

> **Answer:** Champion denies the allegations in Paragraph 73 of the TAC.

74. Certain Contaminated Dog Foods are sold by Defendants that contain levels of BPA—an industrial chemical that "is an endocrine disruptor. It's an industrial chemical that according to Medical News Today '... interferes with the production, secretion, transport, action, function and elimination of natural hormones.'" BPA has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems.

> **Answer:** Champion denies the allegations in Paragraph 74 of the TAC. Champion denies any implication that its products are toxic or result in poisoning.

75. Moreover, Defendants utilized meals and tallow in the Contaminated Dog Foods and it has been recognized that "[a]lmost all tallow contains PE [polyethylene] to some degree. PE is a foreign material in tallow. It finds its way into the rendering plant as meat wrappers mixed in with the raw material. Most of the polyethylene wrappers used by the meat industry are of low density type that will melt at lower temperatures and stay soluble in the tallow."

> **Answer:** Champion denies the allegations in Paragraph 75 of the TAC.

76. Defendants negligently or recklessly do not monitor for the levels and inclusion of BPA in their Contaminated Dog Foods. Defendants also do not require that the packaging suppliers certify that the packaging is BPA free.

32

**Answer:** Champion denies the allegations in Paragraph 76 of the TAC.

77. Despite the presence of these unnatural and potentially harmful chemicals, Defendants prominently warrant, claim, feature, represent, advertise, or otherwise market the Contaminated Dog Foods as made from "Biologically Appropriate™" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables. Indeed, each bag prominently displays the percentage of these ingredients on the front.

**Answer:** Champion admits that the expressions "Biologically Appropriate" and "Fresh Regional Ingredients" have appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 77 of the TAC.

### D. THE MISREPRESENTATIONS AND FALSE & MISLEADING ADVERTISING

78. Defendants made numerous misleading statements and misrepresentations on their labeling, packaging, and advertising about the superior quality, fresh and regional ingredients, and the nutritional, natural, and healthy attributes of the Contaminated Dog Foods. These statements standing alone are misleading to a reasonable consumer and also when reviewed in the entirety of the labeling and packaging. Below are each of the individual statements Plaintiff challenges.

**Answer:** Champion denies the allegations in Paragraph 78 of the TAC.

79. "**Trusted Regional Ingredients**," "**Trusted By Pet Lovers Everywhere**," "**Ingredients We Love**," and "**People We Trust**." Defendants' repeated use of the word "trust" reinforces in the minds of consumers the perception that they can rely on Defendants to deliver an ultra-premium and high quality product utilizing trusted suppliers and ingredients. In actuality, these factual representations are misleading in light of the true ingredients, sourcing, testing, and quality of the Contaminated Pet Foods. Based on these representations, reasonable consumer, like Plaintiff and other members of the Class, would not understand that the Contaminated Dog Foods

contained (or had a risk of containing) heavy metals, toxins, pentobarbital, BPA, or non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packages, advertising, and statements.

**Answer:** Champion admits that the statements "Trusted Regional Ingredients," "Trusted by Pet Lovers Everywhere," "Ingredients We Love," and "People We Trust" have appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 79 of the TAC.

80. Defendants know or should know that claiming to be "Trusted by Pet Lovers Everywhere," claiming to use "Trusted Regional Ingredients," and claiming to use "Ingredients We Love" from "People We Trust" is misleading because Defendants lack sufficient quality control measures with regards to ingredient suppliers in order to substantiate such claims.

**Answer:** Champion denies the allegations in Paragraph 80 of the TAC.

81. Moreover, Defendants' claim regarding being "Trusted by Pet Lovers" and using ingredients from "People We Trust" is further misleading given that Defendants' packaging omits the fact that their products contain and/or have a risk of containing heavy metals, BPA and pentobarbital, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels packaging, advertising, and statements.

**Answer:** Champion denies the allegations in Paragraph 81 of the TAC.

82. Defendants know or should know that their claim of being "Trusted by Pet Lovers" and that their ingredient suppliers are "People we Trust" is misleading because Defendants do not require ingredient suppliers to test for contaminants like heavy metals, BPA, or pentobarbital.

**Answer:** Champion denies the allegations in Paragraph 82 of the TAC.

83. Defendants know or should know that their claim of being "Trusted by Pet Lovers" and that their ingredient suppliers are "People we Trust" is also misleading because Defendants fail to independently test and confirm that their ingredients are free of contaminants like heavy metals, BPA, and pentobarbital.

**Answer:**     Champion denies the allegations in Paragraph 83 of the TAC.

84. Additionally, Defendants know or should know that their claim of having "Trusted Regional Ingredients" is misleading because Defendants' ingredient supplier auditing practices are inadequate and quality control practices are not sufficiently validated during ingredient supplier audits to ensure compliance with Defendants' ingredient specifications.

**Answer:**     Champion denies the allegations in Paragraph 84 of the TAC.

85. Defendants know or should know that consumers are further misled by their claim to use "trusted" ingredient suppliers because Defendants do not audit or visit all raw material suppliers and ingredient suppliers, including some foreign ingredient suppliers.

**Answer:**     Champion denies the allegations in Paragraph 85 of the TAC.

86. Defendants know or should know that they are deceiving consumers over their ingredients being "trusted regional ingredients" because Defendants regularly purchase and use ingredients sourced from non-regional ingredient suppliers.

**Answer:**     Champion denies the allegations in Paragraph 86 of the TAC.

87. Defendants know or should know that they are misleading consumers about the quality of their "trusted ingredients" because Defendants do not require a limitation of heavy metal levels for their ingredients.

**Answer:**     Champion denies the allegations in Paragraph 87 of the TAC.

88.     Defendants know or should know that they are misleading consumers about the quality of their "trusted ingredients" because Defendants do not conduct or outsource any validation testing to ensure that ingredient suppliers are providing ingredients without detectable levels of pentobarbital or ingredients and/or packaging that is free of BPA.

**Answer:**     Champion denies the allegations in Paragraph 88 of the TAC.

89.     Defendants are further misleading consumers about "trusting" their ingredient suppliers because Defendants refused to recall Contaminated Dog Food that used ingredients contaminated with pentobarbital.   Defendants are misleading consumers even more so by discontinuing their business relationship with ingredient suppliers that showed a lack of trust over failing to disclose pentobarbital contamination when Defendants themselves refused to disclose that a pentobarbital contaminated ingredient was used in Contaminated Dog Foods that were eventually sold in retail markets.

**Answer:**     Champion denies the allegations in Paragraph 89 of the TAC.

90.     Defendants have gone above and beyond to create the perception of a reliable and trusted brand, despite lacking any sort of accountability as to their product claims.

**Answer:**     Champion denies the allegations in Paragraph 90 of the TAC.

91.     "**Biologically Appropriate™**."   This often repeated nutritional statement by Defendants, which is also their stated "mission," is misleading and also requires additional disclosures as to the true ingredients and quality of the Contaminated Pet Foods.  A reasonable consumer, like Plaintiff and other members of the Class, would not understand the Contaminated Dog Foods contained (or had a risk or probability of containing) heavy metals, toxins, pentobarbital, euthanized animals, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.

**Answer:** Champion admits that the statement "Biologically Appropriate" has appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 91 of the TAC.

