UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

SCOTT WEAVER, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiff,

        v.                                        Case No. 2:18-cv-1996-JPS

CHAMPION PETFOODS USA INC. and
CHAMPION PETFOODS LP,

        Defendants.

**DEFENDANTS CHAMPION PETFOODS USA INC.'S AND
CHAMPION PETFOODS LP'S MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   SUMMARY OF PLAINTIFF'S REMAINING CLAIMS .................................. 2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 4

    A.    Background as to Champion.................................................................... 4

    B.    Plaintiff's Purchases of Champion Dog Food ....................................... 4

    C.    Statements on Champion's Dog Food Packaging.................................... 5

    D.    The Levels of Heavy Metals in Champion Dog Food are Not Unsafe .................. 8

    E.    BPA is Widely Present in the Environment, Not Uncommon in Dog Food
        and the Levels Found in Champion's Dog Food Would Not Harm a Dog............. 9

    F.    Very Low and Non-Dangerous Levels of Pentobarbital were Found in an
        Ingredient Supplied to Champion in Late March 2018 for its "Red" Diets
        Out of DogStar, but Not Found in its Finished Dog Food.................................. 11

    G.    The FDA's Recent DCM Announcements ......................................... 12

IV.   ARGUMENT ........................................................................................................ 13

    A.    Summary Judgment Should be Entered as to Plaintiff's WDTPA Claim ........... 13

        1.    Summary Judgment Should be Entered as to "Biologically
            Appropriate" for Multiple Reasons.......................................... 14

            a.    "Biologically Appropriate" is Not Actionable.............................. 14

            b.    Summary Judgment Should Be Entered Against Any Claim
                Premised on "Biologically Appropriate" Because Plaintiff's
                Damages Methodology Does Not Test That Statement................ 16

            c.    Even if "Biologically Appropriate" were Actionable, It is
                Not Rendered False Due to the Presence of Heavy Metals or
                BPA...................................................................................... 17

            d.    "Biologically Appropriate" was not Rendered False Due to
                Minute, Non-Dangerous Levels of Pentobarbital in Two
                Shipments of Beef Tallow from a Supplier .................................. 18

            e.    Champion's Biologically Appropriate Statement is not
                Rendered Untrue Due to Speculative DCM Allegations .............. 20

        2.    Champion's Statements that Its Dog Food Contains "Fresh"
            Ingredients are Not Misleading................................................. 21

3.      Champion's Statements that Its Dog Food Is Made With "Regional" Ingredients is Not Untrue or Misleading ............................... 23

4.      Champion's "Never Outsourced" Statement Pertains to the Finished Food Product (Not the Ingredients) and is True......................... 25

5.      The Remaining "Misleading" Statements in the TAC Cannot Form the Basis of Any Claim ........................................................................... 26

B.     Summary Judgment Should be Entered on the Fraud by Omission Claim........... 27

C.     The TAC Negligence Claim is Barred by the Economic Loss Doctrine and Fails for the Same Reasons as Count I, Requiring Summary Judgment .............. 29

V.    CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Butteris v. Christiansen*,
No. 98-1309, 1998 WL 851327 (Wis. Ct. App. Dec. 10, 1998)........................................14, 15

*Continental Assur. Co. v. Am. Bankshares Corp.*,
46 B.R. 206 (E.D. Wis. 1986).................................................................................................28

*Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co.*,
123 F.3d 675 (7th Cir. 1997) ..................................................................................................29

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2013).....................................................................................................14

*Guyer v. Cities Serv. Oil Co.*,
440 F. Supp. 630 (E.D. Wis. 1977).........................................................................................28

*Haley v. Kolbe & Kolbe Millwork Co.*,
No. 14-CV-99-BBC, 2015 WL 6828751 (W.D. Wis. Nov. 6, 2015) .....................................14

*Hemy v. Perdue Farms, Inc.*,
No. 11–888, 2011 WL 6002463 (D.N.J. Nov. 20, 2011)........................................................19

*Home Valu, Inc. v. Pep Boys*,
213 F.3d 960 (7th Cir. 2000) .............................................................................................27, 29

*JBCB, LLC v. McKenna Berry Co., LLC*,
No. 2016AP2208, 2017 WL 6403089 (Wis. Ct. App. Dec. 14, 2017) ..............................27, 28

*Kelly v. Cape Cod Potato Chip Co.*,
81 F. Supp. 3d 754 (W.D. Mo. 2015) ....................................................................................20

*Khasin v. R. C. Bigelow, Inc.*,
No. 12-CV-02204-WHO, 2016 WL 4502500 (N.D. Cal. Aug. 29, 2016) ...........................27

*Kisting v. Gregg Appliances, Inc.*,
No. 16-CV-141, 2016 WL 5875007 (E.D. Wis. Oct. 7, 2016).............................................19

*Kmart Corp. v. Herzog Roofing, Inc.*,
No. 2017AP1041, 2018 WL 5740702 (Wis. Ct. App. Oct. 30, 2018)...................................29

*Loeb v. Champion Petfoods USA Inc.*,
359 F. Supp. 3d 597 (E.D. Wis. 2019)..............................................................................13, 17

*Loeb v. Champion Petfoods USA Inc.*,
No. 18-CV-494-JPS, 2018 WL 2745254 (E.D. Wis. June 7, 2018) ......................................14

*Miller v. Am. Art Clay Co. Inc.*,
28 F. Supp. 3d 825 (W.D. Wis. 2014) ...................................................................................20

*Miller v. U.S. Steel Corp.*,
902 F.3d 573 (7th Cir. 1990) ..................................................................................................29

*Murillo v. Kohl's Corp.*,
   197 F. Supp. 3d 1119 (E.D. Wis. 2016)..............................................................14, 15

*Neuser v. Carrier Corp.*,
   No. 06-C-645-S, 2007 WL 484779 (W.D. Wis. Feb. 9, 2007)...............................21

*Novell v. Migliaccio*,
   2008 WI 44 (Wis. 2008) .........................................................................................13

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,
   310 F. Supp. 3d 1089 (S.D. Cal. 2018).................................................................22

*Owen v. Wangerin*,
   985 F.2d 312 (7th Cir. 1993) ................................................................................26

*Parks v. Ainsworth Pet Nutrition, LLC*,
   377 F. Supp. 3d 241 (S.D.N.Y. 2019)...................................................................22

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
   653 F.3d 241 (3d Cir. 2011)..................................................................................23

*Reilly v. Chipotle Mexican Grill, Inc.*,
   711 Fed. Appx. 525 (11th Cir. 2017) ...................................................................23

*Ries v. Arizona Beverages USA, LLC*,
   No. 10-01139, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ..............................26

*Schmidt v. Bassett Furniture Indus.*,
   No. 08-C-1035, 2011 WL 67255 (E.D. Wis. Jan. 10, 2011) .................................26

*Selzer v. Brunsell Bros.*,
   2002 WI App 232 (Wis. Ct. App. Aug. 29, 2002)................................................13

*Shoemaker v. KraftMaid Cabinetry, Inc.*,
   No. 01-0154, 2001 WL 1340585 (Wis. Ct. App. Nov. 1, 2001) ...........................26

*Slane v. Emoto*,
   582 F. Supp. 2d 1067 (W.D. Wis. 2008) ..............................................................15

*St. Paul Mercury Ins. Co. v. Viking Corp.*,
   No. 04-C-1124, 2007 WL 129063 (E.D. Wis. Jan. 12, 2007) ..............................20

*Tietsworth v. Harley Davidson, Inc.*,
   2004 WI 32 (March 26, 2004) ...............................................................15, 27, 29

*Tylka v. Gerber Prods. Co.*,
   No. 96 C 1647, 1999 WL 495126 (N.D. Ill. July 1, 1999) ...................................15

*Valenti v. Hewlett Packard Co.*,
   No. 03-2257, 2004 WL 1277490 (Wis. Ct. App. 2004) ........................................26

*Wyatt v. Philip Morris USA*,
   No. 09–C–0597, 2013 WL 4046334 (E.D. Wis. Aug. 8, 2013) ............................14

*Zakaria v. Gerber Prod. Co.*,
   No. LACV1500200JAKEX, 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) ...........21

**Statutes**

Wis. Stat. § 94.72.................................................................................................29

**Other Authorities**

Fed. R. Civ. P. 56..............................................................................................13

# I.  INTRODUCTION

Plaintiff Scott Weaver's ("Plaintiff") Third Amended Complaint ("TAC") claims that Champion Petfoods USA, Inc. and Champion Petfoods LP (collectively, "Champion") misled him by selling ORIJEN and ACANA dog food containing or that has "a risk of containing" heavy metals, BPA, pentobarbital, non-regional and non-fresh ingredients, and/or ingredients that were outsourced, rendering Champion's advertisements misleading or violating a duty to disclose. Based on the record, Champion is entitled to summary judgment as to all remaining counts because the undisputed material evidence in this case shows that:

(1)     Champion's "Biologically Appropriate" statement is a nutritional opinion of Champion's (and thus not actionable), but regardless, it is not rendered misleading due to:

    (i)     the presence of naturally occurring heavy metals or BPA, which are ubiquitous in the environment;

    (ii)     the presence of minute pentobarbital in an ingredient received by Champion in late March of 2018 (long after Plaintiff stopped buying Champion's dog food) for its beef-based ("Red") diets, which was undetectable in its finished food; or

    (iii)     as to a new theory inserted into the TAC, the grain-free nature of the diets because Plaintiff can only speculate as to whether Champion's dog food causes Dilated Cardiomyopathy ("DCM") in other dogs because his dogs did not have DCM, and the FDA announcements, upon which Plaintiff bases his claim, started a year after Plaintiff discontinued buying Champion's dog food;

(2)     Champion's "fresh" and "regional" representations are not misleading because Champion never represented that all of its ingredients were "fresh" or "regional;"

(3)     Champion's "Never Outsourced" representation is not deceptive because it applies to the finished product, not ingredients; and

(4)     Plaintiff was not exposed to or, in any event, lacks a damages methodology tied to any of the remaining alleged misrepresentations interspersed throughout the TAC, and, therefore, fails to generate a genuine dispute of material fact as to causality, an element of each of his remaining claims.

