**SCOTT WEAVER,** individually and on behalf of all others similarly situated**,**

     **PLAINTIFF,**

**v.**

**CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP,**

     **DEFENDANTS**

Case No. 2:18-cv-01996-JPS

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ........................................................................................1

        A.      The Dog Food Packaging Deceives Consumers into Paying Ultra-
                Premium High Prices ....................................................................................1

        B.      "Biologically Appropriate" and "Fresh Regional Ingredients" are Specific,
                Measurable Marketing Guarantees ...............................................................2

        C.      CPF's Packaging Is Misleading as It Relates to Contaminants ..............................3

                1.      CPF's Packaging Misleads Reasonable and Objective Consumers
                        Regarding Heavy Metals........................................................................3

                2.      CPF's Packaging Is Misleading with Regard to BPA ................................4

                3.      CPF's Packaging Is Misleading with Regard to Pentobarbital..................5

        D.      CPF's "Fresh" and "Regional" Claims Are False or Are Misleading ....................8

III.    STANDARD OF REVIEW ......................................................................................10

IV.     ARGUMENT...........................................................................................................10

        A.      Summary Judgment on Plaintiff's WDTPA Claim Should Be Denied ................10

                1.      Summary Judgment Should Be Denied as to CPF's "Biologically
                        Appropriate" Claim...............................................................................11

                        a.      "Biologically Appropriate" Is an Actionable Statement of
                                Fact............................................................................................11

                        b.      Plaintiff's Damages Theory Supports His Claim that
                                "Biologically Appropriate" Violates the WDTPA ........................13

                        c.      The Presence of Heavy Metals and BPA Renders
                                Champion's "Biologically Appropriate" Representation
                                False ..........................................................................................14

                        d.      The Presence and/or Risk of the Barbiturate Drug
                                Pentobarbital Renders CPF's "Biologically Appropriate"
                                Representation False ...................................................................15

                2.      There Is a Genuine Issue of Fact as to Whether the Promise of
                        "Fresh" Ingredients Is Misleading ...........................................................19

i

3.     The Factual Record Shows the Term "Regional" Is Untrue, Deceptive, and Misleading.........................................................................22

4.     "Never Outsourced" Represents that the Included Meal and Tallow Are Not Made by a Third-Party Renderer ..................................24

B.    Summary Judgment Should Be Denied on Plaintiff's Fraud by Omission Claim.........................................................................................................25

C.    The Negligence Per Se Claim Is Not Barred by the Economic Loss Doctrine.......................................................................................................27

V.    CONCLUSION.........................................................................................................28

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Ackerman v. Coca-Cola Co.*,
    No. CV-09-0395 (JG), 2010 WL 2925955 (E.D.N.Y. July 21, 2010)............................21

*Adaptive Micro Sys. LLC v. AdsLED, Inc.*,
    No. 11-C-668, 2011 WL 13217958 (E.D. Wis. Oct. 18, 2011)........................................11

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................10, 14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................10

*Christense v. TDS Metrocom LLC*,
    2009 WI App 21, 763 N.W.2d 248 (Wis. Ct. App. 2008) .................................................12

*Dorr v. Sacred Heart Hosp.*,
    597 N.W.2d 462 (Wis. Ct. App. 1999) ......................................................................20, 22

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*,
    No. 09-CV-0852, 2016 WL 3579953 (E.D. Wis. June 24, 2016) ....................................22

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
    8 F. Supp. 3d 467 (S.D.N.Y. 2014)..................................................................................21

*Gonzalez v. City of Elgin*,
    578 F.3d 526 (7th Cir. 2009) ..........................................................................................10

*Good Shepherd Manor Found., Inc. v. City of Momence*,
    323 F.3d 557 (7th Cir. 2003) ..........................................................................................13

*Hemy v. Perdue Farms, Inc.*,
    No. CIV.A. 11-888 FLW, 2011 WL 6002463 (D.N.J. Nov. 30, 2011)............................18

*Hennig v. Ahearn*,
    601 N.W.2d 14 (Wis. Ct. App. 1999) ........................................................................25, 26

*Home Valu, Inc. v. Pep Boys*,
    213 F.3d 960 (7th Cir. 2000) ..........................................................................................28

*In re Syngenta AG MIR 162 Corn Litig.*,
    131 F. Supp. 3d 1177 (D. Kan. 2015)..............................................................................28

*JBCB, LLC v. McKenna Berry Co., LLC*,
    2018 WI App 8, 909 N.W. 2d 210 (Wis. Ct. App. 2017)..................................................26

*Kaloti Enters., Inc. v. Kellogg Sales Co.*,
    2005 WI 111, 699 N.W.2d 205 (Wis. 2005)....................................................27

*Kisting v. Gregg Appliances, Inc.*,
    No. 16-cv-141, 2016 WL 5875007 (E.D. Wis. Oct. 7, 2016)...........................18

*Martin v. LG Elecs. USA, Inc.*,
    No. 14-CV-83-JDP, 2015 WL 1486517 (W.D. Wis. Mar. 31, 2015).............11

*Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*,
    733 F. Supp. 2d 965 (E.D. Wis. 2010)..............................................................10

*MH Imaging, LLC v. K&K Holdings, LLC*,
    2017 WI App 21, 896 N.W.2d 390 (Wis. Ct. App. 2017)................................28

*Murillo v. Kohl's Corp.*,
    197 F. Supp. 3d 1119 (E.D. Wis. 2016).....................................................10, 12

*Obesity Research Institute v. Fiber Research International*,
    310 F. Supp. 3d 1089 (S.D. Cal. 2018).............................................................21

*Ollerman v. O'Rourke Co.*,
    288 N.W.2d 95 (Wis. 1980)..............................................................................25

*Parks v. Ainsworth Pet Nutrition, LLC*,
    377 F. Supp. 3d 241 (S.D.N.Y. 2019)..............................................................21

*Perod Ricard USA v. Bicardi U.S.A.*,
    653 F.3d 241 (3d Cir. 2011)..............................................................................23

*Reilly v. Chipotle Mexican Grill*,
    711 F. App'x 525 (11th Cir. 2017) ...................................................................22

*Schmidt v. Bassett Furniture Indus.*,
    No. 08-C-1035, 2009 WL 3380354 (E.D. Wis. Oct. 20, 2009).......................25

*Scott v. Harris*,
    550 U.S. 372 (2007)..........................................................................................14

*Silverman v. Motorola, Inc.*,
    798 F. Supp. 2d 954 (N.D. Ill. 2011) ................................................14, 15, 19

*Tietsworth v. Harley Davidson*,
    2004 WI 32, 677 N.W.2d 233 (Wis. 2004).................................................11, 28

*Uebelacker v. Paula Allen Holdings, Inc.*,
    464 F. Supp. 2d 791 (W.D. Wis. 2006) .......................................................19, 22

*Walker v. Ranger Ins. Co.*,
  2006 WI App 47, 711 N.W.2d 683 (Wis. Ct. App. 2006) ................................................28

*Weaver v. Champion Petfoods USA Inc.*,
  No. 18-CV-1996-JPS, 2019 WL 2774139 (E.D. Wis. July 1, 2019)..........................26, 28

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008) ........................................................................................21

## STATUTES, RULES & OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ............................................................................................................10

Fed R. Evid. 704 ..................................................................................................................14

RESTATEMENT (SECOND) OF TORTS §552 cmt. *m* (1977)..............................................25

Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. §100.18 ...........................10

# I.  INTRODUCTION

Champion Petfoods USA Inc. and Champion PetFoods LP (together "CPF") labeled its Dog Food[1] to attract certain pet food consumers looking for high quality pet food and willing to pay top market price for it. But CPF's representations on those packages and labels were false and misleading.

