## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **SCOTT WEAVER,** individually and on behalf of all others similarly situated**,** <br><br> **PLAINTIFF,** <br><br> **v.** <br><br> **CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP,** <br><br> **DEFENDANTS** | Case No. 2:18-cv-01996-JPS |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Eastern District of Wisconsin Local Rule 56, Plaintiff Scott Weaver ("Plaintiff") hereby submits his response to Defendants'[1] Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment.

1. Champion was founded in 1975 and initially produced the ACANA brand, which was similar to traditional dry kibble pet food. Declaration of Chinedu Ogbonna, ("Ogbonna Dec.") attached hereto as Exhibit 1, at ¶ 7.

*Response:* **Undisputed and Immaterial.**

2. In approximately 2005, Champion developed its ORIJEN brand, which is based on a Biologically Appropriate nutritional philosophy, which uses animal-based proteins to attempt to mirror how wolves or wilds dogs would get nutrition in nature. Deposition of Peter Muhlenfeld ("Muhlenfeld Dep."), attached hereto as Exhibit 2, at 136:17-147:19; Ogbonna Dec. at ¶ 7.

---

[1] "Defendants" or "CPF" refers to Champion Petfoods USA, Inc. and Champion Petfoods LP.

Subsequently, ACANA adopted this nutritional philosophy and modified its formulas accordingly. Muhlenfeld Dep. at 136:17-23; Ogbonna Dec. at ¶ 7.

*Response:* **Disputed in part.** Disputed to the extent the Biologically Appropriate statement is improperly limited to what it describes and represents to consumers and CPF. Biologically Appropriate is a nutritional factual statement marketed by CPF to differentiate its Dog Food[2] and promises natural ("nourish as nature intended") and fresh ingredients. CPF0001957 (**Pl.'s Ex. 1**); CPF2011360 at -62 (**Pl.'s Ex. 2; filed as restricted**); CPF1286058 at -60, (**Pl.'s Ex. 3; filed as restricted**); CPF2003781 at -74, (**Pl.'s Ex. 4; filed as restricted**) ("High inclusions of fresh meats from animals that locally and sustainably raised, pass fit for human consumption, and are delivered fresh each day…"). Plaintiff also disputes this purported fact to the extent that CPF properly modifies or uses formulas sufficient to meet the Biologically Appropriate definition. Dr. Pusillo's April 5, 2019 Evaluation of Champion Petfoods USA, Inc. and Champion Petfoods LP for Safety Lines 386-87, 594-697, 783-838 (**Pl.'s Ex. 5**).

3.     Champion sells a wide variety of pet food diets under its brand names ORIJEN and ACANA. Third Amended Complaint ("TAC") ¶ 25.

*Response:* **Undisputed.**

4.     For many years, Champion manufactured all of its dog food out of its NorthStar kitchen, in Morinville, Canada. Declaration of Christopher Milam, ("Milam Dec."), attached hereto as Exhibit 3, at ¶ 8.

*Response:* **Undisputed.**

---

[2] "Dog Food" is identified in Paragraphs 7 and 26 of the Third Amended Complaint. Unless otherwise noted, all capitalized terms have the same definition as in Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgement, filed concurrently herewith.

5.      In January of 2016, Champion opened its new DogStar kitchen in Auburn, Kentucky and slowly transitioned the manufacturing of its Dog Food sold in the United States to its new DogStar kitchen, with the exception of the diet ORIJEN Tundra, which has always been manufactured at NorthStar, and the exception of the state of Alaska, which has always received dog food manufactured at NorthStar. Deposition of Erik Flakstad ("Flakstad Dep."), attached hereto as Exhibit 4, at 102:6-103:25; Milam Dec. at ¶ 9.

*Response:*  **Undisputed.**

6.      Because Plaintiff purchased ORIJEN from early 2008 to approximately August 2017, he would have purchased diets produced at both Champion's NorthStar then DogStar Kitchens. Milam Dec. at ¶¶ 8-9; JSMF at ¶¶ 6, 8.

*Response:*  **Undisputed.**

7.      In approximately August of 2017, Plaintiff transitioned his dogs from Champion dog food to Purina Pro Plan. Deposition of Plaintiff Scott Weaver ("Weaver Dep."), attached hereto as Exhibit 5, at 45:13-22; TAC ¶ 21. Purina Pro Plan dog food contains some chicken, but primarily consists of ground rice, whole grain wheat, corn gluten meal, whole grain corn, and a long list of vitamins and other supplements, as reflected by its ingredient panel. Weaver Dep., Ex. 7.

*Response:*  **Disputed in part, Immaterial, and Objection.**  The term "some" is vague and does not represent the total percentage included. It is irrelevant and immaterial what dog food Plaintiff feeds his dogs now as this case is solely about the misleading and false advertising of CPF's products.

8.      Plaintiff contradicted himself on when he stopped purchasing Champion's dog food. Complaint [DE 002] at ¶ 17; First Amended Complaint [DE 015] at ¶ 19; Second Amended

Complaint [DE 023] at ¶ 20; Responses to Defendants' First Set of Interrogatories, attached hereto as Exhibit 6 (stating he stopped purchasing Champion's dog food in October 2017); Weaver Dep. 45:23-46:7; 67:3-9 (stating he stopped purchasing Champion's dog food in April or May of 2018); Letter from Plaintiff's counsel after deposition, attached hereto as Exhibit 7 (stating he stopped purchasing Champion's dog food in March 2018); WEAVER000010-11 attached hereto as Exhibit 8 (stating he stopped purchasing Champion's dog food and began purchasing Purina's dog food in July 2017); TAC ¶ 21 (stating he stopped purchasing Champion's dog food in August 2017).

*Response:* **Disputed in part.** Plaintiff alleged approximately October 2017 in both the complaint and his discovery responses.

9.      Plaintiff's dog Prince Harry is healthy. Weaver Dep. 98:8-9. Plaintiff's dogs Jack and Jill died from cancer. Weaver Dep. 22:10-13. There is no evidence that the dogs' deaths were caused by the consumption of ORIJEN. Declaration of Robert H. Poppenga, DVM, PhD, DABVT ("Poppenga Dec."), attached hereto as Exhibit 9, at Ex. A at 34-35; Weaver Dep. 28:21-24; 57:10¬12; 79:7-9.

*Response:* **Disputed in part, Immaterial and Objection.** Plaintiff's deposition testimony regarding the health of Prince Harry reflects his health at the time of the deposition; his current health is not part of the record. Whether the death of Jack or Jill was caused by consuming ORIJEN is irrelevant and immaterial to this case, and Plaintiff's damages are not based on any illness caused by his dogs' consumption of ORIJEN.

10.     Plaintiff never purchased an ACANA diet or any other ORIJEN diet. Weaver Dep. 44:20-45:7.

*Response:* **Undisputed.**

11.     During the period of time that Plaintiff purchased ORIJEN Regional Red and ORIJEN Six Fish dog food from both the NorthStar and DogStar kitchens, Champion's ORIJEN Regional Red and ORIJEN Six dog food packages contained the statement "Biologically Appropriate Dog Food." Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.[3]

*Response:*  **Undisputed.**

12.     The NorthStar packaging of ORIJEN Regional Red and ORIJEN Six Fish dog food during the period of time that Plaintiff purchased these diets, states: "Here at Champion, our mission is clear and strong; we make Biologically Appropriate Dog and Cat foods." Ogbonna Dec. at ¶¶ 9-10, Ex. B, D.

*Response:*  **Undisputed.**

13.     The DogStar packaging of ORIJEN Regional Red and ORIJEN Six Fish dog food during the period of time that Plaintiff purchased these diets, states the dog food "mirrors the richness, freshness and variety of WholePrey meats that dogs are evolved to eat," that the food is "protein rich [and] carbohydrate limited, and "modern dogs are built like their ancestors [wolves]. Possessing a biological need for a diet that's rich and varied in animal protein." Ogbonna Dec. at ¶¶ 9-10, Ex. A, C. And the DogStar bags at issue explain: "Biologically Appropriate—Protein Rich, Carbohydrate Limited." *Id.*

*Response:*  **Undisputed.**

14.     Peter Muhlenfeld, Champion's former Chief Brand Officer, testified at his deposition that "'[w]e follow what's the most appropriate thing biologically. It's not biologically perfect by the way, it's biologically appropriate." Muhlenfeld Dep. at 120:7-10. Mr. Muhlenfeld

---

[3] Digital images of the dog food packaging that Plaintiff purchased can be found in Exhibits A-D to the Declaration of Chinedu Ogbonna, attached hereto as Exhibit 1.

also testified at his deposition: "So biologically – the philosophy of biologically appropriate is to get as close to the natural diet as possible." *Id.* 154:1-3; *see* 136:17-147:19.

*Response:* **Disputed in part.** Disputed to the extent it does not reflect conflicting testimony by Peter Muhlenfeld in the same deposition. Muhlenfeld Dep. 117:9-118:6, (**Pl.'s Ex. 6**) ("And so the biologically appropriate concept … how I would say -- describe it this way, to the limits of technology, ingredient processing, food science. As close to that as possible with the perfect food."). It is also disputed to the extent that this definition is what was told to consumers or is the only definition of Biologically Appropriate that CPF has stated publicly, including that the packaging states Biologically Appropriate is "Nourish as Nature Intended" and includes fresh ingredients. CPF0001957 (**Pl.'s Ex. 1**); CPF2011360 at -62 (**Pl.'s Ex. 2; filed as restricted**); Washington Dep. 94:2-24 (**Pl.'s Ex. 7**) ("We're putting in place information that differentiates and tells the pet lover why our product is our product. It is nourished as nature intended, it is biologically appropriate. So that's the message to them …."). It is further disputed to the extent that it fails to recognize that Biologically Appropriate is a scientific term. Pusillo Dep. Vol. 1 (defined herein) 264:17-265:10, (Defs.' MSJ Ex. 11).

15.     Although the statements on Champion's packaging vary by diet and other factors, Champion marketed the diets purchased by Plaintiff as containing "fresh" and "regional" ingredients and being "Never Outsourced." Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

*Response:* **Disputed in part.** Only disputed as to the extent "other factors" is vague and immaterial as to what is at issue here concerning the specific misrepresentations of Biologically Appropriate, Fresh Regional Ingredients, and Never Outsourced.

16.     On the front of the NorthStar packaging for ORIJEN Regional Red, it states that the diet includes "regional red meat," and on the back of the packaging, it states that the diet

includes "fresh regional ingredients." Ogbonna Dec. at ¶ 10, Ex. D. It further states "Canada's vast and unspoiled lands – our source of inspiration and fresh regional ingredients." *Id.*

*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh and regional. The packaging includes additional statements regarding the ingredients' freshness and/or regionality, such as "Our FRESH ingredients are raised in our region by people we know and trust"; ORIJEN's "ranch-raised meats, cage-free poultry, nest-laid eggs, wild-caught fish and sun-ripened fruits & vegetables [are] all grown close to home by people we know and trust, and delivered to our kitchen doors FRESH EACH DAY"; and "Made with unmatched regional ingredients, delivered fresh." Defs.' MSJ Ex. 1-D.

