UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

SCOTT WEAVER, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiff,

        v.                                           Case No. 2:18-cv-1996-JPS

CHAMPION PETFOODS USA INC. and
CHAMPION PETFOODS LP,

        Defendants.

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL BACKGROUND .......................................................................... 2

        A.      The Evolution of Champion Petfoods .................................................... 2

        B.      Champion's Wide Variety of Diets and Packaging ............................... 4

        C.      Champion's Historical Testing for Heavy Metals, Response to the Clean
                Label Project, and Genesis of this Lawsuit .......................................... 5

        D.      The Very Low, Non-Dangerous Level of Pentobarbital Found in an
                Ingredient Supplied to Champion in March 2018 for its DogStar "Red"
                Diets ....................................................................................................... 6

        E.      The FDA's Recent DCM Announcements About Grain-Free Food ...... 7

        F.      Facts Specific to Plaintiff Scott Weaver ............................................... 7

III.    LEGAL STANDARD FOR RULE 23 ........................................................... 8

IV.     THE PROPOSED CLASSES SHOULD NOT BE CERTIFIED ................... 8

        A.      Plaintiff Fails to Carry His Burden Under Rule 23(b)(3) Because His Claims
                Are Riddled with Individualized Issues ................................................ 8

                1.      Plaintiff's proposed class raises individualized issues as to the
                        critical element of whether Champion made any untrue or
                        misleading statements of fact ...................................................... 9

                        a.      The statements on Champion bags varied widely throughout
                                the proposed class period by brand, diet, kitchen, and time .......... 9

                        b.      The contents inside of each Champion bag must be
                                compared to the statements made on the outside of the bag ........ 14

                2.      Plaintiff's proposed classes raise individualized issues as to the
                        critical liability element of material inducement and causation .............. 18

                3.      The putative class members' alleged damages are not susceptible to
                        measurement across the entire class ........................................ 23

        B.      Plaintiff Fails to Carry His Burden Under Rule 23(a) .......................... 27

        C.      Plaintiff Fails to Carry His Burden Under Rule 23(c)(4) .................... 28

        D.      Plaintiff Fails to Carry His Burden Under Rule 23(b)(2) ................... 29

V.      CONCLUSION ............................................................................................. 30

**Cases**

*Allen v. Conagra Foods, Inc.*,
  No. 3:13-cv-01279-WHO, 2019 WL 3302821 (N.D. Cal. July 22, 2019) ..............................9

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ................................................................................................30

*Balschmiter v. TD Auto Finance LLC*,
  303 F.R.D. 508 (E.D. Wis. 2014) (Stadtmueller, J.).....................................................19, 29

*In re Bisphenol-a (BPA) Polycarbonate Plastic Prod. Liab. Litig.*,
  No. 08–1967, 2011 WL 6740338 (W.D. Mo. Dec. 22, 2011) ...............................................21

*Blitz v. Monsanto Co.*,
  No. 17-cv-473, 2019 WL 95440 (W.D. Wis. Jan. 2, 2019).....................................................18

*Boulet v. Nat'l Presto Indus., Inc.*,
  No. 11-cv-840-slc, 2012 WL 12996298 (W.D. Wis. Dec. 21, 2012)...............................10, 20

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ..................................................................................................7

*Chambers v. MCI Worldcom Network Serv., Inc.*,
  No. 00-C-348-C, 2001 WL 37114660 (W.D. Wis. Mar. 2, 2001).........................................22

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................................................................7, 23, 25

*In re Dial Complete Mktg. & Sales Prac. Lit.*,
  312 F.R.D. 36 (D.N.H. 2015) ................................................................................................18

*Doster Lighting, Inc. v. E-Conolight, LLC*
  No. 12-c-0023, 2015 WL 3776491 (E.D. Wis. June 17, 2015) ...........................10, 18, 20, 23

*In re General Motors LLC Ignition Switch Litig.*,
  14-MD02543 (JMF), 2019 WL 3564698 (S.D.N.Y. Aug. 6, 2019) ......................................26

*Haley v. Kolbe & Kolbe Millwork Co.*,
  863 F. 3d 600 (7th Cir. 2017) ................................................................................................18

*Haley v. Kolbe & Kolbe Millwork Co., Inc.*,
  No. 14-cv-99-bbc, 2015 WL 9255571 (W.D. Wis. Dec. 18, 2015).........................................8

*Hamilton v. 3D Idapro Sols., LLC*,
  18-cv-54, 2019 U.S. Dist. LEXIS 128217 (W.D. Wis. Aug. 1, 2019) ....................................9

*Harriston v. Chi. Tribune Co.*,
  992 F.2d 697 (7th Cir. 1993) ................................................................................................30

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) ................................................................................................29

*Kartman v. State Farm Mut. Auto Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ...................................................................29

*McCaster v. Darden Restaurants*,
   845 F.3d 794 (7th Cir. 2017) ...................................................................28

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ..................................................26

*Novell v. Migliaccio*,
   2008 WI 44 (Wis. 2008) ......................................................................9, 18

*Oshana v. Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) .............................................................18, 27

*Panwar v. Access Therapies, Inc.*,
   No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015) ...........22

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) .................................................................22

*Retired Chi. Police Ass'n v. City of Chi.*,
   7 F.3d 584 (7th Cir. 1993) .........................................................................8

*Matter of Rhone-Poulenc Rorer Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ...................................................................19

*Riley v. Nat. Fed. of Blind*,
   487 U.S. 781 (1988)..................................................................................29

*Robinson v. Sheriff of Cook Cty.*,
   167 F.3d 1155 (7th Cir. 1999) .................................................................28

*Schmidt v. Bassett Furniture Indus.*,
   No. 08-C-1035, 2011 WL 67255 (E.D. Wis. Jan. 10, 2011) .......9, 18, 28

*Simer v. Rios*,
   661 F.2d 655 (7th Cir. 1981) .....................................................................8

*Spano v. The Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) ...................................................................28

*Szabo v. Bridgeport Machines, Inc.*,
   249 F.3d 672 (7th Cir. 2001) .....................................................................8

*Thorogood v. Sears, Roebuck and Co.*,
   547 F.3d 742 (7th Cir. 2008) ...............................................................8, 19

*In Re Tropicana Orange Juice Mktg. and Sales Prac. Litig.*,
   No. 2:11-07382, 2019 WL 2521958 (D.N.J. June 18, 2019)............12, 13

*Valenti v. Hewlett Packard Co.*,
   No. 03-2257, 2004 WL 1277490 (Wis. Ct. App. June 3, 2004)............18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)........................................................................8, 28, 29

*Wiedenbeck v. Cinergy Health, Inc.*,
    No. 12-CV-508-WMC, 2013 WL 5308206 (W.D. Wis. Sept. 20, 2013) ..............................21

*Wyatt v. Phillip Morris USA, Inc.*,
    No. 09-C-0597, 2013 WL 4046334 (E.D. Wis. Aug. 8, 2013)..............................17, 18, 20, 22

**Statutes**

Wis. Stat. § 100.18(11)(b)(3) ...........................................................................................9

Wis. Stat. § 893.93(1m)(a) ...............................................................................................9

Wis. Stat. § 893.93(1m)(b) ...............................................................................................9

**Other Authorities**

FDA, *Total Diet Study - Elements Results Summary Statistics - Market Baskets
    2006 through 2013*,
    https://www.fda.gov/downloads/Food/FoodScienceResearch/TotalDietStudy/
    UCM184301.pdf (last visited Sept. 4, 2019) ............................................................5

Fed. R. Civ. P. 23 .......................................................................................................1, 7

Fed. R. Civ. P. 23(b)(3)....................................................................................................8

## I.    INTRODUCTION

This is an alleged false labeling case. Trying to shoe-horn his claims into the requirements of Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scott Weaver ("Plaintiff") argues that class treatment is warranted on the asserted basis of a "common course of conduct" by Champion Petfoods USA Inc. and Champion Petfoods LP ("collectively, "Champion"). One would therefore expect Plaintiff to focus on the precise labels at issue and explain how they uniformly align with his assertion of a "common course of conduct." But he does not. Instead, Plaintiff's Motion for Class Certification [D.E. 50] and Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification [D.E. 52] ("Motion" or "Mot.") contains only isolated smatterings of references to the labels actually at issue and mainly challenges Champion's nutritional "philosophy," "central ethos," and "mission" of making Biologically Appropriate food with a focus on "fresh, regional ingredients" and whose food is "never outsourced." *See* Mot. at 1, 2, 5, 18, 25.

