UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

SCOTT WEAVER, Individually and
on Behalf of All Others Similarly Situated,

       Plaintiff,

    v.                                          Case No. 2:18-cv-1996-JPS

CHAMPION PETFOODS USA INC. and
CHAMPION PETFOODS LP,

       Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW SUPPORTING THEIR
MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S
EXPERT WITNESSES DR. JON A. KROSNICK AND MR. COLIN B. WEIR**

---

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. RELEVANT BACKGROUND AND CLAIMS AT ISSUE .................................... 2

III. LEGAL STANDARD ........................................................................................... 7

IV. KROSNICK'S OPINIONS ARE NOT RELEVANT TO PLAINTIFF'S CLAIMS ............. 9

    a.     Krosnick's Survey Does Not Test Any Representation Made by Champion on Any of its Packaging. ......................................................................... 9

    b.     Krosnick Estimates Only a Change in Willingness-to-Pay, Not a Change in Market Price, and His Opinions are Thus Irrelevant to Plaintiff's Theory of Damages ................................................................................................. 15

V. KROSNICK IGNORES BASIC SCIENTIFIC PRINCIPLES, MAKING HIS SURVEY AND OPINIONS UNRELIABLE ................................................................ 19

    a.     Krosnick sampled the wrong population. ................................................. 19

    b.     Krosnick's survey is unscientific because it lacks a control group. ............ 21

    c.     Krosnick injects fatal bias into his survey through the use of his Corrective Statements. ............................................................................................. 23

    d.     Krosnick failed to pre-test his survey. ..................................................... 26

VI. KROSNICK'S "LEWBEL-WATANABE" METHODOLOGY IS NOT WIDELY ACCEPTED IN THE SCIENTIFIC COMMUNITY AS A METHOD OF VALUING THE FEATURES OF CONSUMER GOODS. ............................................ 27

VII. BAD INPUT = BAD OUTPUT: MR. WEIR'S DAMAGES ESTIMATES RELY ON KROSNICK'S FLAWED OPINIONS AND MUST THEREFORE BE EXCLUDED ............................................................................................ 28

VIII. CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ....................................................6

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ....................18

*Bowman v. Int'l Bus. Machines Corp.*,
No. 1:11-cv-0593 RLY-TAB, 2013 WL 12291430 (S.D. Ind. Aug. 19, 2013)..................8, 13

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
923 F. Supp. 2d 1245 (S.D. Cal. 2013)..............................................23

*Brown v. Burlington N. Santa Fe Ry. Co.*,
765 F.3d 765 (7th Cir. 2014) ....................................................27

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015)..................................................30

*Bruton v. Gerber Prods. Co.*,
No. 12-CV-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018)................13

*Cates v. Whirlpool Corp.*,
No. 15-CV-5980, 2017 WL 1862640 (N.D. Ill. May 9, 2017).................8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).....................................................9, 12, 13, 15

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ....................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ....................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................7, 21

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ....................................................8, 15

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010)..............................................8, 30

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
No. 11CV6201 DLC, 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ....................23

*In re Fluidmaster, Inc.*, *Water Connector Components Prod. Liab. Litig.*
No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. March 31, 2017)...........................18

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..................................................19

*In re General Motors LLC Ignition Switch Litig.*,
Nos. 14-MD02543 (JMF), 14-MC-2543 (JMF), 2019 WL 3564698
(S.D.N.Y. Aug. 6, 2019) ...............................................................................16, 17, 18

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) .........................................................................8

*Haley v. Kolbe & Kolbe Millwork Co.*,
863 F.3d 600 (7th Cir. 2017) .........................................................................8

*Haley v. Kolbe & Kolbe Millwork Co., Inc.*,
No. 14-cv-99-bbc, 2016 WL 1180203 (W.D. Wis. Mar. 25, 2016) .........................8

*Happel v. Walmart Stores, Inc.*,
602 F.3d 820 (7th Cir. 2010) .........................................................................8

*Hernandez v. Attention, LLC*,
429 F. Supp. 2d 912 (N.D. Ill. 2005) ...............................................................22

*J.T. Colby & Co., Inc. v. Apple Inc.*,
No. 11 Civ. 4060 (DLC), 2013 WL 1903883 (S.D.N.Y. May 8, 2013) .....................23

*Jimenez v. Allstate Ins. Co.*,
No. 2:10-cv-08486-JAK-FFM (C.D. Cal. May 13, 2019) [D.E. 334].......................25

*Kopplin v. Wis. Cent. Ltd.*,
914 F.3d 1099 (7th Cir. 2019) .......................................................................15

*Krik v. Exxon Mobil Corp.*,
870 F.3d 669 (7th Cir. 2017) .........................................................................8

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999)...................................................................................7

*Lemmermann v. Blue Cross Blue Shield of Wis.*,
713 F. Supp. 2d 791 (E.D. Wis. 2010).............................................................28

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009) .........................................................................8

*Marine Travelift, Inc. v. Marine Lift Sys., Inc.*,
No. 10-C-1046, 2013 WL 3289076 (E.D. Wis. June 28, 2013) ...............................8

*Muha v. Encore Receivable Mgmt, Inc.*,
516 F. Supp. 2d 959 (E.D. Wis. 2009).............................................................26

*Muha v. Encore Receivable Mgmt, Inc.*,
558 F.3d 623 (7th Cir. 2009) .......................................................................25

*In re My Ford Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) .............................................................18

*Nat'l Football League Props., Inc. v. ProStyle, Inc.*,
57 F. Supp. 2d 665 (E.D. Wis. 1999)...............................................................23

*In re NJOY, Inc. Consumer Class Action Litig.*,
No. CV 14-428 (JFW), 2016 WL 787415 (C.D. Cal. Feb. 2, 2016)........................18

*Peaceable Planet, Inc. v. Ty, Inc.*,
  362 F.3d 986 (7th Cir. 2004) ............................................................19

*In re POM Wonderful, LLC*,
  No. ML 10-02199 DDP, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)................13

*Prosperity Hands, LLC v. State Farm Fire & Casualty Co.*,
  No. 15-C-0483, 2017 WL 435786 (E.D. Wis. Feb. 1, 2017)..........................28

*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013) ................................................23

*Riel v. Immediate Credit Recovery, Inc.*,
  No. 17-CV-440-JPS, 2018 WL 502659 (E.D. Wis. Jan. 22, 2018) ..................22

*Schneider v. Chipotle Mexican Grill, Inc.*,
  328 F.R.D. 520 (N.D. Cal. 2018) ...............................................13, 14

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
  104 F. Supp. 2d 1033(S.D. Ind. 2000) ................................................19

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck*,
  No. 01 Civ. 2775 (DAB), 2001 WL 588846 (S.D.N.Y. June 1, 2001)................23

*Spraying Sys. Co. v. Delavan, Inc.*,
  975 F.2d 387 (7th Cir. 1992) ..........................................................26

*Timm v. Goodyear Dunlop Tires N. Am., Ltd.*,
  932 F.3d 986 (7th Cir. 2019) ...........................................................8

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) .........................................................28

## Rules

Fed. R. Evid. 702(a)........................................................................7, 15

Fed. R. Evid. 702(b).............................................................................7

Fed. R. Evid. 702(c).............................................................................7

Fed. R. Evid. 702(d).............................................................................7

## Other Authorities

Carson, R. T. (2000), "Contingent Valuation: A Users Guide," *Environmental
  Science & Technology*, 34 (8) ........................................................27

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011),
  *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf .........20, 21, 26, 28

Jon A. Krosnick & Stanley Presser, *Question and Questionnaire Design*, *in*
  HANDBOOK OF SURVEY RESEARCH 263 (2d ed. 2010)............................................26

*Lead in Food, Foodwares, and Dietary Supplements*, United States Food and Drug Administration (Feb. 19, 2019), https://www.fda.gov/food/metals/lead-food-foodwares-and-dietary-supplements (last visited Aug. 12, 2019)....................................24

*Mercury and Health*, World Health Organization (March 31, 2017), https://www.who.int/news-room/fact-sheets/detail/mercury-and-health (last visited Aug. 12, 2019)....................................................................................................24

Report of Dr. Jon A. Krosnick, *Schneider et al. v. Chipotle Mexican Grill, Inc.*, No. 4:16-cv-02200-HSG (N.D. Cal. Nov. 17, 2017) [D.E. 95-42]..........................................14

Vern R. Walker, *Theories of Uncertainty: Explaining the Possible Sources of Error in Inferences*, 22 Cardozo L. Rev. 1523 (2001)............................................................21

## I. INTRODUCTION

Evidence from an expert witness must be relevant and reliable. When it is not, it must be excluded. Here, the opinion testimony offered by Plaintiff's experts, Dr. Jon A. Krosnick ("Krosnick") and Mr. Colin B. Weir ("Weir"), is neither relevant nor reliable and must be excluded for the following reasons.

