# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

**SCOTT WEAVER,** individually and on behalf of all others similarly situated,

     **PLAINTIFF,**

**v.**

**CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP,**

     **DEFENDANTS.**

Case No. 2:18-cv-01996-JPS

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT WITNESSES
DR. JON A. KROSNICK AND MR. COLIN B. WEIR**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND .................................................................................................. 2

III. THE DAMAGES SURVEY ................................................................................ 3

IV.  THE PENTOBARBITAL SURVEY .................................................................. 8

V.   ARGUMENT ....................................................................................................... 9

    A.  LEGAL STANDARD ................................................................................... 9

    B.  DR. KROSNICK's OPINIONS ARE RELEVANT UNDER FRE 702 ...................... 11

        1.  Dr. Krosnick's Damages Survey Is Tied to Plaintiff's Claims .............................. 11

        2.  Dr. Krosnick's Damages Survey Measures Consumers' Change in Value of
           CPF's Dog Foods ................................................................................................... 14

    C.  DR. KROSNICK'S SURVEYS AND OPINIONS ARE RELIABLE
       UNDER RULE 702 ..................................................................................... 19

        1.  Dr. Krosnick Surveyed the Appropriate Population .............................................. 19

        2.  Dr. Krosnick's Survey Has Control Groups .......................................................... 20

        3.  Dr. Krosnick's Surveys Are Not Biased ................................................................ 21

        4.  Pre-Testing Is Not Required for a Scientifically Valid Survey .............................. 22

        5.  Dr. Krosnick's Use of the Lewbel-Watanabe Estimation Approach is Reliable ... 23

    D.  MR. WEIR'S DAMAGES OPINIONS ARE RELEVANT AND RELIABLE ........... 24

VI.  CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AHP Subsidiary Holding Co.,*
1 F.3d 611, 618 (7th Cir. 1993) ..........................................................................................17

*Allen v. Conagra Foods, Inc.,*
No. 3:13-CV-01279-WHO, 2019 WL 3302821 (N.D. Cal. July 22, 2019).............................17

*Bielskis v. Louisville Ladder, Inc.,*
663 F.3d 887 (7th Cir. 2011) .................................................................................................10

*Broomfield v. Craft Brew Alliance, Inc.,*
Case No. 17cv1027-BLF, 22018 .........................................................................................17

*C. W. ex. rel. Wood v. Textron, Inc.,*
807 F.3d 827 (7th Cir. 2015) ...................................................................................................9

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)...............................................................................................11, 14, 16

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993)................................................................................................. passim

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,*
326 F.R.D. 592 (N.D. Cal. 2018).........................................................................................17

*GE v. Joiner,*
522 U.S. 136 (1997)................................................................................................................10

*Gopalratnam v. Hewlett-Packard Co.,*
877 F.3d 771 (7th Cir. 2017) .................................................................................................24

*Gopalratnam v. Hewlett-Packard Co.,*
C. A. No. 13-cv-618-PP, 2017 WL 1067768 (E.D. Wis. March 21, 2017).............................9

*Hadley v. Kellogg Sales Co.,*
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...............................................................................16

*Hilsley v. Ocean Spray Cranberries, Inc.,*
No. 17-CV-2335-GPC (MDD), 2019 WL 3006465 (S.D. Cal. July 10, 2019) ......................17

*In re Dial Complete Marketing and Sales Practices Litigation,*
320 F.R.D. 326 (D.N.H. 2017) ........................................................................................16, 18

*In re FCA US LLC Monostable Elec. Gearshift Litig.*
382 F. Supp. 3d 687 (E.D. Mich. May 22, 2019) ................................................................17

*In re General Motors LLC Ignition Switch Litig.*,
    Case Nos. 14-MD02543 (JMF), 2019 WL 3564698 (S.D.N.Y. Aug. 6, 2019).......................17

*In re MyFord Touch Consumer Litig.*,
    291 F. Supp. 3d 936 (N.D. Cal. 2018) ...................................................................................17

*Jiminez v. Allstate Ins. Co.*,
    Case No. 10-CV-08486 JAK (FEMx) (C.D. Cal. May 13, 2019) ..........................................22

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..........................................................................................................9, 10

*Lapsley v. Xtek, Inc.*
    689 F.3d 802 (7th Cir. 2012) .................................................................................................10

*Lees v. Carthage Coll.*,
    714 F.3d 516 (7th Cir. 2013) .................................................................................................19

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
    661 F. Supp. 2d 940 (N.D. Ill. 2009) ....................................................................................19

*Ortiz v. City of Chicago*,
    656 F.3d 523 (7th Cir. 2011) .................................................................................................19

*Schneider v. Chipotle Mexican Grill, Inc.*,
    328 F.R.D. 520 (N.D. Cal. 2018).....................................................................................13, 14

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) .................................................................................................10

*United States v. Pansier*,
    576 F.3d 726 (7th Cir. 2009) ............................................................................................9, 10

**RULES**

Fed. R. Civ. P. 26...........................................................................................................................21

Fed. R. Evid. 702 ................................................................................................................. passim

Fed. R. Evid. 703 ..........................................................................................................................24

Case 2:18-cv-01996-JPS   Filed 09/25/19   Page 4 of 30   Document 78

# I. INTRODUCTION

Plaintiff's experts Dr. Jon Krosnick and Colin Weir are highly qualified professionals and their respective testimony easily meets the relevance and reliability requirements of Fed. R. Evid. 702 and *Daubert*., Simply because CPF's experts disagree with their opinions does not make them inadmissible or even wrong. Experts disagree – but that is not the standard. Ultimately, the jury must decide which opinions are correct.[1]

Dr. Krosnick is an internationally renowned expert in survey research. He has written numerous peer-reviewed publications and he has created, performed and analyzed many surveys. His work in this case utilizes well accepted methodologies, which he applies to the facts particular to this litigation. Dr. Krosnick applied that expertise, experience, and analysis to the two survey research experiments he designed and conducted in this case. The first survey ("Damages Survey") studied whether providing consumers with factual information about:

1) the risk of heavy metals (arsenic, lead, cadmium and mercury) in CPF's Dog Food;

2) the risk of BPA in CPF's Dog Food;

3) the use of non-fresh ingredients in CPF's Dog Foods;

4) the use of non-regional ingredients in CPF's Dog Food; and

5) the use of third-party manufacturers to make ingredients in CPF's Dog Food affected the value of the Dog Food.

