# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **SCOTT WEAVER,** individually and on behalf of all others similarly situated,<br><br>    **PLAINTIFF,**<br><br>v.<br><br>**CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP,**<br><br>    **DEFENDANTS.** | Case No. 2:18-cv-01996-JPS |

**PLAINTIFF'S LOCAL RULE 7(j) APPENDIX OF UNPUBLISHED AUTHORITIES IN SUPPORT OF HIS MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS, LORIN M. HITT, PURSUANT TO FEDERAL RULES OF EVIDENCE 702 AND 403**

## INDEX

| EXHIBIT | AUTHORITY |
|---|---|
| Exhibit 1: | *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, No. 07 C 4718, 2010 WL 1687883 (N.D. Ill. Apr. 26, 2010) |
| Exhibit 2: | *Empire Med. Review Servs., Inc. v. CompuClaim, Inc.*, No. 13-CV-1283, 2018 WL 5823660 (E.D. Wis. Mar. 16, 2018) |
| Exhibit 3: | *Guido v. L'Oreal USA, Inc.*, No. 2:11-cv-1067-CAS (JCx), 2014 WL 6603730 (C.D. Cal. July 24, 2014) |
| Exhibit 4: | *Loontjens v. Sentry Ins.*, No. 13-CV-1217-JPS, 2014 WL 5305893 (E.D. Wis. Oct. 15, 2014) |

Dated: October 4, 2019

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By s/ Rebecca A. Peterson
CHARLES N. NAUEN, #1031943
ROBERT K. SHELQUIST
REBECCA A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: cnnauen@locklaw.com
rkshelquist@locklaw.com
rapeterson@locklaw.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
KARLA M. GLUEK
RAINA C. BORRELLI
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com

ROBBINS ARROYO LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com
smckany@robbinsarroyo.com

2

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
scruzhodge@litedepalma.com

PETERSON LAW and MEDIATION, LLC
Mark A. Peterson (Wisconsin SBN 1016259)
1433 N Water Street, Suite 400
Milwaukee, WI 53202
Telephone: (414) 877-7312
Email: mark@markpetersonlaw.com

*Attorneys for Plaintiff*

3

# EXHIBIT 1

KeyCite Yellow Flag - Negative Treatment

Distinguished by Uncommon, LLC v. Spigen, Inc., N.D.Ill., March 26, 2018

2010 WL 1687883
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. Illinois,
Eastern Division.

BOBAK SAUSAGE COMPANY, Plaintiff,
v.
A & J SEVEN BRIDGES, INC., d/b/a Bobak's Signature Events, an
Illinois Corporation, and John Bobak and Anna Zalinski, Defendants.

No. 07 C 4718.
|
April 26, 2010.

**Attorneys and Law Firms**

Ethan F. Hayward, Lowis & Gellen, LLP, Marcos Reilly, Stephen Devereux Vernon, Hinshaw & Culbertson LLP, Chicago, IL, for Plaintiff.

Annette Michele McGarry, Marianne C. Holzhall, McGarry & McGarry, LLC, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

ROBERT M. DOW, JR., District Judge.

**\*1** This matter is before the Court on Defendants' motion [52] to exclude the expert testimony of Plaintiff's witness, Thomas J. Callahan, pursuant to Federal Rule of Civil Procedure 702. For the reasons explained below, Defendants' motion [52] is respectfully denied without prejudice.

## I. Background

### A. The Parties

Plaintiff Bobak Sausage Company ("BSC") is an Illinois corporation that manufactures, markets, and sells a variety of wholesale and retail food products. BSC owns three federally registered trademarks, but alleges infringement only of Bobak's word mark ("the Mark"). BSC provides retail grocery, deli, restaurant, and catering services under the marks, and has its principal place of business in Chicago. BSC and its predecessors have used the Mark in commerce continually since 1967, and the Mark has been federally registered by BSC on the Principal Register since 2004.

Defendant A & J Seven Bridges, Inc. ("A & J") is an Illinois corporation that provides banquet hall, conference center, and food catering services at its location at 6440 Double Eagle Drive in Woodridge, Illinois, under the mark "Bobak's Signature Events (and Conference Center at Seven Bridges)". Defendants (and siblings) John Bobak and Anna Zalinski operate the conference center. [1] A & J's events consist of approximately forty-five percent corporate functions and fifty-five percent family social

events such as weddings and anniversaries. A & J serves steak, chicken, and seafood dishes, and, prior to the commencement of this lawsuit, occasionally served BSC sausage as an appetizer. Most of A & J's patrons either are customers who patronized the business before A & J purchased it or are referrals from those patrons. However, A & J also advertises through its website and in local wedding materials.

### B. The Lawsuit

Early in 2005, BSC orally granted A & J a limited license to use the Mark as part of its d/b/a "Bobak's Signature Events." The license was terminable at will and was conditioned upon A & J's execution of a formal written trademark license agreement. Since at least April of 2005, A & J has used the registered trademark "Bobak's" as part of its trade name for banquet and catering services. BSC alleges that since it granted the oral license in January 2005, it has repeatedly (albeit unsuccessfully) demanded that A & J execute a formal written license agreement. In October 2006, BSC provided A & J with a draft formal trademark license agreement with BSC, but A & J did not execute that agreement. On July 10, 2007, Plaintiff sent A & J a formal notice of termination of the alleged license agreement. Despite that notice and repeated demands to cease and desist, A & J continues to use the "Bobak's" name.

### C. The Survey

BSC hired Amplitude Research to develop and analyze a trademark confusion survey. Thomas J. Callahan is a senior consultant for Amplitude Research. Callahan has never developed a trademark confusion survey, nor has he ever served as an expert witness. However, Callahan has designed more than 100 academic, governmental, and commercial surveys. Amplitude, in turn, hired Communications Center, Inc. ("CCI") to conduct the actual survey.

**\*2** The survey consisted of eight questions that were asked of 360 participants. In total, eight thousand calls were made. Two questions were targeted toward understanding the participants' familiarity with the companies and six questions measured the participants' perceptions concerning the products. The participants were selected using a random digit dial sample drawn from the population of the Chicago Metropolitan Statistical Area and reflect census data quotas. The surveyors only contacted households, not businesses.

The survey did not use threshold questions, such as "Are you in the market to buy sausage and rent a banquet facility?" in order to locate and utilize potential purchasers. Additionally, Callahan did not use a third product as a "control." According to Callahan, his controls were the "familiarity" questions and statistical controls that would reveal random guessing. Because the survey was conducted over the phone, the participants did not see the trademarks in question. The marks referred to in the survey were "Bobak's brand food products" and "Bobak's Signature Events." The surveyors did not inform the participants what products and services each company provided.

The participants answered according to a scale (provided by the surveyor), ranging from strongly agree to strongly disagree. The surveyors asked follow-up questions to ascertain why the participants answered as they did. Verbatim responses to the questions were coded and tabulated by Amplitude. After analyzing the survey, Callahan concluded that 31%-43% of the participants "agree it is likely that Bobak's brand food products and Bobak's Signature Events have the same ownership, management, or products" and 7%-13% of the participants "agreed it is unlikely that the two businesses share ownership, management, or products."

## II. Analysis

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), provide the legal framework for the admissibility of expert testimony. See *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir.2009). Rule 702 permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Rule 702 requires that the district court act as a " 'gatekeeper' who determines whether proffered expert testimony is

reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.,* 498 F.3d 734, 741-42 (7th Cir.2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 749 (7th Cir.2006)); see also *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert,* 509 U.S. at 589; *Jenkins v. Bartlett,* 487 F.3d 482, 488-89 (7th Cir.2007).

To determine reliability, "the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive at a particular conclusion." *Pansier,* 576 F.3d at 737 (citing *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000)); see *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007). *Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology-including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert* at 593-94. "[T]he test of reliability is flexible," however, "and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho,* 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142; see also *Pansier,* 576 F.3d at 737 (the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable.") (citing *Jenkins,* 487 F.3d at 489); *Lewis,* 561 F.3d at 704-05 ("the law grants the district court great discretion regarding the manner in which it conducts that [*Daubert* ] evaluation.").

**\*3** In addition, in considering Defendants' motion, it is important to bear in mind the Seventh Circuit's teaching about the critical distinction between a jury trial and a bench trial with respect to the Rule 702 inquiry:

> Where the gatekeeper and the factfinder are one and the same-that is, the judge-the need to make such decisions prior to hearing the testimony is lessened. See *United States v. Brown,* 415 F.3d 1257, 1268-69 (11th Cir.2005). That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem,* 465 F.3d 767, 777 (7th Cir.2006); see also *United States v. Brown,* 415 F.3d 1257, 1269 (11th Cir.2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself"). Under this sensible approach, where there is no jury demand, and therefore the judge will be the trier of fact at trial, the Court may choose to (i) allow the presentation of borderline testimony, (ii) subject the testimony to the rigors of cross-examination, and (iii) decide later whether the testimony is entitled to some consideration or whether it should be excluded as irrelevant, unreliable, or both.

### A. Qualifications

Thomas Callahan has a B.A. in Economics from the University of Missouri, an M.A. in Psychology from the University of Missouri, an M.B.A. from Michigan State University, and a Ph.D. in Business Administration, concentrating in Organizational Behavior and Strategic Management, from Michigan State University. He is an Associate Professor at the University of Michigan. As noted above, Callahan has never developed a trademark confusion survey, nor has he ever testified as an expert witness; however, he has designed more than 100 academic, governmental, and commercial surveys. In Defendants' initial brief, they appear to challenge Callahan's qualifications to offer expert testimony in this matter. In their reply brief, they do not address

his qualifications, but rather focus on the reliability of the survey. In the interest of completeness, the Court briefly addresses Callahan's qualifications.

Federal Rule of Evidence 702 allows parties to introduce expert opinions if the expert is qualified by "knowledge, skill, experience, training, or education." Anyone who has relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness. See *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir.2000). In assessing an expert's qualifications, a court should consider the proposed expert's full range of experience and training. *LG Electronics U.S.A., Inc. v. Whirlpool Corp.,* 661 F.Supp.2d 940, 951 (N.D.Ill.2009); *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1218 (7th Cir.1997). Experts can be qualified based on experience alone. Shari Seidman Diamond, *Reference Guide on Survey Research,* in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 238 (2d ed. 2000) ("FJC REFERENCE MANUAL"). However, in regard to surveys, education in psychology, marketing, and communication, or other related fields, may be pertinent. *Id.* At the very least, the survey expert must understand "survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis." *Id.*

**\*4** An expert witness should not be precluded from testifying simply because he has never testified as an expert witness. In fact, many courts have expressed more concern about expert witnesses who have too much-not too little-experience as witnesses in court. See *Daubert v. Merrrell Dow Pharmaceutical, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995); *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.,* 958 F.2d 1169, 1174-1175 (1st Cir.1992); *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 800 (4th Cir.1989); *In re Air Crash Disaster At New Orleans, La.,* 795 F.2d 1230, 1236 (5th Cir.1986).

On balance, the Court concludes that Callahan has the "knowledge, skill, experience, training, or education" that Rule 702 mandates from experts. Callahan has written questionnaires and analyzed data since 1985. In addition, Callahan's curriculum vitae states that he has written surveys for more than twelve years, and Callahan testified that he designed more than 100 surveys in his career. Although Callahan could be qualified based on his experience alone, his academic career-a Master's Degree in Psychology and a Doctorate in Philosophy in Organizational Behavior and Strategic Management-enhances his qualifications. To be sure, Callahan has never created nor analyzed a trademark survey. Callahan has performed limited research regarding trademark surveys, which detracts from his ability to transfer his experience and education to professional testimony. Nevertheless, he is educated in relevant fields and his professional experience, deposition, and survey report reflect that he has sufficient understanding of survey methodology, instrument design, and statistical analysis to be qualified for the purpose of giving opinion testimony under Rule 702.

### B. Reliability

To meet Rule 702 and *Daubert's* standard of reliability, a survey offered to establish the likelihood of consumer confusion must "have been fairly prepared and its results directed to the relevant issues." *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272 (S.D.N.Y.1990) (citations omitted); see also *Coors Brewing Co. v. Anheuser-Busch Co., Inc.,* 802 F.Supp. 965, 972 (S.D.N.Y.1992) ("The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself."). "The criteria for the trustworthiness of survey evidence are that: (1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise, and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured." *Weight Watchers Int'l, Inc.,* 744 F.Supp. at 1272 (collecting cases). Although these criteria generally address the weight that a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant, and thus inadmissible. See, e.g., *Evory v. RJM Acquisitions Funding LLC,* 505 F.3d 769, 776 (7th Cir.2007) ("survey evidence

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

4

in debt-collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible").

**\*5** Consumer surveys frequently are used by litigants as a means of attempting to show likelihood of confusion in a trademark case. *Simon Property Group, L.P. v. mySimon, Inc.,* 104 F.Supp.2d 1033, 1038 (S.D.Ind.2000). To be admissible, consumer survey results must be presented through expert witnesses. *Id.* at 1039. "No survey model is suitable for every case. At bottom, however, a survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Id.* at 1038; see also 5 MCCARTHY ON TRADEMARKS § 32:163 at 32-237 (4th ed.1999) ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results"); *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1245-46 (9th Cir.1984) (even where marks were identical when viewed in isolation, determination of likely confusion required consideration "in light of the way the marks were encountered in the marketplace and the circumstances surrounding the purchase of the pens," which sufficed to distinguish the two marks except in context of telephone solicitation, where such distinctions were not evident).

Trademark confusion measures whether a potential purchaser who views the junior mark would associate its products with the products of the senior mark. *James Burroughs Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976). A trademark confusion survey "must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Simon Prop. Group,* 104 F.Supp.2d at 1038. However, trademark confusion also can be measured by sound, meaning, or connotation. *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,* 80 F.Supp.2d 815, 880 (N.D.Ill.1999) (citing *Knaack Mfg. Co. v. Rally Accessories, Inc.,* 955 F.Supp. 991, 1000 (N.D.Ill.1997); *Henri's Food Prod., Inc. v. Kraft, Inc.,* 717 F.2d 352, 354 (7th Cir.1983)).

