# EXHIBIT 6

1                    UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WISCONSIN
2     - - - - - - - - - - - - - - - - - - - - - - - - - - -
      SCOTT WEAVER, individually      Case No.
3     and on behalf of all others     2:18-cv-01996-JPS
      similarly situated
4
                    vs
5
      CHAMPION PETFOODS USA,
6     INC., and CHAMPION
      PETFOODS, LP
7      - - - - - - - - - - - - - - - - - - - - - - - - - - -

8                              - - -

9                  Friday, September 20th, 2019

10                             - - -

11                  Videotaped Deposition of LORIN HITT,

12     was taken pursuant to Notice at the law offices of

13     GREENBERG TRAURIG, LLP, 1717 Arch Street, Suite 400,

14     Philadelphia, PA 19103, on the above date before

15     DEBRA G. JOHNSON-SPALLONE, CCR, RPR, Delaware CSR,

16     Notary Public in and for the States of Pennsylvania,

17     New Jersey, and Delaware, and a Federally Approved

18     Reporter of the United States District Court

19     commencing on or about 9:05 a.m.

20

21

22

23

24

25

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 2 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com                                    Page 1 (1)
**Depo International, Inc.**

1    APPEARANCES:

2

3    GUSTAFSON GLUEK PLLC
     BY:  RAINA C. BORRELLI, ESQUIRE
4    Canadian Pacific Plaza
     120 South Sixth Street
5    #2600
     Minneapolis, MN 55402
6    (612) 333-8844
     rborrelli@gustafsongluek.com
7    Representing the Plaintiff

8

9    GREENBERG TRAURIG, P.A.
     BY:  JARED R. KESSLER, ESQUIRE
10   333 S.E. 2nd Avenue
     Miami, FL 33131-3238
11   (305) 579-0836
     kesslerj@gtlaw.com
12   Representing the Defendants

13

14   ALSO PRESENT:

15   ALEISHA CATTS, Video Technician

16

17

18

19

20

21

22

23

24

25

(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**

1                    I N D E X

2                    - - - - -

3  TESTIMONY OF:    LORIN HITT

4  By Ms. Borrelli.............        6

5

6

7                    - - - - -

8                  E X H I B I T S

9                    - - - - - -

10  EXHIBIT                              PAGE

11  NUMBER            DESCRIPTION        MARKED

12                  - - - - - - -

13  Hitt-1      Second Rebuttal Expert

14              Report of Lorin M. Hitt,

15              September 12, 2019          7

16  Hitt-2      Rebuttal Expert Report

17              of Lorin M. Hitt,

18              September 12, 2019          7

19  Hitt-3      Rebuttal Expert Report

20              of Lorin M. Hitt, May

21              13, 2019                  15

22

23

24

25

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 4 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com                        Page 3 (3)
**Depo International, Inc.**

1      - - - - - - - - - - -
2      P R O C E E D I N G S
3      - - - - - - - - - - - - - -
4          (It is stipulated and agreed by and
5  between counsel that sealing, and certification of
6  the within deposition be waived; and that all
7  objections, except as to the form of the question,
8  be reserved until the time of trial.)
9          - - - -
10         (The following is held off of the
11 video record and is recorded on the stenographic
12 record only.)
13         - - -
14         COURT REPORTER:  Will counsel
15 please state their transcript order on the record.
16         MS. BORRELLI:  Yes.  Just
17 electronic for now.  I need it by Monday.  No rough.
18         Final electronic on Monday.
19         MR. KESSLER:  We would take a
20 draft, if you could do it.  No rush, and then we
21 will do expedited Monday, too.
22         VIDEO TECHNICIAN:  Everyone stand
23 by.
24         - - -
25         (The following is recorded on both

Page 4

1  the video record and the stenographic record.)
2          - - -
3          VIDEO TECHNICIAN:  This is the
4  videographer speaking, Aleisha Catts, here on behalf
5  of Depo International.
6          Today is September 20th of 2019,
7  and the time is 9:06 a.m.
8          We are at 1717 Arch Street,
9  Philadelphia, Pennsylvania to take the video
10 deposition of Lorin Hitt in the matter of Scott
11 Weaver versus Champion Petfood, USA, Incorporate,
12 et al.
13         Will counsel please introduce
14 yourself?
15         MS. BORRELLI:  Raina Borrelli from
16 Gustafson Gluek on behalf of the Plaintiffs.
17         MR. KESSLER:  Jared Kessler from
18 Greenberg Traurig on behalf of the Defendants.
19         VIDEO TECHNICIAN:  Will the court
20 reporter please administer the oath.
21         - - - -
22         LORIN HITT, after having been first
23 duly sworn as a witness, testified as follows:
24         - - - -
25         - - -

Page 5

1          - - -
2          EXAMINATION
3          - - - -
4  BY MS. BORRELLI:
5      Q.    Morning, Dr. Hitt.
6          We have met before a few months
7  ago.
8      **A.    Yes.  Good morning.**
9      Q.    Good morning.
10         I know you know the ground rules
11 for deposition as you have done this a number of
12 times.
13         I will just remind you; ask anytime
14 you need a break, and let's try not to talk over one
15 another.
16         Okay?
17     **A.    Okay.**
18     Q.    All right.
19         Anything that would prevent you
20 from testifying truthfully today?
21     **A.    No.**
22     Q.    All right.
23         I'm going to start by handing you
24 what I have marked as Exhibit-1, which is the Second
25 Rebuttal Expert Report of Lorin M. Hitt in the

Page 6

1  Reitman versus Champion case.
2          - - -
3          (At which time a Second Rebuttal
4      Expert Report of Lorin M. Hitt, September
5      12, 2019, was received and marked as
6      Deposition Exhibit Hitt-1 for
7      identification by the court reporter.)
8          - - -
9          MR. KESSLER:  Thank you.
10         - - -
11 CONTINUATION
12 BY MS. BORRELLI:
13     Q.    Take a look, and let me know if
14 that is your signature on page eight of that report.
15     **A.    Yes.**
16     Q.    Okay.
17         And I'm also going to hand you what
18 has been marked as Exhibit-2, your Rebuttal Expert
19 Report of Lorin M. Hitt in Weaver versus Champion
20 dated September 12, 2019.
21         - - -
22         (At which time a Rebuttal Expert
23     Report of Lorin M. Hitt, September 12,
24     2019, was received and marked as Deposition
25     Exhibit Hitt-2 for identification by the

Page 7

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 5 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com          **Page 4 (4 - 7)**
**Depo International, Inc.**

court reporter.)

- - -

CONTINUATION

BY MS. BORRELLI:

Q. And do you see your signature on page 46 of Exhibit-2?

A. **Yes.**

Q. **All right.**

So, these are the two reports we are here to discuss today; right?

A. **Okay.**

Q. I will try not to retry old ground from your previous report and deposition in Reitman unless necessary to clarify anything.

Okay?

A. **Okay.**

Q. **All right.**

So, Exhibit-1 is your second rebuttal expert report in the Reitman case.

Is it fair to characterize your opinions in this report as limited to Dr. Krosnick's second survey regarding Pentobarbital in Mr. Weir's supplemental report?

A. **I think that's right. It was intended to rebut those directly, and did not, as**

far as I know, introduce anything new.

Q. All right.

So, you're not offering any new opinions in your second rebuttal report, Exhibit-1, regarding Dr. Krosnick's first survey and first report in terms of the diminution in value survey?

A. **That's correct.**

Q. And you're not offering any new or different opinions about Mr. Weir's initial report in Reitman.

Is that right?

A. **I think, generally, that's right.**

Q. Okay.

I guess with the understanding of what you say about his supplemental report, right, tangentially implicates that first report?

A. **Yeah. That's the extent of it.**

Q. And then in Exhibit-2, which is your report in the Weaver case, are you offering any new opinions in that report regarding Dr. Krosnick's first survey and first report?

A. **So, I would not say it's a new opinion. There is definitely some new analysis that supports the existing opinions, and so, that's in there.**

**There are some analysis that was in his original survey which was not in the previous report, and then there is the Pentobarbital discussion as well, which is somewhere between the two, and I believe that's it.**

Q. In Exhibit-2, your rebuttal report, are you offering any new or different opinions regarding Mr. Weir's report --

A. **So --**

Q. -- obviously understanding the numbers are different?

A. **So, the numbers are different.**

**There is -- there is a little bit more discussion on some of the existing points that wasn't there before, but there's -- I don't think there's any fundamentally new opinions, other than, you know, additional new discussion and analysis of his new -- of his new materials.**

Q. Between your report in Weaver, and your second rebuttal report in Reitman, Exhibit 1, are there any different opinions about Dr. Krosnick's Pentobarbital survey and report in these two reports?

A. **No.**

Q. Since the time that you offered

your opinions in Reitman, which I believe was May 13, 2019 --

Does that sound right?

A. **Yes. Yes.**

Q. Okay.

A. **That's correct.**

Q. Okay.

A. **That's right.**

Q. -- have you reviewed any additional documents to support your opinions in Exhibits-1 and 2?

A. **So -- so, yes. In most cases it is reviewing just newer versions of things that already existed in the Weir report, the Krosnick report, the new Complaints.**

**In terms of additional information, there is -- in the Weaver report some of the sources had to change because they are no longer available, and so, those were updated as well.**

**So, that I don't know if I -- they're Websites. I don't know if I consider them documents, but they're -- that was something else that is also new.**

Q. And when you say "sources had to change," you mentioned Websites, do you mean, like,

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 6 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 5 (8 - 11)**
Depo International, Inc.

1 you Goggled something and that Website no longer
2 existed?
3      A.   Yes.  It was -- yeah, it was
4 regarding the prices.
5      Q.   Okay.
6      A.   So, some of the sources we used for
7 the prices no longer had the prices for those
8 products available.  So, those were updated.
9          But I think -- I think that is the
10 extent of it.  It is just simply updating -- it
11 updating the document references, and, you know, the
12 reports, the other case material, and so forth to
13 the current state in the case.
14     Q.   Did you receive any additional
15 documents from Champion that you reviewed related to
16 your opinions in Exhibits-1 and 2?
17     A.   I don't think so.
18     Q.   Between the time of your first
19 report in May of 2018, and today, did you review any
20 additional deposition testimony in this case, and by
21 that I mean, Weaver or Reitman?
22         (Pause)
23     A.   I don't believe so.
24     Q.   Between May 13 of 2019, and today,
25 did you speak with anyone at Champion about this

1 case, either by phone or in writing?
2      A.   I didn't speak with anybody
3 directly at Champion.
4      Q.   Did you have any staff assisting
5 you with researching and drafting your reports
6 Exhibits-1 and 2?
7      A.   Yes.
8      Q.   And where -- who employs those
9 staff?
10     A.   They are employed by Cornerstone
11 Research.
12     Q.   Do you know whether anyone at
13 Cornerstone Research that you worked with spoke or
14 communicated with anyone at Champion during the time
15 of your first report, and these reports?
16     A.   I don't know.
17         (Pause)
18     Q.   When were you retained in the
19 Weaver case?
20     A.   I don't recall whether there was a
21 formal retention or I just considered it an
22 extension of the existing one.
23         So, I -- I actually don't know.
24     Q.   When did you become aware that you
25 were going to issue expert opinions in the Weaver

1 case?
2      A.   It would have been in the
3 July/August timeframe this year.  I think the first
4 work was in August, but I think I had been made
5 aware of it.  Things were coming in probably about a
6 month before.  I don't know exactly when, though.
7      Q.   Was your assignment in the Weaver
8 case the same as your assignment in the Reitman
9 case?
10     A.   My understanding that it was
11 basically the same.
12     Q.   Did anyone deliver the work that
13 you could do in the Weaver case to support your
14 case?
15     A.   No.
16     Q.   Did you ask for anything in the
17 Weaver case to support your opinions that was not
18 given to you?
19     A.   So, there was -- I revisited the
20 question of whether or not there is any retail
21 pricing information available.
22         My understanding is, it continues
23 to not be available.  So, that was the one document
24 request I had, and there was nothing to be used.
25         So, that was the only one.

1      Q.   Did your staff or you do any
2 additional research to determine if that retail
3 pricing information was available from a source,
4 other than Champion?
5      A.   So, I -- I asked my research staff
6 to explore whether or not there was anything that
7 might be available.
8          I -- I think it was mostly directed
9 at Champion, but they -- they may also have done
10 some additional work to see if it was readily
11 available, but there was nothing -- nothing that
12 they were able -- able to obtain.
13     Q.   Were any budgetary restrictions
14 placed on you as far as work that you could do in
15 the Weaver case?
16     A.   No.
17     Q.   So, no one prevented you from doing
18 what you thought was the best work you could do as
19 an expert in the Weaver case?
20     A.   That's correct.
21         - - -
22         (At which time a Rebuttal Expert
23     Report of Lorin M. Hitt, May 13, 2019, was
24     received and marked as Deposition Exhibit
25     Hitt-3 for identification by the court

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 7 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 6 (12 - 15)**
Depo International, Inc.

1  reporter.)

2  - - -

3  CONTINUATION

4  BY MS. BORRELLI:

5  Q. Just for reference, I am going to

6  hand you Exhibit-3, which is your rebuttal report in

7  Reitman from May.

8  Just take a quick look.

9  Confirm it is what I say it is.

10  (Pause)

11  **A. Looks correct.**

12  Q. All right.

13  And I will say, it is just the body

14  of your report. I didn't add any of the exhibits,

15  attachments, et cetera, or do you have the whole

16  thing?

17  **A. I have -- I have a CV as well.**

18  Q. All right. Excellent.

19  **A. So -- I think this is the whole**

20  **thing.**

21  Q. All right.

22  I don't have it, so better you.

23  Okay.

24  MR. KESSLER: Do you want a copy of

25  it?

1  MS. BORRELLI: That's fine.

2  I don't think I'm going to need it.

3  - - -

4  CONTINUATION

5  BY MS. BORRELLI:

6  Q. Exhibits-1 and 3, are your two

7  reports in Reitman.

8  Do those two reports together

9  contain all the opinions that you intend to offer in

10  the Reitman case?

11  **A. As of this moment, yes.**

12  **Things could come up today.**

13  **Things could change, more**

14  **information, but at the moment, those are my**

15  **opinions as they stand now.**

16  Q. Between Exhibits-1 and 3, do they

17  contain all of the bases and reasoning for those

18  opinions that you hold in Reitman?

19  **A. Yes.**

20  Q. In Exhibit-2, does that contain all

21  of the opinions that you intend to offer in the

22  Weaver case?

23  **A. Sitting here right now, that is**

24  **yes. You know, again, things can change. New**

25  **information, rebuttal reports, but at the moment**

1  this -- this reflects my opinions as -- as of this

2  time.

3  Q. And does Exhibit-2 contain all of

4  the bases and reasoning for those opinions in

5  Weaver?

6  **A. Yes. Excuse me.**

7  Q. Did you review your deposition

8  transcripts from May taken -- I think it was May --

9  taken in the Reitman case?

10  **A. Yes.**

11  Q. Beyond anything that you may have

12  indicated on your errata sheet, do you have anything

13  to change from that testimony?

14  **A. Not -- no.**

15  Q. So, you stand by everything you

16  said in your deposition that day?

17  **A. Yes --**

18  Q. Okay.

19  **A. -- with -- with the changes to**

20  **sound a little more correct --**

21  Q. Yeah.

22  **A. -- but that was -- that was -- that**

23  **was, yes.**

24  Q. What did you do to prepare for your

25  deposition today?

1  **A. So, reviewed my older reports.**

2  **Reviewed the more recent reports.**

3  **Went through all the documents**

4  **supporting the new analyses in -- in both Weaver and**

5  **Reitman.**

6  **Spoke with my research team.**

7  **Spoke with counsel.**

8  Q. What did you discuss with your

9  research team as far as preparing for today's

10  deposition?

11  **A. Most of the discussion was going**

12  **through the backup materials for the new**

13  **calculations.**

14  Q. When you say, "the new

15  calculations," which calculations are you referring

16  to?

17  **A. So, Mr. Weir changed his -- he did**

18  **not change his methodology in an abstract way, but**

19  **he changed the way he implemented it to --**

20  **mechanically he shifted from doing a lot of work in**

21  **the statistics package to Excel.**

22  **So, it was going through those**

23  **materials, as well as the modifications that my**

24  **research team had put together to -- to do the error**

25  **corrections of the new -- new issues in Mr. Weir's**

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 8 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com    **Page 7 (16 - 19)**
**Depo International, Inc.**

1 analysis.

2    Q.    Okay.

3         When you say you "spoke with

4 counsel," when was that?

5    A.    I believe counsel was on the phone

6 when I spoke with my research team last -- was it

7 Friday, and then we had a discussion yesterday.

8    Q.    Did you review Dr. Hanssens' two

9 new reports, one in Reitman and one in Weaver?

10   A.    Yes.

11   Q.    And did you review those prior to

12 finalizing your reports, Exhibits-1 and 2?

13   A.    Yes.  I believe I had a final or

14 near final copy of those that I reviewed before we

15 executed the report.

16   Q.    In your opinions in Exhibits-1 and

17 2, do you rely on any of Dr. Hanssens' opinions to

18 support your opinions?

19   A.    Yes, in the same way as before,

20 plus he did more -- a deeper dive on the

21 Pentobarbital survey.  So, I'm aware of those.

22        I believe I cited him for those,

23 but I relied on him for that extended analysis, but

24 mine had more restrictions on that.

