# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SCOTT WEAVER,

               Plaintiff,

v.

CHAMPION PETFOODS USA INC.
and CHAMPION PETFOODS LP,

               Defendants.

Case No. 18-CV-1996-JPS

**ORDER**

## 1. INTRODUCTION

Plaintiff, a Wisconsin consumer, asserts in his third amended complaint that Defendants, makers of pet food, deceptively marketed their dog food as having various high-quality attributes when this was not the case. (Docket #41). Defendants have filed a renewed motion for summary judgment, seeking dismissal of the case in its entirety. (Docket #144). For the reasons explained below, Defendants' motion must be granted.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the

Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The non-movant "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3.     RELEVANT FACTS

Defendants produce Orijen and Acana dog foods. Defendants assert that these products are made with a "Biologically Appropriate nutritional philosophy," which informs their ingredients based on what dogs and wolves would eat in the wild. Peter Muhlenfeld, Defendants' former chief brand officer, said that the idea was "to get as close to the natural diet as possible." (Docket #155-1 at 6). Plaintiff believes that "biologically appropriate" is a factual statement rather than a philosophical ideal about what should be included in dog foods. For Plaintiff, it is a scientific term subject to objective testing.

Defendants operated exclusively out of Canada until 2016, when they opened a new factory in Kentucky. Defendants shifted almost all of their Orijen and Acana production to that facility. Plaintiff purchased the Orijen brand from 2008 until 2017, and so would have received product from both and after the transition. He never bought Acana.

Orijen's packaging reflects Defendants' marketing approach. The bags state that the food is biologically appropriate, "mirrors the richness, freshness and variety of WholePrey meats that dogs are evolved to eat," and is "protein rich [and] carbohydrate limited[.]" (Docket #155-1 at 5). The packaging further claims that "modern dogs are built like their ancestors

[wolves]. Possessing a biological need for a diet that's rich and varied in animal protein." *Id.* The bags also tout the various fresh and regionally sourced qualities of the ingredients used in the finished product, including that the ingredients are never outsourced. Defendants downplay this, stating that the bags do not say that *all* of the ingredients have these qualities, but Plaintiff notes that this might not be how a consumer would read the packaging.

At the time Plaintiff purchased Defendants' dog food, the following information referred to as "Meat Math" appeared on the packaging. The DogStar packaging of ORIJEN Six Fish specifically states "this 13 lb package of ORIJEN is made with over 11 lbs of fresh, raw, or dehydrated fish ingredients," and identifies these ingredients as Wild Atlantic Herring, Wild Yellowtail Flounder, Wild Atlantic Mackerel, Wild Acadian Redfish, Wild Monkfish, and Wild Alaskan Cod." The Meat Math also states it uses "approximate inclusions" and 1/3 of the fish ingredients are dried or oils and uses "fresh, raw or dry" in describing three of the fish immediately below the poundage, plus it describes anchovy, sardine and salmon as "dehydrated."



(Docket #155-1 at 13).

The DogStar ORIJEN Regional Red packaging states that 11 pounds of its 13-pound package are fresh or raw ingredients, and the packaging

Case 2:18-cv-01996-JPS   Filed 07/08/20   Page 3 of 19   Document 184

further states that the top ten ingredients are delivered fresh or raw. This too reflects "1/3 DRIED OR OILS" and that some of the animal protein plus eggs are "dehydrated."



(Docket #155-1 at 14).

On the ORIJEN Regional Red and ORIJEN Six Fish packaging from NorthStar, it states on the back that "Quality is Never Outsourced" and explains that "we prepare ORIJEN ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." (Docket #155-1 at 17). The ORIJEN Regional Red and ORIJEN Six Fish packaging from DogStar states "NEVER OUTSOURCED. PREPARED EXCLUSIVELY IN OUR DOGSTAR® KITCHENS - We don't make foods for other companies and we don't allow our foods to be made by anyone else." (Docket #155-1 at 17).