92. "**Fresh Regional Ingredients**" and "**Delivered daily**." These factual representations as to the sourcing, superior quality, and healthiness of the Contaminated Dog Foods by Defendants is misleading and also requires additional disclosures as to the true ingredients, sourcing, testing, and quality of the Contaminated Pet Foods. A reasonable consumer, like Plaintiff and other members of the Class, would not understand that the Contaminated Dog Foods were made from imported, frozen, stored, expired, regrind kibble, adulterated, and/or heavy metal, BPA, or toxins filled ingredients or that the ingredients were only delivered daily and not immediately utilized. Moreover, a reasonable consumer, like Plaintiff and other members of the Class, would not expect that inferior suppliers, including rendering facilities, were utilized and in fact manufactured the tallow and meal included in the Contaminated Dog Foods.

**Answer:** Champion admits that the statements "Fresh Regional Ingredients" and "Delivered daily" have appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 92 of the TAC.

93. "**Never Outsourced**." This factual representation as to superior quality and ingredients by Defendants is misleading and also requires additional disclosures as to the true ingredients, sourcing, testing, and quality of the Contaminated Pet Foods. Reasonable consumers, like Plaintiff and other members of the Class, would not understand that the Contaminated Dog Foods included ingredients like meals and tallow that were not manufactured in Defendants' DogStar Kitchens.

**Answer:** Champion admits that the statement "Never Outsourced" has appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 93 of the TAC.

94. "**Nourish as Nature Intended**." This factual representation as to the superior quality, natural characteristics, and healthiness by Defendants is misleading and also requires additional disclosures as to the true ingredients, sourcing, testing, and quality of the Contaminated Pet Foods. Reasonable consumers, like Plaintiff and other members of the Class, would not understand that the Contaminated Dog Foods included BPA, pentobarbital, and other unnatural ingredients that do not conform to the labels, packaging, advertising, and statements.

**Answer:** Champion admits that the statement "Nourish as Nature Intended" has appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 94 of the TAC.

95. "**Delivering Nutrients Naturally**" and "**Made with Fresh and Natural Ingredients**." These factual representations as to the superior quality, natural characteristics, and healthiness by Defendants is misleading and also requires additional disclosures as to the true ingredients, sourcing, testing, and quality of the Contaminated Pet Foods. Reasonable consumers, like Plaintiff and other members of the Class, would not understand that the Contaminated Dog Foods included and/or had a risk of inclusion of BPA, pentobarbital, and other unnatural ingredients that do not conform to the labels, packaging, advertising, and statements.

**Answer:** Champion admits that the statement "Delivering Nutrients Naturally" has appeared at times on some of Champion's product packaging. Champion denies the remaining allegations in Paragraph 95 of the TAC.

96.     Meals are made from "**ingredients deemed fit for human consumption**." This factual representation as to the superior quality, natural characteristics, and healthiness by Defendants is misleading and also requires additional disclosures as to the true ingredients, sourcing, testing, and quality of the Contaminated Pet Foods. Reasonable consumers, like Plaintiff and other members of the Class, would not understand that the Contaminated Dog Foods were made from ingredients that had a risk of containing or did in fact contain BPA, pentobarbital, and/or had potential for a cross-contamination with euthanized meat. Moreover, MOPAC is not certified by the European Union for rendering ingredients, including meal and tallow supplied to Defendants.

**Answer:**     Champion denies the allegations in Paragraph 96 of the TAC.

## III.    DEFENDANTS FALSELY ADVERTISE THE CONTAMINATED DOG FOODS

97.     Defendants formulate, develop, manufacture, label, package, distribute, market, advertise, and sell their extensive Acana and Orijen lines of dry and freeze-dried pet food products across the United States, including the Contaminated Dog Foods.

**Answer:**     Champion admits that that it sells ORIJEN and ACANA dog food products to distributors throughout the United States. Champion denies the remaining allegations in Paragraph 97 of the TAC.

98.     Defendants tout themselves as "a leader and innovator in making pet foods, Champion works to our own standards. These are our standards, not USDA, not FDA, not [the Canadian Food Inspection Agency]. These agencies set minimum standards which we exceed exponentially. Why? Because our Mission and our Values dictate that we do, and that's what pet lovers expect from us."

**Answer:** Champion lacks knowledge or information sufficient to form a belief concerning the allegations in Paragraph 98 of the TAC as Plaintiff does not identify where this statement comes from and therefore Champion denies the allegations.

99. In 2016, Defendants opened DogStar Kitchens, a 371,100 square foot production facility on 85 acres of land outside Bowling Green, Kentucky. This facility has the capacity to produce up to 220 million pounds of Acana and Orijen pet food per year. Defendants' Chief Executive Officer ("CEO"), Frank Burdzy, said, "The US is our fastest growing market." Prior to this facility's construction, Defendants' Acana and Orijen products were exclusively manufactured in Canada. Since that facility began production, all Acana and Orijen foods sold in the United States are manufactured at the DogStar Kitchens facility.

**Answer:** Champion denies the allegation that all ACANA and ORIJEN foods sold in the United States are manufactured at the DogStar Kitchen facility since its opening. Champion admits the remaining allegations in Paragraph 99 of the TAC.

100. Defendants have represented a commitment to using fresh and local ingredients, including wild-caught fish.

**Answer:** Champion denies the allegations in Paragraph 100 of the TAC.

101. Defendants have represented that their DogStar Kitchens meet the European Union's standard for pet food: "USA Dogstar® kitchens, ingredients, processes, and foods all meet the strictest European Union standards—which are stricter than those set by [the Association of American Feed Control Officials], the [Canadian Food Inspection Agency] or FDA. Likewise, Defendants proclaim that Orijen is "[u]nmatched by any other pet food maker anywhere, our kitchens meet the strictest standards in the world, including the Government of Canada, and the

European Union." Indeed, Defendants' own CEO has stated that "[e]ven if we're selling in Canada or the U.S. or Asia, we manufacture to the [European Union] standard."

> **Answer:** Champion admits that on its websites it has stated that its DogStar Kitchens meet certain European Union standards in connection with pet food processing. Champion lacks knowledge or information sufficient to form a belief concerning the remaining allegations in Paragraph 101 of the TAC as Plaintiffs do not identify where this statement comes from and therefore Champion denies the remaining allegations in Paragraph 101 of the TAC.

102. However, contrary to Defendants' assertion, they do not meet the European Union standards for pet foods.

> **Answer:** Champion denies the allegations in Paragraph 102 of the TAC.

103. The European Parliament and the Council of the European Union state that "[p]roducts intended for animal feed must be sound, genuine and of merchantable quality and therefore when correctly used must not represent any danger to human health, animal health or to the environment or adversely affect livestock production." The European Parliament and the Council of the European Union provide maximum levels for undesirable substances in animal feed, such as lead, arsenic, mercury, and cadmium, and make clear that products that contain undesirable substances that exceed the specified maximum levels will be prohibited. In relevant part, subject to certain exceptions, arsenic must not exceed 2 parts per million (or 2000 ppb). Yet, the testing results contained herein show that certain of Defendants' products have exceeded the European Union's maximum level for arsenic in animal feed.

> **Answer:** Champion admits that the European Union provides regulations regarding maximum levels for undesirable substances in animal feed, such as lead, arsenic, mercury,

and cadmium. Champion states that the allegations in Paragraph 103 of the TAC are a conclusion of law and no response thereto is required, but to the extent a response is required, Champion denies the allegations.