For these and other reasons set forth below, because Plaintiff cannot establish that a genuine issue of material fact exists with respect to any of his claims, Champion asks the Court

to enter to summary judgment in its favor on all counts.

## II.   SUMMARY OF PLAINTIFF'S REMAINING CLAIMS

The TAC's remaining claims are: (i) violation of the WDTPA; (ii) fraud by omission; and (iii) negligence. The common denominator for each is Plaintiff's allegation that Champion sold dog food that contains or has "a risk of containing" "heavy metals, BPA, pentobarbital, toxins, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to Champion's labels, packaging, advertising, and statements," regardless whether that risk is actually realized and regardless whether any actual injury results. TAC ¶ 6. In addition, the TAC muses that the grain-free nature of many Champion diets somehow causes a rare heart disease, DCM, but Weaver has no evidence that his dogs were or could have been affected. *Id.* ¶¶ 10, 14.

Critically, this litigation has now morphed into a case about whether the retail price of Champion's foods ***might*** be different ***if*** the packages contained different information – ***untethered to any legal obligation requiring such different information***. Plaintiff bases his damages for each of his claims on his expert, Dr. Krosnick's, consumer survey, which purports to measure the diminution in value of Champion's dog food premised upon eight "corrective statements" (all drafted by Plaintiff's counsel) that Plaintiff contends should be added to Champion's packaging to "correct" the purported misrepresentations upon which he premises his claims. *See* Defendants Statement of Proposed Undisputed Material Facts ("SUMF") at ¶ 84. The survey never showed respondents the NorthStar Six Fish or Regional Red packages (products Plaintiff actually bought), but utilized only DogStar ORIJEN Six Fish and ACANA Duck and Pear packaging (which Plaintiff never bought). *Id.* ¶ 85. The eight corrective statements are as follows:

1.      Laboratory testing has shown there is a risk that this food may contain mercury. The World Health Organization has said that in humans, "Mercury may have toxic effects on the nervous, digestive and immune systems, and on lungs, kidneys, skin and eyes."

2.      Laboratory testing has shown there is a risk that this food may contain cadmium. A federal public health agency of the U.S. Department of Health and Human Services, has found, "Kidney and bone effects have also been observed in laboratory animals ingesting cadmium. Anemia, liver disease, and nerve or brain damage have been observed in animals eating or drinking cadmium."

3.      Laboratory testing has shown there is a risk that this food may contain lead. The Food & Drug Administration has said, "Lead is poisonous to humans and can affect people of any age or health status."

4.      Laboratory testing has shown there is a risk that this food may contain arsenic. The Environmental Protection Agency has said, "Arsenic has been linked to a number of cancers. These include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate."

5.      Laboratory testing has shown there is a risk that this food may contain BPA. The Food & Drug Administration has said, "BPA is an industrial chemical used to make polycarbonate, a hard, clear plastic, which is used in many consumer products."

6.      The manufacturer of this food has stated that it may include ingredients that are not are delivered to them fresh but have been frozen before they are used to make the dog food.

7.      The manufacturer of this food has stated that it may include ingredients that are sourced outside the region where it is manufactured. This may include not only other regions within the United States but also other regions internationally.

8.      The manufacturer of this food has stated that it uses third parties to process and manufacture protein meals and tallows used in its dog foods.

*Id.* ¶ 84. Plaintiff's basic theory is that if Champion's packaging had included some or all of these "corrective" statements, then consumers would subjectively place a lower value on the products, which would translate to a lower retail price.  Plaintiff seeks to capture this difference between the actual price paid and the hypothetical "value" of the products. Beyond the foregoing, Plaintiff has not offered a damages methodology based on any other purported corrective statements to "correct" any other alleged misleading statements.

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Background as to Champion

Founded in 1975, Champion initially produced the ACANA brand, which was similar to traditional pet foods, but in 2005 developed the ORIJEN brand by adopting a Biologically Appropriate nutritional philosophy.[1] SUMF ¶ 1. Unlike traditional dog food which relies on significant amounts of grains (much of which are fillers) and many nutritional supplements, ORIJEN's Biologically Appropriate approach uses primarily animal-based proteins in an attempt to mirror how wolves or wild dogs would get nutrition in nature (albeit within the limitations of dry kibble form). *Id.* ¶ 2. Over time, Champion transitioned its Biologically Appropriate approach to ACANA diets as well. *Id.* Champion's dog food consists of a variety diets (*i.e.,* formulations) under the ORIJEN and ACANA brand names (with ACANA having three sub-brands in the United States). *Id.* ¶ 3. For many years, Champion manufactured all of its dog food out of its NorthStar kitchen in Morinville, Alberta, Canada. *Id.* ¶ 4. In January 2016, Champion opened its new DogStar kitchen in Kentucky and throughout 2016 transitioned the manufacturing of nearly all of its dog food sold in the United States (except for Alaska) to come exclusively from its new DogStar kitchen, with the exception of ORIJEN Tundra. *Id.* ¶ 5.

### B.    Plaintiff's Purchases of Champion Dog Food

Plaintiff Scott Weaver resides in Fitchburg, Wisconsin. JSMF ¶ 3. Three of Plaintiff's dogs are the subject of the TAC: Jack, born in 2007, Jill, born in 2008, and Prince Harry born in 2010. *Id.* ¶ 4. Plaintiff fed each dog puppy food for about their first year of life before transitioning to Champion's ORIJEN Six Fish Diet in early 2008. *Id.* ¶ 5. In late 2008, Plaintiff transitioned Jack from Six Fish to ORIJEN Regional Red due to Jack's fish allergy. *Id.* ¶ 7. After

---

[1] Champion Petfoods LP is a Canadian limited partnership headquartered in Edmonton, Alberta, Canada that owns Champion Petfoods, USA Inc., which is incorporated in Delaware and headquartered in Auburn, Kentucky. *See* Joint Statement of Material Facts ("JSMF") ¶¶ 1-2.

that, Jack only ate ORIJEN Regional Red, and Jill and Prince Harry continued to only eat ORIJEN Six Fish.[2] *Id.* Plaintiff fed his dogs these respective diets until he stopped purchasing Champion dog food in approximately August 2017 and switched them to Purina. SUMF ¶ 7. Plaintiff's dog Jill passed away at age ten on April 30, 2018, and Jack passed away at age eleven on May 24, 2018. JSMF ¶ 9. There is no evidence that their deaths were caused by the consumption of Champion's ORIJEN dog food. SUMF ¶ 57. Plaintiff's dog Prince Harry is healthy. *Id.* ¶ 9. Plaintiff never purchased an ACANA diet or any other ORIJEN diet. *Id.* ¶ 10.

### C.     Statements on Champion's Dog Food Packaging

During all relevant times, the front of the packaging for ORIJEN Regional Red and Six Fish from both NorthStar and DogStar stated the diet was "Biologically Appropriate Dog Food." *Id.* ¶ 11. As reflected on Champion's NorthStar packaging for ORIJEN Regional Red and Six Fish, it says that "Here at Champion, our mission is clear and strong; we make Biologically Appropriate Dog and Cat foods." *Id.* ¶ 12. On Champion's ORIJEN Regional Red and Six Fish DogStar packaging, Champion explains its Biologically Appropriate philosophy by stating that its dog food "mirrors the richness, freshness and variety of WholePrey meats that dogs are evolved to eat" and is "protein rich [and] carbohydrate limited." *Id.* ¶ 13. Champion expounds on this nutritional approach by stating on these specific packages that "modern dogs are built like their ancestors [wolves]. Possessing a biological need for a diet that's rich and varied in animal protein." *Id.* As Champion's former Chief Brand Officer testified, "'[w]e follow what's the most appropriate thing biologically. It's not biologically perfect by the way, it's biologically appropriate." *Id.* ¶ 14 ("So biologically – the philosophy of biologically appropriate is to get as close to the natural diet as possible."). Plaintiff's damages methodology does not test this

---

[2] Given that Plaintiff purchased ORIJEN through mid-2017, he would have purchased dog food manufactured at both Champion's NorthStar and DogStar kitchens. SUMF ¶ 6.

terminology, as it is not one of the "corrective statements." *Id.* ¶ 84.