CPF's labels evolved from generic representations of quality to robust marketing touting specific factual attributes through statements and pictures, promising high-quality food that provided top nutritional value and contained natural, fresh, and local ingredients. With this aggressive campaign, CPF succeeded in growing its share of the premium pet food market, but it failed to fulfill the promises it made on those labels. Throughout the Class Period (defined in TAC, ¶153), CPF continued to grow its market share and charge ultra-premium prices by misleading consumers that the Dog Food was high quality, natural, fresh, and made with regional (local) ingredients, when in reality the  Dog Food does not satisfy those promises.

# II.  STATEMENT OF FACTS

## A.  The Dog Food Packaging Deceives Consumers into Paying Ultra-Premium High Prices

CPF sells two brands of high-priced premium Dog Food, Acana and Orijen, to pet owners by falsely and misleadingly marketing its Dog Food as Biologically Appropriate and made with Fresh Regional Ingredients that are Never Outsourced (collectively "BAFRINO"). ¶98. CPF further represents that its Dog Food will "Nourish as Nature Intended" by "Delivering Nutrients

---

[1] "Dog Food" is identified in Paragraphs 7 and 26 of the Third Amended Complaint ("TAC"). Unless otherwise noted, all paragraph references ("¶_" or "¶¶__") are to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment and Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment.

Daily." ¶99. CPF relies on its BAFRINO marketing strategy to deceptively convey that its premium pricing reflects an ultra-premium product made with the high-quality ingredients. ¶130.

In fact, CPF's Dog Food contains, or has a material risk of containing, heavy metals, Bisphenol A ("BPA"), and even pentobarbital, and are not made with fresh and regional ingredients. ¶¶45, 56, 109-113, 122-123. Plaintiff Scott Weaver ("Plaintiff") purchased Orijen Regional Red and Six Fish from early 2008 to approximately August 2017 for his three Golden Retrievers. ¶6. Plaintiff testified that he would not have purchased the Dog Food if he had known the truth about CPF's ingredients. ¶102.

### B. "Biologically Appropriate" and "Fresh Regional Ingredients" are Specific, Measurable Marketing Guarantees

CPF represents to consumers that "Biologically Appropriate" means Dog Food that "mirror[s] the freshness and variety of meats that dogs … are evolved to eat," with an emphasis on the use of "fresh" (i.e. never frozen) animal ingredients. ¶100. CPF touts "Biologically Appropriate" as a measurable statement of fact that allows consumers to understand the ingredients used by CPF when making their purchasing decisions. *Id.* CPF intentionally uses "Biologically Appropriate" as a scientific term that differentiates its Dog Food as being at the "limits of technology, ingredient processing, food science" and "as close … as possible with the perfect food." ¶14.

CPF also represents to consumers that its Dog Food is "made with unmatched regional ingredients, delivered fresh" and that the ingredients are "raised in our region by people we know and trust." ¶16. CPF packaging further describes "Fresh Regional Ingredients" to mean that its Dog Food is "[p]repared with pride from trusted regional ingredients" that are "Grown Close to Home," by focusing on "local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." ¶17. CPF provides additional

representations, such as "Fresh and Regional: Delivered daily from local farms and ranches," that its top 10 ingredients are made from "fresh or raw, premium animal ingredients," and that out of 13 pounds of Dog Food, 11 pounds contain animal ingredients. ¶26.

CPF's Orijen brand specifically claims to use "ranch-raised meats, cage-free poultry, nest-laid eggs, wild-caught fish and sun-ripened fruits & vegetables all grown close to home by people we know and trust and delivered to our kitchen doors FRESH EACH DAY." ¶27. And CPF uses photographs of "exemplar" suppliers to represent to consumers that its "Fresh Regional Ingredients" are sourced from small, regional farms owned by local families. ¶32. CPF has admitted it "ha[s] recently considered changing [the 'regional'] definition … as we have outgrown our ability to source from our local region"). ¶21. Thus, CPF knew that a consumer could be misled into thinking that all the undisclosed non-regional ingredients were indeed regional. *Id.*

Based on CPF's packaging, Plaintiff, like other consumers, reasonably understood the description of "Biologically Appropriate" to mean that contaminants such as heavy metals, BPA, and pentobarbital are tested for and excluded from the Dog Food to the greatest extent possible. ¶53. Plaintiff, like objective consumers, also reasonably interpreted CPF packaging, labeling, and photographs to mean that "everything is fresh" and that ingredients are delivered in a fresh condition and used that day from local or "regional" sources. ¶¶16-21, 24.

### C. CPF's Packaging Is Misleading as It Relates to Contaminants

#### 1. CPF's Packaging Misleads Reasonable and Objective Consumers Regarding Heavy Metals

Heavy metals are not present in all food or dog food and certain ingredients have varying amounts of heavy metal contamination. ¶¶39, 45. CPF's own testing reveals that fish and plant ingredients sourced from the Atlantic may contain high heavy metal levels, while other ingredients, such as chicken, lack detectable amounts of heavy metals. *Id.* A U.S. Food & Drug

Association ("FDA") study has shown that a majority of human food and beverage products lack detectable amounts of arsenic, lead, and mercury. ¶41. Internally, CPF's goal was to produce Dog Food without any heavy metals in its future product formulations. ¶39. CPF's goal of zero heavy metals in its Dog Food is reasonable, as it aligns with other current food and beverage standards, such as the U.S. Environmental Protection Agency's ("EPA") "maximum contaminant level goal" for arsenic of zero. *Id.* Additionally, CPF employees testified that even they believed the Dog Food and their ingredients were free of heavy metals. *Id.*

Despite evidence that reducing or even eliminating heavy metals is possible with proper control and monitoring, CPF internally acknowledged that its failure to do so was negligent and ongoing. ¶103. Although CPF admittedly conducts minimal heavy metal testing, CPF fails to monitor these tests, as evidenced by its use of ingredients with high heavy metal levels. ¶¶45, 47, 103. As a result, there is evidence that CPF's Dog Food sometimes contains heavy metals that appear to exceed both World Health Organization and EPA daily consumption standards. ¶47.

Plaintiff's animal nutritionist expert, Dr. Gary Pusillo, opined that the nutritional value of CPF Dog Food is steadily reduced as heavy metal presence increases. *Id.*[2]

### 2. CPF's Packaging Is Misleading with Regard to BPA

BPA is a contaminant that can be controlled and excluded, as evidenced by the existence of BPA-free products currently sold in retail markets. ¶¶49-52. Regulatory agencies encourage the elimination of BPA from products based on the implicit understanding that manufacturers are able

---

[2] Although the limited data set of heavy metal testing of the Dog Food does not indicate that the National Research Counsel ("NRC") maximum tolerable levels ("MTLs") were necessarily exceeded, the NRC MTLs are adulteration standards at most—not a governing standard creating a safe harbor for ultra-premium Dog Food. ¶¶43, 45.

to exclude BPA from goods sold in retail markets. *Id.* And CPF was aware of the risk of the inclusion of BPA but failed to mitigate that risk or disclose to consumers that there was a known risk it was ignoring instead of actively confronting.