17.     On the front of DogStar's ORIJEN Regional Red packaging, it states that the diet is "made with regional ingredients delivered fresh or raw daily; Angus Beef, Suffolk Lamb, Mutton, Wild Catfish, Yorkshire Pork, and Boer Goat." Ogbonna Dec. at ¶ 10, Ex. C. The back of the DogStar Regional Red during the period of time that Plaintiff purchased these diets, states that the "Angus Beef, Suffolk Lamb, Yorkshire Pork, and Boer Goat," are "grass-fed on Kentucky ranches and delivered fresh or raw, in richly nourishing WholePrey ratios." *Id.*

*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh and regional. The packaging includes additional statements regarding the ingredients' freshness and/or regionality, such as "Fresh and Regional: Delivered daily from local farms and ranches"; "Prepared with pride from trusted regional ingredients"; and "Fresh Regional Ingredients: Grown Close to Home—We focus on local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." Defs.' MSJ Ex. 1-C.

18. On the front of the NorthStar ORIJEN Six Fish packaging, it states that the diet is "made with wild-caught regional saltwater and freshwater fish," and on the back of the packaging, it states that the diet includes "fresh regional ingredients." Ogbonna Dec. at ¶ 9, Ex. B.

*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh and regional. The packaging includes additional statements regarding the ingredients' freshness and/or regionality, such as "Our FRESH ingredients are raised in our region by people we know and trust"; ORIJEN's "ranch-raised meats, cage-free poultry, nest-laid eggs, wild-caught fish and sun-ripened fruits & vegetables [are] all grown close to home by people we know and trust, and delivered to our kitchen doors FRESH EACH DAY"; and "Made with unmatched regional ingredients, delivered fresh." Defs.' MSJ Ex. 1-B.

19. The DogStar packaging of ORIJEN Six Fish packaging during the period of time that Plaintiff purchased these diets, states that the diet is "made with six wild and sustainably caught fish delivered daily; New England Herring, Flounder, Mackerel, Redfish, Monkfish, and Alaskan Cod." Ogbonna Dec. at ¶ 9, Ex. A. The back of the DogStar packaging of ORIJEN Six Fish during the period of time that Plaintiff purchased these diets, states it contains "unmatched inclusions of wild caught fish – whisked to our kitchens from cold New England waters Fresh or Raw, in richly nourishing WholePrey ratios." *Id.* It further states "New England's vast Atlantic waters – our source of inspiration and fresh regional fish." *Id.*

*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh and regional. The packaging includes additional statements regarding the ingredients' freshness and/or regionality, such as, "Prepared with pride from trusted regional ingredients"; "Fresh and Regional: Delivered

daily fresh or raw"; and "Fresh Regional Ingredients: Grown Close to Home—We focus on local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." Defs.' MSJ Ex. 1-A.

20.     The back of the packaging for both the ORIJEN Regional Red and ORIJEN Six Fish manufactured at DogStar during the period of time that Plaintiff purchased these diets, states that fresh and regional means Champion is "focus[ed] on local ingredients that are ethically raised by the people we know and trust, and delivered to our kitchens fresh or raw each day." Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.

*Response:* **Disputed in part.**  Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh and regional.  The packaging includes additional statements regarding the ingredients' freshness and/or regionality, such as, "Fresh Regional Ingredients: Grown Close to Home—We focus on local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." Defs.' MSJ Exs. 1-A and 1-C.

21.     None of Champion's packaging for ORIJEN Regional Red or ORIJEN Six Fish states that 100%, each, or all ingredients are regional or fresh. Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

*Response:* **Disputed in part and Immaterial.** Disputed to the extent this shows how a consumer would understand the multiple references to fresh on the packaging.  Weaver Dep. at 77:10-16 (Weaver testified that the label is "telling me that everything is fresh.") (Defs.' MSJ Ex. 5); CPF1973924 (**Pl.'s Ex. 8; filed as restricted**) (CPF "ha[s] recently considered changing [the 'regional'] definition … as we have outgrown our ability to source from our local region").

22.     Champion never stated on its NorthStar or DogStar packaging of ORIJEN Regional Red or Six Fish that its dog food only contains "fresh" ingredients, that the ingredients are "all

fresh," were "never frozen," or anything of the like. Weaver Dep. 76:10-14; Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

*Response:* **Disputed in part and Objection.** Disputed to the extent it is offered as a fact to establish that the labeling was not misleading as CPF knew the term "fresh" was misleading on its labels. CPF1295489 (**Pl.'s Ex. 9**) ("You cannot use 'delivered fresh' in some cases and 'fresh' in other cases and assume the consumer automatically knows you mean 'delivered fresh' but just left out the 'delivered' part."); CPF1306725 (**Pl.'s Ex. 10**) ("Labeling is always contextual. If the product always has greens that are Kentucky and are always fresh and the … statement doesn't overemphasize the greens to the exclusion of other ingredients … then yes you can say with fresh Kentucky greens.") CPF0255511 at -12 (**Pl.'s Ex. 11; filed as restricted)** (stated CPF's weaknesses include "misconceptions about our foods" and "Authenticity (we are not doing everything we say we are)"). Plaintiff also objects to the extent this purported fact is asking this Court to conclude, as a factual determination, how Plaintiff or consumers would understand the multiple references on CPF's packages to fresh ingredients.

23. The front of packaging for the DogStar ORIJEN Regional Red diet and ORIJEN Six Fish diet purchased by Plaintiff clearly state that the diets include "freeze-dried tripe" and "freeze-dried liver," respectively. Weaver Dep. 74:8-25; Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.

*Response:* **Undisputed and Immaterial.**

24. Plaintiff testified that the fact that freezing was used "wouldn't be a problem for [him]." Weaver Dep. 75:5-7.

*Response:* **Disputed.** Plaintiff testified that if it was not delivered fresh and used that day, it would not be fresh and that he relied on this representation on the label when purchasing the food. Weaver Dep. 130:9-131:7 (Defs.' MSJ Ex. 5).

25.     The back of the DogStar packaging of ORIJEN Six Fish during the period of time that Plaintiff purchased these diets, which contains what Champion calls "Meat Math" and states "this 13 lb package of ORIJEN is made with over 11 lbs of fresh, raw, or dehydrated fish ingredients," and identifies these ingredients as Wild Atlantic Herring, Wild Yellowtail Flounder, Wild Atlantic Mackerel, Wild Acadian Redfish, Wild Monkfish, and Wild Alaskan Cod." Ogbonna Dec. at ¶ 9, Ex. A. As Plaintiff acknowledged at his deposition, this leaves room for about 2 pounds of non-fresh ingredients. Weaver Dep. 77:21-78:2.



*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh. The packaging includes additional statements regarding the ingredients' freshness, such as, "Fresh and Regional: Delivered daily, fresh or raw" and "Fresh Regional Ingredients: Grown Close to Home—We focus on local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." Defs.' MSJ Ex. 1-A.

26.     The DogStar ORIJEN Regional Red packaging states that 11 pounds of its 13-pound package are fresh or raw ingredients, and the packaging further states that the top ten ingredients are delivered fresh or raw. Ogbonna Dec. at ¶ 10, Ex. C.



*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are fresh. The packaging includes additional statements regarding the ingredients' freshness, such as, "Fresh and Regional: Delivered daily from local farms and ranches" and "Fresh Regional Ingredients: Grown Close to Home—We focus on local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." Defs.' MSJ Ex. 1-C. Also disputed to the extent the packaging states that each 13 pound package contains 11 pounds of "fresh, raw, or dehydrated animal ingredients." Also disputed to the extent the Defendants' statement that the "top ten ingredients are delivered fresh or raw" mischaracterizes the packaging statement that reads, "Top 10 fresh or raw, premium animal ingredients." *Id.*

27. The NorthStar ORIJEN Six Fish package states it is "made with wild-caught regional saltwater and freshwater fish." Ogbonna Dec. at ¶ 7, Ex. B.

*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are regional. The packaging includes additional statements regarding the ingredients' regionality, such as, "Made with unmatched regional ingredients"; ORIJEN's "ranch-raised meats, cage-free poultry, nest-laid eggs, wild-caught fish and sun-ripened fruits & vegetables [are] all grown close to home by people

we know and trust, and delivered to our kitchen doors FRESH EACH DAY"; and "Our FRESH ingredients are raised in our region by people we know and trust." Defs.' MSJ Ex. 1-B.

28. The NorthStar package of Regional Red states the formula "features unmatched inclusions of ranch-raised Black Angus beef, wild boar, lamb, heritage pork and bison .... delivered fresh." Ogbonna Dec. at ¶ 10, Ex. D.

*Response:* **Disputed in part.** Disputed to the extent the packaging is not limited to just those statements and does not limit or narrow which ingredients are regional. The packaging includes additional statements regarding the ingredients' regionality, such as, "Made with unmatched regional ingredients"; ORIJEN's "ranch-raised meats, cage-free poultry, nest-laid eggs, wild-caught fish and sun-ripened fruits & vegetables [are] all grown close to home"; and "Our FRESH ingredients are raised in our region by people we know and trust." Defs.' MSJ Ex. 1-D. Further disputed to the extent that CPF's packaging misleadingly advertises these ingredients as being delivered "fresh," when heritage pork, ranch-raised lamb, and free-range bison were delivered raw to NorthStar. Declaration of Richard Raposo, ¶12 (Defs.' MSJ Ex. 21) ("Depending on the supplier's availability, heritage pork, ranch-raised lamb (from Alberta, Canada), and free-range bison included in the ORIJEN Regional Red NorthStar diet were delivered fresh to Champion's NorthStar Kitchen. Otherwise, they were delivered raw ....").

29. On the ORIJEN Regional Red and ORIJEN Six Fish packaging from NorthStar, it states on the back that "Quality is Never Outsourced" and explains that "we prepare ORIJEN ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." Ogbonna Dec. at ¶¶ 9-10, Ex. B, D.

*Response:*  **Undisputed**.

30.     On the ORIJEN Regional Red and ORIJEN Six Fish packaging from DogStar, the package states "NEVER OUTSOURCED. PREPARED EXCLUSIVELY IN OUR DOGSTAR® KITCHENS - We don't make foods for other companies and we don't allow our foods to be made by anyone else." Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.



*Response:*  **Undisputed**.

31.     Plaintiff testified that he understood that "never outsourced" "means that they make it themselves, and they don't make it – have somebody else make it for them in a big mill somewhere." Weaver Dep. 85:17-21. When asked if "never outsourced" referred to the finished food product, Plaintiff stated "yes." *Id.* at 85:24.

*Response:*  **Disputed in part.** Disputed to the extent that this does not reflect Plaintiff's full understanding as to whether CPF would have a third party supplier make its meal and tallow. Weaver Dep. at 129:12-20 (Defs.' MSJ Ex. 5) (Plaintiff testified if a third party made the meal it was outsourced).