Arguments about a nutritional philosophy or ethos align poorly with the requirements of Rule 23. Plaintiff's remaining three claims all hinge on Plaintiff (and a class) proving a misrepresentation of a material fact and causation and/or reliance upon such a misrepresentation—all of which must be demonstrated through collective evidence common to the class. Here, when the facts are grounded against the actual advertising labels found on the many varieties of Champion's bags purchased collectively by Plaintiff and all putative class members, individualized issues predominate over common issues, thus precluding class certification under Rule 23(b)(3), for at least three principal reasons:

1. Champion's representations on its packaging materially varied depending on the brand, the kitchen where the food was made, the particular diet (out of 47 different diets) and the date of production;

2. A determination of whether the statements are untrue or misleading as to the dozens of diets at issue requires a diet-by-diet analysis because the diet-specific ingredients *inside* the bag must be compared to the labels on the *outside* of the bag; and

3. The issues of causation and reliance are inherently individualized inquiries essential to a liability determination under Wisconsin law.

This hurdle of predominance is insurmountable in its own right, but just beyond it lies the hurdle of demonstrating a class-wide method of showing damages that aligns with Plaintiff's theory of liability. Among other fatal flaws, Plaintiff's damages model fails to allow isolation on any particular theory of liability and is predicated upon a non-existent duty for Champion to include on its packages "corrective statements" that were authored by his lawyers and measure the purported impact of things Champion ***did not*** say (and had no obligation to say), as opposed to his legal claim, which is based upon things Champion ***did*** say. This misalignment and failure to isolate means that Plaintiff's damages theory cannot satisfy the fundamental standard set forth by the Supreme Court in *Comcast*, and certification should be denied for this reason as well.

Plaintiff also cannot meet his burden as to 23(a)'s commonality, typicality and adequacy requirements. Nor can he fall back on 23(b)(2) or (c)(4) as alternatives to salvage some narrower class certification. Champion asks the Court to deny Plaintiff's Motion.

## II.     FACTUAL BACKGROUND

### A.     The Evolution of Champion Petfoods

Reinhard Muhlenfeld founded Champion in about 1979 as a feed mill, and in the 1980s started producing dog food for other companies. Declaration of Chinedu Ogbonna (hereinafter "**Ex. A**")[1] ¶¶ 8-10. When Champion first began producing its own dog food, it was not very different from traditional dog foods. *Id.* ¶ 11. But in about 2005, Reinhard's son Peter began

---

[1] Exhibits A to W, cited throughout this brief, are attached to the Declaration of David A. Coulson in Support of Defendants' Response in Opposition to Plaintiff's Motion for Class Certification, filed contemporaneously herewith.

executing his vision to develop dog foods that are tailored to the way canines, and their ancestor wolves, were evolved to feed in the wild. *Id.* ¶ 16; Deposition of Peter Muhlenfeld Vol. 1 (hereinafter, "**Ex. B**") at 24:1-12; Deposition of Peter Muhlenfeld Vol. 2 (hereinafter, "**Ex. C**") at 138:13-139:17; 171:14-19. The result of this effort was ORIJEN. Ex. C at 136:17-20. Unlike traditional dog food, which relies on grains, some protein meals, and many synthetic supplements, ORIJEN consists primarily of animal-based proteins in an attempt to mirror nutrition in nature (albeit within the limitations of dry kibble). Ex. C at 138:13-17; Deposition of Jeff Johnston (hereinafter, "**Ex. D**") at 47:15-48:6. Over time, Champion transitioned this Biologically Appropriate approach to ACANA diets as well and has continually innovated by developing new diets. Ex. C at 136:17-23.

Champion also broke the pet food mold by obtaining as many of its ingredients as possible from suppliers who were relatively close to Champion's manufacturing facilities (called "kitchens"), and whom it knew and trusted. Ex. A ¶ 14. This allowed it to include fresh ingredients (preserved through no more than refrigeration) in many instances. *Id.* Even with minimal advertising, Champion's diets became increasingly sought after by consumers (who Champion considers "Pet Lovers"). Ex. B at 181:5-6; 182:5-9; 183:4-11; 186:20-23; Ex. C at 125:5-8; 128:13-15; 219:23-220:5. As demand increased, Champion expanded its production capacity, but it never outsourced the making of its finished pet food. Ex. A ¶ 15. These three basic values—Biologically Appropriate, Fresh Regional Ingredients, and Never Outsourced—eventually came together into a single neologism, "BAFRINO," which forms Champion's mission and helps explain how ORIJEN and ACANA differ from traditional mass-produced dog food. *Id.* ¶ 20.

In around 1990, Champion built its NorthStar kitchen in Alberta and produced all of its dry kibble dog food there. Ex. A ¶ 10. In January 2016, Champion opened its DogStar kitchen in

Kentucky, and during 2016 transitioned the manufacturing of nearly all of its dog food sold in the U.S. there. Declaration of Christopher Milam (hereinafter, "**Ex. E**") ¶ 8. As a result, U.S. consumers would have purchased diets from both kitchens during 2016 and into 2017. *Id.* ¶ 9.

### B. Champion's Wide Variety of Diets and Packaging

ACANA in the U.S. is comprised of three distinct families (Singles, Heritage and Regionals). Ex. A ¶ 21. Within each family, there are many diets. During the class period, ACANA had 32 different diets, each made from a unique formula and ingredient profile. *Id.* ORIJEN, was made up of 15 different diets, each with its own unique formula and ingredient profile. *Id.* ¶ 22.

Each diet's packaging reflects the diverse characteristics of that diet. *Id.* ¶ 34. The labeling on the front and back emphasize the philosophy of the diet, certain, specific ingredients for that diet, and, especially with ACANA, the exact source of key ingredients. *Id.* ¶ 35. Each diet uses different ingredients depending on the kitchen and date of production. Declaration of Richard Raposo (hereinafter, "**Ex. F**") ¶ 7; Ex. E ¶¶ 17-19. On the back of every package, an AAFCO[2]-required ingredient panel lists the ingredients included in the dog food in descending order by weight. Ex. A ¶ 36. The back of the packaging of some diets (including those purchased by Plaintiff) includes a panel indicating the poundage of the particular fresh or raw ingredients in the particular diet out of total poundage. *Id.* ¶ 37. This is referred to as "Meat Math." *Id.*

The formulas for Champion's diets have changed over time, and so have the statements on its labeling. *Id.* ¶ 33. The way that the "biologically appropriate" philosophy is executed varies by diet, which is spelled out in statements on the bags, which have themselves changed over time. Ex. E ¶ 65; Ex. F ¶ 42. "Fresh" and "regional" ingredients are a focus, but Champion has never claimed that *all* or *100%* of its ingredients were fresh or regional. Ex. B at 197:18-25; Ex. D at 49:18-19;

---

[2] The American Association of Feed Control Officials ("AAFCO") provides model guidelines for product labels on animal feeds, which may be adopted in whole or in part by individual states.

Deposition of Plaintiff (hereinafter "**Ex. G**") at 76:10-14. Instead, such claims are package-specific, as some bags focused on certain specific ingredients being fresh and regional, while others focused on other specific ingredients being fresh and regional. Ex. E ¶¶ 24, 25, 30-33. The challenged "Never Outsourced" description varied too, but as Plaintiff conceded, the packaging conveyed that it was the finished dog food product—not the ingredients—that are never outsourced. Ex. A ¶ 29; Ex. G at 85:17-24.

C.     **Champion's Historical Testing for Heavy Metals, Response to the Clean Label Project, and Genesis of this Lawsuit**

Nearly all foods contain some level of heavy metals, such as arsenic, cadmium, lead, and mercury, because they are naturally occurring elements that are ubiquitous in the environment. *See* FDA, *Total Diet Study - Elements Results Summary Statistics - Market Baskets 2006 through 2013*, https://www.fda.gov/downloads/Food/FoodScienceResearch/TotalDietStudy/UCM184301.pdf (last visited Sept. 4, 2019); Expert Report of Dr. Robert H. Poppenga (hereinafter "**Ex. H**") at 3–6. Unsurprisingly, then, they are commonly found in dog foods. *Id.* at 6, 35. By 2008 and onward, Champion conducted third-party testing which reflected that its dog food contained heavy metals in an amount far below any levels determined to present a health concern for dogs according to the National Research Council (NRC) and Food and Drug Administration (FDA)'s Maximum Tolerable Limits ("MTLs"). Ex. D at 102:9-14; 144:1-3. Viewing the totality of the many tests conducted, both before and after this litigation, the levels of heavy metals in Champion's diets are far below the MTLs and the similar European Union regulatory standards.[3] Ex. H at 17-24, 35.