First, Krosnick's initial survey (the "Damages Survey"), which provides a key input for Plaintiff's damages methodology, does not fit Plaintiff's theories of liability in this case, that hinge on alleged misrepresentations appearing on Champion's pet food packaging. Critically, Krosnick does not test—or attempt to test—the effect on consumers of the content of Champion's purported misrepresentations. Rather, he tests only the effect of a random combination of between zero and eight "Corrective Statements" drafted by Plaintiff's counsel, and, therefore, the results cannot be isolated to a particular theory of liability and are disconnected from Plaintiff's liability theories. His second survey (the "Pentobarbital Survey") likewise does not measure change in value or even purchase decision making and is not tied to any particular representations appearing on Champion's packaging.

Second, Krosnick's resulting analysis does not estimate the change in market price attributable to Champion's alleged misrepresentations, which is the measure of damages Plaintiff seeks. Instead, Krosnick estimates only the change in consumers' willingness-to-pay ("WTP") and attempts to conflate this measure with a change in market price. But the two are not the same. Academics and the judiciary alike recognize their important distinction. Because Krosnick does not estimate a change in market price, his opinions are irrelevant to Plaintiff's claims.

Third, even if Krosnick's surveys fit Plaintiff's claims—which they do not—they suffer from numerous, severe methodological errors that render them unreliable. To start, in both surveys, Krosnick sampled the wrong population of consumers. Indeed, less than *one percent* of

his survey respondents could be considered members of the putative class Plaintiff seeks to represent. And within his irrelevant sample for his Damages Survey, Krosnick violates a fundamental principle of scientific research by foregoing a meaningful control group. Without such a control group, he cannot draw meaningful conclusions, or any conclusions, about the effect on willingness-to-pay (let alone market price) attributable to Champion's challenged representations. Additionally, both of his surveys utilize inflammatory, misleading, and out-of-context "Corrective Statements" written by Plaintiff's counsel, injecting bias that unquestionably renders his results unreliable. This bias likely would have been identified if Krosnick conducted a survey pretest, a procedure he previously described as a survey "best practice," but, here, he conveniently ignored his own recommendation.

Fourth, Krosnick's "Lewbel-Watanabe approach," which he used for calculating a decrease in the WTP, is not widely recognized as a method to value features of consumer goods. Rather, the approach is used—when it is rarely used at all—to estimate the value of goods that are *not* traded and that do *not* have a "market price" (such as clean air or clean water). Indeed, the only other instance that Krosnick or Weir could identify where this approach was used to value features of consumer goods was Krosnick's expert report on behalf of plaintiffs in another lawsuit.

Finally, Weir's damages report and opinions suffer the simple fault of relying upon Krosnick's flawed Damages Survey results that Weir plugs into an algebraic equation. Because Krosnick's work is irrelevant and unreliable, so too is Weir's. Moreover, Weir lacks an economic basis for his full refund damages method as to Pentobarbital and it is unreliable for being grounded on speculation.

## II.    RELEVANT BACKGROUND AND CLAIMS AT ISSUE

A summary of Champion's history as a pet food manufacturer as well as Plaintiff's claims, is found in Champion's Motion for Summary Judgment. *See* Defendants' Memorandum of Law

in Support of their Motion for Summary Judgment [D.E. 47] at pp. 1-12. In short, Plaintiff claims that allegedly false representations on Champion's pet food packaging damaged him and the putative class he seeks to represent.

In an attempt to offer evidence of damages on a class-wide basis, Plaintiff employed two professional expert witnesses: Krosnick, a professor of Communication and Political Science, and Weir, an economist. Krosnick conducted two surveys: the Damages Survey and the Pentobarbital Survey. *See* **Exhibit A**[1], Expert Report of Dr. Jon A. Krosnick, dated Aug. 13, 2019 (the "Krosnick Report").[2] Krosnick's Damages Survey was a nationwide survey and he used its results to purportedly estimate the diminution in value attributable to Champion's alleged misrepresentations suffered by purchasers of Champion's pet food in Wisconsin. *See id.* Using Krosnick's diminution in value estimates as an input, Weir performed simple arithmetic to estimate damages on a class-wide basis. *See* **Exhibit B**, Expert Report of Mr. Colin B. Weir, dated Aug. 13, 2019 (the "Weir Report").

To conduct his Damages Survey, Krosnick sampled 6,728 adult respondents from across the United States, most of whom do not live in Wisconsin and have never purchased the at-issue products. Although there are over 40 Champion pet food diets at issue in this case, Krosnick showed survey respondents images of only one of two formulations of Champion pet food—either ORIJEN Six Fish dog food made at Champion's DogStar Kitchen in Auburn, Kentucky or ACANA Duck & Pear singles dog food, also made at DogStar:

---

[1] Exhibits A to G, cited throughout this brief, are attached to the Declaration of David A. Coulson in Support of Defendants' Motion to Exclude the Opinions of Plaintiff's Expert Witnesses Dr. Jon A. Krosnick and Mr. Colin B. Weir, filed contemporaneously herewith.
[2] The Krosnick Report is comprised of two parts: Part 1, dealing with the Damages Survey, *see* Krosnick Report at pp. 1-335, and Part 2, dealing with the Pentobarbital Survey. *See* Krosnick Report at pp. 336-661.

 

Krosnick Report, pp. 223, 236. "After seeing photos of one side of the package, respondents read a transcript of all of the words on the side they had just viewed[,]" and repeated the process for "all sides of the package." *Id.* p. 41 ¶ 9. Then, respondents read between zero and eight pieces of additional information appearing on a separate screen, which Krosnick refers to as "Corrective Statements."[3] *See id.* at p. 41 ¶ 10. Unbeknownst to respondents, Plaintiff's attorneys drafted the eight Corrective Statements that Krosnick used verbatim in his Damages Survey:

1. Laboratory testing has shown there is a risk that this food may contain mercury. The World Health Organization has said that in humans, "Mercury may have toxic effects on the

---

[3] Krosnick's Pentobarbital Survey was conducted in a somewhat similar manner. There, instead of purporting to test any effect on market price, he used a nationwide survey sample to attempt to test the effect of two new Corrective Statements on consumers' perceptions of the perceived quality and healthiness of Champion's pet foods. *See* Krosnick Report at pp. 337-365. The two Corrective Statements used in Krosnick's Pentobarbital Survey are: (1) The dog food you saw may contain a drug called pentobarbital. According to the U.S. government, pentobarbital is used to calm animals, to put them to sleep, to reduce their feelings of pain, and to end their lives, and (2) According to the U.S. government, the dog food you saw was made with meat products provided by a company that did not make sure to keep out meat from animals whose lives had been ended by giving them a drug called pentobarbital. *See* Krosnick Report at p. 372 ¶ 75.

nervous, digestive and immune systems, and on lungs, kidneys, skin and eyes."

2. Laboratory testing has shown there is a risk that this food may contain cadmium. A federal public health agency of the U.S. Department of Health and Human Services, has found, "Kidney and bone effects have also been observed in laboratory animals ingesting cadmium. Anemia, liver disease, and nerve or brain damage have been observed in animals eating or drinking cadmium."

3. Laboratory testing has shown there is a risk that this food may contain lead. The Food & Drug Administration has said, "Lead is poisonous to humans and can affect people of any age or health status."

4. Laboratory testing has shown there is a risk that this food may contain arsenic. The Environmental Protection Agency has said, "Arsenic has been linked to a number of cancers. These include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate."