The second survey ("Pentobarbital Survey") studied whether providing consumers with information about the risk of pentobarbital in certain of CPF's dog foods affected their perceptions of the quality and healthiness of the dog food.

---

[1] CPF" refers to Champion Petfoods USA, Inc. and Champion Petfoods LP. "Dog Food" is identified in Paragraphs 7 and 26 of the Third Amended Complaint ("TAC").

1

543074.1

Both of these survey studies were scientifically designed, professionally undertaken and critically evaluated so that they delivered reliable information to support Plaintiff's theory of liability and damages against CPF. The Damages Survey found that the value of CPF's dog food decreased when CPF's false or misleading representations (all on the packaging labels) are corrected. Mr. Weir- who is a highly qualified economist in his own right- then used this decrease in value to determine damages. Although the Pentobarbital Survey did not add this additional analysis to determine damages based on the risk of pentobarbital in CPF's Dog Food, it also found that providing information about the risk of pentobarbital in CPF's Dog Food changed consumer perceptions of the healthiness and quality of the food. These survey results are directly tied to Plaintiff's claims in this case, and CPF offers nothing more than distorted portions of the record and speculation about the reliability of Dr. Krosnick's results in support of its motion. CPF does not (because it cannot) dispute Dr. Krosnick and Mr. Weir's education, experience, or other expert qualifications, and their arguments about Dr. Krosnick's survey design choices are appropriate for cross-examination at trial- not a basis to exclude his opinions entirely. CPF's motion should be denied.

## II.    BACKGROUND

Dr. Krosnick the Frederic O. Glover Professor of Humanities and Social Sciences and a Professor of Communication, Political Science, and (by courtesy) Psychology at Stanford University in Stanford, California, a Research Psychologist at the U.S. Census Bureau, and a Research Advisor of the Gallup Organization. He is highly accomplished in the field of survey design and analysis. No one disputes that. Plaintiff asked Dr. Krosnick to conduct two surveys to

support Plaintiff's claims in this case. *See* Ex. A[2] (Krosnick Report at 2-3 (summarizing Dr. Krosnick's extensive experience and research); *see also id.* at 69-170 (Curriculum Vita of Jon Krosnick). Both of these surveys satisfy Fed. R. Evid. 702 and *Daubert*. CPF's motion should be denied.

## III.    THE DAMAGES SURVEY

Dr. Krosnick's Damages Survey results demonstrate that when consumers are shown information correcting CPF's false or misleading statements (on the packaging labels) that its dog food is Biologically Appropriate, made with Fresh Regional Ingredients, and Never Outsourced, the consumers' perception of the market value of the dog food decreases (shorthanded by CPF as "BAFRINO"). Ex. A (Krosnick Report at 2, 29-31); Ex. C (Krosnick Dep. at 12:6-24).

To reach this conclusion, Dr. Krosnick designed and conducted a scientifically valid survey that collected information from nearly 7,000 respondents. Dr. Krosnick's survey population was a representative sample of U.S. adult consumers. Ex. A (Krosnick Report at 19). This is the appropriate population of interest for this survey based on the guidance from the Federal Trade Commission, which Dr. Krosnick considers "important thought leaders in the country on matters of consumer deception." Ex. C (Krosnick Dep. at 14:19-25). Dr. Krosnick has been hired by the FTC to work as an expert and to teach their staff how to conduct consumer deception surveys. *Id.* at 14:25-15:3.

Respondents were shown high resolution photographs of each side of either Orijen Six Fish or Acana Duck and Pear packaging. Ex. A (Krosnick Report at 33, 41). At the same time, they were shown, in typed paragraphs below the photos, all text that appeared on the side of the

---

[2] All citations to Exs. A through H are to the Declaration of David A. Coulson in Support of Defendants' Motion to Exclude the Opinions of Plaintiff's Expert Witnesses Dr. Jon A. Krosnick and Mr. Colin B. Weir, ECF No. 73 and 73-1 through 73-8.

packaging they were viewing. *Id.* at 41. This effectively provided them with all information about that particular product that they would have available to them when shopping in a brick and mortar store, including showing them the many times that CPF's packaging states that its food is Biologically Appropriate, made from Fresh Regional Ingredients, and Never Outsourced. Ex. C (Krosnick Dep. at 89:3-7) ("this whole section of the questionnaire is simply allowing them to look at the package and read the words on the package.").

The two packages Dr. Krosnick chose to use in his survey were identified after conducting a thorough analysis of the commonality amongst CPF's entire set of dog food labels. Each of CPF's labels state (multiple times) that the food is Biologically Appropriate, made from Fresh Regional Ingredients, and Never Outsourced. Ex. A (Krosnick Report at 38) (100% of the CPF foods at issue says Biologically Appropriate, Regional Ingredients, and Never Outsourced). It is undisputed that none of the packaging disclosed the risk of the presence of heavy metals and BPA or that many of the ingredients are ***not*** Fresh or Regional. *See e.g. id.* at 34-41.