As Judge Hamilton observed in *Simon Property Group,* "[n]o survey is beyond criticism, especially in the context of litigation." 104 F.Supp.2d at 1039. That observation accords with the Seventh Circuit's teaching that survey evidence need not be perfect to be admissible. *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club,* 34 F.3d 410, 416 (7th Cir.1994). In fact, the court of appeals has stressed that only in "rare" situations will a proffered survey be "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible ." *AHP Subsidiary Holding Co.,* 1 F.3d 611, 618. Finally, consistent with the Seventh Circuit's observations about bench trials noted above, the Court may provisionally admit borderline opinion testimony and exclude it later if, upon further reflection, it is not sufficiently reliable or relevant to be entitled to any consideration at all. See *Simon Property Group, L.P.,* 104 F.Supp.2d at 1039 n. 3 (explaining that in cases dealing with problematic survey evidence involving an injunction hearing or a bench trial, "the safest course for the trial judge is to admit the evidence and to treat the criticisms as going to the weight of the evidence").

**\*6** Callahan's survey, composed of eight questions asked to 360 participants (out of 8,000 calls made), was relatively straightforward. The first two questions gauged familiarity; the third, fifth, and seventh questions measured perceptual familiarity; and the fourth and sixth questions requested that the participant explain his or her reasoning. Plaintiffs and their lawyer requested that the eighth question be added to the survey, and Callahan claims that it did not affect his analysis. The participants had the option to choose one of six answers ranging from "strongly agree" to "strongly disagree," including "can't say," and no answer was suggested as the correct one. Closed-ended questions are thought to be useful in surveys. *See* FJC REFERENCE MANUAL at 253. Although Callahan did not rotate the responses-and therefore the participant might have reflexively answered "can't say," because it was always the last option in the close-ended questions-his report contains the percentages of times that the participants selected an answer. Thus, the Court can pinpoint responses that may have been suspect because of the recency effect and take that potential shortcoming into consideration in assessing the reliability of the survey.

Finally, participants were directed not to guess when responding, which presumably supports the reliability of the survey because the participants would have answered knowledgeably or not at all.

Despite these useful features, the survey has many significant flaws. First, the universe is too broad. Callahan's definition of the relevant universe was the entire Chicago metropolitan area (or at least anyone in that area with a telephone), without regard to the respondents' purchasing preferences. The participants were filtered according to demographic quotas and to exclude businesses. Furthermore, the survey did not use threshold questions to measure the preferences or purchasing inclinations of the participants. As such, the survey was overinclusive, as it included many participants who were not in the market for either Bobak's Sausage Company Products or A & J's Signature Events products. The survey also was underinclusive because it excluded businesses, a large section of A & J's market. In a trademark case, the proper universe usually is potential purchasers of the junior users' products or services. See *LG Electronics U.S.A., Inc. v. Whirlpool Corp.,* 661 F.Supp.2d 940, 953 (N.D.Ill.2009). To narrow the scope of potential customers of A & J, Callahan could have added two simple survey questions: (1) Have you sought to purchase banquet or conference facility services in the last twelve months? and (2) Do you plan to purchase banquet or conference facility services in the next twelve months? See *id.* And to broaden the survey appropriately, Callahan could have included businesses.

The survey also used leading questions. Respondents were asked if they agreed with statements such as (1) "It is likely that Bobak's brand food products and Bobak's Signature Events have the same ownership," and (2) "When planning an event, it is likely that I would choose Bobak's Signature Events based on the belief that they serve Bobak's brand food products." These questions appear skewed to obtain a desired result, by linking Bobak's brand food products and Bobak's signature events (and thereby implying that the two are affiliated) and also by using "likely" to imply the answer to the question.

 **\*7** Furthermore, Callahan did not use the visual marks and he took no steps to put the trademarks in a typical marketplace situation. Admittedly, as the products sold by the parties are substantially dissimilar, a marketplace situation would have been difficult to replicate. And Callahan's perceptual similarity questions marginally addressed whether or not the companies are associated with one another. Therefore, although Callahan's survey is not as probative as it would have been if it had used the actual marks, the survey is not fatally flawed simply because it was a telephone survey.

The survey also had minimal controls. Surveys typically use a control group or a control question. *Nat'l Football League Props., Inc. v. Prostyle, Inc.,* 57 F.Supp.2d 665, 667-73 (E.D.Wis.1999). Trademark surveys measure how the trademark influences participants' "perceptions or understanding of a product." FJC REFERENCE MANUAL at 256. Therefore, a control group or control question is used to measure the origins of the perceptions in order to assure that the participants are not basing their answers on preconceptions. *Id.* In addition, the ability to evaluate the effect of the wording of a particular question makes the control group design particularly useful in assessing responses to closed-ended questions, providing an additional safeguard against poorly worded questions. *Id.* at 258.

Callahan claims that "principle components analysis" was his control. Although Callahan did not use a control group, he contends that the familiarity questions and the random selection of respondents were types of controls. However, Callahan did not explain if the responses to the familiarity questions affected whether or not the participants were included in the study. Otherwise, he took no steps to account for skewing factors specific to a trademark case. Plaintiff's response argues that this statistical analysis was used to "ensure the survey respondents were not giving random answers." (Pl. Resp. at 10.) However, the goal of a control in a trademark survey is not only to prevent random answers, but also to bring preconceptions to light. Therefore, in Callahan's survey, is it difficult to ascertain the baseline knowledge of some of the participants. This is apparent in some of the responses. For example, in response to a follow-up question, one participant answered, "We used to have a Bobak restaurant and there was (sic) some problems with the family and the ownership of the store." (Callahan Dep. 98:8-10.) Furthermore, the use of a control group or a control questions could have emphasized potential problems with Callahan's questions. See FJC REFERENCE MANUAL at 258. Despite these concerns, Plaintiff raises a legitimate question concerning

whether an additional control (another hypothetical "Bobak" entity) would have added much to the reliability of the survey in the particular circumstances of this case.

Technical defects in a survey are a matter of degree. The judge, as a trier of fact, has wide discretion in assessing whether the cumulative effect of technical defects simply affects the weight given to the survey or renders the expert's opinion inadmissible altogether. *LG Elecs. U.S.A., Inc.,* 661 F.Supp.2d at 951. The Court's preliminary conclusion is that the flaws described above substantially limit the helpfulness of the proposed survey in this case to the trier of fact. Plaintiff has described the survey as "no frills," which is not a problem if at least the critical steps in survey methodology are followed. Here, for the reasons stated above, it is evident to the Court that "plaintiff could have conducted its survey more carefully." *McDonald's Corp. v. McBagels, Inc.,* 649 F.Supp. 1268, 1278 (S.D.N.Y.1986). Two hallmarks of a good survey include the selection of an appropriate universe of respondents and the use of non-leading questions. The Callahan survey fell somewhat short of the mark in both respects.

 **\*8** Cumulatively, the flaws noted above present a close question in regard to whether to exclude Callahan and his survey evidence. On balance, however, the Court cannot conclude at this time that as a result of these errors, the Callahan survey is one of the "rare" surveys that is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.,* 1 F.3d at 618. The Court stresses that this conclusion is preliminary-in part because of the somewhat atypical circumstances in which this motion was brought. The admissibility of survey evidence often is resolved in the context of a battle of the experts, where both sides have developed and placed before the Court competing views on the issue of consumer confusion. Here, because Defendants chose to seek the exclusion of Plaintiff's expert before undertaking any expert work of their own, the Court has evaluated Dr. Callahan's survey with a less developed record than often is the case. In addition, because there is no jury demand in this case, the Court retains the ability to "exclude" or "disregard" Dr. Callahan's testimony and survey at a later stage-even after trial-if it later concludes that the testimony and survey are of little or no value in deciding the issues in the case. See *Simon Property Group,* 104 F.Supp.2d at 1039 n. 3.

### III. Conclusion

For the reasons stated above, Defendants' motion [52] to exclude the expert testimony of Plaintiff's expert witness is denied without prejudice. This case is set for further status on 5/10/10 at 9:00 a.m.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1687883

### Footnotes

1     Stan Bobak, president of BSC, is a cousin of Defendants; in fact, their fathers are brothers and their mothers are sisters.

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

2018 WL 5823660
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

EMPIRE MEDICAL REVIEW SERVICES, INC., Plaintiff,

v.

COMPUCLAIM, INC., Defendant.

Case No. 13-CV-1283
|
Signed 03/16/2018

**Attorneys and Law Firms**

Christopher R. Liro, Aaron T. Olejniczak, Andrus Intellectual Property Law LLP, Milwaukee, WI, Dustin T. Woehl, Kasdorf Lewis & Swietlik SC, Alexander T. Pendleton, Pendleton Legal SC, Milwaukee, WI, Michael J. Cerjak, Cannon & Dunphy SC, Brookfield, WI, for Plaintiff.

Joseph D. Newbold, Christa D. Wittenberg, John R. Schreiber, O'Neil Cannon Hollman DeJong & Laing SC, Milwaukee, WI, Timothy D. Wenger, Christopher C. Cassara, Partridge Snow & Hahn LLP, New Bedford, MA, for Defendant.

**DECISION AND ORDER**

WILLIAM E. DUFFIN, U.S. Magistrate Judge

**Introduction**

 **\*1**  This long-pending action is back before the court on CompuClaim, Inc.'s motion to exclude certain opinions offered by John G. Peters, an expert retained by Empire Medical Review Services, Inc. (ECF No. 159.)

Empire "develops software that is used by healthcare providers and other entities to process or submit claims for payment of healthcare services." (ECF No. 60, ¶ 28.) "CompuClaim is a provider of healthcare electronic data interchange, billing and compliance systems that facilitate the connection between healthcare providers, state and nonprofit agencies and electronic payers." (ECF No. 63 at 9, ¶ 6.) In 2010 Empire and CompuClaim entered into an agreement regarding the use and development of software. (ECF No. 60, ¶¶ 37-41.) Empire alleges that CompuClaim breached the agreement and unlawfully copied the relevant software. (ECF No. 60, ¶¶ 47-60.) CompuClaim alleges that the software did not perform as intended (ECF No. 63 at 12, ¶¶ 27-31), leading to "substantial harm to its business, including, but not limited to, lost sales and profits" (ECF No. 63 at 13, ¶ 39).

CompuClaim identified Frederick Orwiler, its Vice President and Director of Operations, as a hybrid fact/expert witness to support its claims of lost sales and lost profits. (ECF No. 160 at 2.) CompuClaim provided a summary of Orwiler's anticipated testimony. (ECF No. 161-3.) Empire retained Peters "to provide expert testimony analyzing and rebutting CompuClaim's damage claim (and also addressing the damages that CompuClaim's wrongful actions caused EMRS)." (ECF No. 183 at 1.) In accordance with Federal Rule of Civil Procedure 26(a)(2)(B) Peters provided a written report that set forth six opinions. (ECF No. 161-1.)

CompuClaim does not dispute Peters's qualifications but seeks to exclude the following five opinions on the basis that they are "improper, unreliable, and irrelevant":

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.     1

1. Orwiler is not free from bias with respect to providing opinions on [CompuClaim's] lost profit. (ECF No. 161-1 at 4 (all pagination reflects ECF numbering).)

2. CompuClaim's assertion that nine school districts would have become customers but for the failure of Empire's software is unsupported by the evidence. (ECF No. 161-1 at 7.)

3. CompuClaim's assumption that every one of the nine school district prospects would have become a customer is unreasonable. (ECF No. 161-1 at 8.)

4. Even if the nine school districts did become customers, CompuClaim's assumption that it would have maintained all of them as customers, at the same level, for the next five years is unreasonable. (ECF No. 161-1 at 8.)

5. The problems with Empire's software did not create any "dent" in CompuClaim's business. CompuClaim's business actually increased during the period it says it was damaged. (ECF No. 161-1 at 9.)

(ECF No. 160 at 1.)

### Applicable Standards

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**\*2** (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]here are many different kinds of experts, and many different kinds of expertise." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 780 (7th Cir. 2017) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ). Thus, courts must flexibly apply the principles set forth by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), on a case-by-case basis. *Gopalratnam*, 877 F.3d at 780 (citing *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017); *C.W. v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) ).

Expert testimony must "be 'ground[ed] in the methods and procedures of science' and must 'assist the trier of fact to understand or determine a fact in issue.' " *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) (quoting *Daubert*, 509 U.S. at 590-91, 113 S.Ct. 2786). Under *Daubert*, the court is the evidentiary gatekeeper and must preliminarily assess the proposed expert's testimony to determine whether "the testimony's underlying reasoning or methodology is scientifically valid and properly applied to the facts at issue." *Krik*, 870 F.3d at 674 (citing *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786). In performing this gatekeeping function, the court should consider, among other factors, "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Id.* (quoting

*Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017) ). "[E]xpert testimony that is more technical than scientific is governed by the same criteria as the admission of scientific expert testimony." *Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) ). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory committee's note (2000 Amends.) ).

### Analysis

The court concludes that Peters's challenged opinions fail to satisfy the standard set forth in Rule 702. Empire has failed to show that the challenged opinions will "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), or are a "product of reliable principles and methods," Fed. R. Evid. 702(c).

**Helpfulness**

Peters's criticism of Orwiler's conclusions is primarily evidentiary. Most of Peters's opinions (Opinions 2, 3, 4, and 5) assert largely that, based on his review of the evidence, he did not find support for Orwiler's conclusions. (*See, e.g.*, 161-1 at 7 ("I found no basis for the claim that any alleged CC problems in early 2012 had any impact or correlation with CC's possible sales to the 9 prospects."); 161-1 at 8 ("CC's lost revenue claim is speculative and unsupported because it provided no evidence for most of the 9 districts claimed that the prospect was ever really a prospect; nor did CC prove that it successfully signs all of its prospects.").

**\*3** Peters also criticizes Orwiler because "Orwiler is not free from bias with respect to providing opinions on CC's lost profit." (ECF No. 161-1 at 4.) In support, he notes that, based on the documents he reviewed, Orwiler's income is tied to CompuClaim's performance and profitability. Thus, he would stand to benefit from a large damages award. (ECF No. 161-1 at 4.)