25   Q.    So, where you cite to Dr. Hanssens

1 in Exhibits-1 and 2, is it fair to assume that those

2 are the areas in which you rely on his opinions?

3    A.    Yes, that's correct.

4    Q.    Did you agree with all of

5 Dr. Hanssens' opinions in his two new reports; one

6 issued in Reitman and one issued in Weaver?

7    A.    I -- I did not read them with a --

8 with an eye towards whether I agree or disagree.

9         I -- my understanding is, I agree

10 with the points which I referenced, and it appears

11 broadly consistent with my understanding.  But,

12 again, I didn't do any kind of line-by-line

13 analysis, other than the specific -- the specific

14 items that I -- I cited.

15   Q.    Did you review any other expert

16 reports issued since your May report to form your

17 opinions in Exhibits-1 and 2, either from the

18 Plaintiffs or from the Defendants?

19   A.    So, the -- I think Weir has -- has

20 a rebuttal report which I am responding to, and I

21 also reviewed the -- the new Weaver and Krosnick

22 reports, the extended Krosnick report, and the new

23 Weaver report in -- in preparation for these.

24   Q.    So, you don't recall reviewing any

25 of the reports from what I will call the liability

1 experts in this case?

2    A.    No, other than Mr. Weir,

3 Dr. Krosnick and Professor Hanssens, that is the

4 extent of the reports that I have reviewed.

5    Q.    Was anything then added to your CV

6 since your last deposition in May?

7    A.    Probably on the margin; teaching.

8 I -- I -- I update it continuously.  So, without

9 doing a Red line, I'm not sure.

10        Teaching has been updated.

11        There is a new working paper that

12 we are circulating around that is -- that is

13 definitely on the list.

14        Things may have progressed from

15 being in press to published, but I don't think there

16 is anything else that I recall directly that is

17 changed in the last few months.

18   Q.    Are any of the papers or

19 publications that are forthcoming or you're working

20 on related to survey design or survey analysis?

21   A.    Not survey design.

22        I don't think so.

23   Q.    And have you taught any courses

24 since May related to survey design or survey

25 analysis?

1    A.    It would have been the same as --

2 as before.  I am teaching my analytics class now.

3    Q.    Okay.

4    A.    But that's the only thing that

5 would have changed.

6    Q.    Has any -- have any cases been

7 added to your list of items since May of 2019?

8    A.    Yes.

9    Q.    Okay.

10        Which cases are those?

11   A.    They will be on the back page, and

12 there should be two.  One is Dolby, and one is

13 HedgeServ.  HedgeServ is support -- reporting

14 depositions.

15   Q.    Can you tell me what the HedgeServ

16 case is about?

17   A.    That's pending, so a lot of that is

18 confidential.  It is a contract dispute between a

19 software vendor and a district software distributor.

20   Q.    Obviously not asking you to violate

21 any Protective Orders.

22        Are you able to tell me at all what

23 sorts of opinions you are offering in that case or

24 generally --

25   A.    Yes.

1    Q.    -- what you have been asked to do?
2    A.    I can -- it's generally in the
3  realm of pricing.  It is -- it is a dispute over
4  pricing.
5    Q.    And what is the Dolby case about?
6    A.    That is a dispute over an
7  intellectual property licensing agreement.
8    Q.    Again, without violating any
9  Protective Orders, can you tell me, generally, what
10  -- what your assignment is in that case?
11    A.    It is addressing economics and
12  pricing, and there are some business practice issues
13  regarding sort of common practices in the software
14  industry.
15    Q.    So, is it fair to say that neither
16  of those cases involve you providing any opinions
17  about survey evidence or analysis?
18    A.    Yes, I believe that is correct.
19    Q.    Okay.
20    And since we last spoke in May,
21  have you designed any surveys?
22    A.    Nothing finished.
23    We are beginning to work on some
24  updates to one of my previous papers.  It is in
25  preliminary stages right now.
Page 24

1    Q.    What sort of survey is that that
2  you are working on?
3    A.    It will -- I think we discussed
4  these before.  It is a -- it is a work practices
5  survey regarding a business practice in nursing
6  homes.
7    Q.    I do recall that.
8    So, not related to consumer
9  products?
10    A.    It is -- it is not -- well, it is a
11  -- no, this one is not consumer products.
12    Q.    All right.
13    A.    This one is really business
14  practices.
15    Some of the ones in there were
16  commercial products, but this is -- this is neither.
17    Q.    Okay.
18    Can you grab Exhibit-1, which is
19  your report -- your second rebuttal report in
20  Reitman.
21    A.    Okay.
22    Q.    And in paragraph one, page one,
23  this is under the heading "Background and
24  Assignment."
25    The last sentence in paragraph one
Page 25

1  says you were asked by counsel for Champion to
2  review and respond to the Weir Supplemental Report
3  and the Second Krosnick Report.
4    Can you be a little more specific
5  about what your assignment was with respect to those
6  two reports?
7    A.    I think that actually captures it
8  pretty well, which is to review these, and see if I
9  have any, either additional opinions that would be
10  related to those reports, or if I had any issues
11  with the information that was presented in those
12  reports.
13    So, it was intended to focus
14  specifically on those, and the -- the changes
15  relative to the previous ones.
16    Q.    Okay.
17    So, there was no limitation put on
18  you to look at the economic issues in those two
19  reports.  It was just, "look at those reports and
20  let us know what you think"?
21    A.    It was within the same scope of the
22  questions I was asked before, yeah.  Focus on the
23  economic issues, and to the extent it feeds into the
24  opinions about market prices, and -- and the same --
25  it's basically the same assignment as I had in the
Page 26

1  previous report focused on these two supplements.
2    Q.    Your first opinion in this report
3  is on page two, starting in paragraph nine.
4    You say that Dr. Krosnick's
5  Pentobarbital Survey does not support Mr. Weir's
6  estimation of damages.
7    Is -- is it fair to characterize
8  this opinion as just saying that the Pentobarbital
9  Survey was not used by Weir to calculate the illegal
10  sales damages?
11    A.    I think that's one of two things I
12  would say.
13    One; he doesn't actually use it,
14  and two; because it doesn't address willingness to
15  pay or pricing or anything that would lead to a
16  quantification of damages, I don't think he could
17  have used it for his calculations.  And so, that is
18  -- that's the second opinion, but that's -- that's
19  the scope of it.
20    Q.    Okay.  So, I just want to make sure
21  I am clear.
22    Your two opinions here are; number
23  one; Mr. Weir doesn't use the Pentobarbital Survey
24  at all in his legal sales damages calculation.
25    Is that right?
Page 27

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 10 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 9 (24 - 27)**
Depo International, Inc.

1    **A.**    **That's correct.**
2    Q.    And number two is that; regardless
3 of that fact, Mr. Weir -- I'm sorry -- that the
4 Pentobarbital Survey doesn't address willingness to
5 pay or diminution of value, thus it cannot be a used
6 to determine damages anyway?
7    **A.**    **At least within the framework**
8 **Mr. Weir is using it, that is -- that is fair.**
9    Q.    All right.
10      What is your understanding of the
11 Plaintiff's claims regarding Pentobarbital in the
12 both Reitman and Weaver --
13    **A.**    **So -- so, my general -- well, I --**
14 **I --**
15    Q.    -- at least as far as damages?
16    **A.**    **As far as damages, I -- I think my**
17 **understanding is -- is broadly that; Mr. Weir**
18 **basically contends that the sales were illegal, and,**
19 **therefore, the -- it would be that his -- his**
20 **damages model is based on the total refund of all**
21 **sales of those products that could be allegedly**
22 **contaminated.**
23      **That is pretty much my**
24 **understanding.**
25    Q.    If we accept that period of

1 liability as true, and let's say that Plaintiff's
2 prove that, is it your opinion that Plaintiff's
3 would still need a survey showing willingness to pay
4 just for back damages period --
5    MR. KESSLER: Object to the form.
6    THE WITNESS: So, if -- if,
7 ultimately, the calculations says all of the -- it
8 only requires these sales, doesn't require
9 diminution of value, then you don't need that survey
10 input into it. But then, he also doesn't use it for
11 what he does do.
12      So, I don't see the connection
13 between that survey and the actual damages
14 calculation even when he did do it.
15      - - -
16 CONTINUATION
17 BY MS. BORRELLI:
18    Q.    Okay. So, I just want to make sure
19 I understand.
20      You would agree that if Plaintiff's
21 showed that had those -- the sales of those products
22 that may have been contaminated with Pentobarbital
23 were illegal, then Plaintiffs would not need a
24 willingness-to-pay type survey to support those
25 damages?

1    MR. KESSLER: Object to form.
2    I think you're asking for a legal
3 conclusion.
4    THE WITNESS: Yeah.
5      So -- so -- so what I can say is --
6 is; given the way Mr. Weir has done the calculation
7 and what his -- his -- his claim of the appropriate
8 rate to compute damages is, he does not require
9 willingness to pay on that because he's got a full
10 refund.
11      I didn't do an evaluation as to
12 whether or not a different methodology would
13 actually be appropriate, but certainly if
14 conditional on using his method, it doesn't require
15 diminution of value.
16      (Pause)
17    THE WITNESS: And when I mean "his
18 method," I mean the illegal sales damage. Not
19 supporting him, the method he used for the other
20 statements.
21      - - -
22 CONTINUATION
23 BY MS. BORRELLI:
24    Q.    And your second opinion in
25 Exhibit-1 is that, Mr. Weir's corrections to his

1 damages measures do not address most of the
2 criticisms in your initial report, and, therefore,
3 his damages calculation remains unreliable.
4      Is that right?
5    **A.**    **I -- I think that's right.**
6      **But the only thing I would modify**
7 **slightly is that, it is not so much a calculation**
8 **issue as a separate, you know, the implementation**
9 **calculation part from the conceptual part, but I**
10 **disagree with the conceptual framing of his**
11 **analysis, and that's most -- I don't think he**
12 **responded to any of those issues.**
13      **The calculation issue he**
14 **addressed -- he addressed some of those.**
15    Q.    Okay.
16      So, is his opinion, basically,
17 saying that Mr. Weir's supplemental report just
18 addresses the calculation errors, but none of your
19 other criticisms of his general methodology?
20    MR. KESSLER: Form.
21    THE WITNESS: I think that is
22 actually -- let me just hear that again, make sure I
23 --
24      - - -
25      (At which time the following

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 11 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 10 (28 - 31)**
**Depo International, Inc.**

1 question; "So, is his opinion, basically, saying
2 that Mr. Weir's supplemental report just addresses
3 the calculation errors, but none of your other
4 criticisms of his general methodology?" was read
5 back by the court reporter.)
6       - - -
7       THE WITNESS:  Yeah, I -- I think
8 that's -- that's -- probably correct.  He -- he
9 fixed those things.  He didn't address all the
10 issues about market prices and market -- and, you
11 know, willingness to pay that we -- I raised in the
12 previous report.
13       - - -
14 CONTINUATION
15 BY MS. BORRELLI:
16       Q.    Okay.
17       And is the basis for this opinion
18 just the fact that Mr. Weir's supplemental report
19 just addresses calculation errors or is there
20 anything beyond that?
21       **A.    It's -- it's based on my read of**
22 **his report, and that it's focused on fixing the**
23 **calculation, yes.**
24       Q.    And then continuing on page three
25 of your second rebuttal report, you say that

1 Mr. Weir still has errors in calculating total
2 sales.
3       Do you see that?
4       **A.    Yes.**
5       Q.    If Mr. Weir were to correct his
6 calculations to only include sales from the time
7 period identified in Plaintiffs' class definition,
8 would you agree that those sales calculations are
9 accurate --
10       MR. KESSLER:  Object to form.
11       MS. BORRELLI:  -- notwithstanding
12 the second portion about the package prices?
13       MR. KESSLER:  Object to the form.
14       THE WITNESS:  So -- so, I would not
15 say accurate.  They're consistent with the
16 methodology he lays out, and the data he uses.
17       I can't vouch for accuracy either
18 of the source data or the general approach, but
19 certainly he would have taken the data he used, and
20 followed the method as he described it.
21       - - -
22 CONTINUATION
23 BY MS. BORRELLI:
24       Q.    So, the math would be right?
25       **A.    The math would be right.**

1       (Pause)
2       Q.    Okay.
3       Then in Paragraph 15, you say for
4 certain products Mr. Weir applies an incorrect
5 package price.
6       If that error was corrected, would
7 you agree that Mr. Weir's math was right according
8 to his methodology after also correcting the time
9 period issue?
10       MR. KESSLER:  Object to form.
11       THE WITNESS:  If -- if he -- if he
12 corrected -- yeah, if he corrected, you know, the --
13 the various, what I am calling -- referring to as,
14 you know, errors in tabu -- tabulating total sales,
15 then he would have given his data and his
16 methodology would have implemented that consistently
17 with what he described.
18       I'm not saying that's the correct
19 methodology, but certainly the mathematical
20 calculation based on his methodology would be
21 correct.
22       - - -
23 CONTINUATION
24 BY MS. BORRELLI:
25       Q.    And is that reflected in Table 1 on

1 page five of Exhibit-1?
2       You have calculations as shown in
3 what was and then corrected for errors with the
4 total of 61.29 million.
5       **A.    Yes.  That's the total -- or that's**
6 **the amount, I believe, he should have gotten had he**
7 **corrected the -- the -- what I'm referring to as the**
8 **tabulation errors in his analysis.**
9       Q.    In your review of Mr. Weir's
10 analysis in calculations, were you looking for
11 anywhere he may have made calculation errors that
12 could have increased the damages number?
13       **A.    So, I was not specifically looking**
14 **for errors in either direction.**
15       **There were certain classes of**
16 **errors I was looking to see if he made, and then in**
17 **this particular case, there are ones -- there --**
18 sorry.
19       **Stepping back.**
20       **The -- the source of errors in this**
21 **analysis was either time period or -- or was**
22 **mismatching price to products, and to the extent I**
23 **found errors in mismatching products, these could go**
24 **in either direction.**
25       **In fact, in this one they do.**

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 12 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 11 (32 - 35)**
Depo International, Inc.

1 So, we -- you know, my analysis --
2 my analyst team went through and made all those
3 corrections for where we identified prices that were
4 not correctly attached to products.
5 Some of those were positive.
6 Some of those were negative.
7 Q. Did you identify those ones that
8 are positive in your report?
9 A. Yes. They're -- they're mentioned
10 in the Footnote 2 of Table 1.
11 Q. I'm sorry.
12 Can you show me where?
13 I'm not seeing where you say you
14 identified incorrect product price that increased
15 damages.
16 A. So, it is -- it is -- it doesn't
17 say which ones increase and which ones did not
18 increase.
19 So, let me just go through it
20 line-by-line, and I will find the ones.
21 (Pause)
22 A. Oh, okay. That -- that did not
23 apply here. I don't think --
24 (Pause)
25 A. Let me make sure.

1 THE WITNESS: I don't believe we
2 identified any that would have increased damages in
3 that one.
4 We focused principally on pricing
5 ones, and in that one all went one direction. But
6 in the other case, went both directions.
7 - - -
8 CONTINUATION
9 BY MS. BORRELLI:
10 Q. So, if you had, for instance, any
11 errors that would increase damages, would you have
12 identified those in your report?
13 MR. KESSLER: Same objection.
14 THE WITNESS: To the extent they --
15 they were -- we found errors in the -- in the things
16 we reviewed, again, we did not attempt to replicate
17 it completely.
18 We focused on the areas where we
19 thought there might be potential error. So, we
20 would have corrected them in both directions if we
21 found them.
22 - - -
23 CONTINUATION
24 BY MS. BORRELLI:
25 Q. So, what areas were you focusing

1 I may be mixing up the two reports.
2 (Pause)
3 A. Let me just check something real
4 quick. Let me just see if I am recalling them
5 correctly.
6 (Pause)
7 A. So, that -- the methodology I
8 described is correct.
9 Whether or not that applied to both
10 reports, I have to check that.
11 (Pause)
12 A. Oh, okay. Yes. Sorry.
13 I misspoke on that.
14 The statements I made about
15 methodology are correct.
16 In terms of Reitman, those
17 corrections are all in one direction.
18 In the Weaver report there is a
19 correction in the opposite direction.
20 Q. Okay.
21 In yours and your team's analysis
22 of Dr. -- I'm sorry -- Mr. Weir's calculations, did
23 you identify any errors at all that would have
24 increased damages in Reitman?
25 MR. KESSLER: Object to form.