While Plaintiff acknowledges that the final products for Orijen and Acana were not outsourced, he contends that many of the ingredients could be considered outsourced to some degree. Some of the ingredients came from local sources, but others came from across the globe. Defendants explain that this is generally predicated on the inability of local sources to meet their supply needs. Plaintiff is unmoved, noting that the packaging actively disclaims any outsourcing whatsoever.

Case 2:18-cv-01996-JPS   Filed 07/08/20   Page 4 of 19   Document 184

The packaging also uses pictures of bucolic countryside and family-run farms to display Defendants' suppliers and, hopefully, communicate to consumers about the wholesomeness of the ingredients. Plaintiff claims that this is a farce. Defendants' primary suppliers are actually multinational conglomerates like Tyson, some of which have their own image issues, and Defendants would prefer to be distanced from them. The suppliers pictured on the packaging often supply very little, but are chosen instead by their ability to elicit good feelings.

Some of the misleading statements identified in Plaintiff's pleadings were not actually read by him, as they came from packaging he did not purchase, websites he did not visit, and papers he did not read.

Bisphenol-A ("BPA") is a chemical used in the making of plastics and resins. It tends to leach into the products packaged in plastic containers, and it is otherwise widely dispersed in the environment. Humans and animals are regularly exposed to BPA. Plaintiff asserts that a consumer would understand the "biologically appropriate" promise as indicating that the product has little or no BPA. Defendants counter that they do not intentionally add BPA to their products, and they do not warrant that their products are BPA-free. According to the parties' laboratory testing, many brands of dog food contain BPA. The BPA levels found in Defendants' products would not cause harm to a dog consuming the products.

Defendants also use beef tallow in their products—fat rendered from animal carcasses. They receive tallow from a number of suppliers, include a company called JBS. In May 2018, Defendants learned that some of JBS's shipments had tested positive for pentobarbital. Pentobarbital is a chemical used to euthanize animals. It is not an intended ingredient and is, indeed, an adulterant. Defendants suggest that very little or even no pentobarbital

was detectable in the finished products, and that such low levels would not be dangerous to dogs. Thus, although Defendants were able to retain most product which may have contained the tainted tallow, the 100,000 pounds that had made it to retail were not recalled. Plaintiffs maintain that the FDA has a zero-tolerance approach to the chemical's presence, so any detectable amount renders the food unfit for consumption. However, it is undisputed that the Plaintiff had stopped purchasing Defendants' dog food by the time Defendants learned that some of JBS's shipments had tested positive for pentobarbital.

## 4. ANALYSIS

Defendants have moved for summary judgment on all of Plaintiff's claims in the Third Amended Complaint (Count I, Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18 *et seq.* ("WDTPA"); Count II, Fraud by Omission; and Count III, Negligence). (Docket #41). Throughout all of Plaintiff's claims are allegations that Defendants' statements on the dog food packaging were false or misleading. Additionally, Plaintiff claims that Defendants had the duty to disclose information regarding the potential risk of the dog food containing BPA and pentobarbital. The only damages Plaintiff is claiming is that he was "injured when he paid the purchase price or a price premium" for the dog food that "did not deliver what was promised." (Docket #41 at 12). Defendants seek dismissal of all claims. The Court will address each in turn.

### 4.1 "Biologically Appropriate"

Defendants offer two bases for dismissal of Plaintiff's claims based on the "Biologically Appropriate" phrase. First, Defendants argue that the phrase is a nutritional philosophy, not a statement of fact. It should therefore be likened to non-actionable commercial puffery. *Tietsworth v.*

Case 2:18-cv-01996-JPS   Filed 07/08/20   Page 6 of 19   Document 184

*Harley-Davidson, Inc.*, 677 N.W.2d 233, 245–46 (Wis. 2004). Plaintiff counters that the philosophy boils down to a representation that the products are fresh and natural, containing only ingredients that a dog would eat in the wild. This representation is, in turn, capable of being factually proven or disproven.