104. Defendants' representation that the ingredients are fit for human consumption are likewise misleading under the European Union standards.

**Answer:** Champion denies the allegations in Paragraph 104 of the TAC.

105. Defendants warrant, claim, state, represent, advertise, label, and market their Contaminated Dog Foods as:

(a)    "Biologically Appropriate™";

(b)    "Fresh Regional Ingredients" and "Delivered daily";

(c)    "Trusted Everywhere"

(d)    "People We Trust";

(e)    "Ingredients We Love from People We Know and Trust";

(f)    "Never Outsourced";

(g)    "Nourish[ing] as Nature Intended";

(h)    "Delivering Nutrients Naturally";

(i)    "Made with Fresh and Natural Ingredients";

(j)    "Premium Meat and Fish Ingredients"; and

(k)    "Ingredients deemed fit for human consumption."

**Answer:** Champion denies the allegations in Paragraph 105 of the TAC.

106. Defendants therefore had a duty to ensure that these statements were true. As such, Defendants knew or should have known that the Contaminated Dog Foods included the presence of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or

unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.

**Answer:**    Champion denies the allegations in Paragraph 106 of the TAC.

107.    Likewise, by declaring, claiming, stating, featuring, representing, advertising, or otherwise marketing that Orijen and Acana foods, including the Contaminated Dog Foods, are:

(a)    "Biologically Appropriate™";

(b)    "Fresh Regional Ingredients" and "Delivered daily";

(c)    "Trusted Everywhere";

(d)    "People We Trust";

(e)    "Ingredients We Love from People We Know and Trust";

(f)    "Never Outsourced";

(g)    "Nourish[ing] as Nature Intended";

(h)    "Delivering Nutrients Naturally";

(i)    "Made with Fresh and Natural Ingredients";

(j)    "Premium Meat and Fish Ingredients"; and

(k)    "Ingredients deemed fit for human consumption."

Defendants had a duty to ensure that there were no chemicals included in the Contaminated Dog Foods.  In fact, Defendants offered further assurances by representing the quality control over the manufacturing of the Contaminated Dog Foods as a rigid process free of outsourcing.

**Answer:**    Champion denies the allegations in Paragraph 107 of the TAC.

108.    Defendants specifically promise on their website, "[W]e prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation—from where our ingredients come from, to every cooking, quality and food safety process."   Similarly,

43

Defendants promise that their "Dogstar® Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients." Finally, Defendants promise "[s]tandards that rival the human food processing industry for authenticity, nutritional integrity, and food safety." According to the Orijen and Acana websites, Defendants "feature state-of-the-art fresh food processing technologies." As such, Defendants knew or should have known that higher temperatures coupled with the type of containers used in manufacturing create a real risk of BPA in their products.

> **Answer:** Champion admits that the statement "[W]e prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation—from where our ingredients come from, to every cooking, quality and food safety process" has appeared on ACANA's website from time to time. Champion admits that the statement "Dogstar® Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients" has appeared on ORIJEN's website from time to time. Champion admits that the statement "feature state-of-the-art fresh food processing technologies" has appeared on both ACANA's and ORIJEN's websites from time to time. Champion denies the remaining allegations in Paragraph 108 of the TAC.

109.    In promoting their promises, warranties, claims, representations, advertisements, or otherwise marketing that the Contaminated Dog Foods are superior quality, healthy, never outsourced and made with fresh, regional ingredients, Defendants provide further assurances to their customers:

> Equipped with state-of-the-art fresh food processing technologies, our DogStar® kitchens feature 25,000 square feet of cooler space, capable of holding over 500,000 pounds of fresh *local meats, fish and poultry, plus fresh* whole local fruits and vegetables.

Unmatched by any pet food maker, our ingredients are deemed fit for human consumption when they arrive at our kitchens fresh, bursting with goodness, and typically within 48 hours from when they were harvested.

**Answer:**       Champion admits that the statement "Equipped with state-of-the-art fresh food processing technologies, our DogStar® kitchens feature 25,000 square feet of cooler space, capable of holding over 500,000 pounds of fresh local meats, fish and poultry, plus fresh whole local fruits and vegetables" has appeared on ACANA's website from time to time. Champion denies the remaining allegations in Paragraph 109 of the TAC.

110.    To this end, Defendants' websites further warrant, claim, feature, represent, advertise, or otherwise market that the Contaminated Dog Foods are manufactured in such a way that would prevent BPA forming by closely monitoring temperatures and quality:

- "[O]ur unique Votator Heat Exchangers bring chilled fresh ingredients to room temperature without introducing water or steam, which enables us to add even more fresh meats into our foods."

- "Referred to as 'the most significant preconditioning development for extrusion cooking in the last 20 years,' our High Intensity Preconditioners were custom-built for DogStar®, feeding fresh meats from the Votators to Extruders at rates previously unheard of, and without high temperatures."

- "At the heart of our kitchens is a twin thermal extruder which is fed fresh ingredients from our High Intensity Preconditioner.

  The first of its kind in North America, it took 11 months to build, and features custom steam injection to enable very high fresh meat inclusions and a gentle cooking process which helps further reduce the carbohydrates in our foods and preserves their natural goodness."

**Answer:**       Champion admits that the bulleted quotes appeared on ACANA's website from time to time. Champion denies the remaining allegations in Paragraph 110 of the TAC.

111.    Thus, Defendants engaged in deceptive advertising and labeling practice by expressly warranting, claiming, stating, featuring, representing, advertising, or otherwise marketing on Acana and Orijen labels and related websites that the Contaminated Dog Foods are natural, fit for human consumption, fit for canine consumption, in compliance with relevant European Union regulations and standards, and made from "Biologically Appropriate™" and "Fresh Regional Ingredients" when they contain the non-naturally occurring chemicals of pentobarbital and BPA.

**Answer:**    Champion denies the allegations in Paragraph 111 of the TAC.

112.    Based on these false representations, Defendants charge a premium, knowing that the claimed superior quality, healthy, nutritious, and natural make-up of the Contaminated Dog Foods (as well as all of the other alleged false and/or misleading representations concerning fresh and regional ingredients) are factors an average consumer would consider in picking a more expensive dog food.  By negligently and/or deceptively representing, marketing, and advertising the Contaminated Dog Foods as natural, fit for human consumption, fit for canine consumption, in compliance with relevant European Union regulations and standards, and made from "Biologically Appropriate™" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables, Defendants wrongfully capitalized on, and reaped enormous profits from, consumers' strong preference for natural pet food products.  Moreover, Defendants were improperly selling adulterated dog food that should not have been on the shelves at all as any level of pentobarbital is not acceptable in pet food.

**Answer:**    Champion denies the allegations in Paragraph 112 of the TAC.

113.    Additionally, Defendants knew or should have known that their ingredients, and thus final products, could contain materials such as heavy metals, pentobarbital, toxins, BPA, non-

regional and non-fresh, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements yet they did not test all ingredients and finished products, including the Contaminated Dog Foods, for such materials.

> **Answer:**   Champion denies the allegations in Paragraph 113 of the TAC.

114.   The Contaminated Dog Foods are available at numerous retail and online outlets in the United States, including Wisconsin.

> **Answer:**   Champion denies the allegations in Paragraph 114 of the TAC.

115.   The Contaminated Dog Foods are widely advertised, and Defendants employ a Chief Marketing Officer, a Vice President for Customer Engagement, and a Director of Marketing in both the United States and Canada.