Focusing on corrective statements 6-8 from Plaintiff's expert's report, although the statements vary by diet and other factors, Champion marketed the diets purchased by Plaintiff as containing "fresh" and "regional" ingredients and being "Never Outsourced." *Id.* ¶ 15. Specifically, on the front of the NorthStar packaging for ORIJEN Regional Red, it states "regional red meat," and on the back of the packaging, it states "fresh regional ingredients." *Id.* ¶ 16. On the front of DogStar's ORIJEN Regional Red packaging, it states that the diet is "made with regional ingredients delivered fresh or raw daily; Angus Beef, Suffolk Lamb, Mutton, Wild Catfish, Yorkshire Pork, and Boer Goat." *Id.* ¶ 17. The back of the DogStar Regional Red packaging explains that "Angus Beef, Suffolk Lamb, Yorkshire Pork, and Boer Goat" are "grass-fed on Kentucky ranches and delivered fresh or raw, in richly nourishing WholePrey ratios." *Id.*

On the front of the NorthStar ORIJEN Six Fish packaging, it states "New England's vast Atlantic waters – our source of inspiration and fresh regional fish," and that it is "made with wild-caught regional saltwater and freshwater fish," and on the back, it states "fresh regional ingredients." *Id.* ¶¶ 18-19. On the DogStar ORIJEN Six Fish packaging, it states that that the diet is "made with six wild and sustainably caught fish delivered daily; New England Herring, Flounder, Mackerel, Redfish, Monkfish, and Alaskan Cod." *Id.* ¶ 19. On the back, it further explains that ORIJEN Six Fish contains "wild caught fish – whisked to our kitchens from cold New England waters Fresh or Raw, in richly nourishing WholePrey ratios." *Id.* In addition, on the back of the packaging for both the ORIJEN Regional Red and ORIJEN Six Fish diets from DogStar, Champion explains that they "focus on local ingredients that are ethically raised by the people we know and trust, and delivered to our kitchens fresh or raw each day." *Id.* ¶ 20.

Champion never states on any of the packaging challenged in this litigation that 100%,

each, or all ingredients are regional or fresh. *Id.* ¶ 21. Nor does it make statements that ingredients are "never frozen," or that the food contains no ingredients that had been frozen. *Id.* ¶ 25. As required by AAFCO regulations,[3] each package on the back has an ingredients panel that lists all ingredients in order of weight. *Id.* ¶ 92.

Although descriptions differ depending on diets and other factors, Champion notes that its dog food is "Never Outsourced." *Id.* ¶ 15. On the ORIJEN Regional Red and ORIJEN Six Fish packaging from NorthStar, it states on the back that "Quality is Never Outsourced" and explains that "we prepare ORIJEN ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." *Id.* ¶ 29. On the ORIJEN Regional Red and ORIJEN Six Fish packaging from DogStar, the package states "NEVER OUTSOURCED. PREPARED EXCLUSIVELY IN OUR DOGSTAR® KITCHENS - We don't make foods for other companies and we don't allow our foods to be made by anyone else." *Id.* ¶ 30. Plaintiff admitted that "Never Outsourced" applies only to the finished food, not ingredients. *Id.* ¶ 31.

Finally, the TAC also asserts or implies that a veritable grab-bag of other statements are misleading, including: (i) "Trusted by Pet Lovers Everywhere"; (ii) "Ingredients We Love from People We Know and Trust"; (iii) "excluding…anything else that nature didn't intend your dog to eat"; (iv) "Virtually All of the Nutrients in ACANA are Natural and Not Synthetic"; (v) "Deemed fit for human consumption"; (vi) "Trusted Everywhere"; (vii) "Delivered Daily"; (viii) "Nourish as Nature Intended"; (ix) "Delivering Nutrients Naturally"; (x) "Made with Fresh and Natural Ingredients;" (xi) "USA DogStar kitchens, ingredients, processes, and foods all meet the strictest European Union standards – which are stricter than those set by AAFCO, the Canadian

---

[3] The Association of American Feed Control Officials ("AAFCO") provides a forum for state regulatory officials to come together and create model guidelines to ensure that the regulation of animal feeds is as uniform as possible from state to state. *Id.* ¶ 86.

Food Inspection Agency, or FDA"; (xii) "Unmatched by any other pet food maker anywhere, our kitchens meet the strictest standards in the world, including the Government of Canada, and the European Union;" (xiii) "Premium Meat and Fish Ingredients"; (xiv) "We prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation- from where our ingredients come from, to every cooking, quality and food safety process"; (xv) "Dogstar Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients"; (xvi) "Are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry for authenticity, nutritional integrity, and food safety"; (xvii) "Feature state-of-the-art fresh food processing technologies"; (xviii) "Feature unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive"; (xix) "guaranteed" [to] keep your dog happy, healthy, strong"; (xx) "Only 1 supplement – zinc"; (xxi) "Provide a natural source of virtually every nutrient your dog needs to thrive"; and (xxii) "Unmatched regional ingredients delivered fresh." TAC ¶¶ 4, 10, 11, 12, 38, 92, 94, 95, 101, 105(j); 108, 123, 124, 192(b), 192(d), 192(f).

Statements (iii) and (iv) only appeared on the brochure cited to in the TAC. SUMF ¶ 34. Plaintiff testified that he did not read any of Champion's brochures. *Id.* ¶ 35. Statements (xi), (xii), (xiv), (xv), (xvi), (xvii), and (xviii) only appeared on Champion's website. *Id.* ¶ 36. Plaintiff testified that he did not visit Champion's website prior to making any of his purchases of Champion's dog food. *Id.* ¶ 37. Statements (x) and (xxii) did not appear on the bags of the ORIJEN diets that Plaintiff bought. *Id.* ¶ 33. In any event, in Plaintiff's damages methodology, the foregoing statements were not tested by way of "corrective" statements. *Id.* ¶ 84.

### D. The Levels of Heavy Metals in Champion Dog Food are Not Unsafe

Nearly all foods, whether for humans or pets, contain some levels of heavy metals, such as arsenic, cadmium, lead, and mercury. *Id.* ¶ 41. These heavy metals are naturally occurring

elements that are ubiquitous in the environment and commonly found in dog foods. *Id.* ¶ 39. The trace levels of heavy metals in Champion's dog food are naturally occurring in the ingredients it used to make the food; Champion does not add heavy metals as ingredients. *Id.* ¶ 40.

In 2005, the National Research Council ("NRC") published a study in the Mineral Tolerance Animals, 2nd Revised Edition, 2005, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury in dog foods. *Id.* ¶ 42. In 2011, the FDA conducted its own review as to the levels of heavy metals in pet food entitled the Target Animal Safety Review and adopted the MTLs utilized by the NRC, namely (1) Arsenic 12,500 μg/kg (12.5 mg/kg); (2) Cadmium 10,000 μg/kg (10 mg/kg); (3) Lead 10,000 μg/kg (10 mg/kg); and (4) Mercury 267 μg/kg (.27 mg/kg).[4] *Id.* ¶ 43. Three years earlier, in 2002, the European Union ("EU") had enacted regulations for the safe upper limits of arsenic (10 mg/kg), cadmium (2 mg/kg), mercury (.3 mg/kg), and lead (5 mg/kg) in pet foods. *Id.* ¶ 44.

By any measure, the levels of heavy metals in Champion's dog food are well below the MTLs set by the NRC/FDA and the EU safety standards for heavy metals in pet food. *Id.* ¶ 45. This is confirmed by Champion's own testing performed in the ordinary course of its business, as well as the testing performed for Plaintiff. *Id.* As Champion's toxicology expert Dr. Poppenga concluded, "the levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs." *Id.* ¶ 46. Plaintiff's expert was unable to identify any known safety standard or guideline for dog food that Champion is violating. *Id.* ¶ 47.

### E.     BPA is Widely Present in the Environment, Not Uncommon in Dog Food and the Levels Found in Champion's Dog Food Would Not Harm a Dog

Bisphenol-A (BPA) is a monomer, a chemical that is produced for use primarily in the

---

[4] The abbreviation μg/kg means micrograms per kilogram (parts per billion) while the measurement mg/kg means milligrams per kilogram (parts per million). 1 mg/kg is equal to 1,000 μg/kg (parts per billion). Both measurements are provided because at times the MTLs and levels are heavy metals are expressed in mg/kg while at other times they are expressed in μg/kg.

production of polycarbonate plastics and epoxy resins. *Id.* ¶ 48. Polycarbonate plastics and epoxy resins frequently appear in water bottles, infant bottles, CDs, medical devices, and lacquers to coat products such as food cans and bottle tops. *Id.* ¶ 49. Humans and animals are most commonly exposed to BPA through their diet, as BPA tends to leach into food and liquid. *Id.* ¶ 50. However, because of humankind's extensive use of plastics, BPA is also prevalent in the environment, and many studies have measured levels of BPA in our air, dust, and water. *Id.* ¶ 51. Given BPA's ubiquitous presence in our environment, humans and animals are exposed to BPA daily through a variety of pathways. *Id.* ¶ 52. It is an undisputed fact that Champion does not add BPA as an ingredient. *Id.* ¶ 53. Nor does Champion advertise its food as "BPA Free," or words to that effect. *Id.* Plaintiff also does not claim that any of his dogs suffered any adverse health consequence from BPA exposure from any source. *Id.* ¶ 57.