CPF and Plaintiff's testing results confirm that BPA exclusion is possible in dog foods, as BPA was found relatively infrequently in many of the tested foods. ¶50.[3] Yet despite the ability to control BPA contamination, CPF only took the passive step to ask its packaging suppliers to guarantee that the packaging was BPA free; it did not undertake testing for BPA or require the suppliers to provide testing results. ¶¶104-105. CPF ultimately failed to ensure its products were free of BPA with its negligible quality controls, the evidence shows that the presence of BPA can be mitigated when monitored correctly. ¶¶49-52, 104-105.

A reasonable consumer, like Plaintiff, would not expect the Dog Food to contain any amounts of an excludable, plastic contaminant such as BPA, based on CPF's representation that its Dog Food is "Biologically Appropriate" and made with the highest quality ingredients. ¶53. In addition, a reasonable consumer, like Plaintiff, would not have purchased the Dog Food had the risk and/or presence of BPA been disclosed on CPF packaging and labeling. ¶102.

### 3. CPF's Packaging Is Misleading with Regard to Pentobarbital

According to the FDA, a Dog Food is considered adulterated and not eligible for sale if found with "any level" of the euthanasia drug pentobarbital. ¶72. Although CPF was aware that the dog food industry had a serious issue with pentobarbital contamination from beef tallow, including recalls in both February 2017 and February 2018, CPF never tested any of its beef tallow for pentobarbital prior to May 2018. ¶116. Although CPF properly designated beef tallow

---

[3] And when the Dog Food was tested, it had BPA contamination at almost twice the amount found in CPF's competitors. ¶56.

as a high-risk ingredient, meaning it has the highest risk of contaminating the Dog Food, CPF failed to audit its beef tallow supplier, JBS USA Holdings, Inc. ("JBS"), prior to February 2018. ¶¶117, 119.

When CPF finally audited JBS in February 2018, the CPF auditor observed that JBS equipment had excessive buildup of other products, indicating likely cross-contamination with other ingredients that were not produced according to CPF specifications. ¶120. The CPF auditor should have recognized that JBS Standard Operating Procedure for handling and excluding "dead or condemned carcasses" from CPF products was likely inadequate and required immediate corrective actions. ¶118. However, the CPF auditor failed to follow-up or even discuss this serious deficiency internally at CPF because corrective action follow-ups were a "weak point" for him. ¶120.

Shortly after this audit, in May 2018, the FDA alerted CPF that it had manufactured over 1.7 million pounds of Dog Food with pentobarbital contaminated beef tallow from JBS. ¶67. Although CPF quickly estimated that its Dog Food was contaminated with detectable amounts of pentobarbital (up to 3.4 part per billion ("ppb")), it had already shipped over 866,000 pounds of Dog Food to distributors, including over 100,000 pounds that were already in retail markets. ¶¶68, 121. According to FDA standards, CPF's early estimate of 3.4 ppb would designate all 1.7 million pounds of kibble as adulterated. ¶72. Despite these troubling initial estimates, CPF opted not to recall its contaminated Dog Food. Instead, in an effort to protect is profits at the expense of its customers, CPF tested 11 samples of its affected Dog Food, a woeful total of approximately 0.26 pounds (out of an approximately 1.7 million pounds), to see if pentobarbital was detectable in excess of 2 ppb. ¶¶123, 127. According to Plaintiff's expert, this sampling was insufficient to properly assess the 1.7 million pounds of affected Dog Food, given the small sampling amount

of Dog Food tested and due to the heterogeneity nature of tallow that results in inconsistent distribution of pentobarbital. ¶127.

Although this limited testing did not detect pentobarbital in excess of 2 ppb, CPF's expert acknowledged that the 1.7 million pounds of Dog Food, including the 100,000 pounds of kibble that was eventually sold in retail markets, very well could have been contaminated with pentobarbital at levels below 2 ppb. ¶¶68, 122. CPF's expert also admitted that the vast majority of the Dog Food that was not tested could potentially have been contaminated with pentobarbital in excess of 2 ppb, including the 100,000 pounds of kibble made with the contaminated tallow that was sold in retail markets. ¶¶68, 123. Likewise, the FDA has opined that a negative test for pentobarbital on a sample "simply indicates that the particular sample tested was negative for pentobarbital" and "random testing of finished product may not be representative of all units in your products." ¶129. Plaintiff's expert agreed, noting that pentobarbital is likely present at some level in the affected the Dog Food. ¶126.

During the FDA's investigation, CPF apparently refused to accommodate the FDA's request that it submit an entry to the Reportable Food Registry, which is reserved for "when there is a reasonable probability that the use of, or exposure to, an article of food will cause serious adverse health consequences or death to humans or animals." ¶73. Before the FDA closed its investigation, FDA officials recommended testing for pentobarbital, and in response, CPF represented that pentobarbital testing would be required on all future shipments of beef tallow before the beef tallow would be used in the Dog Food. ¶124. However, CPF disregarded these assurances and still does not test any of its beef tallow for pentobarbital. *Id*. CPF also never notified consumers about the May 2018 pentobarbital contamination. ¶125. CPF made this decision to avoid "a panic in the marketplace." ¶72.

CPF's Dog Food was likely at risk for pentobarbital contamination for months, if not years, prior to May 2018, as evidenced by JBS's retained tallow samples from November 2017, January 2018, and February 2018, which all tested positive for detectable levels of pentobarbital. ¶128. But CPF did not disclose the risk of contamination, because it never tested any of the retained tallow it received from JBS for pentobarbital before May 2018. ¶116. Although CPF acknowledged it would be illegal to intentionally use any ingredient contaminated with pentobarbital in its Dog Food, CPF does not seem interested in confirming whether pentobarbital contaminated ingredients have been used in the past. ¶74.

A reasonable consumer, like Plaintiff, would not expect the Dog Food to contain any amounts of a poisonous contaminant such as pentobarbital, based on CPF's representation that its Dog Food is "Biologically Appropriate" and made with the highest quality ingredients. ¶¶98, 102, 130. CPF's packaging does not disclose any mention of pentobarbital or that pentobarbital contamination and/or risk of contamination is possible. ¶102. In addition, a reasonable consumer, like Plaintiff, would not have purchased the Dog Food had the risk and/or presence of pentobarbital been disclosed on CPF packaging and labeling. *Id.*

### D.    CPF's "Fresh" and "Regional" Claims Are False or Are Misleading

CPF's claim of "Fresh Regional Ingredients" is inaccurate and misleading due to its use of non-fresh ingredients, including frozen ingredients, expired ingredients, and "regrinds," which are often sourced from non-regional and international ingredient suppliers instead of CPF's advertised "exemplar" suppliers. ¶¶110-114.

CPF is aware that consumers, as well as its own employees, often struggle to understand the distinction between "fresh" ingredients and "raw" (frozen) ingredients. ¶106. A reasonable consumer, like Plaintiff, would understand that the claim of "fresh or raw," in conjunction with "Biologically Appropriate," would mean that "everything is fresh." ¶21. In spite of this, CPF's

packaging and labeling does not clearly distinguish which ingredients are "fresh" or "raw" or that certain ingredients may either be "fresh" *or* "raw" depending on the season. ¶107. CPF's marketing department echoed this sentiment by flagging "fresh ingredients" as a misleading packaging claim that cannot be substantiated because not all of CPF's ingredients are fresh and delivered daily. ¶112. CPF's packaging is also misleading to the extent it repeatedly emphasizes the use of "fresh ingredients," when in fact certain ingredients are "delivered fresh," but are not necessarily fresh once used in the finished Dog Food. ¶¶22, 110-111.