32.     On the packaging for ORIJEN Regional Red and Six Fish manufactured at both NorthStar and DogStar, Champion includes exemplar pictures of some of its ingredient suppliers. Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

*Response:* **Disputed in part.** Disputed to the extent that the packaging does not always include "exemplar" pictures of a typical ingredient supplier. *See, e.g.,* CPF1807782 (**Pl.'s Ex. 12**) (DogStar FAQ: "In some cases, our feature farmers alone cannot supply all of our volume requirements, however the farmers, ranchers or fisherman on the bag represents where we get majority of our ingredient from."); CPF1800577 (**Pl.'s Ex. 13**) (DogStar FAQ: "It's important to understand that our feature farmers by themselves cannot supply all of our fresh ingredients. For example, we have three botanical growers, but feature our main supplier as he supplies the vast majority of what we use in our foods."); *see* CPF0228757 (**Pl.'s Ex. 14; filed as restricted**) (row 22 of "Ing Master" tab of spreadsheet on Ingredient Supplier showing CPF's "Fresh Cobb Chicken" suppliers: "Primary Supplier" is "Griffins"; "Secondary Supplier" is "Pilgrim's Pride"; "Third Supplier" is "Marksbury Farm"; and "Feature Farm 1" is "Clark Family Farm"); *see also* CPF1798452 (**Pl.'s Ex. 15**) ("Chicken would be the feature for Kentucky that we have gotten very little from .... We need a new chicken feature!"). Also disputed to the extent that some of the "exemplar" pictures are misleadingly identified to conceal large corporate suppliers. CPF1812999 (**Pl.'s Ex. 16**) ("Attached are sample photos that we would like from one of your farmers. If you would agree and you have a farmer that agrees we would not have to name Tyson."); CPF1817671 at -73 (**Pl.'s Ex. 17**) ("For clarification—Does Greg's farm in Robards Kentucky have a name? We know Tyson is the company that owns the farm."), at -72 ("My take is that we shouldn't mention the name of the farm, since Tyson is a huge multinational conglomerate (if it's the same Tyson Foods I'm thinking of). I'd just say, 'Like Greg in Robards, Kentucky...' I know we typically mention the name, but it seems problematic in this case." and "I'm going to move forward and use Robbie's suggestion to change it to 'Like Greg in Robards, Kentucky...'").

15

33.     The statements (x) "Made with Fresh and Natural Ingredients;" and (xxii) "Unmatched regional ingredients delivered fresh" in the TAC do not appear any of the bags of the ORIJEN diets that Plaintiff purchased. Ogbonna Dec. at ¶¶ 9-10, 19, Ex. A-D.

*Response:*  **Undisputed.**

34.     The statements (iii) "excluding...anything else that nature didn't intend your dog to eat" and (iv) "Virtually All of the Nutrients in ACANA are Natural and Not Synthetic" in the TAC appear only on the brochure cited to in the TAC, and do not appear on any of the bags of the ORIJEN diets that Plaintiff purchased. Ogbonna Dec. at ¶¶ 9-10, 20, Ex. A-D.

*Response:*  **Undisputed.**

35.     Plaintiff testified that he did not read any of Champion's brochures. Weaver Dep. 43:11-13.

*Response:*  **Undisputed.**

36.     The following statements in the TAC only appeared on one of Champion's websites, and do not appear on any of the bags of the ORIJEN diets that Plaintiff purchased: (xi) "USA DogStar kitchens, ingredients, processes, and foods all meet the strictest European Union standards – which are stricter than those set by AAFCO, the Canadian Food Inspection Agency, of FDA", (xii) "Unmatched by any other pet food maker anywhere in the world, our kitchens meet the strictest standards in the world, including the Government of Canada, and the European Union"; (xiv) "We prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation- from where our ingredients come from, to every cooking, quality and food safety process"; (xv) "Dogstar Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients"; (xvi) "Are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry for authenticity,

nutritional integrity, and food safety"; (xvii) "Feature state-of-the-art fresh food processing technologies"; (xviii) "Feature unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive." Ogbonna Dec. at ¶¶ 9-10, 21, Ex. A-D.

*Response:* **Undisputed.**

37.     Plaintiff testified that he did not visit Champion's website prior to making any of his purchases of Champion's dog food. Weaver Dep. 36:1-9; 43:19-24.

*Response:* **Undisputed.**

38.     Plaintiff testified he did not read Champion's White Paper. 37:6-9.

*Response:* **Undisputed.**

39.     Heavy metals, such as arsenic, cadmium, lead, and mercury, are naturally occurring substances that are ubiquitous in the environment and commonly found in dog food. Poppenga Dec. at Ex. A at 3-5, 35.

*Response:* **Disputed in part, Objection, and Immaterial.** Heavy metals are not everywhere but can vary by region, and there is evidence that heavy metals can be controlled by using ingredients with non-detectable amounts of heavy metals. *See* CPF0217103 (**Pl.'s Ex. 18**) (CPF third party testing showing non-detectable amounts of heavy metals in deboned chicken); Dr. Pusillo's Rebuttal Report to Dr. Poppenga's Supplemental Rebuttal Report at 20 (Sept. 5, 2019) (**Pl.'s Ex. 19-B**) ("Sept. 5 Dr. Pusillo Rebuttal Report"); Pusillo Dep. Vol. 1 139:1-2 (Defs.' MSJ Ex. 11) ("They should buy ingredients that don't have heavy metals in it."); *see also* Dr. Gary Pusillo's Rebuttal to Dr. Poppenga's Expert Report (May 13, 2019) (**Pl.'s Ex. 19-A**) ("May 13 Dr. Pusillo Rebuttal Report") ("The EPA sets its 'maximum contaminant level goal' for arsenic in water at zero, which is the level at which 'there is no known or expected risk of health.'"). There is even evidence that CPF and its employees believe no heavy metals in its Dog Food is possible

and its own internal goals were no heavy metals. *See* CPF2092037 at -43 (**Pl.'s Ex. 20; filed as restricted**) (Acana Singles Marketing Launch Plan: "feature … no heavy metals"); Jason Keith Arnold 30(b)(6) Dep. 14:9-13 (**Pl.'s Ex. 21**) ("I'm not aware of heavy metals being present in our foods."); 30(b)(6) Deposition of Chris Milam ("Milam Dep.") 38:23-39:9 (**Pl.'s Ex. 22)** (DogStar tests ingredients for heavy metals and "[w]e have not found any levels of heavy metals in any ingredients.").

40.     The trace levels of heavy metals in Champion's dog food are naturally occurring within the natural ingredients used to make the food; Champion does not add heavy metals to its dog food. Declaration of Gayan Hettiarachchi, ("Hettiarachchi Dec."), attached hereto as Exhibit 10, at ¶¶ 8-9.

*Response:* **Disputed in part.** *See* Plaintiff's response to CPF's proposed fact #39 above.

41.     Nearly all foods, whether for humans or pets, contain some levels of heavy metals. FDA, *Total Diet Study Elements Results Summary Statistics: Market Baskets 2006 through 2013* (rev. 2017) (April 15, 2014), https://www.fda.gov/media/77948/download; *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019).

*Response:* **Disputed in part.** *See* Plaintiff's response to CPF's proposed fact #39 above. Also disputed to the extent that the referenced FDA study does not appear to conclude that nearly all human foods, including beverages, contain some levels of heavy metals.  The FDA's *Total Diet Study Elements Results Summary Statistics: Market Baskets 2006 through 2013* ("FDA Report") (**Pl.'s Ex. 23**) tested 824 food and drink samples for mercury, 8,193 food and beverage samples for arsenic and cadmium, and 8,804 food and drink samples for lead and recorded the number of tests that resulted in non-detection and detection of each heavy metal.  Based on Plaintiff's summation of all of the samples that resulted in non-detect, it appears that 671 of the 824 samples

tested non-detect for mercury (81.4%); 7,230 of the 8,193 samples tested non-detect for arsenic (88.2%); 3,030 of the 8,193 samples tested non-detect for cadmium (36.9%); and 7,754 of the 8,804 samples tested non-detect for lead (88%). *See* FDA Report (**Pl.'s Ex. 23**). It is further disputed to the extent that some of the foods, such as ground beef and pork roast, did not detect the presence of cadmium, arsenic, or lead in any of the 32 samples tested by the FDA. FDA Report at 3, 13, 64 (**Pl.'s Ex. 23**).

42.     In 2005, the NRC published a study in the Mineral Tolerance Animals, 2nd Revised Edition, 2005, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury. Poppenga Dec. Ex A at 14.

*Response:* **Undisputed.**

43.     In 2011, the FDA conducted its own review of the levels of heavy metals in pet food entitled the Target Animal Safety Review and adopted the MTLs utilized by the NRC in the Mineral Tolerance of Animals, namely (1) Arsenic 12,500 µg/kg (12.5 mg/kg); (2) Cadmium 10,000 µg/kg (10 mg/kg); (3) Lead 10,000 µg/kg (10 mg/kg); and (4) Mercury 267 µg/kg (.27 mg/kg). Poppenga Dec. Ex. A at 14.

*Response:* **Disputed.** The FDA has not adopted the MTLs as a regulation or even an official guideline as the Target Animal Safety Review was merely a peer-reviewed article authored by the CVM that merely stated MTLs could be ***considered*** in determining whether the dog food is adulterated (not allowed to be sold in commerce). Ralph Obenauf, et al., *Target Animal Safety Reviews* (2011), https://www.fda.gov/media/81895/download (**Pl.'s Ex. 24**); Deposition of Robert H. Poppenga, DMV, PhD, DABVT (May 22, 2019) ("May 22 Dr. Poppenga Dep.") at 147:19-22 (**Pl.'s Ex. 25**); Expert Report of Dr. Robert H. Poppenga, DVM, PhD DABVT at 14 ("Dr. Poppenga Expert Report") (attached as Ex. A to Defs.' MSJ Ex. 9).

44.    In 2002, the European Union promulgated regulations for the safe upper limits of total arsenic (10 mg/kg), cadmium (2 mg/kg), mercury (.3 mg/kg), and lead (10 mg/kg) in pet foods. Poppenga Dec. Ex. A at 15-16.

*Response:*  **Undisputed.**

45.    The levels of heavy metals in Champion's dog food—whether one takes the testing Champion performed in the ordinary course of its business or the testing performed by the Plaintiff—are below the MTLs set by the NRC/FDA, and also below the EU safety standards for heavy metals in pet food. Poppenga Dec. Ex. A at 17-24.

*Response:*  **Disputed in part.** CPF has tested ingredients that appear to exceed the NRC MTL.  *See* EUROFINS000054 (**Pl.'s Ex. 26**) (Eurofins testing results for CPF which show Monkfish (frozen) with arsenic levels of 20.529 ppm, exceeding the 12.5 ppm arsenic NRC MTL); *see also* EUROFINS000336 (**Pl.'s Ex. 27**) (Eurofins testing results for CPF which show spray dried herring with mercury levels of 0.65 ppm, exceeding the 0.267 ppm mercury NRC MTL).

46.    Dr. Robert Poppenga concluded "the levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs." Poppenga Dec. Ex. A at 35.

*Response:*  **Disputed in part.** *See* Pusillo Dep. Vol. 2 (defined herein) 94:17-21 (Defs.' MSJ Ex. 12) ("The CDC considers there's no safe level in the blood for heavy metals…. I consider there's no safe level for heavy metals .…").

47.    Plaintiff's expert did not identify any known safety standard or guidelines applicable to canines or to dog food that Champion's dog food exceeds. Deposition of Gary Pusillo on April 26, 2019 ("Pusillo Dep. Vol. 1"), attached hereto as Exhibit 11, at 11:21-12:22; 13:21¬14:12; 31:4-8; Deposition of Gary Pusillo on May 31, 2019 ("Pusillo Dep. Vol. 2"),

attached hereto as Exhibit 12, at 86:8-17; 93:5-18; 94:4-12. Plaintiff's expert is not a pet food safety expert or a toxicologist. Pusillo Dep. Vol. 1 36:23-37:5; 130:6-14; 143:22-24; Pusillo Dep. Vol. 2 67:21-23.