---

[3] The Motion misleadingly quotes a 2018 internal draft strategic plan from the marketing department that brain-stormed about having "no … heavy metals" in future ACANA Regionals diets and freeze-dried treats. Mot. at 3, 13; Mot. Ex. 18, 19. But those statements and exhibits are taken out of context and do not assist Plaintiff in meeting his burden under Rule 23. First, such a representation was never made to any class members. Second, this idea was not pursued by Champion because it is scientifically impossible, and the level of heavy metals in the Regional

In April 2017, a non-profit called the Clean Label Project ("CLP") over the internet rated pet foods based on several criteria, including heavy metal content, and gave one star (out of 5) to Champion's brands. Ex. A ¶ 48. This generated significant publicity, and Pet Lovers made inquiry to Champion. *Id.* ¶ 49. Champion contacted CLP to find out more about the organization and its rating methods, and found out that better ratings from CLP were essentially for sale to members of its "program." *Id.* ¶¶ 50-51. Champion declined to join CLP's program and turned down its offer to buy Ellipse Analytics' (the partner lab of CLP) test results at an excessive price. *Id.* ¶ 52. Instead, Champion published a White Paper explaining that the levels of naturally occurring heavy metal content were at a safe level. *Id.* ¶ 53. The White Paper was publicly available and widely viewed by consumers. *Id.* ¶¶ 53-54.

Champion later learned through the discovery process that there was a market and a buyer for CLP's test results. Ellipse sold its heavy metal test results to the Plaintiffs' lawyers here, who used them to sue Champion. Deposition of Sean Callan Vol. 1 (hereinafter "**Ex. I**") at 64:15-18; 147:7-10; 203:14-21. This Court dismissed Plaintiff's liability theory based on heavy metals, (*see* July 1, 2019 Order [D.E. 39]), yet Plaintiff continues to assert heavy metals allegations. *See* TAC ¶¶ 1, 42-46, 53.

### D. The Very Low, Non-Dangerous Level of Pentobarbital Found in an Ingredient Supplied to Champion in March 2018 for its DogStar "Red" Diets

Since 2016, Champion's DogStar Kitchen has purchased beef tallow (fat) from four different suppliers, one of them being JBS. Ex. E ¶¶ 73-74; Deposition of Kenneth Gilmurray (hereinafter, "**Ex. K**") at 226:14-16. Beef tallow is a minor ingredient only in Champion "Red" diets, used in a spray coating on finished kibble for flavor. Ex. E ¶¶ 69, 71. On or around May 7,

---

diets are safe. Ex. D at 102:9-14; 144:1-3; 191:16-193:13; 202:9-16. And third, the level of heavy metals has nothing to do with whether ingredients are fresh or regional.

2018, Champion learned that two lots of beef tallow (from the JBS MOPAC rendering facility located in Pennsylvania) delivered in late March 2018 had tested positive for small amounts of pentobarbital. Ex. K at 42:8-43:4; 218:2-10; Ex. 21. Of the 1.7 million pounds of dog food manufactured using the affected beef tallow, Champion quarantined or retrieved from distributors approximately 1.6 million pounds; only about 100,000 pounds had been sold by distributors to retailers. Deposition of Jim Wagner (hereinafter, "**Ex. L**") at 131:14-18. Based on test results of samples of the kibble by Texas A&M Veterinary Medical Diagnostic Laboratory indicating a "Non-Detect" reading of pentobarbital, the opinion of a private consultant, and the FDA's approval, Champion determined that consumption of the kibble posed no danger to dogs and it was unnecessary to recall the affected food from retailers. Ex. L at 47:15-21; 48:12-17; 52:20-24.

### E. The FDA's Recent DCM Announcements About Grain-Free Food

In the TAC, Plaintiff added sparse allegations about canine dilated cardiomyopathy ("DCM"), a disease of cardiac muscle in dogs. But Plaintiff has no expert testimony regarding DCM or its cause, and the FDA reports cited in support of Plaintiff's allegations concede that no causal link between any dog food diet and DCM has been established. *See* TAC ¶ 14.

### F. Facts Specific to Plaintiff Scott Weaver

From early 2008 to August 2017, Plaintiff fed his dogs ORIJEN Six Fish and ORIJEN Regional Red. Ex. G at 44:2-6; 46:25-47:2; TAC ¶ 21. He never purchased an ACANA diet or any other ORIJEN diet. Ex. G at 44:21-45:7. Plaintiff did no internet research about Champion, and never visited the Champion, ORIJEN, or ACANA websites. *Id*. at 36:1-9; 37:22-39:2; 43:19-24. He was unaware of Champion's White Paper. *Id*. at 37:6-9. He did not read any brochures from Champion. *Id*. at 43:11-16. The only information he read was the packaging of the diets he bought, and, even then, he admitted he did not read all of it. *Id*. at 43:8-10; 80:20-22. Instead, he purchased those two ORIJEN diets based on the recommendation of a breeder. *Id.* at 29:8-11.

## III. LEGAL STANDARD FOR RULE 23

A class may only be certified if it satisfies the prerequisites of Federal Rule of Civil Procedure 23. *E.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). This requires a "rigorous analysis" which may frequently entail "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Because a class action presents a number of "downsides," district courts entertaining class certification must exercise "caution." *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744–46 (7th Cir. 2008). Plaintiff must demonstrate by a preponderance of the evidence that Rule 23's requirements are met and that certification is appropriate. *Wal-Mart*, 564 U.S. at 350; *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993) (affirming denial of plaintiff's motion for class certification). Courts may not "accept the plaintiff's assertions as conclusive." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). Instead, the court should "receive evidence . . . and resolve the disputes before deciding whether to certify the class." *Id.*

## IV. THE PROPOSED CLASSES SHOULD NOT BE CERTIFIED

### A. Plaintiff Fails to Carry His Burden Under Rule 23(b)(3) Because His Claims Are Riddled with Individualized Issues

For a class to be certified pursuant to Rule 23(b)(3), the plaintiff must show that (1) that questions of law or fact that are common to all of the class members "predominate over any questions affecting only individual members"; and (2) that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts must look to "the substantive elements of plaintiff's claims, the proof necessary for those elements and how those issues will be presented at trial." *Haley v. Kolbe & Kolbe Millwork Co., Inc.*, No. 14-cv-99-bbc, 2015 WL 9255571, at *7 (W.D. Wis. Dec. 18, 2015); *see also Simer v.*

*Rios*, 661 F.2d 655, 672 (7th Cir. 1981) (inquiry into the predomination analysis focuses on, among other things, "the substantive elements of plaintiffs' cause of action" and "the proof necessary for the various elements"). And in conducting this examination, the court may not simply assume the truth of the matters as asserted by the plaintiff. *See Szabo*, 249 F.3d at 676. An analysis of the elements of Plaintiff's claims makes clear that there are critical individual issues which preclude a finding of predominance, and that class treatment is not the superior method of litigating them.

1. **Plaintiff's proposed class raises individualized issues as to the critical element of whether Champion made any untrue or misleading statements of fact**

   a. **The statements on Champion bags varied widely throughout the proposed class period by brand, diet, kitchen, and time**

To establish liability, Plaintiff must prove that the statements he is attacking are untrue or misleading. *Novell v. Migliaccio*, 2008 WI 44, ¶ 49 (Wis. 2008) (WDTPA); *Schmidt v. Bassett Furniture Indus.*, No. 08-C-1035, 2011 WL 67255, at *7 (E.D. Wis. Jan. 10, 2011 (fraudulent omission); *Hamilton v. 3D Idapro Sols., LLC*, 18-cv-54, 2019 U.S. Dist. LEXIS 128217, at *4 (W.D. Wis. Aug. 1, 2019) (negligence). During the class period,[4] Champion sold 47 different dog food diets in Wisconsin, and the statements displayed on each of the bags varied to reflect the unique strengths and benefits of each different option. Ex. A ¶¶ 21-23. Wisconsin courts have routinely refused to certify classes when the statements at issue vary.[5] *See, e.g.*, *Schmidt*, 2011 WL

---

[4] The time period covered by the purported class definition (July 1, 2014, to the present) is improper. Plaintiff first joined a lawsuit against Champion in the Central District of California on April 19, 2018. *See Reitman et al v. Champion Petfoods USA, Inc. et al*, No. 2:18-cv-01736-DOC-JPR (ECF No. 39). Thus, the latest that Plaintiff could genuinely claim to be misled by any alleged false or misleading statements is April 19, 2018, and the class period must thus end on that date. Additionally, the statute of limitations for Plaintiff's claims is three years. *See* Wis. Stat. § 100.18(11)(b)(3) (WDTPA); Wis. Stat. § 893.93(1m)(b) (fraud); Wis. Stat. § 893.93(1m)(a) (negligence). Accordingly, the earliest possible beginning date for the class period is April 19, 2015—three years before Plaintiff initiated legal action against Defendants.