5. Laboratory testing has shown there is a risk that this food may contain BPA. The Food & Drug Administration has said, "BPA is an industrial chemical used to make polycarbonate, a hard, clear plastic, which is used in many consumer products."

6. The manufacturer of this food has stated that it may include ingredients that are not delivered to them fresh but have been frozen before they are used to make the dog food.

7. The manufacturer of this food has stated that it may include ingredients that are sourced outside the region where it is manufactured. This may include not only other regions within the United States but also other regions internationally.[4]

8. The manufacturer of this food has stated that it uses third parties to process and manufacture protein meals and tallows used in its dog foods.

*Id.* at p. 42 ¶ 10.

After seeing between zero and eight Corrective Statements, respondents who indicated they currently own or had previously owned a dog, were asked whether they would or would not buy the Champion product they saw at one of five pre-determined prices. *See id*. p. 42 at ¶ 11. The survey showed a respondent a single price. This price was either the manufacturer's suggested retail price ("MSRP"), a price five percent above or below the MSRP, or a price ten percent above

---

[4] Krosnick's Corrective Statement discussing the geographic sourcing of ingredients has seemingly no connection to Champion's dog foods manufactured at its NorthStar Kitchen in Alberta, Canada.

or below the MSRP. *See id*. at p. 42 ¶¶ 12, 13. These price options are appropriate, claimed Krosnick, citing a source he could not—or would not—identify. *See* **Exhibit C**, Deposition of Dr. Jon A. Krosnick, dated May 8, 2019 ("Krosnick Dep.") at 80:22-81:19 (testifying that he could not remember the name, employer, or contact information for the source of information on which he relied).

Krosnick analyzed data from 5,808 people who own or had ever owned a dog and, without a meaningful control group to compare to, concluded that "providing information about the risk of the presence of heavy metals and BPA in the dog foods and providing corrective information about the local sourcing, use of fresh ingredients, and participation of third parties in manufacturing decreased the value of the dog food by measurable amounts[.]" Krosnick Report, p. 29 ¶ 78. Specifically, "the more corrective statements a respondent read," regardless of the combination in which the respondent read them, "the less likely he or she was to purchase the product[.]" *Id.* at p. 50 ¶ 33. Krosnick estimated the "impact of [the] corrective statements on value" as follows:

**Percent Decrease in the Value of the Product**
**With Increasing Numbers of Corrective Statements**

| Number of corrective statements | Percent decrease in value |
|---|---|
| 1 | -10.7% |
| 2 | -20.3% |
| 3 | -28.8% |
| 4 | -36.4% |
| 5 | -43.3% |
| 6 | -49.3% |
| 7 | -54.8% |
| 8 | -59.6% |

*Id.* at p. 30 ¶ 79. Krosnick offered no opinion regarding the incremental effect of any individual statements on respondents, or the weight consumers place on the substance of the Corrective Statements. *See infra*. § IV. Instead, he calculated *only* the impact on value of the aggregate

*number* of Corrective Statements that respondents saw. Krosnick Report, p. 30 ¶ 79.

After Krosnick produced his diminution in value estimates attributable to random combinations of the Corrective Statements, Weir used the estimates in his two-step approximation of purported class-wide diminution in value damages. First, Weir estimated Champion's Wisconsin sales of the at-issue formulations during the class period. Second, he multiplied total sales of each at-issue product by Krosnick's purported diminution in value estimates corresponding to seven or eight Corrective Statements to estimate diminution in value on a product-by-product basis. The sum of these estimates is Weir's estimate of class-wide diminution in value damages.

## III.    LEGAL STANDARD

Rule 702 permits an expert to testify at trial only if that testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert opinions may be considered only if (1) "the testimony is based on sufficient facts or data," (2) the testimony is the product of reliable principles and methods," and (3) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). District courts act as a "gatekeeper" over all proffered expert or scientific testimony to ensure satisfaction of these threshold requirements. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

In evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (holding "when an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion."). As the gatekeeper, the Court must ensure that the proffered expert has the requisite knowledge, skill,

experience, training, or education relevant to such evidence or fact in issue. *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 3289076, at *3 (E.D. Wis. June 28, 2013). The court must also ensure that the "expert testimony is both relevant and reliable." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007); *see also Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 886 (E.D. Wis. 2010) (Stadtmueller, J.) ("a district court is obliged to function as a 'gatekeeper' regarding expert testimony, which requires insuring that the proposed testimony is both relevant and reliable."). Under that rubric, courts within the Seventh Circuit have repeatedly excluded experts even at the class certification stage. *See, e.g.*, *Allen*, 600 F.3d at 818-19; *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611–13 (7th Cir. 2017); *Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *11-16 (N.D. Ill. May 9, 2017); *Haley v. Kolbe & Kolbe Millwork Co., Inc.*, No. 14-cv-99-bbc, 2016 WL 1180203, at *1 (W.D. Wis. Mar. 25, 2016); *Bowman v. Int'l Bus. Machines Corp.*, No. 1:11-cv-0593 RLY-TAB, 2013 WL 12291430, at *8 (S.D. Ind. Aug. 19, 2013).

The proponent of the evidence bears the burden of establishing that the proffered expert has the requisite qualifications to testify, offers opinions that are relevant to the issues in dispute, and utilizes a sound and reliable methodology. *See, e.g.*, *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017) (quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017)) ("Notably, 'the party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the *Daubert* standard by a preponderance of the evidence.'"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*") ("[T]he party presenting the expert must show that the expert's findings are based

on sound science, and this will require some objective, independent validation of the expert's methodology."). Plaintiff cannot meet his burden as to Krosnick or Weir. Their opinions are so fundamentally flawed and unreliable that their testimony must be excluded.

## IV. KROSNICK'S OPINIONS ARE NOT RELEVANT TO PLAINTIFF'S CLAIMS

### a. Krosnick's Damages Survey Does Not Test Any Representation Made by Champion on Any of its Packaging

Each of Plaintiff's claims are based on alleged misrepresentations appearing on Champion's pet food packaging and the damages Plaintiff seeks equal the diminution in the value of Champion's pet food attributable to those alleged misrepresentations. Krosnick's Damages Survey, and Corrective Statements used within it, however, do not fit with Plaintiff's claims because Krosnick did not test the effect on market price of any of the purportedly false representations that actually appear on Champion's pet food packaging. His survey and opinions are thus irrelevant to Plaintiff's claims and must be excluded. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (excluding damages evidence when expert could not apportion damages between multiple theories of liability).

In *Comcast*, plaintiffs sued Comcast for alleged antitrust violations, based on four distinct theories of antitrust liability. *Id.* at 31. Of the four theories of liability, the District Court certified only one for class treatment. *See id.* As evidence of damages, Plaintiffs proffered an expert whose model calculated class-wide damages at approximately $875 million. *Id.* at 32. The model, however, did not isolate damages resulting from the single theory of antitrust liability that the District Court accepted for class-wide treatment; rather, the damages model accounted for all four theories of liability. *See id.* at 36–37.

The Ninth Circuit affirmed the District Court's certification ruling, but the Supreme Court reversed, commenting that "[i]f [plaintiffs] prevail on their claims, they would be entitled only to

damages resulting from [the one theory of liability that the District Court certified], since that is the only theory of antitrust impact accepted for class-action treatment by the District Court." *Id.* at 35. "It follows," then, "that a model purporting to serve as evidence of damages in this class action ***must measure only those damages attributable to that theory***." *Id.* (emphasis added). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

Like the disallowed damages model in *Comcast*, Krosnick's Damages Survey does not isolate or measure any change in market price or any purported diminution in value attributable to each of Plaintiff's theories of liability (*i.e.*, the many different alleged misrepresentations of which Plaintiff complains). The crux of Plaintiff's claims is that representations on Champion's pet food packaging are untrue. Any model offered as evidence of Plaintiff's damages must therefore measure ***only*** the damages attributable to those alleged misrepresentations. *See id.* But Krosnick did not even attempt to measure the purported diminution in value attributable to any specific statements that actually appear on Champion's packaging[5]:

> Q. Okay. ***Did any part of your experiment attempt to understand how respondents interpreted any of the content that Champion did put on the product***?
>
> A. ***No***.
>
> . . .
>
> Q. Similarly, there's nothing about your survey that asked the respondents if they attached any meaning or significance to the expression "Biologically Appropriate"?