After reviewing images of the dog food packaging and the text from the packaging, respondents were randomly assigned to be shown anywhere between zero and eight corrective statements. These corrective statements provide factual information that CPF's packaging does not- that its dog food has a risk of containing heavy metals and BPA and thus is not "Biologically Appropriate," that it contains ingredients that are not fresh and thus is not made with "Fresh [] Ingredients," and that it contains ingredients sourced from international locations as well as locations around the United States an is thus not made with "Regional Ingredients." *Id.* at 41-42. Contrary to CPF's assertions that Plaintiff's counsel drafted the corrective statements, the four corrective statements about heavy metals (lead, mercury, arsenic, and cadmium) and the corrective statement about BPA directly quote information from various governmental sources. *See Id.* at 41-

42; Ex. 1[3] ("Public Health Statement Cadmium," Agency for Toxic Substances & Disease Registry, September 2012); Ex. 2 ("Mercury and health," World Health Organization, March 31, 2017); Ex. 3 ("Lead in Food, Foodwares, and Dietary Supplements," U.S. Food and Drug Administration, Feb. 19, 2019); Ex. 4 ("Chemical Contaminant Rules," U.S. Environmental Protection Agenc7); Ex. 5 ("Bisphenol A (BPA): Use in Food Contact Application," U.S. Food and Drug Administration, June 27, 2018). CPF does not dispute the accuracy of this information, and, in fact, their expert Dr. Poppenga agreed that these statements are factually correct. Ex. 6 (Poppenga Dep. at 182:2-8, 183:24-184:3). Similarly, the corrective statements as to fresh, regional, and never outsourced are based on documents and testimony from CPF. *See* ECF No. 62 (Plf.'s Response to Defs.' Statement of Undisputed Material Facts and Statement of Additional Material Facts), at ¶¶109-111, 113-115, 116. Dr. Krosnick, whose undergraduate degree, master's degree, and Ph.D. are all in psychology, determined that these statements all accurately conveyed the information from the source material. Ex. A (Krosnick Report at 70); Ex. C (Krosnick Dep. at 20:24-22:3).

After viewing zero to eight of the corrective statements (creating control groups of respondents that either saw or did not see each corrective statement), survey respondents that owned or had ever owned a dog were asked whether they would purchase the CPF dog food they saw at one particular price. Ex. A (Krosnick Report at 42). The price points (MSRP, and MSRP plus or minus 5% or 10%) were chosen as the best available proxy for actual retail sales prices. Because CPF did not produce retail sales data for its products and such data is not available in any significant way from other sources, Dr. Krosnick used CPF's Manufacturer's Suggested Retail

---

[3] All citations to Exs. 1 through 14 are to the Declaration of Rebecca A. Peterson in Support of Plaintiff's Opposition to Defendants' Motion to Exclude the Opinions of Plaintiff's Expert Witnesses Dr. Jon A. Krosnick and Mr. Colin B. Weir, filed herewith.

Price ("MSRP"). Ex. C (Krosnick Dep. at 90:13-19) (describing that he used a range of prices around MSRP in his survey under the assumption that CPF knew what consumers were willing to pay in the real-world market); Ex. 7 (Hitt Dep. at 50:19-25) (CPF's expert Dr. hit acknowledging that retail price data was not available). Dr. Krosnick spoke with an expert in the pet food industry and was told that most sales of dog food tend to be within 10% of the MSRP. Ex. C (Krosnick Dep. at 80:11-21) ("I consulted with an expert in pet food who told me that, overwhelmingly, often consumers are paying manufacturer's suggested retail prices…"). Moreover, CPF itself instructed its distributors to ensure that retailer pricing of its products stayed within 10% of the MSRP. Ex. 8 (CPF2070652) (CPF 2017-2018 USA Retail Program Guide, stating that "In general, promotions should be based on value add only, where the offer should not exceed 10% of the MAP or MSRP price."). By using market prices that were actually charged to consumers as well as by holding the quantity of products sold fixed as a matter of history, Dr. Krosnick's results can be used to determine the diminution in value of the CPF Dog Foods in the but-for world (i.e. without CPF's misrepresentations). Ex. G (Weir Dep. at 41:22-43:9).

The data from this survey enabled Dr. Krosnick to calculate a diminution in value percent attributable to disclosure of the information in the corrective statements (i.e. the information that Plaintiff alleges must be made to consumers to correct the misrepresentations made by CPF). The analysis of the data showed the following decrease in value attributable to the corrective statements:

**Percent Decrease in the Value of the Product**

**With Increasing Numbers of Corrective Statements**

| Number of corrective statements | Percent decrease in value |
|:---:|:---:|
| 1 | -10.7% |
| 2 | -20.3% |
| 3 | -28.8% |
| 4 | -36.4% |
| 5 | -43.3% |
| 6 | -49.3% |
| 7 | -54.8% |
| 8 | -59.6% |

Ex. A (Krosnick Report at 30).

As Dr. Krosnick testified, there was no statistically significant difference (a key factor in analyzing survey data) in the effect of any of the corrective statements. Ex. C (Krosnick Dep. at 65:15-22) ("I saw no significant difference in the impact of the statements, so there is no analysis reported here in this report on that matter."). CPF's survey expert, Dr. Hanssens, agreed that Dr. Krosnick's calculations were accurate, *see* Ex. 9 (Hanssens Dep. at 40:7-16), and Dr. Hanssens agrees that Dr. Krosnick's results were statistically significant. *Id.* at 45:25-46:5.

Using Dr. Krosnick's analysis of the data generated from survey respondents that showed the change in the value of the Dog Foods (as expressed in percentages), Mr. Weir used his professional education and experience to calculate class damages. Ex. B (Weir Report at ¶9). He first determined the sales of each of the at-issue Dog Foods in Wisconsin during the Class Period. *Id.* at ¶¶25-34. Then he applied the diminution in value percentages obtained from Dr. Krosnick's survey results to calculate damages for each of the products, which he then summed to determine damages throughout the Class Period. *Id.* at ¶¶35-38. Mr. Weir also calculated what he called "Illegal Sales Damages" for the three CPF Dog Foods that had a risk of containing pentobarbital under a full refund damages theory. *Id.* at ¶¶39-41.