As CompuClaim correctly observes, Peters's conclusions are essentially nothing more than the sort of summation of the evidence that an attorney would offer at the close of trial. (ECF No. 160 at 13 (quoting *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004); *see also* 4-702 Weinstein's Federal Evidence § 702.03 (2018) (citing cases) ("Proffered expert testimony should be excluded when it will not help the trier of fact to any degree beyond the assistance that the lawyers representing the parties could provide during their closing arguments.") Peters merely offers his view as to the conclusions the finder of fact should draw from the evidence.

Moreover, "it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend." *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987). A lay finder of fact is wholly capable of reviewing and assessing the evidence to determine whether a claim is supported. *See United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017); *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (noting that expert testimony would not assist the trier of fact when expert's testimony related only to a fact jurors could determine for themselves); *Florek v. Vill. of Mundelein*, 649 F.3d 594, 602-03 (7th Cir. 2011) ("[W]hen the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible.").

Similarly, the assessment of bias is such a routine task for the finder of fact that it is doubtful it would ever be appropriate for an expert to opine as to the credibility of another witness. *See, e.g.*, *Goodwin v. MTD Prods.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact ....");

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

*United States v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe ....").

The court presumes that Peters's knowledge and experience assisted him in his review–for example, by recognizing which documents would be most likely to contain relevant information or, more generally, in being able to understand those documents. But the fact that a person of skill and experience might be able to do a task easier or better does not mean that it is a task beyond the ken of a layperson.

**Product of Reliable Principles and Methods**

In a declaration submitted in response to CompuClaim's motion to exclude his testimony, Peters states that, in preparing his opinions, "I used procedures/methods I had been taught in college and continuing education classes, had learned in 40 years of on-the-job training, and had seen other forensic accountants use in litigation matters." (ECF No. 185, ¶ 6.) Thus, Empire argues that the opinions are admissible because they are based on Peters's accounting experience. (ECF No. 183 at 4-5.)

**\*4** "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). "Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.' " *Id.* (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) ); *see also United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (finding inadmissible expert's opinion where "[s]he, in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so.' "). "[A]n expert's opinion that lacks proper substantiation [i]s 'worthless.' " *Noel*, 581 F.3d at 497 (quoting *Minasian v. Standard Chartered Bank*, 109 F.3d 1212, 1216 (7th Cir. 1997) ). "The expert must explain the methodologies and principles supporting the opinion." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010).

Peters, at times, refers to what might appear to be principles or methodologies. For example, with respect to CompuClaim's position that each of the nine prospects identified by Orwiler would have become a customer, Peters's report states, "A proper study would involve a charting of all contacts and proposals made by CC over an historical time period with comparison to actual contracts signed to support the % of contracts attained versus proposed (i.e. batting average)." (ECF No. 161-1 at 8.) And in his declaration Peters states, "In my work under Opinion 3 (and to a large degree under Opinion 2), I was following the methods outlined in the AICPA 'Practice Aid 10-1 Serving as an Expert Witness or Consultant'."

However, Peters does he identify any authority for his assertion as to what would be a "proper study" and the "practice aid" does not articulate a methodology for the sort of analysis Peters undertook. In fact, Peters cites the practice aid only for a generic definition of forensic accounting (ECF No. 185, ¶ 14) and for the notion that an accountant might be helpful in crafting discovery demands (ECF No. 185, ¶ 13).

There is no dispute that Peters is qualified to offer an opinion on accounting matters. But simply because he is an expert does not permit the court to admit his opinions when he failed to ground those opinions in reliable principles and methods. *See Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 815 n.17 (N.D. Ill. 2005).

Accounting generally, and lost profit calculations specifically, are not matters devoid of established objective principles and methodologies such that a reliance upon an expert's amorphous experience is all there is. *See, e.g., Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*, 886 F.Supp.2d 873, 880 (N.D. Ill. 2012) (discussing method for calculating lost profits); *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743 at \*1, 2011 U.S. Dist. LEXIS 10337 at \*3 (N.D. Ill. Feb. 3, 2011) (same). To the contrary, principles and methods of accounting and auditing are well-established and formalized.

Peters's articulation of his methodology is essentially, "I did what an accountant does." That may be true, but it is not enough. If a physician were to offer his opinion as to the cause of a party's injury (or, more analogously, his opinion that someone else's causation opinion was wrong), the physician would have to explain his methodology in more detail than, "I did what a doctor does." "Because I said so," even from a person who seems qualified to say so, is not a reliable principle or method under Rule 702. *See* Noel, 581 F.3d at 497; *see also* Minix, 597 F.3d at 835 (concluding district court acted within its discretion to exclude expert opinion because expert "cited no medical standards or principles in support of" his conclusion and, thus, "[g]iven [expert's] failure to explain his methodology, the district court could conclude that the report offered nothing of value to the judicial process" (internal quotation marks omitted) ).

## Conclusion

 **\*5**  Notwithstanding his assertions that he is "uniquely qualified to provide a trier of fact information" (ECF No. 185, ¶ 7) and that he has "substantially more experience and knowledge about the existence of and interpretation of sales forecasts than the 'common man' would have," (ECF No. 185, ¶ 9), Peters's opinions offer nothing more than what a lay finder of fact can, and must, determine on its own. In fact, if the evidence for CompuClaim's counterclaim for lost profits is as lacking as Peters suggests, surely no expertise is needed to understand that. It doesn't take an expert to recognize that evidence isn't there. Therefore, Peters's proposed testimony would not be helpful to the finder of fact.

Moreover, Peters failed to establish that his opinions are the product of any reliable principles or methodology. Although Peters is qualified to offer an opinion on accounting matters, he must still ground those opinions in reliable principles or methodology. Consequently, Empire having failed in its burden to show that Peters's opinions are admissible pursuant to Rule 702, the court must exclude Peters from offering at trial the five opinions CompuClaim challenged in its motion.

**IT IS THEREFORE ORDERED** that CompuClaim, Inc.'s motion to exclude certain proposed expert opinions of John G. Peters (ECF No. 159) is **granted**.

**All Citations**

Slip Copy, 2018 WL 5823660

---

**End of Document**                                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    5

# EXHIBIT 3

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re NJOY, Inc. Consumer Class Action Litigation, C.D.Cal., August 14, 2015

2014 WL 6603730
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Jill GUIDO, et al.

v.

L'OREAL, USA, INC., et al.
Catherine Altamura, et al.

v.

L'Oreal, USA, Inc., et al.

Nos. 2:11–cv–01067–CAS (JCx), 2:11–cv–05465–CAS (JDx).
|
Signed July 24, 2014.

**Attorneys and Law Firms**

David Parisi, Grace Tersigni, for Plaintiffs.

Katherine Murray, Nicholas Begakis, for Defendants.


RENEWED MOTION TO CERTIFY CALIFORNIA CLASS (Case No. 11–1067, Dkt. 120, filed January 6, 2014)


MOTION TO DECERTIFY NEW YORK CLASS (Case No. 11–5465, Dkt. 129, filed April 25, 2013)


MOTION TO EXCLUDE EXPERT OPINIONS OF DR. SANJOG
MISRA (Case No. 11–5465, Dkt. 128, filed April 11, 2014)

CHRISTINA A. SNYDER, Judge.

 **\*1** Catherine Jeang, Deputy Clerk.

Laura Elias, Court Reporter / Recorder.


## I. INTRODUCTION

On February 3, 2011, plaintiffs Jill Guido, a California resident, and Natalie Lefebvre, a Texas resident, commenced this action in this Court by filing a complaint against defendants L'Oreal, USA, Inc. and L'Oreal USA Products, Inc. (collectively "L'Oreal") in Case No. 11–1067. Meanwhile, on February 4, 2011, plaintiffs Catherine Altamura, a California resident, and Lisa Pearly, a New York resident, filed a similar complaint in the United States District Court for the Southern District of New York against the same defendants. On May 5, 2011, Altamura and Pearly voluntarily dismissed the New York action and refiled the action in this Court on June 30, 2011. See Case No. 11–5465. By order dated September 19, 2011, the Court consolidated the two cases for pretrial purposes.

WESTLAW   © 2015 Thomson Reuters. No claim to original U.S. Government Works.   1

On November 16, 2012, pursuant to a stipulation by the parties, plaintiffs submitted a First Consolidated Class Action Complaint ("FCAC"). The FCAC asserts claims on behalf of two putative classes of California and New York residents who purchased a L'Oreal hair care product known as Garnier Fructis Sleek & Shine Anti–Frizz Serum ("Serum"). The FCAC alleges seven claims for relief: (1) breach of implied warranty of merchantability, (2) breach of implied warranty of fitness, (3) violation of California Business and Professions Code § 17200 ("UCL"), (4) violation of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750, (5) false advertising under California Business and Professions Code § 17500 ("FAL"), (6) deceptive acts and practices pursuant to New York General Business Law § 349, and (7) false advertising pursuant to New York General Business Law § 350.

By order dated July 1, 2013, the Court granted in part and denied in part plaintiffs' motion for class certification. The Court certified a class consisting of New York purchasers of the Serum. The Court declined to certify a class of California purchasers of the Serum, based on the Court's conclusion that plaintiffs had not articulated a classwide theory of damages, as required by Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1429 (2013).

On January 6, 2014, plaintiffs filed a renewed motion to certify a California class. Case No. 11–1067, Dkt. 120. L'Oreal filed an opposition on April 25, 2014, Case No. 11–1067, Dkt. 132 and plaintiffs filed a reply on May 9, 2014, Case No. 11–1067, Dkt. 133.

On April 11, 2014, L'Oreal filed a motion to exclude the testimony of Dr. Sanjog Misra, who submitted an expert declaration in support of plaintiffs' renewed motion to certify a California class. Case No. 11–5465, Dkt. 128. Plaintiffs filed an opposition on April 25, 2014, Case No. 11–5465, Dkt. 130, and L'Oreal filed a reply on May 9, 2014, Case No. 11–5465, Dkt. 131.

On April 11, 2014, L'Oreal filed a motion to decertify the New York class. Case No. 11–5465, Dkt. 129. Plaintiffs filed an opposition on May 24, 2014, Case No. 11–5465, Dkt. 133 and L'Oreal filed a reply on June 2, 2014, Case No. 11–5465, Dkt. 134. After considering the parties' arguments, the Court finds and concludes as follows.

## II. BACKGROUND

**\*2** These facts are substantially adopted from the Court's prior orders on class certification. Serum is a hairstyling product manufactured, distributed, and marketed by L'Oreal for sale in retail outlets nationwide. Declaration of Grace Tersigni ("Tersigni Decl.") Ex. 1, at 24–25 (deposition of Garnier Senior VP Kathryn Peeler). Serum was launched in 2004 for a suggested retail price of $5.99 per bottle, which has remained constant throughout the product's existence in the market. *Id.* at 69:9–12. During the Class Period, defined below, L'Oreal sold approximately 9.9 million units of Serum throughout the nation. *Id.,* Ex. 2 at 1.

Serum's label and packaging has changed since its introduction to the market. When it was launched in 2004, Serum was sold in a clear green round-shaped bottle with a label that included a flammability warning written in green text. Near the end of 2006, Garnier removed denatured alcohol as an ingredient in Serum in order to comply with California's Volatile Organic Compound regulations, Cal.Code Regs. tit. 17, § 94509(a). At the beginning of 2007, Garnier altered the bottle's shape, from a round shape to a bell shape, and removed the flammability warning. *Id.* at 61:21–62:19. Other than this change in Serum's packaging, the labeling has been uniform, and does not vary from bottle to bottle.

Plaintiffs contend that Serum is flammable, even though the denatured alcohol has been removed, and that the product should been sold with a flammability warning. L'Oreal, however, argues that because the alcohol has been removed from Serum, it no longer requires a flammability warning.

Plaintiffs seek to represent the following classes:

WESTLAW    © 2015 Thomson Reuters. No claim to original U.S. Government Works.    2

*California Class:* All individuals who purchased Garnier Fructis Sleek & Shine Anti–Frizz Serum in the state of California at any time during the period of February 2, 2008 to the present.

*New York Class:* All individuals who purchased Garnier Fructis Sleek & Shine Anti–Frizz Serum in the state of New York at any time during the period of February 4, 2008 to the present.

## III. LEGAL STANDARD

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 647 (C.D.Cal.1996) (citing *Crown, Cork & Seal Co. v. Parking,* 462 U.S. 345 (1983)). Federal Rule of Civil Procedure 23 governs class actions. A class action "may be certified if the trial court is satisfied after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982).

To certify a class action, plaintiffs must set forth facts that provide prima facie support for the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2548 (2011); *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.),* 213 F.3d 454, 462 (9th Cir.2000). These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Falcon,* 457 U.S. at 155 (quoting *Califano v. Yamasaki,* 442, U.S. 682, 701 (1979)).

**\*3** If the Court finds that the action meets the prerequisites of Rule 23(a), the Court must then consider whether the class is maintainable under Rule 23(b). *Dukes,* 131 S.Ct. at 2548. Rule 23(b)(3) governs cases where monetary relief is the predominant form of relief sought, as is the case here. A class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir.1998) (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997)). The predominance inquiry measures the relative weight of the common to individualized claims. *Id.* "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir.2001) (citing *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996)).

In determining superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests members in the class have in individually controlling the prosecution or defense of the separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class action. *Id. at* 1190–1993. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Id.* (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1778 at 535–39 (2d. ed.1986)).

More than a pleading standard, Rule 23 requires the party seeking class certification to "affirmatively demonstrate ... compliance with the rule-that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common

questions of law or fact, etc." *Dukes,* 131 S.Ct. at 2551. This requires a district court to conduct "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.*

## IV. ANALYSIS

The Court previously found that plaintiffs had satisfied all of the requirements of Rule 23, except for articulating a classwide method of calculating damages for the California class. Plaintiffs now renew their motion to certify the California class, and support their motion with the opinion of Dr. Sanjog Misra, a professor of marketing at the University of California Los Angeles Anderson School of Management. L'Oreal moves to exclude the testimony of Dr. Misra, and also argues that Dr. Misra's testimony does not articulate a classwide theory of damages. L'Oreal further argues that (1) the California class no longer satisfies the other requirements of Rule 23, and (2) that the New York class no longer satisfies the other requirements of Rule 23, and should therefore be decertified. The Court begins with Dr. Misra and classwide calculation of damages, and then turns to the balance of L'Oreal's arguments on certification and decertification.