1 on?
2 A. Price matching.
3 That's the main one where there is
4 a potential, because the source data is what it is.
5 There's an issue about proper
6 matching of prices. That's where there's a lot of
7 potential for problems.
8 Q. Is that because there's some
9 ambiguity in the data as far as product names?
10 A. I think that's part of it.
11 Q. And in your view is some of that
12 open to interpretation, the data?
13 A. So -- so, let me separate it in two
14 pieces.
15 There were judgment -- one; there
16 is -- there are judgment calls to be made.
17 But two; there is a methodology
18 that Mr. Weir articulated for making those judgment
19 calls. And so, in some cases he is inconsistent
20 with that methodology.
21 So, there is ambiguity but there's
22 also inconsistencies, and those are -- are ones I
23 identified.
24 Q. Did you reach out to anyone at
25 Champion, by either you or your research team, where

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 13 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 12 (36 - 39)**
**Depo International, Inc.**

1 you had questions about which products matched with
2 which parts of the data?
3       A.   I don't know of any instances where
4 that was the case, but I -- I -- I don't know for
5 certain.
6       Q.   Okay.
7            And with respect to the illegal
8 sales damages, you have similar opinions, correct,
9 with respect to the time period and the market
10 pricing.
11           Is that right?
12      A.   Yes, they are -- they are basically
13 the same kinds of issues.
14      Q.   So, would you agree that if the
15 pre-October 2016 sales were taken out, and the
16 packaging price adjusted, that Mr. Weir's
17 calculations would mathematically be correct
18 according to his methodology?
19      A.   According to his method, and
20 reasonable assumptions that it could not have
21 started before October of 2016, I think that would
22 be correct.
23           There is this issue that it is
24 uncertain when the contaminated tallow entered into
25 the actual product, which might change that date

1 further, but we have no information about that.
2           So, this was the, I think, the
3 correction of things that are clearly at issue.
4 There could be other corrections that would be
5 appropriate, if -- if more information became
6 available.
7       Q.   And in Footnote 20 on page five,
8 you say, "regardless of the errors and
9 miscalculations, I feel that Mr. Weir provides no
10 economic basis for his full refund illegal sales
11 damages".
12           What do you mean by that?
13      A.   At least my understanding of his
14 argument is that this is a legal issue; that there
15 -- if they are illegal, then the sales are illegal,
16 and it's full refund.
17           There is not an economic analysis
18 that is supporting that.  He is relying on the legal
19 argument that these were, indeed, illegal sales.
20      Q.   What sort of economic analysis
21 would you find reasonable to support the full
22 refund?
23      A.   That's not something I considered.
24 So, I don't know.  He -- it depends on the
25 circumstances, and I didn't do any further analysis

1 on that.
2       Q.   So, as you just mentioned a minute
3 ago, and as stated in your report in Paragraph 18,
4 you "understand from counsel that Champion did not
5 begin purchasing the beef tallow from the supplier
6 at issue until October of 2016".
7           Did you provide any documentation
8 about that issue or just asked to assume that that
9 was the case?
10      A.   Somewhere -- so, there was -- I
11 don't have any documentation of that.  My research
12 team reached out, and said when -- which packages
13 and when would this -- this -- the allegedly
14 contaminated tallow product enter the -- you know,
15 the production stream, and this was the -- this is
16 what we were provided by counsel.
17      Q.   And then in Paragraph 19 you say;
18 "even using October 2016 as a start date is overly
19 inclusive, because I understand that the beef tallow
20 that tested positive for Pentobarbital was delivered
21 to Champion in March, 2018."
22           What is the basis for that
23 understanding?
24      A.   So, the basis of that understanding
25 is to -- to the report.  I believe there is a --

1 it's cited in -- in 23.  In personal discussion with
2 counsel on the dates from before, but the -- the
3 documents that support that date is the testing
4 document or the -- I would have to look at it
5 exactly to have it correct.  There was a letter that
6 was sent that said, basically, it was tested for --
7 positive for Pentobarbital.
8       Q.   So, beyond that document cited in
9 Footnote 23 under conversations with counsel, did
10 you review any other materials that supported your
11 opinions about the proper start date for the illegal
12 sales damages?
13      A.   No, that is -- that is -- and that
14 is why we used the October 2016 date as the
15 reference point.  We don't have further information
16 that would refine it, but I do note that the actual
17 testing date it does postdate it.
18      Q.   If we turn to the Weaver report,
19 which is Exhibit-2.
20           Was your assignment in the Weaver
21 case any different than your assignment in the
22 Reitman case?
23      A.   No.  My understanding was that the
24 assignments were -- were the same.
25      Q.   Were you asked to do anything

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 14 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 13 (40 - 43)**
**Depo International, Inc.**

1 further with respect to Dr. Krosnick's Pentobarbital
2 survey, and we've already discussed Reitman?
3    A.   No.
4    Q.    Did you review any new materials to
5 support your opinions in what was separate from what
6 you reviewed in Reitman?
7    A.   So, I -- yes.  So, there's --
8 there's -- the vast majority of them were -- were
9 simply, essentially, updates of the materials from
10 before the reports -- the new -- the Complaint.
11 Things like that.  So, those -- the -- the vast
12 majority of the changes were there.
13        There was also some of the
14 citations, what the sources were, are no longer
15 available.  I mentioned this before, so those were
16 updated.  So, that would bring new materials.
17        So, other than new case documents
18 that are specific to this, and that update, I think
19 that is the vast majority of it, and then the
20 materials we had from before.
21        (Pause)
22    Q.    So, with respect to your opinions
23 regarding Dr. Krosnick's first survey, the only
24 significant difference I see between your Reitman
25 report and your Weaver report is the opinion that
                                        Page 44

1    Q.       (Pause)
2    Q.    So, in that first paragraph, 56,
3 you say, "the behavior of Respondents in
4 Dr. Krosnick's diminution value survey is
5 inconsistent with the fundamental economic principal
6 that, all else constant, consumers are less likely
7 to buy a product at a higher price than at a lower
8 price."
9        Do you see that sentence?
10    A.   Yes.
11    Q.    In Dr. Krosnick's diminution value
12 survey, was everything being held constant except
13 for price?
14        MR. KESSLER:  Objection to form.
15        THE WITNESS:  So, the -- so, the
16 design of his survey was that variation occurred in
17 the number of corrective statements in the price
18 that was random, and those were both randomized.
19 Everything else should have been a random draw.
20        - - -
21 CONTINUATION
22 BY MS. BORRELLI:
23    Q.    So, those two things were changing,
24 the number of corrective statements and the price
25 between survey Respondents.
                                        Page 46

1 starts on Page 22, Paragraph 56.
2    A.   That is correct.
3    Q.    Okay.
4        Would you agree that your other
5 opinions regarding Dr. Krosnick's first survey are
6 identical to your first report?
7    A.   Yes, I think that's fair.
8    Q.    And the basis in reasoning are,
9 essentially, identical?
10    A.   Subject to the new materials, yes.
11    Q.    And, again, by "new materials," you
12 simply mean pricing that was not available --
13    A.   And the --
14    Q.    -- online anymore?
15    A.   And the small modif -- you know, I
16 did review all the new reports, but they were,
17 essentially, the same as they were before, at least
18 with regard as to these issues.
19    Q.    Yeah.  Okay.
20        So, starting on Page 22 you opine
21 that Dr. Krosnick's diminution of value survey data
22 are inconsistent with his estimates of percent
23 decrease in value.
24        Do you see that?
25    A.   Yes.
                                        Page 45

1        Is that right?
2        MR. KESSLER:  Objection to form.
3        THE WITNESS:  Those are the two
4 primary ways in which the randomization occurred,
5 yes.
6        - - -
7 CONTINUATION
8 BY MS. BORRELLI:
9    Q.    So, this was not a situation where
10 everything was the same, but the price was the only
11 thing changing between Respondents; correct?
12    A.   I would disagree with that, because
13 the way -- you can do the analysis holding the
14 number of statements constant, which is what I was
15 referring to when I am making that statement.
16    Q.    And are you referring to your
17 analysis in Table 4?
18    A.   Table 4, and then Table 4 and
19 the -- let's just see.  Where does it appear?
20        (Pause)
21    A.   Yes.  Table 4 in the associated
22 graphs that are Figure 1, and then the long list of
23 similar looking ones are all things on that I looked
24 at.
25        Either, you know, holding one
                                        Page 47

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 15 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
Depo International, Inc.
Page 14 (44 - 47)

1 **constant and looking at one across the other, and**
2 **holding or looking at both simultaneously.**
3          (Pause)
4     Q.    You say, "the fact that Respondents
5 of Dr. Krosnick's survey do not behave in a manner
6 consistent with rational economic behaviors suggests
7 that the survey is unreliable".
8          You use the word "suggests" there.
9          Is there anyway to verify that the
10 survey is unreliable for this reason?
11     **A.    I think this would be -- be**
12 **evidence that that's the case.  There is -- there is**
13 **no absolute certainty in anything, but the -- the**
14 **idea -- one of the standard tests you typically will**
15 **do when analyzing economic data is to see if the**
16 **Respondents behave in what would be consistent with**
17 **the underlying theories you were using for the**
18 **analysis, and, you know, price -- behavior of prices**
19 **inconsistent with known economic behavior which**
20 **would typically violate that.**
21          **There are many reasons why that**
22 **occurs, but what it says is that the survey is not**
23 **able to replicate expected behavior, and, therefore,**
24 **it could be unreliable.**
25     Q.    In between May of 2019, when you
                                        Page 48

1 issued your initial report in Reitman and now, did
2 you design or conduct any survey as part of your
3 work in this case --
4     **A.    No.**
5     Q.    -- Weaver or Reitman?
6     **A.    No, no additional.  I did not**
7 **design any surveys in this case.**
8          (Pause)
9     Q.    So, is this sort of test looking at
10 the price behavior of Respondents, is that a
11 standard statistical testing of reliance in the
12 economic community?
13     **A.    So, it is a standard practice, and**
14 **in pretty much all scientific work that you tabulate**
15 **data to see if it is consistent with your theory**
16 **before you employ more complicated models, because,**
17 **ultimately, when you start deploying models on data,**
18 **you have to be able to distinguish the things that**
19 **are actually being caused by the data from things**
20 **that are being caused by assumptions in the models.**
21          **So, this would be a standard thing**
22 **that you would do at the beginning of any analysis**
23 **to see if the survey data or the data source,**
24 **whatever it is, is broadly consistent with --**
25     Q.    Do you have a citation for that
                                        Page 49

1 proposition?
2     **A.    It's not something you would**
3 **typically cite.**
4          **I served as a Department Editor of**
5 **the leading journal in our field for five years, and**
6 **this is pretty typical of what you would see in a**
7 **published academic work, as you tabulate the data**
8 **first to see if it is consistent, and then -- then**
9 **you move on to something more complicated.**
10          **If it fails this test, then you**
11 **probably need to revise your model or your data or**
12 **both.**
13     Q.    What journal is that?
14     **A.    Management Science.**
15     Q.    Is that an economic stream or
16 business type journal?
17     **A.    It's a little of both.  It is a lot**
18 **-- there are lot of economic analysis, yeah.**
19     Q.    In Footnote 76 on page 22 you say
20 that "this analysis applies equally in Reitman."
21          When did you receive the data you
22 needed to do the analysis in this section of your
23 Weaver report?
24     **A.    I have had this since the**
25 **beginning, since this is based on Dr. Krosnick's**
                                        Page 50

1 original survey data production.
2     Q.    So, since approximately April of
3 2019.
4          Does that sound right?
5     **A.    It's in that timeframe, yes.**
6     Q.    So, you could have done this
7 analysis in your initial Reitman report?
8     **A.    Yes.**
9     Q.    Were you asked to do this
10 additional data analysis for Weaver?
11     **A.    No.**
12     Q.    It's just something you chose to
13 do?
14     **A.    It is something I chose to do that**
15 **I had been thinking about ways of looking at this**
16 **data, because the model, you know, as I have**
17 **mentioned in my previous deposition and my previous**
18 **report, the characteristics from the model I find**
19 **strange and unusual.  And so, I was thinking of ways**
20 **where you could examine whether the underlying**
21 **effects are true without having to rely on -- model.**
22 **I've been thinking about it for a while, and it**
23 **seems to be the best way to do it.**
24          MS. BORRELLI:  Could we go off the
25 record?
                                        Page 51

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 16 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 15 (48 - 51)**
**Depo International, Inc.**

VIDEO TECHNICIAN:  The time is now 10:02 a.m., and we are going off the record.

- - -

(Recess was taken at this time.)

- - -

VIDEO TECHNICIAN:  Stand by.

The time is now 10:11 a.m.

This is the beginning of tape number two, and we are back on the record.

- - -

CONTINUATION
BY MS. BORRELLI:

Q.   Okay.

Dr. Hitt, we are talking about your opinions in the Weaver report, Exhibit-1, starting on page -- I'm sorry -- Paragraph 56.

A.   Okay.

Q.   I think we discussed this in your prior deposition, but can you remind me.

How do you define statistical significance?

A.   Yeah.  I -- I -- we -- we -- we did discuss this last time.

It is -- it is, again, what statistical significance, it only has to be against

*Page 52*

a similar hypothesis.

So, it's a typically stated reasons different, but you have to have the alternate to specify.

Q.   And did you do any tests of statistical significance of the data that your report in Table 4, as well as in Figure 1 in the attached Appendices?

A.   So, not explicit tests, but the charts have the confidence intervals, and so, if you wanted to do the comparison of whether or not, for example, moving across Figure 1 where those statements are different, you can look to see whether or not the confidence intervals overlap, and if they do, they won't be statistically different.

Q.   And you did not do that test of the data in Figure 1, and then the Appendices with the similar confidence intervals?

A.   The confidence intervals are all there.  So, you can read the test off of the chart, but I didn't do a separate calculation of that statistic, no.

Q.   So, if I look at Figure 1, are you telling me if I can draw a line across all of those and the confidence intervals overlap, the results

*Page 53*

are statistically significant?

A.   So, I wouldn't say it that way.

Again, it depends on the comparison you have.  If you -- if you want to compare two of them, you can do it by looking whether or not the confidence intervals overlap.

If you want to do more than two, there is more calculation you need to do.

Q.   I just want to make sure I understand.

I'm looking at Figure 1, the title "Base Price" in the left.

A.   Yes.

Q.   So, let's say we look between two and three corrective statements.  If I can draw a line there showing that those confidence intervals overlap.

What does that tell you?

A.   That tells you that those aren't statistically different, but you can distinguish them from being the same.

Q.   Again, what does that -- so, what does that mean with respect to this data that you are showing here in Figure 1?

A.   So -- so -- so, what it says is, is

*Page 54*

that, for example, you can't distinguish the effect statistically between the number between two and three statements if you wanted to make that interpretation.

The primary presentation of the graph is just showing the -- is it -- those are on there primarily to show how wide confidence intervals are on -- on the ends, and also to show the Plaintiffs' analytics are a little hashmark in the beginning shows that those don't show any particular pattern either.

Q.   You pointed out the two on the ends.

What are the sample sizes that's contributing to those numbers?

A.   Off the top of my head, I don't know, because these are segmentations, but they are very small.

Q.   Can you get reliable information from such a small sample?

A.   Generally, no, and that's one of the -- well, you -- you get -- it's what it is.  You get a very, very wide confidence interval, and that is one of the problems with the approach Dr. Krosnick took, at least in -- at least in the

*Page 55*

1 focus on seven and eight corrective statements,
2 because that relies -- he observed data at those
3 levels is actually a very small sample.
4          And especially -- that's especially
5 true for eight where the samples are extremely
6 small.
7          (Pause)
8     Q.    So, your analysis in Table 4, that
9 is based on the raw data from Dr. Krosnick's
10 surveys.
11          Is that right?
12     A.    Yeah, that is correct.  That is --
13 that is taking all the data that would have entered
14 into his regression, and not distinguishing between
15 the two packaging -- the randomization of the two
16 packages.
17          So, that would have been the full
18 sample that -- that was the basis of his regression.
19     Q.    And I'm not sure I asked this in --
20 in your prior deposition, but remind me.
21          Do you disagree with Dr. Krosnick's
22 math in the regression he ran and/or do you disagree
23 with the theory?
24     A.    If I believe that he implemented
25 the method he described.  The -- the -- what he did

1 regression of some sort to determine -- to figure
2 out your data to whatever model you are looking at?
3          MR. KESSLER:  Objection to form.
4          THE WITNESS:  That's -- that's kind
5 of a hard thing to -- to say generally appropriate,
6 because saying you are using regression is kind of
7 like saying you are using math.
8          It is a huge family of techniques,
9 and so, the -- the -- it is appropriate to use a
10 model, and one of the ways in which you can estimate
11 a model is by regression.
12          And there is hundreds of different
13 kinds of regression, too.  So, that's extremely
14 general.
15          - - -
16 CONTINUATION
17 BY MS. BORRELLI:
18     Q.    Okay.
19          So that it is standard practice to
20 take your data and put it in some sort of a model of
21 some sort to look at it.
22          Is that a fair and general
23 characterization?
24     A.    There is -- there is a number of
25 different things you can do.

1 is consistent with the way he described it.
2          So, from that perspective, yeah, he
3 did the math based on what he was doing.  Whether
4 that is the right analysis he did, that is -- that
5 is a separate issue.
6          (Pause)
7     Q.    And, in general, when you are
8 looking at survey data, what's the purpose of
9 running a regression as opposed to simply looking at
10 the raw data?
11     A.    It depends on what conclusion you
12 are trying to draw.
13     Q.    If you are trying to determine a
14 diminution in value percent, what is the purpose in
15 doing a regression versus looking at the raw data?
16     A.    I think that is too general to
17 answer precisely.
18          You would use regression to
19 estimate some form of model.  If you were trying to
20 estimate -- if that model was what you were going to
21 give you something that you needed, that's -- that's
22 one of the reasons you use regression, but there are
23 other techniques as well.
24     Q.    But you would agree it is common
25 practice and generally appropriate to use the

1          You can do tabulations.
2          You can do model estimation.
3          You can do machine learning, which
4 is slightly different way of modeling.
5          All sorts of things you can do, but
6 people do all sort of things and typically in that
7 combination.
8          (Pause)
9     Q.    You may have said this already.
10          I am sorry if I missed it.
11          What does the -- what does a
12 confidence interval tell you?
13     A.    Without being, you know, overly
14 technical.
15          If you, basically, did the same
16 experiment again with a 95 percent -- the 95 percent
17 confidence levels, if you did the experiment again
18 from scratch with 95 percent probability, you'd get
19 an answer that lies within that confidence interval.
20          That is a sort of, I think, the
21 best casual way to express it.
22          You can express it in terms of
23 distribution as well, but that's basically the same
24 thing with more math.
25     Q.    And are there different ways to

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 18 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 17 (56 - 59)**
Depo International, Inc.