The Court will assume, without deciding, that "Biologically Appropriate" is an actionable representation under the WDTPA. Defendants' second argument for dismissal is that the presence, or risk of presence, of BPA in the finished products does not render the phrase misleading. The Court agrees, in line with its reasoning consistently expressed in its prior order on Defendants' motion to dismiss, (Docket #39), and its decisions addressing the substantially similar claims and arguments raised in *Kellie Loeb v. Champion Petfoods USA Inc. et al.*, 18-CV-494-JPS (E.D. Wis.). *See Loeb v. Champion Petfoods USA Inc.*, No. 18-CV-494-JPS, 2018 WL 2745254 (E.D. Wis. June 7, 2018) (hereinafter "*Loeb I*," deciding a motion to dismiss); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597 (E.D. Wis. 2019) (hereinafter "*Loeb II*," deciding a motion for summary judgment).

The Court's prior opinions dealt with allegations that Defendants' marketing statements were rendered misleading by the presence, or the risk of presence, of heavy metals in the products. The Court rejected this theory because Defendants did not intentionally add heavy metals to their products. Rather, minute amounts of heavy metals are omnipresent in the environment and in all pet foods. If the mere presence of heavy metals in pet foods made a manufacturer's statements of quality misleading, then the WDTPA would effectively bar the sale of any pet foods packaged or marketed in a manner that touts their quality. This is nonsensical, of course, as every pet food is advertised in this way.

The Court previously declined to apply this approach to BPA because Defendants had not established the pervasiveness of that contaminant. (Docket #39 at 7–8). Defendants have now done so. Though BPA is not a natural substance, it has invaded the environment and is present in many dog foods. Defendants do not intend for BPA to end up in their products, but it nevertheless appears. Defendants claim that the BPA levels in their products vary from exceedingly low to entirely nonexistent, none of which poses any threat of harm to dogs.

Plaintiff insists that, as with the heavy metal allegations, it does not matter whether the BPA is present in a potentially harmful concentration. Indeed, Plaintiff does not care if BPA is actually present in Defendants' products at all. Instead, the mere risk that BPA could be present is, according to Plaintiff, enough to make "Biologically Appropriate" misleading, because BPA is clearly not a fresh, natural food item for dogs. Plaintiff himself testified that he would not have purchased Defendants' products had he known there was a risk they contained BPA.

The Court sees no reason to treat BPA differently than heavy metals. To hold Defendants liable for the risk that their products contain unintended and non-harmful concentrations of these substances, a fact common to many other pet food manufacturers, would be extraordinary. Defendants and all other manufacturers would need to immediately pull their products off of Wisconsin store shelves, lest they face a tide of litigation from consumers who did not care, until now, that the products had such contaminants.

Plaintiff's response to the Court's position is unhelpful at best. He contends that BPA's omnipresence is irrelevant to his claim. Plaintiff states that "[o]ne could likewise say sugar is everywhere. That is not the point.

Case 2:18-cv-01996-JPS   Filed 07/08/20   Page 8 of 19   Document 184

The prevalence of a certain characteristic does not give manufacturers free reign to falsely represent the true nature of its ingredients." (Docket #154-1 at 19). The analogy to sugar makes no sense. It is an intentional ingredient in food products, rather than being an unintended yet naturally present contaminant. In any event, the third quoted sentence is true. But by stating that their food is "Biologically Appropriate," Defendants do not falsely represent that their products are BPA-free or heavy metal-free.

The only way Plaintiff would be satisfied, it seems, is to require pet food manufacturers to include a disclosure of unintended ingredients on product packaging. This list would surely cover the whole bag, and yet be false at the same time; perhaps a piece of dust entered the bag with the food itself, and dust is certainly not something a dog should eat. Plaintiff might also be content if manufacturers scrubbed and sanitized their products to ensure that not one molecule of contaminants could enter the food. Plaintiff has not pleaded such a claim, and presents no evidence that such measures are even possible, much less practicable.