> **Answer:**   Champion admits from time to time it has employed a Chief Marketing Officer, a Vice President for Customer Engagement, and a Director of Marketing. Champion denies the remaining allegations in Paragraph 115 of the TAC.

116.   The official websites for Acana and Orijen display the Contaminated Dog Foods, descriptions and full lists of ingredients for the Contaminated Dog Foods and includes the following promises:

> **Answer:**   Champion admits that the websites for ACANA and ORIJEN generally display the diets for each brand, the list of ingredients for each diet, and the images below Paragraph 116 of the TAC, but they vary over time. Champion denies the remaining allegations in Paragraph 116 of the TAC.

117.   Defendants' websites repeat the false and misleading claims, representations, advertisements, and other marketing about the Contaminated Dog Foods' benefits, quality, purity, and natural make-up, without any mention of the heavy metals, pentobarbital, toxins, BPA,

non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements they contain. This is not surprising given that natural pet food sales represent over $5.5 billion in the United States and have consistently risen over the years.

> **Answer:** Champion lacks knowledge sufficient to form a belief concerning the accuracy of the image below Paragraph 117 of the TAC and therefore denies any allegation related thereto. Champion denies the remaining allegations in Paragraph 117 of the TAC.

118. Moreover, Defendants have themselves acknowledged the importance of quality dog food to the reasonable consumer:

> According to Frank Burdzy, President and Chief Executive Officer of Champion Petfoods, "Our No. 1 mandate is BAFRINO—biologically appropriate, fresh regional ingredients, never outsourced." Burdzy continued, "We build relationships with our suppliers and farms and fisheries. We are trusted by pet owners.

> **Answer:** Champion admits that Frank Burdzy made the statements attributed to him in Paragraph 118 of the TAC. Champion denies the remaining allegations in Paragraph 118 of the TAC.

119. As a result of Defendants' omissions, a reasonable consumer would have no reason to suspect the presence of heavy metals, pentobarbital, BPA, non-regional and non-fresh ingredients, and/or unnatural other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Foods without conducting his or her own scientific tests, or reviewing third-party scientific testing of these products.

> **Answer:** Champion denies the allegations in Paragraph 119 of the TAC.

120. However, after conducting third-party scientific testing, it is clear that the Contaminated Dog Foods do in fact contain levels of both heavy metals and/or BPA. Moreover, government agency testing of an ingredient utilized by Defendants in its products—tallow—

showed a positive result for pentobarbital. This same supplier's 2017 and 2018 retained tallow samples tested positive in relation to a recall by another pet food company. This recall ultimately covered the time period of fall 2016 to spring 2018.

> **Answer:** Champion lacks knowledge or information sufficient to form a belief regarding the allegations relating to government agency testing, tallow samples from another pet food company, and a recall from another pet food company, and therefore denies the allegations related thereto. Champion denies the remaining allegations in Paragraph 120 of the TAC.

121. Defendants have wrongfully and misleadingly advertised and sold the Contaminated Dog Foods without any label or warning indicating to consumers that these products contain (or had a high risk or probability of containing) heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements, or that these toxins can over time accumulate in the dog's body to the point where poisoning, injury, and/or disease can occur.

> **Answer:** Champion denies the allegations in Paragraph 121 of the TAC.

122. Defendants' omissions are material, false, misleading, and reasonably likely to deceive the public. This is true especially in light of the long-standing campaign by Defendants to market the Contaminated Dog Foods as healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced to induce consumers, such as Plaintiff, to purchase the products. For instance, Defendants market the Contaminated Dog Foods as "Biologically Appropriate™," using "Fresh Regional Ingredients" "Nourishing as Nature Intended," "Never Outsourced," and made with "ingredients deemed fit for human consumption," all on the products' packaging and on Defendants' websites.

**Answer:** Champion denies the allegations in Paragraph 122 of the TAC.

123. Moreover, Defendants devote significant web and packaging space to the marketing of their DogStar Kitchens, which they tell consumers "are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry."

**Answer:** Champion denies the allegations in Paragraph 123 of the TAC.

124. Defendants state on their website that the Orijen pet foods "feature[] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive." Defendants further promise on the products' packaging and on its website that its Orijen and Acana foods are "guaranteed" to "keep your dog happy, healthy, and strong." Using such descriptions and promises makes Defendants' advertising campaign deceptive based on the presence and/or risk of inclusion of heavy metals, pentobarbital, ingredients cross-contaminated with horse meat, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Foods. Reasonable consumers, like Plaintiff and other members of the Class, would consider the risk and/or mere presence of heavy metals in the Contaminated Dog Foods a material fact in considering what pet food to purchase, including whether to pay a premium price.

**Answer:** Champion admits that the statement "features unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive" appeared on ORIJEN's website from time to time. Champion admits the expression "guaranteed" to "keep your dog happy, healthy, and strong" appeared from time to time on some of ACANA's and ORIJEN's product packaging. Champion denies the remaining allegations in Paragraph 124 of the TAC.

125.     Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Dog Foods are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced and are free of contaminants.  Moreover, Defendants knew or should have reasonably expected that the presence of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, and advertising in their Contaminated Dog Foods is something an average consumer would consider in purchasing dog food.  Defendants' representations and omissions are false, misleading, and reasonably likely to deceive the public.

**Answer:**     Champion denies the allegations in Paragraph 125 of the TAC.

126.     Moreover, reasonable consumers, such as Plaintiff and other members of the Class, would have no reason not to believe and/or anticipate that the Contaminated Dog Foods are "Biologically Appropriate'," made using "Fresh Regional Ingredients," "Nourishing as Nature Intended," "Never Outsourced," and made with "ingredients deemed fit for human consumption." Non-disclosure and/or concealment of the risk and/or actual inclusion of heavy metals, pentobarbital, ingredients cross-contaminated with horse meat, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Foods coupled with the misrepresentations that the food is healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced is intended to and does, in fact, cause consumers to purchase a product Plaintiff and members of the Class would not have bought if the true quality and ingredients were disclosed.  As a result of these false

or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Dog Foods.

**Answer:** Champion denies the allegations in Paragraph 126 of the TAC.

127. The expectations of reasonable consumers and deception of these consumers by Defendants' advertising, misrepresentations, packaging, and labeling is further highlighted by the public reaction to the allegations in this lawsuit, as reported by various websites.

**Answer:** Champion denies the allegations in Paragraph 127 of the TAC.

## IV. IN THE END DEFENDANTS ONLY ACTED TO PROTECT THEMSELVES AND THE FALSE IMAGE THAT GAINED THE TRUST OF THE PET LOVERS

128. Defendants specifically target "Pet Lovers" while championing the Contaminated Dog Foods as ultra-premium kibble that is the highest quality and most nutritious on the market.

**Answer:** Champion denies the allegations in Paragraph 128 of the TAC.

129. However, Defendants have abandoned their duties to Pet Lovers, like Plaintiff and the Class, in order to protect the brand images of Acana and Orijen and prevent the disclosure of the substandard utilized suppliers, ingredients, and quality of the Contaminated Dog Foods.