Plaintiff alleges that Champion's ORIJEN Regional Red diet contains 0.0377 mg/kg of BPA and Champion's ORIJEN Six Fish diet contains 0.0395 mg/kg of BPA. TAC ¶ 7. Plaintiff's lab, Ellipse Analytics, utilized a 30 ppb Level of Quantification ("LOQ") testing criteria and found that one-third of several hundred dog foods tested had BPA in them. SUMF ¶ 54. If Plaintiff's lab used a more sensitive LOQ, it would have found BPA in more of the tested dog foods. *Id.* At Champion's request, Eurofins laboratory tested five samples of the Regional Red and Six Fish diets utilizing a highly-sensitive five parts per billion (ppb) LOQ for BPA, which would count as a "zero" according to Plaintiff's criteria. *Id.* ¶ 55. Each test demonstrated that the amount of BPA, if any, was non-detectable as it was below the five ppb LOQ.[5] *Id.* Additionally, Champion's testing of other dog food brands demonstrated that BPA was also found in these brands at various low levels similar to (if not greater than) Champion. *Id.* ¶ 56. The levels of

---

[5] Another laboratory utilized by Plaintiff to test Champion's dog food diets for BPA, ExperTox, did not detect any BPA in any of the 38 samples of Champion's dog food it tested. SUMF ¶ 62.

BPA purportedly in Champion's dog food according to the TAC would not cause an adverse health effect in a dog. *Id.* ¶ 57. Plaintiff put forth no expert who opines that the BPA levels detected would be harmful to a dog. *Id*. ¶ 59.

> ### F. Very Low and Non-Dangerous Levels of Pentobarbital were Found in an Ingredient Supplied to Champion in Late March 2018 for its "Red" Diets Out of DogStar, but Not Found in its Finished Dog Food

Champion uses beef tallow (a/k/a fat) as an ingredient for its beef-based dog food diets (branded as the "Red" diets), as it is sprayed on the kibble at the end of the production run and is primarily for palatability. *Id.* ¶ 61. Beef tallow is created through a process called "rendering," during which the fatty tissue of a healthy slaughtered cow gets converted in part into beef meal and in part into beef tallow. *Id.* Champion's ingredient specifications to its suppliers require that all beef tallow sold to Champion be rendered from "EU Category 3" standard cows, meaning "no dead, dying, or condemned" animals are allowed. *Id.* ¶ 62.

From around October 2016 to May 2018, Champion's DogStar Kitchen purchased beef tallow from several suppliers, one of them being JBS. *Id.* ¶ 63. On May 7, 2018, Champion learned from JBS that the Pennsylvania Department of Agriculture had inspected JBS' MOPAC rendering plant in Pennsylvania and took samples. *Id.* ¶ 65. Two lots of beef tallow delivered to Champion on or around March 26, 2018 and March 28, 2018 had tested positive for small amounts of pentobarbital (at 56 ppb and 16 ppb, respectively). *Id.* ¶ 64.

Upon learning this, Champion reacted swiftly. First, Champion analyzed which of its production runs (also called "lots") used the affected beef tallow and quarantined all unused portions of it, along with any other MOPAC products and all unshipped kibble made with the affected beef tallow. *Id.* ¶ 66. Additionally, Champion pulled back from its distributors all of the food that used the affected beef tallow they had. *Id*. Of the 1.7 million pounds of dog food manufactured using the affected beef tallow, Champion quarantined or retrieved approximately

1.6 million pounds; only about 100,000 pounds had been sold into retail *anywhere*. *Id.* ¶ 68. It is not known if any of that was sold in Wisconsin.[6] *Id*. Second, Champion retained a consultant to assess whether the consumption of dog food from the affected lots would pose a health risk to dogs. *Id.* ¶ 68. Due to the low amount of pentobarbital in the affected tallow, as well as the fact that tallow is only a small fraction of the finished food, the consultant determined, using the FDA's No Observable Effect Level (NOEL), that the small amount of pentobarbital in the beef tallow used in the affected lots would not pose any danger to any dog. *Id*. Third, Champion submitted eleven (11) composite samples of the quarantined dry finished kibble made with the affected tallow lots to Texas A&M Veterinary Medical Diagnostic Laboratory ("TVMDL") for testing. *Id.* ¶ 70. All eleven (11) composite samples tested by TVMDL resulted in a "Non-Detect" reading with a 2 ppb LOD. *Id.*

Based on that assessment, Champion determined that it was not necessary to recall its products made with the affected tallow that had been shipped to retailers because the finished dog food posed no danger to dogs. *Id.* ¶ 72. The FDA inspected Champion's DogStar Kitchen on May 16th, 17th, and 23rd of 2018, reviewed the TVMDL test results and (i) approved of Champion's handling of the situation, including Champion's decision not to recall product from retailers, (ii) determined no other action was needed, and (iii) issued a no action letter. *Id.* ¶ 73.

### G.    The FDA's Recent DCM Announcements

Canine dilated cardiomyopathy ("DCM") is a rare disease of cardiac muscle in dogs that results in a decreased ability of the heart to generate pressure to pump blood through the vascular system. *Id.* ¶ 75. On July 12, 2018, the U.S. Food & Drug Administration ("FDA") announced that it was investigating reported cases of DCM to determine whether there was a link between

---

[6] It is a certainty, however, that none of the affected product was sold to Plaintiff, because he had stopped purchasing Champion's ORIJEN pet food much earlier.

DCM in dogs and diets containing peas, lentils, other legume seeds, or potatoes. *Id.* ¶ 76. The FDA updated its report in February of 2019 and stated it was continuing to "collect and evaluate information about the DCM cases." *Id.* On June 27, 2019, the FDA issued another update in which it identified, based on Adverse Event Reports, a variety of grain-free dog food brands that dogs had been fed prior to being diagnosed with DCM. *Id.* ¶ 78. ACANA and ORIJEN were among the brands listed. *Id.* In the report, the FDA stated that it "strives to learn more about this emergence of DCM and its potential link to certain diets or ingredients." *Id.* ¶ 79. The FDA also stated it will "continue to investigate this potential association. Based on the data collected and analyzed thus far, the agency believes that the potential association between diet and DCM in dogs is a complex scientific issue that may involve multiple factors." *Id.* The FDA concluded by stating it "is continuing to investigate and gather more information in an effort to identify whether there is a specific dietary link to the development of DCM."[7] *Id* ¶ 80.

## IV.    ARGUMENT[8]

### A.    Summary Judgment Should be Entered as to Plaintiff's WDTPA Claim

To avoid summary judgment on his WDTPA claim (Count I), Plaintiff must present evidence sufficient to create a genuine issue of material fact in his favor as to whether: (1) Champion made a representation [of fact] to the public with the intent to induce an obligation; (2) the representation was untrue or misleading; and (3) the representation materially caused Plaintiff a pecuniary loss. *Novell v. Migliaccio*, 2008 WI 44, ¶ 44 (Wis. 2008).[9]

As to the first element, Wisconsin law requires that the Plaintiff must identify a "specific

---

[7] Plaintiff has not produced an expert as to DCM.

[8] The standard for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is set forth in *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597, 599 (E.D. Wis. 2019).

[9] Plaintiff's purchases from 2008 through April 19 of 2015 are barred by the three-year statute of limitations governing WDTPA claims. *See Selzer v. Brunsell Bros.*, 2002 WI App 232, ¶ 29 (Wis. Ct. App. Aug. 29, 2002) (holding WDTPA claim accrued, regardless of whether plaintiff knew of his injury, when catalog containing the allegedly false statement was received).

factual representation that [Champion] had made with the intent to induce [Plaintiff] to purchase its [product]."[10] *Haley v. Kolbe & Kolbe Millwork Co.,* No. 14-CV-99-BBC, 2015 WL 6828751, at *1 (W.D. Wis. Nov. 6, 2015). Wisconsin courts also require that a plaintiff demonstrate that a defendant's untrue or misleading representation "caused the plaintiff a pecuniary loss." *Wyatt v. Philip Morris USA*, No. 09–C–0597, 2013 WL 4046334, at *4 (E.D. Wis. Aug. 8, 2013). In other words, Plaintiff must present evidence sufficient to create a genuine issue of material fact as to whether Champion's alleged misrepresentations of fact "materially induced" him to buy the dog food products. *See id.*

### 1. Summary Judgment Should be Entered as to "Biologically Appropriate" for Multiple Reasons

#### a. "Biologically Appropriate" is Not Actionable

Champion's description of its dog food as "Biologically Appropriate" is not an actionable factual representation as required by the WDTPA. It is an unactionable statement of opinion because it is not capable of being proven as a verifiable fact.[11] *See, e.g.*, *Murillo v. Kohl's Corp.,* 197 F. Supp. 3d 1119, 1126–27 (E.D. Wis. 2016) ("WDTPA claims cannot be premised on expressions of opinion."); *Butteris v. Christiansen*, No. 98-1309, 1998 WL 851327, at *3 (Wis. Ct. App. Dec. 10, 1998) ("A representation is one of opinion if it expresses only the maker's judgment as to quality, value, authenticity, or other matters of judgment.").