Moreover, CPF's use of frozen ingredients, including some animal ingredients that have been in frozen storage for three to four years, further contradicts its marketing claim of "fresh ingredients." ¶110. CPF will also routinely use expired ingredients in its Dog Food, as long as CPF employees have conducted a subjective "smell test" or sensory evaluation and determined that the ingredient's shelf life can be extended. *Id.* Finally, CPF incorporates sizable amounts of "regrinds," Dog Food that has not met CPF specifications, as an ingredient in CPF diets at inclusion rates as high as 18% of the total diet, despite not being "fresh" or even listed as an ingredient on CPF packaging. ¶111.

CPF's "Fresh Regional Ingredients" packaging claim is further misleading based on its undisclosed use of international suppliers, with ingredients sourced from the European Union, New Zealand, Norway, China, and Latin America. ¶¶113, 115. Although CPF vehemently denies any ingredients are sourced from China, the evidence shows that CPF uses at least two vitamins that originate in China. ¶115. To further mislead consumers, CPF packaging utilizes eye-catching photographs that depict small, local farmers and ranchers, which CPF represents as "exemplar suppliers," who provide its main ingredients, without disclosing to consumers that its primary ingredient suppliers are actually often large, multinational conglomerates, such as Tyson. ¶32.

When selecting exemplar suppliers, CPF will even purposefully conceal a suppliers' association with or ownership by large corporations in order to maintain the façade of only using small, local farmers. *Id.* Based on CPF's packaging and labeling, a reasonable consumer would not expect CPF to use non-fresh ingredients, including frozen ingredients, expired ingredients, and regrinds or ingredients from non-regional suppliers.

## III. STANDARD OF REVIEW

On a motion for summary judgment, CPF bears the burden of proving an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue of material fact exists when there is sufficient evidence for a jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court "must accept all facts and reasonable inferences in the light most favorable to the non-moving party," *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009),[4] and all doubts are "resolved against the moving party." *Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 965, 967 (E.D. Wis. 2010).

## IV. ARGUMENT

### A. Summary Judgment on Plaintiff's WDTPA[5] Claim Should Be Denied

There are multiple material facts in dispute on Plaintiff's WDTPA claim. Contrary to CPF's argument, the evidence shows that CPF made and continues to make numerous representations of fact to the public (including Plaintiff) on its Dog Food labels, which are untrue or misleading. *Murillo v. Kohl's Corp.*, 197 F. Supp. 3d 1119, 1126 (E.D. Wis. 2016); *see also*

---

[4] Here, as throughout, all emphasis is deemed added and citations and footnotes are omitted unless otherwise noted.

[5] "WDTPA" is the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. §100.18.

*Martin v. LG Elecs. USA, Inc.*, No. 14-CV-83-JDP, 2015 WL 1486517, at *8 (W.D. Wis. Mar. 31, 2015). For example, CPF promises on its label that its Dog Food is "Biologically Appropriate" and made with "Fresh Regional Ingredients" and "Natural Ingredients" that are "Delivered Daily," "Never Outsourced," and come from "trusted" suppliers. ¶98. CPF further represents that its Dog Food will "Nourish as Nature Intended," "Delivering Nutrients Naturally." ¶99. None of that is true, and, as a result, Plaintiff suffered a pecuniary loss by paying more for the Dog Food than it was worth.

### 1. Summary Judgment Should Be Denied as to CPF's "Biologically Appropriate" Claim

#### a. "Biologically Appropriate" Is an Actionable Statement of Fact

CPF bases its labeling and marketing of the Dog Food around its "BAFRINO" concept. ¶¶2, 130; Exhibits to Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' MSJ Ex.") at 1A-1D (ECF Nos. 51-2 to 51-5). The "BA" in the "BAFRINO" concept means "Biologically Appropriate." *Id*. Far from being mere puffery, "Biologically Appropriate" is a factual representation that CPF makes on every bag of Dog Food to induce consumers to purchase its products. ¶¶2, 98. CPF's Dog Food labels represent that "Biologically Appropriate" means that the food is fresh, natural, and contains food dogs evolved to eat. ¶¶1, 100.

Because CPF defines "Biologically Appropriate" as encompassing natural and fresh ingredients, this is a statement that the trier of fact can evaluate to determine its truth or falsity. *Adaptive Micro Sys. LLC v. AdsLED, Inc.*, No. 11-C-668, 2011 WL 13217958, at *4 (E.D. Wis. Oct. 18, 2011); Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("MSJ") at 21 (ECF No. 47). As such, this case is distinguishable from the cases relied on by CPF. For example, in *Tietsworth v. Harley Davidson*, 2004 WI 32, ¶44, 677 N.W.2d 233, 246 (Wis. 2004), the court found that statements about the product being "a masterpiece" and of "premium

quality" were unactionable puffery. However, the trier of fact here can evaluate the truth or falsity of Biologically Appropriate by determining whether the Dog Food contain fresh, natural ingredients. As discussed in more detail herein, there is a genuine issue of fact as to whether that is the case. *See infra* Secs. IV.A.1.b-d.

CPF's reliance on *Murillo*, 197 F. Supp. 3d at 1126-28, is misplaced because (contrary to CPF's representation in its brief) the court held that plaintiffs had an actionable claim under the WDTPA. In *Murillo*, the plaintiff claimed that the defendant omitted certain information about pricing in its advertisements, which resulted in the pricing information that was advertised being misleading. *See id*. (citing *Christense v. TDS Metrocom LLC*, 2009 WI App 21, ¶11, 763 N.W.2d 248, 248 (Wis. Ct. App. 2008), which held that "a nondisclosure of facts, combined with an affirmative representation that is undermined by the non-disclosed facts, may result in liability under § 100.18(1)."). The *Murillo* court found that certain statements made by defendant, including "incredible savings" and "significant discount[s]," were not puffery and were actionable under the WDTPA when taken as a whole with misrepresentations about the products' prices. *Id*. at 1127-28. Similarly, here, Plaintiff alleges that CPF claims its Dog Food is Biologically Appropriate, which it then defines on the label as meaning, among other things, "rich, fresh, and a variety of meats." When the term "Biologically Appropriate" is taken as a whole along with the other misrepresentations about the product, as in *Murillo*, it cannot be considered puffery.

To argue, as CPF appears to do, that the "BA" portion of CPF's BAFRINO mandate is puffery, while conceding that the remainder of that term (Fresh Regional Ingredients, Never Outsourced) is not is contrary to CPF's own representations. Plaintiff's Biologically Appropriate claim, which arises out of CPF's own factual representations regarding what "Biologically Appropriate" means, should not be dismissed.