*Response:* **Disputed.** Dr. Pusillo's testimony and report identified heavy metal safety standards that levels of CPF's dog food appears to exceed. *See* May 13 Rebuttal Report of Dr. Pusillo at 13 (**Pl.'s Ex. 19-A**) (CPF's dog food has heavy metal levels that appear to have exceeded both EPA and WHO heavy metal standards for arsenic, cadmium, and mercury); *see also* Pusillo Dep. Vol. 2 94:17-21 (Defs.' MSJ Ex. 12). ("The CDC considers there's no safe level in the blood for heavy metals .… I consider there's no safe level for heavy metals."); *see also* Pusillo Dep. Vol. 1 227:17-18 (Defs.' MSJ Ex. 11) ("Well they know my opinion about heavy metals, that zero is … the target."), 270:24-25 (Defs.' MSJ Ex. 11) ("Well, technically every level takes away from the nutritional value of the food.").

48.     Bisphenol-A (BPA) is a chemical molecule that is produced for use primarily in the production of polycarbonate plastics and epoxy resins. Poppenga Dec. Ex. A at 25.

*Response:* **Undisputed.**

49.     Polycarbonate plastics and epoxy resins frequently appear in water bottles, infant bottles, CDs, medical devices, and lacquers to coat products such as food cans and bottle tops. Poppenga Dec. Ex. A at 25.

*Response:* **Disputed and Objection.** BPA-free containers are available and "regulatory agencies have encouraged elimination of BPA in infant containers," May 22 Dr. Poppenga Dep. 133:9-134:10 (**Pl.'s Ex. 25**); Deposition of Sean Callan (May 9, 2019) ("Callan Dep.") 187:3-5 (**Pl.'s Ex. 28**). This purported fact is also irrelevant to whether the labeling was misleading.

50.	Humans and animals are most commonly exposed to BPA through their diet, as BPA tends to leach into food and liquid. Dr. Poppenga Expert Report 25-26.

*Response:*  **Disputed and Objection.** Disputed as the opinion actually states, "can leach" and says nothing about the most common method.  Dr. Poppenga Expert Report at 25-26 (Defs.' MSJ Ex. 9 at Ex. A).  Disputed as the opinion also states toys and training devices are a source of exposure to BPA for dogs.  *Id.*  Disputed to the extent that this does not reflect that BPA has been addressed in certain products, including water bottles and baby food, which has led to the reduction of BPA exposure.  Callan Dep. 186:20-187:2 (**Pl.'s Ex. 28**).  Disputed as previous testing on several hundreds of dog food diets showed relatively infrequent detectable levels of BPA. Callan Dep. 54:10-15 (**Pl.'s Ex. 28**).  This purported fact is also irrelevant to whether the labeling was misleading.

51.	BPA is also prevalent in the environment, and many studies have measured levels of BPA in our air, dust, and water. Poppenga Dec. Ex. A at 25.

*Response:*  **Disputed and Objection.** BPA free containers are available and "regulatory agencies have encouraged elimination of BPA in … infant containers," May 22 Dr. Poppenga Dep. 133:9-134:10 (**Pl.'s Ex. 25**).  Callan Dep. 187:3-5 (**Pl.'s Ex. 28**).  Disputed as previous testing on several hundreds of dog food diets showed relatively infrequent detectable levels of BPA.  Callan Dep. 54:10-15 (**Pl.'s Ex. 28**).  This purported fact is also irrelevant to whether the labeling was misleading.

52.	Given BPA's ubiquitous presence in our environment, humans and animals are exposed to BPA daily through a variety of pathways. Poppenga Dec. Ex. A at 25, 35.

*Response:*  **Disputed and Objection.** BPA free containers are available and "regulatory agencies have encouraged elimination of BPA in … infant containers." May 22 Dr. Poppenga Dep.

133:9-134:10 (**Pl.'s Ex. 25**); Callan Dep. at 187:3-5 (**Pl.'s Ex. 28**). Disputed purported as previous testing on several hundreds of dog food diets showed relatively infrequent detectable levels of BPA. Callan Dep. 54:10-15 (**Pl.'s Ex 28**). This fact is also irrelevant to whether the labeling was misleading.

53. Champion does not add BPA as an ingredient during its making of its dog food. Hettiarachchi Dec. at ¶ 10. None of Champion's packaging for ORIJEN Regional Red or ORIJEN Six Fish states that its dog food is "BPA free," or words to that effect. Ogbonna Dec. at ¶¶ 9-10, Ex. A-D; Weaver Dep: 88:4-7.

*Response:* **Disputed and Immaterial.** Disputed to the extent this is offered to show that a consumer would understand that the Dog Food has a risk of BPA. Weaver Dep. 126:11-127:18 (Defs.' MSJ Ex. 5) (Weaver testified he did not think "biologically appropriate" food would contain BPA or have the risk of containing BPA. He believed the labels communicated that the Dog Food is "biologically appropriate" and "naturally sourced," and that CPF "would have done testing or it wouldn't contain things that would harm my pets."); s*ee also id*. at 90:21-91:13 (Weaver testified that BPA or heavy metals in any amount would make the Dog Food not biologically appropriate), 126:5-19 (Weaver testified he also did not believe "biologically appropriate" to mean there are heavy metals or pentobarbital in the pet food.). Also disputed to the extent CPF claimed all of its plastics were BPA free. CPF0069630 (**Pl.'s Ex. 29)** (Muhlenfeld stated, "We assure pet lovers there is no health risk to their cherished dogs and cats; all plastic is of food grade, approved by the Canadian Food Inspection Agency as free of Bisphenol A (BPA) …."). Immaterial as to whether it states BPA free is not relevant to showing that CPF knew that the terms were misleading and that consumers were misled.

54.     Ellipse Analytics, which has been engaged by Plaintiff, utilized a 30 ppb Level of Quantification ("LOQ") testing criteria and found that a third of several hundred dog foods tested had BPA in them. Deposition of Sean Callan ("Callan Dep."), attached hereto as Exhibit 13, at 54:10-15; 55:4-8. Mr. Callan testified that he would have found more dog foods with BPA in it if he used a more sensitive test. *Id.* at 59:11-16.

*Response:*  **Disputed.**  Mr. Callan's testimony is that it is possible, not that he would have, found more dog foods with BPA.  Callan Dep. 59:11-16 (**Pl.'s Ex. 28**).

55.     Eurofins laboratory tested five samples of the Regional Red and Six Fish diets purchased by the Plaintiff utilizing a five parts per billion (ppb) LOQ for BPA. Poppenga Dec. Ex. A at 27.  Each test demonstrated that the amount of BPA, if any, was non-detectable as it was below the five ppb level of detection. *Id.*

*Response:*  **Undisputed.**

56.     Champion tested other dog food brands for BPA. Poppenga Dec. Ex. A at 28. These brands also had low levels of BPA similar to (if not greater than) Champion. *Id.* at 27-28.

*Response:*  **Disputed it part, Objection, and Immaterial.** Disputed to the extent that CPF's testing revealed that CPF's dog food diets contained almost twice as much BPA as the other dog food products tested. *See* Expert Rebuttal Report of Katerina Mastovska at 7 (**Pl.'s Ex. 30**) ("The results in the tested Champion Petfoods products ranged from <5.00 to 19.6 ng/g.  The results in the blinded samples from other manufacturers ranged from <5.00 to 10.7 ng/g.").  The levels of BPA in other dog foods is irrelevant here and immaterial.

57.     The levels of BPA, purportedly in Champion's dog food according to the TAC, would not cause an adverse effect in a dog. Poppenga Dec. Ex. A at 35.

*Response:*  **Objection and Immaterial.**  This is irrelevant and prejudicial as there is no allegation in this case that the levels of BPA caused harm to any dogs.

58.     One of the laboratories utilized by Plaintiff to test for BPA and plasticizers, ExperTox, did not detect any BPA in any of the 38 samples of Champion's dog food it tested. Pusillo Dep. Vol. 1: 19:15-17; 21:11-18; 43:2-5; 124:9-13; Vol. 2 111:16-112:1.

*Response:*  **Undisputed.**

59.     Both of Plaintiff's experts, Dr. Pusillo and Sean Callan, did not opine on what levels of BPA would be harmful to dogs. Pusillo Dep. Vol. 1. 26:12-16; 108:22-109:1; Pusillo Dep. Vol. 2. 112:5-13; Callan Dep. 84:17-85:18. Plaintiff's expert, Dr. Pusillo, is not a BPA expert and gave no opinion on the source of BPA (*i.e.* how it could have come to be present) in Champion's dog food. Pusillo Dep. Vol. 1. 15:11-12; 15:14-16; 15:22-25.

*Response:*  **Undisputed and Immaterial.**  This is irrelevant and prejudicial as there is no allegation in this case that the levels of BPA caused harm to any dogs.

60.     Plaintiff's expert, Gary Pusillo, had testing done that detected trace levels of phthalates in Champion's dog food, but he had no opinion about what a dangerous level of phthalates would be, and conceded he is not an expert in phthalates or as to plastics. Pusillo Dep. Vol. 1. 16:9-20; 108:22-109:1; 129:20-21; Pusillo Dep. Vol. 2 112:14-24.

*Response:*  **Undisputed and Immaterial.** This is irrelevant and prejudicial as there is no allegation in this case that levels of phthalates caused harm to dogs.

61.     Champion uses beef tallow (fat) as an ingredient in its beef-based ("Red") dog food diets. Milam Dec. at ¶ 16. Beef tallow is created through a process called "rendering." Milam Dec. at ¶ 17. During the rendering process, the fatty tissue of a healthy slaughtered animal, such as a cow, gets converted into a purified fat, such as lard or tallow. *Id.*

*Response:* **Undisputed.**

62.     Champion's ingredient specifications to its suppliers of beef tallow require that all beef tallow sold to Champion is rendered from EU Category 3 cows, with no dead, dying, or condemned euthanized animals allowed. Deposition of Kenneth Gilmurray ("Gilmurray Dep."), attached hereto as Exhibit 14 at 180:14-19; 181:1-11; 186:25-189:7; 247:6-248:12; Gilmurray Dep. Ex. 18 ("EU certified, category 3. Product shall not contain animals dead or condemned upon reaching the slaughter facility. Product shall be from animals deemed fit for human consumption, and consist of meat, organ and bone."); Ex. 19.

*Response:* **Disputed in part.**  Disputed to the extent that CPF stated to the FDA that there was no written agreement with JBS and this is "something they have overlooked."   FDA Establishment Inspection Report (Hettiarachchi Dep., Ex. 33) (**Pl.'s Ex. 31**).

63.     JBS is one of three companies that supplied shipments, called "lots," of beef meal and/or beef tallow to Champion between August 2016 and May 2018. Milam Dec. at ¶ 21; Gilmurray Dep. 226:14-16.