[5] Indeed, the only case cited by Plaintiff in which a WDTPA claim was certified is *Allen v. Conagra Foods, Inc.*, No. 3:13-cv-01279-WHO, 2019 WL 3302821 (N.D. Cal. July 22, 2019), and it is

67255, at *6 (holding that individualized issues predominated Plaintiff's WDTPA claim because the finder of fact would have to determine whether each class member saw the alleged misrepresentation); *Doster Lighting, Inc. v. E-Conolight, LLC* No. 12-c-0023, 2015 WL 3776491, at *18 (E.D. Wis. June 17, 2015) (denying certification for WDTPA claim because "each purchaser may have had different information or experience with LED technology or the products in dispute"); *Boulet v. Nat'l Presto Indus., Inc.,* No. 11-cv-840-slc, 2012 WL 12996298, at *9-10 (W.D. Wis. Dec. 21, 2012) (refusing to certify class in WDTPA claim regarding defective deep fryers after finding individualized issues would predominate). The Court should do the same here.

Plaintiff purports to attack three main statements: "Biologically Appropriate," "Fresh Regional Ingredients," and "Never Outsourced."[6] *See* Mot. at 1, 25. This is an artificially simplified view of the statements at issue. Plaintiff invites this Court to dispense with any rigorous analysis of the actual labels and ignore the numerous variations and context given to these terms, which differ by brand, diet and place and time of production.

---

readily distinguishable. The plaintiff in *Allen* purchased the product at issue with both of the offending labels, (*id.* at *5), whereas Plaintiff here never purchased any ACANA diets and only a few of the ORIJEN diets. Moreover, (i) the packaging at issue here involves far more variations than the "Fat Free Zero Calories" and the "0g Fat 0 Calories…per serving" representations at issue in *Allen*; (ii) "zero" and "free" are self-defining, unlike the statements at issue here that must be read in context; and (iii) the contents of the product there uniformly had fat and calories, whereas the contents of the diets at issue here vary significantly. Finally, in *Allen,* the plaintiff's conjoint survey satisfied the requirements of *Comcast* by measuring "the marketplace premium, if any, solely attributable to the challenged claim." *Id.* at *22. In contrast, the survey performed by Krosnick here (which is not conjoint) fails to isolate the premium attributable to any challenged statement. *See* infra at pp. 22-27.

[6] Although the Motion also makes mention of "Natural Ingredients," "Delivered Daily," "Trusted Suppliers," "Nourish as Nature Intended," and "delivering nutrients naturally," (Mot. at 1, 18), Plaintiff effectively abandoned these advertising claims as the subject of a class action because the Motion relies exclusively on the statements of "Biologically Appropriate," "Fresh Regional Ingredients," and "Never Outsourced" as the basis upon which he claims that "common questions of truth in labeling predominate." (Mot. at 25, V.B.I (b).) Moreover, Plaintiff has no damages methodology tied to those statements.

The expression "Biologically Appropriate" is not self-defining. Instead, it acquires meaning from the qualifying language, and the surrounding explanations provide critical context and meaningfully differ from bag to bag. For example, the NorthStar ORIJEN Six Fish bag does not qualify "Biologically Appropriate" on the front, but the back explains that "Biologically Appropriate Dog Food" means that "[a]ll dogs are evolved as carnivores, designed by Mother Nature to Thrive on Whole Prey such as fowl or fish, and possessing a biological need for a diet rich and varied in fresh whole meats supplemented with smaller amounts of fruits, vegetables and grasses … [and is] Loaded with the protein-packed fish ingredients (80%) your dog is evolved to eat." Ex. F ¶ 43. In contrast, the front of the DogStar ORIJEN Six Fish bag has an icon with the letters "BA," under which it states, "BIOLOGICALLY APPROPRIATE PROTEIN-RICH | CARBOHYDRATE-LIMITED," and the back explains that "Biologically Appropriate" means "NOURISH AS NATURE INTENDED – ORIJEN mirrors the richness, freshness and variety of Whole Prey meats dogs are evolved to eat." Ex. E ¶ 66. Different still, the DogStar ACANA Lamb & Apple package states "Our foods mirror the richness, freshness and a variety of meats for which DOGS ARE EVOLVED TO EAT." *Id.* ¶ 67. Finally, the NorthStar ACANA Duck & Pear bag describes "Biologically Appropriate" merely as "Protein-Rich and Carbohydrate Limited." Ex. F ¶ 44.

The statements about "fresh, regional" ingredients also varied significantly throughout the class period. Ex. E ¶¶ 24-37, 44-57; Ex. F ¶¶ 13-37. For example, NorthStar ORIJEN Regional Red on the front states "Made with Angus Beef, Wild Boar, Ranch-Raised Lamb, Heritage Pork & Free – Range Bison" (Ex. F ¶ 17), whereas the DogStar ORIJEN Regional Red states "Made with Regional Ingredients Delivered Fresh or Raw Daily," identifying underneath the specific ingredients to which that statement referred: "Angus Beef Suffolk Lamb, Mutton, Wild Catfish

Yorkshire Pork and Boer Goat." Ex. E ¶ 48. Unlike the diets manufactured in the NorthStar kitchen, the DogStar diets display "Meat Math" on the back of the bag, breaking down precisely what contents are fresh, raw, or dehydrated. *Id.* ¶ 26. For instance, the DogStar Regional Red package states that "This 13 lb package of ORIJEN is made with over 11 lbs of Fresh, Raw or Dehydrated Animal Ingredients." *Id.* ¶ 27. The Meat Math statements that appear on many (but not all) ACANA diets are generally more simplistic than for ORIJEN, but they still convey specific, individualized information to the consumer about the contents of the bag. *Id.* ¶ 28.

Further examples abound. DogStar ORIJEN Six Fish simply states on the front "Made with Six Wild and Sustainably Caught Fish Delivered Daily" (and then lists them) and identifies the Atlantic Ocean and New England as the source of the fish. *Id.* ¶ 48. It does not contain the language "made with fresh regional ingredients" like the ORIJEN Original bag, and it does not state "Made with Fresh or Raw…" on the front as many other diets do. *Id.* Few of the NorthStar ORIJEN bags at issue describe any ingredients as "raw." Ex. F ¶ 28. This is critical because raw ingredients can include ones that have been frozen according to AAFCO regulations. Ex. A ¶ 45. Further, some ACANA diets do not describe the main ingredients as "regional" at all, but rather as "local," and specifically identify their source, such as the DogStar bags of ACANA Singles Pork & Squash and ACANA Heritage Free-Run Poultry, which both list Kentucky-grown vegetables, fruit, and botanicals as "fresh and local" ingredients. Ex. E ¶ 50.

In short, the varied statements that appeared on ORIJEN and ACANA bags cannot simply be clumped together as "BAFRINO" as Plaintiff would have it for class certification, because the statements varied across two brands, two kitchens from two countries, dozens of diets, and over time. Moreover, the numerous contexts in which the statements have appeared precludes Plaintiff's claim from being susceptible to class-wide proof that Champion made untrue or misleading

representations to every class member. Plaintiff's attempt to bundle together scores of assorted statements cannot satisfy his burden to demonstrate predominance.