---

[5] Krosnick included in his Damages Survey images for the packaging of only two Champion diets manufactured at Champion's DogStar Kitchen: ORIJEN Six Fish dog food and ACANA Duck & Pear singles dog food. Krosnick Report, pp. 223, 236. Krosnick did not show survey respondents the packaging of any other Champion diet and did not show respondents images of packaging for any diet manufactured at Champion's NorthStar Kitchen.

A.      Correct.

Q.      ***As a result of your experiment, did you form any opinions about the relative importance of any of the content of Champion's packages***?

A.      ***No***.

Krosnick Dep. at 126:21-127:15 (emphasis added).  Nor did he quantify a purported diminution in

value attributable to the substance of any of his eight Corrective Statements:

Q.      Was there - - for the people who saw two [Corrective Statements], was there any difference, that you saw, which two in combination had the greatest impact?

A.      I did not explore that.

Q.      Okay.  Why not?

A.      I didn't have any interest in it.

                                    . . .

Q.      But did you, for example, look to see if there was any combination of the seven that had a greater impact than others?

A.      I did not.

Q.      Okay.  And might as well close it out.  3 through 6, the answers would be the same?

A.      Yeah. . . . So what I'm telling you is that among individuals who received the same number of corrective statements, ***I did not do any type of subgroup analysis to explore whether the different combinations of three yielded different results from other combinations of three***.

*Id.* at 66:15-20, 67:2-15 (emphasis added).

       Rather than measure the impact on market price attributable to specific representations

made by Champion on its packaging or the impact on market price attributable to the substance of

any of the eight Corrective Statements drafted by Plaintiff's counsel, Krosnick measured *only* how

the aggregate *number* of Corrective Statements (regardless of combination) impacted a purported

measure of value.  *See id.*; *see also* Krosnick Report, p. 29 ¶ 79.  By ignoring statements actually

appearing on Champion's packaging, Krosnick ignored the root of Plaintiff's claims. And by failing to quantify the separate and distinct impact of each individual Corrective Statement, Krosnick was forced to make the illogical assumption that each Corrective Statement has the exact same effect on consumer purchasing behavior.

Put another way, according to Krosnick, survey respondents' purchase decisions are affected in precisely the same way by, for example, a statement about the risk of a presence of mercury, lead, or arsenic in food, and a statement about the geographic source of some ingredients. This conclusion defies common sense; surely, consumer reaction (if any) to a statement that "[a]rsenic has been linked to a number of cancers[,]" is likely to be vastly different from consumer reaction to a statement that "the manufacturer of this food has stated that it may include ingredients that are sourced outside the region where it is manufactured." Krosnick Report, pp. 41-42 ¶ 10. But Krosnick's Damages Survey contains no mechanism for acknowledging that distinction, and he makes no effort to otherwise quantify it. Krosnick Dep. at 65:20-22 ("I saw no significant difference in the impact of the statements, so there is no analysis reported here in this report on that matter."). Because Krosnick does not—and cannot—isolate or quantify the purported diminution in value attributable to anything appearing on Champion's packaging, his survey and opinions are irrelevant to Plaintiff's claims and should be excluded.[6] *See In re ConAgra Foods,*

---

[6] Another fundamental problem with Krosnick's Damages Survey is that his diminution in value estimate is based on a theory of liability relating to the mere presence of trace amounts of heavy metals, **which has already been dismissed from this suit**. *See* July 1, 2019 Order [D.E. 39], at 15 ("Plaintiff may not proceed on Count One with respect to heavy metals."). That is exactly the situation prohibited by the Supreme Court in *Comcast*. Four of the eight corrective statements in Krosnick's survey pertain exclusively to the existence of heavy metals, and there is no way to separate them from the damages calculation because Krosnick's estimates of diminution in value incorporate the effects of *all* of the Corrective Statements used in the Damages Survey. This problem would be further exacerbated if summary judgment or a jury verdict eliminates one or more of the remaining four theories, because Plaintiff would have no way to isolate and calculate damages applicable only to whatever theories prevailed. As a result, Krosnick's methodology has

*Inc.*, 302 F.R.D. 537, 579 (C.D. Cal. 2014) (finding that plaintiff's expert "must be able to isolate the price premium associated with misleading customers" and that because the expert's damages model did not take into account "all of the meanings consumers ascribe to [the term 'all natural'] . . . [it did] "not suffice under *Comcast*."); *see also Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2018 WL 1009257, at *9–12 (N.D. Cal. Feb. 13, 2018); *In re POM Wonderful, LLC*, Case No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (finding that plaintiff's proffered expert failed under *Comcast* when expert "made no attempt . . . to explain how [d]efendant's alleged misrepresentations caused any amount of damages."); *Bowman*, 2013 WL 12291430 at *8.

In an effort to shore-up Krosnick's ill-fated Damages Survey and related opinions, Plaintiff will likely cite *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520 (N.D. Cal. 2018). There, as here, Krosnick and Weir teamed up to estimate diminution in value and class-wide damages in support of plaintiffs' false advertising claims against Chipotle. The plaintiffs in that case claimed that three of Chipotle's in-store advertisements, which represented Chipotle's foods as "non-GMO" or "GMO-free," were false or misleading because Chipotle served protein products raised on GMO feed, dairy products made from milk from animals raised on GMO feeds, and beverages made with syrup from GMO corn. *See id.* at 527.

Krosnick designed a survey intended to estimate the diminution in value purportedly suffered by Chipotle customers resulting from Chipotle's allegedly false "non-GMO" and "GMO-free" labeling. Survey respondents were shown the at-issue Chipotle advertisements and, then, half of the respondents saw an additional statement, which has actually appeared on Chipotle's

---

no way to isolate any diminution in value resulting from the theories upon which liability is based, an outcome prohibited by *Comcast*.

website, which stated: "It is important to note that most animal feed in the U.S. is genetically modified, which means that the meat and dairy served at our restaurant are likely to come from animals given at least some GMO feed." *See* **Exhibit D**, Expert Report of Dr. Jon A. Krosnick, *Schneider et al. v. Chipotle Mexican Grill, Inc.*, No. 4:16-cv-02200-HSG (N.D. Cal. Nov. 17, 2017) [D.E. 95-42] (the "*Chipotle* Report"). Both sets of respondents (*i.e.*, those that saw the additional information from Chipotle's website and those that did not) were asked to indicate "Would Purchase" or "Would Not Purchase" at a particular price a Chipotle product that they designed. From the results of his survey, Krosnick concluded that consumers who did not see Chipotle's GMO-qualifying language paid slightly more than those who had. *See Chipotle* Report, p. 32 ¶¶ 82, 83.

After a *Daubert* challenge, the district court found Krosnick's survey and opinions to be admissible, but his methodology in that case was drastically different from the Damages Survey he conducted here in at least three key ways which highlight the unreliability of his opinions in this case. *See Schneider*, 328 F.R.D. at 543. First, Krosnick's survey in *Chipotle* used a control group, whereas in his Damages Survey in this case he had no meaningful controls. *Compare Chipotle* Report p. 19, ¶ 45 *with* Krosnick Dep. at 97:7-11 (conceding that there is no control group). Second, Krosnick's *Chipotle* survey used only one corrective statement—which was drafted by Chipotle and appeared on Chipotle's website—and that statement went to the heart of Chipotle's non-GMO and GMO-free claims. Here, in his Damages Survey, Krosnick uses eight Corrective Statements—drafted by Plaintiff's counsel—most of which are untethered to any specific statements that actually appear on Champion's packaging. Third, in *Chipotle*, Krosnick pre-tested his survey; here he did not. *Compare Chipotle* Report p. 20, ¶ 47 ("The questionnaire was subject to cognitive pretesting[.]") *with* Krosnick Dep. at 51:16-17 ("there was no pretesting

done for this particular questionnaire[.]").  The differences continue, but, at bottom, the survey designed by Krosnick in *Chipotle* is fundamentally different than the Damages Survey he employed here, and thus the *Daubert* ruling there provides no support for the flawed survey and methodology he employed in this case.