## IV. THE PENTOBARBITAL SURVEY

Dr. Krosnick also conducted a survey to determine how providing information about the risk of pentobarbital in certain CPF products affected consumer perceptions of the quality and healthiness of the dog food. Ex. A (Krosnick Report at 355). In other words, Dr. Krosnick assessed whether the risk of pentobarbital was material to consumers' purchasing decisions. Because it is illegal to sell any dog food with pentobarbital, (thus no percentage reduction in value would be appropriate), Dr. Krosnick did not ask purchase questions that would allow for a calculation of diminution in value. In this survey.

The Pentobarbital Survey was designed in a similar manner to the Damages Survey- a representative sample of U.S. adult consumers viewed all sides and text of the three CPF dog foods that had a risk of containing pentobarbital, and then respondents were shown either zero corrective statements or one of two corrective statements about the risk of the presence of pentobarbital. *Id.* at 354, 372. The two corrective statements were:

1) The dog food you saw may contain a drug called pentobarbital. According to the U.S. government, pentobarbital is used to calm animals, to put them to sleep, to reduce their feelings of pain, and to end their lives.

2) According to the U.S. government, the dog food you saw was made with meat products provided by a company that did not make sure to keep out meat from animals whose lives had been ended by giving them a drug called pentobarbital.

*Id.* at 372. Respondents were then asked questions about the health and quality of the food. Krosnick Report at 372.

Based on the survey results, Dr. Krosnick determined that informing consumers about the risk that pentobarbital could be present in CPF's dog food decreased their perceptions of the quality and healthiness of the food, thus demonstrating that this information is material to consumers. *Id.* at 364-365.

## V.     ARGUMENT

### A.     <u>LEGAL STANDARD</u>

Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharms., Inc*. 509 U.S. 579, 589 (1993), govern the admissibility of expert testimony. *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009); *Gopalratnam v. Hewlett-Packard Co.*, C. A. No. 13-cv-618-PP, 2017 WL 1067768 at *3 (E.D. Wis. March 21, 2017). Rule 702 permits the admission of expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Pansier*, 576 F.3d at 737 (quoting Rule 702). District courts are obligated to act as a "gatekeeper" to ensure that the expert testimony is both reliable and relevant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589; *see also C. W. ex. rel. Wood v. Textron, Inc.*, 807 F.3d 827, 836 (7th Cir. 2015) (holding that the district court takes on the role of gatekeeper in determining whether or not an expert's testimony is reliable). The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be

deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.* 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152).

To determine reliability, the proponent must show that the expert's testimony is based on "sufficient facts or data" and that it is "the product of reliable principles and methods." Fed. R. Evid. 702. The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *Kumho Tire*, 526 U.S. at 147-49. Expert testimony cannot be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also GE v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). District courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Pansier*, 576 F.3d at 737 (emphasis in original).

To determine relevance, the proponent must show that the expert's "reasoning or methodology properly can be applied to the facts in issue" and "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Daubert*, 509 U.S. at 592-93; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); Fed. R. Evid. 702.

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the district court considers whether the proffered expert (1) is qualified, (2) has employed a reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony that is relevant to the case at hand. *See Kumho Tire*, 526 U.S. at 151-53; *GE*, 522 U.S. at 146; *Daubert*, 509 U.S. at 589-93; *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Dr. Krosnick and Mr. Weir's opinions more than satisfy these considerations.

**B.   DR. KROSNICK's OPINIONS ARE RELEVANT UNDER FRE 702**

1.   Dr. Krosnick's Damages Survey Is Tied to Plaintiff's Claims

Plaintiff's claims in this case are based on the theory that CPF's BAFRINO representation is false or misleading. *See* ECF No. 60 at 7-8. To support Plaintiff's theory of damages for these claims (i.e. that Plaintiff and the Class members did not receive the benefit of the bargain when they purchased CPF's Dog Food), the eight corrective statements in Dr. Krosnick's Damages Survey test how information correcting each of CPF's false or misleading BAFRINO statements affect consumers' perception of the value of the Dog Food, thus meeting the *Comcast* requirement that damages be attributable to Plaintiff's legal theory. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). In fact, unlike the damages model at issue in *Comcast*, which was rejected because it did not distinguish between damages for various theories of liability, the results from Dr. Krosnick's damages survey are limited specifically to each separate theory of liability against CPF for each of its BAFRINO misrepresentations. *See id.* at 36-37. That is why Dr. Krosnick used eight corrective statements.

Each respondent in Dr. Krosnick's survey was shown all the text on the bag of Dog Food, including CPF's representations that its food is "Biologically Appropriate," made from "Fresh" ingredients, and made from "Regional" ingredients.[4] Ex. A (Krosnick Report at 38). CPF represents that "Biologically Appropriate" means that the food is fresh, natural, and contains food

---

[4] In a footnote, CPF notes that Dr. Krosnick's survey only showed respondents one of two types of CPF Dog Food- either Acana Duck and Pear or Orijen Six Fish, without noting any legal or scientific criticism of that aspect of Dr. Krosnick's design. Defs.' Br. at 16 n. 5. As clearly laid out in Dr. Krosnick's report, Dr. Krosnick compared these two bags of dog food to other CPF dog foods and concluded that these two bags contain the same BAFRINO misrepresentations as every other bag of CPF Dog Food at issue, and thus which specific formula respondents viewed is irrelevant to assessing damages attributable to CPF's misrepresentations. Krosnick Report at 38. CPF makes no attempt to dispute or challenge that conclusion.

dogs evolved to eat. ECF No. 62 (Plf.'s Response to Defs.' Statement of Undisputed Material Facts and Statement of Additional Material Facts), at ¶¶1, 100. Plaintiff alleges that this representation is false or misleading because CPF's Dog Food is not fresh, not regional, and has a risk of containing heavy metals[5] and BPA that do not nourish as nature intended. Therefore, to support Plaintiff's damages theory, the corrective statements in Dr. Krosnick's survey provided information to correct this misleading representation (that the Dog Food is not fresh, not regional, and has a risk of containing heavy metals and BPA that do not nourish as nature intended). Ex. A (Krosnick Report at 41-42).