### A. Classwide Calculation of Damages

**\*4** The crux of plaintiff's renewed motion to certify the California class is Dr. Misra's testimony that damages can be calculated on a classwide basis. L'Oreal seeks to exclude this testimony under *Daubert v. Merrell Dow Pharms.,* Inc. 509 U.S. 579 (1993). On June 17, 2014, the Court held an evidentiary hearing, at which Dr. Misra testified about his opinions in this case. The Court begins its analysis by summarizing Dr. Misra's testimony and opinions, then addresses the admissibility of those opinions under Rule 702 and *Daubert,* and finally analyzes whether Dr. Misra's testimony remedies the deficiencies identified in the Court's previous order on class certification.

#### 1. Testimony of Dr. Misra

Dr. Sanjog Misra is a professor of marketing at the UCLA Anderson School of Management. Misra Decl. ¶ 1. He graduated from Ravenshaw College, in Cuttack India, and received a Master's degree in statistics and a Doctorate in management from the State University of New York at Buffalo. *Id.* ¶ 2. Before joining UCLA, Dr. Misra taught at the Simon School of Business at the University of Rochester. *Id.* ¶ 3. He has taught masters and Ph.D. courses on Applied Econometrics, Marketing Models, Statistics and Decision Making, and other subjects. *Id.* ¶ 3. Dr. Misra's research focuses on the use of statistical models to understand how consumers and firms make decisions, and how marketing factors into those decisions. *Id.* ¶ 4. Dr. Misra's research on these subjects has been published in several journals in the field. *Id.*

Plaintiffs retained Dr. Misra to opine on whether methodologies existed which could determine if there was a method of quantifying the impact of a flammability warning on the market price of the Serum, and whether there was a method for calculating the "true market value" of the Serum. *Id.* ¶ 8. Dr. Misra opined that two methodologies existed which could calculate the true market value of the Serum: Random Coefficient Demand Estimation ("RCDE") and Conjoint analysis. *Id.* ¶ 9.

RCDE is a methodology that aims to estimate how various product features, including the price of the product, affect sales for the product. *Id.* ¶ 13. RCDE is based on a model of rational choice, assuming that consumers make rational purchasing decisions that trade off product features against price. *Id.* ¶ 14. When consumers choose between multiple products, they choose the product that offers them the highest overall utility, therefore revealing which features the consumers value, and how much the consumers value them. *Id.* ¶¶ 14–15. By running regressions on historical market share data, the RCDE model estimates a distribution of tastes and preferences of consumers. Transcript of June 17, 2014 Evidentiary Hearing ("Transcript") at 8:24–9:1. Dr. Misra testified that RCDE is "required reading" in marketing and economics Ph.D. programs, and "is now a fairly standard approach to estimating demand models." *Id.* at 9:10–15. Dr. Misra has performed RCDE analysis as part of his consultation services with various industries; Dr. Misra offered the example of using RCDE to evaluate how different drug characteristics and marketing activities affect doctor's prescription choices. *Id.* 14:7–20.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

4

**\*5** Dr. Misra opines that the perceived risk associated with a flammability warning on the Serum is a type of product feature that is susceptible to RCDE analysis. *Id.* ¶ 16. By running regressions on historical marketing data for the Serum and related products, a function can be generated that estimates how much consumers value the perceived risk of flammability, versus the other features of Serum. In turn, this function would reveal the difference, if any, between the historical market price of the Serum, and the true market value of a Serum displaying a flammability warning. *Id.* ¶ 19. Dr. Misra testified that historical marketing data about product sales is typically available from syndicated data sources such as Nielsen, and that this syndicated data is what academics and firms usually use when performing RCDE analysis. Transcript at 15:25–16:7, 16:23–17:17. Dr. Misra testified that, to the best of his knowledge, these sources, as well as potentially L'Oreal itself, possessed the marketing and sales data necessary to run RCDE on the Serum. *Id.* at 68:7–16. But Dr. Misra acknowledged at the hearing on June 17, 2014, that he was not certain that the data existed. *See id.* at 18:18–19 ("So I cannot claim to know whether or not it exists for this particular product."). Dr. Misra also conceded that without this data, an RCDE analysis could not be performed on the Serum. *See id.* at 68:7 ("That's true. The data has to exist.").

Dr. Misra also testified about a second methodology, Conjoint analysis. Conjoint analysis works on principles similar to RCDE analysis, except that the regressions are based on surveys of consumers, rather than historical sales data. Misra Decl. ¶ 21. Conjoint analysis has been used for decades as a way of estimating the market's willingess to pay for various product features. *Id.* To perform a Conjoint analysis, consumers are asked to answer surveys in which they repeatedly chose between similar, but slightly different products. *Id.* ¶ 22. As an example, Dr. Misra suggests that surveys here could ask consumers to choose between Serums that differed in price, brand, and the presence of a flammability warning. *Id.* ¶ 22(i). As with RCDE, this survey data can then be regressed to generate a function that captures the value of the product as a function of various product features. *Id.* ¶ 22(v). This function, in turn, will estimate the portion of the Serum's market price attributable to the lack of a flammability warning.

As between RCDE and Conjoint analysis, Dr. Misra expressed a preference for RCDE because it is based on historical data, but also noted that Conjoint analysis is more flexible because the surveys can be customized. Misra Decl. ¶ 28. Dr. Misra has not yet performed a RCDE or Conjoint analysis in this case. Transcript at 32:20–23. Nor has Dr. Misra administered the consumer surveys that would be needed to generate the data required for a Conjoint analysis. *Id.* at 31:19–21. However, Dr. Misra opines that he does not need to run the models in order to discuss their potential application in this case. *Id.* at 38:8–21.

2. Admissibility of Dr. Misra's Testimony

**\*6** L'Oreal challenges the admissibility of Dr. Misra's testimony under [Fed.R.Evid. 702](#) and *[Daubert v. Merrell Dow Pharms., Inc.,](#)* [509 U.S. 579 (1993)](#). At the outset, the parties dispute how *Daubert* and [Rule 702](#) apply at the class certification stage. L'Oreal asserts that this court should apply a "full *Daubert* inquiry" in deciding whether to certify the California class. L'Oreal further argues that *[Ellis v. Costco Wholesale Corp.,](#)* [657 F.3d 970 (9th Cir.2011)](#), commands the Court to evaluate both the admissibility and the persuasiveness of Dr. Misra's testimony.

Plaintiffs, by contrast, urge the Court to adopt a "tailored" Daubert analysis, which examines "whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving [Rule 23](#) criteria, such as commonality and predominance." *[Tait v. BSH Home Appliances Corp.,](#)* [289 F.R.D. 466, 495 (C.D.Cal .2012)](#); *see also [Bruce v. Harley–Davidson Motor Co., Inc.,](#)* [2012 WL 769604, at \*4 (C.D.Cal. Jan. 23, 2012)](#) (adopting a "tailored' or 'focused' inquiry [which] assesse[s] whether the experts' opinions, based on their areas of expertise and the reliability of their analysis of the available evidence, should be considered in deciding the issues relating to class certification"). Plaintiffs cite *[In re Zurn Pex Plumbing Prods. Liab. Litig.,](#)* [644 F.3d 604, 612–13 (8th Cir.2011)](#), which held that a full *Daubert* analysis was not appropriate at class certification because (1) merits discovery was still ongoing, (2) *Daubert's* goal of "protect[ing] juries from being swayed by

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

dubious scientific testimony ... is not implicated at the class certification stage," and (3) class certification is inherently tentative and subject to later revision.

The interaction between *Daubert* and class certification is an area of considerable uncertainty at the moment. *See Tait,* 289 F .R.D. at 490 (discussing contrasting views). *Comcast,* in particular, deepened this uncertainty by granting certiorari on the *Daubert*-at-certification question, but then deciding the case on different grounds. *See Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1435 (2013) (Ginsburg, J. and Breyer, J., dissenting). Here, however, the Court need not wade into this debate, as the Court finds that Dr. Misra's testimony is admissible even when scrutinized with the full force of *Daubert.*

Under *Daubert,* a trial judge acts as a "gatekeeper" to insure that expert testimony "is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. A trial judge executes this "gatekeeper" role whether expert testimony is scientific or non-scientific, with the purpose of ensuring that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

**\*7** The Supreme Court in *Daubert* enumerated a list of factors useful for evaluating the reliability of a scientific expert. These factors include, but are not limited to: "(1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Mukhtar v. Cal. State Uni ., Hayward,* 299 F.3d 1053, 1064 (9th Cir.2002); *see Daubert v. Merrell Dow Pharm., Inc. ("Daubert* II"), 43 F.3d 1311, 1317 (9th Cir.1995) (adding as a factor "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."). Trial courts have broad discretion to determine whether these factors are "reasonable measures of reliability" for evaluating non-scientific testimony. *Kumho Tire,* 526 F.3d at 153. In exercising this broad discretion, "not only must the trial court be given broad discretion to decide whether to admit expert testimony, it must have the same kind of latitude in deciding how to test an expert's reliability." *United States v. Hankey,* 203 F.3d 1160, 1168 (9th Cir.2000). When an expert's testimony is not scientific or technical, the reliability of that testimony need not be based on "a particular methodology or technical framework," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter v. Provident Life and Acc. Ins. Co.,* 373 F.3d 998, 1018 (9th Cir.2004).

In addition to evaluating an expert's reliability, a trial court must also determine whether an expert has "appropriate qualifications —i.e., some special knowledge, skill, experience, training or education." *Hankey,* 203 F.3d at 1168. "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter,* 373 F.3d at 1015. Nonetheless, there are limitations on when an individual qualifies as an expert in a particular field. In particular, the fact that an expert is qualified in a particular field or discipline does not automatically qualify that expert in related disciplines. *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999) (expert qualified to testify regarding fire reconstruction and investigation not qualified to testify on automobile accident reconstruction).

Applying these standards here, the Court finds that Dr. Misra's testimony about RCDE and Conjoint analysis is sufficiently reliable to pass muster under Rule 702 and Daubert. [1] At the hearing on June 17, 2014, Dr. Misra testified persuasively that both RCDE and Conjoint analysis are methodologies that are well-accepted in the econometrics field. *See* Transcript at 5:22– 6:1 ("[RCDE] is now a fairly standard approach to estimating demand models. It's required reading. And every single Ph.D. student that goes through any program in economics or marketing, now even in political science or sociology, are required to understand and adopt this method."); *id.* at 7:19–24 (similar testimony regarding Conjoint analysis). Both RCDE and Conjoint

analysis have been the subject of extensive literature published in peer-reviewed journals, and Dr. Misra himself has published a number of peer-reviewed papers discussing these methodologies. *See* Transcript at 8:5–9:15; Misra Decl. Ex. 1 (Dr. Misra's CV, listing publications). Finally, this lengthy publication history illustrates that RCDE and Conjoint analysis "grow[ ] naturally and directly out of research ... conducted independent of the litigation" and have not been "developed ... expressly for purposes of testifying." *Daubert II,* 43 F .3d at 1317.

**\*8** Moreover, even L'Oreal's expert, Dr. Dominque Hanssens, testified at deposition that he himself has used RCDE and Conjoint analysis in his academic work and when consulting for firms. *See* Havens Beckman Decl. Ex. 3 (Hannsens Depo.) at 45:15–25; 49:19–51:2. Dr. Hanssens also conceded that Conjoint analysis could "reach a sound conclusion regarding the impact of a flammability warning on the price of serum." Begakis Decl. Ex I. This concession parallels the conclusions of several district courts who have considered the admissibility of Conjoint analysis under *Daubert. See, e.g., Apple, Inc. v. Samsung Elecs. Co., Ltd.,* 2014 WL 794328 at \*17 (N .D.Cal. Feb. 25, 2014) ("Thus, the Court concludes that Dr. Vellturo's use of Dr. Hauser's choice-based Conjoint survey with an outside option to quantify the diminished demand that Samsung would have experienced after it designed around the patented features is sufficiently supported by the literature and is therefore admissible ."); *Khoday v. Symantec Corp.,* 2014 WL 1281600, at \*33 (D.Minn. Mar. 13, 2014) ("Plaintiffs have presented the Conjoint analysis used by their expert Gaskin as a means to isolate the value for specific convenience features of the download insurance products."); *Microsoft Corp. v. Motorola, Inc.,* 904 F.Supp.2d 1109, 1120 (W.D.Wash.2012) (finding Conjoint analysis "admissible as relevant under FRE 401 and 402 and ... sufficiently reliable under FRE 702 and *Daubert.* "). Although RCDE does not share this case-law pedigree, Dr. Misra has testified that the "the fundamental primitives of both methods are identical." Transcript at 6:21–22.

Finally, the Court concludes that Dr. Misra has "appropriate qualifications" to offer evidence on the subject of RCDE and Conjoint analysis. *Hankey,* 203 F.3d at 1168. As discussed above, Dr. Misra has a doctorate in management, and has published papers on the subject of RCDE and Conjoint analysis, and currently teaches both models as part of his curriculum at the UCLA Anderson School of Business. These credentials show that Dr. Misra has sufficient "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, to testify on the subject of RCDE and Conjoint analysis. Accordingly, the Court concludes that RCDE and Conjoint analysis are not "junk science" and that Dr. Misra's testimony is thus admissible under *Daubert* and the Federal Rules of Evidence. *See Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir.2011).

L'Oreal resists this conclusion on three grounds, none of which are availing. First and foremost, L'Oreal contends that Dr. Misra's testimony is inadmissible because Dr. Misra has not yet performed either an RCDE or a Conjoint analysis in this case. Because Dr. Misra has not yet run either of the models, the Court cannot determine whether Dr. Misra "reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702(d).

This argument misconstrues Dr. Misra's testimony, and misstates plaintiffs' burden on class certification. As discussed at greater length below, plaintiffs need not show on class certification that they paid a premium for Serum due to the absence of a flammability warning. Instead, they must merely provide a method for calculating that premium on a classwide basis.