1 calculate confidence intervals?
2     A.   Yes, because they rely on certain
3 -- they rely on certain assumptions.
4     Q.   What methodology did you use to
5 calculate the confidence intervals in your Weaver
6 report?
7     A.   These are what are referred to as
8 Clopper-Pearson, and it is -- most of the methods
9 show similar results.
10         There is a -- with all confidence
11 intervals for buying and distribution, in
12 particular, you have issues regarding the time, the
13 fact that there's a discrete number of levels, and
14 so, we are -- what to do when you fall between them,
15 these different methods treat that value
16 differently, but these are Clopper-Pearson.
17     Q.   And did you --
18     A.   Oh, sorry.
19     Q.   Did you attempt to calculate
20 confidence intervals in any other methodology?
21     A.   Yes.  I believe we also computed
22 them using the Jeffreys Bayesian technique.  They
23 basically look the same.
24         I don't think there is any
25 conclusion I would draw that would differ between

1 those two methodologies.  Those are the two more
2 common ones.  There is probably six or eight more.
3     Q.   Did you produce the results of the
4 Jeffreys Bayesian confidence intervals that you ran?
5     A.   I -- they may be in the backup.
6 They don't appear -- the -- the ones on here, the
7 Clopper-Pearson ones.
8         The ones that appear in the report,
9 I do not recall if they related to the backup
10 documents or not.
11     Q.   Could we have those, please?
12     A.   I think it's one -- adding one line
13 to --
14     Q.   Okay.
15     A.   -- this data --
16     Q.   Okay.
17     A.   So, these are enough to produce.
18     Q.   Oh, all right.
19         (Pause)
20     Q.   And, again, just -- you may have
21 said this, but just so I understand it.
22         For what purpose did you calculate
23 the confidence intervals in Figure 1 and in the
24 exhibits attached to Appendix 4 in your report --
25     A.   For --

1     Q.   -- to show --
2     A.   For -- I'm sorry.
3         So, one is, I think this is -- is a
4 good visual presentation that the estimates,
5 particularly at the end of the sample, are very
6 precise.  So, this is one way to look at it.
7         So -- so, that's one.
8         The second is to just illustrate
9 that the -- there is a fair amount of variation, and
10 that that variation typically is well within the
11 confidence bands between corrective statements.
12         So, it is very hard to conclude,
13 based on this tabulation of data that there is any
14 particular pattern, not just a systematic one of
15 declining -- declining in the number --
16     Q.   And did you do this analysis of the
17 data for each product that was used in the survey
18 separately as well?
19     A.   Yeah.  There is -- there is three
20 dimensions upon which the randomization was done in
21 Krosnick's analysis, Dr. Krosnick's analysis.
22         One is the number of -- number of
23 -- prices were randomized, number of statements was
24 randomized, and then the two products were
25 randomized.

1         So, there is every combination of
2 that.  So, the extended number of charts in the back
3 are each product, each price level, number of
4 corrective statements.
5     Q.   When you break it down by each of
6 those variables, were the results that you received
7 consistent?
8     A.   You get the same basic
9 observations, which is that they seem to vary
10 considerably, and they typically are not distinct.
11 The contrast between the number of corrective
12 statements are not typically outside of each other's
13 confidence intervals, and that is more of a general
14 -- general observation that, you know, these charts
15 basically look very similar.
16     Q.   Okay.
17     A.   There are some variation across
18 them, but they look generally similar.
19     Q.   Look at the paragraph on page 24.
20     A.   (Witness complies.)
21     Q.   Towards the end of that paragraph
22 you say -- there is a sentence that starts, "in
23 fact, there is no pattern at all apparent in the
24 data".
25         Do you see that sentence?

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 19 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**
Page 18 (60 - 63)

1      A.    Yes.

2      Q.    And you say, "especially taking

3 into account the statistical uncertainty in the

4 percentages."

5        Do you have a -- is there a journal

6 or textbook you can cite in support of that

7 proposition?

8      A.    It's basic standard technique to --

9 to clock data, and when you do not see any visible

10 pattern then, you know, I will show you what the

11 data looks like. You can see that there is not a

12 visual pattern there.

13        Most data analytic textbooks

14 encourage you to plot your data ahead of time just

15 to see what the relationship are.

16        That is pretty standard, and that's

17 something that is almost always required when at

18 least the places I published, both in the UK and in

19 management. It is a pretty common thing to do.

20      Q.    In Footnote 80 on that page you say

21 that, "Dr. Krosnick created indices based on control

22 variables to include in his regressions. In theory

23 such controls should not be necessary for his

24 analysis or for the analyses in Table 4 and Figure 1

25 here."

1 tests you can do, but that wasn't one of the issues

2 that I was especially concerned about.

3        (Pause)

4      Q.    Turn to page 29 of Exhibit-2,

5 Paragraph 71.

6        Based on my comparison, I believe

7 that this paragraph was not included in your initial

8 Reitman report, Exhibit-3.

9        Does that sound right to you?

10      A.    That's correct.

11      Q.    And what -- what was the reasoning

12 for including this paragraph here in Weaver and not

13 in Reitman?

14      A.    So, I'm always thinking about ways

15 to try to present the -- the same ideas in a

16 simpler, more straightforward way that is more

17 understandable.

18        And so, given some -- given some

19 more thought, this seemed to be potentially helpful

20 in explaining why I believe what I believe about

21 supply and demand.

22      Q.    And how do you define the "but-for"

23 world as you use that term in this paragraph?

24      A.    So -- so, the but-for world as --

25 as I would understand it in this context is that

1 What is the basis for that

2 statement?

3      A.    Basic statistical theory.

4        If you -- if you randomize

5 properly, then it should also be randomized over the

6 control periods, and so you shouldn't have to

7 have -- in the end the contrast you draw in the data

8 should not depend on those control variables.

9        To the extent your randomization is

10 imperfect, they might, but if you're truly -- if

11 it's truly randomized, you shouldn't need the

12 control variables to draw the contrast.

13        (Pause)

14      Q.    Do you have any opinions about

15 whether Dr. Krosnick's sample was properly

16 randomized?

17      A.    So, the only -- I did do additional

18 examination as to whether or not across these

19 various groups the levels of control variables are

20 randomized consistently, and they seem to be.

21        So, as -- as -- as far as I could

22 tell, there doesn't seem to be any issue, at least

23 with these that -- that the -- the randomization was

24 a problem.

25        I didn't do the -- there are more

1 Champion would sell products with different labeling

2 on it, and, you know, accepting the -- the --

3 if I accepted the Plaintiffs labeling, it would be

4 with the corrective statements on it in some way.

5 That's the natural "but-for" world that would be

6 just accepting, you know, the Plaintiff's arguments.

7      Q.    So, the only thing that is

8 different in the "but-for" world is that Plaintiff's

9 corrective statements appear on the packaging on

10 Champion products?

11      A.    Well, that would be the -- that

12 would be the -- the -- the difference in the

13 product, but then you have -- then have all the

14 reactions that would cause, including the changes

15 in, you know, whatever changes in equilibrium;

16 price. Changes in supplier behavior. Champion.

17 Changes in competitive behavior.

18        That -- that would occur in the

19 "but-for" world as a result of this kind of change,

20 and there is some discussion, too, in the report as

21 to what those kinds of changes are.

22        But certainly, you change -- change

23 one characteristic in a world where firms are

24 optimizing, you can get a reaction, and those

25 reactions would also cause a change in prices,

1 quantities and competitive behavior, and potentially
2 other things.
3     Q.    Okay.
4         So, in your view all the changes
5 are the "but-for" world?
6     A.    Yes.
7     Q.    A whole list of things I think you
8 said.
9     A.    That's not necessarily intended to
10 be exhaustive, but you make one change, and then you
11 have to make another, and the reaction to it could
12 be a change, and that would cause many changes
13 simultaneously.
14     Q.    And since you issued your report in
15 Reitman in May, have you done any analysis of what
16 the supply side would look like in your definition
17 of the "but-for" world in this case?
18     A.    No.  I have not done any additional
19 work on -- on the supply side, no.
20         (Pause)
21     Q.    Look at Paragraph 85 on Page 34 of
22 Exhibit-2.
23         Is this a paragraph in which you
24 changed the prices and citations because the -- the
25 ones you cited prior were not available anymore.

1     A.    That's exactly right.
2     Q.    Okay.
3         So, this different pricing
4 information doesn't change your opinions at all?
5     A.    No.  It is -- it was an observation
6 that there is there -- there do exist different
7 prices, and that's still true.
8         There is no change there.
9     Q.    Okay.
10         So, starting on Page 39, Paragraph
11 97, are your opinions related to -- is this opinion
12 related to Dr. Krosnick's Pentobarbital survey, is
13 this the same as the package in Reitman reported in
14 Exhibit-1?
15     A.    Yes.  This should be -- yes, it is
16 the same opinion.
17     Q.    Okay.
18         And the basis is the same -- the
19 same we have already discussed today?
20     A.    Yeah.
21         My answers to questions about this
22 would be the same as the questions about the other
23 one.
24     Q.    Okay.
25         And are your opinions regarding

1 errors in Mr. Weir's calculations the same as in
2 Reitman, although applied to different numbers?
3     A.    Generally, yes.  It's the same kind
4 of issues, because the data used for this is
5 slightly different because Mr. Weir uses different
6 prices for Wisconsin sales relative to the
7 California sales.
8         There is different matching issues,
9 but, essentially, it's an issue of -- issue of
10 matching products to prices, and so, that is,
11 essentially, identical.
12         (Pause)
13     Q.    Your opinion that Mr. Weir's
14 estimation method overstates dollar sales of its
15 accused products.
16         Is that the same opinion you would
17 -- you had offered in your first Reitman report?
18     A.    Which one are you referring to
19 specifically?
20     Q.    It's paragraphs one and two on 103.
21         (Pause)
22     A.    Oh, yeah.
23         These are, essentially, the same.
24     Q.    I think you said you haven't
25 received any additional retail sales data since your

1 deposition in May of this year.
2     A.    That's correct.
3     Q.    Okay.
4         Then starting on page 42 there's a
5 discussion of the errors you identified in
6 Mr. Weir's calculations.
7         Like in Reitman, were these errors
8 related to the time period of sales included, and
9 then the packaging prices?
10     A.    Yeah.  I think that's fair.
11     Q.    So, you would agree that if
12 Mr. Weir corrected the errors that you identified
13 here, at least according to his methodology, the
14 math would be correct?
15     A.    Yes, he would be -- he would be
16 consistent -- consistent with his own approach, yes.
17         (Pause)
18     A.    As far as we know.
19         (Pause)
20     Q.    With respect to Mr. Weir's
21 Wisconsin damage calculations, did you identify any
22 calculation errors that may have increased the
23 damages under his methodology?
24         MR. KESSLER:  Object to form.
25         THE WITNESS:  Yeah, in this

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 21 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 20 (68 - 71)**
**Depo International, Inc.**

1 particular --

2       MS. BORRELLI:  Diminution in sales.

3       THE WITNESS:  Yes.  Yes.  So -- so

4 --

5       MS. BORRELLI:  Diminution of value.

6       THE WITNESS:  So -- so -- so, there

7 were -- there is one situation.  This one is in --

8 in Table 5, the second footnote where he -- I think

9 there is -- there is some cases where he misapplies

10 a 13 pound package with a 13 kilogram package price,

11 and that would actually cause it to increase.

12       - - -

13 CONTINUATION

14 BY MS. BORRELLI:

15       Q.    And is that increase included in

16 the calculations you identify in Table 5?

17       A.    Yes.

18       Q.    Can you show me where?

19       A.    I'd have to look up these products.

20       To see it actually in action, you

21 would have to go to the sheet itself and --

22       Q.    Okay.

23       A.    -- see the corrections, but it

24 would be for -- let's see, the product and payer --

25       (Pause)

Page 72

1       A.    Let's see, if the price -- apple.

2       Yeah, you can't see it directly

3 because all -- this has all the changes all at

4 once --

5       Q.    Huh-huh.

6       A.    -- but if you go to the actual

7 backup, you can actually see the prices rise in

8 that.

9       So, for example, a can of lamb and

10 an apple decreases partially.  That's a time period

11 issue, but also there's an offsetting effect.

12       But in the backup -- in the backup

13 to the calculation there is a spreadsheet tab called

14 "Calculation" that has -- you can look specifically

15 which prices were changed, and you can see when they

16 increased.

17       Q.    So, you didn't intentionally

18 exclude directions that would have increased

19 damages?

20       A.    No.  The once -- within the method

21 used, mostly following the research team, and I give

22 the framework, but the idea was to systematically go

23 through and look for mismatches of products to

24 prices and correct those errors consistently

25 throughout.  And so, those should be in there.

Page 73

1       Q.    And they were -- you offer an

2 opinion about errors Mr. Weir had in calculating the

3 illegal sale damages.

4       So, like in your second Reitman

5 report, Exhibit-1, are these errors limited to this

6 time period, and then package pricing issues?

7       A.    Yes.  There is going to be -- there

8 is going to be a different -- both -- both of those

9 factors are different here, but the -- the errors

10 are in the same spirit.

11       Q.    And how do they differ?

12       A.    Just the time period is different,

13 and the products effected are different.  So, there

14 is different -- if the products that were -- that

15 were effected in both the -- the price issues could

16 -- would extend across the two -- but it is

17 different time periods, and some of the illegal

18 sales damages products are not -- are only some of

19 those.

20       Well -- sorry.

21       Those are a subset of all of the

22 products that are considered in the other one, and

23 there was products for which there is corrections in

24 the broader population that don't apply here,

25 because those products aren't included.

Page 74

1       Q.    Right.

2       In your various understandings

3 about the proper time period, are the basis for

4 those understandings the same as we have already

5 discussed with respect to your Reitman report?

6       A.    Yes.  Same basis.  Same approach.

7       Q.    And Mr. Weir made the calculations

8 to his -- if Mr. Weir made the corrections to the

9 calculations that you identify are necessary with

10 respect to the illegal sales damages, would you

11 agree that the damages number would be correct --

12       MR. KESSLER:  Object.

13       MS. BORRELLI:  -- to his

14 methodology?

15       MR. KESSLER:  Object to the form.

16       THE WITNESS:  The -- the -- the

17 figure is -- the figure would be correct based on

18 his methodology.

19       I would not say this is the -- this

20 is necessarily a correct figure for damages, but,

21 yes, the math would be correct based on his --

22       MS. BORRELLI:  Okay.

23       Can we just take a few minutes, and

24 I will be about done, just to make sure.

25       MR. KESSLER:  Yeah.

Page 75

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 22 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 21 (72 - 75)**
Depo International, Inc.

1    VIDEO TECHNICIAN:  The time is now
2  10:44 a.m., and we are going off the record.
3        - - -
4      (Recess was taken at this time.)
5        - - -
6    VIDEO TECHNICIAN:  Stand by.
7    The time is now 10:48 a.m.
8    We are back on the record.
9    MS. BORRELLI:  I don't think I have
10  anything else.
11    So, we are done.
12    Thank you for your time this
13  morning.
14    MR. KESSLER:  I don't have any
15  questions.
16    So, that means your deposition is
17  concluded.
18    THE WITNESS:  Thank you.
19    VIDEO TECHNICIAN:  This is the end
20  of today's deposition of Dr. Lorin Hitt.
21    The time is now 10:49 a.m., and we
22  are going off the record.
23        - - - -
24      (Witness excused.)
25        - - - -

Page 76

1        - - -
2      (Deposition concluded at
3        10:49 a.m.)
4        - - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 77

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 23 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Page 22 (76 - 77)**
**Depo International, Inc.**

1

2     I, Debra G. Johnson-Spallone, certify that the

3   foregoing is a true and accurate transcription of

4   the notes taken by me on the date set forth.

5     I further certify that I am not an attorney or

6   counsel of any of the parties, nor a relative or

7   employee of any attorney or counsel in connection

8   with the action, nor financially interested in the

9   action.

10

11

12

13

14   _____

15   DEBRA G. JOHNSON-SPALLONE, CCR, RPR

16   License NJ #30X100118200

17

18

19   This transcript is not to be copied unless under the

20   direct control and supervision of the certifying

21   reporter.

22

23

24

25

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 24 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**                                    **Page 23 (78)**

1                    INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over carefully and

4     make any necessary corrections.

5          You should state the reason in the appropriate

6     space in the errata sheet for any correction that is

7     made.

8          After so doing, please sign and date the errata

9     sheet.   You are signing subject to the changes you

10    have noted on the errata sheet, which will be

11    attached to your deposition.

12         It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition

16    transcript may be deemed to be accurate as submitted

17    and may be used in court.