Plaintiff is strangely adamant that he will not offer any other form of his present claim to make it viable. This would include hearkening back to *Loeb*, where the plaintiff alleged that the products contained excessive levels of heavy metals. In that case, the plaintiff ultimately failed to prove that the levels were actually "excessive" by some meaningful metric. That is a correctable error, and this same reasoning could apply equally to BPA. Another avenue, mentioned in the Court's motion to dismiss order, is a comparative theory. If Plaintiff could establish that Defendants' products contained contaminants at concentrations equal to or greater than less expensive brands, a misrepresentation claim would seem appropriate. In the end, these observations mean little. The Court is a referee, not an

advisor. On the facts and evidence before it, the Court must conclude that summary judgment is appropriate on Plaintiff's claim that "Biologically Appropriate" is rendered misleading by the risk of presence of BPA.

The same is true of the pentobarbital allegations, though for a different reason. The only confirmed shipments of contaminated tallow Defendants received came months after Plaintiff stopped purchasing the affected products. Plaintiff lacks standing to sue for a risk of harm he never experienced. *See Kisting v. Gregg Appliances, Inc.*, No. 16-CV-141, 2016 WL 5875007, at *3–5 (E.D. Wis. Oct. 7, 2016) ("In this case, Kisting's claims relate to seventy different models of Samsung televisions, sixty-nine of which Kisting did not purchase. Kisting's alleged injury stems from the advertising that he saw and relied upon and the model of television that he purchased. Kisting would not individually have standing to pursue claims based on injuries sustained from television models he did not purchase and the fact this is a class action suit does not change the standing analysis.").

Plaintiff counters that the risk of pentobarbital contamination existed well before the chemical was detected in the 2018 shipments, because Defendants had been using JBS for years, and JBS's shoddy business practices presented an ongoing threat of contamination. Thus, Plaintiff contends that his purchases may have indeed been contaminated, but the issue went undetected at the time. This line of reasoning departs from the record evidence and enters the realm of mere speculation, which is insufficient to ward off summary judgment. *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001). Without evidence that pentobarbital was present in prior shipments, Plaintiff cannot credibly allege that the products he purchased had a detectable level of pentobarbital, or a meaningful risk of

such a level.[1] To the contrary, the only testing that was done was by Defendants in 2018, and it did not detect any pentobarbital in the finished products. Defendants are, therefore, entitled to summary judgment as to whether pentobarbital's alleged presence rendered "Biologically Appropriate" misleading.

### 4.2 "Fresh" and "Regional" Ingredients

Plaintiff has argued that based on Defendants' "packaging and labeling, a reasonable consumer, including Plaintiff, would not expect [Defendants] to use non-fresh ingredients, including frozen ingredients . . . or ingredients from non-regional suppliers." (Docket #154-1 at 10). Defendants are entitled to summary judgment regarding the "fresh" and "regional" ingredient statements for the following reasons.

First, Plaintiff has argued that because Defendants' packaging states "Fresh Ingredients," that means that a reasonable consumer would believe that all the ingredients must be "fresh." However, when the dog food packaging is viewed in full, it is clear that some ingredients are "fresh, raw, or dehydrated," and that some ingredients are frozen and/or freeze-dried, and that at least several pounds of both types of dog food are not fresh ingredients. It is absurd to conclude that one statement can be read in isolation regarding all the ingredients in a product while ignoring the other statements on the packaging that refute that conclusion. Second,

---

[1]Plaintiff maintains that dog food is considered adulterated, and cannot legally be sold, when any pentobarbital is present. Defendants respond that the pentobarbital must be at a detectable level for the product to be adulterated. Plaintiff does not dispute this, but instead criticizes Defendants' testing methods as being insufficiently sensitive to detect a very low level of pentobarbital. Plaintiff did not, however, perform any of his own testing to confirm his suspicions. Again, Plaintiff's speculation cannot substitute for evidence.

Defendants do use fresh ingredients in their dog food, therefore the statement on the packaging is not false or misleading.