**Answer:** Champion denies the allegations in Paragraph 129 of the TAC.

130. Moreover, Defendants have taken actions in their own self-interest that are directly in conflict with the "trust" they have asked consumers to place in their companies. For instance, Defendants sued MOPAC for both the delivered meal and tallow, yet they failed to recall or even inform consumers of the 100,000 pounds of kibble manufactured with the contaminated tallow.

**Answer:** Champion denies the allegations in Paragraph 130 of the TAC.

131. Defendants were afforded the choice to use the tallow and meal in making future kibble and seek legal damages, whereas Defendants refused to provide Pet Lovers with that same choice by not disclosing the contamination.

52

**Answer:**     Champion denies the allegations in Paragraph 131 of the TAC.

132.    Indeed, Defendants also sought reimbursement for product that contained plastic, yet refused to disclose the risk of BPA in its finished kibble to Plaintiff and the Class.

**Answer:**     Champion denies the allegations in Paragraph 132 of the TAC.

133.    Thus, Defendants misled consumers into believing they were purchasing ultra-premium kibble that is the highest quality and most nutritious on the market that they could "trust" by taking actions that are contradictory to the claims consumers relied on.

**Answer:**     Champion denies the allegations in Paragraph 133 of the TAC.

## V.     DEFENDANTS' STATEMENTS VIOLATE WISCONSIN LAWS

134.    Wisconsin laws are designed to ensure that a company's claims about its products are truthful and accurate.  Defendants violated these state laws by negligently, recklessly, and/or intentionally incorrectly claiming that the Contaminated Dog Foods are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced and by not accurately detailing that the products contain (or had a high risk or probability of containing) heavy metals, pentobarbital, toxins, imported ingredients, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.  Defendants misrepresented that the Contaminated Dog Foods are natural, fit for human consumption, fit for canine consumption, in compliance with relevant European Union regulations and standards, and made from "Biologically Appropriate™" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables; "Nourish[ing] as Nature Intended;" and "Never Outsourced."

**Answer:**     Champion denies the allegations in Paragraph 134 of the TAC.

135.    Defendants' marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiff to plead reliance upon each advertised misrepresentation.

**Answer:**    Champion denies the allegations in Paragraph 135 of the TAC.

136.    Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that are never outsourced, and do not contain non-regional and non-fresh ingredients or premade meals from a supplier that accepts dead horses and/or ingredients that had levels of (or risks of inclusion of) pentobarbital, BPA, and heavy metals.  Likewise, Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Dog Foods are natural, made with fresh ingredients fit for human consumption, healthy, and superior quality despite the presence of pentobarbital and/or BPA in the food.

**Answer:**    Champion denies the allegations in Paragraph 136 of the TAC.

137.    Finally, when considering the packaging as whole with each of these statements highlighted and often repeated, the whole packaging is misleading and promises to consumers that the Contaminated Dog Foods are superior quality, natural, healthy and regionally sourced.

**Answer:**    Champion denies the allegations in Paragraph 137 of the TAC.

## VI.    PLAINTIFF'S RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANTS

138.    Plaintiff reasonably relied on Defendants' own claims, warranties, representations, advertisements, and other marketing concerning the particular qualities and benefits of the Contaminated Dog Foods.

**Answer:**    Champion denies the allegations in Paragraph 138 of the TAC.

139.    Plaintiff also relied upon Defendants' false and/or misleading representations alleged herein, including the websites and/or the Contaminated Dog Foods' labels and packaging, in making their purchasing decisions.

**Answer:**    Champion denies the allegations in Paragraph 139 of the TAC.

140.    Any reasonable consumer would consider the labeling of a product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase. Here, Plaintiff relied on the certainty of the various specific statements and misrepresentations by Defendants that the Contaminated Dog Foods were natural, fit for human consumption, fit for canine consumption, in compliance with relevant European Union regulations and standards, and made from "Biologically Appropriate™" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables; "feature[ing] unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive"; and were "guaranteed" to "keep your dog happy, healthy, and strong" with no disclosure of the inclusion of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.

**Answer:**    Champion denies the allegations in Paragraph 140 of the TAC.

## VII.   DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS AND THEIR MATERIALITY

141.    Defendants have, and had, exclusive knowledge of the physical and chemical makeup of the Contaminated Dog Foods.  Defendants also had exclusive knowledge of their suppliers, including where the ingredients are sourced, how the ingredients arrive at the DogStar Kitchens, whether the ingredients were stored and how prior to arrival, the quality of received ingredients, and whether any were using rendering facilities that supplied ingredients at risk for containing toxins, heavy metals, and/or pentobarbital.  Defendants also had exclusive knowledge

that the delivered daily ingredients were not used immediately and that expired ingredients were utilized after a simple smell test. Defendants have publicly stated on their website that they require their suppliers to "provide heavy metal and mercury test results, for which we also test our final food products." As such, they have had test results that show the inclusion of heavy metals in the Contaminated Dog Foods.

> **Answer:**    Champion denies the allegations in Paragraph 141 of the TAC.

142. Additionally, Defendants received notice of the contaminants in their dog and cat food, including the Contaminated Dog Foods, through the Clean Label Project, which found higher levels of heavy metals in their dog and cat food products compared to competitors' products. In fact, Defendants actually responded to the Clean Label Project's findings. Defendants spoke with the Clean Label Project by phone regarding its findings and methodology, which showed that Orijen pet foods have high levels of heavy metals compared to other pet foods. The Clean Label Project informed Defendants that it compared Orijen pet foods to competitors' products and gave them a one-star rating, meaning their products contained higher levels of contaminants than other products on the market. Defendants' direct contact with the Clean Label Project demonstrates their knowledge about the Contaminated Dog Foods.

> **Answer:**    Champion admits that the Clean Label Project claims to have tested certain of its dog and cat foods for heavy metals and that Champion exchanged communications with the Clean Label Project. Champion denies all remaining allegations within Paragraph 142 of the TAC.

143. Defendants' white paper, in fact, was issued in defense of the Clean Label Project findings and acknowledges their products contain heavy metals. In that same White Paper,

Defendants stated "[w]e systematically test ORIJEN and ACANA products for heavy metals (arsenic, cadmium, lead and mercury) at two third-party laboratories."

> **Answer:** Champion admits that its White Paper states that Champion's products contain trace amounts of naturally-occurring heavy metals. Champion admits that the quoted statement appears in its White Paper. Champion denies all remaining allegations in Paragraph 143 of the TAC.

144. The White Paper discussed the sources of arsenic, cadmium, lead, and mercury, and what Defendants contend to be acceptable levels of those heavy metals in pet food. The White Paper was based on positive heavy metal testing results retained by Defendants from at least 2016 going forward. These testing results were never disclosed to consumers although Defendants received numerous consumer inquiries regarding heavy metal testing and/or the presence of heavy metals in the Contaminated Dog Foods and its ingredients over the years.

> **Answer:** Champion admits that the White Paper discusses the natural and environmental sources of arsenic, cadmium, lead, and mercury. Champion admits that the White Paper compares test results from ACANA and ORIJEN products to the maximum tolerable limits established by the FDA and National Research Council (NRC) for arsenic, cadmium, lead, and mercury. Champion denies all remaining allegations in Paragraph 144 of the TAC.

145. Defendants did not widely disseminate this White Paper or direct consumers to this White Paper. In fact, the White Paper was circulated to limited individuals with the specific instruction by Defendants that it is should not be widely disseminated. Moreover, Defendants did not change their packaging or labeling to include a disclaimer that the Contaminated Dog Foods contain any levels of the heavy metals or include a copy of the White Paper findings on the

packaging or labeling. Finally, there is no disclosure as to whether the Contaminated Dog Foods tested were manufactured in the United States or Canada.