---

[10] A plaintiff cannot premise a WDTPA claim on an omission. *Loeb v. Champion Petfoods USA Inc.,* No. 18-CV-494-JPS, 2018 WL 2745254, at *9 (E.D. Wis. June 7, 2018).

[11] Champion recognizes that in its Order on Champion's Motion to Dismiss in *Loeb,* the Court stated that the "Biologically Appropriate" statement was a disputable fact. *Loeb,* 2018 WL 2745254, at *6. However, at that stage under Rule 12, the Court was confined to that Complaint's allegations, which did not attach the packaging that is necessary to give the context for the Biologically Appropriate statement as an opinion of Champion's. *See Fink v. Time Warner Cable,* 714 F.3d 739, 742 (2d Cir. 2013) ("The primary evidence in a consumer-fraud case arising out of allegedly false advertising is, of course, the advertising itself. And in determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial.").

It is uncontroverted that Champion has adopted a nutritional philosophy that its dog food is "Biologically Appropriate"—meaning that its goal is for the dog food formulas (in dry kibble form) to closely mirror what a dog would eat in the wild. SUMF ¶ 13. This concept appears on Champion's packaging and marketing materials in different ways. For example, the DogStar bags at issue explain: "Biologically Appropriate—Protein Rich, Carbohydrate Limited." *Id*. It is beyond dispute that Champion includes a high amount of animal protein sources (such as meat and fish) in its Biologically Appropriate diets and has limited carbohydrates, and that its food is true to its nutritional philosophy. *Id*.

However, Champion's Biologically Appropriate nutritional philosophy is just that – a philosophy, a matter of opinion. To be sure, Champion's nutritionists strongly believe in this philosophy, but recognize it is also open to debate.[12] But no matter how strongly Champion believes in its Biologically Appropriate philosophy, it is still an opinion or matter of judgment, which is not actionable under the WDTPA. *Murillo*, 197 F. Supp. 3d at 1126 (dismissing plaintiff's misrepresentation claims about "incredible savings and the like" because they "constitute puffery"); *Tietsworth v. Harley Davidson, Inc.*, 2004 WI 32, ¶ 44 (March 26, 2004) (affirming dismissal of WDTPA based on statements that a motorcycle was "masterpiece," "of premium quality," and "filled to the brim with torque and ready to take you thundering down the road" as the statements were puffery); *Slane v. Emoto*, 582 F. Supp. 2d 1067, 1085 (W.D. Wis. 2008) (granting summary judgment on WDTPA claim where defendant's representations are "opinions on quality, value, authenticity or other matters of judgment…falls squarely into the domain of puffery, because a factfinder would be unable to determine the truth or falsity of those

---

[12] In contrast to Champion's diets, as an example, the Purina Pro Plan dog food that Plaintiff switched to uses a fundamentally different nutritional approach, as its food contains some chicken, but primarily consists of ground rice, whole grain wheat, corn gluten meal, whole grain corn, and a long list of vitamins and other supplements. SUMF ¶ 7.

claims"); *see also Tylka v. Gerber Prods. Co.*, No. 96 C 1647, 1999 WL 495126, at *8 (N.D. Ill.

July 1, 1999) (holding statements such as "optimum nutrition" and "nutritionally, you can't buy a

better food than Gerber," or "most wholesome nutritious safe foods you can buy anywhere in the

world" to be puffery and not actionable). Given that Biologically Appropriate is an expression of

opinion, it cannot be an actionable statement, requiring entry of summary judgment as to it.

> **b.** **Summary Judgment Should Be Entered Against Any Claim Premised on "Biologically Appropriate" Because Plaintiff's Damages Methodology Does Not Test That Statement**

None of the corrective statements tether Biologically Appropriate to a corrective

disclosure. Dr. Krosnick concedes in general that he did nothing "to understand how respondents

interpreted any of the content that Champion did put on the product." *Id.* ¶ 86. As to Biologically

Appropriate, he admitted:

> Q. Similarly, there's nothing about your survey that asked the respondents if they attached any meaning or significance to the expression "Biologically Appropriate"?
>
> A. Correct.
>
> Q. As a result of your experiment, did you form any opinions about the relative importance of any of the content of Champion's packages?
>
> A. No.

*Id*. Because Plaintiff has no damages methodology to measure the effect of Biologically

Appropriate (even if this were a statement of fact) being untrue or misleading, his claim fails for

this independent reason. *Ries v. Arizona Beverages USA, LLC,* No. 10-01139, 2013 WL

1287416, at *8 (N.D. Cal. Mar. 28, 2013) (granting summary judgment for defendant because

plaintiffs failed to show "evidence establishing the difference between the value of an Arizona

Iced Tea billed as all-natural and the value of a comparable beverage not marketed or sold at a

premium due to such claims.").

Champion anticipates, however, that Plaintiff will argue that corrective statements 1-5 somehow connect to Biologically Appropriate on the theory that dog food cannot be considered by consumers as Biologically Appropriate if it has the presence (or risk thereof) of heavy metals, BPA, or pentobarbital. Putting aside that such a theory is not tested by his expert, summary judgment should be entered as to this theory for the reasons set forth in Section V(A)(1)(c-d).

### c. Even if "Biologically Appropriate" were Actionable, It is Not Rendered False Due to the Presence of Heavy Metals or BPA

The presence of naturally occurring heavy metals or environmentally ubiquitous BPA in Champion's finished dog food products does not result in the Biologically Appropriate statement being misleading. First, the Court has already rejected Plaintiff's heavy metals theory. ECF No. 39 ("Order") at 7.[13] It is undisputed that the trace amounts of heavy metals in Champion's foods are naturally occurring in the ingredients used to make the food, not added as an ingredient, and are not present at a level that would pose a danger to a dog consuming the food. SUMF ¶¶ 40, 46. Consequently, the Biologically Appropriate statement is not rendered misleading by the mere presence of naturally occurring heavy metals in the ingredients. *See* Order at 7 (rejecting Plaintiff's "mere presence" theory of liability); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597, 604-605 n.7 (E.D. Wis. 2019) (holding "[p]laintiff thus lacks any affirmative proof that Orijen contains concentrations of heavy metals which 'are excessive, dangerous, and render [Champion's] representations regarding the Products, including the packaging of the Products, false and misleading" and an the argument that the packaging is misleadingly advertised due to the "mere presence of any heavy metals…is absurd").

Similarly, the mere presence or risk of presence of BPA in the finished food product does

---

[13] Champion addresses the heavy metal allegations herein because, despite the Court's prior Order dismissing Plaintiff's heavy metals theory, the TAC persists with asserting heavy metals allegations. *See, e.g.,* TAC ¶¶ 179, 183.

not render Champion's Biologically Appropriate statement untrue or misleading. To start, Champion's Biologically Appropriate philosophy pertains to the design of, *i.e.,* the formula for, Champion's dog food diets. It is undisputed that ***BPA was not added as an ingredient*** to Champion's diets. SUMF ¶ 53. Rather, BPA is ubiquitous in the environment, and Plaintiff has no expert opinion even as to how trace amounts of BPA may sometimes get into Champion's finished product. *Id.* ¶ 52. Moreover, Champion's testing of other dog food brands demonstrated that BPA was also found in these brands at various low levels similar to (if not greater than) Champion. *Id.* ¶ 56. And, Plaintiff's own expert admitted that his lab tested hundreds of dog food diets and found BPA in a third of them, and would have found more if the lab used lower than a 30 ppb LOQ. *Id.* ¶ 54.

As with heavy metals, the trace levels of BPA which might be detected sometimes in Champion's foods are ***not found*** at a level that would pose a danger to dogs. *Id.* ¶ 57. Indeed, Plaintiff put forth no expert who opines that the BPA levels are at an unsafe level or would compromise the food's nutritional value. *Id.* ¶ 59. In short, as with heavy metals, Plaintiff's theory based on the mere risk of or the actual presence of BPA rests on speculation and does not render the Biologically Appropriate statement misleading.