### b. Plaintiff's Damages Theory Supports His Claim that "Biologically Appropriate" Violates the WDTPA

Plaintiff's damages methodology shows that he suffered a pecuniary loss attributable to CPF's "Biologically Appropriate" misrepresentation. Dr. Krosnick's survey found the diminution in value of the Dog Food attributable to the risk of the presence of heavy metals (lead, arsenic, mercury, and cadmium) and BPA as well as to CPF's use of non-fresh, non-regional, and outsourced ingredients. ¶84; Defs.' MSJ Ex. 19 (hereafter "Krosnick Report") at 41-42 (ECF No. 51-25). Each respondent in Dr. Krosnick's survey was shown all the text on the bag of Dog Food. The text on the Dog Food labels includes CPF's "Biologically Appropriate" promise and its definition of that term—that the Dog Food contains natural and fresh ingredients and nourishment as nature intended, similar to what a dog would eat in the wild. *See supra* Sec. IV.A.1.a; ¶2; Krosnick Report at 41. The corrective statements in Dr. Krosnick's survey then provided information, which would show that the "Biologically Appropriate" representation on the label is untrue, deceptive, or misleading—i.e. that the Dog Food is not fresh, not regional, and has a risk of containing heavy metals and BPA that do not nourish as nature intended. ¶84; Krosnick Report at 41-42. Therefore, these corrective statements are directly tied to (1) CPF's representation that its Dog Food is Biologically Appropriate, as it defines that term and (2) Plaintiff's damages. The results of the survey show a diminished value associated with each of these disclosures. ¶82; Krosnick Report at 29-31. CPF cannot distort Plaintiff's theory of liability to avoid responsibility for the damage Plaintiff suffered due to its misleading claim that the Dog Food is Biologically Appropriate.

Dr. Krosnick, as an expert witness, cannot testify as to an ultimate legal conclusion in the case, such as whether Biologically Appropriate is a misrepresentation under the WDTPA. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("The district

court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *see also* Fed. R. Evid. 704. What he can, and will, testify to is that the corrective statements in his survey about the risk of heavy metals and BPA, that CPF's use of non-fresh ingredients are material to consumers, and that disclosing this information results in a decrease in the market value of the Dog Food, which directly ties to Plaintiff's theory of liability.

### c. The Presence of Heavy Metals and BPA Renders Champion's "Biologically Appropriate" Representation False

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury can find that the risk of the Dog Food containing heavy metals or BPA renders its "Biologically Appropriate" representation false. *Silverman v. Motorola, Inc*., 798 F. Supp. 2d 954, 958 (N.D. Ill. 2011) (citing *Anderson*, 477 U.S. at 248; *Scott v. Harris*, 550 U.S. 372, 380 (2007)). CPF represents that "Biologically Appropriate" means that the Dog Food contains natural and fresh ingredients and nourishment as nature intended, similar to what a dog would eat in the wild. *See infra* Sec. IV.A.1.b.; ¶2. Contrary to these factual representations, the Dog Food has a risk of containing heavy metals such as arsenic, lead, mercury, and cadmium and in fact contain levels that exceed certain heavy metal standards. ¶¶45, 47, 103. Regardless of whether the levels of heavy metals present in CPF's pet food are safe for consumption (a question not presented by this litigation), a reasonable consumer could still find that the presence of these contaminants are not nourishing but harmful and, therefore, not "Biologically Appropriate." Heavy metals are viewed as a potential health risk, including by CPF itself. ¶¶46-47, 103. Similarly, BPA is an industrial chemical that has been linked to various health issues, including being an endocrine disruptor. ¶¶84, 131. By CPF's own definition of "Biologically Appropriate," a manmade industrial chemical is not natural and does not provide nourishment as nature intended. Moreover, no reasonable consumer would believe otherwise.

Plaintiff's testimony offers further support that the risk of heavy metals and BPA in CPF's pet food renders its "Biologically Appropriate" representation false. ¶53 (stating that any level of heavy metals or BPA is not "Biologically Appropriate"; "I would say, again, they're telling me that it's biologically appropriate, that it's naturally sourced. I assume that they would have done testing or it wouldn't contain things that would harm my pets."; Plaintiff Weaver again stating he does not believe pet food with heavy metals, BPA, or pentobarbital is "Biologically Appropriate.").

As discussed above, the evidence contradicts CPF's claim (MSJ at 9, 17) that heavy metals are everywhere. *See supra* Sec. II.C.1. But even if that were true, it is irrelevant to the question of whether CPF made false or misleading statements to its pet food purchasers. ¶39. Similarly, the evidence also contradicts CPF's argument (MSJ at 17-18) that BPA is everywhere and also irrelevant to the question at issue in this case. *See supra* Sec. II.C.2; ¶51. Because it is not a foregone conclusion, as CPF tries to argue, that its Dog Food would necessarily have heavy metals and BPA, there is at least a question of fact for the jury whether CPF's statements that its food was "Biologically Appropriate" intentionally deceived consumers with regard to the risk of heavy metals and BPA in its Dog Food.

Summary Judgment should not be entered here as there is a genuine issue of material fact as to whether the risk of heavy metals and BPA in the Dog Food renders CPF's "Biologically Appropriate" representation false.

> **d.** **The Presence and/or Risk of the Barbiturate Drug Pentobarbital Renders CPF's "Biologically Appropriate" Representation False**

A reasonable jury can find that the presence and/or risk of pentobarbital contaminated tallow in CPF's Dog Food renders its "Biologically Appropriate" representation false. *Silverman*, 798 F. Supp. 2d at 958. Pentobarbital is a drug that is primarily used to euthanize animals. The FDA has stated that there is no tolerance for pentobarbital in pet food and CPF, itself, has

acknowledged that "any level" of pentobarbital is an adulterant according to the FDA. ¶¶68, 72, 74. In other words, pet food adulterated by pentobarbital is illegal to sell, and CPF's own 30(b)(6) witnessed acknowledged using the pentobarbital contaminated tallow to manufacture any dog food would be illegal. ¶74. CPF cannot argue that this lethal drug is "Biologically Appropriate" for pets—and has in fact admitted that pentobarbital is not "Biologically Appropriate." ¶101.

CPF chooses to ignore the wealth of evidence that supports Plaintiff's pentobarbital allegations, and instead incorrectly argues that Plaintiff's "only non-speculative evidence" tying pentobarbital to the Dog Food is that CPF received two lots of beef tallow containing pentobarbital in late March of 2018 from its supplier, JBS. MSJ at 17-18. However, 1,738,790 pounds of Orijen and Acana brand dog and cat food was manufactured using beef tallow contaminated with pentobarbital, 872,447 pounds of that food was shipped to third-party distributors, and 866,343 pounds were retained by CPF. ¶121. Further, non-detect results for the eleven composite samples of dry kibble made with the affected tallow lots cannot support the conclusion that the contaminated dog food contained no pentobarbital given the small number and size tested relative to the total size of potentially contaminated finished product (approximately .26 pounds out of an approximately 1.7 million pounds) and the heterogeneity of certain raw materials. *See* ¶127.

Moreover, the FDA has explicitly found that pet food may still be contaminated with pentobarbital, even if samples test negative:

What does it mean if a sample tests negative for pentobarbital?

*A negative test simply indicates that the particular sample tested was negative for pentobarbital...*

¶129 (emphasis added). The FDA went further to state that finished product testing is not sufficient to mitigate the risk of pentobarbital in manufacturing pet food. *Id.* ("random testing of finished product may not be representative of all units of your products. Furthermore, finished product

testing cannot mitigate the risk of pentobarbital in your raw material"). Consistent with the FDA's findings, Dr. Pusillo determined that the contaminated Dog Food's potentially heterogeneous nature made it possible that different parts of each batch of dog food could contain different concentrations of pentobarbital. *Id.* Likewise, Dr. Callan concluded that the random sampling performed by CPF was insufficient to assess the actual risk because of the small sample size tested relative to the total size of potentially contaminated finished product and the heterogeneity of certain raw materials. ¶127. Also fatal to CPF's argument, is that both CPF and its expert, Dr. Robert H. Poppenga, determined that the final product of the affected Dog Food could potentially contain up to the detectable amount of approximately 3.4 ppb of pentobarbital. ¶123.