*Response:* **Undisputed.**

64.     On or about May 7, 2018, Champion learned that two JBS lots of beef tallow (from its Pennsylvania MOPAC rendering facility) delivered to Champion on or around March 26, 2018 and March 28, 2018, contained small amounts of pentobarbital. Gilmurray Dep. 42:8-43:4; 218:2¬5; Gilmurray Dep., Ex. 21. Pentobarbital is not an ingredient in Champion's dog food. Milam Dec. at ¶ 22; Hettiarachchi Dec. at ¶ 11.

*Response:* **Disputed.**  Disputed as to whether the tallow tested positive for "small amounts of pentobarbital" when CPF acknowledged "any level" of pentobarbital is an adulterant, according to the FDA, and CPF testified it could not legally make dog food from the tallow that tested

positive for pentobarbital. CPF2118826 (**Pl.'s Ex. 32**);Wagner Dep. at 51:7-11 **Pl.'s Ex. 33** ("So once you know an ingredient has a contaminant in it and it's detectable, you can't use it. So we by law cannot use it. We wouldn't use it if it had a potential risk with it.").

65.     At an in-person meeting, JBS explained that the Pennsylvania Department of Agriculture had inspected the MOPAC rendering facility and took samples to test. Gilmurray Dep. 220:5-8; 221:11-222:9. Two of the five samples (at 56 ppb and 16 ppb, respectively) came from lots of beef tallow that had been shipped to Champion's DogStar Kitchen. Gilmurray Dep. 218:6¬10; 222:6-9; Gilmurray Dep., Ex. 21.

*Response:* **Disputed in part.** Disputed to the extent that this was the only testing done in connection with the investigation at MOPAC. *See, e.g.*, JBS0020412 (**Pl.'s Ex. 34; filed as restricted**); Gilmurray General Dep., Exs. 8-9, 25-26 (**Pl.'s Ex. 35; filed as restricted**); FDA Warning letter to JBS (Apr. 23, 2019) (**Pl.'s Ex. 36**).

66.     Champion analyzed which of its production runs (also called "lots") used the affected beef tallow and quarantined all unused portions of the affected beef tallow, along with any other MOPAC product in its possession and all unshipped kibble made with the affected beef tallow. Deposition of Jim Wagner ("Wagner Dep."), attached hereto as Exhibit 15 at 131:14-18; 133:9-12. Champion also pulled back from its distributors all of the food that used the affected beef tallow they had in their possession. *Id.* at 131:16-18.

*Response:* **Undisputed.**

67.     Of the 1.7 million pounds of dog food manufactured using the affected beef tallow, approximately 1.6 million was retrieved by Champion and only about 100,000 pounds was sold into retail. Wagner Dep. 131:14-18. It is not known if any of that product was sold in Wisconsin. Flakstad Dep. 72:20-21; 80:9-15; 113:16-114:9.

*Response:* **Undisputed.**

68. Champion retained a consultant, Exponent, to assess whether the 100,000 pounds of dog food from the affected lots would pose a risk to dogs. Hettiarachchi Dep. ¶ 18, Ex. A. Due to the low amount of pentobarbital in the affected tallow, as well as that fact that tallow is only a small fraction of the finished food, Exponent determined, using the FDA's No Observable Effect Level (NOEL), that the amount of pentobarbital in the beef tallow used in the affected lots would not pose any danger to any dog. *Id.*

*Response:* **Disputed in part and Immaterial.** Disputed to the extent CPF's internal calculations estimated that the maximum risk of pentobarbital exposure was 3.4 ppb, which is a detectable amount of pentobarbital that according to the FDA, would designate the affected dog food as adulterated. CPF2118689 (**Pl.'s Ex. 37**) ("Estimated max. amount in diet = 3.40 ug/kg [ppb]"); *Champion Petfoods USA Inc., v. JBS USA Food Company*, 18-CI00371, filed November 13, 2018 ("JBS Complaint") (**Pl.'s Ex. 38**). Further disputed to the extent the FDA has previously stated there is "no tolerance level for pentobarbital in pet food." FDA Warning letter to Evanger's Pet Food (June 29, 2017) ("Evanger's Warning Letter") (**Pl.'s Ex. 39**) ("In your firm's correspondence dated 5/18/17, it was stated that if any amount of pentobarbital were to be found in any of your ground loaf products, it would be in an amount that a laboratory would deem as being within the possibility of error and well within the range that FDA had previously deemed not be a health or safety concern in pet foods. ***FDA does not agree with your assessment that the process of grinding will dilute any pentobarbital present in the loaf products to non-detectable or safe levels. The agency notes that there is no tolerance level for pentobarbital in pet food.***"). CPF's expert, Dr. Poppenga, agrees that CPF's internal calculations concluded with the possibility of a detectable amount of pentobarbital as well. Dr. Poppenga Expert Report at 33 (Defs.' MSJ

Ex. 9 at Ex. A); August 26 Dr. Poppenga Dep. 48:14-49:9 (**Pl.'s Ex. 40**). Furthermore, Exponent's reliance on the FDA's NOEL is irrelevant and prejudicial because the FDA opined that any detectable amount of pentobarbital constitutes adulteration, without consideration as to whether the FDA's NOEL is exceeded. *FDA, Questions & Answers: Contaminants in Pet Food* (Sept. 27, 2018), (https://www.fda.gov/animal-veterinary/animal-health-literacy/questions-answers-contaminants-pet-food (last accessed Sept. 5, 2019) (**Pl.'s Ex. 41**).

69.     As a matter of course, approximately every 2 hours, during Champion's operational production times, Champion collects about an 18-ounce sample from each of its production runs. Hettiarachchi Dec. at ¶ 13. Champion determined that it had run only 6 production runs, comprised of 11 production shifts, with the affected beef tallow. *Id.* ¶ 14. Champion took approximately 4.5 to 6 ounce samples out of every 18-ounce 2-hour sample that was collected during the 11 production shifts. *Id*. ¶ 15; Wagner Dep. 49:12-15. Champion then mixed those samples to create 11 individual properly mixed and homogenized composite 18-ounce samples, which were representative of the 11 production shifts. *Id.* ¶ 16; Wagner Dep. 49:1-2; 50:3-9.

*Response:*  **Undisputed.**

70.     These eleven (11) composite samples were then sent to Texas A&M Veterinary Medical Diagnostic Laboratory ("TVMDL") for testing. Hettiarachchi Dec. at ¶ 15; Wagner Dep. 48:22-23; 49:1-2. All eleven (11) composite samples tested by TVMDL resulted in a "Non-Detect" reading by its lab equipment with a 2 ppb Level of Detection ("LOD"). Deposition of Travis Mays ("Mays Dep."), attached hereto as Exhibit 16, Ex. 7. Plaintiff has no testing to the contrary. Callan Dep. 135:20-24; 137:1-10.

*Response:*  **Undisputed.**

71.     Travis Mays, the Section Head of Analytical Chemistry at TVMDL, testified that although an ingredient used in manufacturing Champion dog food contained some amount of pentobarbital, pentobarbital will not necessarily be present in Champion's finished dog food product because that is dependent on the amount of pentobarbital present in the ingredient and the prevalence of that ingredient in the dog food. Mays Dep. 105:9-106:3.

*Response:*  **Disputed in part.**  Disputed to the extent this represents the entirety of Travis Mays's, Section Head of Analytical Chemistry at TVMDL, testimony.  Specifically, Mr. Mays testified that if an ingredient used in manufacturing the Dog Food contained pentobarbital, TVMDL could only detect it if it was present in a concentration of 2 ppb or more  and that TVMDL's conclusions about pentobarbital in CPF's pet food only extend to the 11 samples tested and cannot be extrapolated to any of CPF's dog foods that TVMDL did not test. Mays Dep. 105:9-106:11, 106:18-107:7 (Defs.' MSJ Ex. 16).

72.     As a result of the risk assessment and non-detect test results, Champion determined that it would not recall its products made with the affected tallow that had been shipped to retailers because the finished dog food posed no danger to dogs. Wagner Dep. 47:15-21; 48:12-17; 52:20−24.

*Response:*  **Disputed.**  CPF acknowledged "any level" of pentobarbital is an adulterant according to the FDA, which is supported by previous FDA statements to the pet food industry. CPF2118826 (**Pl.'s Ex. 32)**; Evanger's Warning Letter, (**Pl.'s Ex. 39**). CPF chose not to inform consumers about the pentobarbital in order to avoid "panic in the marketplace."  Wagner Dep. 47:10-20, 98:6-20 (**Pl.'s Ex. 33**).  In addition, CPF's internal calculations estimated that the maximum risk of pentobarbital exposure was 3.4 ppb, which is a detectable amount of

pentobarbital that according to the FDA, would designate the affected dog food adulterated. CPF2118689 (**Pl.'s Ex. 37**) ("Estimated max. amount in diet = 3.40 ug/kg [ppb]").

73.    The Federal Food and Drug Administration (FDA) inspected Champion's DogStar Kitchen over three days on or around May 16th, 17th, and 23rd of 2018. Wagner Dep., Ex. 4. After inspecting Champion's facilities and reviewing Texas A&M's test results, the FDA (i) approved of Champion's handling of the situation, including Champion's decision not to recall products from retailers, (ii) determined no other action needed to be taken, and (iii) issued a no action letter. Wagner Dep. 33:5-34:12, 53:20-54:12, 84:14-23, Ex. 4.

*Response:*  **Disputed and Objection.**  The FDA requested that CPF submit an entry to the Reportable Food Registry which is reserved for "when there is a reasonable probability that the use of, or exposure to, an article of food will cause serious adverse health consequences or death to humans or animals." FDA, *Reportable Food Registry for Industry*, https://www.fda.gov/food/compliance-enforcement-food/reportable-food-registry-industry (**Pl.'s Ex. 42**); CPF2118826 (**Pl.'s Ex. 32**) ("The FDA requested that we complete an entry in the Reportable Food Registry .…"). The FDA stated it would not escalate the incident to a recall as long as there are "no reports of related serious illness of pets." CPF2118826 at -28 (**Pl.'s Ex. 32**). The FDA's "no action indicated" conclusion was limited to the inspection of CPF's DogStar facility. *Id.*; FDA, *Clinical Investigator Inspection List (CIIL) Database Codes*, https://www.fda.gov/drugs/enforcement-activities-fda/clinical-investigator-inspection-list-ciil-database-codes (last accessed Sept. 5, 2019) (**Pl.'s Ex. 43**). There is no evidence the FDA approved of CPF's decision to leave the remaining dog food on store shelves, as the FDA simply deemed its conclusion as no action. The FDA's actions are also irrelevant to Plaintiff's negligence per se claim for adulteration which is based on Wisconsin law. TAC, ¶¶185-197.