The recent decision in *In Re Tropicana Orange Juice Mktg. and Sales Prac. Litig.,* No. 2:11-07382, 2019 WL 2521958 (D.N.J. June 18, 2019), illustrates that class treatment is not appropriate when the advertising statements at issue varied. There, the plaintiff moved to certify a class over claims that Tropicana Pure Premium orange juice was misleadingly marketed as "100% pure and natural," "100% pure," "100% orange juice," "pasteurized orange juice," "pasteurized," "pure," "natural," "fresh," and "grove to glass." *Id.* at *9. The language used, though similar in some respects, varied in terminology and style. Additionally, the alleged misstatements "sometimes appeared on individual packaging, and sometimes not." *Id.* As a result of these variables, the plaintiff could not "demonstrate[] that a uniform misrepresentation was made to the class," because such variations in labeling "are the poster child for lack of predominance." *Id.* at 10.[7]

Here, as in *Tropicana*, there has been no "uniform misrepresentation" that could affect all putative class members the same way. The Champion statements (and their qualifiers) attacked by Plaintiff have appeared on some, but not all, of Champion's different dog food diets. And when they did appear, the terminology and wording differed, and they were displayed in varying contexts. The finder of fact would be required to perform an individualized inquiry into each product purchased by each class member to determine what statements appeared on each consumer's packaging before determining whether they were misleading. Accordingly, individual

---

[7] Although the *Tropicana* opinion found that the plaintiff there established predominance as to the self-defined "pasteurized" or "pasteurized orange juice" labels, any attempts by Plaintiff here to analogize that to "Biologically Appropriate" falls flat. While "Biologically Appropriate" may have appeared on all bags, as explained *supra*, how it appeared and the language that qualified its meaning varied by diet.

issues predominate, and the Court should deny class certification.

**b.     The contents *inside* of each Champion bag must be compared to the statements made on the *outside* of the bag**

The statements Plaintiff attacks do not appear in a vacuum. Rather, it is necessary to view each representation in the context in which it appears and in light of the actual ingredients contained in each particular bag. In other words, one must first look on the outside of the packaging to determine how ingredients are described, and then compare that description to the ingredients inside the bag to determine whether there was a misrepresentation of fact.

For example, an ingredient that was "fresh" for one particular diet is not necessarily fresh in another diet. Ex. E ¶ 32. Never did Champion advertise that it uses 100% fresh ingredients. Ex. B at 197:18-25; Ex. D at 49:18-19. To the contrary, many Champion packages clearly state that particular ingredients are "fresh or raw"[8] and/or were "dehydrated" or "freeze-dried." Ex. A ¶ 43. Whether an ingredient was in fact fresh (preserved by no more than refrigeration) necessitates a diet-by-diet analysis and, depending on the time of the year, a lot-by-lot analysis of the diets purchased by each class member. Ex. E ¶¶ 24-37; Ex. F ¶¶ 13, 23-29. The finder of fact must examine all of the Champion packages among Champion's 47 diets sold during the class period to determine 1) which ingredients are marketed as fresh; and 2) whether each of those ingredients were in fact fresh for that diet and for the particular lots produced. None of this can be established by collective evidence applicable to the entire putative class.

Similarly, the description of "regional" or "regionally sourced" varies among diets and even within a diet, (Ex. E ¶¶ 44-57; Ex. F ¶¶ 30-37), in part because "regional" is an inherently

---

[8] "Raw" includes ingredients that were preserved through freezing. *See* Ex. A ¶ 45; *see also* Ex. C at 248:2-10 ("A. Raw. It's a frozen ingredient. Q. According to AAFCO or according to an average … consumer? A. Yes. Certainly to a consumer. Absolutely. You go to the pet food [store], you say where's the raw section[?], they'll point you to a freezer.").

relative term. For example, the DogStar ORIJEN Original diets contains (i) eggs that were sourced in Kentucky at a farm located 45 minutes away, (ii) poultry sourced in Kentucky, Georgia, and Pennsylvania, (iii) and fish sourced from the Atlantic Ocean. Ex. E ¶ 54. DogStar's ACANA Regionals Grasslands dog food bag identifies the rainbow trout as being from "Soda Springs, Idaho" and the free-run quail from "Columbia, South Carolina." *Id.* ¶ 50.

Other bags expressly state on their face that certain ingredients are sourced internationally. For example, the 2016-2017 DogStar ACANA Lamb & Apple package states that the lamb in that diet is "[g]rass-fed on Kentucky and **New Zealand** ranches," and the 2014-2015 NorthStar ACANA Lamb and Apple package says the lamb is from North Island, **New Zealand**. Ex. E ¶ 60; Ex. F ¶ 40 (emphasis added). The ACANA Duck & Pear from NorthStar package states that the duck is from Aurora, Ontario. Ex. F ¶ 35. Since Plaintiff's liability theory depends on Champion not disclosing that a source of ingredients could be far away from the kitchen (Mot. 5-6), a diet-by-diet, class-member to class-member analysis is required. The fact finder would have to review the packaging of each diet purchased by each class member to identify which particular ingredients are described as "regional," and then determine whether that representation is misleading or not based upon which kitchen made the dog food, the source of the ingredient, and whether that information was disclosed on the package.

In fact, the examples cited in Plaintiff's Motion regarding fresh regional ingredients demonstrate why common issues do not predominate. To start, Plaintiff challenges the use of frozen rabbit from France. Mot. at 3. But, as to the packages at issue, rabbit was an ingredient in only ORIJEN Tundra and later one ACANA diet. Ex. F ¶ 41. Plaintiff also complains about regrinds. Mot. at 4, 18. To clarify, it is a common industry practice to reuse kibbles that were improperly shaped. Ex. E ¶ 38. While there is nothing wrong with them from a nutritional

standpoint, they do not look good aesthetically. *Id.* Champion has a process by which small amounts of such regrind may be mixed into certain productions when their use would be at least nutritionally equal, or better. *Id.* ¶¶ 39-40. Whether a particular production run contains regrinds requires a lot-by-lot analysis. *Id.* ¶¶ 38-39. The same is true for the infrequent use of "expired" ingredients, where Champion's policy is that such ingredients may sometimes be used only when testing shows it is safe to do so and it will not compromise nutritional value. *Id.* ¶¶ 41-43. For that reason, very few production runs include them. *Id.* ¶ 43. Similarly, turmeric from India is a tiny ingredient only in diets that are manufactured in the DogStar kitchen, and spray-Dried Mackerel from Morocco is used only in some fish-based diets. *Id.* ¶¶ 62-63. Neither is ever advertised as fresh or regional. *Id.* Finally, contrary to Plaintiff's assertions, no vitamins from China were used in dog food diets before 2019. *Id.* ¶ 64.

Beyond the foregoing, class treatment is precluded by Plaintiff's allegations regarding an incident where Champion received two lots of beef tallow that it later learned had tested positive for pentobarbital.[9] The only bags that could have possibly been affected were Champion's DogStar beef-based diets (the "Red Diets"), which is only four of the dozens of diets at issue. *Id.* ¶¶ 80-81. Further, Plaintiff's only non-speculative evidence implicates only those bags that included beef tallow supplied by JBS/MOPAC to the DogStar kitchen in late March 2018 (***after*** Weaver stopped

---

[9] Plaintiff's TAC also alleges levels of bisphenol A ("BPA") were detected by Plaintiff's Ellipse lab using a 30 ppb LOQ in most, but not all, of the diets tested. TAC ¶ 7; Ex. I at 105:9-20. BPA is environmentally ubiquitous. Ex. H at 25, 35. Testing by Plaintiff using ExperTox lab detected no level of BPA in 38 samples of Champion dog food (*see* Deposition of Dr. Gary Pusillo Vol. 1 (hereinafter, "**Ex. M**") at 21:11-18; 43:2-5), and Champion's post-litigation testing showed most diets had no detectable BPA, and those that did ranged from only about 6 ppb to 19 ppb (Ex. H at 27-28), which would count as "zero" under Plaintiff's testing expert's criteria. Ex. I at 58:7-17; 105:9-20. Champion's toxicology expert opines that even the levels detected by Ellipse pose no danger to a dog's health, and Plaintiff has no expert who opines to the contrary. Ex. H at 35. In any event, the variations as to BPA would require a bag-by-bag analysis, which precludes predominance as to the TAC's BPA liability theory.

buying Champion products). Ex. K at Ex. 21; TAC ¶ 21. And it is not known if any were sold at retail to consumers in Wisconsin, because Champion does not know which retailers obtained what products from distributors and Plaintiff has conducted no third-party discovery to pinpoint the destination of retail sales. Deposition of Erik Flakstad (hereinafter, "**Ex. N**") at 72:20-21; 80:9-15; 113:16-114:9. Moreover, since 2016, Champion received tallow from four other suppliers, so many bags would have no ingredients from JBS. Ex. E ¶ 74. Not even Plaintiff's expert relating to pentobarbital issues could provide any non-speculative mechanism for estimating what percentage of tallow, if any beyond the two affected lots, could have had a detectible presence of pentobarbital during the relevant period. *See* Deposition of Sean Callan Vol. 2 (hereinafter "**Ex. J**") at 49:15-50:10. As a result, individual inquiry would be required to determine which potential class members, if any, purchased one of the specific bags affected.