In short, Krosnick fails to anchor his research or opinions to Champion's representations that Plaintiff claims are misleading.  Even his Corrective Statements are analyzed based only on aggregate impact with no way to isolate on the impact of a particular Corrective Statement.[7] Because Krosnick does no more than estimate the effect of the aggregate number of Corrective Statements, his survey—and resulting opinions—are not tied to the content of Plaintiff's claims and must be excluded. *See Comcast*, 569 U.S. 27, 35 (2013); *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019); *Ervin*, 492 F.3d at 904–05; Fed. R. Evid. 702(a) (expert evidence must "help the trier or fact[.]").

### b. Krosnick Estimates Only a Change in WTP, Not a Change in Market Price, and His Opinions are Thus Irrelevant to Plaintiff's Theory of Damages

Krosnick's analysis—even if it were tied to Plaintiff's theory of the case, which it is not— does not and cannot measure a purported diminution in *market price*, which is the measure of damages Plaintiff seeks.  *See* Weir Report ¶¶ 35-37; *see also* Mem. in Support of Plaintiff's Mot. for Class Certification [D.E. 52] at p. 7 ("The results of [Krosnick's] survey showed that the value of the Dog Food decreased with each additional piece of corrective information shown . . . . This survey data can be used to determine class-wide damages.").  By his own admission, Krosnick measures only a change in consumers' willingness-to-pay ("WTP").  *See* Krosnick Dep. at 9:11-10:13 (explaining that Krosnick's definition of value is "the amount of money that I would have

---

[7] This flaw also plagues Plaintiff's effort to certify the putative class he seeks to represent.  *See* Defendants' Resp. in Opp. to Plaintiff's Mot. for Class Certification [D.E. 63] at pp. 23-27.

to give up in order to remain at the same level of well-being after receiving the [product.]"). But WTP is not equal to market price, which is determined by the intersection of demand *and* supply.[8] *See In re General Motors LLC Ignition Switch Litig.*, Case Nos. 14-MD02543 (JMF), 14-MC-2543 (JMF), 2019 WL 3564698, at *11 (S.D.N.Y. Aug. 6, 2019) ("market value is determined by the interaction of *both* supply *and* demand.").

The recent opinion in *In re General Motors* explains this important distinction. *See id.* There, plaintiffs claimed that they purchased GM vehicles with defective ignition switches and sought recovery of benefit-of-the-bargain damages (*i.e.*, "the difference between the actual value of what plaintiff has received and that which he expected to receive."). *Id.* at *5 (citation omitted). The plaintiffs' damages expert performed a conjoint analysis, which measured consumer desires by asking survey respondents about their preferences for certain combinations of product features (including a defective feature), to estimate the amount that consumers would be willing to pay for a vehicle with a particular defect that was fully disclosed. *See id.* at *12. Using the results of his survey, plaintiffs' expert constructed hypothetical "demand curves" for the "but-for" world—that is, the world in which GM disclosed the alleged defects before selling allegedly defective cars. *See id.* But because the expert's model focused only on changes to demand, he calculated only changes to consumers' willingness-to-pay and thus "did not estimate any possible changes in [the defendant's] willingness to *sell* . . . instead, he assumed that 'the new equilibrium' (*i.e.*, market) 'price' in the but-for world would be the price at which 'all the purchasers of defective vehicles in

---

[8] To be sure, academics and leading industry practitioners alike recognize the important distinction between WTP and market price and note that WTP (either at the individual level or as an average) is not equivalent to the price at which a product is actually sold in the marketplace. *See* **Exhibit E**, Rebuttal Expert Report of Dr. Dominique M. Hanssens, dated Sept. 12, 2019 (the "Hanssens Report") at ¶ 40.

the actual-world would also buy in the but-for-world.'" *Id*.

This is not evidence of damages, the court concluded. *See id*. at *13. "The benefit-of-the-bargain theory awards damages based on the difference between what the plaintiff paid for and the fair market value of what the plaintiff received." *Id*. Because fair market value is determined according to the equilibrium price of a good which "depends on supply *and* demand," "where the law awards damages based on the difference in market value, ***evidence—including conjoint analyses—that measure only consumers' subjective valuation or willingness to pay is not sufficient evidence of such damages***." *Id*. at *13-14 (emphasis added).

Like the plaintiffs in *In re General Motors*, Plaintiff here seeks damages determined by the difference between what he paid for Champion's pet foods and the hypothetical "but-for" market price of Champion's pet foods without the allegedly false representations (*i.e.*, the price premium attributable to Champion's allegedly false representations). But Krosnick does not estimate market price in the but-for world. First, he does not show to the survey respondents a "but-for product" (for example, an at-issue Champion package with the allegedly misleading information removed). Rather, he merely qualifies real-world Champion packaging using biased and misleading "Corrective Statements."

Second, even if he had used a "but-for product" in his Damages Survey, Krosnick cannot estimate the market price of Champion's pet foods in the but-for world because he ignores supply-side considerations. Indeed, Krosnick admits that he formed his opinions *without any* consideration of Champion's manufacturing costs, costs of goods sold, or willingness to sell. *See* Krosnick Dep. at 112:22-113:25. Because he ignores supply-side factors, Krosnick cannot estimate a hypothetical but-for market price and likewise cannot estimate the difference between the but-for market price and real-world prices Plaintiff and the putative class actually paid. *See In re*

*General Motors*, 2019 WL 3564698 at \*12-14. Without considering supply, Krosnick's purported change in WTP does no more than masquerade as a change in market price and his opinions cannot be used as evidence of Plaintiff's purported damages. *See generally*, *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at \*31 (N.D. Ill. March 31, 2017). (holding plaintiffs failed to demonstrate that the proffered expert's study was sufficiently reliable and reasoning "[a]sking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages."); *Apple, Inc. v. Samsung Elecs. Co*., No. 11-CV-01846-LHK, 2014 WL 976898, at \*11 (N.D. Cal. Mar. 6, 2014) (rejecting a damages model that failed to provide a way to compare "willingness to pay metrics—which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices"); *In re NJOY, Inc. Consumer Class Action Litig.*, Case No. CV 14-428 (JFW) (JEMx), 2016 WL 787415, \*7 (C.D. Cal. Feb. 2, 2016) ("[a] consumer's . . . willingness to pay for products with or without the message is not an accurate indicator of restitutionary damages, because it does not permit the court to calculate the *true market price* of N-JOY e-cigarettes absent the purported misrepresentations.").[9]

---

[9] Champion recognizes that several courts have admitted evidence in the form of conjoint surveys that lacked supply-side considerations. *See generally*, *In re My Ford Touch Consumer Litig.*, 291 F. Supp. 3d 936 (N.D. Cal. 2018). Champion submits that those decisions are not well-reasoned and that the cases Champion relies on are more persuasive. Regardless, Krosnick's survey is admittedly *not* a conjoint. *See* Krosnick Dep. at 99:23-100:4 (Q. Would you describe the experiment you did in this case as a conjoint analysis? A. The - - the principles used here are identical to the principles that underlie conjoint measurements, but the design of this study looks importantly different from most common conjoint analyses[.]"). And although Plaintiff is likely to rely on cases admitting conjoint surveys, his reliance is misplaced, as the better economic theory counsels the need to consider supply in determining market price. *See, e.g.*, *In re General Motors*,

## V.    KROSNICK IGNORES BASIC SCIENTIFIC PRINCIPLES, MAKING HIS SURVEYS AND OPINIONS UNRELIABLE

Often, challenges to survey methodology go to the weight of expert testimony, not its admissibility.  However, "conclusions and methodology are not entirely distinct from one another," and a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered," which is the case here.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Survey evidence should therefore be excluded if it suffers from serious methodological flaws.  *See Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 992 (7th Cir. 2004) (concluding survey relating to consumer's understanding of descriptive names was "not merely devoid of probative value, unprofessional, and probably inadmissible under the *Daubert* standard; it was irrelevant."); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1052 (S.D. Ind. 2000) (consumer surveys inadmissible because they were "merely transparent paths to a desired but artificial result, one driven by leading and suggestive questions, distortions of consumer experiences, and without obvious controls.").  Myriad methodological flaws contaminate Krosnick's surveys and render them, and his opinions formed from them, unreliable and, therefore, inadmissible.