Similarly, the corrective statement providing information that some ingredients may have been frozen is directly tied to CPF's representation that it uses "Fresh" ingredients, the corrective statement providing information that some ingredients are sourced from around the United States and internationally is directly tied to CPF's representation that it uses "Regional" ingredients, and the corrective statement providing information about CPF's use of third parties to process and manufacture protein meals and tallows is directly tied to CPF's representation that its food is "Never Outsourced." Each of the corrective statements therefore are tied directly to Plaintiff's theory of liability damages. The results of the survey show a diminished value associated with each of these disclosures. *Id.* at 29-31.

---

[5] CPF argues that because Plaintiff's Count One was dismissed (ECF No. 39), that Dr. Krosnick's corrective statements about heavy metals are irrelevant. That is not the case. Plaintiff's claim that "Biologically Appropriate" is misleading remains in the case, and the risk of the presence of heavy metals goes to that claim, as discussed above. Moreover, if the Court determines that Plaintiff's claims associated with any of the eight corrective statements cannot proceed, Dr. Krosnick can return to the data and survey results and determine the appropriate diminution in value percentage based on the number of corrective statements applicable to the remaining claims. *See* Ex. A (Krosnick Report at 30). Mr. Weir can then adjust his damages analysis accordingly.

The survey results Dr. Krosnick obtained showed that the percent diminution in value attributable to each of the eight corrective statements was essentially the same. Ex. C (Krosnick Dep. at 65:19-22) ("I saw no significant difference in the impact of the statements, so there is no analysis reported here in this report on that matter."). CPF attempts to distort this result to suggest that Dr. Krosnick manipulated the data in some way, but there is no evidence to support that assertion. To the contrary, CPF's own survey expert Dr. Hanssens admitted that that Dr. Krosnick's calculations are accurate, and he does not dispute that Dr. Krosnick properly reported the results of his survey data under his methodology. Ex. 9 (Hanssens Dep. at 40:7-16, 45:25-46:5). CPF argues, with no support from the factual record or from its own experts, that survey respondents could not possibly have reacted the same to corrective statements about heavy metals and statements about the origin of ingredients. ECF No. 72 ("Defs.' Br.") at 18. But the data shows what it shows, and CPF's speculation cannot refute the admittedly correct analysis to the contrary. Of course, as Dr. Hanssens admitted, CPF and its experts could have conducted their own survey to use as evidence in support of this argument, but it did not. *Id.* at 39:12-18) (Q: And you didn't do any independent survey of consumers with respect to the allegations in this case. Correct? You didn't do your own survey to find out what effects these [corrective] statements may have on consumers. Correct? A: That's correct. Q: You could have. A: I suppose so."). Speculation by CPF is far from a compelling reason to exclude Dr. Krosnick's Damages Survey.

Finally, CPF's attempt to distinguish Dr. Krosnick's work in *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520 (N.D. Cal. 2018), where the Court found Dr. Krosnick's survey work and related opinions admissible, is unpersuasive. There, the court found that Dr. Krosnick's survey was consistent with plaintiffs' liability theory even though the survey did not show respondents the product at issue both with and without the "non-GMO" claim, but rather

showed some respondents a corrective statement about the presence of GMOs in the products. *Chipotle*, 328 F.R.D. at 541. This is identical to what Dr. Krosnick did in his Damages Survey here. Respondents were randomly selected to view information correcting CPF's BAFRINO misrepresentations, thus tying the survey results to Plaintiff's theory of liability. As discussed further below, CPF's contentions that Dr. Krosnick's Damages Survey did not use a control group and that Dr. Krosnick did not pre-test his survey are not true or irrelevant. Like in *Chipotle*, because the Damages Survey is relevant, any issues about Dr. Krosnick's survey design go "to the weight of Dr. Krosnick's opinions, rather than to their admissibility." *Id.* at 543.

The corrective statements used in the Damages Survey are directly tied to Plaintiff's claim that CPF's BAFRINO representations on its packaging are misleading and deceptive, and thus Dr. Krosnick's survey design satisfies *Comcast* and will "help the trier of fact" under Rule 702. Informing consumers about these misrepresentations (through the eight factually truthful corrective statements used in Dr. Krosnick's Damages Survey) causes a decrease in the value of the Dog Foods that can then be used to determine damages. To suggest that this is untethered from Plaintiff's theory of liability is simply not true.

> 2.    Dr. Krosnick's Damages Survey Measures Consumers' Change in Value of CPF's Dog Foods

Contrary to CPF's argument, Dr. Krosnick's Damages Survey determined the diminution in value associated with correcting CPF's BAFRINO misrepresentations. *See* Ex. A (Krosnick Report at 5) ("I have reached the conclusion, based on a survey that I conducted, that providing corrective information to consumers… decreased the apparent quality and healthiness of Champion dog foods and ***decreased the economic value*** of the dog foods to consumers by specific, measurable amounts.") (emphasis added). To find this decrease in economic value, respondents were shown a package of CPF dog food, shown between zero and eight of the corrective

statements, and then asked if they would purchase that dog food at a particular price (either MSRP, +/- 5% of MSRP, or +/-10% of MSRP). *See* Ex. A (Krosnick Report at 41-43). Using price levels based on the MSRP allowed Dr. Krosnick to measure the change in market value associated with learning about CPF's various misrepresentations. This diminution in value percentage, when applied to the market prices that Plaintiff and Class members paid for CPF's dog food products was then used by Mr. Weir to determine the damage suffered by each Plaintiff and Class member.