**\*9** The distinction is well illustrated by *Pedroza v. PetSmart, Inc .,* 2013 WL 1490667 (C.D.Cal. Jan. 28, 2013), one of the cases relied upon by L'Oreal. The *Pedroza* plaintiffs sought to certify a class of PetSmart store managers, alleging the PetSmart had a policy and practice of misclassifying the managers as exempt from various wage-and-hour regulations. Under the substantive law at issue, the store managers were exempt if they spent "more than 51% of their time on managerial tasks in any given workweek." *Id.* at \*6 (quoting *Dunbar v. Albertson's, Inc.,* 141 Cal.App. 4th 1422, 1426 (2006)). The *Pedroza* court declined to certify the class because plaintiff had not shown that they were "subjected to a common policy or practice requiring them to spend more than 50 percent of their time on nonexempt tasks," and thus failed to show that their claims were

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

capable of class-wide resolution. *Id.* at *11. In reaching this conclusion, the *Pedroza* court excluded under *Daubert* an expert's testimony that a survey could establish on a classwide basis that the managers were not exempt:

> Friedland fails to provide any specific information about the methodology of his proposed survey, much less provide sufficient information for us to evaluate the methodology's soundness. Indeed, Friedland does not explain what data he plans to use in developing the survey, why such data is sufficiently complete and reliable, how he plans to use such data to develop a survey, how he plans to select a representative sample of SMs to participate in the survey, why such a selection would be representative, and why the survey will reliably show how the SM allocated their time between exempt and nonexempt tasks. Instead, F[ri]edland merely "promises" that he will be able to complete a survey that can reliably show whether the SMs spent more than 50 percent of their time on nonexempt tasks, an issue that concerns commonality, as discussed below. We find and conclude that this type of unsupported, conclusory "promise" of reliable data is insufficient to pass muster under *Daubert*.

*Id.* at *3. The key step in this analysis is that the Pedroza plaintiffs directly relied on the results of the proposed survey to establish commonality. If the survey did not accurately determine the status of the individual store managers, then it could not provide a method for adjudicating the case on a classwide basis. Here, by contrast, the actual results of the RCDE and Conjoint models-the premium attributable to the absence of a flammability warning-are irrelevant to commonality and predominance. It does not matter whether the models determine that class members paid a premium of 25 cents or 50 cents-or perhaps, as L'Oreal contends, 0 cents. All that matters is that the premium can be determined for each class member "in one stroke." *Dukes, 131 S.Ct. at 2551.* Dr. Misra's testimony, as he himself explained, *see* Transcript at 32:14–19, was properly directed to this question. Accordingly, the Court concludes that Daubert does not require plaintiffs to actually run their damages models to make Dr. Misra's testimony admissible for purposes of class certification. *Cf. Werdebaugh v. Blue Diamond Growers, 2014 WL 2191901 (N.D.Cal. May 23, 2014)* ("In sum, while Dr. Capps has yet to run the model and determine what price differences, if any, are attributable to the alleged label misrepresentations, he sets forth what is in the Court's view a workable model of calculating damages....").

**\*10**  Second, L'Oreal criticizes a statement in Dr. Misra's declaration observing that their was a 39–cent change in the price of Serum after the flammability warning was removed from the Serum bottle. Misra. Decl. ¶ 9(iii). L'Oreal argues that this calculation suffers from a host of infirmities, including that it does not account for inflation and is based on overbroad sales data. The Court credits Dr. Misra's explanation that he noted the 39–cent change as a preliminary "fact-checking device," and that this simple comparison does not factor into either RCDE or Conjoint analysis. Transcript at 47:17–48:9.

Finally, L'Oreal argues that Dr. Misra is not qualified to opine on flammability warnings because (1) he has never testified in litigation before and (2) Dr. Misra does not have special or expert knowledge about calculating the value attributable to a flammability warning, as opposed to other product features. Neither contention is persuasive. First, "[t]hat [Dr. Misra] had never before testified as an expert witness does not preclude his opining as an expert in this case." *United States v. Smith, 520 F.3d 1097, 1105 (9th Cir.2008) aff'd on reh'g en banc, 561 F.3d 934 (9th Cir.2009).* Second, L'Oreal's contention that Dr. Misra is not qualified in the field of evaluating flammability warnings defines the relevant field of expertise too narrowly. In the absence of some suggestion that flammability warnings are a distinct field of inquiry, Dr. Misra's general qualifications in the field of attributing value to product features are more than sufficient. "A lack of specialization affects the weight of the expert's testimony, not its admissibility." *In re Silicone Gel Breasts Implants Prods. Liab. Litig., 318 F.Supp.2d 879, 889 (C.D.Cal.2004).*

Accordingly, the Court concludes that Dr. Misra's opinion is admissible under Rule 702 and *Daubert*.

3. Predominance under *Comcast*

The Court previously declined to certify the California class because "[u]nder *Comcast,* courts can only certify a 🔖 Rule 23(b) (3) class if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability." Case No. 11–5465, Dkt. 108 at 23. Without a method of calculating classwide relief, plaintiff could not establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." 🔖 Fed.R.Civ.P. 23(b)(3). Accordingly, the Court now turns to the question of whether RCDE and Conjoint analysis offer a classwide method of calculating relief, and whether those methods are consistent with plaintiffs' theory of liability.

First, the Court finds that both models calculate relief on a classwide basis. RCDE and Conjoint analysis purport to calculate what Serum would have cost if the Serum bottle had borne a flammability warning. This is the price that plaintiffs allege that all class members would have paid if L'Oreal had complied with its alleged obligations. Because, under this theory, every class member allegedly overpaid by a uniform amount, RCDE and Conjoint analysis may be applied on a classwide basis.

 **\*11** Second, both RCDE and Conjoint analysis are consistent with plaintiffs' theory of liability. As the Court explained in its prior order on class certification, plaintiff's theory of liability rests on the claim that, due to the absence of a flammability warning on the Serum bottle, "Serum's true market price is either $0 or a figure substantially lower than $6." Case No. 11–5465, Dkt. 108 at 20. The key component of the damages model is thus the "true market value" of the Serum bearing a flammability warning: "Once the true market price has been computed, plaintiffs contend that each class member can be awarded, for each bottle of Serum purchased, the difference between Serum's historical market price and its true market price." *Id.* Both RCDE and Conjoint analysis provide this key component. As Dr. Misra explained, these methodologies "are capable of discerning and quantifying the-the value of the product and market outcomes associated with it such as prices or market shares or quantities with and without the flammability warning." Transcript at 12:5–8. And because RCDE and Conjoint analysis can predict the "value of the product" without a flammability warning, these models can calculate the true market value of the Serum. As such, both methodologies are consistent with plaintiffs' theory of liability.

However, while the Court finds that both RCDE and Conjoint analysis could potentially calculate damages on a classwide basis, the Court nonetheless concludes that RCDE analysis does not provide a basis for class certification at this juncture. As explained above, RCDE analysis isolates the value of particular product features based on the regression analysis of historical sales data. Dr. Misra has opined that he believes such data is available through a variety of syndicated sources, as well as potentially from L'Oreal itself. But when the Court pressed him on this subject at the evidentiary hearing on June 17, 2014, Dr. Misra conceded that he "cannot claim to know whether or not [the data] exists for this particular product."). Dr. Misra also conceded that without this data, an RCDE analysis could not be performed on the Serum. Transcript at 18:18–19. Nor have plaintiffs provided any other assurance that the required sales data can be procured from either L'Oreal or some other source. L'Oreal, for its part, contends that the data does not exist.

Without this data, Dr. Misra cannot perform an RCDE analysis in this case. *See id.* at 68:7 ("That's true. The data has to exist."). Moreover, because plaintiffs have not yet procured the relevant sales data, the Court cannot accurately evaluate the contention of L'Oreal's expert Dr. Hanssens that there has not been sufficient variation in the sales history of the Serum for RCDE to isolate the causal impact of the removal of the flammability warning. Accordingly, the Court concludes that, whatever the theoretical merits of RCDE, plaintiffs have not established that RCDE can actually provide a classwide calculation of damages in this case. [2] As such, Dr. Misra's testimony about RCDE does not satisfy the predominance requirement of 🔖 Rule 23(b)(3).

 **\*12** Conjoint analysis, by contrast to RCDE, does not require preexisting sales data to generate conclusions about the Serum. Instead, Conjoint analysis relies on data produced by surveys performed specifically for the purposes of evaluating a specific product. As such, these surveys can be tailored to fit the purposes of the Conjoint analysis in question. As Dr. Misra explained: "If you have the right type of data for a coefficients demand model, that's—that's fantastic you can get very good results with

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

that. If you don't have access to that, you can do a Conjoint." Transcript at 38:13–16. Unlike RCDE, then, there do not appear to be any potentially insurmountable barriers to the application of Conjoint analysis in this case. Cf. *Werdebaugh,, 2014 WL 2191901 at \*26* ("Defendants provide no basis to believe that ... the regression analysis will be unworkable."). As such, the Court concludes that Dr. Misra's testimony concerning Conjoint analysis satisfactorily establishes that common issues predominate with respect to the California class.

The thrust of L'Oreal's opposition is that plaintiffs have not actually shown that they paid any premium for the Serum due to the absence of a flammability warning. At the evidentiary hearing held on June 17, 2014, L'Oreal particularly stressed the D.C. Circuit's decision in *In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244 (D.C.Cir.2013).* In *Rail Freight Fuel Surcharge,* a class of railroad shippers accused freight railroads of violating antitrust laws by conspiring to fix the price of fuel surcharges. *Id.* at 248. In support of their motion for class certification, the plaintiffs submitted a damages regression model that purported to isolate the portion of the fuel surcharges that was attributable to the railroads' price-fixing conspiracy. *Id.* at 250. Characterizing these damages models as "plausible" and "workable," the district court certified the class. *Id.* at 251.

The D.C. Circuit reversed. As relevant here, the D.C. Circuit first focused on what it perceived to be a serious flaw in the plaintiffs' damages model. "The model purport[ed] to quantify the injury in fact to all class members attributable to the defendants' collusive conduct." *Id.* at 252. But the model failed to account for the fact that certain members of the class had their shipping rates fixed by legacy contracts which pre-dated the alleged price-fixing conspiracy. *Id.* The model was thus prone to generate false positives, by calculating that class members with legacy contracts had suffered damages, when in fact those class members had suffered no damages because their rates were locked in by the legacy contracts. Citing *Comcast,* which had been published after the district court's decision to certify the class, the D.C. Circuit found that this flaw in the plaintiff's damages model precluded class certification: "No damages model, no predominance, no class certification." *Id.* at 253.

**\*13** L'Oreal cites *Rail Freight Fuel Surcharge* for the proposition that Rule 23 requires the plaintiffs to proffer a damages model that establishes classwide injury. *See* Mot. Exclude 12–13; Transcript at 84:4–85:2. In other words, on L'Oreal's reading of *Rail Freight Fuel Surcharge,* a plaintiff must do more than merely show that a classwide model exists-they much show that classwide injury exists. And plaintiffs have not met this burden, L'Oreal contends, because Dr. Misra has not yet performed either an RCDE or Conjoint analysis.

This argument fails, for two reasons. First, L'Oreal misreads *Rail Freight Fuel Surcharge.* The D.C. Circuit did not hold that Rule 23 required the plaintiffs to prove that they had in fact been injured by the alleged price fixing conspiracy. Instead, the plaintiffs need only "show that they *can* prove, through common evidence, that all class members were in fact injured by the alleged conspiracy." *Rail Freight Fuel Surcharge, 725 F.3d at 252* (emphasis added). The D.C. Circuit concluded that the plaintiffs in Rail Freight Fuel Surcharge did not make this showing, because of the false-positive problem discussed above. But critical to the D.C. Circuit's analysis was the fact that the model miscalculated the damages of some, but not all, of the class members. As such, the model provides no assurance that the action would not degenerate into plaintiff-by-plaintiff inquiries into whether the model accurately calculated each classmember's particular damages. And "[w]hen a case turns on individualized proof of injury, separate trials are in order." *Id.* at 253.

It is this risk of countless individualized mini-trials that informed the Supreme Court's reasoning in *Comcast,* and drove the D.C. Circuit's holding in *Rail Freight Fuel Surcharge. Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1434–35, 185 L.Ed.2d 515 (2013)* ("But such assurance is not provided by a methodology that identifies damages that are not the result of the wrong.... The permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless."). Here, by contrast, there is no suggestion that either RCDE or Conjoint analysis could fail in a way that would fracture the

class into plaintiff-by-plaintiff mini-trials. Both models purport to calculate the price premium caused by L'Oreal's omission of a flammability warning from the Serum bottle. Both models calculate the premium classwide-every class member paid the same extra charge for each bottle of Serum. Of course, plaintiffs' premium calculation may be wrong. Or, as L'Oreal suggests, a properly performed RCDE and Conjoint analysis may reveal that there was in fact no extra charge associated with the removal of the flammability warning. But under either scenario, plaintiffs' claims would fail across the board, not plaintiff-by-plaintiff. "A failure of proof on the common question ... ends the litigation and thus will never cause individual questions ... to overwhelm questions common to the class." *Amgen,* 133 S.Ct. at 1196. Accordingly, the Court concludes that *Rail Freight Fuel Surcharge,* read properly, does not require plaintiffs to actually prove classwide injury as a predicate to class certification. [3]

**\*14** Second, even if *Rail Freight Fuel Surcharge* did require classwide proof of injury at this stage, that is not the law in this circuit. Ninth Circuit precedent could not be clearer that the strength of a plaintiff's claim is not at issue when deciding whether to certify a class. " '[W]hether class members could actually prevail on the merits of their claims' is not a proper inquiry in determining the preliminary question 'whether common questions exist.' " *Stockwell v. City & Cnty. of San Francisco,* 749 F.3d 1107, 1112 (9th Cir.2014) (quoting *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 983 n. 8 (9th Cir.2011)); see also *id. Stockwell v. City & Cnty. of San Francisco,* 749 F.3d 1107, 1112 (9th Cir.2014) ("[D]emonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies."). " Rule 23 does not authorize a preliminary inquiry into the merits of the suit for purposes other than determining whether certification was proper.... To hold otherwise would turn class certification into a mini-trial." *Ellis,* 657 F.3d 970, 983 (9th Cir.2011); *see also Parsons v. Ryan,* 2014 WL 2523682 at *11 n. 19 (9th Cir. June 5, 2014) (citing cases).