18

19

20

21

22

23

24

25

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 25 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**                                    **Page 24 (79)**

1                 E R R A T A    S H E E T

2    PAGE LINE   CORRECTION    REASON FOR

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 26 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com                    **Page 25 (80)**
**Depo International, Inc.**

1            C E R T I F I C A T E

2

3    I, the undersigned witness, do hereby certify that I

4    have read the foregoing deposition, and that to the

5    best of my knowledge, recollection and belief, said

6    deposition is true and correct with the exception of

7    the corrections listed:

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Signature

22   Date

23

24

25

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 27 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**                                    **Page 26 (81)**

## WORD INDEX

**< 1 >**
**1** 10:20 34:25
36:10 47:22 53:7,
12, 17, 23 54:11, 24
61:23 64:24
**10:02** 52:2
**10:11** 52:7
**10:44** 76:2
**10:48** 76:7
**10:49** 76:21 77:3
**103** 70:20
**12** 3:15, 18 7:5, 20,
23
**120** 2:4
**13** 3:21 11:2
12:24 15:23 72:10
**15** 3:21 34:3
**1717** 1:13 5:8
**18** 42:3
**19** 42:17
**19103** 1:14

**< 2 >**
**2** 11:11 12:16
13:6 20:12, 17
21:1, 17 36:10
**2:18-cv-01996-JPS**
1:3
**20** 41:7
**2016** 40:15, 21
42:6, 18 43:14
**2018** 12:19 42:21
**2019** 1:9 3:15, 18,
21 5:6 7:5, 20, 24
11:2 12:24 15:23
23:7 48:25 51:3
**20th** 1:9 5:6
**22** 45:1, 20 50:19
**23** 43:1, 9
**24** 63:19
**2600** 2:5
**29** 66:4
**2nd** 2:10

**< 3 >**
**3** 17:6, 16
**30** 79:14
**305** 2:11

**30X100118200**
78:16
**33131-3238** 2:10
**333** 2:10
**333-8844** 2:6
**34** 68:21
**39** 69:10

**< 4 >**
**4** 47:17, 18, 21
53:7 56:8 61:24
64:24
**400** 1:13
**42** 71:4
**46** 8:6

**< 5 >**
**5** 72:8, 16
**55402** 2:5
**56** 45:1 46:2 52:16
**579-0836** 2:11

**< 6 >**
**6** 3:4
**61.29** 35:4
**612** 2:6

**< 7 >**
**7** 3:15, 18
**71** 66:5
**76** 50:19

**< 8 >**
**80** 64:20
**85** 68:21

**< 9 >**
**9:05** 1:19
**9:06** 5:7
**95** 59:16, 18
**97** 69:11

**< A >**
**a.m** 1:19 5:7 52:2,
7 76:2, 7, 21 77:3
**able** 15:12 23:22
48:23 49:18
**absolute** 48:13
**abstract** 19:18
**academic** 50:7

**accept** 28:25
**accepted** 67:3
**accepting** 67:2, 6
**account** 64:3
**accuracy** 33:17
**accurate** 33:9, 15
78:3 79:16
**accused** 70:15
**action** 72:20 78:8,
9
**actual** 29:13 40:25
43:16 73:6
**add** 16:14
**added** 22:5 23:7
**adding** 61:12
**additional** 10:17
11:9, 16 12:14, 20
15:2, 10 26:9 49:6
51:10 65:17 68:18
70:25
**address** 27:14 28:4
31:1 32:9
**addressed** 31:14
**addresses** 31:18
32:2, 19
**addressing** 24:11
**adjusted** 40:16
**administer** 5:20
**ago** 6:7 42:3
**agree** 21:4, 8, 9
29:20 33:8 34:7
40:14 45:4 57:24
71:11 75:11
**agreed** 4:4
**agreement** 24:7
**ahead** 64:14
**al** 5:12
**ALEISHA** 2:15 5:4
**allegedly** 28:21
42:13
**alternate** 53:3
**ambiguity** 39:9, 21
**amount** 35:6 62:9
**analyses** 19:4 64:24
**analysis** 9:23 10:1,
17 20:1, 23 21:13
22:20, 25 24:17
31:11 35:8, 10, 21
36:1 37:21 41:17,
20, 25 47:13, 17
48:18 49:22 50:18,

20, 22 51:7, 10
56:8 57:4 62:16,
21 64:24 68:15
**analyst** 36:2
**analytic** 64:13
**analytics** 23:2 55:9
**analyzing** 48:15
**and/or** 56:22
**answer** 57:17 59:19
**answers** 69:21
**anybody** 13:2
**anymore** 45:14
68:25
**anytime** 6:13
**anyway** 28:6 48:9
**apparent** 63:23
**appear** 47:19 61:6,
8 67:9
**APPEARANCES**
2:1
**appears** 21:10
**Appendices** 53:8, 17
**Appendix** 61:24
**apple** 73:1, 10
**applied** 37:9 70:2
**applies** 34:4 50:20
**apply** 36:23 74:24
**approach** 33:18
55:24 71:16 75:6
**appropriate** 30:7,
13 41:5 57:25
58:5, 9 79:5
**Approved** 1:17
**approximately** 51:2
**April** 51:2
**Arch** 1:13 5:8
**areas** 21:2 38:18,
25
**argument** 41:14, 19
**arguments** 67:6
**articulated** 39:18
**asked** 15:5 24:1
26:1, 22 42:8
43:25 51:9 56:19
**asking** 23:20 30:2
**assignment** 14:7, 8
24:10 25:24 26:5,
25 43:20, 21
**assignments** 43:24
**assisting** 13:4

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 28 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
Depo International, Inc.
Page 1

associated  47:*21*
assume  21:*1*  42:*8*
assumptions  40:*20*
49:*20*  60:*3*
attached  36:*4*  53:*8*
61:*24*  79:*11*
attachments  16:*15*
attempt  38:*16*
60:*19*
attorney  78:*5*, *7*
79:*13*
August  14:*4*
available  11:*18*
12:*8*  14:*21*, *23*
15:*3*, *7*, *11*  41:*6*
44:*15*  45:*12*  68:*25*
Avenue  2:*10*
aware  13:*24*  14:*5*
20:*21*

< B >
back  23:*11*  29:*4*
32:*5*  35:*19*  52:*9*
63:*2*  76:*8*
Background  25:*23*
backup  19:*12*  61:*5*,
*9*  73:*7*, *12*
bands  62:*11*
Base  54:*12*
based  28:*20*  32:*21*
34:*20*  50:*25*  56:*9*
57:*3*  62:*13*  64:*21*
66:*6*  75:*17*, *21*
bases  17:*17*  18:*4*
basic  63:*8*  64:*8*
65:*3*
basically  14:*11*
26:*25*  28:*18*  31:*16*
32:*1*  40:*12*  43:*6*
59:*15*, *23*  60:*23*
63:*15*
basis  32:*17*  41:*10*
42:*22*, *24*  45:*8*
56:*18*  65:*1*  69:*18*
75:*3*, *6*
Bayesian  60:*22*
61:*4*
beef  42:*5*, *19*
beginning  24:*23*
49:*22*  50:*25*  52:*8*
55:*10*

behalf  1:*3*  5:*4*, *16*,
*18*
behave  48:*5*, *16*
behavior  46:*3*
48:*18*, *19*, *23*  49:*10*
67:*16*, *17*  68:*1*
behaviors  48:*6*
belief  81:*5*
believe  10:*5*  11:*1*
12:*23*  20:*5*, *13*, *22*
24:*18*  35:*6*  38:*1*
42:*25*  56:*24*  60:*21*
66:*6*, *20*
best  15:*18*  51:*23*
59:*21*  81:*5*
better  16:*22*
Beyond  18:*11*
32:*20*  43:*8*
bit  10:*13*
body  16:*13*
BORRELLI  2:*3*
3:*4*  4:*16*  5:*15*  6:*4*
7:*12*  8:*4*  16:*4*
17:*1*, *5*  29:*17*
30:*23*  32:*15*  33:*11*,
*23*  34:*24*  38:*9*, *24*
46:*22*  47:*8*  51:*24*
52:*12*  58:*17*  72:*2*,
*5*, *14*  75:*13*, *22*  76:*9*
break  6:*14*  63:*5*
bring  44:*16*
broader  74:*24*
broadly  21:*11*
28:*17*  49:*24*
budgetary  15:*13*
business  24:*12*
25:*5*, *13*  50:*16*
but-for  66:*22*, *24*
67:*5*, *8*, *19*  68:*5*, *17*
buy  46:*7*
buying  60:*11*

< C >
calculate  27:*9*  60:*1*,
*5*, *19*  61:*22*
calculating  33:*1*
74:*2*
calculation  27:*24*
29:*14*  30:*6*  31:*3*, *7*,
*9*, *13*, *18*  32:*3*, *19*,
*23*  34:*20*  35:*11*

53:*21*  54:*8*  71:*22*
73:*13*, *14*
calculations  19:*13*,
*15*  27:*17*  29:*7*
33:*6*, *8*  35:*2*, *10*
37:*22*  40:*17*  70:*1*
71:*6*, *21*  72:*16*
75:*7*, *9*
California  70:*7*
call  21:*25*
called  73:*13*
calling  34:*13*
calls  39:*16*, *19*
Canadian  2:*4*
captures  26:*7*
carefully  79:*3*
Case  1:*2*  7:*1*  8:*19*
9:*19*  12:*12*, *13*, *20*
13:*1*, *19*  14:*1*, *8*, *9*,
*13*, *14*, *17*  15:*15*, *19*
17:*10*, *22*  18:*9*
22:*1*  23:*16*, *23*
24:*5*, *10*  35:*17*
38:*6*  40:*4*  42:*9*
43:*21*, *22*  44:*17*
48:*12*  49:*3*, *7*  68:*17*
cases  11:*12*  23:*6*,
*10*  24:*16*  39:*19*
72:*9*
casual  59:*21*
CATTS  2:*15*  5:*4*
cause  67:*14*, *25*
68:*12*  72:*11*
caused  49:*19*, *20*
CCR  1:*15*  78:*15*
certain  34:*4*  35:*15*
40:*5*  60:*2*, *3*
certainly  30:*13*
33:*19*  34:*19*  67:*22*
certainty  48:*13*
certification  4:*5*
certify  78:*2*, *5*  81:*3*
certifying  78:*20*
cetera  16:*15*
CHAMPION  1:*3*, *6*
5:*11*  7:*1*, *19*  12:*15*,
*25*  13:*3*, *14*  15:*4*, *9*
26:*1*  39:*25*  42:*4*,
*21*  67:*1*, *10*, *16*
change  11:*18*, *25*
17:*13*, *24*  18:*13*

19:*18*  40:*25*  67:*19*,
*22*, *25*  68:*10*, *12*
69:*4*, *8*
changed  19:*17*, *19*
22:*17*  23:*5*  68:*24*
73:*15*
changes  18:*19*
26:*14*  44:*12*  67:*14*,
*15*, *16*, *17*, *21*  68:*4*,
*12*  73:*3*  79:*9*
changing  46:*23*
47:*11*
characteristic  67:*23*
characteristics
51:*18*
characterization
58:*23*
characterize  8:*20*
27:*7*
chart  53:*20*
charts  53:*10*  63:*2*,
*14*
check  37:*3*, *10*
chose  51:*12*, *14*
circulating  22:*12*
circumstances  41:*25*
citation  49:*25*
citations  44:*14*
68:*24*
cite  20:*25*  50:*3*
64:*6*
cited  20:*22*  21:*14*
43:*1*, *8*  68:*25*
claim  30:*7*
claims  28:*11*
clarify  8:*14*
class  23:*2*  33:*7*
classes  35:*15*
clear  27:*21*
clearly  41:*3*
clock  64:*9*
Clopper-Pearson
60:*8*, *16*  61:*7*
combination  59:*7*
63:*1*
come  17:*12*
coming  14:*5*
commencing  1:*19*
commercial  25:*16*
common  24:*13*
57:*24*  61:*2*  64:*19*

(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**

communicated 13:*14*

community 49:*12*

compare 54:*4*

comparison 53:*11* 54:*3* 66:6

competitive 67:*17* 68:*1*

Complaint 44:*10*

Complaints 11:*15*

completely 38:*17*

complicated 49:*16* 50:*9*

complies 63:*20*

compute 30:*8*

computed 60:*21*

conceptual 31:*9, 10*

concerned 66:*2*

conclude 62:*12*

concluded 76:*17* 77:*2*

conclusion 30:*3* 57:*11* 60:*25*

conditional 30:*14*

conduct 49:*2*

confidence 53:*10, 14, 18, 19, 25* 54:*6, 16* 55:*7, 23* 59:*12, 17, 19* 60:*1, 5, 10, 20* 61:*4, 23* 62:*11* 63:*13*

confidential 23:*18*

Confirm 16:*9*

connection 29:*12* 78:*7*

consider 11:*21*

considerably 63:*10*

considered 13:*21* 41:*23* 74:*22*

consistent 21:*11* 33:*15* 48:*6, 16* 49:*15, 24* 50:*8* 57:*1* 63:*7* 71:*16*

consistently 34:*16* 65:*20* 73:*24*

constant 46:*6, 12* 47:*14* 48:*1*

consumer 25:*8, 11*

consumers 46:*6*

contain 17:*9, 17, 20* 18:*3*

contaminated 28:*22* 29:*22* 40:*24* 42:*14*

contends 28:*18*

context 66:*25*

CONTINUATION 7:*11* 8:*3* 16:*3* 17:*4* 29:*16* 30:*22* 32:*14* 33:*22* 34:*23* 38:*8, 23* 46:*21* 47:*7* 52:*11* 58:*16* 72:*13*

continues 14:*22*

continuing 32:*24*

continuously 22:*8*

contract 23:*18*

contrast 63:*11* 65:*7, 12*

contributing 55:*15*

control 64:*21* 65:*6, 8, 12, 19* 78:*20*

controls 64:*23*

conversations 43:*9*

copied 78:*19*

copy 16:*24* 20:*14*

Cornerstone 13:*10, 13*

correct 9:*7* 11:*6* 15:*20* 16:*11* 18:*20* 21:*3* 24:*18* 28:*1* 32:*8* 33:*5* 34:*18, 21* 37:*8, 15* 40:*8, 17, 22* 43:*5* 45:*2* 47:*11* 56:*12* 66:*10* 71:*2, 14* 73:*24* 75:*11, 17, 20, 21* 81:*6*

corrected 34:*6, 12* 35:*3, 7* 38:*20* 71:*12*

correcting 34:*8*

correction 37:*19* 41:*3* 79:*6* 80:*2*

corrections 19:*25* 30:*25* 36:*3* 37:*17* 41:*4* 72:*23* 74:*23* 75:*8* 79:*4* 81:*7*

corrective 46:*17, 24* 54:*15* 56:*1* 62:*11* 63:*4, 11* 67:*4, 9*

correctly 36:*4* 37:*5*

counsel 4:*5, 14* 5:*13* 19:*7* 20:*4, 5*

26:*1* 42:*4, 16* 43:*2, 9* 78:*6, 7*

courses 22:*23*

COURT 1:*1, 18* 4:*14* 5:*19* 7:*7* 8:*1* 15:*25* 32:*5* 79:*17*

created 64:*21*

criticisms 31:*2, 19* 32:*4*

CSR 1:*15*

current 12:*13*

CV 16:*17* 22:*5*

< D >

damage 30:*18* 71:*21*

damages 27:*6, 10, 16, 24* 28:*6, 15, 16, 20* 29:*4, 13, 25* 30:*8* 31:*1, 3* 35:*12* 36:*15* 37:*24* 38:*2, 11* 40:*8* 41:*11* 43:*12* 71:*23* 73:*19* 74:*3, 18* 75:*10, 11, 20*

data 33:*16, 18, 19* 34:*15* 39:*4, 9, 12* 40:*2* 45:*21* 48:*15* 49:*15, 17, 19, 23* 50:*7, 11, 21* 51:*1, 10, 16* 53:*6, 17* 54:*23* 56:*2, 9, 13* 57:*8, 10, 15* 58:*2, 20* 61:*15* 62:*13, 17* 63:*24* 64:*9, 11, 13, 14* 65:*7* 70:*4, 25*

date 1:*14* 40:*25* 42:*18* 43:*3, 11, 14, 17* 78:*4* 79:*8* 81:*22*

dated 7:*20*

dates 43:*2*

day 18:*16*

days 79:*14*

DEBRA 1:*15* 78:*2, 15*

declining 62:*15*

decrease 45:*23*

decreases 73:*10*

deemed 79:*16*

deeper 20:*20*

Defendants 2:*12* 5:*18* 21:*18*

define 52:*20* 66:*22*

definitely 9:*23* 22:*13*

definition 33:*7* 68:*16*

Delaware 1:*15, 17*

deliver 14:*12*

delivered 42:*20*

demand 66:*21*

Department 50:*4*

depend 65:*8*

depends 41:*24* 54:*3* 57:*11*

deploying 49:*17*

Depo 5:*5*

deposing 79:*13*

Deposition 1:*11* 4:*6* 5:*10* 6:*11* 7:*6, 24* 8:*13* 12:*20* 15:*24* 18:*7, 16, 25* 19:*10* 22:*6* 51:*17* 52:*19* 56:*20* 71:*1* 76:*16, 20* 77:*2* 79:*3, 11, 14, 15* 81:*4, 6*

depositions 23:*14*

described 33:*20* 34:*17* 37:*8* 56:*25* 57:*1*

DESCRIPTION 3:*11*

design 22:*20, 21, 24* 46:*16* 49:*2, 7*

designed 24:*21*

determine 15:*2* 28:*6* 57:*13* 58:*1*

differ 60:*25* 74:*11*

difference 44:*24* 67:*12*

different 9:*9* 10:*7, 11, 12, 21* 30:*12* 43:*21* 53:*3, 13, 15* 54:*20* 58:*12, 25* 59:*4, 25* 60:*15* 67:*1, 8* 69:*3, 6* 70:*2, 5, 8* 74:*8, 9, 12, 13, 14, 17*

differently 60:*16*

dimensions 62:*20*

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 30 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**
Page 3

diminution  9:*6*
28:*5*  29:*9*  30:*15*
45:*21*  46:*4, 11*
57:*14*  72:2, *5*
direct  78:*20*
directed  15:*8*
direction  35:*14, 24*
37:*17, 19*  38:*5*
directions  38:*6, 20*
73:*18*
directly  8:*25*  13:*3*
22:*16*  73:*2*
disagree  21:*8*
31:*10*  47:*12*  56:*21,*
*22*
discrete  60:*13*
discuss  8:*10*  19:*8*
52:*23*
discussed  25:*3*
44:*2*  52:*18*  69:*19*
75:*5*
discussion  10:*4, 14,*
*17*  19:*11*  20:*7*
43:*1*  67:*20*  71:*5*
dispute  23:*18*  24:*3,*
*6*
distinct  63:*10*
distinguish  49:*18*
54:*20*  55:*1*
distinguishing  56:*14*
distribution  59:*23*
60:*11*
distributor  23:*19*
DISTRICT  1:*1, 18*
23:*19*
dive  20:*20*
document  12:*11*
14:*23*  43:*4, 8*
documentation
42:*7, 11*
documents  11:*10,*
*22*  12:*15*  19:*3*
43:*3*  44:*17*  61:*10*
doing  15:*17*  19:*20*
22:*9*  57:*3, 15*  79:*8*
Dolby  23:*12*  24:*5*
dollar  70:*14*
Dr  6:*5*  8:*21*  9:*5,*
*20*  10:*22*  20:*8, 17,*
*25*  21:*5*  22:*3*  27:*4*
37:*22*  44:*1, 23*