Third, the same flawed logic permeates Plaintiff's argument that Defendants' "regional ingredients" statement is misleading. Defendants do indeed use regional suppliers for ingredients, however, nowhere on the packaging does it state that *all* of the ingredients are regional. Further, the packaging for both NorthStar and DogStar included statements that provided context to what "regional" meant.[2] It also seems obvious that the salt-water fish included in the Six Fish dog food would not be regional to Kentucky, but rather to the Atlantic Ocean as advertised on the packaging. Thus, because the packaging included statements that provided context to "regional" and did not state that *all* ingredients were regional, the "Regional" statement is not false or misleading.

### 4.3 "Never-Outsourced"

Defendants are entitled to summary judgment on the "Never-Outsourced" statement for the following reasons. Plaintiff makes the absurd argument that because the ingredient for beef tallow is made at a rendering facility, then the "never-outsourced" statement is false or misleading. However, in his argument that the ingredients are not all regional, it is clear that Plaintiff understands that ingredients are not all

---

[2]DogStar's ORIJEN Regional Red packaging stated "America's vast and fertile lands – our source of inspiration and fresh regional ingredients," and NorthStar packaging for ORIJEN Regional Red stated "Canada's vast and unspoiled lands – our source of inspiration and fresh regional ingredients." (Docket #155-1 at 7–8). NorthStar's ORIJEN Six Fish packaging stated "made with wild-caught regional saltwater and freshwater fish," and DogStar packaging of ORIJEN Six Fish stated "New England's vast Atlantic waters – our source of inspiration and fresh regional fish" and "unmatched inclusions of wild caught fish – whisked to our kitchens from cold New England waters Fresh or Raw, in richly nourishing WholePrey ratios." (Docket #155-1 at 8–9).

directly from Defendants, but instead are purchased from outside vendors. Additionally, Defendants' NorthStar packaging states that "Quality is Never Outsourced" and that "we prepare Orijen ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." (Docket #155-1 at 17). The DogStar packaging states "NEVER OUTSOURCED. PREPARED EXCLUSIVELY IN OUR DOGSTAR® KITCHENS - We don't make foods for other companies and we don't allow our foods to be made by anyone else." (*Id.*). Further, it is undisputed that Defendants did not outsource the making of its finished food products. (*Id.* at 18). Therefore, Defendants' statements regarding "Never-Outsourced" are not false or misleading.

### 4.4    Fraud by Omission and Negligence

Plaintiff's remaining claims are Fraud by Omission (Count II) and Negligence (Count III). Both of the remaining claims must fail for the same reasons as the Plaintiff's WDTPA claim discussed above in Sections 4.1—4.3.

> All misrepresentation claims share the following required elements: 1) the defendant must have made a representation of fact to the plaintiff; 2) the representation of fact must be false; and 3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage. [I]ntentional misrepresentation, [] carries the following additional elements: 4) the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and 5) the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage.

*Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 239 (Wis. 2004). Additionally, "'silence, a failure to disclose a fact, is not an intentional misrepresentation unless the seller has a duty to disclose.' The existence

and scope of a duty to disclose are questions of law for the court." *Id.* (quoting *Ollerman v. O'Rourke Co., Inc.*, 288 N.W.2d 95, 100 (Wis. 1980)).

As explained above, Plaintiff has failed to meet the second element because Defendants' statements on the dog food packaging that Plaintiff purchased were not false. The dog food contained "fresh" and "regional" ingredients and the final product of dog food was "never-outsourced."

Additionally, Defendants did not owe Plaintiff a duty to disclose the potential that extremely low levels of BPA may unintentionally be present in the final product. Defendants do not add BPA to their products, but due to BPA's spread throughout the environment, it nevertheless may appear. Defendants do not state that the product is BPA free, and the exceedingly low to entirely nonexistent BPA levels in their products do not pose any threat of harm to dogs. Finally, Plaintiff has not provided any evidence or shown a genuine dispute of material fact that any of the dog food he purchased contained a detectable amount of pentobarbital.