> **Answer:** Champion denies the allegations in Paragraph 145 of the TAC.

146. Defendants likewise had knowledge of the potential risk and inclusion of pentobarbital and BPA in their Contaminated Dog Foods. Defendants have publicly stated they ask their suppliers if the packaging contains BPA while at the same time admitting that they in fact do not perform any tests to confirm that the Contaminated Dog Foods are BPA-free. Moreover, Defendants no longer boast about "exceeding" regulations when asked if the Contaminated Dog Foods are BPA-free.

> **Answer:** Champion denies the allegations in Paragraph 146 of the TAC.

147. Defendants also misrepresented the sourcing of their ingredients with respect to both the country or place of origin and the presence of, or risk of presence of, pentobarbital.

> **Answer:** Champion denies the allegations in Paragraph 147 of the TAC.

148. Defendants were or should have been aware of a recall by pet food company Evangers because its food contained pentobarbital.

> **Answer:** Champion denies the allegations in Paragraph 148 of the TAC.

## VIII. DEFENDANTS ACTED INTENTIONALLY TO MISLEAD CONSUMERS

149. Defendants acted intentionally to hide the true quality and composition of the Contaminated Dog Foods, including the actual levels of heavy metals, the lack of testing for BPA, the true freshness and source of all ingredients, and the risk of or actual manufacturing of the Contaminated Dog Foods with ingredients tainted with pentobarbital.

> **Answer:** Champion denies the allegations in Paragraph 149 of the TAC.

150. All this was done by Defendants while marketing to Pet Lovers based on "Trust" and with ultra-premium claims to ensure they can charge the high premium price for the Contaminated Dog Foods.

**Answer:** Champion denies the allegations in Paragraph 150 of the TAC.

151. Indeed, Defendants knew consumers cared about the levels of heavy metals, sourcing of ingredients, quality controls, and the quality of the third party suppliers based on consumer questions and surveys. Yet, Defendants chose to deny transparent answers or labels and instead misled and misrepresented the Contaminated Dog Foods in order to make a profit.

**Answer:** Champion denies the allegations in Paragraph 151 of the TAC.

152. In fact, the intention and knowledge of Defendants to mislead Pet Lovers is so entwined in the culture that one of pillars of the Company's "Trusted Everywhere Trail" is "the art of storytelling."

**Answer:** Champion denies the allegations in Paragraph 152 of the TAC.

## CLASS ACTION ALLEGATIONS

153. Plaintiff brings this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who reside in the State of Wisconsin who, from July 1, 2013, to the present (the "Class Period") and purchased the Contaminated Dog Foods in the State of Wisconsin for household or business use, and not for resale (the "Class").

**Answer:** Champion admits that Plaintiff purports to bring this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and (b)(3) on behalf of the putative class defined in Paragraph 153 of the TAC, but denies that any such class could be certified.

154. Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

**Answer:** Champion admits that Plaintiff purports to exclude from the putative class, Champion Petfoods USA Inc. and Champion Petfoods LP, and any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter, but denies that the putative class could ever be certified.

155.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

**Answer:** Champion denies the allegations in Paragraph 155 of the TAC.

156.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class members in a single action will provide substantial benefits to the parties and Court.

**Answer:** Champion denies the allegations in Paragraph 156 of the TAC.

157.    Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

(a)    whether Defendants owed a duty of care to Plaintiff and the Class;

(b)    whether Defendants knew or should have known that the Contaminated Dog Foods contained heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising and statements;

(c)    whether Defendants failed to test for the presence of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements;

(d)    whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are natural, fit for human consumption, fit for canine consumption, in compliance with relevant European Union regulations and standards, and made from  "Biologically Appropriate™"

and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

(e)     whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced;

(f)     whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are natural;

(g)     whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are made from ingredients fit for human and dog consumption when pentobarbital was present in meal and tallow supplied by MOPAC, who knowingly accepted deads;

(h)     whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Foods are made from ingredients fit for human consumption when the included meal and tallow was cross-contaminated with euthanized horse meat utilized by MOPAC at its processing facility;

(i)     whether Defendants wrongfully represented and continue to represent that the manufacturing of the Contaminated Dog Foods is subjected to rigorous standards, including temperature;

(j)     whether Defendants wrongfully failed to state that the Contaminated Dog Foods contained (or had a risk or probability of containing) heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements;

(k)     whether Defendants' representations in advertising, statements packaging, and/or labeling are false, deceptive, and misleading;

(1)     whether those representations are likely to deceive a reasonable consumer;

(m)     whether a reasonable consumer would consider the presence of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements as a material fact in purchasing pet food;

(n)     whether Defendants had knowledge that those representations were false, deceptive, and misleading;

(o)     whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(p)      whether a representation that a product is healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced is material to a reasonable consumer;

(q)      whether Defendants' representations and descriptions on the labeling of the Contaminated Dog Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(r)      whether Defendants violated Wisconsin state laws;

(s)      whether Defendants engaged in unfair trade practices;

(t)      whether Defendants' conduct was negligent;

(u)      whether Defendants' conduct was fraudulent;

(v)      whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages; and

(w)      whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

**Answer:**      Champion denies the allegations in Paragraph 157 of the TAC, including subparagraphs (a) through (w).

158.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

**Answer:**      Champion denies the allegations in Paragraph 158 of the TAC.

159.    Plaintiff's claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

**Answer:**      Champion denies the allegations in Paragraph 159 of the TAC.

160.    Plaintiff will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

**Answer:**    Champion denies the allegations in Paragraph 160 of the TAC.

161.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

**Answer:**    Champion denies the allegations in Paragraph 161 of the TAC.

162.    Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

**Answer:**    Champion denies the allegations in Paragraph 162 of the TAC.

163.    As a result of the foregoing, class treatment is appropriate.

**Answer:**    Champion denies the allegations in Paragraph 163 of the TAC.

### CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT, WIS. STAT. § 100.18, *ET SEQ.* AGAINST DEFENDANTS ON BEHALF OF THE CLASS

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**Answer:**    Champion adopts and reasserts each and every allegation contained above, as though fully set forth herein.

165.    Defendants willingly engaged in deceptive trade practices, in violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18 ("WDTPA") by:

63

(a)    Representing that their Contaminated Dog Foods have characteristics, ingredients, uses, and benefits that they do not have and also are not made with ingredients from the type of suppliers they advertise;

(b)    Representing that their Contaminated Dog Foods are of a superior standard, quality, and grade when they contain or have a risk of containing levels of pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements and create a risk of DCM in dogs; and

(c)    Representing that their Contaminated Dog Foods are natural when they contain pentobarbital, BPA, and other unnatural ingredients.

**Answer:**    Champion denies the allegations in Paragraph 165 of the TAC, including subparagraphs (a)-(c).

166.    Defendants knew or should have known that the Contaminated Dog Foods did not have the ingredients, uses, and benefits described herein because:

(a)    They contain levels of various, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements;

(b)    They contain ingredients that are frozen, stored for years, and/or expired prior to manufacturing or composed of regrind kibble;

(c)    They are made from ingredients that contain or have the risk of containing pentobarbital;

(d)    They are routinely manufactured with substitute ingredients not included in the Ingredient List, MeatMath®, or nutritional analysis;

(e)    They are manufactured using ingredients sourced from areas far outside Kentucky and the United States; and

(f)    Additionally, when considering the packaging as whole with each of these statements highlighted and often repeated, the whole packaging is misleading and promises to consumers that the Contaminated Dog Foods are superior quality, natural, healthy, and regionally sourced.