### d. "Biologically Appropriate" was not Rendered False Due to Minute, Non-Dangerous Levels of Pentobarbital in Two Shipments of Beef Tallow from a Supplier

Likewise, the presence of a minute and non-dangerous level of pentobarbital received in two shipments of beef tallow does not make Champion's Biologically Appropriate statement untrue or misleading.[14] As an initial matter, Plaintiff's only non-speculative evidence tying

---

[14] Throughout the TAC, Plaintiff implies that there was a risk of pentobarbital in all of the tallow supplied by JBS starting in 2016 until Champion terminated JBS as a supplier in May 2018 and, therefore, a risk of pentobarbital in any production runs of the "Red" diets that included JBS's tallow. However, this supposition rests on conjecture.

pentobarbital to Champion's dog food is that Champion received two lots of beef tallow containing small levels of pentobarbital in late March of 2018 from its supplier JBS. *Id.* ¶ 64. Further, it is also undisputed that Plaintiff stopped purchasing Champion's dog food by August of 2017. *Id.* ¶ 7. Because Plaintiff could not have purchased any of Champion's dog food which contained the affected beef tallow from JBS (*Id.* ¶¶ 7, 64), he does not have standing for a claim based on the TAC's pentobarbital allegations. *Kisting v. Gregg Appliances, Inc.*, No. 16-CV-141, 2016 WL 5875007, at *4 (E.D. Wis. Oct. 7, 2016) (holding "[plaintiff] would not individually have standing to pursue claims based on injuries sustained from television models he did not purchase and the fact this is a class action suit does not change the standing analysis."); *Hemy v. Perdue Farms, Inc.,* No. 11–888, 2011 WL 6002463 (D.N.J. Nov. 20, 2011) (dismissing claims for lack of standing premised on alleged misrepresentations on 'Perdue' brand chicken packaging because neither plaintiff purchased any Perdue products under the Perdue brand name but rather purchased Perdue's 'Harvestland' brand chicken products).

Regardless, Plaintiff has no testing that demonstrates that pentobarbital was in Champion's finished dog food. In May 2018, Champion sent 11 composite samples of its dog food that was manufactured using the affected beef tallow to TVMDL to determine whether pentobarbital was present in the finished (Red) dog food product. *Id.* ¶ 70. The scientists at TVMDL, using a highly sensitive 2 ppb LOD, determined that pentobarbital was not present in Champion's finished dog food. *Id*. Plaintiff has no testing to the contrary. *Id.*

That no pentobarbital was detected in the finished food is dispositive here, because the FDA's guidance is that "the **detection** of pentobarbital in pet foods renders the product adulterated." *Id.* ¶ 74. The FDA reiterated this when asked if there is any acceptable level of pentobarbital in pet food by stating "its **detection** renders the product adulterated." *Id*. Consistent

with its past guidance, the FDA agreed with Champion's determination that no recall of the relatively small quantity of finished product that had made it into retail was warranted. *Id.* ¶ 73. In the end, Plaintiff has no evidence that any detectable level of pentobarbital was in any production run of Champion's Red dog food, let alone in a package of dog food he purchased.

Finally, as noted *supra* at Section III(C), Biologically Appropriate pertains to the design of the diet, but Champion never added pentobarbital as an ingredient (as the TAC incorrectly assumes, *see* ¶ 165(c)). For all these reasons, Champion's Biologically Appropriate statement is not untrue or misleading based on Champion having received those two lots of JBS beef tallow.

### e. Champion's Biologically Appropriate Statement is not Rendered Untrue Due to Speculative DCM Allegations

With respect to the TAC's DCM allegations[15] which is based on nothing but two FDA announcements (TAC ¶ 14), Plaintiff stopped purchasing Champion's dog food about a year before the FDA made its first announcement regarding DCM. He thus lacks standing to sue on such a theory. *Kisting*, 2016 WL 5875007, at *4; *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 763 (W.D. Mo. 2015) (holding plaintiff lacked standing "as to varieties of the Chips she did not purchase). Even if he had standing, the TAC's allegations are based only on speculation. None of Plaintiff's dogs were diagnosed with DCM, and not only does he have no evidence that Champion's dog food causes DCM in other dogs, but he has no expert witness on the topic. On their face, the FDA reports acknowledge that the FDA is "continuing to investigate and gather more information in an effort to identify whether there is a specific dietary link to development of DCM." *Id.* ¶ 80. In short, Plaintiff's speculative allegations cannot generate a disputed issue of material fact to support a WDTPA claim. *See St. Paul Mercury Ins. Co. v. Viking Corp.*, No.

---

[15] In the TAC, Plaintiff's desperately asserts this DCM theory. Because the dispositive motion deadline was imminent, Champion opted to answer and move under Rule 56, notwithstanding that this claim does not pass muster even under Rule 12.

04-C-1124, 2007 WL 129063, at \*26–27 (E.D. Wis. Jan. 12, 2007) (granting summary judgment on WDPTA count where "at most, [plaintiff] can only speculate" and plaintiff "failed to provide sufficient evidence" of false, misleading, or deceptive conduct on behalf of the defendant); *Miller v. Am. Art Clay Co. Inc.*, 28 F. Supp. 3d 825, 831 (W.D. Wis. 2014) (granting summary judgment when there was "no way to make a reasoned finding" that the clay purchased from defendant caused mesothelioma as "the record establishes only a mere possibility of causation").

Finally, because Plaintiff has not proposed any damages methodology tied to DCM (SUMF ¶ 84), these allegations cannot be utilized to support a WDTPA claim (or a claim under Counts II and III). *Zakaria v. Gerber Prod. Co.*, No. LACV1500200JAKEX, 2017 WL 9512587, at \*23 (C.D. Cal. Aug. 9, 2017) (granting defendant's summary judgment motion where plaintiff's damages expert "does not provide a basis for calculating damages").

For all the reasons in Section V(A)(1), as a matter of law, Plaintiff's WDTPA claim cannot be premised on Champion's statement that its food is "Biologically Appropriate."

### 2. Champion's Statements that Its Dog Food Contains "Fresh" Ingredients are Not Misleading

Plaintiff's damages methodology hinges on a "corrective statement" that Champion's dog food "may include ingredients that are not delivered to them fresh but have been frozen before they are used to make the dog food." SUMF ¶ 84. But Plaintiff cannot demonstrate that Champion falsely marketed its dog food as *only* containing "fresh" and no "frozen" ingredients.

To start, it is undisputed that Champion never stated on its NorthStar or DogStar packaging that its dog food contains **only** "fresh" ingredients, that the ingredients are "all fresh," or "100% fresh," or, for that matter, "Never Frozen." SUMF ¶ 21. In stark contrast to Plaintiff's "corrective statement," the packaging for the DogStar ORIJEN Regional Red diet and ORIJEN Six Fish diet purchased by Plaintiff state that the diets include "freeze-dried tripe" and "freeze-

dried liver," respectively.[16] *Id.* ¶ 23. Moreover, in its Meat Math on the back center, the DogStar ORIJEN Six Fish packaging states "this **13 lb package** of ORIJEN is **made with** over **11 lbs of fresh, raw**,[17] or dehydrated fish ingredients," and identifies those ingredients. *Id.* ¶ 25 (emphasis added). Likewise, the DogStar ORIJEN Regional Red packaging states that 11 pounds of its 13-pound package are fresh or raw ingredients, and the packaging further states that the **top ten ingredients** are delivered "fresh or raw." *Id.* ¶ 26 (emphasis added). Further, the NorthStar ORIJEN Six Fish package states it is "made with wild-caught regional saltwater and freshwater fish." *Id.* ¶ 27. Finally, the NorthStar package of Regional Red states the formula "**features** unmatched inclusions of ranch-raised Black Angus beef, wild boar, lamb, heritage pork and bison …. delivered fresh."[18] *Id*. ¶ 28 (emphasis added). In short, nowhere does Champion represent that its finished dog food contained all fresh and no ingredients that were ever frozen; inferring to the contrary is not reasonable as a matter of law.[19] *See, e.g., Parks v. Ainsworth Pet*

---

[16] Plaintiff conceded that the fact that freezing of ingredients was used "wouldn't be a problem for [him]." SUMF ¶ 24. Additionally, Plaintiff kept purchasing Champion's ORIJEN dog food after the production switched to DogStar, at which point the packaging stated that it was made with "Fresh, Raw, or Dehydrated" or "Fresh or Raw" ingredients, which by definition could include frozen ingredients. *Id.* ¶ 88. Consequently, Plaintiff was not materially induced to buy the ORIJEN diets by virtue of the corrective statement (from the damages methodology) not being disclosed to him. *Neuser v. Carrier Corp.,* No. 06-C-645-S, 2007 WL 484779, at *4 (W.D. Wis. Feb. 9, 2007) (holding a "plaintiff must demonstrate that the affirmative statement was a material inducement in the purchasing decision" to prevail on a claim under the WDTPA).

[17] AAFCO defines "raw" as "food in its natural or crude state not having been subjected to heat in the course of preparation of food." *Id.* ¶ 90. Therefore, "raw" includes ingredients that are or were frozen before being used in production, and the raw ingredients Champion used were "fresh frozen." *Id*. Further, Plaintiff put forward no expert witness who opines that the nutritional quality of Champion's diets is negatively impacted by the use of a fresh frozen raw ingredient as opposed to the same ingredient being fresh, meaning preserved only by refrigeration.