At the very least, the contaminated Dog Food has a risk of containing pentobarbital at levels greater than 0 but below 2 ppb. ¶¶122-123 (Dr. Poppenga admitting that CPF's eleven composite samples and its untested affected dry kibble still have a risk of containing pentobarbital at levels below 2 ppb). Although the testing of CPF's eleven composite samples utilized a limit of detection of 2 ppb, Dr. Pusillo confirmed in his rebuttal report that test methods exist that can successfully detect pentobarbital at levels below 2 ppb. ¶123. Dr. Callan determined that pentobarbital would not burn off during the manufacturing process. ¶126. The FDA has also found that the process of grinding may not dilute the presence of pentobarbital. ¶68. Consequently, a trier of fact could find that CPF's Dog Food has a significant, non-speculative risk of containing pentobarbital.

In what can only be characterized as an admission, CPF sued JBS for its failure to timely notify CPF of the pentobarbital contamination and for the damages CPF incurred as a result of manufacturing pet food with pentobarbital contaminated tallow. ¶68. In that lawsuit, CPF stated that the dog food contained a risk of 3.4 ppb of pentobarbital. ¶¶68, 72. Despite this, CPF never conducted a recall of the affected pet food, nor did it inform consumers that they purchased pet

food potentially contaminated with pentobarbital as it did not want to cause "panic in the marketplace." ¶72. Although CPF argues that the FDA did not require CPF to recall its products (MSJ at 18), it neglects to mention the FDA requested that CPF submit an entry to the Reportable Food Registry which is reserved for "when there is a reasonable probability that the use of, or exposure to, an article of food will cause serious adverse health consequences or death to humans or animals" and that the FDA's determination was based on CPF's representation that it would begin testing for pentobarbital. ¶¶73, 124. However, CPF has yet to begin testing its Dog Food for pentobarbital. ¶124.

CPF also argues that Plaintiff lacks standing to bring the pentobarbital related allegations. MSJ at 19. In doing so, CPF relies on inapposite cases where the plaintiffs did not actually purchase the products at issue. *See Kisting v. Gregg Appliances, Inc.*, No. 16-cv-141, 2016 WL 5875007, at *4-5 (E.D. Wis. Oct. 7, 2016) (finding the plaintiff lacked standing because he did not actually purchase the television models at issue); *Hemy v. Perdue Farms, Inc.*, No. CIV.A. 11-888 FLW, 2011 WL 6002463, at *11 (D.N.J. Nov. 30, 2011) (finding the plaintiffs did not have standing because they did not purchase the defendant's brand of food with the alleged misrepresentations, and instead purchased different brand of food from the defendant). Unlike *Kisting* and *Hemy*, Plaintiff purchased Regional Red diet, advertised as "Biologically Appropriate," that had a risk of containing pentobarbital. ¶11.

The Dog Food that has a risk of containing pentobarbital is not confined to the food manufactured with tallow CPF received from JBS in March 2018. For example, as early as February 2017, and again in February 2018, CPF was aware of pentobarbital contamination in other pet foods and that CPF could be using the same supplier. ¶116. Although CPF was aware that it should test its pet food for the presence of pentobarbital at the time (¶¶116-118), it did not

conduct testing. ¶¶116, 124. CPF also considered tallow a high-risk ingredient, meaning it carried a risk of contaminating its finished pet food product. ¶117. Despite this acknowledgement, CPF did not audit JBS (its tallow supplier) from 2012 - 2017. ¶119. When CPF did finally audit JBS in 2018, it noted that a corrective action was needed for buildup of other products on equipment and spilled product on floors but failed to follow-up with JBS. *See* ¶120.

CPF received approximately 233,140 pounds of tallow from JBS from November 22, 2017 to February 8, 2018. ¶128. In May of 2018, Five Rivers Cattle Feeding, a subsidiary of JBS, sent Tallow samples from the same time period—November 22, 2017, January 18, 2018, and February 12, 2018—that tested positive for pentobarbital at levels of 52 ppb, 29 ppb, and 133 ppb respectively. *Id.* Although CPF received repeated red flags that prior lots of tallow it received from JBS may be contaminated with pentobarbital, it did not conduct any testing of these prior lots. CPF now attempts to use its willful ignorance to its advantage by arguing any risk of pentobarbital is pure speculation.

Defendants' motion should be denied because Plaintiff has raised a genuine issue of material fact as to whether CPF's "Biologically Appropriate" representation is rendered false due to the risk of pentobarbital. *Silverman*, 798 F. Supp. 2d at 958.[6]

**2.      There Is a Genuine Issue of Fact as to Whether the Promise of "Fresh" Ingredients Is Misleading**

"A statement is untrue if it is false, while a statement is deceptive or misleading 'if it causes a reader or listener to believe something other than what is in fact true or leads to a wrong belief.'" *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 804 (W.D. Wis. 2006). "When

---

[6] At this time, Plaintiff agrees to dismiss his Dilated Cardiomyopathy allegations without prejudice.

conflicting inferences can be drawn, the determination whether [CPF]'s promise is deceptive, misleading or untrue, contrary to § 100.18, stats., is a question of fact that must be determined by the trier of fact." *Dorr v. Sacred Heart Hosp.*, 597 N.W.2d 462, 473 (Wis. Ct. App. 1999). The "F" in CPF's "BAFRINO" mission stands for "fresh" ingredients. The evidence of this statement's falsity is vast, and Plaintiff's damages methodology shows that he suffered a pecuniary loss attributable to it.

CPF's packaging, including for the food purchased by Plaintiff, is littered with promises of "fresh" ingredients. ¶¶15-20, 26-28. CPF claims this does not mean "100% fresh" or "Never Frozen," but Dr. Krosnick's survey, Plaintiff's testimony, and CPF's internal documents, plainly show that consumers and CPF's employees take a contrary view. Plaintiff testified that the label is "telling [him] that everything is fresh." ¶21. CPF's position is also contradicted by the American Association of Feed Control Officials ("AAFCO") and numerous other regulations governing the term "fresh," which "means not frozen or heated or dried or rendered or cooked, only held chilled." ¶88; Defs.' MSJ Ex. 1-E (AAFCO manual defining "fresh" as "not … subject to freezing, to treatment cooking, drying, rendering, hydrolysis, or similar process").

Even if "fresh" does not mean "100% fresh" or "never frozen," CPF's Dog Food still misleads consumers. As a matter of course, CPF incorporates regrinds, expired and "dried" ingredients into the Dog Food. ¶¶110-112. It has also used tallow from a high-risk rendering facility (JBS) that contained and/or had a risk of containing pentobarbital from euthanized (i.e. not "fresh") animals. ¶¶116-118. And most importantly, CPF's marketing department admits the

"fresh" claim is "misleading" and cannot be substantiated because "[n]ot all ingrdients [sic] are fresh and delivered daily."[7] ¶112.

Unlike in *Parks v. Ainsworth Pet Nutrition, LLC*, these non-conforming ingredients are not "trace." 377 F. Supp. 3d 241, 247 (S.D.N.Y. 2019). And unlike *Obesity Research Institute v. Fiber Research International*, 310 F. Supp. 3d 1089, 1123 (S.D. Cal. 2018), CPF uses the term "fresh" to describes its "ingredients" rather than a single ingredient. ¶¶15-20. Because the non-fresh ingredients are omnipresent in CPF's Dog Food, the "fresh" representation is undeniably misleading and deceptive even if it is not literally untrue.