74. The FDA issued a guidance relating to pentobarbital that stated, it is "the detection of pentobarbital in pet foods [that] renders the product adulterated." FDA, *Questions and Answers: Evanger's Dog and Cat Food* (webpage archived on Feb. 7, 2019 at 19:57) https://wayback.archive-it.org/7993/20190207195700/https://www.fda.gov/AnimalVeterinary/ NewsEvents/ucm544348.htm (last accessed August 14, 2019), attached hereto as Exhibit 17. In response to a frequently asked question regarding whether there is any acceptable level of pentobarbital in pet food, the FDA reiterated its position that "its detection renders the product adulterated." *Id.*

*Response:* **Disputed in part.** CPF acknowledged "any level" (of pentobarbital) is an adulterant according to the FDA, which is support by previous FDA statements to the pet food industry. CPF2118826 (**Pl.'s Ex. 32**); Evanger's Warning Letter (**Pl.'s Ex. 39**). CPF testified it could not legally make dog food from the tallow that tested positive for pentobarbital because the ingredient contained pentobarbital. Wagner Depo 51:3-11 (**Pl.'s Ex. 33**). ("So once you know an ingredient has a contaminant in it and it's detectable, you can't use it. So we by law cannot use it. We wouldn't use it if it had a potential risk with it."). CPF's internal calculations estimated that the maximum risk of pentobarbital exposure was 3.4 ppb, which is a detectable amount of pentobarbital that according to the FDA, would designate the affected dog food as adulterated. CPF2118689 (**Pl.'s Ex. 37**) ("Estimated max. amount in diet = 3.40 ug/kg [ppb]").

75. Canine dilated cardiomyopathy ("DCM") is a disease of cardiac muscle in dogs that results in a decreased ability of the heart to generate pressure to pump blood through the vascular system. FDA, *FDA Investigating Potential Connection Between Diet and Cases of Canine Heart Disease* (July 12, 2018), https://www.fda.gov/animal-veterinary/cvm-updates/fda-investigating-potential-connection-between-diet-and-cases-canine-heart-disease.

*Response:* **Undisputed.**

76.     On July 12, 2018, the U.S. Food & Drug Administration ("FDA") issued a report that it was investigating reported cases of DCM in dogs eating certain pet foods containing peas, lentils, other legume seeds, or potatoes. FDA, *FDA Investigating Potential Connection Between Diet and Cases of Canine Heart Disease* (July 12, 2018), https://www.fda.gov/animal-veterinary/cvm-updates/fda-investigating-potential-connection-between-diet-and-cases-canine-heart-disease. The FDA updated its report in February of 2019 and stated it was continuing to "collect and evaluate information about the DCM cases." FDA, *FDA Provides Update on Investigation into Potential Connection Between Certain Diets and Cases of Canine Heart Disease* (Feb. 19, 2019), https://www.fda.gov/animal-veterinary/cvm-updates/fda-provides-update-investigation-potential-connection-between-certain-diets-and-cases-canine-heart.

*Response:* **Undisputed.**

77.     The February update also stated that "[a] large proportion of the reported diets in DCM cases – both grain-free and grain-containing – contained peas and/or lentils in various forms (whole, flour, protein, etc.) as a main ingredient (listed within the first 10 ingredients, before vitamins and minerals)." FDA, *FDA Provides Update on Investigation into Potential Connection Between Certain Diets and Cases of Canine Heart Disease* (Feb. 19, 2019), https://www.fda.gov/animal-veterinary/cvm-updates/fda-provides-update-investigation-potential-connection-between-certain-diets-and-cases-canine-heart.

*Response:* **Undisputed.**

78.     On, June 27, 2019, the FDA issued a report in which it listed Champion (ACANA and ORIJEN), along with many other brands, as a diet a dog had been fed prior to being diagnosed with DCM. FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated*

*Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy.

*Response:* **Undisputed.**

79.    In the report, the FDA stated that it "strives to learn more about this emergence of DCM and its potential link to certain diets or ingredients." FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy. The FDA also stated it will "continue to investigate this potential association. Based on the data collected and analyzed thus far, the agency believes that the potential association between diet and DCM in dogs is a complex scientific issue that may involve multiple factors." *Id*.

*Response:* **Undisputed.**

80.    The FDA issued no recall of any kind, did not restrict the manufacturers of grain free dog food, and did not advise consumers to discontinue feeding such foods to their dogs. The FDA informed consumers that it "is continuing to investigate and gather more information in an effort to identify whether there is a specific dietary link to the development of DCM." FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy.

*Response:* **Undisputed.**

81.    The February and June FDA updates also stated that "[a] large proportion of the reported diets in DCM cases – both grain-free and grain-containing – contained peas and/or lentils in various forms (whole, flour, protein, etc.) as a main ingredient (listed within the first 10

ingredients, before vitamins and minerals)." FDA, *FDA Provides Update on Investigation into Potential Connection Between Certain Diets and Cases of Canine Heart Disease* (Feb. 19, 2019), https://www.fda.gov/animal-veterinary/cvm-updates/fda-provides-update-investigation-potential-connection-between-certain-diets-and-cases-canine-heart; FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy. In the ORIJEN Six Fish diet, peas are the 14th most abundant ingredient, and in the ORIJEN Regional Red diet, peas are the 16th most abundant ingredient. Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.

> *Response:* **Undisputed.**

82. Plaintiff bases his damages for each of his claims on an expert's calculation of the difference between Champion's actual sales and the sales that would have been made but for the alleged misrepresentations. Deposition of Colin Weir ("Weir Dep."), attached hereto as Exhibit 18 at 93:6-95:11. That calculation is based entirely on a "diminution in value" figure attained through a consumer survey. *Id.*; 76:15-20. The first consumer survey, conducted by Dr. Jon Krosnick and produced on April 8, 2019, purports to measure the effect on the price of Champion's dog food premised upon eight "corrective statements," which Plaintiff claims are necessary to correct the purported misrepresentations and omissions upon which he premises his claims. Expert Report of Dr. Jon Krosnick ("Krosnick Report"), attached hereto as Exhibit 19 at 41-42.

> *Response:* **Disputed in part.** Plaintiff's damages are based on a scientifically designed and conducted consumer survey performed by Dr. Jon Krosnick that determined the percent diminution in value of the Dog Food due to CPF's misrepresentations. Krosnick Report at 29-30 (Defs.' MSJ Ex. 19-1). Dr. Krosnick's survey is intended to "assess whether providing corrective

statements to respondents reduced the value of the [dog food] to them." Krosnick Dep. 64:18-21

(**Pl.'s Ex. 44**).   The survey found that disclosing information about the risk of the presence of

heavy metals and BPA in the Dog Food, that not all ingredients in the Dog Food are fresh, that not

all ingredients in the Dog Food are regionally sourced, and that the Dog Food may contain

ingredients made by third parties decreased the value of the dog food Plaintiff purchased by 59.6%.

Krosnick Report at 29 (Defs.' MSJ Ex. 19-1).

83.    The "corrective statements" were drafted by Plaintiff's counsel. Deposition of Dr.

Jon Krosnick ("Krosnick Dep."), attached hereto as Exhibit 20 at 20:7-14; 90:19-91:3.

*Response:*   **Disputed in part.** The corrective statements regarding mercury, cadmium,

lead, arsenic, and BPA that were used in Dr. Krosnick's survey directly quote information from

U.S. governmental sources regarding these substances.  Krosnick Report at 41-42 (**Defs.'MSJ Ex.**

**19-1**).   The results of Dr. Krosnick's survey do not depend on whether any of the corrective

statements are true or not.  Krosnick Dep. 22:14-16 (**Pl.'s Ex. 44**).

84.    The eight "corrective statements" are:

(1)    Laboratory testing has shown there is a risk that this food may contain mercury.
The World Health Organization has said that in humans, "Mercury may have toxic effects on the
nervous, digestive and immune systems, and on lungs, kidneys, skin and eyes."[4]

(2)    Laboratory testing has shown there is a risk that this food may contain cadmium. A
federal public health agency of the U.S. Department of Health and Human Services, has found,
"Kidney and bone effects have also been observed in laboratory animals ingesting cadmium.
Anemia, liver disease, and nerve or brain damage have been observed in animals eating or drinking
cadmium."

---

[4] Dr. Krosnick's first survey utilizes the eight "corrective statements" listed in Paragraph 84
herein. *See also* Krosnick Report at 41-42. Dr. Krosnick produced a second survey on August 13,
2019, which asked consumers for their impressions on the quality and healthiness of the products
based on two statements regarding pentobarbital. Krosnick Report at 372. However, Dr.
Krosnick does not premise any diminution of value from the results of this second survey.

(3)     Laboratory testing has shown there is a risk that this food may contain lead. The Food & Drug Administration has said, "Lead is poisonous to humans and can affect people of any age or health status."

(4)     Laboratory testing has shown there is a risk that this food may contain arsenic. The Environmental Protection Agency has said, "Arsenic has been linked to a number of cancers. These include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate."

(5)     Laboratory testing has shown there is a risk that this food may contain BPA. The Food & Drug Administration has said, "BPA is an industrial chemical used to make polycarbonate, a hard, clear plastic, which is used in many consumer products."

(6)     The manufacturer of this food has stated that it may include ingredients that are not are delivered to them fresh but have been frozen before they are used to make the dog food.

(7)     The manufacturer of this food has stated that it may include ingredients that are sourced outside the region where it is manufactured. This may include not only other regions within the United States but also other regions internationally.

(8)     The manufacturer of this food has stated that it uses third parties to process and manufacture protein meals and tallows used in its dog foods.

Krosnick Report at 42-43.

*Response:*  **Undisputed.**

85.     Part one of Dr. Krosnick's survey utilizes the DogStar ORIJEN Six Fish and ACANA Duck and Pear packaging. Krosnick Report at 38.

*Response:*  **Disputed in part.** Respondents for Part One of Dr. Krosnick's survey saw photos and a transcript of the text of each side of the packaging for either Orijen Six Fish or Acana Duck and Pear Singles diet.  Krosnick Report at 41 (Defs.' MSJ Ex. 19-1).

86.     Dr. Krosnick did nothing "to understand how respondents interpreted any of the context that Champion [] put on the product." Krosnick Dep. 126:21-24. As to Biologically Appropriate, he testified:

Q.     Similarly, there's nothing about your survey that asked the respondents if they attached any meaning or significance to the expression "Biologically Appropriate"?

A.     Correct.

Q. Okay. As a result of your experiment, did you form any opinions about the relative importance of any of the content of Champion's packages?

A. No.

Krosnick Dep. 127:5-9; 127:12-15.

*Response:* **Disputed in part.** Respondents for Part One of Dr. Krosnick's survey were shown between zero and eight of the corrective statements after viewing photos and a transcript of the text of each side of the packaging. Krosnick Report at 41-42 (Defs.' MSJ Ex. 19-1). The purpose of this was to assess the decrease in value of the Dog Food associated with disclosing the information in the corrective statements. Krosnick Report at 20 (Defs.' MSJ Ex. 19-1); Krosnick Dep. 114:15-20 (**Pl.'s Ex. 44**) ("I think you can view this survey as a measurement of the decrease in value to consumers as analogous to a price premium.").

87.    The American Association of Feed Control Officials ("AAFCO") AAFCO provides a forum for state regulatory officials to come together and create model guidelines to ensure that the regulation of animal feeds is as uniform as possible from state to state. Ogbonna Dec. at ¶ 6. While most states follow AAFCO model regulations, exact language and interpretation may differ among states. *Id.* Champion strives to create product labels for distribution in the United States that are consistent with AAFCO Model Regulations. *Id.*

*Response:* **Immaterial and Objection.** AAFCO does not govern Plaintiff's claims here so any reference is irrelevant and prejudicial to the case. Also a state's interpretation of AAFCO and whether "Champion strives to create product labels for distribution in the United States that are consistent with AAFCO Model Regulations" calls for a legal inquiry, not a factual determination, as to the AAFCO regulations and guidelines.