Similar problems arise from Plaintiff's claims as to the FDA's investigation of DCM as potentially associated with grain-free diets. Among other things, the FDA's potential concern is with diets that have legumes as one of the first 10 ingredients in the ingredient list. *See* TAC ¶ 14 (and FDA reports cited therein). That encompasses some Champion diets but not many others, and not the ORIJEN diets Plaintiff bought. Ex. E ¶¶ 22-23; Ex. F ¶¶ 11-12. And at least a half-dozen ACANA diets sold during the class period are grain-inclusive with oats. Ex. F ¶ 10. Additionally, only class members buying dog food after July 2018—the earliest date that the TAC alleges any duty to disclose the FDA report—could have been affected by any non-disclosure, and that does not include Plaintiff whose last purchase was in August 2017.

At bottom, because Champion's dog food packaging and ingredients varied not only over time, but also by brand, diet, and kitchen, Plaintiff's WDTPA and other claims require individualized proof as to whether representations were misleading for each class member, making

certification inappropriate. *See Wyatt v. Phillip Morris USA, Inc.*, No. 09-C-0597, 2013 WL 4046334, at *4 (E.D. Wis. Aug. 8, 2013) (refusing to certify a WDTPA claim after finding, among other things, that the individualized inquiries necessitated by a WDTPA claim would "render the claim unmanageable as a class action"); *In re Dial Complete Mktg. & Sales Prac. Lit.*, 312 F.R.D. 36, 73–74 (D.N.H. 2015) (denying motion for class certification under WDTPA because the claims were "incapable of classwide proof"); *see also Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514–15 (7th Cir. 2006) (affirming denial of motion for class certification for claims for violation of state consumer fraud and deceptive practices act). As a result, Plaintiff cannot establish predominance as to the element of whether Champion made any untrue or misleading statement.

### 2. Plaintiff's proposed classes raise individualized issues as to the critical liability element of material inducement and causation

Plaintiff's WDTPA claim requires a showing of causation, that "the [challenged] statement was a significant factor contributing to the particular plaintiff's decision to purchase the product." *Wyatt*, 2013 WL 4046334 at *4 n.2. That is, Plaintiff must present evidence as to whether an alleged misrepresentation "materially induced" him into buying the product at issue. *Novell*, 2008 WI 44, ¶ 53. To meet his burden, Plaintiff "would have to show that each member of the class was materially induced by . . . the alleged misrepresentation." *Blitz v. Monsanto Co.*, No. 17-cv-473, 2019 WL 95440, at *5 (W.D. Wis. Jan. 2, 2019); *Schmidt*, 2011 WL 67255, at *6 ("At a minimum, to meet the causation element under [the WDTPA], plaintiffs would have to show that they saw the Bassett sign . . . prior to placing their furniture orders.").[10] Failure to do so is a "death knell"

---

[10] *See also Valenti v. Hewlett Packard Co.*, No. 03-2257, 2004 WL 1277490, at *2 (Wis. Ct. App. June 3, 2004) (WDTPA claim failed as a matter of law because of "the consumers' failure to see or rely on any particular statements regarding the cartridges prior to making their purchase."); *Doster*, 2015 WL 3776491 at *18 (holding that class certification was improper for WDTPA claim given that individualized purchasing inquiries will vary because "each purchaser may have had different information or experience with LED technology or the products in dispute").

to WDTPA claims, and the same is true for Plaintiff's fraudulent omission and negligence claims as well. *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F. 3d 600, 615 (7th Cir. 2017); s*ee Schmidt*, 2011 WL 67255, at *7 (fraud by omission claim requires evidence that defendant's failure to disclose induced plaintiff to act); *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (causation element of negligence claim will only be found when "the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from" a defendant's negligent conduct).

Allowing Plaintiff's claims to proceed as a class would ignore the inherently individualized nature of each decision to purchase Champion dog food. *See Balschmiter v. TD Auto Finance LLC*, 303 F.R.D. 508, 527 (E.D. Wis. 2014) (Stadtmueller, J.) (holding that predominance was not met when the issue of whether consent was given would "depend on the facts of each situation."). First, consumers necessarily had differing understandings of the meaning of the statements at issue, based both on the surrounding context of the statements and their own pre-existing experiences. *See Thorogood*, 547 F.3d at 747 (reversing class certification because plaintiff could not show that each putative class member had the same understanding of the advertising statements at issue). Plaintiff testified that to him, "fresh" means that it has "not been sitting around and getting moldy or stale," (Ex. G at 73:18-21), and "the fact that freezing was used … wouldn't be a problem" (*id.* at 75:5-7). Two consumers testified at depositions that their definitions of "fresh" hinge on whether the ingredient was processed in any way, (Deposition of Matthew Ficarelli (hereinafter, "**Ex. O**") at 61:19-24; Deposition of Jennifer Reitman (hereinafter, "**Ex. P**") at 98:6-11), but another explained that preserving an ingredient "within a reasonable amount of time" could maintain the "fresh" denotation (Deposition of Carol Shoaff (hereinafter, "**Ex. Q**") at 82:25-83:2). Another consumer testified that her interpretation of the word "fresh" is that there are very few steps in the

supply chain between the ingredient's source and the manufacturing plant (Deposition of Lisa Slawsby (hereinafter, "**Ex. R**") at 147:8-25), while another's is that the ingredient "was either picked recently, grown recently, or in the case of meat, butchered recently" (Deposition of Erin Grant (hereinafter, "**Ex. S**") at 135:15-19).

Similar variation exists in consumers' understanding of "biologically appropriate." One consumer explained that "biologically appropriate" refers to "the balance of proteins to carbs to fats" within the kibble. Ex. P at 128:1-3. Others understood that it referred to food "like what [dogs] would be eating naturally if they were wild," (Ex. S at 122:11-17), and that the food "had vegetables, because dogs in the wild eat vegetables and grass" as well as meat (Deposition of Kellie Loeb (hereinafter, "**Ex. T**") at 87:18-21). Plaintiff interpreted it to mean that the dog food was generally "healthy food for my dogs." Ex. G at 78:16-18. As to "Never Outsourced," Plaintiff understood that "[i]t means that they make [the finished food] themselves, and they don't . . . have somebody else make it for them. . . ." *Id.* at 85:17-24.

Second, each proposed class member's claim necessarily depends upon evidence of individualized knowledge that varies from consumer to consumer. *See, e.g.*, *Wyatt*, 2013 WL 4046334, at *4 ("[T]he need to make individualized inquiries into each class member's knowledge at the time of each purchase to identify those class members who were actually injured by [defendant's] conduct prevents this case from being certified as a class action.").[11] One example of the material differences in consumer knowledge relates to the existence of trace levels of naturally-occurring heavy metals in the dog food. To the extent the heavy metals theory is still a

---

[11] *See also Doster*, 2015 WL 3776491, at *18 (denying class certification of WDTPA claim where each purchaser had different information or experience with the products at issue); *Boulet*, 2012 WL 12996298, at *10 (class certification denied "given the fact-intensive individualized injury that would be required to determine the degree to which class members relied on [Defendant's] 'cool-touch' representation and the harm, if any, that they incurred as a result. . . .").

part of this case, some class members would be precluded from recovery because they were aware of the heavy metal content in Champion's food based on reading the White Paper, CLP's internet publications or on the widely read blog The Truth About Pet Food,[12] or elsewhere on the internet, but continued to purchase the food anyway. Indeed, Plaintiff's Motion acknowledges that a significant number of consumers knew about it. *See* Mot. at 8 (Champion received "so many questions about heavy metals" that it "developed a standard response."). It is inescapable that individualized hearings would be required to determine who knew what—and when. *See, e.g.*, *Wiedenbeck v. Cinergy Health, Inc.*, No. 12-CV-508-WMC, 2013 WL 5308206, at *10 (W.D. Wis. Sept. 20, 2013) (denying class certification because the putative class members were exposed to different informational materials and therefore lacked evidence of a common understanding); *In re Bisphenol-a (BPA) Polycarbonate Plastic Prod. Liab. Litig.*, No. 08–1967, 2011 WL 6740338, at *1 (W.D. Mo. Dec. 22, 2011) ("[p]laintiffs' proposed class cannot be certified because . . . [i]ndividuals who knew about BPA's existence and the surrounding controversy before purchasing [the] products have no injury.").