### a.    Krosnick sampled the wrong population in his Damages Survey

In his Damages Survey, Krosnick surveyed an irrelevant sample population that is not only inconsistent with Plaintiff's putative class definition, which includes only consumers in the State of Wisconsin who purchased Champion pet food.  *See* Hanssens Report ¶¶ 47-56; *see also* Third Amended Complaint ("TAC") [D.E. 41] ¶ 153.  As Dr. Shari Diamond—who Krosnick relies heavily upon in his report—explains, consumers who are the purchasers or potential purchasers of

---

2019 WL 3564698 at *16 (rejecting conjoint for failure to account for supply-side effects on market price).

the product are likely to have different preferences and exhibit different purchase behaviors than a broad population such as the population of American adults. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011), *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf, at p. 377 (hereinafter, "*Reference Manual on Scientific Evidence*"); *see also* Hanssens Report ¶ 51. Indeed, the "definition of the relevant population is crucial because there may be systemic differences in the responses of members of the population and nonmembers. For example, consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase." Reference Manual on Scientific Evidence, p. 377; *see also* Hanssens Report ¶ 51. But American adults broadly—instead of the narrower set of Champion pet food purchasers—was the sample Krosnick chose. *See* Krosnick Report p. 19 ¶ 45 ("the questionnaire was then administered to a large, nationally representative sample of American adults[.]").

Illuminating the irrelevance of Krosnick's survey sample is the fact that only six percent of respondents reported *ever* purchasing any at-issue ACANA or ORIJEN dog food and even less—only four percent—reported doing so during the class period. *See* Hanssens Report ¶¶ 53-54; *see also* Krosnick Report, App. B at pp. 254-57. And only 11 people—less than one percent of survey respondents—reported having bought ACANA or ORIJEN products and that they live in the State of Wisconsin; said another way, at most, *less than one percent of Krosnick's Damages Survey population could be considered part of the putative class*. *See* Hanssens Report ¶ 54; Krosnick Report, App. B at pp. 254-57. Because Krosnick conducted no analysis or testing to compare members of his irrelevant target population (American adults) to members of the putative class (Wisconsin consumers who purchased Champion pet food), he cannot draw meaningful conclusions about the putative Wisconsin class members from his nationwide survey

respondents.[10]  *See* Hanssens Report ¶ 50.

### b. Krosnick's Damages Survey is unscientific because it lacks a control group

Even if Krosnick surveyed a relevant population—which, to be sure, he did not—his Damages Survey and opinions must also be reliable.  *See Daubert*, 509 U.S. at 590.  Here, Krosnick's Damages Survey is unreliable because he ignores a foundational requirement of scientific research:  a control group.  Indeed, the adjective "scientific" implies "a grounding in the methods and procedures of science[,]" and "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method."  *Id*.  A "properly designed survey experiment compares a control group to a treatment group."  Hanssens Report ¶ 35.

As explained in by the Federal Judicial Center:

> A good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are not exposed (the control group) . . . . ***[D]ata from a treatment group without a control group generally reveal very little and can be misleading.***  Comparisons are essential.

*Reference Manual on Scientific Evidence*, pp. 218-220 (emphasis added); *see also* Vern R. Walker, *Theories of Uncertainty: Explaining the Possible Sources of Error in Inferences*, 22 Cardozo L. Rev. 1523, 1554 n. 47 (2001) ("The design of a controlled experiment is intended to create a situation in which a statistically significant difference between the test group and the control group would warrant an inference if causation.").  Despite the consensus that a control group is necessary in any properly-designed survey experiment, Krosnick opts to forego one in his Damages Survey:

Q.      Okay. Which is the control group?

A.      There - - there isn't really a control group here.

---

[10]      A similar problem impacts Krosnick's Pentobarbital Survey.  There, again, he employed a nationwide sample population.  Evidencing the irrelevance of that sample set, however, is the fact that only **one** survey respondent in the Pentobarbital Survey resides in Wisconsin and has ever purchased Champion dog food.  *See* Hanssens Report ¶ 128.

Q.     Okay. Why not?

A.     It's not the design.

Krosnick Dep. at 97:7-11.  For this reason alone, Krosnick's Damages Survey, and his opinions based upon it, are unscientific, unreliable, and should be excluded from this case.

Plaintiff and Krosnick may contend that Krosnick's Damages Survey does have a control group—despite Krosnick's testimony otherwise—because each Corrective Statement was shown to only half of the respondents.  *See* Krosnick Report, p. 26 ¶ 66.  The half of respondents who did not view a particular Corrective Statement, however, do not constitute a control group for that Corrective Statement.  *See* Hanssens Report ¶ 34 n.50.  First, the half of respondents who did not view a particular Corrective Statement are a mix of people who saw anywhere from zero to seven *other* Corrective Statements.  These respondents could not possibly provide a reliable benchmark with which to isolate the effect of a particular statement or a subset of statements.  In other words, Krosnick has no proper baseline, representing the real-world experiences of consumers, to compare with his but-for world of consumers seeing one or more of the Corrective Statements.  Second, regardless of whether the group of respondents who did not see a particular Corrective Statement might theoretically constitute a control group, Krosnick did not *use* these groups as control groups in his analysis.  Nowhere in his report or testimony is there any comparison between the half of respondents who saw a particular Corrective Statement and the half of respondents who did not see that Corrective Statement.

Without a control group, Krosnick ignores foundational scientific principles.  His Damages Survey and opinions are therefore unscientific and, as a result, unreliable and inadmissible.  *See id.* at ¶ 34; *see Riel v. Immediate Credit Recovery, Inc.*, No. 17-CV-440-JPS, 2018 WL 502659, at *4 (E.D. Wis. Jan. 22, 2018) (Stadtmueller, J.) (holding survey inadmissible based on failure to include a control group); *Hernandez v. Attention, LLC*, 429 F. Supp. 2d 912, 917 (N.D. Ill. 2005)

("The survey's fatal flaw is that it did not make use of a control group."); *Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 669–72 (E.D. Wis. 1999) (Stadtmueller, J.) (excluding survey evidence and conclusions based on evidence because, among other reasons, survey failed to include a control group or question); *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (excluding expert evidence when the expert failed to, among other things, use adequate controls); *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1257–58 (S.D. Cal. 2013) (excluding a handbag trade dress confusion survey and noting that problems with survey were "exacerbated because [the expert] did not use a control to test the accuracy of his survey."); *J.T. Colby & Co., Inc. v. Apple Inc.*, Case No. 11 Civ. 4060 (DLC), 2013 WL 1903883, at *22 (S.D.N.Y. May 8, 2013) (finding that serious flaws in survey results rendered expert report and survey inadmissible and noting that "In order to offer sound results, most surveys must employ an adequate control."); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck*, Case No. 01 Civ. 2775 (DAB), 2001 WL 588846, *12 (S.D.N.Y. June 1, 2001) (survey to assess implied falsity of a commercial suffered the "fatal flaw" in that there were no controls in place to assure the accuracy of the results); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015) ("Indeed, it is axiomatic that, when designing an experiment to test whether an observed result was caused by given variable, the control or benchmark group must lack that variable. That is the whole point of a control group.").