Dr. Krosnick did not "ignore[] supply-side considerations" as CPF claims. Defs.' Br. at 23. In cases like this where damages are measured as what consumers would have paid for CPF's dog food in the but for world (i.e. absent CPF's misrepresentations), the only difference between the real world transactions that occurred and the hypothetical but for world where diminution in value can be measured by comparison to the real world market prices, the only difference should be the absence of the misrepresentations (and thus a changed market price). Ex. G (Weir Dep. at 108:18-109:13) (the but-for is as one where "things remain the same, other than the market value of those products and consumers being told the truth about those products.").

Dr. Krosnick worked with Plaintiff's damages expert, Mr. Weir, who is an experienced economist, to ensure that the relevant supply-side factors were incorporated into his study. *Id.* at 41:22-43:9. Mr. Weir asked that Dr. Krosnick use a range of real-world prices in his survey and that he assume the quantity of supply to be fixed as a matter of history when analyzing the survey results. *Id.* Dr. Krosnick did so, thus making it "possible to use the results of this survey to calculate damages in this case." Ex. A (Krosnick Report at 31). Using real-world market prices takes into account all of the supply-side factors that CPF contends must be considered- cost of production,

cost of goods sold, and willingness to sell.[6] *See* Ex. G (Weir Dep. at 103:3-104:1) ("Q: If I am understanding you correctly, you just said that the supply side factors are reflected in the price that consumers paid for dog food; is that right? A: Correct. Q: What are some of the supply side factors that are reflected in that price? A: We could probably go on for days listing different ways that you could describe those, but for example, cost of production, that's going to be included. Cost of retailing, that's going to be included. Any of the things that comprise the supply side of the market, to the extent that they have any impact on price at all, are reflected in those historic prices that consumers actually paid."). Holding the quantity sold fixed as a matter of history, in conjunction with using market prices, allows the but-for world to be assessed by holding constant the supply side conditions that were actually present in the market, including what competition was present, what retailing costs were present etc. Ex. G (Weir Dep. at 110:7-20).

Courts have held that these two factors- real world market prices and holding quantity supply fixed- adequately accounts for supply side factors for surveys determining diminution in value using a consumer survey. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("[C]ourts have also found that [survey] analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premium without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period."); *In re Dial Complete Marketing and Sales Practices Litigation*, 320 F.R.D. 326 (D.N.H. 2017)

---

[6] Although two of CPF's experts- Dr. Hanssens and Dr. Hitt- criticized Dr. Krosnick's survey for allegedly failing to consider supply side factors, neither of these experts made any attempt to calculate the change in supply curve in the but-for world and, in fact, both suggested that information necessary to do so was not even available to them. Ex. 9 (Hanssens Dep. at 137:7-138:12); Ex. 7 (Hitt Dep. at 81:1-19).

16

(approving a survey where "the supply element of the supply and demand price function is fixed" and is included in the market price paid for the product at issue); *Broomfield v. Craft Brew Alliance, Inc*., Case No. 17cv1027-BLF, 22018 WL 4952519, at \*18-19 (N.D. Cal. Sept. 25, 2018); *In re MyFord Touch Consumer Litig*., 291 F. Supp. 3d 936, 969-71 (N.D. Cal. 2018) (finding that the [survey] analysis adequately accounted for supply-side factors "by assuming that the supply—the quantity—was fixed"); *In re FCA US LLC Monostable Elec. Gearshift Litig*.382 F. Supp. 3d 687, 702 (E.D. Mich. May 22, 2019); *AHP Subsidiary Holding Co.*, 1 F.3d 611, 618 (7th Cir. 1993) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, [citation omitted], such situations will be rare…"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018), *leave to appeal denied*, No. 18-80081, 2018 WL 4922825 (9th Cir. Sept. 18, 2018), *and reconsideration denied sub nom*, *Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, No. 17-CV-00564-NC, 2018 WL 5793479 (N.D. Cal. Nov. 2, 2018) ("Here, the conjoint survey used actual market-clearing prices as the basis for the prices in the survey, actual competitor products, and actual label claims on those products… the conjoint survey "was performed in a market that is long-established and efficient, where retailers' pricing is responsive to market forces," and [] it took into account the fixed quantity of supply… because those sales occurred in the past… Therefore, it does appear that plaintiffs calculated the price premium consumers paid… and not just a theoretical willingness to pay. The price premium study therefore passes muster under *Daubert* and Federal Rule of Evidence 702."); *Allen v. Conagra Foods, Inc.*, No. 3:13-CV-01279-WHO, 2019 WL 3302821, at \*23 (N.D. Cal. July 22, 2019); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-CV-2335-GPC(MDD), 2019 WL 3006465, at \*5 (S.D. Cal. July 10, 2019). Thus, unlike in *In re General Motors LLC Ignition Switch Litig.*, Case Nos. 14-MD02543

(JMF), 2019 WL 3564698 (S.D.N.Y. Aug. 6, 2019), Dr. Krosnick did in fact properly account for the supply side and was not solely looking at willingness to pay a premium.

In the *Dial* case, the court discussed how plaintiff's survey expert did in fact account for the supply side by relating the analysis to the actual market in which the products at issue were sold. 320 F.R.D. at 334-337. The court noted that if plaintiffs were required to determine damages after calculating the shift in the supply curve that would occur with the shift in the demand curve associated with the decrease in price consumers would pay for the products after learning of the misrepresentations, "that approach can be expected to describe a price for the product at a point on the quantity sold axis below (perhaps significantly) the point that represents the actual number of offending products sold to class consumers in the actual market." *Id.* at 336. Thus, the proper question is (which Dr. Krosnick's survey asked and answered), "[a]t what price in [the]actual market… could [the defendant] have sold the equivalent number of products without the false claim(s)?" *Id.*[7] This is why the use of market prices and holding quantity sold fixed properly accounts for the supply side when determining a price premium in a misrepresentation case.