Accordingly, the Court rejects L'Oreal's contention that plaintiffs must actually establish classwide injury in order to certify the California class. The Court therefore concludes that plaintiffs have established a classwide method of calculating relief, and accordingly have satisfied Rule 23(b)(3)'s predominance requirement.

### B. Remaining Rule 23 Requirements

Having concluded that plaintiffs have articulated a classwide theory of damages as required by *Comcast,* the Court turns to the balance of plaintiffs' motion to certify a California class. In considering whether to certify a California class, the Court is not writing on a blank slate. Instead, the Court considers this question against the background of the Court's previous order on class certification, which found that plaintiff had established all of the elements required for certifying a California class, except for a classwide theory of damages. However, in its opposition to plaintiff's renewed motion to certify a California class, L'Oreal advances a number of arguments that, in effect, ask this Court to reconsider its previous ruling that plaintiffs have established all but one of the elements of Rule 23.

L'Oreal similarly moves to decertify the New York class. The Court has a continuing duty to ensure compliance with class action requirements pursuant to Rule 23, and therefore may decertify a class at any time. *Falcon,* 457 U.S. at 160 ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation."). It is within the Court's discretion to decertify a class. *Marlo v. United Parcel Serv., Inc.,* 639 F.3d 942, 944 (9th Cir.2011). L'Oreal contends that developments subsequent to the Court's previous order certifying a New York class show that plaintiffs no longer meet all of the elements of Rule 23.

**\*15** At the outset, the parties dispute which party bears the burden of proof on a motion to decertify. Plaintiffs assert that, because a class has already been certified, L'Oreal bears the burden of showing that the class should be decertified. Opp. Decert. 6–7 (citing *Stiller v. Costco Wholesale Corp.,* 2014 WL 1455440, at *9 (S.D. Cal. April 15, 2014)). L'Oreal, by contrast, argues that the burden on decertification, like the burden on certification, is borne by plaintiffs. The Court finds that L'Oreal

WESTLAW   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

has the better of this argument. *Marlo, 639 F.3d at 947*, unambiguously holds that the party seeking class certification bears the burden of satisfying 📑 Rule 23, both at initial certification and on a later motion to decertify. *See also* 📑 *Negrete v. Allianz Life Ins. Co. of N. Am.,* 287 F.R.D. 590, 598 (C.D.Cal.2012)* ("To the extent that *pre-Marlo* cases conclude that a defendant bears the burden on a motion to decertify ..., these cases are no longer good law." (citation omitted)).

Accordingly, plaintiffs bear the burden of satisfying 📑 Rule 23, both on their renewed motion to certify a California class, and in opposing L'Oreal's motion to decertify the New York class. Because there is substantial overlap between the arguments raised by L'Oreal in opposing certification and in supporting decertification, the Court considers certification and decertification collectively, except as otherwise noted below. Moreover, because the Court previously found that plaintiffs had met their burden on 📑 Rule 23, [4] the Court takes L'Oreal's contentions argument-by-argument, rather than analyzing 📑 Rule 23 element-by-element.

With these threshold considerations in mind, the Court proceeds to the substance of plaintiffs' renewed motion to certify and L'Oreal's motion to decertify. The bulk of L'Oreal's briefs are dedicated to arguing that plaintiffs have not shown they have suffered an injury due to the lack of a flammability warning on the Serum. Out of this single basic contention, L'Oreal hatches eight separate arguments, all directed to different requirements under 📑 Rule 23(b)(3):

1. L'Oreal maintains that the class cannot be certified, because class members lack standing-a class member only has standing if they can show injury in fact, and no class member was injured by L'Oreal's failure to include a flammability warning on the Serum. Opp. Cert. 15–17; Mot. Cert. 22–25.

2. L'Oreal contends the class is not ascertainable "because the evidence confirms that the class would consist of individuals who did not lose any money, and who were not injured by the conduct challenged in this case." Opp. Cert. 18; Mot. Decert. 18–19.

3. L'Oreal argues that the class is not sufficiently numerous under 📑 Fed.R.Civ.P. 23(a)(1), because plaintiffs have not shown that any purchasers of the serum were injured, let alone enough purchasers to call for class treatment. Opp. Cert. 18–19; Mot. Decert. 19–20.

4. L'Oreal argues that plaintiffs have not demonstrated commonality under 📑 Fed.R.Civ.P. 23(a)(2), because the evidence does not support plaintiffs' classwide theory that purchasers of the Serum paid a premium due to the absence of a flammability warning. Opp. Cert. 19–20; Mot. Decert. 20–22.

**\*16** 5. L'Oreal asserts that the named plaintiffs are not typical under 📑 Fed.R.Civ.P. 23(a)(3) because the named plaintiffs were not injured by the absence of a flammability warning. Opp. Cert. 20–21; Mot. Decert. 22.

6. L'Oreal contends that the named plaintiffs will not adequately represent the California class as required by 📑 Fed.R.Civ.P. 23(a)(4) because they were not injured by L'Oreal's conduct. Opp. Cert. 21.

7. L'Oreal argues that the New York class must be decertified, because GBL 📑 §§ 349 and 350 require that plaintiffs show they were injured, and plaintiffs have failed to produce evidence showing their injury. Mot. Decert. 8–12.

8. L'Oreal asserts that *Comcast* requires plaintiffs to adduce evidence of classwide injury, and here plaintiffs have failed to produce evidence showing that the New York class was injured at all. Mot. Decert. 13–15.

All of these arguments turn on the same underlying premise: that plaintiffs were not injured by L'Oreal's conduct. As explained above, whether plaintiffs were injured is the ultimate merits issue in this case. "[T]he court should not turn the class certification

proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012), quoted approvingly by *Parsons v. Ryan,* 2014 WL 2523682 (9th Cir. June 5, 2014). Moreover, for all of these arguments, L'Oreal fails to explain how the merits of plaintiffs' claims actually "overlap[s]" with the requirements of Rule 23. *Dukes,* 131 S.Ct. at 2551. L'Oreal cannot simply garb its merits arguments in the terminology of Rule 23–it must affirmatively show that a merits inquiry is unavoidably necessary to resolve whether the classes should be certified. "Merits questions may be considered to the extent-but only to the extent-that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen,* 133 S.Ct. at 1194–95. Here, L'Oreal has not shown that such a searching merits inquiry is necessary, and the Court accordingly finds the eight above-referenced arguments unpersuasive.

In addition to the contentions described above, L'Oreal advances four other arguments about miscellaneous Rule 23 requirements, which the Court considers in turn. First, L'Oreal claims that the classes are not ascertainable because it will be difficult to determine who purchased the Serum. "As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay, Inc.,* 257 F.R.D. 563, 567 (N.D.Cal.2009); *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 331, 319 (C.D.Cal.1998) ("A class definition should be precise, objective, and presently ascertainable."). L'Oreal asserts that, because the Serum is inexpensive, and no retailers kept records of who purchased the Serum during the class period, ascertaining the actual membership of the classes will be impossible. Opp. Cert. 17. L'Oreal presses much the same argument in contending that class treatment is not manageable under Fed.R.Civ.P. 23(b)(3)(D). *Id.* at 25.

**\*17** Contrary to L'Oreal's arguments, courts routinely certify class actions involving inexpensive products where there are unlikely to be records of who purchased the product. *See Lanovaz v. Twinings N. Am., Inc.,* 2014 WL 1652338 (N.D.Cal. Apr. 24, 2014) (citing cases); *Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 535 (N.D.Cal.2012) (explaining that if ascertainability required class members to retain receipts, "there would be no such thing as a consumer class action.").

Moreover, the cases cited by L'Oreal are either readily distinguishable or unpersuasive. *In re POM Wonderful LLC,* 2014 WL 1225184 at \*6 (C.D.Cal. Mar. 25, 2014) stressed that "[c]lass actions, and consumer class actions in particular, each fall on a continuum of ascertainability dependent upon the facts of the particular case or product." *Pom Wonderful* fell "well toward the unascertainable end of the spectrum" because "towards the based on the volume of product sold, every adult in the United States is a potential class member." *Id.* Here, by contrast, L'Oreal sold approximately 9.9 million units of Serum throughout the nation, and the classes are limited to purchasers residing in New York and California. Similarly, *Sethavanish v. ZonePerfect Nutrition Co.,* 2014 WL 580696, at \*5 (N.D.Cal. Feb. 13, 2014), relies on the Third Circuit case *Carrera v. Bayer Corp.,* 727 F.3d 300 (3d Cir.2013). *Carrera* held that a class "was not ascertainable because there was insufficient evidence to show that retailer records could be used to identify class members." *Id.* at 308–09. But as *McCrary v. Elations Co., LLC,* 2014 WL 1779243, at \*8 (C.D.Cal. Jan. 13, 2014), explains, "[w]hile *[Carrera]* may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit." Instead, "[i]n this Circuit, it is enough that the class definition describes 'a set of common characteristics sufficient to allow' a prospective plaintiff to 'identify himself or herself as having a right to recover based on the description.' " *Id.* (citing *Moreno v. AutoZone, Inc.,* 251 F.R.D. 416, 421 (N.D.Cal.2008)).

Second, L'Oreal argues that the conduct of plaintiffs' counsel since the prior motion for class certification demonstrates that they have not zealously litigated this case, and therefore shows that the named plaintiffs are not adequate under Fed.R.Civ.P. 23(a)(4). Opp. Cert. 21–22. L'Oreal states that, since the Court denied certification of the California class by order dated July 1, 2013, plaintiffs' counsel has delayed the litigation of this case. In particular, on the day plaintiffs' renewed motion was due,

plaintiffs' filed an ex parte application seeking to extend the deadline for filing the renewed motion for class certification. Case No. 11–5465, Dkt. 118. [5] L'Oreal contends that this procrastination shows that plaintiffs' counsel are not adequate.

The Court finds this contention unpersuasive. Rule 23(a)(4) examines "the vigor with which the named representatives and their counsel will pursue the common claims." *Hanlon v. Chrysler Corp.,* 150 F.3d at 1021. A single ex parte application seeking to modify the case schedule does not call into doubt the "vigor" of plaintiffs' counsel. Nor can L'Oreal complain of delay in this case, as L'Oreal itself sought to stay proceedings pending resolution of its Rule 23(f) appeal of this Court's order certifying the New York class. Case No. 11–5465, Dkt. 110.

**\*18** Third, L'Oreal asserts that the New York class should be decertified because the $50 dollar per sale statutory damages available under GBL § 349(h) grossly outweigh even the most generous calculation of plaintiffs' actual damages. Mot. Decert. 15–17. Any recovery by the New York class would thus constitute an excessive fine under the Eighth Amendment; L'Oreal reasons that this in turn means that class treatment is not the superior method of adjudicating the controversy, as required by Fed.R.Civ.P. 23(b) (3). L'Oreal cites *In re Zyprexa Products Liab. Litig.,* 671 F.Supp.2d 397 (E.D.N.Y.2009), a case in which the State of Mississippi brought misleading marketing claims against a pharmaceutical company, seeking statutory damages for each instance of false marketing. The *Zyprexa* court granted summary judgment on statutory damages, reasoning that "Mississippi's requests for statutory penalties on a per-violation basis, in addition to actual damages sought, would result in a multibillion dollar cumulative penalty grossly disproportionate to both the injury Mississippi has suffered and the seriousness of Lilly's alleged misconduct." *Id. at 463.* Similarly, L'Oreal contends that the disproportionality of statutory damages here requires decertification of the New York class.

This argument fails. The question of whether aggregating statutory damages against L'Oreal would violate the Eighth Amendment is a merits question, not properly answered on class certification. Indeed, *Zyprexa* decided the Eighth Amendment issue on summary judgment, not at class certification. But even if this Court were to accept L'Oreal's efforts to bootstrap an Eighth Amendment argument through the superiority element of Rule 23(b)(3), that argument would still fail. Disproportionate statutory damages preclude class treatment only if that disproportionality would thwart the underlying statutory scheme. *Bateman v. Am. Multi–Cinema, Inc.,* 623 F.3d 708, 716 (9th Cir.2010). But any inquiry into the underlying statutory scheme of GBL § 349 is foreclosed here by *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010). As explained in the Court's previous order on class certification, *Shady Grove* held that federal law preempted a New York state statute limiting the aggregation of statutory damages in class actions. That holding binds the Court here: if an explicit statute is insufficient to preclude class treatment, then so too is any inquiry into the underlying statutory scheme. *See Shady Grove,* 559 U.S. at 436 (Ginsburg, J., dissenting) (criticizing the *Shady Grove* majority for "approv[ing] Shady Grove's attempt to transform a $500 case into a $5,000,000 award, although the State creating the right to recover has proscribed this alchemy"). The Court declines to contravene *Shady Grove* under the guise of a Rule 23(b)(3) superiority analysis.

Fourth, L'Oreal contends that plaintiff cannot establish that common issues predominate with respect to the California class, because the Court will need to determine on a purchaser-by-purchaser basis whether individual class members were concerned with flammability. This argument fails because, as explained in the Court's prior orders on class certification, "[u]nder the CLRA, plaintiffs may prove causation on a classwide basis by demonstrating the materiality of the omissions. Since materiality concerns objective features of allegedly deceptive advertising, not subjective questions of how it was perceived by each individual consumer, whether an omission is material presents a common question of fact suitable for class litigation." Dkt. 112 (citing *Massachusetts Mut. Life Ins. Co. v. Superior Court,* 97 Cal.App. 4th 1282, 1294 (2002)); *see also Mazza v. Am. Honda Motor Co., Inc .,* 666 F.3d 581, 595 (9th Cir.2012) ( "Under California's UCL, restitution is available to absent class members without individualized proof of deception, reliance, or injury.").

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   14

## V. CONCLUSION

**\*19** In accordance with the foregoing, defendant's motion to exclude the testimony of Dr. Sanjog Misra is hereby DENIED. Plaintiffs' renewed motion for class certification is GRANTED. The following class is hereby certified:

*California Class:* All individuals who purchased Garnier Fructis Sleek & Shine Anti–Frizz Serum in the state of California at any time during the period of February 4, 2008 to the present.