45:*5, 21*  46:*4, 11*
48:*5*  50:*25*  52:*14*
55:*25*  56:*9, 21*
62:*21*  64:*21*  65:*15*
69:*12*  76:*20*
draft  4:*20*
drafting  13:*5*
draw  46:*19*  53:*24*
54:*15*  57:*12*  60:*25*
65:*7, 12*
duly  5:*23*

< E >
EASTERN  1:*1*
economic  26:*18, 23*
41:*10, 17, 20*  46:*5*
48:*6, 15, 19*  49:*12*
50:*15, 18*
economics  24:*11*
Editor  50:*4*
effect  55:*1*  73:*11*
effected  74:*13, 15*
effects  51:*21*
eight  7:*14*  56:*1, 5*
61:*2*
either  13:*1*  21:*17*
26:*9*  33:*17*  35:*14,*
*21, 24*  39:*25*  47:*25*
55:*11*
electronic  4:*17, 18*
employ  49:*16*
employed  13:*10*
employee  78:*7*
employs  13:*8*
encourage  64:*14*
ends  55:*8, 13*
enter  42:*14*
entered  40:*24*
56:*13*
equally  50:*20*
equilibrium  67:*15*
errata  18:*12*  79:*6,*
*8, 10, 13*
error  19:*24*  34:*6*
38:*19*
errors  31:*18*  32:*3,*
*19*  33:*1*  34:*14*
35:*3, 8, 11, 14, 16,*
*20, 23*  37:*23*  38:*11,*
*15*  41:*8*  70:*1*  71:*5,*

7, 12, 22  73:*24*
74:*2, 5, 9*
especially  56:*4*
64:*2*  66:*2*
ESQUIRE  2:*3, 9*
essentially  44:*9*
45:*9, 17*  70:*9, 11, 23*
estimate  57:*19, 20*
58:*10*
estimates  45:*22*
62:*4*
estimation  27:*6*
59:*2*  70:*14*
et  5:*12*  16:*15*
evaluation  30:*11*
evidence  24:*17*
48:*12*
exactly  14:*6*  43:*5*
69:*1*
EXAMINATION
6:*2*  65:*18*
examine  51:*20*
example  53:*12*
55:*1*  73:*9*
Excel  19:*21*
Excellent  16:*18*
exception  81:*6*
exclude  73:*18*
Excuse  18:*6*
excused  76:*24*
executed  20:*15*
exhaustive  68:*10*
EXHIBIT  3:*10*  7:*6,*
*25*  10:*20*  15:*24*
Exhibit-1  6:*24*
8:*18*  9:*4*  25:*18*
30:*25*  35:*1*  52:*15*
69:*14*  74:*5*
Exhibit-2  7:*18*  8:*6*
9:*18*  10:*6*  17:*20*
18:*3*  43:*19*  66:*4*
68:*22*
Exhibit-3  16:*6*  66:*8*
exhibits  16:*14*
61:*24*
Exhibits-1  11:*10*
12:*16*  13:*6*  17:*6,*
*16*  20:*12, 16*  21:*1,*
*17*
exist  69:*6*
existed  11:*14*  12:*2*

existing  9:*24*  10:*14*
13:*22*
expected  48:*23*
expedited  4:*21*
experiment  59:*16,*
*17*
Expert  3:*13, 16, 19*
6:*25*  7:*4, 18, 22*
8:*19*  13:*25*  15:*19,*
*22*  21:*15*
experts  22:*1*
explaining  66:*20*
explicit  53:*9*
explore  15:*6*
express  59:*21, 22*
extend  74:*16*
extended  20:*23*
21:*22*  63:*2*
extension  13:*22*
extent  9:*17*  12:*10*
22:*4*  26:*23*  35:*22*
38:*14*  65:*9*
extremely  56:*5*
58:*13*
eye  21:*8*

< F >
fact  28:*3*  32:*18*
35:*25*  48:*4*  60:*13*
63:*23*
factors  74:*9*
fail  79:*15*
fails  50:*10*
fair  8:*20*  21:*1*
24:*15*  27:*7*  28:*8*
45:*7*  58:*22*  62:*9*
71:*10*
fall  60:*14*
family  58:*8*
far  9:*1*  15:*14*  19:*9*
28:*15, 16*  39:*9*
65:*21*  71:*18*
Federally  1:*17*
feeds  26:*23*
feel  41:*9*
field  50:*5*
Figure  47:*22*  53:*7,*
*12, 17, 23*  54:*11, 24*
58:*1*  61:*23*  64:*24*
75:*17, 20*

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 31 of 39    Document 105-6
**(763) 591-0535 | info@depointernational.com**
**Depo International, Inc.**
Page 4

**Final** 4:*18* 20:*13*, *14*
**finalizing** 20:*12*
**financially** 78:*8*
**find** 36:*20* 41:*21* 51:*18*
**fine** 17:*1*
**finished** 24:*22*
**firms** 67:*23*
**first** 5:*22* 9:*5, 16, 21* 12:*18* 13:*15* 14:*3* 27:*2* 44:*23* 45:*5, 6* 46:*2* 50:*8* 70:*17*
**five** 35:*1* 41:*7* 50:*5*
**fixed** 32:*9*
**fixing** 32:*22*
**FL** 2:*10*
**focus** 26:*13, 22* 56:*1*
**focused** 27:*1* 32:*22* 38:*4, 18*
**focusing** 38:*25*
**followed** 33:*20*
**following** 4:*10, 25* 31:*25* 73:*21*
**follows** 5:*23*
**Footnote** 36:*10* 41:*7* 43:*9* 50:*19* 64:*20* 72:*8*
**foregoing** 78:*3* 81:*4*
**form** 4:*7* 21:*16* 29:*5* 30:*1* 31:*20* 33:*10, 13* 34:*10* 37:*25* 46:*14* 47:*2* 57:*19* 58:*3* 71:*24* 75:*15*
**formal** 13:*21*
**forth** 12:*12* 78:*4*
**forthcoming** 22:*19*
**found** 35:*23* 38:*15, 21*
**framework** 28:*7* 73:*22*
**framing** 31:*10*
**Friday** 1:*9* 20:*7*
**full** 30:*9* 41:*10, 16, 21* 56:*17*
**fundamental** 46:*5*
**fundamentally** 10:*16*

**further** 41:*1, 25* 43:*15* 44:*1* 78:*5*

**< G >**
**general** 28:*13* 31:*19* 32:*4* 33:*18* 57:*7, 16* 58:*14, 22* 63:*13, 14*
**generally** 9:*12* 23:*24* 24:*2, 9* 55:*21* 57:*25* 58:*5* 63:*18* 70:*3*
**give** 57:*21* 73:*21*
**given** 14:*18* 30:*6* 34:*15* 66:*18*
**GLUEK** 2:*3* 5:*16*
**go** 35:*23* 36:*19* 51:*24* 72:*21* 73:*6, 22*
**Goggled** 12:*1*
**going** 6:*23* 7:*17* 13:*25* 16:*5* 17:*2* 19:*11, 22* 52:*2* 57:*20* 74:*7, 8* 76:*2, 22*
**Good** 6:*8, 9* 62:*4*
**gotten** 35:*6*
**grab** 25:*18*
**graph** 55:*6*
**graphs** 47:*22*
**GREENBERG** 1:*13* 2:*9* 5:*18*
**ground** 6:*10* 8:*12*
**groups** 65:*19*
**guess** 9:*14*
**GUSTAFSON** 2:*3* 5:*16*

**< H >**
**hand** 7:*17* 16:*6*
**handing** 6:*23*
**Hanssens** 20:*8, 17, 25* 21:*5* 22:*3*
**hard** 58:*5* 62:*12*
**hashmark** 55:*9*
**head** 55:*16*
**heading** 25:*23*
**hear** 31:*22*
**HedgeServ** 23:*13, 15*

**held** 4:*10* 46:*12*
**helpful** 66:*19*
**higher** 46:*7*
**HITT** 1:*11* 3:*3, 14, 17, 20* 5:*10, 22* 6:*5, 25* 7:*4, 19, 23* 15:*23* 52:*14* 76:*20*
**Hitt-1** 3:*13* 7:*6*
**Hitt-2** 3:*16* 7:*25*
**Hitt-3** 3:*19* 15:*25*
**hold** 17:*18*
**holding** 47:*13, 25* 48:*2*
**homes** 25:*6*
**huge** 58:*8*
**Huh-huh** 73:*5*
**hundreds** 58:*12*
**hypothesis** 53:*1*

**< I >**
**idea** 48:*14* 73:*22*
**ideas** 66:*15*
**identical** 45:*6, 9* 70:*11*
**identification** 7:*7, 25* 15:*25*
**identified** 33:*7* 36:*3, 14* 38:*2, 12* 39:*23* 71:*5, 12*
**identify** 36:*7* 37:*23* 71:*21* 72:*16* 75:*9*
**illegal** 27:*9* 28:*18* 29:*23* 30:*18* 40:*7* 41:*10, 15, 19* 43:*11* 74:*3, 17* 75:*10*
**illustrate** 62:*8*
**imperative** 79:*12*
**imperfect** 65:*10*
**implementation** 31:*8*
**implemented** 19:*19* 34:*16* 56:*24*
**implicates** 9:*16*
**include** 33:*6* 64:*22*
**included** 66:*7* 71:*8* 72:*15* 74:*25*
**including** 66:*12* 67:*14*
**inclusive** 42:*19*
**inconsistencies** 39:*22*

**inconsistent** 39:*19* 45:*22* 46:*5* 48:*19*
**Incorporate** 5:*11*
**incorrect** 34:*4* 36:*14*
**increase** 36:*17, 18* 38:*11* 72:*11, 15*
**increased** 35:*12* 36:*14* 37:*24* 38:*2* 71:*22* 73:*16, 18*
**indicated** 18:*12*
**indices** 64:*21*
**individually** 1:*2*
**industry** 24:*14*
**information** 11:*16* 14:*21* 15:*3* 17:*14, 25* 26:*11* 41:*1, 5* 43:*15* 55:*19* 69:*4*
**initial** 9:*9* 31:*2* 49:*1* 51:*7* 66:*7*
**input** 29:*10*
**instance** 38:*10*
**instances** 40:*3*
**INSTRUCTIONS** 79:*1*
**intellectual** 24:*7*
**intend** 17:*9, 21*
**intended** 8:*25* 26:*13* 68:*9*
**intentionally** 73:*17*
**interested** 78:*8*
**International** 5:*5*
**interpretation** 39:*12* 55:*4*
**interval** 55:*23* 59:*12, 19*
**intervals** 53:*10, 14, 18, 19, 25* 54:*6, 16* 55:*8* 60:*1, 5, 11, 20* 61:*4, 23* 63:*13*
**introduce** 5:*13* 9:*1*
**involve** 24:*16*
**issue** 13:*25* 31:*8, 13* 34:*9* 39:*5* 40:*23* 41:*3, 14* 42:*6, 8* 57:*5* 65:*22* 70:*9* 73:*11*
**issued** 21:*6, 16* 49:*1* 68:*14*
**issues** 19:*25* 24:*12* 26:*10, 18, 23* 31:*12*

Case 2:18-cv-01996-JPS     Filed 10/11/19     Page 32 of 39     Document 105-6
(763) 591-0535 | info@depointernational.com
Depo International, Inc.
Page 5

32:*10* 40:*13* 45:*18*
60:*12* 66:*1* 70:*4, 8*
74:*6, 15*
**items** 21:*14* 23:7
**its** 70:*14*

**< J >**
**JARED** 2:*9* 5:*17*
**Jeffreys** 60:*22* 61:*4*
**Jersey** 1:*17*
**JOHNSON-**
**SPALLONE** 1:*15*
78:2, *15*
**journal** 50:*5, 13, 16*
64:*5*
**judgment** 39:*15, 16,*
*18*
**July/August** 14:*3*

**< K >**
**KESSLER** 2:*9*
4:*19* 5:*17* 7:*9*
16:*24* 29:*5* 30:*1*
31:*20* 33:*10, 13*
34:*10* 37:*25* 38:*13*
46:*14* 47:2 58:*3*
71:*24* 75:*12, 15, 25*
76:*14*
**kesslerj@gtlaw.com**
2:*11*
**kilogram** 72:*10*
**kind** 21:*12* 58:*4, 6*
67:*19* 70:*3*
**kinds** 40:*13* 58:*13*
67:*21*
**know** 6:*10* 7:*13*
9:*1* 10:*17* 11:*20,*
*21* 12:*11* 13:*12, 16,*
*23* 14:6 17:*24*
26:*20* 31:8 32:*11*
34:*12, 14* 36:*1*
40:*3, 4* 41:*24*
42:*14* 45:*15* 47:*25*
48:*18* 51:*16* 55:*17*
59:*13* 63:*14* 64:*10*
67:*2, 6, 15* 71:*18*
**knowledge** 81:*5*
**known** 48:*19*
**Krosnick** 11:*14*
21:*21, 22* 22:*3*
26:*3* 55:*25* 64:*21*

**Krosnick's** 8:*21*
9:*5, 20* 10:*22* 27:*4*
44:*1, 23* 45:*5, 21*
46:*4, 11* 48:*5*
50:*25* 56:*9, 21*
62:*21* 65:*15* 69:*12*

**< L >**
**labeling** 67:*1, 3*
**lamb** 73:*9*
**law** 1:*12*
**lays** 33:*16*
**lead** 27:*15*
**leading** 50:*5*
**learning** 59:*3*
**left** 54:*12*
**legal** 27:*24* 30:2
41:*14, 18*
**letter** 43:*5*
**level** 63:*3*
**levels** 56:*3* 59:*17*
60:*13* 65:*19*
**liability** 21:*25* 29:*1*
**License** 78:*16*
**licensing** 24:*7*
**lies** 59:*19*
**limitation** 26:*17*
**limited** 8:*21* 74:*5*
**line** 22:*9* 53:*24*
54:*16* 61:*12* 80:*2*
**line-by-line** 21:*12*
36:*20*
**list** 22:*13* 23:*7*
47:*22* 68:*7*
**listed** 81:*7*
**little** 10:*13* 18:*20*
26:*4* 50:*17* 55:*9*
**LLP** 1:*13*
**long** 47:*22*
**longer** 11:*18* 12:*1,*
*7* 44:*14*
**look** 7:*13* 16:*8*
26:*18, 19* 43:*4*
53:*13, 23* 54:*14*
58:*21* 60:*23* 62:*6*
63:*15, 18, 19* 68:*16,*
*21* 72:*19* 73:*14, 23*
**looked** 47:*23*
**looking** 35:*10, 13,*
*16* 47:*23* 48:*1, 2*

49:*9* 51:*15* 54:*5,*
*11* 57:*8, 9, 15* 58:*2*
**Looks** 16:*11* 64:*11*
**LORIN** 1:*11* 3:*3,*
*14, 17, 20* 5:*10, 22*
6:*25* 7:*4, 19, 23*
15:*23* 76:*20*
**lot** 19:*20* 23:*17*
39:*6* 50:*17, 18*
**lower** 46:*7*
**LP** 1:*6*

**< M >**
**machine** 59:*3*
**main** 39:*3*
**majority** 44:*8, 12,*
*19*
**making** 39:*18*
47:*15*
**Management** 50:*14*
64:*19*
**manner** 48:*5*
**March** 42:*21*
**margin** 22:*7*
**MARKED** 3:*11*
6:*24* 7:*5, 18, 24*
15:*24*
**market** 26:*24*
32:*10* 40:*9*
**matched** 40:*1*
**matching** 39:*2, 6*
70:*8, 10*
**material** 12:*12*
**materials** 10:*18*
19:*12, 23* 43:*10*
44:*4, 9, 16, 20*
45:*10, 11*
**math** 33:*24, 25*
34:*7* 56:*22* 57:*3*
58:*7* 59:*24* 71:*14*
75:*21*
**mathematical** 34:*19*
**mathematically**
40:*17*
**matter** 5:*10*
**mean** 11:*25* 12:*21*
30:*17, 18* 41:*12*
45:*12* 54:*23*
**means** 76:*16*
**measures** 31:*1*
**mechanically** 19:*20*