The Court finds that Defendants did not have a duty to disclose to Plaintiff. Further, Plaintiff has not provided any evidence to support a genuine dispute of material fact that dog food he purchased contained pentobarbital. Therefore, summary judgment must be granted to Defendants on Plaintiff's Fraud by Omission and Negligence claims.

### 4.5 Damages

The Court previously excluded Plaintiff's experts who intended to testify regarding classwide damages based upon the results of a consumer survey. (Docket #134). Plaintiff now presents two alternative theories of damages: benefit-of-the-bargain and full refund. The Court will address each in turn.

### 4.5.1    Benefit-of-the-Bargain

Benefit-of-the-bargain damages comprise the difference between the purchase price of the product and its actual value. *Mueller v. Harry Kaufmann Motorcars, Inc.*, 859 N.W.2d 451, 458–59 (Wis. Ct. App. 2014). Defendants claim that Plaintiff needs expert testimony to quantify this difference for the jury. The cases they cite for that proposition do not, however, say anything of the sort; they instead state the unremarkable principle that damages cannot be speculative. *Entm't USA, Inc. v. Moorehead Commc'n, Inc.*, 897 F.3d 786, 793–94 (7th Cir. 2018); *Tietsworth*, 667 N.W.2d at 240.

Defendants also point to *Sielaff v. Matco Tools Corporation*, 617 N.W.2d 676, 2000 WL 760364, at *3 (Wis. Ct. App. 2000), for the same proposition, but it is similarly unhelpful. In *Sielaff*, the court did not allow the owner of a tool dealership to testify as to his belief in the business's fair market value. The court held that although expert testimony is not required for matters within the purview of the average lay person, the fair market value of an ongoing tool business is not common knowledge. *Id.* Unlike *Sielaff*, the value of a bag of dog food, whether reduced to zero or some proportion of the purchase price, is within the knowledge and comprehension of the average juror.

Plaintiff, by contrast, cites opinions which permit the owner of property to testify to its value, and leave it to the trier of fact to assess whether that testimony is credible. *Mueller*, 859 N.W.2d at 461–62; *D'Huyvetter v. A.O. Smith Harvestore Prod.*, 475 N.W.2d 587, 593 (Wis. Ct. App. 1991). Defendants attempt to distinguish these cases, noting that in both, the owner testified that the property was entirely worthless. But the principles announced in *Mueller* and *D'Huyvetter* are not so limited. The

Wisconsin Supreme Court has held that a car buyer can state her belief in the diminished value of the vehicle based on the defects therein at the time of purchase. *Mayberry v. Volkswagen of Am., Inc.*, 692 N.W.2d 226, 238–39 (Wis. 2005). She did not claim that the car's value was zero; instead, its purported worth was about half the purchase price. *Id.* The court held that her testimony was sufficient to survive summary judgment, but need not be believed by a jury at trial. *Id.* The same is true in the instant case.

### 4.5.2 Full Refund

The language of the WDTPA permits, and its purpose encourages, a plaintiff to pursue full refund damages in certain circumstances. *Mueller*, 859 N.W.2d at 458–60. Defendants maintain that a full refund theory is not applicable to this case because Plaintiff indisputably received some value from the dog food; his dogs ate the food and survived for many years. Defendants' support for this approach (in Wisconsin case authority, at least) comes from the following sentence from *Mueller*: "[p]ermitting recovery for a full refund of the purchase price, *in instances where such a refund is warranted*, adheres to the remedial purpose of Wis. Stat. § 100.18." *Id.* at 459 (emphasis added).[3]

*Mueller* does not explain when a refund is or is not warranted. But the circumstances of that case provide a clue. The plaintiff bought a car and immediately experienced problems with it. *Id.* at 455. She only drove it for

---

[3]Defendants also cite two out-of-circuit cases to undermine Plaintiff's full refund approach, but they are inapposite, as they apply state-specific consumer protection regimes. *In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (California's regime only permitted benefit-of-the-bargain damages); *Buetow v. A.L.S. Enter., Inc.*, 259 F.R.D. 187, 192 n.4 (D. Minn. 2009) (same). Nevertheless, both courts discuss why a full refund theory is a poor fit for consumer goods such as fruit juice (*POM Wonderful*), hunting clothes (*Buetow*), and dog food.