**Answer:**    Champion denies the allegations in Paragraph 166 of the TAC, including subparagraphs (a)-(f).

167.    Defendants knew or should have known that the Contaminated Dog Foods were not of a superior standard, quality, or grade because they contain (or have the risk of containing) levels of pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising and statements and create a risk for DCM for dogs, all factors that a reasonable consumer would consider material.

**Answer:**    Champion denies the allegations in Paragraph 167 of the TAC.

168.    Defendants knew or should have known that the Contaminated Dog Foods were not natural because they contain material levels of pentobarbital, BPA, and other unnatural ingredients.

**Answer:**    Champion denies the allegations in Paragraph 168 of the TAC.

169.    Defendants' misrepresentations, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Class with respect to the Contaminated Dog Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs.

**Answer:**    Champion denies the allegations in Paragraph 169 of the TAC.

170.    Defendants intended that Plaintiff and the Class would rely on Defendants' misrepresentations, concealment, warranties, and/or deceptions regarding the Contaminated Dog Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs.

**Answer:**    Champion denies the allegations in Paragraph 170 of the TAC.

171.    Defendants' conduct described herein occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

**Answer:**    Champion denies the allegations in Paragraph 171 of the TAC.

172.    The facts concealed or misrepresented by Defendants were material facts in that Plaintiff and any reasonable consumer would have considered them when deciding whether to purchase the Contaminated Dog Foods. Had Plaintiff known the Contaminated Dog Foods did not have the quality and ingredients advertised by Defendants, they would not have purchased the Contaminated Dog Foods.

**Answer:**    Champion denies the allegations in Paragraph 172 of the TAC.

173.    Defendants intended that Plaintiff and the Class would rely on the deception by purchasing the Contaminated Dog Foods, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

**Answer:**    Champion denies the allegations in Paragraph 173 of the TAC.

174.    Defendants' unlawful conduct is continuing, with no indication that Defendants intend to cease this fraudulent course of conduct.

**Answer:**    Champion denies the allegations in Paragraph 174 of the TAC.

175.    As a result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or levels, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. Moreover, Plaintiff and the Class would not have purchased and/or paid the premium price for the Contaminated Dog Foods had they known the truth of the quality and source of ingredients actually used in manufacturing the Contaminated Dog Foods. There is an association between Defendants' acts and omissions as alleged herein and the damages suffered by Plaintiff.

**Answer:**    Champion denies the allegations in Paragraph 175 of the TAC.

176.     As a direct and proximate result of Defendants' violations of the WDTPA, Plaintiff and the Class have been injured, and that harm is likely to continue unless Defendants are enjoined from misrepresenting the ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by dogs of their Contaminated Dog Foods described herein.

**Answer:**     Champion denies the allegations in Paragraph 176 of the TAC.

177.     Pursuant to Wis. Stat. Ann. § 100.18, Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the WDTPA.

**Answer:**     Champion denies that Plaintiff and the putative class are entitled to any relief whatsoever.

## COUNT II

### Fraud by Omission Against Defendants on Behalf Of The Class

178.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**Answer:**     Champion adopts and reasserts each and every allegation contained above, as though fully set forth herein.

179.     Defendants concealed from and failed to disclose to Plaintiff and the Class that their Contaminated Dog Foods contained heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

**Answer:**     Champion denies the allegations in Paragraph 179 of the TAC.

180.     Defendants were under a duty to disclose to Plaintiff and members of the Class the true quality, characteristics, ingredients and suitability of the Contaminated Dog Foods because: (1) Defendants were in a superior position to know the true state of facts about their products;

(2) Defendants were in a superior position to know the actual ingredients, characteristics, and suitability of the Contaminated Dog Foods; and (3) Defendants knew that Plaintiff and the Class could not reasonably have been expected to learn or discover that the Contaminated Dog Foods were misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Contaminated Dog Foods.

**Answer:**       Champion denies the allegations in Paragraph 180 of the TAC.

181.    The facts concealed or not disclosed by Defendants to Plaintiff and the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Contaminated Dog Foods.

**Answer:**       Champion denies the allegations in Paragraph 181 of the TAC.

182.    Plaintiff and the Class justifiably relied on the Defendants' omissions to their detriment.  The detriment is evident from the true quality, characteristics, and ingredients of the Contaminated Dog Foods, as well as the source and quality of the ingredients, which is inferior when compared to how the Contaminated Dog Foods are advertised and represented by Defendants.

**Answer:**       Champion denies the allegations in Paragraph 182 of the TAC.

183.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they purchased Contaminated Dog Foods that were worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising and create a risk for DCM for dogs, and statements.  Moreover, Plaintiff and the Class would not have purchased and/or

paid the premium price for the Contaminated Dog Foods had they known the truth of the quality and source of ingredients actually used in manufacturing the Contaminated Dog Foods.

**Answer:**     Champion denies the allegations in Paragraph 183 of the TAC.

184.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

**Answer:**     Champion denies that Plaintiff and the putative class are entitled to any relief whatsoever.

## COUNT III

### Negligence Against Defendants On Behalf Of The Class

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

**Answer:**     Champion adopts and reasserts each and every allegation contained above, as though fully set forth herein.

186.    Defendants' conduct is negligent per se.

**Answer:**     Champion denies the allegations in Paragraph 186 of the TAC.

187.    Defendants violated their statutory duty under Wis. Stat. § 94.72, which prohibits the sale and distribution of adulterated and misbranded feed products.  This statute was adopted to protect public safety and to protect consumers, such as Plaintiff and the Class.

**Answer:**     Champion denies the allegations in Paragraph 187 of the TAC.

188.    The term "feed product" is defined as "any commercial feed or other product or material used or distributed for use as a feed or an ingredient in the mixing or manufacturing of feed for animals or birds" and includes the Contaminated Dog Foods.  *Id.*

**Answer:**     Champion states that the statutory provision cited in Paragraph 188 of the TAC speaks for itself, is the best evidence of its terms and content, and no response to

Paragraph 188 of the TAC is required. To the extent a response is required, Champion denies the allegations in Paragraph 188 of the TAC.

189.    A feed product is adulterated if:

(a)    It bears or contains any poisonous or deleterious substance which may render it injurious to the health of animals or which is unsafe within the meaning of section 406, 408 or 409 of the federal food, drug and cosmetic act, 21 USC 346, 346a and 348;

(b)    It is, or bears or contains any color additive which is unsafe within the meaning of section 706 of the federal food, drug and cosmetic act, 21 USC 376;

(c)    A valuable component is omitted or abstracted from it in whole or part or a less valuable substance is substituted for a valuable component; or

(d)    Its composition or quality falls below or differs from that which it is purported or represented to possess by its labeling.

*Id.*

**Answer:**    Champion states that the statutory provision cited in Paragraph 189 of the TAC speaks for itself, is the best evidence of its terms and content, and no response to Paragraph 189 of the TAC is required. To the extent a response is required, Champion denies the allegations in Paragraph 189 of the TAC.

190.    The Contaminated Dog Foods are adulterated as their composition and quality falls below or differs from what is on the label, including that they are "Biologically Appropriate™" and contain "Fresh and Regional Ingredients" from "trusted suppliers." The Contaminated Dog Foods are also adulterated as they were made with pentobarbital contaminated ingredients.

**Answer:**    Champion denies the allegations in Paragraph 190 of the TAC.

191.    A feed product is misbranded if "its labeling is false or misleading in any particular." *Id.*

**Answer:**    Champion states that the statutory provision cited in Paragraph 191 of the TAC speaks for itself, is the best evidence of its terms and content, and no response to

Paragraph 191 of the TAC is required. To the extent a response is required, Champion denies the allegations in Paragraph 191 of the TAC.

192.    Defendants falsely represented to Plaintiff and the Class that their Contaminated Dog Foods are:

      (a)    natural, fit for human consumption, fit for canine consumption, in compliance with relevant European Union regulations and standards and made from "Biologically Appropriate™" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables;

      (b)    contain "only 1 supplement – zinc;"

      (c)    nutritious, superior quality, pure, natural, healthy and safe for consumption; "provid[e] a natural source of virtually every nutrient your dog needs to thrive;"

      (d)    "guaranteed to keep your dog healthy, happy and strong";

      (e)    manufactured using "Fresh Regional Ingredients;" and

      (f)    contain "unmatched regional ingredients delivered fresh."

**Answer:**    Champion denies the allegations in Paragraph 192 of the TAC, including subparagraphs (a)-(f).

193.    Defendants also falsely represented to Plaintiff and the Class that their Contaminated Dog Foods conform to the nutritional analysis, ingredient list, and MeatMath® set forth on the Contaminated Dog Foods' packaging and Defendants' website.

**Answer:**    Champion denies the allegations in Paragraph 193 of the TAC.

194.    Defendants failed to exercise due care when it sold the Contaminated Dog Foods to Plaintiff and the Class based on: (1) its exclusive knowledge of the ingredients, content and sourcing materials of the Contaminated Dog Foods; (2) failing to properly audit and monitor third-party suppliers; (3) failing to test its ingredients and finished products for pentobarbital, a controlled substance that's inclusion renders pet food adulterated; and (4) failing to ensure the

quality and composition of the contaminated ingredients did not fall below what was on the labels and packaging.

**Answer:** Champion denies the allegations in Paragraph 194 of the TAC.

195. Defendants' violations of Wis. Stat. Ann. § 94.72 was a substantial factor in the harm suffered by Plaintiff and the Class, including purchasing the Contaminated Dog Foods that was not allowed to be sold as pet food at all since it was adulterated. Without Defendants' negligence, Plaintiff and the Class would not have been harmed or injured as they would not have been able to purchase the Contaminated Dog Foods.

**Answer:** Champion denies the allegations in Paragraph 195 of the TAC.

196. There is no contract between Defendants and Plaintiff and the Class that would provide for damages or any other relief under a contract-based claim.

**Answer:** Champion states that the allegations in Paragraph 196 of the TAC are a conclusion of law and no response thereto is required.

197. Due to Defendants' negligence, Plaintiff and the Class have been damaged in an amount to be proved at trial or, alternatively, seek rescission and disgorgement under this Count.

**Answer:** Champion denies the allegations in Paragraph 197 of the TAC, and denies that Plaintiff or the putative class are entitled to any relief whatsoever.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against the Defendants as to each and every count, including:

A. An order declaring this action to be a proper class action, appointing Plaintiff and their counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B. An order enjoining Defendants from selling the Contaminated Dog Foods until the heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural

or other ingredients are removed or full disclosure of the risk or and/or presence of such appear on all labels, packaging, and advertising;

C.      An order enjoining Defendants from selling the Contaminated Dog Foods as "Biologically Appropriate™" until the inclusion of and/or risk of inclusion of heavy metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements and the risk of DCM is disclosed;

D.      An order enjoining Defendants from selling the Contaminated Dog Foods in any manner suggesting or implying that they are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced;

E.      An order enjoining Defendants from selling adulterated products under Wisconsin law;

F.      An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

G.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

H.      An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Wisconsin law, plus pre- and post-judgment interest thereon;

I.      An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

J.      An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

K.      An order requiring Defendants to pay punitive damages on any count so allowable;

L.      An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class; and

M.      An order providing for all other such equitable relief as may be just and proper.

**<u>Answer:</u>**      Regarding Plaintiffs' Prayer for Relief, including subparagraphs A through M, Champion denies that any grounds exist to certify a class or for entering judgment against Champion, or for monetary damages, pre-judgment or postjudgment interest, attorney's fees or costs, or any other relief against Champion and for Plaintiff or the putative class.

## <u>AFFIRMATIVE DEFENSES</u>

Champion hereby pleads their Affirmative Defenses to the TAC without assuming the burden of proof when the law places the burden upon Plaintiff, and without prejudice to its Answer, as follows:

1.      Plaintiff's and the putative class's claims are barred in whole or in part by the applicable statute of limitations. The proposed class definition goes back to July 1, 2013, which exceeds the statute of limitations for some or all of Plaintiff's claims.

2.      Plaintiff's and the putative class's claims are barred in whole or in part by the doctrines of waiver and estoppel as consumers who were aware of the presence of heavy metals through Champion's disclosures in the White Paper, the purported information published by the Clean Label Project, or through other means and continued to purchase Champion's dog food have

waived their claims premised on alleged misrepresentations located on Champion's products' packaging and/or on its website and are estopped from asserting such claims.

3. Plaintiff's and the putative class's claims are barred in whole or in part because Plaintiff and the putative class lack Article III standing. When Plaintiff and the putative class purportedly purchased Champion's dog food, they received exactly what was advertised on the products' packaging: a premium dog food.

4. To the extent the TAC seeks injunctive or other equitable relief, neither Plaintiff nor any putative class members are entitled to such relief because, among other reasons, the hardship that would be imposed on Champion by any such relief would be greatly disproportionate to any hardship that Plaintiff or putative class members might suffer in its absence. Furthermore, claims for equitable relief are barred because an adequate remedy at law exists.

5. To the extent Plaintiff and the members of the putative class claim exemplary or punitive damages, such awards are prohibited under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff and the putative class members also fail to allege facts to entitle them to such an award.

6. Plaintiff's claims for damages under Count II and III, to the extent there are any damages, are barred by the economic loss rule.

7. Champion reserves the right to assert additional affirmative defenses based on information learned during discovery.

Dated: August 5, 2019

s/ Susan E. Lovern
Susan E. Lovern, SBN 1025632
Mark E. Schmidt, SBN 1052450
Derek J. Waterstreet, SBN 1090730
von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue
Suite 1000
Milwaukee, Wisconsin 53202
Telephone: (414) 287-1286
Facsimile: (414) 238-6599
E-mail: slovern@vonbriesen.com
      mschmidt@vonbriesen.com
      dwaterstreet@vonbriesen.com

s/ David A. Coulson
David A. Coulson
Florida Bar No. 176222 (admitted to E.D.
Wis.)
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0754
Facsimile: (305) 579-0717
Email: coulsond@gtlaw.com

**Attorneys for Defendants**
**Champion Petfoods USA Inc. and**
**Champion Petfoods LP**