[18] Additionally, the standards issued by AAFCO state that when a pet food represents that it is "made with" certain ingredients, those ingredients must constitute at least 3% of the product weight. SUMF ¶ 91.

[19] As to Plaintiff's new allegations in the TAC that Champion at times has used expired or substituted ingredients and regrinds (TAC ¶ 15, 91, 165), Plaintiff has no evidence he purchased a bag which contained either expired or substituted ingredients or regrinds.

*Nutrition, LLC*, 377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019) (holding that "a reasonable consumer would not be so absolutist as to require that "natural" means there is no glyphosate, even an accidental and innocuous amount, in the [p]roducts"); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1123 (S.D. Cal. 2018) (finding "no reasonable juror could find that [defendant, through its statement "Lipozene is made with 100% pure Glucomannan,"] was advertising that it was entirely made with glucomannan).

Moreover, Plaintiff is tied to a damages methodology utilizing a corrective statement that is dependent upon Champion representing that ***all*** of its ingredients in every diet are fresh: "The manufacturer of this food has stated that it may include ingredients that are not are delivered to them fresh but have been frozen before they are used to make the dog food." SUMF ¶ 84. This is merely one example of many as to how Plaintiff's purported "corrective" statements are misaligned with the content they are ostensibly correcting. Champion never represented that its dog food contained no ingredients that had been frozen before use. Because Plaintiff's damages methodology relies on a statement that incorrectly presupposes that Champion represents that all of its ingredients are fresh and is thus not causally tied to the actual representations on the bag, Champion is entitled to summary judgment as to the "fresh" representation for this independent reason. *Reilly v. Chipotle Mexican Grill, Inc.*, 711 Fed. Appx. 525, 530 (11th Cir. 2017) (affirming summary judgment for defendant where plaintiff's expert could not establish damages based on a misrepresentation.).

### 3. Champion's Statements that Its Dog Food Is Made With "Regional" Ingredients is Not Untrue or Misleading

Plaintiff's damages methodology also relies on a "corrective statement" that Champion's dog food "may include ingredients that are sourced outside the region where it is manufactured. This may include not only other regions within the United States but also other regions

internationally." SUMF ¶ 84. Once again, Plaintiff offers a solution in search of a problem. Champion never marketed its dog food as **only** containing "regional" ingredients, that the ingredients are "all regional," or "100% regional." *Id.* ¶ 21. Because Plaintiff's damages methodology is premised upon a representation Champion never actually made, Champion is entitled to summary judgment as to the "regional" representation.[20] *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 253 (3d Cir. 2011) (affirming dismissal of false advertising claim and stating "even if the words 'Havana Club,' taken in isolation, may be understood as indicating a product's geographic origin in Havana, Cuba, those same words cannot mislead a reasonable consumer who is told in no uncertain terms that 'Havana Club' is a brand of rum made in Puerto Rico"). For this reason alone, summary judgment is appropriate.

In addition, both the NorthStar and DogStar packaging at issue provide context for the "regional" statement, which Plaintiff's "corrective" statement ignores. On the NorthStar packaging for both the Six Fish and the Regional Red diets, it states "Canada's vast and unspoiled lands – our source of inspiration and fresh regional ingredients." SUMF ¶ 16. Similarly, on the DogStar packaging for Regional Red, it states "America's vast and fertile lands – our source of inspiration and fresh regional ingredients," while on the DogStar packaging for Six Fish, it states "New England's vast Atlantic waters – our source of inspiration and fresh regional fish." *Id.* ¶¶ 19-20. Here, as a matter of undisputed fact, the ingredients Champion represented as "regional" were regional, within the context of the full communication on the package. To start, for the NorthStar Six Fish diet, the "regional wild-caught saltwater fish" came from the Pacific Ocean and are sourced from Keltic Seafood Ltd. in Port Hardy, British

---

[20]Plaintiff's "regional" corrective statement is illogical for Plaintiff's NorthStar diets because these diets were manufactured in Canada as stated on the packaging. SUMF ¶ 5. Therefore, this corrective statement, which relies on the assumption that the diet is manufactured in the United States, is wholly inapplicable to Plaintiff's purchases of the ORIJEN made at NorthStar.

Columbia, Canada, and the "freshwater fish" came from lakes located in the Canadian Provinces, sourced from Freshwater Fish Co. in Winnipeg, Manitoba, Canada. SUMF ¶ 91. For the DogStar Six Fish diet, the "wild-caught fish" come from the Atlantic Ocean, the nearest ocean to DogStar. *Id.* ¶ 92. In fact, Plaintiff **admitted** he knew the fish in the DogStar Six Fish diet were sourced from New England. *Id.* ¶ 93. For the NorthStar Regional Red diet, "the Regional Red Meats" such as angus beef, wild boar, and heritage pork were sourced from ranches in Alberta, Canada, while the lamb was sourced from Alberta, Canada, as well as New Zealand, and the free-range bison is sourced from ranches in Alberta Canada, as well as ranches in Colorado when the Canadian supply was low. *Id.* ¶ 94. Finally, for the DogStar Regional Red diet, Champion sources the lamb, mutton, and goat ingredients from farms in Kentucky and Indiana, and ranches in New Zealand, the beef ingredients from Nebraska, the pork ingredients from Kentucky and Indiana, and the catfish ingredients from Kentucky. *Id.* ¶ 95. When Plaintiff's myopic and constricted view of regional is replaced with Champion's actual statements, in their full context, the undisputed facts demonstrate that Champion did not make an untrue or misleading representation as to "regional," warranting entry of summary judgment for this reason as well.

> **4. Champion's "Never Outsourced" Statement Pertains to the Finished Food Product (Not the Ingredients) and is True**

Plaintiff alleges that the "Never Outsourced" language was misleading. To that end, Plaintiff's damages methodology relies on a "corrective statement" that Champion "uses third parties to process and manufacture protein meals and tallows used in its dog foods." SUMF ¶ 84. But the "Never Outsourced" statements applies to the finished food product, as Champion is not a ranch, slaughterhouse, renderer, fishing operation, farm, or any kind of ingredient producer. SUMF ¶ 94. Protein meals (included in some but not all diets) and tallow ingredients are made by renderers. *Id.* The ORIJEN Regional Red and ORIJEN Six Fish packaging from NorthStar

state that "Quality is Never Outsourced" and "we prepare ORIJEN ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." *Id.* ¶ 29. On the DogStar packaging for ORIJEN Regional Red and ORIJEN Six Fish, it explains that "Never Outsourced" means the finished dog food is "prepared exclusively in our DogStar Kitchens – we don't make foods for other companies and we don't allow our foods to be made by anyone else." *Id.* ¶ 30. In fact, Champion did not outsource the making of its finished food products. *Id.* ¶ 97. Critically, the purported "corrective" statement would have had no value or impact to Plaintiff. When asked what the "Never Outsourced" statement meant, Plaintiff testified "[i]t means that they make it themselves, and they don't … have somebody else make it for them in a big mill somewhere." *Id.* ¶ 31. And, when asked if "Never Outsourced" applied to the finished food product, Plaintiff answered "yes." *Id.* Summary judgment is warranted against this claim.

### 5. The Remaining "Misleading" Statements in the TAC Cannot Form the Basis of Any Claim

With respect to the remaining statements that Plaintiff contends are misleading (*see* Section III(c)), statements (iii), (iv), (x)-(xii), (xiv)-(xviii), and (xxii) were not on any of the packages of the dog food Plaintiff purchased, and Plaintiff did not view any brochures or websites. SUMF ¶¶ 33, 34, 35, 36, 37. Therefore, these statements could not possibly form the basis of any of Plaintiff's claims. *See Valenti v. Hewlett Packard Co.*, No. 03-2257, 2004 WL 1277490, at *1 (Wis. Ct. App. 2004) (affirming summary judgment for defendants because "the consumers failure to see or rely on any particular statements regarding the cartridges prior to making their purchase was fatal to their [WDTPA] claim"); *Schmidt v. Bassett Furniture Indus.*, No. 08-C-1035, 2011 WL 67255, at *6 (E.D. Wis. Jan. 10, 2011) ("At a minimum, to meet the causation element under [the WDTPA], plaintiffs would have to show that they saw the Bassett sign or other indicia of agency prior to placing their furniture orders."); *see also Owen v.*

*Wangerin*, 985 F.2d 312, 315–16 (7th Cir. 1993) (affirming Stadtmueller, J. finding that "reliance was unreasonable ... because [plaintiff] did not read the deed, he could not have reasonably relied upon the misrepresentations").

Finally, with respect to all of the misleading statements in Section III(C), Plaintiff cannot generate a genuine dispute of material fact as to them because he lacks a damages methodology tied to the correction of those statements. For this reason, summary judgment should be entered as to those statements.[21] *Shoemaker v. KraftMaid Cabinetry, Inc.*, No. 01-0154, 2001 WL 1340585, at *2-5 (Wis. Ct. App. Nov. 1, 2001) (affirming dismissal of plaintiff's claims on the basis that plaintiff failed to provide evidence of a damages methodology at trial); *Khasin v. R. C. Bigelow, Inc.*, No. 12-CV-02204-WHO, 2016 WL 4502500, at *5-6 (N.D. Cal. Aug. 29, 2016) (granting summary judgment where plaintiff's "failure to provide any evidence of damages").

### B.     Summary Judgment Should be Entered on the Fraud by Omission Claim

As this Court observed in its Order, and because the fraud by omission claim did not materially change from the SAC to the TAC (*compare* SAC ¶¶ 151-157 *with* TAC ¶¶ 178-184), this claim "is better described as one for intentional misrepresentation."[22] Order at 10. Because Count II relies on the same deficient misrepresentation theories that form the basis for his WDTPA claim, the fraud by omission claim must also fail. *See* Sec. V(A).

Further, Champion is entitled to summary judgment on Count II because Plaintiff cannot establish that Champion owes him a duty to disclose. *See Tietsworth*, 2004 WI 32, ¶ 12 ("It is well-established that a non-disclosure is not actionable as a misrepresentation tort unless there is

---

[21] The TAC also contends that Champion's White Paper contains misrepresentations. TAC at ¶¶ 47-53. Champion disagrees, but, regardless, Plaintiff admits he never read it. SUMF ¶ 38.

[22] Count II is also barred by the economic loss rule. *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000) (affirming that the economic loss rule bars intentional misrepresentation claim); *Tietsworth*, 2004 WI 32, ¶ 37 ("The economic loss doctrine bars the plaintiffs' common-law fraud claim.").

a duty to disclose."). "The crucial element in determining whether a duty exists is whether the mistaken party would reasonably expect disclosure." *JBCB, LLC v. McKenna Berry Co., LLC*, No. 2016AP2208, 2017 WL 6403089, at *3 (Wis. Ct. App. Dec. 14, 2017). A duty to disclose would arise here only if "[t]here is a reasonable expectation of disclosure when taking advantage of a party's ignorance is **so shocking to the ethical sense of the community**, and is **so extreme and unfair**, as to amount to a form of **swindling** in which the party is led by appearances into a bargain that is a trap of whose essence and substance he is unaware." *Id.* (emphasis added).

On this record, there could be no reasonable expectation of disclosure because Champion did not take advantage of Plaintiff's ignorance to swindle him into a bargain that was a trap. The undisputed facts reflect that: (i) Champion's dog food contained heavy metals (as do other dog foods) at levels that are not unsafe;[23] (2) Champion's dog food potentially contained trace levels of BPA, but below any level that would cause harm, similar to many other dog foods; and (iii) Champion received two shipments of beef tallow that, unbeknownst to it,[24] contained minute levels of pentobarbital that would not cause harm to dogs, Champion's finished dog food product produced from these lots did not contain any detectable level of pentobarbital, and the FDA approved of Champion's handling of the situation. *See* Sec. III(F). As a matter of law, these facts are not "so shocking to the ethical sense of the community, and [] so extreme and unfair, as to amount to a form of swindling in which the party is led by appearances into a bargain that is a trap of whose essence and substance he is unaware." *JBCB, LLC*, 2017 WL 6403089, at *3.

---

[23] Counts II and III, to the extent they are based on heavy metals, should be dismissed for the same reasons and rationale set forth in the Court's Order applicable to the WDTPA. Order at 7.

[24] Because it is an undisputed fact that Champion did not know about pentobarbital being in the tallow supplied by JBS until May 2018, long after Plaintiff stopped purchasing Champion dog food, Plaintiff also cannot satisfy the "knowledge" element of Count II. *See Continental Assur. Co. v. Am. Bankshares Corp.,* 46 B.R. 206, 208 (E.D. Wis. 1986) (granting defendant's motion for summary judgment on plaintiff's fraud claim where the evidence demonstrated that none of the defendants had knowledge of the misrepresentations).

With respect to DCM, Plaintiff stopped purchasing Champion's dog food before the FDA made its first announcement about DCM. Additionally, Plaintiff's DCM theory relies on the July 2018 and June 2019 reports from the FDA, which do not reach any conclusions about a causal link. Speculation cannot create a duty to disclose. *Id.*

Finally, concerning the "fresh" and "regional" statements, because Champion never represented that all ingredients that were either "fresh" or "regional," a duty to disclose could not arise due to Champion using ingredients were not "regional" or "fresh." Regardless, the fact that some ingredients would be raw (*i.e.*, fresh-frozen) or from outside the kitchen's "region," especially when Plaintiff puts forward no evidence that this would materially impact the nutritional quality of the food, would not come close to the necessary level of "extreme," "unfair," or "amount to swindling" to trigger a duty to disclose. Because Plaintiff cannot establish a duty to disclose, summary judgment should be granted as to Count II. *See also Guyer v. Cities Serv. Oil Co.*, 440 F. Supp. 630, 633 (E.D. Wis. 1977) (granting summary judgment on misrepresentation claim and reasoning "[t]he plaintiffs in this action have failed to establish that the defendant had a duty to disclose its Milwaukee marketing strategy to them, and the Court has determined that as a matter of law the defendant had no such duty.").

### C. The TAC Negligence Claim is Barred by the Economic Loss Doctrine and Fails for the Same Reasons as Count I, Requiring Summary Judgment

As a threshold matter, Count III for negligence is barred by the economic loss rule. "Under the economic loss doctrine, Wisconsin law bars tort claims which seek only 'economic losses' related to a commercial transaction."[25] *Home Valu, Inc. v. Pep Boys*, 213 F.3d at 963.

---

[25] In its Motion to Dismiss the SAC, Champion argued that Plaintiff's negligence claim was barred by the economic loss doctrine. *See* ECF No. 27 at 15-16. In the face of this, Plaintiff voluntarily dismissed his negligence claim. *See* ECF No. 29 at n. 8. Nevertheless, the TAC reasserts negligence, this time pointing to there being no contract between parties. TAC ¶¶ 148-184. But the economic loss rule precludes the negligence claim regardless of the absence of a

"The economic loss doctrine has been applied by Wisconsin courts to bar claims of negligent and strict responsibility misrepresentation, and by federal courts applying Wisconsin law to bar claims of negligent, strict responsibility, and intentional misrepresentation," when economic damages are sought. *Tietsworth*, 2004 WI 32, ¶ 29. To the extent that Count III is premised on Wis. Stat. § 94.72, the economic loss doctrine still requires dismissal. *See Kmart Corp. v. Herzog Roofing, Inc.*, No. 2017AP1041, 2018 WL 5740702, at *1 (Wis. Ct. App. Oct. 30, 2018) (unpublished) (dismissing negligence per se claim under the economic loss doctrine).

As it is indisputable that Plaintiff is seeking economic losses, *see* TAC ¶ 197, Count III is barred by the economic loss doctrine. *See Home Valu*, 213 F.3d at 965 (affirming dismissal of negligent, strict responsibility, and intentional misrepresentation claims as barred by Wisconsin's economic loss doctrine); *Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co.*, 123 F.3d 675, 682 (7th Cir. 1997) (holding "Wisconsin would not allow a negligence...claim seeking to recover economic damages" based on representations regarding product quality).

Finally, as Count III appears to be based on the same alleged misrepresentations that were the subjects of Counts I and II, TAC ¶ 191, summary judgment should be entered for the same reasons outlined by Champion *supra*.

## V.    CONCLUSION

For the foregoing reasons, Champion asks the Court to grant the Motion and enter summary judgment for Champion.

---

contract. *See Miller v. U.S. Steel Corp.,* 902 F.3d 573, 575 (7th Cir. 1990) (affirming the dismissal of a tort claim under Wisconsin law despite the absence of privity of contract because "[p]rivity of contract is not an element of the economic loss doctrine").

Dated:  August 15, 2019                    Respectfully submitted,

By:     s/ Susan E. Lovern
        Susan E. Lovern, SBN 1025632
        Mark E. Schmidt, SBN 1052450
        Derek J. Waterstreet, SBN 1090730
        von BRIESEN & ROPER, s.c.
        411 East Wisconsin Avenue
        Suite 1000
        Milwaukee, Wisconsin 53202
        Telephone: (414) 287-1286
        Facsimile: (414) 238-6599
        E-mail: slovern@vonbriesen.com
                mschmidt@vonbriesen.com
                dwaterstreet@vonbriesen.com

        s/ David A. Coulson
        David A. Coulson
        Florida Bar No. 176222 (admitted to E.D.
        Wis.)
        GREENBERG TRAURIG, P.A.
        333 S.E. 2nd Avenue, Suite 4400
        Miami, Florida 33131
        Telephone: (305) 579-0754
        Facsimile: (305) 579-0717
        Email: coulsond@gtlaw.com

        *Attorneys for Defendants*
        *Champion Petfoods USA Inc. and*
        *Champion Petfoods LP*