CPF claims its misleading promise of "fresh" ingredients is cured by conflicting statements found on its back labels and ingredient panels. This tactic has been rejected by courts on multiple occasions. "'Reasonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.'" *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG), 2010 WL 2925955, at *16 (E.D.N.Y. July 21, 2010) (alteration in original); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939-40 (9th Cir. 2008); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 479-80 (S.D.N.Y. 2014). And "the presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by [CPF]'s labeling and marketing." *Ackerman*, 2010 WL 2925955, at *16. "Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging." *Williams*, 552 F.3d at 939-40. As CPF itself

---

[7] CPF attempts to stretch the 100% argument even further by arguing that AAFCO only requires that 3% of its ingredients be fresh. But CPF offers no evidence that consumers are relying on the AAFCO definition, or even know of it, when reading CPF's labels. And there is no rule that satisfying AAFCO renders a representation truthful as a matter of law. ¶89.

states, "You cannot use 'delivered fresh' in some cases and 'fresh' in other cases and assume the consumer automatically knows you mean 'delivered fresh' but just let out the 'delivered' part." ¶22. Thus, a genuine issue of fact exists regarding the untrue, deceptive, and misleading nature of the "fresh" claim.

Finally, the survey and report prepared by Dr. Krosnick determined the value attributable to the word "fresh" rather than the diminution in value attributable to the presence of "frozen" ingredients. Dr. Krosnick's survey results remain relevant whether the "fresh" promise is untrue because of CPF's use of frozen ingredients or due to its use of regrinds or expired or otherwise non-fresh ingredients. In other words, Dr. Krosnick did the work that was absent in *Reilly v. Chipotle Mexican Grill*, 711 F. App'x 525 (11th Cir. 2017) (unpublished table decision); he analyzed the difference in value between "fresh" and "non-fresh" ingredients. *Cf. id.* at 529-30. To the extent CPF disagrees with the way in which Dr. Krosnick conducted his analysis, this is a question of fact for the jury. *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-CV-0852, 2016 WL 3579953, at *10 (E.D. Wis. June 24, 2016).

### 3. The Factual Record Shows the Term "Regional" Is Untrue, Deceptive, and Misleading

There are certainly disputes of material fact as to whether the term "regional" is untrue, deceptive, or misleading. First, as stated above, "A statement is untrue if it is false, while a statement is deceptive or misleading 'if it causes a reader or listener to believe something other than what is in fact true or leads to a wrong belief.'" *Uebelacker*, 464 F. Supp. 2d at 804. Second, conflicting inferences must go to the trier of fact. *Dorr*, 597 N.W.2d at 473. Here, the factual record not only shows that CPF did not disclose all the non-regional sources for their "regional" ingredients, it also shows that CPF knew that consumers cared about the sourcing of regional ingredients and intentionally created an impression that all ingredients were regional (unless

otherwise disclosed). ¶¶21, 32, 113-114. In doing so, CPF **purposefully** only featured farms that would buttress this promise of "regional" ingredients and went as far as omitting any mention of Tyson because, while CPF "typically mention[s] the name [of the farm]," it is "problematic" "since Tyson is a huge multinational conglomerate." ¶114. CPF also refused to acknowledge that they in fact do receive ingredients from China. ¶115. Indeed, CPF has admitted it "ha[s] recently considered changing [the 'regional'] definition … as we have outgrown our ability to source from our local region"). ¶21. Thus, CPF knew that a consumer could be misled into thinking that all the undisclosed non-regional ingredients were indeed regional. *Id.*

The single case cited by CPF is not persuasive. In *Perod Ricard USA v. Bicardi U.S.A.*, the Third Circuit emphasized the need to look at the entire label. 653 F.3d 241, 253 (3d Cir. 2011). And here, as discussed above, the pervasiveness of the term "regional" and the context in which it was used shows that it was indeed untrue, misleading, and deceptive. MSJ at 24. Moreover, and dispositive here, the *Pernod* Court emphasized that, when a consumer is "told in no uncertain terms" that the reference is merely a brand name, there can be no misrepresentation. 653 F.3d at 253. But nowhere on the packaging does CPF state that the term "regional" is just the brand name, and in fact, CPF does the opposite as it highlights and discusses that "regional" is tied to the sourcing of the ingredients of the Dog Food from the "vast and fertile lands" of Canada and the United States or "New England's vast Atlantic waters." ¶¶2, 16-19, 27-28, 92-95, 114. At the bottom, CPF's labels repeatedly tell consumers that its Dog Food is "prepared with pride from trusted regional ingredients" when they actually use ingredients from all over the world. ¶¶17, 19, 113, 115. As such, a genuine issue of fact exists regarding the untrue, deceptive, and misleading nature of the "regional" claim.

CPF also attempts to pigeonhole a corrective statement used in Dr. Krosnick's survey to determine the value attributable to the word "regional" for consumers. MSJ at 23-25. In doing so, CPF fails to acknowledge that the corrective statement ***does not*** misconstrue the statements on its packaging or state that the packaging claims 100% of the ingredients are "regional." Instead, the corrective statement clearly states that the dog food ***may include*** ingredients that are not regionally sourced, including international ingredients. ¶84. Here, there are multiple ingredients that may be sourced internationally or outside the Dogstar or NorthStar kitchen regions that are not disclosed on the packaging. ¶¶92-95, 113. And contrary to CPF's assertion, there is no contextual disclosure on the labels for various ingredients. ¶¶17-20, 27-28. Thus, the survey conducted by Dr. Krosnick does not support a dismissal of the "regional" based claims here.

### 4. "Never Outsourced" Represents that the Included Meal and Tallow Are Not Made by a Third-Party Renderer [8]

CPF's use of a high-risk rendering facility for its beef tallow and meal contradicts its promise that the Dog Food is never outsourced. Plaintiff testified that if another party (*e.g.* JBS, a Category 2 Rendering Facility) made the tallow and meal for the Dog Food he would consider it to be outsourced. ¶31. Further, CPF admits that the packaging for the Dog Food states: "Quality is Never Outsourced" and that "we prepare Orijen ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." ¶29. Yet CPF did not test or even try to confirm what was included in the meal and tallow supplied by JBS and utilized in the Dog Food. ¶119. Specifically, CPF failed to: (1) have a written agreement with JBS; (2) test any product for pentobarbital delivered by JBS; (3) require JBS to do any testing itself; and (4) properly audit JBS,

---

[8] Plaintiff does not dispute that the statements addressed in the MSJ at section IV.A.2.5 were not viewed by Plaintiff.

a supplier of an ingredient CPF considered "high risk." ¶¶62, 116-119. When CPF finally did the one audit of JBS, it turned a blind eye by failing to pursue a corrective action in response to discovering that materials remained on the equipment from earlier production runs (creating a possibility of cross contamination). ¶120. Thus, CPF not only outsourced (*contra:* "Quality is Never Outsourced"), it had no knowledge of what was included in every morsel as promised to consumers (*contra* "we know exactly what goes into each and every morsel"), clearly raising a genuine issue of material fact as to CPF's promises of never outsourcing its Dog Food.

**B.    Summary Judgment Should Be Denied on Plaintiff's Fraud by Omission Claim**

In Wisconsin, "[i]f there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the non-existence of the fact." *Ollerman v. O'Rourke Co.*, 288 N.W.2d 95, 100 (Wis. 1980). A duty to disclose arises when:

> (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Schmidt v. Bassett Furniture Indus.*, No. 08-C-1035, 2009 WL 3380354, at *10 (E.D. Wis. Oct. 20, 2009). Although whether there is a duty to disclose is a policy decision that must be decided by the Court, "the facts surrounding an act of nondisclosure must be fully determined" by the jury, including "defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it … or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure." *Hennig v. Ahearn*, 601 N.W.2d 14, 23 (Wis. Ct. App. 1999) (quoting RESTATEMENT (SECOND) OF TORTS §552 cmt. *m* (1977)).

Of these factors, the only one challenged by CPF is whether Plaintiff should "reasonably expect disclosure" from CPF that the Dog Food have a risk of containing heavy metals, BPA,

pentobarbital, non-fresh and non-regional ingredients, and that the "never outsourced" claim is untrue. MSJ at 27-28. According to CPF, in order for a reasonable expectation of disclosure to exist, their actions must be "so shocking to the ethical sense of the community, and … so extreme and unfair, as to amount to a form of swindling .…" *Id.* (quoting *JBCB, LLC v. McKenna Berry Co., LLC*, 2018 WI App 8, ¶18, 909 N.W. 2d 210, 210 (Wis. Ct. App. 2017) (unpublished table decision)). Although the case the *JBCB* court cites for this proposition, *Hennig*, 601 N.W.2d at 23, simply identifies this standard from the Restatement of Torts as offering guidance, assuming this is the standard, CPF's conduct is such that Plaintiff reasonably expected disclosure. As this Court found when denying CPF's motion to dismiss this claim, "Plaintiff could have reasonably expected that something so dangerous and disgusting as harmful chemicals and other contaminants would be disclosed if present in Defendants' products, where all of the marketing materials emphasized their premium quality and healthfulness." *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *5 (E.D. Wis. July 1, 2019). The evidence shows this is exactly what occurred.

Plaintiff testified that he did not know about the risk of heavy metals or BPA in the Dog Food, and he testified that if he had known he "would never give them to one of my puppies, dogs, any animal." ¶102; (also testifying as to BPA, pentobarbital, and heavy metals, Mr. Weaver doesn't understand "[w]hy would anybody put that in any food for a pet?"). Plaintiff's position is supported by Dr. Krosnick's survey, which found that the risk of the presence of heavy metals, BPA, and pentobarbital, the use of non-fresh and non-regional ingredients, and the fact that ingredient manufacturing is outsourced, are all material to a reasonable consumer. ¶¶82, 84. Had consumers known the truth, they would have paid more than 50% less, which certainly suggests Plaintiff was injured. ¶82.

CPF touts the BAFRINO promises and that the Dog Food will "Nourish as Nature Intended," "Deliver[] Nutrients Naturally." ¶¶98-99. Each of these statements, as well as the overall look and feel of the Dog Food's labels (along with the premium price tag) is intended to give consumers, like Plaintiff, the appearance that the Dog Food is healthy and of the highest quality. ¶130. Plaintiff thus could reasonably expect disclosure of the true contents or, at a minimum, risk of the true contents, of the Dog Food. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶¶19-20, 699 N.W.2d 205, 213 (Wis. 2005).

Plaintiff has presented evidence that, in fact, the Dog Food has a risk of containing heavy metals. ¶45. Plaintiff has presented evidence that the Dog Food has a real risk of containing BPA. ¶56. Plaintiff has presented evidence that the Dog Food has a real risk of containing pentobarbital. ¶¶122-123, 125-126. Plaintiff has presented evidence that the Dog Food may contain ingredients that are, in fact, not fresh, regional or "biologically appropriate" as CPF has defined that term on its own labels. ¶¶110-115, 121-123, 125-126. Plaintiff has, at the very least, demonstrated a genuine issue of material fact as to whether this information was so material that Plaintiff (and other members of the putative Class) should "reasonably expect disclosure" from CPF of these facts. This is particularly true "when one party exclusively holds knowledge of facts material to the transaction that the other party has no means of acquiring," as is the case here. *See Kaloti*, 2005 WI 111, ¶19, 699 N.W.2d at 213 (when one party holds exclusive knowledge of material facts, this weighs in favor of finding a duty to disclose). Plaintiff's fraud by omission claim should not be dismissed.

### C.    The Negligence Per Se Claim Is Not Barred by the Economic Loss Doctrine

Contrary to CPF's argument, the Economic Loss Doctrine does not preclude Plaintiff's negligence per se claim. MSJ at 29-30. In Wisconsin, "[t]he economic loss doctrine exists to compel parties bound by a contractual relationship to pursue damages via contract, not to prevent

an injured party from bringing potentially viable tort claims when no contract exists." *MH Imaging, LLC v. K&K Holdings, LLC*, 2017 WI App 21, ¶15, 896 N.W.2d 390, 390 (Wis. Ct. App. 2017) (unpublished table decision); *see also Walker v. Ranger Ins. Co*., 2006 WI App 47, ¶¶9-10, 711 N.W.2d 683, 687 (Wis. Ct. App. 2006). This same principle has been recently recognized in Federal Courts. *In re Syngenta AG MIR 162 Corn Litig*., 131 F. Supp. 3d 1177, 1206 (D. Kan. 2015). Here, the law of the case is that there is no contract claim between Plaintiff and CPF, so the Economic Loss Doctrine is inapplicable. *Weaver*, 2019 WL 2774139, at *4.[9]

CPF offers only a single sentence for dismissal of this claim even if the Court finds the Economic Loss Doctrine is inapplicable. MSJ at 30. Specifically, CPF argues that the negligence per se claim should be dismissed as it is based on the same misrepresentations CPF seeks summary judgment on in connection to the WDTPA and fraud by omission claim. However, as addressed above, these misrepresentations are not properly subject to summary judgment as there are material disputed facts as to whether the BAFRINO statements are misleading.

## V.    CONCLUSION

For the reasons stated herein, the Court should deny Defendants' request for summary judgement in its entirety.

---

[9] *Tietsworth* does not suggest otherwise. 2004 WI 32, ¶¶23-37, 677 N.W.2d at 241-44. Specifically, the court determined that the requested relief was best remedied through a breach of express warranty claim. *Id.* Here, an express warranty claim or any other contract claim is not available to Plaintiff as there was no contract or privity between CPF and Plaintiff. *See Weaver*, 2019 WL 2774139, at *4. Likewise, *Home Valu, Inc. v. Pep Boys* does not support applying the Economic Loss Doctrine here as it predates the Wisconsin decisions above and concerns "when two corporations, with the benefit of counsel, negotiate a commercial transaction at arms length." 213 F.3d 960, 964 (7th Cir. 2000).

Dated: September 16, 2019

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By s/ Rebecca A. Peterson

CHARLES N. NAUEN, #1031943
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: cnnauen@locklaw.com
rkshelquist@locklaw.com
rapeterson@locklaw.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
KARLA M. GLUEK
RAINA C. BORRELLI
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com

ROBBINS ARROYO LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com
smckany@robbinsarroyo.com

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

PETERSON LAW and MEDIATION, LLC
MARK A. PETERSON (1016259)
1433 N. Water Street, Suite 400
Milwaukee, WI 53202
Telephone: (414) 877-7312
E-mail: mark@markpetersonlaw.com

*Attorneys for Plaintiff*