88.    AAFCO defines "raw" as "food in its natural or crude state not having been subjected to heat in the course of preparation of food." Ogbonna Dec. at ¶ 13, Ex. E. Champion's

raw ingredients are "fresh frozen." Milam Dec. at ¶ 11; Declaration of Richard Raposo ("Raposo Dec."), attached hereto as Exhibit 21, at ¶¶ 9, 12.

*Response:* **Disputed in part, Objection and Immaterial.** Although it appears CPF correctly cites the current definition of raw (whether this was the definition for the entire class period is unclear), any reference to AAFCO is irrelevant, prejudicial, and immaterial, as AAFCO does not govern Plaintiff's claims here. Disputed as to whether CPF ingredients are "fresh frozen" under AAFCO because fresh is a separate definition from raw and does not allow for frozen ingredients. Ogbonna Dec., ¶¶12-13 (Defs.' MSJ Ex. 1); CPF2042296 (**Pl.'s Ex. 45**) ("But let me answer your questions about fresh, raw, dehydrated & airdried. The reference in the AAFCO OP (2015 printed) is in the feed terms pages 342, 343, 344 and 347. These pages have the AAFCO definition of (respectively): dehydrated, dried, fresh and raw…. Fresh means not frozen or heated or dried or rendered or cooked, only held chilled. Raw means in its natural or crude state not having been subjected to heat.").

89.     AAFCO regulations state that when a pet food represents that it is "made with" certain ingredients, those ingredients must constitute at least 3% of the product weight. Ogbonna Dec. at ¶ 14, Ex. F.

*Response:* **Objection and Immaterial.** Although it appears CPF correctly cites the current requirement for "made with" (whether this was the definition for the entire class period is unclear), any reference to AAFCO is irrelevant, prejudicial, and immaterial as AAFCO does not govern Plaintiff's claims here.

90.     As required by AAFCO regulations, the back of every package of Champion dog food has an ingredients panel that lists all ingredients included in the dog food, in order of weight. Ogbonna Dec. at ¶ 15.

*Response:*   **Objection and Immaterial.**   Any reference to AAFCO is irrelevant, prejudicial, and immaterial as AAFCO does not govern Plaintiff's claims here.  Further, whether the ingredient package meets the AAFCO regulations calls for a legal conclusion.

91.    For the NorthStar Six Fish diet, the regional wild-caught saltwater fish come from the Pacific Ocean and are sourced from Keltic Seafood Ltd. in the Port Hardy, British Columbia, Canada, and the freshwater fish come from lakes located in the Canadian Provinces and are sourced from Freshwater Fish Co. in Winnipeg, Manitoba, Canada. Raposo Dec. at ¶¶ 13-14.

*Response:*   **Disputed in part.** Disputed to the extent that this does not represent the location and/or sourcing of all ingredients included in this diet.  CPF sourced numerous ingredients used in its NorthStar Six Fish diet from non-regional suppliers, such as salmon oil from Pesquera La Portada S.A. in Chile.  CPF1562194 (**Pl.'s Ex. 46**).

92.    For the DogStar Six Fish diet, the wild-caught fish come from the Atlantic Ocean and are sourced from Norpel in New Bedford, Massachusetts and came from the Atlantic Ocean, just east of New England. Milam Dec. at ¶ 24.

*Response:*   **Disputed in part.** Disputed to the extent that this does not represent the location and/or sourcing of all ingredients included in this diet.  CPF sourced numerous ingredients used in its DogStar Six Fish diet from non-regional suppliers, such as herring oil from FF Skagen in Denmark.  CPF0041983 (**Pl.'s Ex. 47**).

93.    Plaintiff testified he knew the fish ingredients in the DogStar Six Fish diet were sourced from New England in the Atlantic Ocean. Weaver Dep. 84:7-16.

*Response:*   **Undisputed.**

94.    For the NorthStar Regional Red diet, "the Regional Red Meats" such as angus beef, wild boar, and heritage pork are sourced from ranches in Alberta, Canada, while the lamb is

sourced from Alberta, Canada, as well as, New Zealand when Canadian supply is low, and the free-range bison is sourced from ranches in Alberta Canada, as well as ranches in Colorado when the Canadian supply is low. Raposo Dec. at ¶¶ 15-20.

*Response:* **Disputed in part.** Disputed to the extent that this does not represent the location and/or sourcing of all ingredients included in this diet. CPF sourced numerous ingredients used in its NorthStar Regional Red diet from non-regional suppliers, such as beef meal from Farm Brands Limited in New Zealand. CPF1617586 (**Pl.'s Ex. 48**).

95.     For the DogStar Regional Red diet, the angus beef ingredients were sourced by Darling Ingredients, Inc. in Nebraska, and were sent for processing in Paduka, Kentucky; the lamb, mutton, and goat ingredients were sourced from farms in Kentucky and Indiana, and ranches in New Zealand; the pork ingredients were sourced by Indiana Packers, Corp. from farmers in Kentucky and Indiana; the catfish ingredients were sourced by Darling Ingredients, Inc. from freshwater sources in Kentucky. Milam Dec. at ¶¶ 25-26; 29-30.

*Response:* **Disputed in part.** Disputed to the extent that this does not represent the location and/or sourcing of all ingredients included in this diet. CPF sourced numerous ingredients used in its DogStar Regional Red diet from non-regional suppliers, such as Atlantic mackerel from Northern Pelagic Group, LLC in Massachusetts. CPF0056767 (**Pl.'s Ex. 49**).

96.     Champion is not a ranch, slaughterhouse, renderer, fishing operation, farm, or any kind of ingredient producer. Milam Dec. at ¶ 31. The beef and other protein meals and tallow ingredients are ingredients made by a third-party renderer for Champion. *Id*. at ¶ 23.

*Response:* **Undisputed.**

97.     Champion does not outsource the making of its finished food products. Raposo Dec. at ¶¶ 22-23; Milam Dec. at ¶¶ 33-34.

*Response:*  **Undisputed.**

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

98.     CPF promises on its label that its Dog Food is "Biologically Appropriate" and made with "Fresh Regional Ingredients" and "Natural Ingredients" that are "Delivered Daily," "Never Outsourced," and come from "trusted" suppliers. CPF0001896 (**Pl.'s Ex. 50**); CPF0002863 (**Pl.'s Ex. 51**); CPF1308970 (**Pl.'s Ex. 52**); CPF0001967 (**Pl.'s Ex. 53**); CPF0001957 (**Pl.'s Ex. 1**).

99.     CPF further represents that its Dog food "Nourish[es] as Nature Intended," "Delivering Nutrients Naturally."  CPF0002863 (**Pl.'s Ex. 51**); CPF0001957 (**Pl.'s Ex. 1**); CPF0001874 (**Pl.'s Ex. 54**).

100.     CPF does not intend Biologically Appropriate to be a statement of opinion, but rather something consumers can use to understand the contents and ingredient sources of the Dog Food. CPF2116940 at -49 (**Pl.'s Ex. 55**) ("Q. WHAT DOES BIOLOGICALLY APPROPRIATE™ MEAN? A. The Biologically Appropriate™ concept is simple: mirror the freshness and variety of meats that dogs and cats are evolved to eat."); CPF1707161 (**Pl.'s Ex. 56**) (White Paper authored by CPF detailing its Biologically Appropriate concept and focusing on the use of "fresh" (i.e., never frozen) animal ingredients).

101.     CPF has admitted that the inclusion of pentobarbital in its Dog Food is not Biologically Appropriate.  Deposition of Sarah Brown-Tarry ("Brown-Tarry Dep.") 82:7-11 (**Pl.'s Ex. 57**).

102.     Plaintiff testified that he did not know about the risk of heavy metals or BPA in the Dog Food and, if he had known, he testified that he "would never give them to one of my puppies, dogs, any animal." Weaver Dep. 30:14-21 (Defs.' MSJ Ex. 5); *see also id.* at 63:10-16 (as to BPA, pentobarbital and heavy metals, Mr. Weaver doesn't understand "[w]hy would anybody put that

in any food for a pet?"), 125:12-126:2 (Weaver testified that he would not have purchased the Dog Food if the label disclosed the risk of containing heavy metals, BPA, or pentobarbital); Muhlenfeld Dep. 191:17-192:9 (the risk of inclusion of pentobarbital as an ingredient is not disclosed on the packaging) (**Pl.'s Ex. 6**).

103.    CPF internally acknowledged that it failed to properly monitor and test for heavy metals.  CPF1827829 (**Pl.'s Ex. 58**) (Oct. 3, 2008, e-mail from Peter Muhlenfeld, VP, Sales & Marketing, to Jeff Johnston stressing the importance that CPF conduct heavy metal testing and stating that failure to do so would be negligent); CPF1295266 (**Pl.'s Ex. 59**) (October 16, 2013, e-mail from Jeff Johnston to Frank Burdzy, President & CEO, stating, "On the food safety side of things, there are a number of risks that we are running completely blind to that we really need to be looking at doing surveillance on as a company. These include … heavy metals ….").

104.    CPF does not regularly test for BPA or other plasticizers as it viewed BPA as a "negligible risk."  CPF1842665 (**Pl.'s Ex. 60**).

105.    CPF relies on its packaging suppliers' guarantees to ensure that the packaging was BPA free. Brown-Tarry Dep. 116:11-19 (**Pl.'s  Ex. 57**);  CPF2028405 (**Pl.'s Ex. 61**) ("We have been assured by our supplier that all Champion Petfoods packaging is BPA free.").

106.    CPF was aware that its employees and, at least, consumers from certain regions had difficulty understanding the difference in the meaning between CPF's representations of "fresh" or "raw." CPF1781852 (**Pl.'s Ex. 62**).

107.    CPF does not identify on the packaging of its pet food or elsewhere, which of its ingredients are "fresh" or "raw" or that certain ingredients may be either "fresh" or "raw" depending on the season.  CPF1781852 (**Pl.'s Ex. 62**).

108.    CPF's Vice President of Sales and Marketing, Peter Muhlenfeld, stated he believes that something that has been frozen could not be fresh.  Muhlenfeld Dep. 157:13-16 (**Pl.'s Ex. 6**).

109.    CPF defined "fresh" as it relates to its pet food, as meaning that its "fresh ingredients are never more than three weeks old from their date of production." CPF2004325 at -26 (**Pl.'s Ex. 63**).

110.    CPF sometimes includes expired ingredients in its pet food, as well as frozen ingredients that had been stored for up to 3 to 4 years.  CPF1770001 (**Pl.'s Ex. 64**) (approving the use of expired fresh turkey meat in August 2016); CPF2062755 (**Pl.'s Ex. 65**); CPF1781155 at -56 (**Pl.'s Ex. 66; filed as restricted**) (CPF establishes a process for maximizing the shelf life of fresh meat products where the "odor, color, and consistency" are assessed); CPF1826327 (**Pl.'s Ex. 67**) (2018 e-mail discussing CPF's use of frozen rabbit that it has stored for 3-4 years); Milam Dep. 261:8-10 (**Pl.'s Ex. 22**) (confirming CPF uses frozen rabbit).

111.    CPF utilized regrinds of kibble in its pet food, which were sometimes included at a higher percentage than many other ingredients included in the pet food.  CPF1348192 (**Pl.'s Ex. 68; filed as restricted**); CPF1936705 (**Pl.'s Ex. 69**) (Acana Adult made with 18% regrinds); CPF0213615 (**Pl.'s Ex. 70**) (8.5% regrinds in Orijen foods); CPF0079320 (**Pl.'s Ex. 71; filed as restricted**) ("Regrind Calculation based on 2.5% average usage"); CPF1841061 (**Pl.'s Ex. 72; filed as restricted**) (discussing "the impact of using regrind to replace System 1 ingredients"); CPF1297395 (**Pl.'s Ex. 73**) (admits using Orijen regrinds in Acana); CPF1739605 (**Pl.'s Ex. 74**). (discussing procedure for using regrinds).

112.    CPF's marketing department admits the "Fresh" claim is "misleading" and cannot be substantiated because "[n]ot all ingrdients [*sic*] are fresh and delivered daily." CPF1825639 at

p. 1 (**Pl.'s Ex. 76; filed as restricted**); CPF1768707 at p. 1 (**Pl.'s Ex. 77; filed as restricted**); CPF1825634 (**Pl.'s Ex. 75; filed as restricted**).

113.　There are multiple ingredients that may be sourced internationally or outside DogStar or NorthStar regions that are not disclosed on the packaging, including the European Union, New Zealand, Norway, and Latin America. CPF1768707 (**Pl.'s Ex. 77; filed as restricted**). CPF acknowledged that this was an "Issue/Problem" in light of its "Fresh Local Meat Claim." *Id.*

114.　CPF intentionally masked that some farms were owned by multinational conglomerates, while still portraying them as "regional" or locally owned farms. CPF1817671 (**Pl.'s Ex. 17**) (internal e-mails discussing Facebook advertisement and update of "Fresh Regional Ingredients" section of Website: "For clarification – Does Greg's farm in Robards Kentucky have a name? We know Tyson is the company that owns the farm."), at -73 ("My take is that we shouldn't mention the name of the farm, since Tyson is a huge multinational conglomerate (if it's the same Tyson Foods I'm thinking of). I'd just say, 'Like Greg in Robards, Kentucky…' I know we typically mention the name, but it seems problematic in this case." and "I'm going to suggest to move forward and use Robbie's suggestion to change it to 'Like Greg in Robards, Kentucky…'") at -72.

115.　CPF denied sourcing any of its ingredients from China (Jeff Johnston Dep. 149:21-150:2, 150:19-152:8 (**Pl.'s Ex. 78**)), but evidence shows that CPF sourced at least two of its ingredients from China. CPF0058305 (**Pl.'s Ex. 79**) (e-mail from Jeff Johnston to Bonnie Gerow stating, "There are two vitamins only available from China, the rest of our ingredients come from North America and Europe."); CPF1716671 (**Pl.'s Ex. 80**) (Bonnie, Customer Care Leader, told a customer, "We do not source ingredients from China for either our Canadian or US made foods

and treats."); CPF2087494 (**Pl.'s Ex. 81**) (Christie, Customer Care employee, told a customer, "There are no ingredients from China used in the preparation of our dog and cat food formulas, including vitamins and minerals – we are 100% China-free.").

116. As early as February 2017, and again in February 2018, CPF was aware of pentobarbital contamination in other pet foods and that CPF could be using the same supplier. CPF1748144 (**Pl.'s Ex. 82**); CPF1285631 (**Pl.'s Ex. 83**); CPF1285933 (**Pl.'s Ex. 84**). Although CPF was aware that it should test its pet food for the presence of pentobarbital at the time (CPF1285631 (**Pl.'s Ex. 83**)), it never tested prior to May 2018. Wagner Dep. 14:4-14 (**Pl.'s Ex. 33**).

117. CPF considered tallow a high-risk ingredient, meaning it carried a risk of contaminating its finished pet food products. Wagner Dep. 18:13-19:10 (**Pl.'s Ex. 33**).

118. CPF should have been aware that MOPAC had a Standard Operating Procedure in place for handling "dead or condemned carcasses," while producing beef tallow for CPF. Deposition of Tjart Andries Minnaar 71:8-17 (**Pl.'s Ex. 85**).

119. CPF did not audit JBS for 2012, 2013, 2014, 2015, 2016, or 2017. CPF2117189 (**Pl.'s Ex. 86; filed as restricted**).

120. During a 2018 CPF audit of JBS, it noted a corrective action needed for buildup of other products on equipment and spilled product on floors but failed to follow-up with JBS as that is a weak point at CPF. *See* CPF2117191 (**Pl.'s Ex. 87**); CPF2119942 (**Pl.'s Ex. 88**). (Director of Certification and Compliance admits he never received a corrective action response from JBS and "following up on [corrective action] after audits" is "a weak point" for him).

121. 1,738,790 pounds of Orijen and Acana dog and cat food was manufactured using beef tallow contaminated with pentobarbital; of that kibble, 872,447 pounds was shipped to third-

party distributors, and 866,343 pounds were retained by CPF. CPF2118689 (**Pl.'s Ex. 37**); FDA Establishment Inspection Report at 1 (**Pl.'s Ex. 31**).

122.　CPF's eleven composite samples and its untested dry kibble made with tallow from lots contaminated with pentobarbital have a risk of containing pentobarbital at levels below 2 ppb, including levels such as 1.9 ppb, 1.75 ppb, and 1.50 ppb.  Dr. Poppenga Expert Report at 35 (Defs.' MSJ Ex. 9 at Ex. A); August 26 Dr. Poppenga Dep. 29:8-19 (**Pl.'s Ex. 40**).

123.　Further, CPF's untested dry kibble made with tallow from lots contaminated with pentobarbital have a risk of containing pentobarbital at levels of 2 ppb or more.  August 26 Dr. Poppenga Dep. 28:14-29:7 (**Pl.'s Ex. 40**); Sept. 5 Dr. Pusillo Rebuttal Report at 21 (**Pl.'s Ex. 19-B**); Dr. Poppenga Expert Report at 33 (Defs.' MSJ Ex. 9 at Ex. A).  Specifically, both CPF and Dr. Poppenga determined the final product of the contaminated kibble could potentially contain the detectable amount of approximately 3.4 ppb of pentobarbital in the worst-case-scenario. Dr. Poppenga Expert Report at 33 (Defs.' MSJ Ex. 9 at Ex. A); CPF2118689 (**Pl.'s Ex. 37**); CPF2028635 (**Pl.'s Ex. 89**), August 26 Dr. Poppenga Dep. 48:14-49:9 (**Pl.'s Ex. 40**).  Dr. Pusillo confirmed in his rebuttal report that test methods exist that can successfully detect pentobarbital at levels below 2 ppb. September 5 Dr. Pusillo Rebuttal Report at 15-16 (**Pl's. Ex. 19-B**).

124.　On May 23, 2018, CPF represented to the FDA that testing for pentobarbital will be required on all future shipments of tallow and reported on a certification of analysis prior to acceptance and subsequent use.  FDA Establishment Inspection Report at 4 (**Pl.'s Ex. 31**). Likewise, the FDA also recommended that CPF begin testing for the presence of pentobarbital. CPF2117623 (**Pl.'s Ex. 90**).  CPF did not begin testing its tallow or kibble for the presence of pentobarbital. Wagner Dep. 20:12-21:9 (**Pl.'s Ex. 33**).

125. CPF neither recalled over 100,000 pounds of the Dog Food that was sold in retail markets despite containing tallow contaminated with pentobarbital, nor notified consumers of the contamination. Wagner Dep. 47:10-20, 47:25-48:17 (**Pl.'s Ex. 33**).

126. Dr. Callan found that pentobarbital is not destroyed during the kibble manufacturing process and is likely present at some level in the finished product of CPF's affected dog food, due to the contamination of certain raw materials with pentobarbital. Callan Expert Report at 1 (**Pl.'s Ex. 91**).

127. Dr. Callan found that the quantity of random sampling performed by CPF was insufficient to assess the actual inclusion of pentobarbital in the finished kibble given the small number (11) and size tested relative to the total size of potentially contaminated finished product (approximately .26 lbs out of an approximately 1.7 million pounds) and the heterogeneity of certain raw materials. Callan Expert Report at 1 (**Pl.'s Ex. 91**).

128. From November 22, 2017 to February 8, 2018, CPF received approximately 233,140 pounds of tallow from JBS. CPF0046822 (**Pl.'s Ex. 92**); CPF0047840 (**Pl.'s Ex. 93**); CPF0048919 (**Pl.'s Ex. 94**); CPF0049307 (**Pl.'s Ex. 95**); CPF0050489 (**Pl.'s Ex. 96**). In May of 2018, tallow samples from Five Rivers Cattle Feeding, a subsidiary of JBS, from the same time period—November 22, 2017, January 18, 2018, and February 12, 2018—tested positive for pentobarbital at levels of 52 ppb, 29 ppb, and 133 ppb respectively. JBS0007485 (**Pl.'s Ex. 97; filed as restricted**). CPF never tested the tallow it received from JBS from November 22, 2017 to February 8, 2018, for the presence of pentobarbital.

129. The FDA has stated that a negative test for pentobarbital on a sample "simply indicates that the particular sample tested was negative for pentobarbital" and "random testing of finished product may not be representative of all units of your products. Furthermore, finished

product testing cannot mitigate the risk of pentobarbital in your raw material." *Questions and Answers: Evanger's Dog and Cat Food* (webpage archived on Feb. 7, 2019, at 19:57) https://wayback.archive-it.org/7993/20190207195700/https://www.fda.gov/AnimalVeterinary/ NewsEvents/ucm544348.htm (**Pl.'s Ex. 98**); Evanger's Warning Letter (**Pl.'s Ex. 39**). Consistent with the FDA's findings, Dr. Pusillo determined that the contaminated Dog Food's potentially heterogeneous nature made it possible that different parts of the each batch of dog food could contain different concentrations of pentobarbital. Sept. 5 Dr. Pusillo Rebuttal Report at 15-16 (**Pl.'s Ex. 19-B**).

130. CPF's food packaging, labeling, ultra-premium pricing, use of featured farmer imagery, and BAFRINO marketing was intended to give consumers, like Plaintiff, the appearance that CPF dog food is an ultra-premium product of the highest quality. CPF1973651 at -69 (**Pl.'s Ex. 99; filed as restricted**).

131. BPA is an industrial chemical that has been linked to various health issues, including being an endocrine disruptor. May 13 Dr. Pusillo Rebuttal Report (**Pl's. Ex. 19-A**).

Dated: September 16, 2019

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By s/ Rebecca A. Peterson

CHARLES N. NAUEN, #1031943
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: cnnauen@locklaw.com
rkshelquist@locklaw.com
rapeterson@locklaw.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
KARLA M. GLUEK
RAINA C. BORRELLI
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com

ROBBINS ARROYO LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com
smckany@robbinsarroyo.com

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

PETERSON LAW and MEDIATION, LLC
MARK A. PETERSON (1016259)
1433 N. Water Street, Suite 400
Milwaukee, WI 53202
Telephone: (414) 877-7312
E-mail: mark@markpetersonlaw.com

*Attorneys for Plaintiff*

1388602