That materiality is an individual inquiry is proven by Plaintiff's own expert, who conducted a consumer survey aimed at determining consumers' impressions about the quality or healthiness of Champion products. *See* August 13, 2019 Report of Jon A. Krosnick (hereinafter, "D.E. 55, Ex. 1"). In the survey, respondents were presented with an image of a Champion dog food bag and were asked whether they believed the product was of high quality and healthy. *See id.* at 372, 378. Additionally, some consumers were presented with information positing that the product may contain pentobarbital (*id.* at 372, ¶¶ 73, 75), and were asked the same questions regarding how healthy or what level of quality they believed the product to be (*id.* at 378, ¶ 91). After reading

---

[12] https://truthaboutpetfood.com/

that the food contained pentobarbital, 29.03% to 39.46% of respondents still thought the dog food was of "good" quality, 20.78% to 24.48% still thought it was of "excellent" quality, 11.67% to 15.78% still thought it was "extremely healthy," and 28.84% to 34.43% still thought it was "very healthy." *Id.* at 380. *See also* Rebuttal Expert Report of Dr. Hanssens (hereinafter, "**Ex. U**") at VI(C). This reveals that a substantial portion of the proposed class members would not find the supposed risk of its presence material.

On this record, extensive individualized inquiries would be necessary as to causation (material inducement) and reliance, rendering class treatment inappropriate.[13] Moreover, when there are, as here, a litany of individualized issues, a class action is not the superior method for adjudicating the case. *See, e.g.*, *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (reversing district court's certification of class); *Wyatt*, 2013 WL 4046334, at *3 (the need to hold mini-hearings to determine individualized issues "would prevent this case from being manageable as a class action"); *Chambers v. MCI Worldcom Network Serv., Inc.*, No. 00-C-348-C, 2001 WL 37114660, at *9 (W.D. Wis. Mar. 2, 2001) (finding a "class action is not a superior method of adjudication" due to "the predominance of individual issues.").

---

[13] Likewise, other serious causation concerns plague Plaintiff's sub-class, which includes any person in Wisconsin who "purchased JBS Dog Food between January 2016 and December 2018." Mot. at 8. This necessarily includes consumers who purchased Red diets *over two years* before the affected lots were received by Champion. Plaintiff himself stopped buying Regional Red in August 2017 and could not possibly have been affected by it. TAC ¶ 21. The sub-class period also spans both before and after the period when Champion was purchasing tallow from JBS, and includes purchasers of diets containing beef tallow from four renderers other than JBS. Such an overbroad class definition "wildly overstates" the number of persons that could possibly demonstrate injury. *See Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 329013, at *3 (S.D. Ind. Jan. 22, 2015) (A proper class "cannot be so untethered from the elements of the underlying cause of action that it wildly overstates the number of parties that could possibly demonstrate injury."); *Wyatt*, 2013 WL 4046334 at *3 ("[A] class cannot be certified if it is defined so broadly that it sweeps within it a large number of persons who were not injured by the defendant's conduct.").

### 3. The putative class members' alleged damages are not susceptible to measurement across the entire class

It is axiomatic that a plaintiff representing a putative class must be able to prove damages on a class-wide basis. Otherwise, individual issues "inevitably overwhelm questions common to the class," and preclude a finding of predominance. *Comcast*, 569 U.S. at 34. "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "courts must conduct a rigorous analysis to determine whether that is so." *Id.* at 35. "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id*. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*; *see also Doster*, 2015 WL 3776491, at *19 (declining to certify WDTPA class where damages could not be conducted by a common methodology and plaintiff's consumer survey "highlights the individual nature of the inquiry.").

In the seminal *Comcast* case, plaintiffs sued Comcast for alleged antitrust violations, based on four distinct theories of antitrust liability. *Comcast*, 569 U.S. at 31. Of those four theories of liability, the district court certified only one for class treatment. *See id*. Plaintiffs' damages expert calculated class-wide damages at $875 million, but his methodology encompassed all four theories of liability, with no way to isolate only those damages resulting from the single liability theory that the trial court had certified for class-wide treatment. *Id*. at 32. Upon review, the U.S. Supreme Court held that the proffered damages model could not support class certification. *Id.* at 35.

Plaintiff's attempt here to calculate damages on a class-wide basis fails under the *Comcast* standard. Plaintiff's damages expert, Colin Weir, purports to measure class-wide diminution in value damages by calculating the difference between the total dollars stemming from estimated Wisconsin sales of all Champion products during the class period and the dollar amount of sales

23

that would have been earned but for the allegedly misleading statements. Expert Report of Colin Weir (hereinafter, "D.E. 55, Ex. 39") ¶¶ 38-39. Weir's algebraic methodology, however, depends on an input purporting to represent the diminution in value in each product, supplied by another of Plaintiff's experts, Dr. Jon Krosnick. *Id.* ¶ 39.[14]

Krosnick arrived at the diminution in value percentage through a consumer survey that presented consumers with anywhere from zero to eight so-called "corrective statements" drafted by Plaintiff's counsel. *See* D.E. 55, Ex. 1 at 42, ¶ 10. The corrective statements gave new information about Champion dog food products, including statements that laboratory testing had revealed the presence of heavy metals and BPA that could cause illness, that some ingredients had been frozen, that some ingredients were sourced outside the region where the food was made, and that Champion uses third parties to make certain components of the food. *Id.* After reading their assigned number of corrective statements, survey participants were asked to indicate whether they would or would not purchase the product they saw at a particular price. *Id.* at 42, ¶ 11. The stated conclusion of the survey is that "the more corrective statements a respondent read, the less likely he or she was to purchase the product." *Id.* at 51, ¶ 33. Specifically, Krosnick's report presents a table showing a correlation between the "percent decrease in value" of the Champion product and the "number of corrective statements" a survey respondent was exposed to. *Id.* at 53, ¶ 36. In other words, Krosnick's analysis stands for the unremarkable concept that the more disparaging statements a consumer reads about a product, the less likely a consumer is to buy it.[15]

---

[14] Weir also attempts to calculate illegal sales damages with respect to pentobarbital, which is not supported by any analysis, survey or otherwise.

[15] Krosnick also submitted a second consumer survey asking consumers for their impressions about the quality or healthiness of certain Champion products. *See* D.E. 55, Ex. 1 at 336-373. This second survey plays no role in Plaintiff's damages calculation because there is no diminution in value calculation, and Weir's damages calculation does not incorporate any aspect of it.

Krosnick's diminution in value calculation—and, in turn, Weir's damages computation—provides no method for calculating damages on a class-wide basis. First, the design of the consumer survey is directed to an alleged connection between the ***number*** of corrective statements read by a consumer and the consumer's probability of purchasing the product. It is not tied to the ***content*** of the corrective statements, or the weight consumers may place on them. Thus, the survey's results provide no mechanism for measuring whether, or how much, any particular corrective statement impacted the price consumers would pay for a product.

A fundamental problem with this design is that Krosnick's diminution in value estimate is based on a theory of liability relating to the mere presence of trace amounts of heavy metals, ***which has already been dismissed from this suit***. *See* July 1, 2019 Order [D.E. 39], at 15 ("Plaintiff may not proceed on Count One with respect to heavy metals."). That is exactly the situation prohibited by the Supreme Court in *Comcast.* Four of the eight corrective statements in Krosnick's survey pertain exclusively to the existence of heavy metals, and there is no way to separate them from the damages calculation because Krosnick's estimates of diminution in value incorporate the effects of ***all*** of the corrective statements. This problem would be further exacerbated if summary judgment or a jury verdict eliminates one or more of the remaining four theories, because Plaintiff would have no way to isolate and calculate damages applicable only to whatever theories prevailed. As a result, Krosnick's methodology has no way to isolate any diminution in value resulting from the theories upon which liability is based, an outcome prohibited by *Comcast*.

In addition to that fatal defect, because the corrective statements used in the survey are untethered to the statements actually included on the bags at issue in this case, the survey results are disconnected from Plaintiff's liability theories, in contravention of *Comcast*. 569 U.S. at 35. They were drafted by Plaintiff's counsel and are designed to affirmatively inject ***new*** information

regarding dog food products, rather than measuring the effect of statements that are already in the marketplace. The survey did not ask respondents how likely they would be to purchase a product primarily because it claimed to be "biologically appropriate," include "fresh" or "regional" ingredients, or "never outsourced." It did not ask whether respondents were more likely to purchase a product with such advertising instead of a product without such advertising. It did not ask how important the various attributes at issue are to their purchasing decisions. Instead, it questioned how much a consumer might pay for a product after reading a piece of negative information drafted by Plaintiff's counsel that has never appeared (and would never appear) on any Champion bag.

Moreover, conspicuously absent from the survey's corrective statements is any statement asserting that the dog food is not Biologically Appropriate—which Plaintiff alleges is a false representation. The absence of any statement tied to "Biologically Appropriate," or any consumer testing of its meaning and value, creates yet another abyss between Plaintiff's liability theory and damages methodology.

Another disqualifying flaw is that Krosnick's diminution in value calculation is based on consumers' willingness to pay only, which is but one factor in assessing market price. It accounts for demand-side considerations, but ignores supply-side factors such as Champion's willingness to sell, production costs, and competitor reactions. *See* Expert Rebuttal Report of Dr. Hitt (hereinafter, "**Ex. V**") ¶¶ 18, 31-36, 67-80. As such, Krosnick's diminution in value calculation does not reflect the price consumers would pay for the products in the marketplace. *See In re General Motors LLC Ignition Switch Litig.*, 14-MD02543 (JMF), 2019 WL 3564698, at *12 (S.D.N.Y. Aug. 6, 2019) (excluding damages expert because the model "did not estimate any possible changes in [the defendant's] willingness to sell."); *In re NJOY, Inc. Consumer Class*

*Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (denying class certification because damages expert tested only what consumers were willing to pay "without considering other factors in a functioning marketplace").

For all of the foregoing reasons, Krosnick's diminution in value calculation—and in turn, Weir's damages computation—fails to provide a valid mechanism for determining class-wide damages. Plaintiff's Motion should be denied on this basis alone.[16]

### B.    Plaintiff Fails to Carry His Burden Under Rule 23(a)[17]

Typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... [the] claims are based on the same legal theory." *Oshana*, 472 F.3d at 514. In other words, the named representative's claims must have "the same essential characteristics as the claims of the class at large." *Id*. As discussed above, the representations on Champion's packaging varied depending on the brand, diet, the kitchen where the diet was produced, and the time period in which it was made. *See* supra at pp. 9-13. Despite purporting to represent all Wisconsin purchasers of ACANA and ORIJEN diets, Plaintiff never purchased any ACANA diets and only 4 of 15 ORIJEN diets. Ex. G at 44:21-45:7. Additionally, Plaintiff is not typical for his pentobarbital and DCM theories, since he stopped buying ORIJEN many months before Champion's receipt of adulterated tallow, and before the FDA's first report about DCM. TAC ¶ 21; Ex. K at 42:8-43:4, 218:2-10, Ex. 21. Thus, Plaintiff's claims are atypical of the class he seeks to represent.

---

[16] Additional deficiencies in Krosnick's and Weir's damages reports render them unreliable, such as Krosnick's failure to use a conjoint analysis or any control group in his survey. These and other deficiencies are further explained in the Expert Rebuttal Report of Dr. Hanssens (Ex. U), the Expert Rebuttal Report of Dr. Hitt (Ex. V), and a forthcoming Motion to Exclude Krosnick and Weir.

[17] Champion does not dispute numerosity as to the Class pled in the TAC, but does as to the unpled pentobarbital sub-class because it is entirely speculative as to whether <u>any</u> Wisconsin consumer purchased a bag of a Red diet that contained the affected JBS beef tallow.

Rule 23(a) "commonality" requires a plaintiff to demonstrate that the class members "have suffered the same injury at the hands of the same defendant." *McCaster v. Darden Restaurants*, 845 F.3d 794, 800 (7th Cir. 2017). There must be "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). It is not enough to show that class members "have all suffered a violation of the same provision of law." *McCaster*, 845 F.3d at 800. Rather, a putative class-action plaintiff must identify a common problem whose resolution will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 801. "What matters to class certification … is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart,* 564 U.S. at 350. Here, because the numerous fact-specific questions implicated by Plaintiff's liability theories do not yield any common answers, Plaintiff fails to show commonality. Nor can he adequately represent the interests of the putative class. *See Robinson v. Sheriff of Cook Cty.*, 167 F.3d 1155, 1157 (7th Cir. 1999) ("if [Plaintiff's] claim is atypical, he is not likely to be an adequate representative.").

### C.    Plaintiff Fails to Carry His Burden Under Rule 23(c)(4)

Recognizing the uphill battle he faces in certifying a class, Plaintiff moves in the alternative for certification as to a smorgasbord of issues under Rule 23(c)(4). Mot. at 28. However, when "it is clear that a case involves a number of individualized claims that cannot be resolved via a class action," the Court should not certify a class as to only some of the issues. *Schmidt*, 2011 WL 67255 at *3, 9. In any event, even the issues listed by Plaintiff are not common at all. For example, the very first question of "whether Defendants' claims . . . are untrue, deceptive, or misleading" begs individualized questions about which of the dozens of Champion diets a particular class member

purchased, which statement(s) the class member read, and whether that statement is indeed false or misleading in light of the ingredients in the diet purchased. For the same reasons that common issues do not predominate under 23(b)(3), Plaintiff cannot obtain an issues class under 23(c)(4).

### D.      Plaintiff Fails to Carry His Burden Under Rule 23(b)(2)

Plaintiff makes a last-ditch effort at certification under Rule 23(b)(2) for injunctive relief. As an initial matter, it is a mystery what injunction Plaintiff is asking this Court to impose.[18] Additionally, Plaintiff cannot satisfy the basic requirements of any injunction to show that monetary damages are inadequate to remedy the injury. *Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). Because his claims can be remedied by an award of monetary damages, class certification for an injunction is improper. *Id.* (reversing district court's certification under Rule 23(b)(2) because monetary damages were a fully adequate remedy); *Balschmiter*, 303 F.R.D. at 517 (Stadtmueller, J.) (refusing to certify Rule 23(b)(2) class when it "would impermissibly allow the monetary tail to wag the injunction dog.").

Moreover, a class may only be certified under Rule 23(b)(2) if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498-99 (7th Cir. 2012) (reversing district court's certification of the class). The rule "does not authorize class certification when each individual class member would be entitled to a *different* injunction." *Id.* To the contrary, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." *Wal-Mart*, 564 U.S. at 360. The injunction sought must be

---

[18] If Plaintiff seeks to require Champion to publish on its packages his "Corrective Statements," such compelled speech would almost certainly have First Amendment implications. *See Riley v. Nat. Fed. of Blind*, 487 U.S. 781, 795, 798 (1988) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is thus "subject to exacting First Amendment scrutiny.").

applicable "to all of the class members." *Id.* Neither of Plaintiff's proposed classes satisfy this standard, because no single injunction can provide final relief to the respective class as a whole due to the individual determinations needed to adjudicate liability as explained *supra*.

Regardless, there is no need for an injunction for the sub-class because Champion (1) immediately ceased using JBS/MOPAC as a supplier on May 7, 2018 (Ex. E ¶ 75); (2) since then, only uses a vertically integrated supplier that renders its own Category 3 cattle for Champion directly from its slaughterhouse straight to rendering (*Id.* ¶ 76); and (3) tests every incoming lot of beef tallow for pentobarbital (*Id.* ¶ 77; Ex. L at 144:7-13; Declaration of Jim Wagner (hereinafter, "**Ex. W**") ¶ 4). Thus, a sub-class pursuant to Rule 23(b)(2) is not warranted. *See Arreola v. Godinez*, 546 F.3d 788, 799 (7th Cir. 2008) (affirming decertification of Rule 23(b)(2) class when Plaintiff was no longer suffering any injury). Finally, given that Plaintiff stopped purchasing ORIJEN in August 2017, he could not possibly have suffered any damage from the March 2018 JBS tallow that tested positive for pentobarbital, and thus lacks standing to pursue any injunction on behalf of the sub-class. *See Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) ("To have standing to sue as a class representative, the plaintiff must be part of the class and possess the same interest and suffer the same injury as the class members.").

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff's Motion for Class Certification should be denied.

Dated: September 16, 2019      By:     *s/ Susan E. Lovern*
Susan E. Lovern, SBN 1025632
Mark E. Schmidt, SBN 1052450
Derek J. Waterstreet, SBN 1090730
von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue
Suite 1000
Milwaukee, Wisconsin 53202
Telephone: (414) 287-1286
Facsimile: (414) 238-6599
E-mail: slovern@vonbriesen.com
        mschmidt@vonbriesen.com
        dwaterstreet@vonbriesen.com

*s/ David A. Coulson*
David A. Coulson
Florida Bar No. 176222 (admitted to E.D. Wis.)
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0754
Facsimile: (305) 579-0717
Email: coulsond@gtlaw.com

***Attorneys for Defendants***
***Champion Petfoods USA Inc. and***
***Champion Petfoods LP***