### c. Krosnick injects fatal bias into his surveys through the use of his Corrective Statements

Krosnick's Damages Survey is infected with misleading and biased information, which is most apparent in two ways: (1) his choice of Corrective Statements, and (2) the manner in which the Corrective Statements are presented to survey respondents. In adopting, verbatim, Corrective

Statements drafted by Plaintiff's counsel, Krosnick omits crucial qualifying information and context. *See* Hanssens Report ¶ 88 (the Corrective Statements "are framed in ways that can result in cognitive biases, and fail to provide any context about the negative information they provide[.]"). And the alarmist undertones woven into each Corrective Statement are likely (if not intended) to frighten survey respondents. For example, the Corrective Statement referring to Mercury states: "The World Health Organization [("WHO")] has said that in humans, 'Mercury may have toxic effects on the nervous, digestive and immune systems, and on lungs, kidneys, skin and eyes.'" Krosnick Report, pp. 42-43 ¶ 10. Suspiciously absent, however, is information *from the same source* published by the WHO, that "[a]ll humans are exposed to some level of mercury." *See Mercury and Health*, World Health Organization (March 31, 2017), https://www.who.int/news-room/fact-sheets/detail/mercury-and-health (last visited Aug. 12, 2019). The Corrective Statement about lead states that "The Food & Drug Administration has said, 'Lead is poisonous to humans and can affect people of any age or health status" (Krosnick Report, pp. 42-43 ¶ 10), but omits the fact, also published by the FDA, that "[l]ead occurs in foods because of its presence in the environment."[11] *See Lead in Food, Foodwares, and Dietary Supplements*, United States Food and Drug Administration (Feb. 19, 2019), https://www.fda.gov/food/metals/lead-food-foodwares-and-dietary-supplements (last visited Aug. 12, 2019). Comparable

---

[11] Krosnick's Corrective Statements also ignore information from the National Research Council which, in 2005, published a study in the Mineral Tolerance Animals, 2nd Revised Edition, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury in dog foods and likewise ignores that in 2011 the FDA, in its Target Animal Safety Review, adopted the MTLs utilized by the NRC, and also ignores the European Union's regulatory standards for safe levels of heavy metals in pet food. *See* Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment [D.E. 51] ¶¶ 44-45. Champion's pet foods are well below these levels, but the Corrective Statements make no effort to provide context as to what would be a safe level in dog food.

arbitrary and leading omissions plague each of Krosnick's Corrective Statements.[12]  *See id*.

Compounding the bias driven by Krosnick's misleading Corrective Statements is the fact that the Corrective Statements' presentation "differs substantially from [the] presentation of other information and [are] presented in a way that causes respondents to place heightened focus on these statements."  Hanssens Report ¶ 93.  "Krosnick displayed each [] Corrective Statement as the sole piece of content on the page. . . . The pages that respondents saw with text from Champion packaging contained numerous distinct statements and up to 296 words, far more than the longest [] Corrective Statement, which contained only a maximum of 60 words."  *Id.* at ¶ 95.   Because Krosnick displays Corrective Statements in isolation, respondents are likely to have their attention (or focus) drawn more to the Corrective Statements as opposed to any other information on Champion's packaging Krosnick provided in the survey; resulting in focusing illusion bias.  *See id.* at ¶ 93 ("It is well documented . . . that the manner in which content is shown to respondents can lead to 'focusing illusion bias' or 'focalism,' which occurs when respondents' attention is drawn to a particular piece of information.  Focalism is widely known to result in biased survey responses.").  Where, like here, a survey so clearly biased its respondents, it must be excluded.[13] *See Muha v. Encore Receivable Mgmt, Inc.*, 558 F.3d 623, 626 (7th Cir. 2009) (reasoning "[t]hat questions were drafted by the plaintiffs' lawyer was apt to make them leading, and did"); *Muha v.*

---

[12] Krosnick's Pentobarbital Survey suffers from similar flaws.  In the Pentobarbital Survey, like in the Damages Survey, Krosnick provides leading Corrective Statements without any context.  *See* Hanssens Report ¶¶ 130-134.

[13] Notably, another court recently excluded a survey and opinions proffered by Krosnick as a result of several methodological flaws.  *See* Order to Exclude All Evidence Related to Sixth and Seventh Reports of Plaintiffs' Expert Dr. Jon Krosnick*, Jimenez v. Allstate Ins. Co.*, Case No. LA CV10-08486 JAK (FEMx) (C.D. Cal. May 13, 2019) [D.E. 334] at p. 31 (excluding survey and opinions offered by Krosnick because the substantial "reliability issues of the proffered opinion evidence cannot be separated from the substantial shortcomings of the [s]urvey results on which they are based.").

*Encore Receivable Mgmt, Inc.*, 516 F. Supp. 2d 959, 963 (E.D. Wis. 2009) (Stadtmueller, J.) (reasoning "[s]ome courts have expressed wariness when attorneys draft consumer surveys"); *Spraying Sys. Co. v. Delavan, Inc.*, 75 F.2d 387, 396 (7th Cir. 1992) (survey that failed to replicate market conditions and which statements were solicited and drafted by counsel were indicative of bias).

### d. Krosnick failed to pre-test his surveys

Krosnick ignored a well-established survey best practice—and his own writing on the subject—by failing to pre-test his survey questions. *See* Jon A. Krosnick & Stanley Presser, *Question and Questionnaire Design*, *in* HANDBOOK OF SURVEY RESEARCH 263, 294 (2d ed. 2010) ("No matter how closely a questionnaire follows recommendations based on best practices, it is likely to benefit from pretesting[.]"); Krosnick Dep. at 51:1-21 ("there was no pretesting done for [the Damages Survey]"); **Exhibit F**, Deposition of Dr. Jon A. Krosnick, dated August 27, 2019 ("Krosnick Dep. Vol. 2") at 12:21-23 ("Q: As part of the pentobarbital study, did you do any cognitive pretest of your questions?  A. No."). Pretesting potential survey questionnaires by interviewing respondents while they take the survey is a recommended step in designing a survey. According to Dr. Shari Diamond (whom Krosnick relies upon in the Krosnick Report), "[a] variety of pretest activities may be used to improve the clarity of communication with respondents. Focus groups can be used to find out how the survey population thinks about an issue, facilitating the construction of clear and understandable questions."  *See Reference Manual on Scientific Evidence*, pp. 388-89.  Moreover, in "many pretests or pilot tests, the proposed survey is administered to a small sample (usually between 25 and 75) of the same type of respondents who would be eligible to participate in the full-scale survey.  The interviewers observe the respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased" and to verify that respondents are interpreting

26

questions and answer choices in the manner that the researcher intended.[14] *Id.* That Krosnick did not practice what he preaches is by itself cause for exclusion. *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 770–71 (7th Cir. 2014) (affirming summary judgment based on exclusion of expert who "deviated substantially from the recognized scientific practices that he described in his reports" and "did not adhere to his own stated methods[.]").

## VI. KROSNICK'S "LEWBEL-WATANABE" METHODOLOGY IS NOT WIDELY ACCEPTED IN THE SCIENTIFIC COMMUNITY AS A METHOD OF VALUING THE FEATURES OF CONSUMER GOODS

Contingent valuation surveys—like Krosnick's Damages Survey here—are used to estimate the value of *non-market goods* such as clean air or water, or public goods that do not have an associated price. *See* Hanssens Report ¶¶ 44-46, 109 ("contingent valuation methodology in general, is almost always used to estimate willingness-to-pay for a *non-market* good (or a good that is not traded and that does not have a market price).") (emphasis in original). Dr. Richard Carson, an authority on contingent valuation and with whom Krosnick has co-authored several articles, defines contingent valuation as "[A] survey-based method frequently used for placing monetary values on environmental goods and services *not bought and sold in the marketplace*." Carson, R. T. (2000), "Contingent Valuation: A Users Guide," *Environmental Science & Technology*, 34(8), 1413–1418 (emphasis added). But the products at issue in this case *are* market goods. *See* TAC ¶ 2 (Champion "sell[s] pet food under the brand names Acana and Orijen throughout the United States[.]").

Krosnick refers to his analysis as the "Lewbel-Watanabe approach." But only two other instances where the "Lewbel-Watanabe approach" was used can be found in relevant literature,

---

[14] A pre-test is particularly important in this case because five of Krosnick's eight Corrective Statements used in the Damages Survey refer to "a risk" associated with Champion's pet food. *See* Krosnick Report at pp. 41-42 ¶ 10. Krosnick, however, made no effort to ensure that survey respondents understood the "risk" to which Krosnick refers.

both of which pertain to damages to the environment. *See* Hanssens Report ¶ 109 ("contingent valuation methodology in general, is almost always used to estimate a willingness-to-pay for a *non-market* good[.]") (emphasis in original). When asked, Weir could not identify a single example—other than Krosnick's own work in *Chipotle* discussed above—in which the "Lewbel-Watanabe approach" was used to value market goods. *See* **Exhibit G**, Deposition of Mr. Colin B. Weir, dated Apr. 26, 2019 ("Weir Dep.") at 54:10-55:15. Because Krosnick's novel approach is not an accepted method for valuing attributes of consumer goods, it must be excluded. *See Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 809 n.22 (E.D. Wis. 2010) (Stadtmueller, J.) ("This is not to say that every expert testifying . . . must follow the method in the *Reference Manual on Scientific Evidence*. Rather, the court is . . . demonstrating how the [proffered expert's] methodology was completely divorced from other acceptable methods"); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."); *Prosperity Hands, LLC v. State Farm Fire & Casualty Co.*, No. 15-C-0483, 2017 WL 435786, at *4 (E.D. Wis. Feb. 1, 2017) (excluding opinion testimony because plaintiffs did not show that an expert would rely on the type of methodology employed).

## VII.   BAD INPUT = BAD OUTPUT: WEIR'S DAMAGES ESTIMATES RELY ON KROSNICK'S FLAWED WORK AND MUST THEREFORE BE EXCLUDED

Weir's opinions are unreliable for the simple reason that they are based on Krosnick's work. To estimate damages to the putative class attributable to the diminution in value that class members suffered as a result of Champion's allegedly deceptive representations, Weir first estimated Champion's total sales of each at-issue product in Wisconsin during the time period

2013-2018.[15]  *See* Weir Report, Table 2.  Once he estimated sales of each at-issue product, Weir

multiplied his sales estimates by Krosnick's diminution in value estimates corresponding to 7 or 8

corrective statements as set forth in Krosnick's Damages Survey and report.[16]  As shown below,

the sum of each of those calculations is Weir's diminution in value damages estimate.

| Table 3. Diminution in Value Damages | | | |
|---|---|---|---|
| Product | Dollar Sales | Diminution in Value | Diminution in Value Damages |
| ACA_APPALACHIAN_RANCH_DOG | $ 935,247 | 59.6% | $ 557,407 |
| ACA_DUCK_PEAR | $ 669,574 | 59.6% | $ 399,066 |
| ACA_FREE_RUN_POULTRY | $ 592,491 | 59.6% | $ 353,124 |
| ACA_FRESHWATER_FISH | $ 327,035 | 54.8% | $ 179,215 |
| ACA_HERITAGE_MEATS | $ 595,291 | 59.6% | $ 354,794 |
| ACA_KY_GRASSLANDS_DOG | $ 911,967 | 54.8% | $ 499,758 |
| ACA_LAMB_APPLE | $ 725,339 | 59.6% | $ 432,302 |
| ACA_MEADOWLANDS_DOG | $ 709,532 | 59.6% | $ 422,881 |
| ACA_PORK_SQUASH | $ 498,517 | 59.6% | $ 297,116 |
| ACA_Wild_Atlantic_Dog | $ 556,783 | 59.6% | $ 331,842 |
| ORI_6_FISH_DOG | $ 2,048,918 | 59.6% | $ 1,221,155 |
| ORI_FDF_ADULT | $ 69,886 | 59.6% | $ 41,652 |
| ORI_FDF_REGIONAL_RED | $ 100,819 | 54.8% | $ 55,249 |
| ORI_FDF_TUNDRA | $ 113,935 | 59.6% | $ 67,905 |
| ORI_ORIGINAL | $ 2,045,176 | 54.8% | $ 1,120,756 |
| ORI_PUPPY | $ 947,612 | 59.6% | $ 564,777 |
| ORI_REGIONAL_RED_DOG | $ 1,936,768 | 59.6% | $ 1,154,314 |
| ORI_TUNDRA_DOG | $ 1,123,569 | 59.6% | $ 669,647 |
| **Grand Total** | **$ 14,908,461** | | **$ 8,722,963** |
| Source:  CPF0017614, CPF0017743, CPF2117040 Krosnick Declaration | | | |

*See* Weir Report, Table 3.

---

[15] Weir's estimates span the time period January 1, 2013 to December 31, 2018. *See* **Exhibit H**, Rebuttal Expert Report of Dr. Lorin M. Hitt, dated Sept. 12, 2019, ¶ 105.  This include sales that are outside the putative class period, which is from July 1, 2014 to the present.  *See* Mem. in Support of Plaintiff's Mot. for Class Certification [D.E. 52] at p. 8 (defining the putative class as "All persons residing in the State of Wisconsin who purchased Dog Food between July 1, 2014 and the present[.]").

[16] Weir made no effort to determine which (if any) Corrective Statements applied to at-issue Champion products.  *See* Weir Dep. at 124:10-16 (Q. How did you determine which of the estimates from Doctor Krosnick's report to use in each row of [column three in Table 3]?  A. That's a good question.  That was either provided to me by counsel or it may be the case that Doctor Krosnick has a table that sets that forth.").

Weir's mathematics are straightforward, but his assumptions and inputs are faulty.[17] A fatal error is his reliance on the diminution in value estimates generated by Krosnick. Because Krosnick's survey and resulting analysis cannot provide a market price or value input for computing damages, Weir cannot properly depend on them to form his estimate of diminution in value damages. This is a classic case of "garbage in, garbage out," and Weir's report and opinions should be excluded. *See, e.g., Fail-Safe, L.L.C.*, 744 F. Supp. 2d at 887–88 (Stadtmueller, J.) (excluding expert's opinion when there was "no indication that the underlying data that [the expert] relies upon is anything more than a hopeful projection, a far cry from being 'reliable sources of information' that an expert can rely on in forming an opinion."); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124 (M.D. Pa. 2015) (excluding expert opinion that relied on "unverified secondhand data" as a vital input).

## VIII. CONCLUSION

As the gatekeeper, the Court is tasked with ensuring expert testimony and evidence is both relevant and reliable. Krosnick and Weir's reports and opinions are neither. For all the reasons set forth above, they should be excluded (1) from supporting Plaintiff's Motion for Class Certification and (2) from testifying at trial in this case.

---

[17] Weir's calculation of full-refund damages (referred to by Weir as "Illegal Sales Damages") also suffers from faulty assumptions and inputs. His opinion relating to full-refund damages is not tied to actual sales of Champion products that contained any ingredient that may have contained a detectible level of pentobarbital. Indeed, his estimates are not even tied to the production lots of Champion pet food diets that contain ingredients from JBS MOPAC, as Champion used three other suppliers for the same ingredient during the putative class period. *See* Defendants' Resp. in Opp. to Plaintiff's Mot. for Class Certification [D.E. 63] at pp. 6-7, 16-17. As such, Weir's full-refund opinion is not helpful to the jury and should be excluded.

Dated: September 18, 2019          By:     *s/ Susan E. Lovern*
                                          Susan E. Lovern, SBN 1025632
                                          Mark E. Schmidt, SBN 1052450
                                          Derek J. Waterstreet, SBN 1090730
                                          von BRIESEN & ROPER, s.c.
                                          411 East Wisconsin Avenue
                                          Suite 1000
                                          Milwaukee, Wisconsin 53202
                                          Telephone: (414) 287-1286
                                          Facsimile: (414) 238-6599
                                          E-mail: slovern@vonbriesen.com
                                                  mschmidt@vonbriesen.com
                                                  dwaterstreet@vonbriesen.com

                                          *s/ David A. Coulson*
                                          David A. Coulson
                                          Florida Bar No. 176222 (admitted to E.D.
                                          Wis.)
                                          GREENBERG TRAURIG, P.A.
                                          333 S.E. 2nd Avenue, Suite 4400
                                          Miami, Florida 33131
                                          Telephone: (305) 579-0754
                                          Facsimile: (305) 579-0717
                                          Email: coulsond@gtlaw.com

                                          ***Attorneys for Defendants***
                                          ***Champion Petfoods USA Inc. and***
                                          ***Champion Petfoods LP***