---

[7] The court in *Dial* noted that another key factor in finding that the supply side was adequately considered in the survey at issue was that it offered survey respondents the opportunity to say they would not buy the product at the offered price, therefore ensuring that the willingness to pay of the marginal consumer (i.e. the one that is indifferent between buying and not buying the infringing product) is being measured. *Dial*, 320 F.R.D. at 336 (quoting Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), http://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases)). In Dr. Krosnick's survey, respondents could indicate that they would either buy or not buy the product shown to them at a particular price after viewing between zero and eight corrective statements. Ex. A (Krosnick Report at 41-43).

18

## C.  DR. KROSNICK'S SURVEYS AND OPINIONS ARE RELIABLE UNDER RULE 702

CPF argues that Dr. Krosnick's surveys are unreliable for a host of reasons, all of which go to the weight rather than the admissibility of Dr. Krosnick's opinions. Rule 702 is not intended to "supplant the adversarial process," where evidence can be tested through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lees v. Carthage Coll.*, 714 F.3d 516, 526 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 596; *Ortiz v. City of Chicago,* 656 F.3d 523, 536 (7th Cir. 2011)); *see also LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 956 (N.D. Ill. 2009) ("Evaluating technical deficiencies and awarding weight to [survey] evidence is the province of the trier of fact.").

### 1.  Dr. Krosnick Surveyed the Appropriate Population

Dr. Krosnick's Damage Survey gathered data from a representative sample of U.S. adult consumers. This is the appropriate sample for his survey based on the FTC Guidelines. Ex. 10 ("FTC Policy Statement on Deception," Oct. 14, 1983). According to the FTC's consumer survey guidelines, a survey researcher should look at both the "reasonable consumer," which is all consumers in the country, as well as the subpopulation that has been the target for a particular good. Ex. C (Krosnick Dep. at 15:4-16); Ex. 10 (FTC Policy Statement on Deception) ("The Commission believes that to be deceptive the representation, omission or practice must be likely to mislead reasonable consumers under the circumstances. The test is whether the consumer's interpretation or reaction is reasonable."). Limiting the survey population to only those people who purchased CPF's dog food is inappropriate because they are the people who "fell for the deception," so you also need to understand the views of people who are in the target market for the good. Ex. C (Krosnick Dep. at 15:14-16:3). For this to be a scientifically valid survey, it could not simply focus on people who purchased CPF's dog food. *Id.* at 18:1-2.

Even assuming that Dr. Krosnick's use of the FTC Guidelines was improper, CPF's reliance on Dr. Hanssens to support its argument that "consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase" is simply speculation and it not based on science. Dr. Hanssens did not conduct any survey research of his own to reach any of his opinions- he simply speculates that had Dr. Krosnick used a different survey population that the results would have been different, yet he has no data to support that assumption. Ex. 9 (Hanssens Dep. at 39:12-18) Moreover, CPF does not allege that the responses of people that had purchased CPF food in the past differed from the responses of those that had not, or that the responses of people from Wisconsin differed from the responses of people from other states. If there is no difference in the results between the groups of people that CPF alleges were improperly included in Dr. Krosnick's survey sample, CPF's expert Dr. Hanssens admitted that there is no evidence of any issue with the survey population. *Id.* at 88:16-89:2.

Dr. Krosnick surveyed the relevant population and this is an issue for cross-examination, not a basis to exclude Dr. Krosnick's surveys.

2. <u>Dr. Krosnick's Survey Has Control Groups</u>

Dr. Krosnick, as an expert in the design and analysis of surveys, included a control group in his Damages Survey. Ex. A (Krosnick Report at 6-9) (discussing the importance of randomization in survey research) In the Damages Survey, respondents were randomly assigned to either see or not see each of the eight corrective statements. *Id.* at 41 ("The display of each piece of information was independently randomly assigned to sample members before they started answering the questionnaire… Thus, for each corrective statement, each respondent was randomly assigned to either see it or not see it."). Thus, the control group for each corrective statement is the 50% of respondents that did not see that particular corrective statement, meaning that for each

corrective statement there is a test group and a control group. Ex. 14 (Krosnick Dep. (8/27/19) at 32:17-33:6).

CPF blindly ignores Dr. Krosnick's clear testimony on this issue and seeks to misdirect the Court about the design of Dr. Krosnick's study. CPF explicitly asked Dr. Krosnick what the control group was in his Damages Survey, and Dr. Krosnick testified, "As I said in the last deposition…. each corrective statement- there are eight of them- are randomly assigned either to be presented to the respondent or not, and so half of the respondents saw corrective statement number one, half did not. The half that did not are the control group for the effect of statement number one." *Id.* at 32:17-33:16.

The argument that Dr. Krosnick's design does not "provide a reliable benchmark" to determine the effects of each corrective statement is offered without any legal or expert support. Defs.' Br. at 28 (citing Ex. E (Hanssens Report at ¶34 n.50)), which concludes that the portion of survey respondents that did not see a corrective statement is not a proper control group yet citing no authority for that conclusion). CPF was provided with all of Dr. Krosnick's raw survey data, pursuant to Fed. R. Civ. P. 26. Its experts could have conducted the analysis comparing the half of respondents that saw each corrective statement to the other half of respondents that do not. CPF either did not do this analysis or did so and realized that Dr. Krosnick did in fact make such comparisons in his own analysis of the data and it did not change his results.

Again, Dr. Krosnick's Damages Survey did in fact have control groups and thus CPF's argument should be rejected, but, regardless, this attack is proper for cross-examination and not a basis to exclude Dr. Krosnick's opinions.

3.     <u>Dr. Krosnick's Surveys Are Not Biased</u>

Dr. Krosnick took great care to design the Damages Survey and Pentobarbital Survey to prevent any potential for bias in the results. As discussed above, the corrective statements used in

Dr. Krosnick's survey contain factually accurate information quoted directly from government sources (for heavy metals and BPA), pulled from government sources (for pentobarbital), or obtained through discovery in this action. *See supra* Background. Any argument by CPF that these statements resulted in cognitive biases or frightened survey respondents are purely speculative. CPF's survey expert Dr. Hanssens did not do any testing to determine how respondents interpreted the corrective statements or do his own survey research using corrective statements that he believed would not bias respondents. Ex. 9 (Hanssens Dep. at 55:25-56:3, 56:17-58:8, 59:17-21) (Q: You didn't do any survey to measure the bias by using different or more complete or more clear or less leading corrective statements, yes? A: Yes."); Ex. 11 (Hanssens Dep. 9/18/19 at 59:6-21) (same with respect to the Pentobarbital Survey).

CPF's criticism about how the corrective statements were presented is similarly unsupported. Again, CPF offers no evidence showing that any "focusing illusion bias" is present. Dr. Hanssens simply speculates that the manner in which the corrective information was shown to survey respondents may have caused some bias. Ex. 9 (Hanssens Dep. at 54:2-9, 55:25-56:6). CPF is free to explore these issues with Dr. Krosnick on cross-examination at trial, but the Court should not exclude Dr. Krosnick's opinions based on CPF's speculation about his survey design.[8]

### 4. Pre-Testing Is Not Required for a Scientifically Valid Survey

Although pre-testing a survey may occasionally assist the researcher in improving "the clarity of communication with respondents," pre-testing is not required for a survey to be valid for purposes of Rule 702 and *Daubert*, and CPF does not cite any case law to the contrary. *See*

---

[8] CPF notes that Dr. Krosnick's opinions were recently excluded in another case- *Jiminez v. Allstate Ins. Co.*, Case No. 10-CV-08486 JAK (FEMx) (C.D. Cal. May 13, 2019) [D.E. 334]. *See* Defs.' Br. at 31, n. 13. However, what CPF does not say is that the *Jiminez* case is a wage and hour litigation in which Dr. Krosnick conducted some survey research of employees at the defendant company. It was not at all related to the type of survey he conducted in this matter.

Reference Manual on Scientific Evidence at 388-389. Dr. Krosnick himself noted that although surveys can benefit from pre-testing, it was not required for either the Damages Survey or Pentobarbital Survey because "[t]he questions used in the survey are like questions that have been used in many other surveys that [Dr. Krosnick has] been involved in, and so there was no pretest done for this particular questionnaire…" Ex. C (Krosnick Dep. at 51:11-17; Ex. 14 (Krosnick Dep. 8/27/19 at 14:23-15:12).

Even so, for the Damages Survey, Dr. Krosnick conducted a "soft launch," meaning that approximately 1,059 people were invited to participate in the survey before the rest of the respondents. Ex. A (Krosnick Report at 43). Dr. Krosnick did not receive any feedback during that soft launch period to indicate that respondents were confused by any portion of the questionnaire. Ex. C (Krosnick Dep. at 51:11-21, 52:19-53:11). The lack of a formal pretest is irrelevant to the reliability of Dr. Krosnick's opinions and, again, goes to the weight of his testimony, not the admissibility.

        5.        Dr. Krosnick's Use of the Lewbel-Watanabe Estimation Approach is Reliable

To interpret the results of the Damages Survey, Dr. Krosnick used the Lewbel-Watanabe estimation approach. Ex. A (Krosnick Report at 51). Contrary to CPF's arguments, this is not a "novel" approach. The Lewbel-Watanabe approach was used in a publication in the journal *Science*, which is arguably the most prestigious journal in the science field, with an impact factor of 41, meaning it is very impactful and respected. Very few journals have higher impact factors. Ex. 12 ("High Impact Journals," National Institute of Environmental Health Sciences). Additionally, the paper by Dr. Lewbel that developed this estimation method has been cited 333 times in published literature. *See* Ex. 13. Dr. Krosnick's use of the Lewbel-Watanabe estimation

method is far from novel- in fact it is generally accepted in the field- and there is no reason to exclude his Damages Survey based on its use.

### D.  MR. WEIR'S DAMAGES OPINIONS ARE RELEVANT AND RELIABLE

Mr. Weir, an economist, calculated diminution in value damages related to Plaintiff's claims that CPF's BAFRINO representations are false or misleading and also calculated illegal sales damages associated with the sale of CPF Dog Foods that had a risk of pentobarbital contamination. Dr. Krosnick's Damages Survey results were used as an input in Mr. Weir's Diminution in Value calculation whereby Mr. Weir determined the sales of the relevant CPF Dog Foods and then used the Diminution in Value percentages to calculate damages. Ex. B (Weir Report at ¶¶35-38).

CPF's only argument for the exclusion of Mr. Weir's opinions is that his damages calculation relies on Dr. Krosnick's survey results, which CPF contends are unreliable. However, it is entirely proper for Mr. Weir to rely on Dr. Krosnick's conclusions to support his opinions. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) ("there is nothing objectionable about an expert relying upon the work a colleague…") (citing cases); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed.") (emphasis added). Given the above arguments opposing CPF's motion to exclude Dr. Krosnick, Mr. Weir's damages opinions are similarly reliable and should not be excluded.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that CPF's motion to exclude the opinions of Dr. Krosnick and Mr. Weir be denied.

Dated: September 25, 2019

LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By s/ Rebecca A. Peterson

CHARLES N. NAUEN, #1031943
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: cnnauen@locklaw.com
rkshelquist@locklaw.com
rapeterson@locklaw.com


GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
KARLA M. GLUEK
RAINA C. BORRELLI
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com


ROBBINS ARROYO LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com
smckany@robbinsarroyo.com

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

PETERSON LAW and MEDIATION, LLC
Mark A. Peterson (Wisconsin SBN 1016259)
1433 N Water Street, Suite 400
Milwaukee, WI 53202
Telephone: (414) 877-7312
Email: mark@markpetersonlaw.com

*Attorneys for Plaintiff*