*Exclusions:* Excluded from both classes are defendants as well as all employees of the Court, including, but not limited to, judges, magistrate judges, clerks, and court staff and personnel of the United States District Courts of the Central District of California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court; their spouses or significant others and any minor children living in their households and any other persons within a third degree of relationship to any such federal judge; and finally, the entire jury venire called to for jury service in relation to this lawsuit. Also excluded from the classes are any attorneys or other or other employees of any law firms hired, retained, and/or appointed by or on behalf of the named plaintiffs to represent the named plaintiffs and any/or proposed class members or proposed class in this lawsuit. Also excluded from the classes are (1) any persons who have sustained physical injury or physical damage that relates to or arose from their use of Garnier Anti–Frizz Sleek & Shine Serum and (2) any persons who purchased Garnier AntiFrizz Sleek & Shine Serum for resale or distribution.

For the reasons discussed in the Court's prior order, the Court appoints KamberLaw, LLP and Parisi & Havens LLP as class counsel pursuant to Rule 23(g).

Finally, defendant's motion to decertify the New York class is hereby DENIED.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 6603730

## Footnotes

1   The Court does not separately address *Daubert's* requirement that expert testimony "fit" the issue at hand, *see Daubert II,* 43 F.3d at 1315. Whether Dr. Misra's expert testimony is "relevant to the task at hand," *id.,* asks essentially the same question as whether Dr. Misra's testimony satisfies plaintiff's burden under Rule 23 and *Comcast.*

2   The Court emphasizes the inherent tentativeness of this conclusion. As discussed above, RCDE appears to be a methodologically sound approach to proving classwide damages. If plaintiffs can procure the necessary historical sales data, than RCDE may well come in to prove damages at a later stage. In particular, the Court distinguishes the circumstances here from the situation in *Comcast,* where the district court "accepted only one of respondents' four proposed theories of antitrust impact." *Comcast,* 133 S.Ct. at 1428. Here, the Court "accepts" RCDE as a potential method of proof, but finds that plaintiffs have not yet established all of the prerequisites necessary for its use in this case.

3   L'Oreal's reliance on *Lanovaz v. Twinings N. Am., Inc.,* 2014 WL 1652338 (N.D.Cal. Apr. 24, 2014) and *In re POM Wonderful LLC,* 2014 WL 1225184 (C.D.Cal. Mar. 25, 2014) is similarly unavailing. In *Lanovaz,* the court expressly noted that a regression model "might arrive at a legally relevant damages analysis." *Id.* at \*6. But the expert in *Lanovaz* "expressly abandon[ed] a regression analysis as a method of calculating damages." *Id.* Here, Dr. Misra, far from abandoning regression analysis, continues to insist on its applicability to this case. Similarly, in *POM Wonderful,* the plaintiff's expert simply "assumed that 100% of that price difference was attributable to Pom's alleged misrepresentations." 2014 WL 1225184 at \*4. His analysis therefore did not "answer the critical

question [of] why that price difference existed, or to what extent it was a result of Pom's actions." *Id.* Here, by contrast, both RCDE and Conjoint analysis "evaluate the extent to which the flammability warning on Serum impacts consumer decisions." Misra Decl. ¶ 9(i).

4       In this regard, the Court observes that the Ninth Circuit declined to hear L'Oreal's 23(f) appeal of this Court's order certifying the New York class. Case No. 11–5465, Dkt. 117.

5       The Court granted this ex parte application by order dated November 5, 2013. Case No. 11–5465, Dkt. 118.

---

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    16

# EXHIBIT 4

2014 WL 5305893
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

John J. LOONTJENS, Plaintiff,

v.

SENTRY INSURANCE A Mutual Company, Involuntary Plaintiff,
Ace American Insurance Company, GHP Group, Inc., ABC
Insurance Company, and WW Grainger, Inc., Defendants.

No. 13–CV–1217–JPS.
|
Signed Oct. 15, 2014.

**Attorneys and Law Firms**

David J. McCormick, The Previant Law Firm SC, Milwaukee, WI, for Plaintiff.

Eric J. Goelz, Matthiesen Wickert & Lehrer SC, Hartford, WI, for Involuntary Plaintiff.

Daniel J. La Fave, Cerberus SC, Milwaukee, WI, for Defendants.


**ORDER**

J.P. STADTMUELLER, District Judge.

*\*1* The plaintiff, John Loontjens initiated this suit on August 28, 2013, in the Circuit Court of Milwaukee County, Wisconsin. On October 30, 2013, the defendants, ACE American Insurance Company "(ACE American")", GHP Group Inc. ("GHP"), ABC Insurance Company "(ABC Insurance")", and WW Grainger Inc., removed the suit to the United States District Court for the Eastern District of Wisconsin. (Docket # 1). The plaintiff asserts both negligence and strict liability claims against defendants for a range of alleged deficiencies in the design, warnings, and instructions associated with a Dayton brand portable heater. (Docket # 2, ¶¶ 13–30). The defendants filed a Motion to Exclude the plaintiff's sole liability expert along with a Motion for Summary Judgment. (Docket # 23). The parties have fully briefed those motions (Docket # 24, # 25, # 27, # 29, # 30, # 34).The Court thus turns to resolve the motions, first recounting the pertinent facts and then resolving the Motion to Exclude the plaintiff's sole liability expert before addressing the defendants' Motion for Summary Judgment.


**1. FACTUAL BACKGROUND**

Plaintiff's lawsuit arises from an accident that occurred on September 20, 2010. The plaintiff was attempting to troubleshoot a leak in a small tire that a co-worker had given him from a Dayton brand portable "torpedo" heater, model 3VE53E, as part of his job as a tire mechanic for Miller Compressing Company. The 3VE53E Dayton "torpedo" heater in question was manufactured for defendant GHP in South Korea. The Dayton brand of "torpedo" heaters is a brand name specifically manufactured for the Dayton Manufacturing Company, a wholly owned subsidiary of defendant W.W. Grainger, Inc. The Dayton brand of "torpedo" heaters was assembled, packaged, and shipped directly to defendant W.W. Grainger's distribution center from South Korea. W.W. Grainger resold the pre-packaged Dayton brand "torpedo" heaters it received from GHP without altering the product. The heaters were then resold by defendant W.W. Grainger through its website and/or print catalog to any individual or business.

WESTLAW  © 2015 Thomson Reuters. No claim to original U.S. Government Works.  1

On January 15, 2009, plaintiff's employer, Miller Compressing Company, purchased the subject Dayton 3VE53E heater from defendant W .W. Grainger, Inc. The plaintiff testified that prior to September 20, 2010, he was never asked to work on a tire at Miller Compressing like the tire in question.

On the day of the injury, the plaintiff was given two heater tires to repair, one did not hold any air and the other one leaked. The actual maximum inflation pressure for the tire was 25 PSI. The plaintiff put an unknown quantity of air at an unknown pressure into the tire that leaked. Many of the specific facts related to the injury are disputed by the parties. The plaintiff testified that he only partially inflated the tire so that he could put it into the dunk tank to check for leaks, however, the defendants assert that this is a false statement. After putting some air into the tire, the tire assembly exploded and hurled one of the metal split rims into the air, which struck the left side of the plaintiff's head, threw him backwards into some tires, and caused the loss of his left eye and other injuries. The force of the impact shattered the left side of the plaintiff's safety glasses and punched a large fist hole in his hard hat.

*2 The plaintiff's expert, Dr. Burck, has opined that the catastrophic nature of the failure mode could have been prevented by: using larger nuts and bolts; using larger washers or rectangular ones; using thicker metal in the tire rims; using singular-piece rims; using semi-pneumatic tires; or using pressure relief valve stems. (LaFave Ex. I). The defendants contend that these opinions are unreliable and inadmissable under Fed.R.Evid. 104(a) and 702.

## 2. MOTION TO EXCLUDE EXPERT EVIDENCE

Defendants move to exclude the proposed testimony of Dr. Burck, the plaintiff's sole liability expert, under Federal Rule of Evidence 702 and *Daubert.* The plaintiff intends to use Dr. Burck as a qualified expert in mechanical engineering, metallurgy, and failure analysis. The defendants argue that Dr. Burck should be precluded from testifying about wheel assembly design and servicing related issues because he is not qualified to address them as well as the fact that his methodology is unreliable. The plaintiffs argue that Dr. Burck is eminently qualified to render his metallurgy opinions regarding the defective split-rim tire assembly and that his methodology is reliable under *Daubert.* After much consideration, the Court must deny the defendants' Motion to Exclude the expert testimony of Dr. Burck.

As an initial matter, the Court denies the plaintiff's Motion to Strike the hearsay evidence advanced by the defendants in their challenge to Dr. Burck's competency. In testing the admissibility of expert testimony, the court applies the standards of Fed.R.Evid. 702 in conjunction with Fed.R.Evid. 104(a). *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir.2009). In assessing whether Dr. Burck's testimony is permitted as an expert, the court is obliged to examine a variety of foundational matters that the jury would never be expected to see, or would encounter in a different context at trial.

### 2.1 Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and subsequent cases, the Supreme Court has charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, whether scientific or otherwise. See *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Federal Rule of Evidence 702 and *Daubert,* govern the admission of expert testimony. Rule 702 states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

**\*3** In order to make such an evaluation, the court must analyze the proposed testimony using a three-step analysis. *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007).

First, "the witness must be qualified 'as an expert by knowledge, skill experience, training, or education.' " *Id.* An expert need not have particular academic credentials to be "qualified," but rather "anyone with relevant expertise enabling him [or her] to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir.2000). Ultimately, "whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990). In other words, the focus is not on whether the "expert is qualified in general, but whether his or her 'qualifications provide a foundation for [him or her] to answer a specific question.' " *Gayton v. McCoy,* 593 F.3d 610, 617 (7th Cir.2010) (internal citations omitted).

However, even if the court finds that a witness is a "supremely qualified expert," that witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable...." *Clark v. Takata Corp.,* 192 F.3d 750, 759 n. 5 (7th Cir.1999). Accordingly, at the second step of its analysis of whether expert testimony ought be admitted as evidence, the court must determine that an "expert's reasoning or methodologies underlying the testimony" are "scientifically reliable." *Ervin,* 492 F.3d at 904. Daubert provided a non-exhaustive list of "guideposts" for the court to consult in assessing the reliability of expert testimony: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential error rate when applied; and (4) whether the theory has been generally accepted in the relevant scientific, technical, or professional community. Additionally, other factors may apply. The Seventh Circuit, parroting the Advisory Committee Notes to Rule 702, has suggested other benchmarks for gauging expert reliability, including: (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "whether the expert has adequately accounted for obvious alternative explanations"; (9) "whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Fuesting v. Zimmer, Inc. (Fuesting I),* 421 F.3d 528, 534–35 (7th Cir.2005), vacated in part on other grounds, 448 F.3d 936 (7th Cir.2006). *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469. "[T]he Daubert framework when assessing the reliability of an expert's testimony is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered." *See Mihailovich v. Laatsch,* 359 F.3d 892, 919 (7th Cir.2004); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that, in applying the Daubert framework, a court must "account for the various types of potentially appropriate expert testimony.") Ultimately, the object of the court's Rule 702 reliability inquiry is to ensure that the opinions expressed by testifying experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996).

**\*4** Third, a court must confirm that an expert's testimony is relevant; that is, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin,* 492 F.3d at 904. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert,* 509 U.S. at 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (citing Fed.R.Evid. 401). The proponent of the expert's testimony bears the burden of proof with respect to whether the admissibility

requirements are met. *See* 🔶 *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 704 (7th Cir.2009). With these legal principles in mind, the court proceeds to examine the proposed testimony of Dr. Burck, who is the subject of the *Daubert* motion.

### 2.2 Analysis

First, the court examines whether Dr. Burck is qualified to testify on the issues that his testimony concerns. *See* 📄 *Gayton,* 593 F.3d at 617 ("[W]e must look at each of the conclusions [the expert] draws individually to see if he [or she] has the adequate education, skill, and training to reach them."). Dr. Burck has reached the following conclusions in this matter: 1) as manufactured, distributed, and sold, the accident heater was defective and unreasonably dangerous and not reasonably safe for its intended use because of the catastrophic mode of the wheels at inflation pressures which should have been anticipated; 2) contributing factors to the subject wheel failure were the thin sheet metal construction of the wheel, the small bolt head diameter, and the small thin washer used under the bolt heads, all of which allowed the material surrounding the bolt heads to deform and the heads to pull through; 3) the foreseeable catastrophic failure mode could have been eliminated at a nominal cost, which would have prevented or greatly reduced the injuries to the plaintiff; 4) the catastrophic nature of the failure mode of the wheel when overinflated could have been prevented by reinforcing the material near the bolt holes by the use of washers to distribute the load, as is done by other manufacturers; and 5) the potential for over inflation of the heater tires should have been anticipated by the manufacturer, distributor, and seller of the heater.

### 2.2.1 Dr. Burck's Qualifications

Dr. Burck's academic record indicates that he holds a Bachelor of Science in Mechanical Engineering from Michigan State University, a Master of Science in Engineering Mechanics from Rensselaer Polytechnic Institute, and a Doctorate in Materials Science and Engineering from Northwestern University. Dr. Burck has worked as a consultant in the fields of metallurgical, materials, and mechanical failure analysis from 1984 to the present. Additionally, Dr. Burck's experience includes numerous seminar presentations, talks, and peer-reviewed publications, primarily on the topics of fatigue, fracture, and failure analysis of engineering materials. (McCormick Ex. 14).

**\*5** Here, the court concludes that Dr. Burck is qualified to relate his opinion on the mechanics, qualities, and failure of the split-rim assembly at issue in this matter based on his education and work experience. The defendants' main objection to Dr. Burck's testimony is that a metallurgist is not an expert that "fits" the facts of this case. Defendants argue that Dr. Burck's lack of training, experience, or expertise related to tire or tire repair disqualifies his testimony in this case. However, nothing in Rule 702 or in the jurisprudence interpreting the rule indicates that an expert must have specific knowledge about the precise object of the litigation. *See* 🔶 *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 551 (7th Cir.1980) ("The fact that [the expert] had little actual experience in the study of blasts from coal mining operations[, the specific issue in the litigation,] did not disqualify him from expressing his opinion, which was based on general geological principles."); *see also Tormenia v. First Investors Realty Co.,* 251 F.3d 128, 135 (3d Cir.2000) ("Rule 702 does not require that experts have personal experience with the object of the litigation in which they testify, nor does it require that experts eschew reliance on a plaintiff's account of factual events that the experts themselves did not observe.") In fact, the essence of expert testimony is calling a person to testify who has a knowledge base superior to a lay person in a "general theory or technique" and having that person "apply ... the theory or technique to the specific facts of the case." Kenneth S. Broun, McCormick on Evidence § 13 (6th ed. 2006) ("[T]he expert's testimony is a syllogism: the major premise is the validity of the general theory or technique, the minor premise is the case specific data, and the application of major to minor yields a conclusion relevant to the merits of the case.").

Dr. Burck's opinions relate directly to the design of the split-rim wheel assembly at issue in this case. While Dr. Burck may not be the most qualified person to testify on the issue before the court, the Federal Rules of Evidence to do not require such a standard. Any disputes regarding Dr. Burck's qualifications can be the subject of cross-examination should he testify at trial. *See* G. Joseph & S. Saltzburg, Evidence in America § 51.3 (Courts have made it clear that "trial judges are not to demand that the proffered expert possess the highest possible credentials or skills, or be the most qualified of all conceivable experts.").

### 2.2.2 Reliability of Dr. Burck's Methodology

" 'Even if an expert is qualified,' " a court should not allow an expert to offer an opinion that does not "rely on proper methodologies" and is " 'therefore speculative.' " *Lemmermann v. Blue Cross Blue Shield of Wis.,* 713 F.Supp.2d 791, 801 (E.D.Wis.2010) (citing *Weir v. Crown Equip. Corp.,* 217 F.3d 453 464 (7th Cir.2000)). Accordingly, the court must examine the methodologies that the instant witness used in arriving at the conclusion that the subject heater was unreasonably dangerous. In making such an examination, the court keeps in mind the list of relevant factors provided by the *Daubert* case and its progeny discussed earlier in the order in evaluating the reliability of an expert's methods.

 **\*6** Here, the court finds that Dr. Burck's methodology is scientifically reliable under *Daubert* and, thus, the defendants' Motion to Exclude his testimony should be denied. Dr. Burck's investigation in this matter included: 1) a visit to Miller Compressing where he met with personnel regarding incident and examined the failed wheel and tire components as well as the other tire from the opposite side of the heater; 2) reviewing photographs of the accident site taken by Miller Compressing personnel immediately after the incident and also photographs and a report prepared by an insurance investigator nine days after the accident; 3) destructive failure testing (with metallurgist Dr. Gerald Zaminsk) to determine the inflation pressures required to fail the two exemplar wheel assemblies supplied by counsel for the defendants; 4) Dr. Burck investigated, tested and analyzed the sheet metal used in the split-rim tire assembly, the sheet metal used in the split-rim tire assembly, the nuts and bolts used to secure the split-rim tire assembly, the size of the bolt heads used to secure the split-rim tire assembly and their respective thread diameter and thread pinch, the washers used in the splitrim assembly, and the size of the bolt holes in the split-rim tire assembly as compared to the industry standards; and 5) proposing a destructive test protocol for the subject split-rim tire assembly to test the strength of the steel split rim, however, the defendants refused to allow this testing to proceed. (LaFave Ex. J). Contrary to the defendants' assertions, this extensive list of testing cannot be considered mere conjecture or "bottom line" conclusion. Dr. Burck's testimony will assist the trier of fact to understand the evidence and to determine material facts at issue in this case. *See* *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007).

The methodology used by Dr. Burck is vastly different from the cases defendants cite where courts have found expert testimony unreliable and therefore inadmissable. *Clark v. Takata Corporation* involved a vehicle rollover accident in which the plaintiff claimed that the failure of his seat belt caused him to suffer serious injuries. *Clark v. Takata Corp.,* 192 F.3d 750 (7th Cir.1999). The court excluded the expert testimony of a biomechanical engineer who had performed absolutely no testing on the seat belt at issue or any reenactment of the accident and had reviewed no testimony from the plaintiff or from any of the witnesses at the scene or any of the passengers who were in the accident vehicle. *Id.* at 755, 758. Furthermore, the expert witness in Clark had not made any measurements, such as "how far the front seat was reclined at the time of the accident or the extent to which the roof was crushed in the rollover." *Id.* at 755–56. In giving his opinion, the expert witness simply stated that he had relied on his "experience." *Id.* at 758. Under those facts, the court found the expert's testimony unreliable and properly excluded. *Id.* at 759.

 **\*7** Likewise, in *Lemmermann v. Blue Cross Blue Shield,* the court excluded two of the plaintiff's expert witnesses whose testimony it deemed unreliable under *Daubert.* 713 F.Supp.2d 791 (2010). In *Lemmermann,* the plaintiff claimed that she suffered injuries when chemicals she was using to treat her pool exploded, causing her to suffer from respiratory injuries. *Id.* at 793. She retained an environmental engineering expert to bolster her claim. *Id.* at 798. The expert was to testify regarding two distinct claims: (1) the product could explode when mixed with a small amount of water; and, (2) the manufacturer failed to provide an explosion warning. *Id.* The court ultimately found that the expert was qualified to testify to the first claim, but excluded his testimony regarding the second claim because he lacked "expertise in a manufacturer's responsibilities to the end

users of their products." *Id.* at 800–01. The court ultimately struck the expert engineer's testimony entirely because it found his methodology unreliable. *Id.* at 801. In reaching this conclusion, the court stated the following:

> In essence, Mr. Schuck's "methodology" involved reading several labels and data sheets regarding dichlor and, at best, parroting the conclusions of the authors of those data sheets. Surmising that a chemical reaction will occur because someone else has concluded that a chemical reaction will occur is utterly circular in its logic and is the epitome of an unreliable methodology.

*Id.* at 802. In addition to striking the testimony of the plaintiff's environmental engineering expert, the court also concluded that the expert testimony of the plaintiff's treating pulmonologist was unreliable and therefore excluded. *Id.* at 807. The plaintiff in *Lemmermann* suffered from preexisting asthma. *Id.* at 805. The pulmonologist was going to offer testimony that the plaintiff either acquired Reactive Airways Dysfunction Syndrome (RADS) or suffered an exacerbation of her asthma. *Id.* at 803. Among other things, the court was troubled by the fact that the first criterion for the diagnosis of RADS is "the absence of preexisting disorder, asthma symptomatology or history of asthma in remission, and exclusion of conditions that can simulate asthma," yet the plaintiff suffered from an obvious history of battling asthma. *Id.* at 805. Moreover, the court noted that the "fourth criterion for a valid diagnosis of RADS is the onset of asthma symptoms within minutes to hours, and less than 24 hours after the exposure." *Id.* Yet the court noted that the plaintiff had not complained about shortness of breath on the day of the incident and the records showed her lungs to be free and clear of injury. *Id.* Regarding the diagnosis of exacerbation of preexisting asthma, the court found it unreliable because the only time the expert witness referred to it was at the end of her sworn deposition. *Id.* at 806. In addition to regarding the expert pulmonologist's diagnosis as suspect, the court further found that her methodology regarding causation was suspect. *Id.* at 809. Again, this finding went to the fact that the expert had not investigated to what extent the plaintiff had been exposed to the chemical or even "undertaken any effort to explain her findings regarding causation." *Id.*

**\*8** In contrast to the cases cited by defendants, here, Dr. Burck conducted numerous tests, as detailed above, in relation to the incident at hand. Rather than engaging in a *Daubert* analysis using any of the factors to determine reliability, the defendants point to a variety of additional tests that Dr. Burck should have performed in order to reach a reliable conclusion in this matter. Defendants argue that Dr. Burck failed to consider whether what the plaintiff relates about the accident is physically possible. Defendants further argue that Dr. Burck failed to consider how fast the tire in question would have failed if exposed, even briefly, to line pressure of 130 PSI-the amount of pressure defendants allege was used in the accident.

Indeed, there is no doubt that additional testing may have been helpful in reaching a scientific conclusion in this case. However, it is not the purview of the court as the gatekeeper of evidence to determine the necessity of each and every possible test that could possibly be performed in reaching a valid scientific conclusion. Such determination is better left as the subject of cross-examination. Moreover, Dr. Burck requested additional testing related to destructive testing protocol in this case that the defendants refused to allow. (LaFav Ex. H). Defendants have not pointed to any information that suggests that Dr. Burck used a scientific theory that is untested, not subject to peer review, not evaluated in light of potential error rates, or not accepted in the relevant scientific community. The defendants can more appropriately attack Dr. Burck's inclusion or exclusion of certain possibilities upon cross-examination at trial. As the Supreme Court noted in *Daubert,*

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence....

WESTLAW   © 2015 Thomson Reuters. No claim to original U.S. Government Works.   6

> Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a
> position is insufficient to allow a reasonable juror to conclude that the position more likely than not is
> true, the court remains free to direct a judgment ... and likewise to grant summary judgment.

*Daubert,* 509 U.S. at 596. Accordingly, the defendants' Motion to Exclude Dr. Burck as a liability expert is denied.

## 3. MOTION FOR SUMMARY JUDGMENT

The court now turns to the defendants' Motion for Summary Judgment. The plaintiff alleges that while he inflated one of the tires of the torpedo heater, the rim exploded and smashed into the left side of his face, which caused serious bodily injury. (Compl. at 5). Plaintiff seeks recovery under negligence and/or strict liability in tort. [1]

### 3.1 Legal Standard

Summary judgment is appropriate where the "pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms.,* Inc., 591 F.3d 876, 882 (7th Cir.2010). A genuine issue of material fact exists when a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The initial burden is on the moving party ... to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.* 554 F.3d 1133, 1137 (7th Cir.2009) (quoting *Cody v. Harris,* 409 F.3d 853, 860 (7th Cir.2005)). Once the movant satisfies this initial burden, the burden then shifts to the non-moving party who "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham,* 30 F.3d 879, 883 (7th Cir.1994) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202). In ruling on a summary judgment motion, the court must view the evidence plus all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.,* 491 F.3d 625, 630 (7th Cir.2007). With these standards in mind, the court looks to the specific allegations made by the plaintiff.

### 3.2 Analysis

**\*9** Defendants make three separate arguments in their Motion for Summary Judgment. The Court will address each of the arguments in turn. First, the defendants argue that they are entitled to summary judgment on the assumption that the plaintiff's expert, Dr. Burck, will be excluded in this matter. As discussed above, the court finds that Dr. Burck is qualified to testify regarding his conclusions in this matter. What remains is a duel of the experts, whose ultimate conclusions present an issue of material fact that is within the province of the jury. Thus, the defendants are not entitled to summary judgment under this theory.

Second, the defendants argue that the plaintiff cannot prove any deficiencies in the warnings or instructions to the subject wheel assembly nor that they caused his accident. Defendants correctly note that the plaintiff has not disclosed any expert to address the warnings and instructions regarding the subject wheel assembly. Indeed, the plaintiff's sole expert, Dr. Burck, stated he had no opinion on the issue. The defendants argue that any failure to warn allegations must be dismissed because the concept of what constitutes appropriate instructions or warnings for this component of heater is beyond the ken of average jurors. *See Weis v. United Fire and Cas. Co.,* 197 Wis.2d 365, 380–81, 541 N.W.2d 753 (1995) (holding that "[t]he lack of expert testimony in cases which are so complex or technical that a jury would be speculating without the assistance of expert testimony constitutes an insufficiency of proof .") The defendants further argue that, regardless, the plaintiff cannot prove causation for a failure to warn claim because the plaintiff's testimony indisputably proves that he required no warning about the hazards of overinflating a tire

The court finds that the defendants are not entitled to summary judgment on the failure to warn claim. The defendants have cited to no cases that require an expert specifically on the issue of proper instructions or warnings. Although the plaintiff has no expert on this subject, the issue of the defendants' negligence remains within the purview of the jury. Moreover, the fact that the plaintiff did not check the tire pressure in this case does not disprove the possibility that he may have altered his behavior and avoided injury with a different type of warning. The court finds that material issues of fact exist as to any failure to warn claim and, thus, the defendants are not entitled to summary judgment on the claim.

Finally, the defendants claim that the plaintiff improperly plead punitive damages as a separate claim. The defendants properly note that "[p]unitive damages are a remedy, not a cause of action." *Hansen v. Tex. Roadhouse, Inc.,* 2013 WI App 2 ¶ 21, 345 Wis.2d 669, 827 N.W.2d 99 (Ct.App.2012). As such, the court will dismiss the plaintiff's third claim for punitive damages and will consider the claim as a remedy for the remaining negligence and strict liability claims.

### 4. CONCLUSION

 **\*10** The Court finds that the plaintiff's expert, Dr. Burck, is permitted to testify as an expert witness in this matter under *Daubert.* As such, material issues of fact remain that preclude summary judgment at this stage. Finally, in light of these rulings, the Court has considered the parties' Joint Motion to Adjourn Trial (Docket 38), and finds that staying all pretrial proceedings is no longer necessary. [2]

Accordingly,

**IT IS HEREBY ORDERED** that the defendants' Motion to Exclude Plaintiff's Sole Liability Expert, Dr. Burck (Docket # 23), be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that the defendants' Motion for Summary Judgment (Docket # 23) be and the same is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the Joint Motion to Adjourn Trial and Stay Proceedings (Docket # 38) be and the same is hereby **DENIED .**

### All Citations

Not Reported in F.Supp.3d, 2014 WL 5305893

Footnotes

1    The Plaintiff additionally makes a third claim for punitive damages, which the court shall discuss in detail below.
2    The Court notes that the parties have not fully briefed the issues related to the defendants' expert, Dr. Bolden's, testimony. The plaintiff argues in the opposition brief that portions of Mr. Bolden's report/opinions should be stricken as inherently reliable under *Daubert.* In the interest of efficiency and timely ruling on the Motion for Summary Judgment, the court will consider arguments related to Mr. Bolden's expert opinions in motions *in limine* prior to the start of trial.

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.