**mentioned** 11:*25*
36:*9* 42:2 44:*15*
51:*17*
**met** 6:*6*
**method** 30:*14, 18,*
*19* 33:*20* 40:*19*
56:*25* 70:*14* 73:*20*
**methodologies** 61:*1*
**methodology** 19:*18*
30:*12* 31:*19* 32:*4*
33:*16* 34:8, *16, 19,*
*20* 37:*7, 15* 39:*17,*
*20* 40:*18* 60:*4, 20*
71:*13, 23* 75:*14, 18*
**methods** 60:*8, 15*
**Miami** 2:*10*
**million** 35:*4*
**mine** 20:*24*
**Minneapolis** 2:*5*
**minute** 42:2
**minutes** 75:*23*
**misapplies** 72:*9*
**miscalculations** 41:*9*
**mismatches** 73:*23*
**mismatching** 35:*22,*
*23*
**missed** 59:*10*
**misspoke** 37:*13*
**mixing** 37:*1*
**MN** 2:*5*
**model** 28:*20* 50:*11*
51:*16, 18, 21* 57:*19,*
*20* 58:*2, 10, 11, 20*
59:*2*
**modeling** 59:*4*
**models** 49:*16, 17, 20*
**modif** 45:*15*
**modifications** 19:*23*
**modify** 31:*6*
**moment** 17:*11, 14,*
*25*
**Monday** 4:*17, 18, 21*
**month** 14:*6*
**months** 6:*6* 22:*17*
**Morning** 6:*5, 8, 9*
76:*13*
**move** 50:*9*
**moving** 53:*12*

**< N >**

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 33 of 39    Document 105-6
**(763) 591-0535 | info@depointernational.com**
**Depo International, Inc.**
Page 6

names 39:9
natural 67:5
near 20:14
necessarily 68:9
75:20
necessary 8:14
64:23 75:9 79:4
need 4:17 6:14
17:2 29:3, 9, 23
50:11 54:8 65:11
needed 50:22 57:21
negative 36:6
neither 24:15 25:16
New 1:17 9:1, 3, 8,
20, 22, 23 10:7, 16,
17, 18 11:15, 23
17:24 19:4, 12, 14,
25 20:9 21:5, 21,
22 22:11 44:4, 10,
16, 17 45:10, 11, 16
newer 11:13
nine 27:3
NJ 78:16
Notary 1:16
note 43:16
noted 79:10
notes 78:4
Notice 1:12
notwithstanding
33:11
NUMBER 3:11
6:11 27:22 28:2
35:12 46:17, 24
47:14 52:9 55:2
58:24 60:13 62:15,
22, 23 63:2, 3, 11
75:11
numbers 10:11, 12
55:15 70:2
nursing 25:5

< O >
oath 5:20
Object 29:5 30:1
33:10, 13 34:10
37:25 71:24 75:12,
15
objection 38:13
46:14 47:2 58:3
objections 4:7

observation 63:14
69:5
observations 63:9
observed 56:2
obtain 15:12
obviously 10:10
23:20
occur 67:18
occurred 46:16
47:4
occurs 48:22
October 40:21
42:6, 18 43:14
offer 17:9, 21 74:1
offered 10:25 70:17
offering 9:3, 8, 19
10:7 23:23
offices 1:12
offsetting 73:11
Oh 36:22 37:12
60:18 61:18 70:22
Okay 6:16, 17 7:16
8:11, 15, 16 9:13
11:5, 7 12:5 16:23
18:18 20:2 23:3, 9
24:19 25:17, 21
26:16 27:20 29:18
31:15 32:16 34:2
36:22 37:12, 20
40:6 45:3, 19
52:13, 17 58:18
61:14, 16 63:16
68:3 69:2, 9, 17, 24
71:3 72:12 75:22
old 8:12
older 19:1
once 73:4, 20
ones 25:15 26:15
35:17 36:7, 17, 20
38:5 39:22 47:23
61:2, 6, 7, 8 68:25
online 45:14
open 39:12
opine 45:20
opinion 9:23 27:2,
8, 18 29:2 30:24
31:16 32:1, 17
44:25 69:11, 16
70:13, 16 74:2
opinions 8:21 9:4,
9, 20, 24 10:7, 16,

21 11:1, 10 12:16
13:25 14:17 17:9,
15, 18, 21 18:1, 4
20:16, 17, 18 21:2,
5, 17 23:23 24:16
26:9, 24 27:22
40:8 43:11 44:5,
22 45:5 52:15
65:14 69:4, 11, 25
opposed 57:9
opposite 37:19
optimizing 67:24
order 4:15
Orders 23:21 24:9
original 10:2 51:1
79:12
other's 63:12
outside 63:12
overlap 53:14, 25
54:6, 17
overly 42:18 59:13
overstates 70:14

< P >
P.A 2:9
PA 1:14
Pacific 2:4
package 19:21
33:12 34:5 69:13
72:10 74:6
packages 42:12
56:16
packaging 40:16
56:15 67:9 71:9
PAGE 3:10 7:14
8:6 23:11 25:22
27:3 32:24 35:1
41:7 45:1, 20
50:19 52:16 63:19
64:20 66:4 68:21
69:10 71:4 80:2
paper 22:11
papers 22:18 24:24
paragraph 25:22,
25 27:3 34:3 42:3,
17 45:1 46:2
52:16 63:19, 21
66:5, 7, 12, 23
68:21, 23 69:10
paragraphs 70:20

part 31:9 39:10
49:2
partially 73:10
particular 35:17
55:11 60:12 62:14
72:1
particularly 62:5
parties 78:6
parts 40:2
pattern 55:11
62:14 63:23 64:10,
12
Pause 12:22 13:17
16:10 30:16 34:1
36:21, 24 37:2, 6,
11 44:21 46:1
47:20 48:3 49:8
56:7 57:6 59:8
61:19 65:13 66:3
68:20 70:12, 21
71:17, 19 72:25
pay 27:15 28:5
29:3 30:9 32:11
payer 72:24
pending 23:17
Pennsylvania 1:16
5:9
Pentobarbital 8:22
10:3, 22 20:21
27:5, 8, 23 28:4, 11
29:22 42:20 43:7
44:1 69:12
people 59:6
percent 45:22
57:14 59:16, 18
percentages 64:4
period 28:25 29:4
33:7 34:9 35:21
40:9 71:8 73:10
74:6, 12 75:3
periods 65:6 74:17
personal 43:1
perspective 57:2
Petfood 5:11
PETFOODS 1:3, 6
Philadelphia 1:14
5:9
phone 13:1 20:5
pieces 39:14
placed 15:14

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 34 of 39    Document 105-6
**(763) 591-0535 | info@depointernational.com**
**Depo International, Inc.**
Page 7

places  64:*18*
Plaintiff  2:*7*
Plaintiffs  5:*16*
  21:*18*  29:*23*  33:*7*
  55:*9*  67:*3*
Plaintiff's  28:*11*
  29:*1, 2, 20*  67:*6, 8*
Plaza  2:*4*
please  4:*15*  5:*13,*
  *20*  61:*11*  79:*3, 8*
PLLC  2:*3*
plot  64:*14*
plus  20:*20*
point  43:*15*
pointed  55:*12*
points  10:*14*  21:*10*
population  74:*24*
portion  33:*12*
positive  36:*5, 8*
  42:*20*  43:*7*
postdate  43:*17*
potential  38:*19*
  39:*4, 7*
potentially  66:*19*
  68:*1*
pound  72:*10*
practice  24:*12*
  25:*5*  49:*13*  57:*25*
  58:*19*
practices  24:*13*
  25:*4, 14*
precise  62:*6*
precisely  57:*17*
preliminary  24:*25*
pre-October  40:*15*
preparation  21:*23*
prepare  18:*24*
preparing  19:*9*
PRESENT  2:*14*
  66:*15*
presentation  55:*5*
  62:*4*
presented  26:*11*
press  22:*15*
pretty  26:*8*  28:*23*
  49:*14*  50:*6*  64:*16,*
  *19*
prevent  6:*19*
prevented  15:*17*

previous  8:*13*  10:*2*
  24:*24*  26:*15*  27:*1*
  32:*12*  51:*17*
price  34:*5*  35:*22*
  36:*14*  39:*2*  40:*16*
  46:*7, 8, 13, 17, 24*
  47:*10*  48:*18*  49:*10*
  54:*12*  63:*3*  67:*16*
  72:*10*  73:*1*  74:*15*
prices  12:*4, 7*
  26:*24*  32:*10*  33:*12*
  36:*3*  39:*6*  48:*18*
  62:*23*  67:*25*  68:*24*
  69:*7*  70:*6, 10*  71:*9*
  73:*7, 15, 24*
pricing  14:*21*  15:*3*
  24:*3, 4, 12*  27:*15*
  38:*4*  40:*10*  45:*12*
  69:*3*  74:*6*
primarily  55:*7*
primary  47:*4*  55:*5*
principal  46:*5*
principally  38:*4*
prior  20:*11*  52:*19*
  56:*20*  68:*25*
probability  59:*18*
probably  14:*5*
  22:*7*  32:*8*  50:*11*
  61:*2*
problem  65:*24*
problems  39:*7*
  55:*24*
produce  61:*3, 17*
product  36:*14*
  39:*9*  40:*25*  42:*14*
  46:*7*  62:*17*  63:*3*
  67:*13*  72:*24*
production  42:*15*
  51:*1*
products  12:*8*  25:*9,*
  *11, 16*  28:*21*  29:*21*
  34:*4*  35:*22, 23*
  36:*4*  40:*1*  62:*24*
  67:*1, 10*  70:*10, 15*
  72:*19*  73:*23*  74:*13,*
  *14, 18, 22, 23, 25*
Professor  22:*3*
progressed  22:*14*
proper  39:*5*  43:*11*
  75:*3*

properly  65:*5, 15*
property  24:*7*
proposition  50:*1*
  64:*7*
Protective  23:*21*
  24:*9*
prove  29:*2*
provide  42:*7*
provided  42:*16*
provides  41:*9*
providing  24:*16*
Public  1:*16*
publications  22:*19*
published  22:*15*
  50:*7*  64:*18*
purchasing  42:*5*
purpose  57:*8, 14*
  61:*22*
pursuant  1:*12*
put  19:*24*  26:*17*
  58:*20*

< Q >
quantification  27:*16*
quantities  68:*1*
question  4:*7*  14:*20*
  32:*1*
questions  26:*22*
  40:*1*  69:*21, 22*
  76:*15*
quick  16:*8*  37:*4*

< R >
RAINA  2:*3*  5:*15*
raised  32:*11*
ran  56:*22*  61:*4*
random  46:*18, 19*
randomization  47:*4*
  56:*15*  62:*20*  65:*9,*
  *23*
randomize  65:*4*
randomized  46:*18*
  62:*23, 24, 25*  65:*5,*
  *11, 16, 20*
rate  30:*8*
rational  48:*6*
raw  56:*9*  57:*10, 15*
rborrelli@gustafsong
luek.com  2:*6*
reach  39:*24*
reached  42:*12*

reaction  67:*24*
  68:*11*
reactions  67:*14, 25*
read  21:*7*  32:*4, 21*
  53:*20*  79:*3*  81:*4*
readily  15:*10*
real  37:*3*
really  25:*13*
realm  24:*3*
reason  48:*10*  79:*5*
  80:*2*
reasonable  40:*20*
  41:*21*
reasoning  17:*17*
  18:*4*  45:*8*  66:*11*
reasons  48:*21*  53:*2*
  57:*22*
rebut  8:*25*
Rebuttal  3:*13, 16,*
  *19*  6:*25*  7:*3, 18, 22*
  8:*19*  9:*4*  10:*6, 20*
  15:*22*  16:*6*  17:*25*
  21:*20*  25:*19*  32:*25*
recall  13:*20*  21:*24*
  22:*16*  25:*7*  61:*9*
recalling  37:*4*
receipt  79:*14*
receive  12:*14*  50:*21*
received  7:*5, 24*
  15:*24*  63:*6*  70:*25*
Recess  52:*4*  76:*4*
recollection  81:*5*
record  4:*11, 12, 15*
  5:*1*  51:*25*  52:*2, 9*
  76:*2, 8, 22*
recorded  4:*11, 25*
Red  22:*9*
reference  16:*5*
  43:*15*
referenced  21:*10*
references  12:*11*
referred  60:*7*
referring  19:*15*
  34:*13*  35:*7*  47:*15,*
  *16*  70:*18*
refine  43:*16*
reflected  34:*25*
reflects  18:*1*
refund  28:*20*
  30:*10*  41:*10, 16, 22*
regard  45:*18*

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 35 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**
Page 8

**regarding** 8:*22* 9:*5, 20* 10:*8* 12:*4 24:13* 25:*5* 28:*11* 44:*23* 45:*5* 60:*12* 69:*25*
**regardless** 28:2 41:*8*
**regression** 56:*14, 18, 22* 57:*9, 15, 18, 22* 58:*1, 6, 11, 13*
**regressions** 64:22
**Reitman** 7:*1* 8:*13, 19* 9:*10* 10:*20* 11:*1* 12:*21* 14:*8* 16:*7* 17:*7, 10, 18* 18:*9* 19:*5* 20:*9* 21:*6* 25:*20* 28:*12* 37:*16, 24* 43:*22* 44:*2, 6, 24* 49:*1, 5* 50:*20* 51:*7* 66:*8, 13* 68:*15* 69:*13* 70:*2, 17* 71:*7* 74:*4* 75:*5*
**related** 12:*15* 22:*20, 24* 25:*8* 26:*10* 61:*9* 69:*11, 12* 71:*8*
**relationship** 64:*15*
**relative** 26:*15* 70:*6* 78:*6*
**reliable** 55:*19*
**reliance** 49:*11*
**relied** 20:*23*
**relies** 56:2
**rely** 20:*17* 21:*2* 51:*21* 60:*2, 3*
**relying** 41:*18*
**remains** 31:*3*
**remind** 6:*13* 52:*19* 56:*20*
**replicate** 38:*16* 48:*23*
**Report** 3:*14, 16, 19* 6:*25* 7:*4, 14, 19, 23* 8:*13, 19, 21, 23* 9:*4, 6, 9, 15, 16, 19, 20, 21* 10:*3, 6, 8, 19, 20, 22* 11:*14, 17* 12:*19* 13:*15* 15:*23* 16:*6, 14* 20:*15* 21:*16, 20, 22, 23* 25:*19* 26:*2,*

*3* 27:*1, 2* 31:*2, 17* 32:*2, 12, 18, 22, 25* 36:*8* 37:*18* 38:*12* 42:*3, 25* 43:*18* 44:*25* 45:*6* 49:*1* 50:*23* 51:*7, 18* 52:*15* 53:*7* 60:*6* 61:*8, 24* 66:*8* 67:*20* 68:*14* 70:*17* 74:*5* 75:*5*
**reported** 69:*13*
**Reporter** 1:*18* 4:*14* 5:*20* 7:*7* 8:*1* 16:*1* 32:*5* 78:*21*
**reporting** 23:*13*
**reports** 8:*9* 10:*23* 12:*12* 13:*5, 15* 17:*7, 8, 25* 19:*1, 2* 20:*9, 12* 21:*5, 16, 22, 25* 22:*4* 26:*6, 10, 12, 19* 37:*1, 10* 44:*10* 45:*16*
**Representing** 2:*7, 12*
**request** 14:*24*
**require** 29:*8* 30:*8, 14*
**required** 64:*17*
**requires** 29:*8*
**Research** 13:*11, 13* 15:*2, 5* 19:*6, 9, 24* 20:*6* 39:*25* 42:*11* 73:*21*
**researching** 13:*5*
**reserved** 4:*8*
**respect** 26:*5* 40:*7, 9* 44:*1, 22* 54:*23* 71:*20* 75:*5, 10*
**respond** 26:2
**responded** 31:*12*
**Respondents** 46:*3, 25* 47:*11* 48:*4, 16* 49:*10*
**responding** 21:*20*
**restrictions** 15:*13* 20:*24*
**result** 67:*19*
**results** 53:*25* 60:*9* 61:*3* 63:*6*
**retail** 14:*20* 15:2

70:25
**retained** 13:*18*
**retention** 13:*21*
**retry** 8:*12*
**return** 79:*12*
**review** 12:*19* 18:*7* 20:*8, 11* 21:*15* 26:*2, 8* 35:*9* 43:*10* 44:*4* 45:*16*
**reviewed** 11:*9* 12:*15* 19:*1, 2* 20:*14* 21:*21* 22:*4* 38:*16* 44:*6*
**reviewing** 11:*13* 21:*24*
**revise** 50:*11*
**revisited** 14:*19*
**right** 6:*18, 22* 8:*8, 10, 17, 24* 9:*2, 11, 12, 15* 11:*3, 8* 16:*12, 18, 21* 17:*23* 24:*25* 25:*12* 27:*25* 28:*9* 31:*4, 5* 33:*24, 25* 34:*7* 40:*11* 47:*1* 51:*4* 56:*11* 57:*4* 61:*18* 66:*9* 69:*1* 75:*1*
**rise** 73:7
**rough** 4:*17*
**RPR** 1:*15* 78:*15*
**rules** 6:*10*
**running** 57:*9*
**rush** 4:*20*

**< S >**
**S.E** 2:*10*
**sale** 74:*3*
**sales** 27:*10, 24* 28:*18, 21* 29:*8, 21* 30:*18* 33:*2, 6, 8* 34:*14* 40:*8, 15* 41:*10, 15, 19* 43:*12* 70:*6, 7, 14, 25* 71:*8* 72:*2* 74:*18* 75:*10*
**sample** 55:*14, 20* 56:*3, 18* 62:*5* 65:*15*
**samples** 56:*5*
**saying** 27:*8* 31:*17* 32:*1* 34:*18* 58:*6, 7*
**says** 26:*1* 29:*7*

48:*22* 54:*25*
**Science** 50:*14*
**scientific** 49:*14*
**scope** 26:*21* 27:*19*
**SCOTT** 1:2 5:*10*
**scratch** 59:*18*
**sealing** 4:*5*
**Second** 3:*13* 6:*24* 7:*3* 8:*18, 22* 9:*4* 10:*20* 25:*19* 26:*3* 27:*18* 30:*24* 32:*25* 33:*12* 62:*8* 72:*8* 74:*4*
**section** 50:*22*
**see** 8:*5* 15:*10* 26:*8* 29:*12* 33:*3* 35:*16* 37:*4* 44:*24* 45:*24* 46:*9* 47:*19* 48:*15* 49:*15, 23* 50:*6, 8* 53:*13* 63:*25* 64:*9, 11, 15* 72:*20, 23, 24* 73:*1, 2, 7, 15*
**seeing** 36:*13*
**segmentations** 55:*17*
**sell** 67:*1*
**sent** 43:*6*
**sentence** 25:*25* 46:*9* 63:*22, 25*
**separate** 31:*8* 39:*13* 44:*5* 53:*21* 57:*5*
**separately** 62:*18*
**September** 1:*9* 3:*15, 18* 5:*6* 7:*4, 20, 23*
**served** 50:*4*
**set** 78:*4*
**seven** 56:*1*
**sheet** 18:*12* 72:*21* 79:*6, 9, 10, 13*
**shifted** 19:*20*
**show** 36:*12* 55:*7, 8, 10* 60:*9* 62:*1* 64:*10* 72:*18*
**showed** 29:*21*
**showing** 29:*3* 54:*16, 24* 55:*6*
**shown** 35:2
**shows** 55:*10*
**side** 68:*16, 19*
**sign** 79:*8*

Case 2:18-cv-01996-JPS     Filed 10/11/19     Page 36 of 39     Document 105-6
(763) 591-0535 | info@depointernational.com
Depo International, Inc.
Page 9

signature 7:*14* 8:*5*
81:*21*
significance 52:*21*,
*25* 53:*6*
significant 44:*24*
54:*1*
signing 79:*9*
similar 40:*8* 47:*23*
53:*1*, *18* 60:*9*
63:*15*, *18*
similarly 1:*3*
simpler 66:*16*
simply 12:*10* 44:*9*
45:*12* 57:*9*
simultaneously
48:*2* 68:*13*
Sitting 17:*23*
situated 1:*3*
situation 47:*9* 72:*7*
six 61:*2*
Sixth 2:*4*
sizes 55:*14*
slightly 31:*7* 59:*4*
70:*5*
small 45:*15* 55:*18*,
*20* 56:*3*, *6*
software 23:*19*
24:*13*
sorry 28:*3* 35:*18*
36:*11* 37:*12*, *22*
52:*16* 59:*10* 60:*18*
62:*2* 74:*20*
sort 24:*13* 25:*1*
41:*20* 49:*9* 58:*1*,
*20*, *21* 59:*6*, *20*
sorts 23:*23* 59:*5*
sound 11:*3* 18:*20*
51:*4* 66:*9*
source 15:*3* 33:*18*
35:*20* 39:*4* 49:*23*
sources 11:*17*, *24*
12:*6* 44:*14*
South 2:*4*
space 79:*6*
speak 12:*25* 13:*2*
speaking 5:*4*
specific 21:*13* 26:*4*
44:*18*
specifically 26:*14*
35:*13* 70:*19* 73:*14*

specify 53:*4*
spirit 74:*10*
spoke 13:*13* 19:*6*,
*7* 20:*3*, *6* 24:*20*
spreadsheet 73:*13*
staff 13:*4*, *9* 15:*1*, *5*
stages 24:*25*
stand 4:*22* 17:*15*
18:*15* 52:*6* 76:*6*
standard 48:*14*
49:*11*, *13*, *21* 58:*19*
64:*8*, *16*
start 6:*23* 42:*18*
43:*11* 49:*17*
started 40:*21*
starting 27:*3* 45:*20*
52:*15* 69:*10* 71:*4*
starts 45:*1* 63:*22*
state 4:*15* 12:*13*
79:*5*
stated 42:*3* 53:*2*
statement 47:*15*
65:*2*
statements 30:*20*
37:*14* 46:*17*, *24*
47:*14* 53:*13* 54:*15*
55:*3* 56:*1* 62:*11*,
*23* 63:*4*, *12* 67:*4*, *9*
STATES 1:*1*, *16*, *18*
statistic 53:*22*
statistical 49:*11*
52:*20*, *25* 53:*6*
64:*3* 65:*3*
statistically 53:*15*
54:*1*, *20* 55:*2*
statistics 19:*21*
stenographic 4:*11*
5:*1*
Stepping 35:*19*
stipulated 4:*4*
straightforward
66:*16*
strange 51:*19*
stream 42:*15* 50:*15*
Street 1:*13* 2:*4* 5:*8*
Subject 45:*10* 79:*9*
submitted 79:*16*
subset 74:*21*
suggests 48:*6*, *8*
Suite 1:*13*
supervision 78:*20*

supplemental 8:*23*
9:*15* 26:*2* 31:*17*
32:*2*, *18*
supplements 27:*1*
supplier 42:*5* 67:*16*
supply 66:*21* 68:*16*,
*19*
support 11:*10*
14:*13*, *17* 20:*18*
23:*13* 27:*5* 29:*24*
41:*21* 43:*3* 44:*5*
64:*6*
supported 43:*10*
supporting 19:*4*
30:*19* 41:*18*
supports 9:*24*
sure 22:*9* 27:*20*
29:*18* 31:*22* 36:*25*
54:*9* 56:*19* 75:*24*
survey 8:*22* 9:*5*, *6*,
*21* 10:*2*, *22* 20:*21*
22:*20*, *21*, *24* 24:*17*
25:*1*, *5* 27:*5*, *9*, *23*
28:*4* 29:*3*, *9*, *13*, *24*
44:*2*, *23* 45:*5*, *21*
46:*4*, *12*, *16*, *25*
48:*5*, *7*, *10*, *22* 49:*2*,
*23* 51:*1* 57:*8*
62:*17* 69:*12*
surveys 24:*21* 49:*7*
56:*10*
sworn 5:*23*
systematic 62:*14*
systematically 73:*22*

**< T >**
tab 73:*13*
Table 34:*25* 36:*10*
47:*17*, *18*, *21* 53:*7*
56:*8* 64:*24* 72:*8*, *16*
tabu 34:*14*
tabulate 49:*14* 50:*7*
tabulating 34:*14*
tabulation 35:*8*
62:*13*
tabulations 59:*1*
take 4:*19* 5:*9*
7:*13* 16:*8* 58:*20*
75:*23*

taken 1:*12* 18:*8*, *9*
33:*19* 40:*15* 52:*4*
76:*4* 78:*4*
talk 6:*14*
talking 52:*14*
tallow 40:*24* 42:*5*,
*14*, *19*
tangentially 9:*16*
tape 52:*8*
taught 22:*23*
teaching 22:*7*, *10*
23:*2*
team 19:*6*, *9*, *24*
20:*6* 36:*2* 39:*25*
42:*12* 73:*21*
team's 37:*21*
technical 59:*14*
Technician 2:*15*
4:*22* 5:*3*, *19* 52:*1*,
*6* 76:*1*, *6*, *19*
technique 60:*22*
64:*8*
techniques 57:*23*
58:*8*
tell 23:*15*, *22* 24:*9*
54:*18* 59:*12* 65:*22*
telling 53:*24*
tells 54:*19*
term 66:*23*
terms 9:*6* 11:*16*
37:*16* 59:*22*
test 49:*9* 50:*10*
53:*16*, *20*
tested 42:*20* 43:*6*
testified 5:*23*
testifying 6:*20*
TESTIMONY 3:*3*
12:*20* 18:*13*
testing 43:*3*, *17*
49:*11*
tests 48:*14* 53:*5*, *9*
66:*1*
textbook 64:*6*
textbooks 64:*13*
Thank 7:*9* 76:*12*,
*18*
theories 48:*17*
theory 49:*15* 56:*23*
64:*22* 65:*3*
thing 16:*16*, *20*
23:*4* 31:*6* 47:*11*

Case 2:18-cv-01996-JPS    Filed 10/11/19    Page 37 of 39    Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**
Page 10

49:*21*  58:*5*  59:*24*
64:*19*  67:*7*
**things**  11:*13*  14:*5*
17:*12, 13, 24*  22:*14*
27:*11*  32:*9*  38:*15*
41:*3*  44:*11*  46:*23*
47:*23*  49:*18, 19*
58:*25*  59:*5, 6*  68:*2,
7*
**think**  8:*24*  9:*12*
10:*15*  12:*9, 17*
14:*3, 4*  15:*8*  16:*19*
17:*2*  18:*8*  21:*19*
22:*15, 22*  25:*3*
26:*7, 20*  27:*11, 16*
28:*16*  30:*2*  31:*5,
11, 21*  32:*7*  36:*23*
39:*10*  40:*21*  41:*2*
44:*18*  45:*7*  48:*11*
52:*18*  57:*16*  59:*20*
60:*24*  61:*12*  62:*3*
68:*7*  70:*24*  71:*10*
72:*8*  76:*9*
**thinking**  51:*15, 19,
22*  66:*14*
**thirty**  79:*13*
**thought**  15:*18*
38:*19*  66:*19*
**three**  32:*24*  54:*15*
55:*3*  62:*19*
**time**  4:*8*  5:*7*  7:*3,
22*  10:*25*  12:*18*
13:*14*  15:*22*  18:*2*
31:*25*  33:*6*  34:*8*
35:*21*  40:*9*  52:*1, 4,
7, 23*  60:*12*  64:*14*
71:*8*  73:*10*  74:*6,
12, 17*  75:*3*  76:*1, 4,
7, 12, 21*
**timeframe**  14:*3*
51:*5*
**times**  6:*12*
**title**  54:*11*
**Today**  5:*6*  6:*20*
8:*10*  12:*19, 24*
17:*12*  18:*25*  69:*19*
**today's**  19:*9*  76:*20*
**top**  55:*16*
**total**  28:*20*  33:*1*
34:*14*  35:*4, 5*

**transcript**  4:*15*
78:*19*  79:*14, 16*
**transcription**  78:*3*
**transcripts**  18:*8*
**TRAURIG**  1:*13*
2:*9*  5:*18*
**treat**  60:*15*
**trial**  4:*8*
**true**  29:*1*  51:*21*
56:*5*  69:*7*  78:*3*
81:*6*
**truly**  65:*10, 11*
**truthfully**  6:*20*
**try**  6:*14*  8:*12*
66:*15*
**trying**  57:*12, 13, 19*
**turn**  43:*18*  66:*4*
**two**  8:*9*  10:*5, 23*
17:*6, 8*  20:*8*  21:*5*
23:*12*  26:*6, 18*
27:*1, 3, 11, 14, 22*
28:*2*  37:*1*  39:*13,
17*  46:*23*  47:*3*
52:*9*  54:*4, 7, 14*
55:*2, 12*  56:*15*
61:*1*  62:*24*  70:*20*
74:*16*
**type**  29:*24*  50:*16*
**typical**  50:*6*
**typically**  48:*14, 20*
50:*3*  53:*2*  59:*6*
62:*10*  63:*10, 12*

**< U >**
**UK**  64:*18*
**ultimately**  29:*7*
49:*17*
**uncertain**  40:*24*
**uncertainty**  64:*3*
**underlying**  48:*17*
51:*20*
**undersigned**  81:*3*
**understand**  29:*19*
42:*4, 19*  54:*10*
61:*21*  66:*25*
**understandable**
66:*17*
**understanding**  9:*14*
10:*10*  14:*10, 22*
21:*9, 11*  28:*10, 17,*

24  41:*13*  42:*23, 24*
43:*23*
**understandings**
75:*2, 4*
**UNITED**  1:*1, 18*
**unreliable**  31:*3*
48:*7, 10, 24*
**unusual**  51:*19*
**update**  22:*8*  44:*18*
**updated**  11:*19*
12:*8*  22:*10*  44:*16*
**updates**  24:*24*  44:*9*
**updating**  12:*10, 11*
**USA**  1:*3*  5:*11*
**use**  27:*13, 23*
29:*10*  48:*8*  57:*18,
22, 25*  58:*9*  60:*4*
66:*23*
**uses**  33:*16*  70:*5*

**< V >**
**value**  9:*6*  28:*5*
29:*9*  30:*15*  45:*21,
23*  46:*4, 11*  57:*14*
60:*15*  72:*5*
**variables**  63:*6*
64:*22*  65:*8, 12, 19*
**variation**  46:*16*
62:*9, 10*  63:*17*
**various**  34:*13*
65:*19*  75:*2*
**vary**  63:*9*
**vast**  44:*8, 11, 19*
**vendor**  23:*19*
**verify**  48:*9*
**versions**  11:*13*
**versus**  5:*11*  7:*1, 19*
57:*15*
**Video**  2:*15*  4:*11,
22*  5:*1, 3, 9, 19*
52:*1, 6*  76:*1, 6, 19*
**videographer**  5:*4*
**Videotaped**  1:*11*
**view**  39:*11*  68:*4*
**violate**  23:*20*  48:*20*
**violating**  24:*8*
**visible**  64:*9*
**visual**  62:*4*  64:*12*
**vouch**  33:*17*
**vs**  1:*3*

**< W >**
**waived**  4:*6*
**want**  16:*24*  27:*20*
29:*18*  54:*4, 7, 9*
**wanted**  53:*11*  55:*3*
**way**  19:*18, 19*
20:*19*  30:*6*  47:*13*
51:*23*  54:*2*  57:*1*
59:*4, 21*  62:*6*
66:*16*  67:*4*
**ways**  47:*4*  51:*15,
19*  58:*10*  59:*25*
66:*14*
**WEAVER**  1:*2*
5:*11*  7:*19*  9:*19*
10:*19*  11:*17*  12:*21*
13:*19, 25*  14:*7, 13,
17*  15:*15, 19*  17:*22*
18:*5*  19:*4*  20:*9*
21:*6, 21, 23*  28:*12*
37:*18*  43:*18, 20*
44:*25*  49:*5*  50:*23*
51:*10*  52:*15*  60:*5*
66:*12*
**Website**  12:*1*
**Websites**  11:*21, 25*
**Weir**  11:*14*  19:*17*
21:*19*  22:*2*  26:*3*
27:*9, 23*  28:*3, 8, 17*
30:*6*  33:*1, 5*  34:*4*
39:*18*  41:*9*  70:*5*
71:*12*  74:*2*  75:*7, 8*
**Weir's**  8:*22*  9:*9*
10:*8*  19:*25*  27:*5*
30:*25*  31:*17*  32:*2,
18*  34:*7*  35:*9*
37:*22*  40:*16*  70:*1,
13*  71:*6, 20*
**well**  10:*4*  11:*19*
16:*17*  19:*23*  25:*10*
26:*8*  28:*13*  53:*7*
55:*22*  57:*23*  59:*23*
62:*10, 18*  67:*11*
74:*20*
**Went**  19:*3*  36:*2*
38:*5, 6*
**we've**  44:*2*
**wide**  55:*7, 23*

Case 2:18-cv-01996-JPS   Filed 10/11/19   Page 38 of 39   Document 105-6
(763) 591-0535 | info@depointernational.com
**Depo International, Inc.**
Page 11

**willingness**  27:*14*
28:*4*  29:*3*  30:*9*
32:*11*
**willingness-to-pay**
29:*24*
**WISCONSIN**  1:*1*
70:*6*  71:*21*
**witness**  5:*23*  29:*6*
30:*4, 17*  31:*21*
32:*7*  33:*14*  34:*11*
38:*1, 14*  46:*15*
47:*3*  58:*4*  63:*20*
71:25  72:*3, 6*
75:*16*  76:*18, 24*
79:*1*  81:*3*
**word**  48:*8*
**work**  14:*4, 12*
15:*10, 14, 18*  19:*20*
24:*23*  25:*4*  49:*3,
14*  50:7  68:*19*
**worked**  13:*13*
**working**  22:*11, 19*
25:*2*
**world**  66:*23, 24*
67:*5, 8, 19, 23*  68:*5,
17*
**writing**  13:*1*

**< Y >**
**Yeah**  9:*17*  12:*3*
18:*21*  26:22  30:*4*
32:*7*  34:*12*  45:*19*
50:*18*  52:22  56:*12*
57:2  62:*19*  69:*20*
70:22  71:*10, 25*
73:2  75:25
**year**  14:*3*  71:*1*
**years**  50:*5*
**yesterday**  20:7