about a week and approximately 300 miles. *Id.* at 456. The court concluded that the trial court had erred by not permitting the plaintiff to seek a full refund of the purchase price. *Id.* at 460. This finding was based on a thorough assessment of the WDTPA and its underlying principles. *Id.* at 458–60. In particular, the court noted that

> [i]f consumers were only entitled to recover the cost of repairing damages resulting from a seller's misrepresentations, sellers would have little incentive to repair known problems before selling a product. Allowing consumers, under some circumstances, to recover the full purchase price of a product provides a true deterrent to sellers and thereby more fully adheres to the purpose of the statute.

*Id.* at 459.

Here, Plaintiff received far more value from Defendants' dog food than the *Mueller* plaintiff received for her car. And unlike *Mueller*, which involved a durable good capable of being repaired, Defendants' products were an all-or-nothing proposition. Plaintiff received the vast majority of the benefit of his purchase in that his dogs were sustained and remained healthy. Plaintiff's injury was not having his animals poisoned. Instead, it was his overpayment for what turned out to be a less-than-premium product. These seem like the circumstances contemplated by *Mueller* in which a full refund would be inappropriate.[4] The Court will, therefore,

---

[4]Plaintiff also cites to *K & S Tool & Die. Corporation v. Perfection Machinery Sales, Inc.*, 732 N.W.2d 792 (Wis. 2007), to support his bid for a full refund. That case involved the purchase of a metal press that was supposed to have 1000 tons of pressing force, but the press that was delivered only had 800 tons. *Id.* at 796–97. The plaintiff testified that it did not want an 800-ton press and would not have bought the press had it known the truth. *Id.* at 803–04. This case is, therefore, even less apt than *Mueller*. Plaintiff received the bulk of the value from Defendants' dog food, and the *K & S Tool* plaintiff received essentially nothing from the inadequate metal press.

grant Defendants' motion on this ground and forbid Plaintiff from proceeding on a full refund theory.

**5.    CONCLUSION**

In light of the foregoing, Defendants' renewed motion for summary judgment (Docket #144), must be granted and this action will be dismissed with prejudice. The Court will also grant the parties' motions for leave to file restricted documents. (Docket #140, #153, #170, and #177).

Further, as summary judgment must be granted and the action will be dismissed with prejudice, the following pending motions will be denied as moot: Plaintiff's motion to strike Defendants' notice of supplemental authority (Docket #116); Plaintiff's renewed motion for class certification (Docket #141); and the parties' motions seeking to exclude or limit expert witnesses (Docket #81, #96, #107, #121, and #126).

Accordingly,

**IT IS ORDERED** that Defendants' renewed motion for summary judgment as to Plaintiff's third amended complaint (Docket #144) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motions for leave to file restricted documents (Docket #140, #153 and #170) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion for leave to file restricted document (Docket #177) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motions to exclude Defendants' expert witnesses Dr. Robert H. Poppenga (Docket #81) and Lorin M. Hitt (Docket #96), and to limit testimony of Defendants' expert

witness Dr. Katerina Mastovska (Docket #107), be and the same are hereby **DENIED as moot**;

IT IS FURTHER ORDERED that Plaintiff's motion to strike Defendants' notice of supplemental authority in support of their opposition to Plaintiff's motion for class certification (Docket #116) be and the same is hereby **DENIED as moot**;

IT IS FURTHER ORDERED that Defendants' motions to exclude the opinions of Plaintiff's expert witnesses Dr. Gary Pusillo (Docket #121) and Dr. Sean Callan (Docket #126) be and the same are hereby **DENIED as moot**;

IT IS FURTHER ORDERED that Plaintiff's renewed motion for class certification (Docket #141) be and the same is hereby **DENIED as moot**; and

IT IS FURTHER ORDERED that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2020.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge